**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JACKSONVILLE BRANCH OF THE
NAACP; NORTHSIDE COALITION
OF JACKSONVILLE, INC.; ACLU OF
FLORIDA NORTHEAST CHAPTER;
FLORIDA RISING TOGETHER, INC.;
MARCELLA WASHINGTON;
INGRID MONTGOMERY; AYESHA
FRANKLIN; TIFFANIE ROBERTS;
ROSEMARY McCOY; SHEILA
SINGLETON; EUNICE BARNUM;          Case No. 3:22-cv-493
JANINE WILLIAMS; HARAKA
CARSWELL; and DENNIS BARNUM,

        *Plaintiffs*,

v.

CITY OF JACKSONVILLE and
MIKE HOGAN, in his official capacity
as Duval County Supervisor of Elections,

        *Defendants*.

_____/

## COMPLAINT

**Preliminary and Permanent Injunctive Relief Requested**
**Declaratory Relief Requested**

    1.    In late March, the Jacksonville City Council passed, and Mayor Lenny

Curry signed, Ordinance 2022-01-E (the "Enacted Plan"), redrawing the City Council

and Duval County School Board districts for the next decade.

    2.    Shortly before the Enacted Plan cleared a key procedural hurdle, a

prominent councilmember shared her "support [for] the rich history of [civil rights

groups] bringing litigation to ensure the full actualization of citizenship for African

1

Americans." She continued: "if the factors are present to show that the process undertaken by this Council was in any way violative of the Fourteenth Amendment, I would expect those organizations to bring litigation. It's *required* of you."

3.      Plaintiffs—who include some of Jacksonville's most prominent and active civil rights organizations—bring this suit to fulfill that obligation. They challenge seven City Council districts (the "Challenged Districts") as racially gerrymandered in violation of the Fourteenth Amendment to the United States Constitution.

4.      While redistricting bodies "will . . . almost always be aware of racial demographics," *Miller v. Johnson*, 515 U.S. 900, 916 (1995), and are often required to look at race in drawing maps, the Fourteenth Amendment prohibits the unnecessary centering of race in redistricting decisions. Map-drawing in which race predominates, subordinating race-neutral, traditional redistricting considerations to racial decision-making, is presumptively invalid under the Equal Protection Clause. This type of race-based line drawing is constitutional only where it satisfies strict scrutiny—where it is narrowly tailored to advance a compelling government interest. The Constitution sets a high bar. The Enacted Plan fails to clear it.

5.      In passing the Enacted Plan, the Council impermissibly centered race above other considerations. The Council committees and staff charged with drawing new lines obsessed over race at every step of the process, setting specific racial targets and repeatedly rejecting proposals that did not meet those targets. They consistently foregrounded the racial implications of their decisions in meetings—sometimes

explicitly noting the role that race was playing in their decision-making and sometimes hiding behind proxies for race. The Council's actions were so blatant that the vice chair of the Special Committee on Redistricting publicly complained that the committee was "continually making [race] a predominant[ ] priority."

6.      He was right. Race dictated even the most granular line-drawing decisions in the Enacted Plan. As the Council sought to maximize the Black concentrations of several districts, it abandoned its stated race-neutral criteria to reach that goal. This ensured that Black voters who might otherwise be placed in neighboring districts instead were relegated across the border into packed districts.

7.      The Challenged Districts bear all the typical indicia of racial predominance. They have tortured shapes and fracture neighborhoods as they traverse Jacksonville along racial lines. Zooming in reveals that the Enacted Plan operates with surgical precision in its race-based division of voting precincts.

8.      As a result, the Enacted Plan packs Black residents into just four of the Challenged Districts—Districts 7, 8, 9, and 10 (together, the "Packed Districts"). As a natural corollary of packing those four districts, the Council also stripped Black voters from three adjacent districts—Districts 2, 12, and 14 (together, the "Stripped Districts")—ensuring that these districts had artificially high white populations.

9.      The racial gerrymandering of the Challenged Districts directly affects Plaintiffs' "ability to impact city politics," as one community member put it. The Black population of the Packed Districts is artificially high because the districts snake through the City to capture as many Black voters as possible. The Black population of

3

the Stripped Districts is simultaneously depressed because the districts carefully avoid concentrations of Black voters, who are assigned instead to neighboring Packed Districts. As a consequence, most of Jacksonville's Black voters are segregated into just four of fourteen districts, depressing their influence over City Council elections elsewhere.

10.     There was no legitimate reason for this packing and stripping sufficient to satisfy strict scrutiny. Compliance with Section 2 of the Voting Rights Act ("VRA") is one of the few permissible justifications for allowing race to predominate when drawing district lines. But the City Council was not entitled to set racial targets based on uninformed guesses of what VRA compliance might look like. It was instead required to actually *assess* what VRA compliance involves. There is no evidence that the Council ever attempted to do that. Nor do any other facts indicate that the Enacted Plan is necessary to achieve VRA compliance. To the contrary, several Plaintiffs demonstrated to the Council that the Packed Districts' Black populations far exceed what is needed for Black voters to have the opportunity to elect their preferred candidates.

11.     The Council instead set arbitrary racial targets uninformed by any analysis of what the VRA requires. The VRA does not protect the artificial packing of Black voters and the Council cannot hide behind the VRA here.

12.     Moments before the City Council passed the Enacted Plan, one of its chief proponents announced that she did not "know what [racial] percentage is needed to ensure that the voters in [her Packed District] are able to actualize their preference."

4

She added that she did not want any "dilut[ion] [of] the African American neighbors in Districts 7, 8, 9, and 10." Those are the elements of a successful racial gerrymandering claim—race-based decision-making untethered from any analysis of what the VRA actually requires.

13.     Plaintiffs also challenge Duval County School Board Districts 4, 5, and 6 as racial gerrymanders. School Board Districts 4 and 5 each comprise two Packed Districts of the City Council map. School Board District 6, meanwhile, comprises two Stripped Districts. Therefore, because the Enacted Plan impermissibly uses race to draw their component City Council districts, it necessarily racially gerrymanders School Board Districts 4, 5, and 6, too.

14.     Finally, Plaintiffs ask this Court to exercise supplemental jurisdiction over a municipal law claim. Jacksonville's City Charter requires the Council to draw districts that are "compact" and "logical." There is no evidence that the Council ever attempted to assess these attributes of districts in the Enacted Plan. Many of the Challenged Districts are non-compact. Each is illogical—splitting neighborhoods, voting precincts, and other communities of interest, and instead connecting far-flung regions of the City that do not share economic or social interests.

## PARTIES

15.     Plaintiff Jacksonville Branch of the NAACP ("NAACP Branch") is a nonpartisan nonprofit membership organization serving the Jacksonville since 1917, and is an affiliate branch of the Florida State Conference of Branches and Youth Units of the NAACP, the oldest civil rights organization in Florida, formed in 1909.

16.     The NAACP Branch's mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. Pursuant to this mission, the NAACP Branch has advocated for the voting rights of African Americans and other voters of color in Jacksonville, including its members.

17.     The NAACP Branch has active members throughout the City, most of whom are Black. Its members include residents of City Council Districts 2, 7, 8, 9, 10, 12, and 14, and School Board Districts 4, 5, and 6. If the Challenged Districts are not enjoined, these members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

18.     Plaintiff Northside Coalition of Jacksonville, Inc. ("Northside Coalition") is a nonprofit advocacy organization serving Jacksonville since 2016. Northside Coalition's mission is to empower, educate, and organize community members in efforts to stand against racial, economic, and social injustice. To achieve its goals, the organization works hand-in-hand with elected officials, law enforcement agencies, business professionals, and faith-based organizations.

19.     Since its inception, Northside Coalition has organized hundreds of events to support gun violence reduction, economic empowerment, and poverty reduction. Additionally, Northside Coalition is active in campaigns to raise awareness around community issues and create public forums for debate.

20.     Northside Coalition has been heavily involved in Jacksonville's redistricting process to ensure fair maps and democratic equality for Black residents.

Northside Coalition has organized special events to train members and supporters on voting rights. Its leaders and members have attended numerous City Council hearings and meetings with councilmembers to advocate for fair maps and against race-based packing.

21.    Northside Coalition has members and supporters throughout Jacksonville, including in many of the Challenged Districts. If the Challenged Districts are not enjoined, these members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

22.    Plaintiff ACLU of Florida Northeast Chapter ("ACLU Chapter") is a membership organization founded in 2019 as a regional chapter of the ACLU of Florida.

23.    The mission of the ACLU Chapter is to defend civil liberties and freedoms through education, outreach, and advocacy. Pursuant to that mission, the ACLU Chapter participates in and hosts panel discussions, attends community events, and promotes local efforts to raise awareness and encourage volunteer participation to protect members of their community. Many of these activities focus on voting and voting reform in Jacksonville.

24.    The ACLU Chapter has thousands of members, consisting of all members of the ACLU of Florida residing or employed in Baker, Clay, Duval, Nassau, and St. Johns Counties.

25.    Many of the ACLU Chapter's members reside in Jacksonville, including in the Challenged Districts. If the Challenged Districts are not enjoined, these

members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

26.    Plaintiff Florida Rising Together, Inc. ("Florida Rising") is an organization with a mission to increase the voting and political power of marginalized communities. Since its founding, Florida Rising has engaged its constituencies to expand democracy by ensuring that every eligible voter in the state is able to exercise their fundamental and constitutionally protected right to vote. In furtherance of its goals, Florida Rising actively engages in voter registration, education, engagement, and election protection programming.

27.    As a part of its Expanding Democracy Program, Florida Rising has been actively involved in the Jacksonville redistricting process by educating residents about local redistricting, encouraging and mobilizing its members to speak at public hearings, and working with partners to raise awareness about the process.

28.    Florida Rising's members include Black residents of Jacksonville who live and vote in Jacksonville City Council Districts 2, 7, 8, 9, 10, 12, and 14, and School Board Districts 4, 5, and 6. If the Challenged Districts are not enjoined, these members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

29.    Plaintiff Marcella Washington is a Black resident of the newly enacted and stripped City Council District 2.

30.    Plaintiff Ingrid Montgomery is a Black resident of the newly enacted and packed City Council District 7 and School Board District 4.

8

31.     Plaintiff Ayesha Franklin is a Black resident of the newly enacted and packed City Council District 8 and School Board District 4.

32.     Plaintiff Tiffanie Roberts is a Black resident of the newly enacted and packed City Council District 8 and School Board District 4.

33.     Plaintiff Rosemary McCoy is a Black resident of the newly enacted and packed City Council District 9 and School Board District 5.

34.     Plaintiff Sheila Singleton is a Black resident of the newly enacted and packed City Council District 9 and School Board District 5.

35.     Plaintiff Eunice Barnum is a Black resident of the newly enacted and packed City Council District 10 and School Board District 5.

36.     Plaintiff Janine Williams is a Black resident of the newly enacted and packed City Council District 10 and School Board District 5.

37.     Plaintiff Haraka Carswell is a Black resident of the newly enacted and stripped City Council District 12 and School Board District 6.

38.     Plaintiff Dennis Barnum is a Black resident of the newly enacted and stripped City Council District 14 and School Board District 6.

39.     The Plaintiffs identified in Paragraphs 29–38 (together, "Individual Plaintiffs"), as well as many members of the NAACP Branch, Northside Coalition, the ACLU Chapter, and Florida Rising (together, "Organizational Plaintiffs"), live in race-based districts. The City Council used race as the predominant factor in its decisions to place a significant number of voters, like Individual Plaintiffs and Organizational Plaintiffs' members, within or without their respective City Council

and School Board districts. None of those districts is narrowly tailored to satisfy the VRA or any other compelling interest.

40.     Defendant City of Jacksonville is the consolidated city-county government in Duval County, Florida. As a consolidated government exercising the powers of a chartered county and a municipality, Jacksonville has the authority to regulate its elections consistent with state law. Fla. Const. art. VIII, §§ 1(g), 2(b), 3; Fla. Stat. § 100.3605.

41.     Defendant Mike Hogan is the Duval County Supervisor of Elections, the chief elections officer for the City of Jacksonville. In this capacity, he is vested with broad authority over election administration in Duval County, including the duty to conduct City Council and School Board elections. Fla. Stat. § 98.015; Jacksonville City Charter ("Charter") § 9.01. He is sued in his official capacity.

## JURISDICTION AND VENUE

42.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States. This Court has supplemental jurisdiction over Plaintiffs' municipal law claim pursuant to 28 U.S.C. § 1367.

43.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in this District and a substantial part of the events giving rise to the claims occurred in this District.

44.     This action is properly filed in the Jacksonville Division pursuant to Local Rule 1.04(b) because the action is most directly connected with this Division

and it is most conveniently advanced here.

45.     The Court has personal jurisdiction over the Defendants.

## FACTS

46.     Jacksonville's City Council consists of nineteen councilmembers. Five councilmembers are elected at-large. The other fourteen councilmembers are each elected from one of fourteen City Council districts, also referred to as "neighborhood seats." Charter § 5.01.

47.     The School Board consists of seven members, each elected from one of seven School Board districts. Charter §§ 13.01–02. Each School Board district is coterminous with two combined adjacent City Council districts. *Id.* § 13.02. Because of this structure, any decision affecting City Council districts necessarily alters School Board districts.

48.     The Council has discretion in deciding how to pair City Council districts to form School Board districts. The Enacted Plan pairs City Council districts to form School Board districts as follows:

| Council Districts | School Board District |
|---|---|
| 1 and 2 | 1 |
| 3 and 13 | 2 |
| 4 and 5 | 3 |
| 7 and 8 | 4 |
| 9 and 10 | 5 |
| 12 and 14 | 6 |
| 6 and 11 | 7 |

## I. Brief Overview of Jacksonville's Redistricting Process

49.     Following the 2020 decennial Census, the City Council embarked on the process of redistricting the City Council and the School Board.

50.     On July 2, 2021, Council President Samuel Newby initiated the Second Special Committee on Redistricting ("Redistricting Committee" or "Committee") to redraw the City Council and School Board districts.[1] Councilman Aaron Bowman chaired the Committee, Councilman Danny Becton served as vice chair, and Councilmembers Garrett L. Dennis, Brenda Priestly Jackson, and Randy White served as members, alongside two School Board members.

51.     The Redistricting Committee appointed Bill Killingsworth, Jacksonville's Director of Planning and Development, to serve as the Committee's redistricting consultant. In this capacity, Killingsworth was a central player in the redistricting process, presenting the Committee with proposed plans and drawing new proposals based on member feedback.

52.     The Redistricting Committee met five times in 2021: on August 18, August 24, September 27, October 28, and December 6.

53.     During this period, Councilmembers also convened public "member-to-member" meetings during which councilmembers from specific areas of Jacksonville could discuss proposed plans.

---

[1] This was the second Special Committee on Redistricting of the post-2020 Census redistricting cycle. In October 2020, then-Council President Tommy Hazouri initiated the first iteration, whose authority expired on June 30, 2021.

54.    The member-to-member meetings relevant to the Challenged Districts occurred on September 9, September 23, October 4, and October 21. Most of these meetings were convened by Councilwoman Brenda Priestly Jackson.

55.    The Redistricting Committee submitted its proposed map to the Council on December 21, 2021. The proposal was referred to the Rules Committee on January 11, 2022.

56.    In early 2022, the Rules Committee held four public hearings throughout Jacksonville to hear public comment on the proposed map: on January 27, February 3, February 10, and February 17.

57.    The Rules Committee then considered the proposed map during two regular committee meetings on March 1 and 15, 2022.

58.    At its March 15 meeting, the Rules Committee added a minor amendment to the proposed map[2] and approved what would become the Enacted Plan by a 6 to 1 vote, sending it to the full Council.

59.    The full Council approved the Enacted Plan by a 17 to 1 vote on March 22, 2022. Mayor Lenny Curry subsequently signed it into law.

## II.  Redistricting Criteria

60.    The Council routinely failed to follow both statutorily mandated redistricting criteria and its self-imposed guidelines in favor of racial considerations.

61.    In addition to federal statutory and constitutional constraints,

---

[2]  This amendment affected only Council Districts 3 and 13, which Plaintiffs do not challenge.

13

Jacksonville's Charter and municipal ordinances require districts to adhere to certain criteria. The Charter requires the Council to draw districts that "are as nearly equal in population and are arranged in a logical and compact geographic pattern to the extent possible." Charter § 5.02(a); *see also* Ordinance Code § 18.101(b). Jacksonville ordinances also mandate that "the geographical arrangement and territorial boundaries of the districts must take into consideration other factors, particularly compactness and contiguity, so that the people of the City, and their varied economic, social and ethnic interests and objectives, are adequately represented in the Council." Ordinance Code § 18.101(c).

62.    At the Committee's earliest meetings, Killingsworth listed several additional criteria or considerations that the Committee could adopt to guide its approach to maps.

63.    The Committee instructed him to (1) start with existing districts, (2) not draw incumbent City Council members or School Board members out of their districts, and (3) minimize river crossings to the extent possible.

64.    The Committee did not strictly adhere to these considerations and, instead, adopted lines based largely on race.

65.    The Committee permitted District 2 to cross the St. Johns River, notwithstanding Killingsworth's creation of a draft plan without any Council districts that crossed the river.

66.    The Committee also changed existing district lines beyond what was necessary to equalize population, due to racial considerations.

14

67.    Later, when presenting the Redistricting Committee's final proposal to the Rules Committee, Killingsworth reported that incumbency considerations did not affect any decisions regarding the City Council or School Board districts.

68.    Neither the Redistricting Committee, nor the Rules Committee, nor the full Council ever measured or otherwise meaningfully assessed district compactness.

69.    The Committee also declined to adopt certain discretionary criteria.

70.    In early meetings, Killingsworth advised the Committee that it could consider political factors such as partisanship.

71.    Similarly, guidance from the City's Office of General Counsel noted the legal permissibility of partisan choices.

72.    The Redistricting Committee did not instruct Killingsworth to take into account any partisan or political considerations when proposing draft maps.

73.    Partisan considerations did not affect the boundaries of the City Council or School Board districts.

74.    Incumbent protection did not affect the boundaries of the City Council or School Board districts.

### III.  Racial Predomination During the Line-Drawing Process

75.    Race was the predominant factor motivating the City Council's work. At seemingly every turn, the Council placed race above race-neutral, traditional redistricting criteria. Race featured centrally at nearly every meeting, with councilmembers and staff twisting the term "communities of interest," typically used to validly consider social and political communities, into solely a proxy for race. The

15

Council also set racial targets for districts and drew lines with precision to ensure that Black and white populations were segregated into different districts. The Council's use of race was not narrowly tailored to any compelling government interest, including compliance with VRA Section 2.

76.    In a February 23, 2021, memorandum setting out the "core legal considerations" for redistricting, the Office of General Counsel ("OGC") indicated that VRA Section 2 requires districts in which a minority group is an outright majority of voting-aged residents if the three *Thornburg v. Gingles* preconditions have been established and the totality of the circumstances indicates that Section 2 applies.

77.    In fact, the Council sought to maximize the Black population of the Packed Districts, functionally setting a target that far exceeded the simple-majority target suggested by OGC.

78.    Where, as here, race is the central consideration in mapmaking and traditional, race-neutral criteria are ignored, race predominates and, unless the use of race is necessary to ensure fair and equal opportunity for voters of color to participate in the electoral process, its use is constitutionally suspect.

79.    Race was the predominant factor motivating the City Council's work. Race featured centrally at nearly every meeting, with councilmembers and staff constantly referring to racial data, setting racial targets for districts, and using thinly veiled euphemisms for race.

80.    Killingsworth repeatedly provided racial data to the Redistricting Committee and full Council when discussing proposed plans.

16

81.    At times, councilmembers had Killingsworth read out the racial data of proposed additions to their districts.

82.    Each of Killingsworth's proposals included a table listing the Black percentage of each proposed district.

83.    Neither the Committee nor the Council engaged in a functional analysis of the proposed plans and there was no attempt to determine how these percentages would lead to districts that performed for Black voters. Instead, the Council relied upon blanket racial targets and rejected any attempt to draw unpacked districts.

84.    Each of the early proposals reduced the Black percentage of Districts 7, 8, 9, or 10; each was rejected.

85.    Subsequent proposals maintained existing Black concentration of those districts.

### A. The September 9, 2021, Member-to-Member Meeting

86.    At the September 9 member-to-member meeting of members from North and West Jacksonville's Districts 7, 8, 9, 10, 12, and 14, councilmembers and Killingsworth repeatedly discussed the racial consequences of their decisions.

87.    Councilmembers and Killingsworth were aware that race could not legitimately predominate in their discussions.

88.    Instead, councilmembers and Killingsworth hid behind the term "communities of interest" as a substitute for race, ignoring the traditional, legitimate, use of the term.

89.    District 10 Councilwoman Brenda Priestly Jackson was one of the key

people in the redistricting process. She served on both iterations of the Special Committee on Redistricting and chaired the Rules Committee. She indicated that she had sought the Rules Committee post to influence redistricting. She also convened and chaired the North and West Jacksonville member-to-member meetings.

90.     At the top of the September 9 meeting, Priestly Jackson and Killingsworth set the stage for how the Committee could avoid explicitly mentioning race by misusing "communities of interest" as a euphemism for race:

| Priestly Jackson: | And just to be clear, we don't say minority access districts anymore. What is our unique term of art? |
|---|---|
| Killingsworth: | Communities of interest. |
| Priestly Jackson: | Communities of interest! Okay. I just wanted to start with that. |

91.     But in many instances, they were even more direct in revealing what they meant. Shortly after his exchange with Priestly Jackson, for example, Killingsworth explained the thought process informing one proposed map as follows:

> So, one of the reasons that we looked at [District] 7 changing aside from just the numbers was, there was a discussion that I heard multiple times about, about the [Black] percentages and how to either keep them the same or reduce them. And so that played into it as well—the whole percentages of minority per district.

92.     At that same meeting, District 8 Councilwoman Ju'Coby Pittman discussed the interplay of her district with neighboring District 7:

> If [District 7] Councilman Gaffney wants to stay the same, I don't know how that impacts. But I want to make sure that, you know, the—what was the new word?—"community of interest" stays and not lose any.

93.     District 10 Councilwoman Priestly Jackson noted a similar desire to maintain the Black population of her district during this meeting: "I have zero desire to change. I am not interested in increasing any specific communities of interest, *i.e.*, African Americans or any others in that group. I don't want them packed into District 10."

94.     Priestly Jackson later told media that she was "very comfortable with the demographics of District 10."[3]

95.     These racial targets—maintaining the Black percentage of the Packed Districts—were central considerations informing the Enacted Plan.

96.     The September 9 meeting revolved around the racial makeup of Districts 7, 8, 9, and 10. Killingsworth discussed the racial motivations of parts of his proposal:

> This is a discussion point between 7 and 8, is: we gave down here, where Kings Road and I-95—where the three of your districts [7, 8, and 9]—come together. There's a lot of population there and it's principally African American.

97.     Killingsworth continued: "We moved that population over. That did two things, it balanced you out and it also lowered the minority for Council District 8, is 64% as opposed to 68%."

98.     Killingsworth noted later that Councilwoman Pittman told him that "she's okay with her district staying at 68%." Priestly Jackson responded: "I think a 68% of minority concentration in a district is challenging and problematic. It's kind of

---

[3] Andrew Pantazi, *Jacksonville City Council's Redistricting Plan Will Likely Favor Republicans*, Tributary (Sept. 28, 2021), https://jaxtrib.org/2021/09/28/jacksonville-city-councils-redistricting-plan-will-likely-favor-republicans/.

packed, whether intentional or not. . . . We have an obligation to try to look at bringing that down."

99.    At that same meeting, Councilwoman Priestly Jackson explained: "We must be cognizant of perceptions of packing African Americans in any districts because it further dilutes their voice and vote throughout the rest of the City."

### B. The September 23, 2021, Member-to-Member Meeting

100.    Councilmembers and staff sometimes also used political party as a proxy for race—even though the Redistricting Committee had declined to use partisanship as a criterion for the maps.[4]

101.    At the September 23 North and West Jacksonville member-to-member meeting, Killingsworth repeatedly linked race with correlated party registration figures. The following exchange between Councilmembers Priestly Jackson (District 10), Randy White (District 12), and Ju'Coby Pittman (District 8), and Killingsworth demonstrates how the Council used partisan data as a proxy for racial data:

> Priestly Jackson:    If Councilwoman Pittman and Councilmember White, if you all are comfortable with those concessions with the 2,700—and I don't expect you to have a decision today . . . then I would make the suggestion that we don't need to mess with any others because those solve the issues of the [equal population] imbalance that we were trying to address. . . .
>
>                        . . .
>
> White:    The word you use is 'comfortable,' I'm not real comfortable losing anything. . . .
>
>                        . . .

---

[4]  Plaintiffs allege additional details about the decision to not use partisanship at ¶¶ 69–73, *supra*.

Pittman:   I'd still like to have a discussion so if we can go back. I mean, as of today, because it makes the [equal population] numbers right, but I want to make sure he [White] is comfortable and I'm comfortable in terms of the ethno-racial, Black and white—

Priestly Jackson (interjecting):   We can't use the ethno-racial identifiers. So we're going to talk about some of the party stuff that we want, but we just have to be very, very clear for our communities of interest that we're identifying that. . . .

Killingsworth:   It might be helpful if we revise the map to reflect that [proposed change] and then maybe Councilmember White and Councilmember Pittman have a noticed meeting and we can sit down and answer those specific questions.

### C. The September 27, 2021, Redistricting Committee Meeting

102.   The Redistricting Committee meeting on September 27, 2021, again demonstrated the Committee's commitment to foregrounding race above other redistricting criteria.

103.   Killingsworth advanced a proposed plan that would have shifted the shared border of Districts 8 and 12 and the shared border of Districts 7 and 2. Both proposed border shifts were the most straightforward way to equalize population while hewing to the Committee's ostensible goal of maintaining the existing districts as much as possible.

104.   The Committee rejected those proposed changes because they did not hit the desired racial targets.

105.   Killingsworth's proposal would have moved residents from District 12 (which needed to lose population) to District 8 (which needed to gain population) by

adjusting their shared border at its most southwestern point. He explained that Councilwoman Pittman objected, as she did not believe District 8's new addition from District 12 reflected "her community of interest."

106.   Under this initial proposal, District 8 would have been 66% Black. As enacted, it is 70% Black. This was an instance of the Committee abandoning its criteria and unnecessarily changing district lines to hit racial targets.[5]

107.   Killingsworth then highlighted another area of the districts' shared border, hoping to find a population to shift that "meets a community of interest that Ms. Pittman believes fits her district."

108.   That second-best option also involved reducing District 8's Black percentage. It was not adopted.

109.   Ultimately, no population was shifted from District 12 to District 8. District 8 instead drew its necessary additional residents from District 7—a district that needed to *gain* population, not shed it.

110.   As part of the same rejected proposal presented at the September 27 meeting, Killingsworth suggested smoothing the shared border of Districts 2 and 7 to achieve closer population equality, which would have also united split neighborhoods.

111.   The discussion about this border used the "communities of interest" euphemism for race. Killingsworth explained that District 7 Councilman Gaffney objected to the proposal because the changes were not sufficiently "aligned with his

---

[5] Plaintiffs allege additional details of this proposal, including more detailed racial data, in ¶¶ 182–193, *infra*.

existing district" and noted he'd try to "find a community of interest that meets the numbers that we have to have."

112.   Because the initial proposal—which would have more than adequately provided for Black voters' ability to elect candidates of their choice—did not meet the Committee's racial target, it was rejected.

113.   The racial data accompanying the proposal indicated that, if it were adopted, District 7 would be 58% Black. As enacted, it is 62% Black.[6]

114.   At the same meeting, Killingsworth proposed a second option, also race-motivated, for the border shared by Districts 7 and 2. Indicating a relatively diverse area, he explained that District 7 Councilman Gaffney "believes this might make a more closely aligned community of interest with his existing district . . . than the piece to the south," which was whiter. Killingsworth continued:

> My expectation is if we can find something that works for Councilmember Gaffney, for the same reasons it works for Councilmember Gaffney, it would work for [District 2] Councilmember Ferraro.

115.   In both its conception of maps and its approval process, the Committee chose to foreground race at the September 27 meeting. As a result, illogical lines were drawn, traditional redistricting criteria were ignored, and race predominated at seemingly every turn.

---

[6] Plaintiffs allege additional details of this proposal, including more detailed racial data, in ¶¶ 203–217, *infra*.

### D.  The October 21, 2021, Member-to-Member Meeting

116.    The October 21 member-to-member meeting continued the pattern. Killingsworth discussed more shifts along District 2 and 7's shared border: "[District 7] Councilman Gaffney thought this group was more appropriate with his district and [District 2] Councilman Ferraro agreed."

117.    The area moved into District 7 in that proposal, which was accepted, had a larger Black population than the earlier rejected proposal.

### E.  The October 28 and December 6, 2021, Redistricting Committee Meetings

118.    At the October 28 Redistricting Committee meeting, Vice Chair Danny Becton began raising concerns about the extent to which race was informing the Committee's decisions.

119.    At the December 6 Redistricting Committee meeting, Becton again raised these concerns, prompting the following exchange with Assistant General Counsel Paige Johnston:

Becton:   The statutes don't let us consider minorities per se.

Johnston:   It [race] can't be the primary concern but it can be one of your concerns.

Becton:   But by putting it [a table of race percentages] on this map it kind of appears to contradict that, that we aren't.

. . .

Becton:   So is there a point of including that table at all on the maps? I guess I was just trying to go back into my notes where I've done presentations on redistricting, and it's not even the fact that we can't make it a priority, but according to federal and state law—like I said, I was trying to pull up the legal comments that—it seems like we couldn't even consider it in terms of how we

24

structure the districts.

. . .

Becton:    I was just getting into other attributes. In this case, we were talking whites, Blacks, and percent, it just seems like we're honing in on a certain statistic that—it's my recollection by law, we're really not supposed to be working from that standpoint and it just seems like—if we're gonna do tomorrow what we did yesterday, I just think, does it end here? Or do we just continue what we've always done in that regard.

Johnston:    I think perhaps the reason that the Black and white populations have been displayed on the tables in more recent times is because those are two of the larger groups of categories, and I think there's a distinction in showing if there are significant changes in those districts with redrawing the lines. For instance, you don't want to dilute a particular population and you don't want to create a map that would also cause problems by increasing the numbers and then having an opposite, unintended consequence. But it's certainly something the committee [can] discuss.

. . .

Becton:    I mean, I'm sitting here reading, it says "there's an inherent tension between the Voting Rights Act and Equal Protection Clause where race may be considered as one factor in redistricting but it can't be predominantly over other required factors such as geography, compactness," yada yada yada, and it just seems like—it just feels like we're continually making it a predominantly priority by putting it out there. . . . It just seems like we're putting it [the racial statistics chart] on the map. It is a part, it does seem to have some precedence over a lot of other statistics, and here I've been talking through saying, hey, what I just read, it's what the law states, and we're not supposed to be considering this over other issues.

120.    Priestly Jackson indicated her opposition to eliminating racial data from draft maps, suggesting instead that adding *more* racial data would be more appropriate:

What we may need to do—because I'm gonna tell you now, I would be opposed to excluding the ethno-racial identification of any groups—it probably needs to be more expansive. That's our issue. . . . The legend needs to be changed to reflect the Census classifications of populations, if that's not too much trouble for you, Mr. Killingsworth.

121.   While racial population data can be *a* necessary consideration in redistricting, as these comments make plain, race was *the* forefront consideration for the Committee. There was no analysis done to determine the necessary, and proper, use of race under the Voting Rights Act. Instead, artificial racial targets and bare demographic data controlled the Committee's mapmaking.

### F.  The Rules Committee

122.   Race continued to predominate in the Council's deliberations after the proposed plan moved from the Redistricting Committee and took final shape in the Rules Committee.

123.   Rules Committee Chair Priestly Jackson, in defense of the Enacted Plan, read out the historical racial makeup of Districts 7, 8, 9, and 10 at the Rules Committee's March 15, 2022, meeting. After noting a "gradual decline" in the Black share of the districts, Priestly Jackson explained: "I was ever mindful and cognizant of the ladder that I climbed on that created opportunities for many that sat on the Council before me," which she tied to a desire to maintain the racial makeup of these districts.

124.   Priestly Jackson later explained her view that maintaining the numbers "did no harm," and explained that incumbency did not factor into her decisions.

125.   In a series of Tweets days later (after the Rules Committee had approved the Enacted Plan on March 15 but before passage by the full Council on March 22), Priestly Jackson further confirmed the Committee's goal of not reducing the Black population of the Packed Districts:



126.   The Committee never engaged in the necessary analysis to determine whether maintaining the Black population of these districts at such an elevated level was necessary to allow Black voters an opportunity to elect candidates of their choice. Without doing so, the setting of these racial targets is illegitimate and contravenes Plaintiffs' equal protection rights under the Fourteenth Amendment.

### G.  Final Passage in the Full Council

127.   Councilwoman Priestly Jackson made a similar appeal at the March 22, 2022, Council meeting, just before the Council passed the Enacted Plan. She began by confirming that the Redistricting Committee had used the terms "communities of interest" as a proxy for race, noting that the first incarnation of the Redistricting Committee included the councilmembers from Districts 7, 9, and 10, meaning "there were three of what we call 'minority-access Council districts,' historically, now

'communities of interest,' members on that committee."

128.   Later, when discussing Districts 7, 8, 9, and 10, she explained "the current four communities of interest, or historically known as 'minority-access districts,' we now call them 'communities of interest.'"

129.   Priestly Jackson continued, noting "that for the last four decades, Districts 7, 8, 9, and 10 have had a majority of Black neighbors living in those districts" but that "those numbers have gone down from the 70s to three of them being in the upper 50s now to one still in the 60s."

130.   Against this backdrop, she announced:

> I share with you that a fundamental principle to me was the maintenance of minority-access districts. I don't know what percentage is needed to ensure that the voters in District 10 are able to actualize their preference, but I'm going to assume that since they had not complained to me about it, it was not an issue.

131.   The Council approved the Enacted Plan moments later.

### IV.  The Lack of Narrow Tailoring
### to Achieve a Compelling Interest in Racial Predominance

132.   Where, as here, race was the predominant factor in the government's decision-making, strict scrutiny is triggered and "[t]he burden . . . shifts to the [government] to prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (internal quotations omitted). Traditionally, compliance with the Voting Rights Act, namely Section 2, has served as the primary justification for predominant considerations of race. The Council's use of race, however, was not narrowly tailored

to any compelling government interest, including compliance with VRA Section 2.

133.   To ensure that its use of race was narrowly tailored to compliance with VRA Section 2, the Council was obligated to assess the level of Black voting-age population ("BVAP")[7] necessary for Black voters to have the opportunity to usually elect their candidates of choice.

134.   The Council took no steps to meaningfully assess VRA compliance. There is no indication that the Council conducted a racially polarized voting ("RPV") analysis[8] or any other analysis key to assessing compliance with the VRA.

135.   Beginning at the first Rules Committee public hearing on January 27, 2022, speakers at each hearing reminded the Council of its obligations to conduct a "functional analysis" to achieve VRA Section 2 compliance without racially gerrymandering.

136.   At one hearing, a speaker on behalf of the NAACP Legal Defense & Educational Fund reminded the Council that it "must conduct a localized analysis of racial bloc voting and effectiveness thresholds" and "must avoid drawing local City Council districts in a manner that places voters of color in districts based on their race in higher thresholds than is necessary for them to elect their candidates of choice."

---

[7]  The Council used total population figures instead of focusing on the voting-aged population that can affect elections, which is more typical and appropriate for assessing Voting Rights Act compliance. *See, e.g.*, *Wright v. Sumter Cty. Bd. of Elections & Registration*, 979 F.3d 1282, 1289 (11th Cir. 2020); *see also* Andrew Pantazi, *Jacksonville's Redistricting Plans Ignore Federal Guidelines*, Tributary (Dec. 16, 2021), https://jaxtrib.org/2021/12/16/jacksonvilles-redistricting-plans-ignore-federal-guidelines/.

[8]  An RPV analysis considers whether voting is racially polarized in a jurisdiction's elections. It is a key consideration in determining whether a redistricting plan dilutes the vote of racial minorities and violates VRA Section 2. *See, e.g.*, *Wright*, 979 F.3d at 1305.

137.   At the Rules Committee's February 10 public hearing, Plaintiffs NAACP Branch, Northside Coalition, and ACLU Chapter (together, "Organizational Plaintiffs"), along with the Harriet Tubman Freedom Fighters ("HTFF"), submitted a letter reminding councilmembers of their obligations under VRA Section 2 and the Fourteenth Amendment. The letter—sent to the Council and introduced in public comment by the President of HTFF, Plaintiff Rosemary McCoy—explained that without assessing what BVAP levels are necessary for VRA Section 2 compliance, the Council risked unnecessarily packing Black voters into districts.

138.   The letter was accompanied by an RPV analysis commissioned by Organizational Plaintiffs and HTFF. Dr. Hannah L. Walker, Assistant Professor of Government at the University of Texas at Austin, conducted the analysis and authored a report detailing her conclusions.

139.   Dr. Walker's RPV analysis studied fourteen citywide elections held in Jacksonville between 2014 and 2020.

140.   Dr. Walker's analysis concluded that voting is racially polarized in the city, with a majority of Black voters supporting one candidate and the majority of white voters supporting an opposing candidate in each of the elections she studied.

141.   Dr. Walker's report included an estimate of the proportion of Black citizen voting-age population ("BCVAP") necessary for the Black-preferred candidate to achieve electoral success in each of the fourteen citywide elections in her analysis.

142.   Dr. Walker concluded that, citywide, a proportion of 41% BCVAP, on average, was necessary to allow Black voters the opportunity to elect candidates of

their choice. She also concluded that 44% BCVAP was necessary, on average, when considering races in which the Black-preferred candidate was defeated.

143.   Dr. Walker's report studied citywide election results and did not make district-specific conclusions, but her analysis suggests that Black-preferred candidates would usually be elected in districts with Black populations much lower than the Black populations of the Packed Districts.

144.   Hoping to stave off the need for litigation, Organizational Plaintiffs and HTFF explained that Jacksonville could achieve VRA Section 2 compliance if it drew districts with significantly lower Black populations than Districts 7, 8, 9, and 10 had in the then-draft plan. They further explained that failure to do so could run afoul of the constitutional prohibition on racial gerrymandering.

145.   The Council failed to correct course. There is no indication that councilmembers or staff meaningfully considered Organizational Plaintiffs' statements or accompanying report at all.[9]

146.   At each of the Rules Committee's public hearings—including those held after the Council received Dr. Walker's RPV analysis—commenters asked whether the Council had conducted a functional analysis of the BVAP necessary to achieve VRA Section 2 compliance. There was no public answer, either at those meetings or elsewhere.

---

[9] Killingsworth and Assistant General Counsel Paige Johnston had actual receipt of Dr. Walker's report and Organizational Plaintiffs' and HTFF's letter and discussed it among themselves before the February 10 public hearing began, but they never discussed it publicly. Andrew Pantazi (@apantazi), Twitter (Feb. 10, 2022, 6:26 PM), https://twitter.com/apantazi/status/1491916479100604416.

147.    To the contrary, moments before final passage of the Enacted Plan, Councilwoman Priestly Jackson announced: "I don't know what percentage is needed to ensure that the voters in District 10 are able to actualize their preference." Without such knowledge, she continued, her goal was to prevent "diluting the African American neighbors in Districts 7, 8, 9, and 10." Councilwoman Priestly Jackson had previously acknowledged that at least some of the Packed Districts had Black population levels that risked packing Black voters beyond what was necessary. She had also previously acknowledged being aware of concerns about packing by "late September or October."

148.    Without conducting a functional analysis of RPV, the Council's packing of Districts 7, 8, 9, and 10 was not narrowly tailored to achieve VRA Section 2 compliance.

149.    Likewise, the stripping of Black residents from Districts 2, 12, and 14 was not narrowly tailored to ensure that neighboring districts complied with the VRA.

150.    The Council identified no other compelling interest to justify its use of race when it drew the Challenged Districts.

## V.  Districts 2, 7, 8, 9, 10, 12, and 14 are Racially Gerrymandered

151.    Race predominated in the drawing of the Packed Districts (Districts 7, 8, 9, and 10). Race also predominated in the drawing of the Stripped Districts (Districts 2, 12, and 14). The use of race as the predominant factor to draw the Packed and Stripped Districts was not narrowly tailored to serve a compelling government interest, including compliance with the VRA.

32

152.   The City Council ignored its own redistricting criteria—including the City Charter's legal mandates—to allow race to predominate. It sacrificed compactness and changed existing lines more than necessary as it drew illogical districts to capture Black populations from far-flung areas and combine them into the Packed Districts.

153.   The Packed and Stripped Districts are two sides of the same coin: every time the Council drew an appendage protruding from a Packed District to add more Black residents, it removed those residents from a Stripped District. In that way, the Enacted Plan ensures that a majority of Jacksonville's Black residents are packed into just four districts, while neighboring districts are whiter than they otherwise would be.

154.   The Challenged Districts share several indicators that race predominated over traditional redistricting principles.

### A. Bizarre Shapes

155.   Each of the Packed Districts has a visually bizarre shape and features a "land bridge"—an isthmus of land no wider than a single precinct that connects two bigger areas of land. Other than the Packed Districts, the only other district with a land bridge is Stripped District 14. No district in the southeast portion of Jacksonville includes a land bridge.

156.   The land bridges are indicated in the below "dot density map," which visually represents the racial concentration of residents. Each purple dot represents 25 Black residents; each brown dot represents 25 white residents.



***Figure 1 – Jacksonville Dot Density Map.*** *Each purple dot represents 25 Black residents; each brown dot represents 25 white residents. Dot locations within precincts are approximate.*

157.   Each Packed District's land bridge allows it to reach into a cluster of heavily populated Black precincts in the heart of Jacksonville.

158.   Stripped District 14's land bridge, meanwhile, sneaks below Packed Districts 9 and 10 to capture a disproportionately white area for the Stripped District while keeping it out of the Packed Districts.

### B.  Non-Compactness

159.   The Challenged Districts also tend to be less compact than other districts. The table below indicates the compactness of each district, using the Polsby-Popper measure of compactness on which courts often rely. Polsby-Popper scores range from 0 to 1, with a higher score indicating a more compact district. The districts are ordered

from least to most compact; the Challenged Districts are shaded in grey:

| District No. | Polsby-Popper Score |
|---|---|
| 9 | 0.148 |
| 7 | 0.179 |
| 10 | 0.192 |
| 3 | 0.203 |
| 14 | 0.222 |
| 2 | 0.295 |
| 8 | 0.310 |
| 13 | 0.441 |
| 5 | 0.457 |
| 4 | 0.498 |
| 6 | 0.501 |
| 1 | 0.532 |
| 12 | 0.563 |
| 11 | 0.671 |

160.   All four Packed Districts, and two of the three Stripped Districts, are in the bottom half for compactness. The three least compact districts are Packed Districts.

161.   A district is likely to have a higher Polsby-Popper score (indicating more compactness) if it has smooth borders. Because Districts 8 and 12 abut Jacksonville's smooth western boundary, their Polsby-Popper scores benefit. Those districts' other borders feature the type of bizarre shapes and jaggedness typically associated with lower Polsby-Popper scores.

162.   There is an enormous difference between the compactness of the seven most compact districts and the seven least compact districts, which include six of the seven Challenged Districts. The Polsby-Popper score of District 13 (the seventh most compact district) is nearly fifty percent higher than the score of District 8 (the eighth most compact district).

163.   The result is non-compact, bizarrely shaped districts:



*Figure 2 – Non-compact District Shapes. The silhouettes of Districts 10, 14, and 9 are shown on the first row. Districts 8, 2, and 7 are shown on the second row.*

### C. Splintered Neighborhoods

164.   The Enacted Plan splits forty-seven City-designated neighborhoods. Each of the Challenged Districts splits at least as many neighborhoods as any other district in the Enacted Plan—if not more.

165.   District 10 splits nineteen neighborhoods; District 9 splits seventeen

neighborhoods; District 8 splits thirteen neighborhoods; Districts 2 splits twelve neighborhoods; Districts 12 splits eleven neighborhoods; and Districts 7 and 14 each split nine neighborhoods.

166.   No other district in the Enacted Plan splits more than six neighborhoods.

167.   Many of the neighborhoods that the Packed Districts split are in Jacksonville's heavily Black Urban Core.[10] These Districts' land bridges allow each Packed District to reach into those neighborhoods to capture Black residents and artificially inflate its Black population.

168.   Jacksonville's official neighborhood designations provide objective definitions of local communities of interest. The Council was far more willing to split communities of interest when it drew the Challenged Districts than when it drew the districts in other, whiter areas of the City.

169.   This pattern further indicates that when councilmembers and staff spoke of "communities of interest" during the redistricting process, they used the term only as a euphemism for race. Their use of the term was unmoored from the actual communities of interest reflected in the City's neighborhoods.

170.   In separating these neighborhoods, the Council again demonstrated its disregard for traditional redistricting principles and the predominance of racial considerations in its decision-making.

---

[10] Plaintiffs use the term "Urban Core" to refer generally to the pre-consolidation Old City and surrounding close-in neighborhoods.

## VI.  Racial Gerrymandering in Specific Districts and District Boundaries

171.    The extent to which race predominated in the drawing of the Challenged Districts is further evident when examining the details of each district, especially the borders between neighboring Packed and Stripped Districts.

### A.  District 8

172.    Race was the predominant factor in drawing District 8. Race was not employed in a narrowly tailored manner to advance any compelling government interest, including compliance with VRA Section 2.

173.    District 8 is the most heavily packed district in the Enacted Plan, with a 70.3% Black population.



*Figure 3 – District 8. Each purple dot represents 25 Black residents; each brown dot represents 25 white residents. Dot locations within precincts are approximate.*

174.   District 8 has a bizarre, illogical, and non-compact shape, attributable to racial predominance. The bulk of its area is in the relatively sparsely populated westernmost part of Jacksonville, but a single precinct-wide land bridge moves it east, capturing the College Park neighborhood and dropping south—resulting in an appendage that resembles an arcade claw machine. The claw drops with racial purpose: to grab the densely packed Black-majority neighborhoods of Riverview and Moncrief, as well as other surrounding heavily Black areas.

175.   District 8 could have been drawn more compactly and logically without this appendage. The inclusion of the appendage unnecessarily forces District 8 across the Trout River, a natural geographical boundary line.

176.   The geographic core of District 8 in western Jacksonville has a Black population of 44.3%. The inclusion of the claw-like appendage, with its 80.3% Black population, brings District 8's overall Black population to 70.3%.

177.   At various points in the redistricting process, councilmembers acknowledged that a 70.3% Black population was unnecessarily high and likely constituted race-based packing.

178.   At the September 9 Redistricting Committee meeting, for example, Councilwoman Brenda Priestly Jackson described a 68% minority concentration in the district as "problematic" and "kind of packed."[11] She continued: "We have an

_____

[11] Contrary to federal guidance, the Council used demographic data that counted just those residents who identified themselves as Black only, rather than also including those who identified as Black and another race. As a result, the Black percentage figures discussed at Committee meetings were slightly

obligation to try to look at bringing that down."

179.    Councilwoman Priestly Jackson made her comment after Bill Killingsworth presented a districting option that would have reduced District 8's Black population from 68% to 64%. Killingsworth noted in introducing the option that he had "heard from some" that the 68% figure "should come down."

180.    Killingsworth also noted, however, that Councilwoman Ju'Coby Pittman, the District 8 incumbent, had told him that morning that her district could remain at its Black population. At that meeting, Councilwoman Pittman announced she did not want to lose any "what was the new word?—'community of interest.'"

181.    The proposals at issue were abandoned. As enacted, District 8 has a 70.3% Black population.

### B.  District 8's Border with District 12

182.    Race was the predominant factor in drawing the border shared by Districts 8 and 12—packing the former and stripping the latter. Race was not employed in a narrowly tailored manner to advance any compelling government interest, including compliance with VRA Section 2.

183.    The border between Districts 8 and 12 was the subject of intense discussion at both the September 23 member-to-member meeting and the September 27 Redistricting Committee meeting. Committee Chair Aaron Bowman explained that

---

lower than the actual figures. *See* Andrew Pantazi, *Jacksonville's Redistricting Plans Ignore Federal Guidelines*, Tributary (Dec. 16, 2021), https://jaxtrib.org/2021/12/16/jacksonvilles-redistricting-plans-ignore-federal-guidelines/; *see also* Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7470 (U.S. Dep't of Just. Feb. 9, 2011).

to achieve population equality, "District 8 has to grow, and the likely donor is District 12." Chair Bowman's comment reflected the simple solution of taking population from District 12, which had a surplus, and moving it to the neighboring District 8, which had a deficit.

184.    Killingsworth presented a map that did just that. His proposal extended District 8's southwestern border further into District 12 to equalize population, by including the Town of Baldwin and moving the boundary to I-10:



*Figure 4 – Killingsworth's Rejected District 8 Southwestern Border Extension. The proposed District 12 is colored pink; the proposed District 8 is purple. The 2011 plan is outlined in red.*

185.    Killingsworth reported that Councilwoman Pittman had objected to his plan because Baldwin did not fit "her community of interest that's in her district."

186.    Over two-thirds of the Town of Baldwin's residents are white. It has a Black population of 24%. The area surrounding Baldwin, which Killingsworth also proposed placing in District 8, is even whiter than the town proper.

187.    When Killingsworth introduced the proposal, he provided racial data for

each proposed district, using total population. The data indicated that, if the plan were adopted, District 8 would be 66% Black. As enacted, it is 70% Black.

188.    The Redistricting Committee rejected the proposal, in part "because there was disagreement on the new boundary between CD 8 and CD 12," according to the exhibits accompanying the legislation that became the Enacted Plan.

189.    Killingsworth indicated that the next best option to easily equalize population between Districts 8 and 12 would be to shift precincts along the eastern portion of their shared border. His stated hope was "to find something in [that area] that meets the population numbers of 12 giving and 8 getting that also meets a community of interest that Ms. Pittman believes fits her district."

190.    The area in question, in the Whitehouse neighborhood south of Old Plank Road, is disproportionately white. It includes Precinct 1203, which has 1,580 white residents and 193 Black residents (80.1% and 9.8%, respectively). At the September 27 Committee meeting, District 8 Councilwoman Ju'Coby Pittman noted:

> I'd still like to have a discussion . . . As of today, because it makes the [equal population] numbers right, but I want to make sure [District 12 Councilmember White's] comfortable and I'm comfortable in terms of the ethno-racial, Black and white . . .

191.    Killingsworth's proposal did not come to fruition. District 12 shed 3,921 residents in the Enacted Plan. Not a single one was placed in District 8.

192.    Instead, they were placed elsewhere along racial lines. As many as 1,129 people—60.1% of whom are Black—were placed in the Packed District 10. 2,834 people—52.2% white and only 25.8% Black—went to Stripped District 14.

42

193.    District 8, meanwhile, drew the population it needed from Packed District 7—a district that *also* needed to pick up population rather than shed it. It took in 2,873 residents who had previously been in District 7—64.1% of whom are Black.

### C. District 7

194.    Race was the predominant factor in drawing District 7. Race was not employed in a narrowly tailored manner to advance any compelling government interest, including compliance with VRA Section 2.

195.    District 7 is the second-most Packed District, with a 62% Black population.

196.    District 7 has a visually bizarre, illogical, and non-compact shape. It is largely based in the northern-most region of Jacksonville, but snakes south, crossing the Broward and Trout Rivers, to capture a dense pocket of Black voters in the Urban Core. In reaching south, District 7 resembles a bizarrely shaped hourglass—with a narrow land bridge connecting two bulbous areas of heavily Black population.

197.    District 7 could have been drawn compactly and logically but instead irregularly funnels southward through its land bridge. It unnecessarily crosses the Trout River, a natural geographical boundary.



*Figure 5 – District 7. Each purple dot represents 25 Black residents; each brown dot represents 25 white residents. Dot locations within precincts are approximate.*

198.   District 7's land bridge is a single precinct wide, using the bottom portion of Precinct 703 to connect Black neighborhoods to the north and south. By limiting the land bridge to Precinct 703, the mapmakers avoided including Precinct 204—immediately to the east of the land bridge—in District 7 and instead placed it in the Stripped District 2. Precinct 204 is heavily white: it has a 69.5% white population and only 17.9% Black population.

199.   The land bridge also allows District 7 to avoid the heavily white San Mateo neighborhood and to split Imeson Park to avoid most of its large white population. These heavily white areas are placed instead in District 2.

200.   The land bridge continues south across the Trout River and remains a

single precinct wide, taking in Precinct 701 (61.2% Black population) to reach the heavily Black areas of Fairfield, Brentwood, and other Urban Core neighborhoods.

201.    By reaching south over its land bridge (and over the literal bridge crossing the Trout River), District 7's Black population balloons to 62%. The northern portion of the district has a 56% Black population, while the southern portion has a 69.5% Black population.

202.    District 7's southward appendage reduces its compactness and ignores a natural geographic boundary—the Trout River—while fracturing the Hollyford, Highlands, and Imeson Park neighborhoods.

### D.  Districts 7's Border with District 2

203.    Race was the predominant factor in drawing the border between Districts 7 and 2—packing the former and stripping the latter. The use of race was not narrowly tailored to advance a compelling government interest, including compliance with VRA Section 2.

204.    At the same September 27 Redistricting Committee meeting in which he described the need for population shifts between Districts 8 and 12, Chair Bowman explained the need for District 7 to absorb parts of District 2 along their shared border.

205.    The map that Killingsworth proposed at that meeting included an adjustment to the border between Districts 2 and 7. As illustrated in the map below, Killingsworth proposed widening District 7's land bridge to achieve population equality and, among other things, unite the Imeson Park neighborhood. This would have maintained the northernmost part of the border along Main Street, a major road.



*Figure 6 – Killingsworth's Rejected Proposal to Widen District 7 Land Bridge. The proposed District 7 is mint green; the proposed District 2 is orange. The 2011 plan is outlined in red.*

206.   The Redistricting Committee rejected the proposal, in part "because there was disagreement on the new boundary between . . . CD 7 and CD 2," according to the exhibits accompanying the legislation that became the Enacted Plan.

207.   Killingsworth noted that Councilman Reggie Gaffney, the District 7 incumbent, objected to the initial proposal. Killingsworth explained that Councilman Gaffney asked him to instead look for adjustments closer to the northern end of the border that were "more closer aligned with his district" and "find a community of interest that meets the numbers we have to have."

208.   Killingsworth continued:

> My expectation is if we can find something that works for

> Councilmember Gaffney, for the same reasons it works for Councilmember Gaffney, it would work for [District 2] Councilmember Ferraro.

209. Killingsworth's statement indicated the Councilmembers' mutual interest in keeping Black voters *out* of District 2 and *in* District 7.

210. In rejecting this map, the Committee kept the area—with its thousands of people and 70.5% white population—in District 2 and out of District 7.

211. The racial data accompanying the proposal indicated that Killingsworth's proposed District 7 would have been 58% Black.

212. As enacted, District 7 is 62% Black.

213. Killingsworth acted on Gaffney's request to look further north, adding population to District 7 in an area east of Main Street near Yellow Bluff Road.



*Figure 7 – Racial Demographics of Killingsworth's Rejected Proposal. The map at left displays the proposed change to Districts 7 and 2 in mint green, as in Figure 6. The map at right shows racial demographics, with the Enacted Plan (solid black line) and rejected proposal (dashed red line) overlaid. Darker purples indicate precincts that are more Black; darker browns indicate precincts that are whiter.*

214. Unlike Killingsworth's rejected proposal, the Enacted Plan does not

feature a smooth line along Districts 2 and 7 in this area. Instead, the enacted border zigs and zags. The map above on the left is Killingsworth's proposal (the same map as in Figure 6); the map on the right shows the Enacted Plan (solid black line) and the rejected proposal (dashed red line).

215.   The border zig-zags with racial precision. The map of the Enacted Plan (on the right) is shaded based on the Black percentage of each precinct (or, where the map splits precincts, each portion of a split precinct). A darker brown indicates a lower Black population; a lighter brown indicates a Black population approaching 50%; a darker purple indicates a higher Black population. As the map illustrates, the border's northernmost portion cuts along racial lines, with the whitest areas placed in District 2 and the more racially mixed areas placed in District 7. (The land bridge itself, while heavily white, is sparsely populated with just 221 residents.)

216.   The smooth line between Districts 2 and 7 in Killingsworth's rejected proposal (and in the 2011 Plan) follows a precinct border, along a major roadway: Main Street. Instead of maintaining that border, the mapmakers deviated from Main Street and split Precinct 205. In so doing, they moved a relatively diverse segment out of District 2 and into District 7, as depicted below:



*Figure 8 – Race-Based Splitting of Precinct 205. Proposed changes to the border between Districts 7 and 2 overlayed on racial makeup of Census blocks within Precinct 205. Lighter browns indicate blocks that are more diverse, while darker browns indicate blocks that are whiter.*

217.   At the February 10, 2022, Rules Committee public hearing, a local resident noted that the splitting of the area (the Yellow Bluff Landing neighborhood) in this way constituted packing and did nothing to advance local interests. The resident explained: "the interests and concerns of the Yellow Bluff community are tied with that Yellow Bluff corridor. It should be left intact where its interests lie."

### E.  District 10

218.   Race was the predominant factor in drawing District 10. Race was not employed in a narrowly tailored manner to advance any compelling government interest, including compliance with VRA Section 2.

219.   District 10 is the third most packed district in the Enacted Plan. It is 61.3% Black.

220.   During the redistricting process, District 10's incumbent Councilwoman Brenda Priestly Jackson (who does not plan to seek re-election in District 10) announced that she was "very comfortable with the demographics of District 10" that elected her.

221.   District 10 has a visually bizarre, illogical, and non-compact shape. This shape is attributable to racial predominance.

222.   At its northernmost portion, District 10 widens to capture heavily Black neighborhoods including Sherwood Forest, Harborview, and Carver Manor.

223.   As it snakes south, District 10 extends over a vast, empty region, then narrows to a precinct-wide land bridge, and expands again, capturing Black voters by splitting neighborhoods with District 12 along racial lines.

224.   District 10's land bridge avoids predominantly white neighborhoods while connecting the District's heavily Black northern neighborhoods to predominantly Black neighborhoods further south, including Jacksonville Heights, Sweetwater, and Cedar Hills.



***Figure 9 – District 10.*** *Each purple dot represents 25 Black residents; each brown dot represents 25 white residents. Dot locations within precincts are approximate.*

### F. Districts 10's Border with District 12

225.   Race was the predominant factor in drawing the border between Districts 10 and 12—packing the former and stripping the latter—and it was not employed in a narrowly tailored manner to advance any compelling government interest, including compliance with VRA Section 2.

226.   As the map below illustrates, the shared border divides the Packed District 10 from the Stripped District 12 with racial precision.



*Figure 10 – Race-Based District 10/12 Border. Each purple dot represents 25 Black residents; each brown dot represents 25 white residents. Dot locations within precincts are approximate.*

227.    South of the I-10/I-295 interchange, District 12 protrudes eastward into District 10 to capture Precinct 1201 (69.8% white population).

228.    Further south, District 10's western boundary protrudes irregularly into District 12 to split Precinct 1208.

229.    In splitting the precinct, the Council changed boundaries from the 2011 Plan to capture Black voters. The area added to District 10 is 59.7% Black, while the portion left in District 12 is only 36.7% Black.

230.    This was another instance of the Council prioritizing race over its other stated criteria.

231.    Continuing south, District 12 retracts, ensuring that the plurality-Black Precinct 1014 is in District 10, divided from the plurality-white Precinct 1213 just across the border in District 12.

232.    The table below indicates the Black population of the precincts along the border between Districts 10 and 12, moving from north to south. In the case of split precincts (denoted with an asterisk), the Black population figure reflects the Black population of only the portion of the precinct in the relevant district:

| Precinct in 12 | Black % in 12 | Black % in 10 | Precinct in 10 |
|---|---|---|---|
| 1203 | 9.8 | 25.1 | 1011 |
| 1201 | 15.9 | | |
| 1205 | 34.3 | 44.7 | 1007 |
| 1208* | 36.7 | 41.9 | 1013 |
| | | 57.9 | 1008 |
| | | 53.4 | 1009 |
| | | 59.7 | 1208* |
| 1213 | 38.1 | 53.4 | 1009 |
| | | 61.2 | 1012 |
| | | 51.2 | 1014 |
| | | 39.1 | 1016 |

233.    Along the entire border, the precincts (or split precincts) on the District 10 side have a larger Black population than the adjacent precincts in District 12.

53



*Figure 11 – Precincts Along District 10/12 Border. Darker purples indicate precincts that are more Black; darker browns indicate precincts that are whiter.*

### G. District 10's Border with District 14

234.    Race was the predominant factor in drawing the border between Districts 10 and 14—packing the former and stripping the latter—and race was not employed in a narrowly tailored manner to advance any compelling government interest, including compliance with VRA Section 2.[12]

235.    District 14's land bridge—no wider than a single precinct—reaches under Districts 9 and 10 to capture Precinct 1406 (54.6% white population) and the plurality-white Precincts 1403 and 1402. The land bridge also permits District 14 to jut up to split Precinct 1210, capturing a 52.2% white population portion of the precinct.

---

[12]  Plaintiffs allege additional facts about this part of District 14 and its interaction with District 9 in ¶¶ 257–258, *infra*.

236.   Along the entire border, the precincts on the District 10 side have a larger Black population than the adjacent precincts (or split precinct) in District 14.



*Figure 12 – Race-Based District 10/14 Border. Each purple dot represents 25 Black residents; each brown dot represents 25 white residents. Dot locations within precincts are approximate.*

### H.   District 9

237.   Race was the predominant factor in drawing District 9. Race was not employed in a narrowly tailored manner to advance any compelling government interest, including compliance with VRA Section 2.

238.   District 9 has a visually bizarre, illogical, and non-compact shape that is attributable to racial predominance.

239.   District 9 is packed, with a 60.6% Black population.

240.   At   its   northern   bulb,   the   District   encompasses   heavily   Black

neighborhoods including Grand Park, New Town, and Woodstock.

241.   District 9's land bridge is the most aggressive of them all. At its narrowest point, the land bridge is an isthmus the width of just two city blocks.

242.   The land bridge captures parts of more heavily Black neighborhoods— including Hillcrest and Oak Hill—while avoiding whiter neighborhoods such as Avondale, Riverside, Lakeshore, and Fairfax.



*Figure 13 – District 9. Each purple dot represents 25 Black residents; each brown dot represents 25 white residents. Dot locations within precincts are approximate.*

243.   As District 9 continues south, a "hitchhiker's thumb" protrudes to hook Black voters from the Stripped District 14 into the Packed District 9. The map below shows the surgical-like precision with which the mapmakers deployed race to place residents into or out of the district.

### I. District 9's Border with District 14

244.   Race was the predominant factor in drawing the border between Districts 9 and 14—packing the former and stripping the latter—and it was not employed in a narrowly tailored manner to advance any compelling government interest, including compliance with VRA Section 2.



*Figure 14 – Districts 9 and 14. Each purple dot represents 25 Black residents; each brown dot represents 25 white residents. Dot locations within precincts are approximate.*

245.   At the northernmost portion of the border between Districts 9 and 14, District 9 juts irregularly southward to split the Murray Hill neighborhood, capturing its more heavily Black parts while leaving its whiter portion to District 14.

246.   While Murray Hill overall has a Black population of 23.9%, the portion placed in District 9 has a higher Black population of 33.9%. Meanwhile, the portion

across the border in District 14 has a Black population of just 10.5%.

247.   The irregular protrusion splitting Murray Hill also ensures that whiter areas in Riverside (11.2% Black) and Avondale (3.5% Black) are placed in District 14. The map below illustrates the race-based border:



*Figure 15 – Race-Based District 9/14 Border.* *Each purple dot represents 25 Black residents; each brown dot represents 25 white residents. Dot locations within precincts are approximate.*

248.   At its easternmost point, the border runs south of Precinct 909 (83.9% Black population) to ensure its inclusion in District 9. Adjacent Precinct 1407 (63.9% white population) is on the other side of the border in District 14.

249.   Moving westward, the border divides Precinct 901 (41.8% Black and in District 9) from Precinct 1405 (76% white and in District 14).

250.   Slightly further south, District 9's land bridge begins as a single precinct

wide, comprising Precinct 908, which is 46.8% Black.

251.    The land bridge continues south with the majority-Black Precinct 903. Immediately to its east is Precinct 1412 (56.5% white), which is located in District 14.

252.    Next, the land bridge moves south through the plurality-Black Precinct 906. By keeping District 9 one precinct wide at this point, the mapmakers ensured that District 14 could keep the adjacent Precinct 1408, with its 77.9% white population.

253.    District 9 then widens slightly, jutting into District 14 to capture the plurality-Black Precinct 907.

254.    District 9 then narrows again to avoid the 42.9% white Precinct 1409.



*Figure 16 – Hitchhiker's Thumb. Darker purples indicate precincts that are more Black, while darker browns indicate precincts that are whiter.*

255.    District 9 reaches into Precinct 1409 with a protrusion resembling a

"hitchhiker's thumb" to hook in Black voters, as depicted above. This appendage also splits the Ortega Farms neighborhood, which would not otherwise be divided.

256.    The northward-pointing thumb is majority Black. The adjacent areas in District 14 are majority white.

257.    Further south, District 14's land bridge interrupts District 9's march southward just a precinct shy of the city limit. As alleged in Paragraphs 234–236, District 14's land bridge squeezes between the city limit and Districts 9 and 10 to capture disproportionately white areas.

258.    The precincts that comprise the land bridge are whiter than the precincts in District 9 immediately to their north; the district borders in this area ensure that District 14 minimizes and District 9 maximizes their respective Black populations.



*Figure 17 – Race-Based District 9/14 border. Each purple dot represents 25 Black residents; each brown dot represents 25 white residents. Dot locations within precincts are approximate.*

259.    The table below indicates the Black population of the precincts along the



border between Districts 9 and 14, moving from north to south. In the case of split precincts (denoted with an asterisk), the Black population figure reflects the Black population of only the portion of the precinct in the relevant district:

<table>
<tr><th>Precinct in 9</th><th>Black % in 9</th><th>Black % in 14</th><th>Precinct in 14</th></tr>
<tr><td>909</td><td>83.9</td><td rowspan="2">18.8</td><td rowspan="2">1407</td></tr>
<tr><td rowspan="3">901</td><td rowspan="3">41.8</td></tr>
<tr><td>8.3</td><td>1413</td></tr>
<tr><td rowspan="2">10.8</td><td rowspan="2">1405</td></tr>
<tr><td rowspan="2">908</td><td rowspan="2">46.8</td></tr>
<tr><td rowspan="2">28.8</td><td rowspan="2">1412*</td></tr>
<tr><td>903</td><td>54.5</td></tr>
<tr><td>906</td><td>28.1</td><td rowspan="2">8.7</td><td rowspan="2">1408</td></tr>
<tr><td rowspan="2">907</td><td rowspan="2">49.5</td></tr>
<tr><td rowspan="4">30.6</td><td rowspan="4">1409*</td></tr>
<tr><td>913</td><td>53.8</td></tr>
<tr><td>1409*</td><td>17.0</td></tr>
<tr><td rowspan="3">914</td><td rowspan="3">44.2</td></tr>
<tr><td>36.9</td><td>1410</td></tr>
<tr><td>36.9</td><td>1401</td></tr>
</table>

260. Along the entire border,[13] the precincts on the District 9 side have a larger Black population than the adjacent precincts in District 14.

[13] With the sole exception of the majority-white portion of split Precinct 1409, which was moved into District 9 due to changing Census block boundaries and has a population of about 200.

***Figure 18 – Precincts Along District 9/14 Border.*** *Darker purples indicate precincts that are more Black; darker browns indicate precincts that are whiter.*

## CLAIMS FOR RELIEF

## COUNT ONE

### Racial Gerrymandering
### in Violation of the Fourteenth Amendment to the U.S. Constitution
### (42 U.S.C. § 1983)

261.   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

262.   The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

263.   Under the Fourteenth Amendment's Equal Protection Clause, a racial

classification is prohibited unless it is narrowly tailored to serve a compelling state interest.

264.    As alleged in detail above, race was the predominant factor in the design of City Council Districts 2, 7, 8, 9, 10, 12, and 14 in Ordinance 2022-01-E. Race predominated over all other redistricting criteria when each of these districts was drawn.

265.    The use of race as the predominant factor in creating City Council Districts 2, 7, 8, 9, 10, 12, and 14 was not narrowly tailored to advance any compelling state interests, including compliance with Section 2 of the VRA.

266.    Consequently, these districts do not survive strict scrutiny.

267.    Council Districts 7 and 8 together compose School Board District 4. Council Districts 9 and 10 together compose School Board District 5. Council Districts 12 and 14 together compose School Board District 6. As a result, race was necessarily the predominant factor in the design of School Board Districts 4, 5, and 6 in Ordinance 2022-01-E.

268.    Race predominated over all other redistricting criteria in creating School Board Districts 4, 5, and 6, and its use was not narrowly tailored to advance any compelling state interest, including compliance with Section 2 of the VRA.

269.    Therefore, City Council Districts 2, 7, 8, 9, 10, 12, and 14, and School Board Districts 4, 5, and 6 violate Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## COUNT TWO

### Illogical and/or Non-Compact Districts
### in Violation of the Jacksonville City Charter, Sec. 5.02(a)

270.   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

271.   Section 5.02(a) of the Jacksonville City Charter mandates: "the [city] council shall redistrict the 14 council districts . . . so that all districts . . . are arranged in a logical and compact geographic pattern to the extent possible."

272.   The Florida Supreme Court has concluded that compactness is a standard that "refers to the shape of [a] district," and "seeks to 'ensure that districts are logically drawn and that bizarrely shaped districts are avoided.'" *In re Senate Joint Resol. of Legis. Apportionment 100*, No. SC22-131, __ So. 3d __, 2022 WL 619841, at *3 (Fla. Mar. 3, 2022) (quoting *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 636 (Fla. 2012)).

273.   To be considered compact under Florida law, a district "should not have an unusual shape, a bizarre design, or an unnecessary appendage." *In re SJR 1176*, 83 So. 3d at 634.

274.   City Council Districts 2, 7, 8, 9, 10, 12, and 14 have unusual shapes, bizarre designs, and unnecessary appendages.

275.   City Council Districts 2, 7, 8, 9, 10, 12, and 14 are non-compact.

276.   City Council Districts 2, 7, 8, 9, 10, 12, and 14 do not preserve traditional communities of interest. Instead, they split precincts and neighborhoods and connect

far-flung regions of the City that lack common economic or social interests.

277.   City Council Districts 2, 7, 8, 9, 10, 12, and 14 are not arranged in a logical geographic pattern. The decisions that informed their borders involved illogical choices, including but not limited to the use of race in a manner prohibited by the federal Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A.     Declare the City Council Districts 2, 7, 8, 9, 10, 12, and 14 adopted in Ordinance 2022-01-E to be unconstitutional in violation of the Fourteenth Amendment to the U.S. Constitution as racially gerrymandered; and non-compact and/or illogical in violation of the Jacksonville City Charter;

B.     Declare the School Board Districts 4, 5, and 6 adopted in Ordinance 2022-01-E to be unconstitutional in violation of the Fourteenth Amendment to the U.S. Constitution as racially gerrymandered;

C.     Preliminarily and permanently enjoin Defendants and their agents from calling, holding, supervising, or certifying any elections in the Challenged Districts as defined in Ordinance 2022-01-E;

D.     Order Defendants to hold special elections in the Challenged Districts as defined in Ordinance 2022-01-E to limit the harm to Plaintiffs should adequate relief be unavailable prior to the next regularly scheduled elections;

E.    Retain jurisdiction to render any and all further orders that this Court may deem necessary;

F.     Award Plaintiffs their attorneys' fees in this action;

G.    Award Plaintiffs their costs of suit; and

H.    Grant any and all other relief this Court deems just and proper.

Respectfully submitted this 3rd day of May, 2022,

*/s/ Nicholas Warren*
Nicholas Warren[†] (FBN 1019018)
**ACLU FOUNDATION OF FLORIDA, INC.**
336 East College Avenue, Ste. 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
**ACLU FOUNDATION OF FLORIDA, INC.**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Daniel Hessel*[‡]
Theresa J. Lee*
Nicholas Stephanopoulos*
**ELECTION LAW CLINIC**
**HARVARD LAW SCHOOL**
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
dhessel@law.harvard.edu
thlee@law.harvard.edu
nstephanopoulos@law.harvard.edu

Krista Dolan (FBN 1012147)
**SOUTHERN POVERTY LAW CENTER**
P.O. Box 10788
Tallahassee, FL 32303-2788
(850) 521-3000
krista.dolan@splcenter.org

Bradley E. Heard*
Jack Genberg*
**SOUTHERN POVERTY LAW CENTER**
150 E. Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org

*Attorneys for Plaintiffs*

[†] *Designated lead counsel*    * *Special admission motions forthcoming*    [‡] *Federal practice only*