# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

JACKSONVILLE BRANCH
OF THE NAACP, *et al.*,

     *Plaintiffs*,

v.

CITY OF JACKSONVILLE, *et al.*,

     *Defendants.*

_____/

Case No. 3:22-cv-493-MMH-LLL

**Preliminary Injunctive
Relief Requested**

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

All Plaintiffs in this matter move pursuant to Federal Rule of Civil Procedure 65(a) for a preliminary injunction enjoining Defendants from conducting any future elections using the Jacksonville City Council and Duval County School Board districts enacted in Ordinance 2022-01-E ("Enacted Plan"). A verified description of the conduct and persons subject to restraint is attached at ECF 36-1. For the reasons set forth fully in the following Memorandum, Plaintiffs respectfully request that the Court grant their motion and enjoin implementation of the racially gerrymandered Enacted Plan pending entry of a final judgment.[1]

## MEMORANDUM

For decades, Jacksonville has sorted its residents by race. Since at least the 1990s, the City has classified Black residents to pack them into just four of fourteen City Council districts by stripping them from surrounding districts. There is no valid

_____

[1] Counsel for the Parties have conferred and agree that no bond is necessary in this matter.

reason for this practice, which is "by [its] very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 643 (1993).

Early in the latest redistricting cycle, a key councilmember admitted that Jacksonville's majority-Black districts were packed and undermined Black residents' influence elsewhere. She explained: "it's incumbent upon us" to "bring[ ] . . . down" the concentration of Black voters in districts so "we don't unfairly pack any ethno-racial minority."[2] The City refused to correct course. When the City Council passed the Enacted Plan earlier this year, it prolonged this segregation for yet another decade.[3] Throughout its process, the Council's decisions centered race and sacrificed traditional redistricting criteria to race-based sorting. Race was so central that the Vice Chair of the Redistricting Committee lamented: "[W]e're continually making it a [ ] predominant[ ] priority." ECF 34-15 (12/6/21 Tr.) 25:6–8. With this singular focus on the racial implications of every decision, the Council stripped Black residents from

---

[2] ECF 34-10 (9/9/21 Tr.) 57:19–58:7 (Councilmember Brenda Priestly Jackson: "I think the 68 percent of minority concentration in district is . . . challenging and problematic. It's . . . kind of packed whether intentional or not, I would like to see what those numbers are with the populations that everybody said that they could still consider if it brings it down some, I think it's incumbent upon us as Jacksonville ethno-racially diversifies and grows, then we make certain all districts are doing that and we don't unfairly pack any ethno-racial minority in a . . . district.); *see also id.* 25:21–26:2 (Priestly Jackson: "So our goal would be to get everybody, you know, down to 60 percent or below and I think we can do that because that is unfair to our neighbors that they are packed in one particular group."), 18:3–9 (Priestly Jackson: "I am not interested in increasing any specific communities of interest ie African Americans or any others in that group. I don't want them packed into district 10. We are currently at 58 percent and I think that that's a good number. It can go down, but again . . . I'm very satisfied."), 27:1–5 (Priestly Jackson: "You can keep [a] majority as much as you can as a community of interest. But in 2021, we must be cognizant of perceptions of packing African Americans in any district because it further dilutes their voice and vote throughout the rest of the city.").

[3] The Enacted Plan will be used in the 2023, 2027, and 2031 City Council elections, and the 2024, 2026, 2028, and 2030 School Board elections. *See* City Charter §§ 5.02(a), 13.03.

City Council Districts 2, 12, and 14 (together, "Stripped Districts") to pack them into

Districts 7, 8, 9, and 10 (together, "Packed Districts").

The Council violated the Fourteenth Amendment when it drew these seven City

Council districts (together, "Challenged Districts") and Duval County School Board

Districts 4, 5, and 6, each of which comprise two Challenged Districts. "The Equal

Protection Clause prohibits a State, without sufficient justification, from 'separat[ing]

its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State*

*Bd. of Elections* (*Bethune-Hill I*), 137 S. Ct. 788, 797 (2017) (quoting *Miller v. Johnson*, 515

U.S. 900, 911 (1995)). Because race was the predominant factor motivating district

lines, the City must satisfy strict scrutiny by proving that its use of race "serves a

'compelling interest' and is 'narrowly tailored' to that end." *Cooper v. Harris*, 137 S. Ct.

1455, 1464 (2017) (quoting *Bethune-Hill I*, 137 S. Ct. at 800)*.*

The City cannot meet that burden. Although courts assume governments have

a compelling interest in complying with Section 2 of the Voting Rights Act ("VRA"),[4]

*Cooper*, 137 S. Ct. at 1464, the City's use of race was not narrowly tailored to achieve

that laudable goal. The City cannot show that it narrowly tailored its use of race with

a "functional analysis" assessing racial bloc voting to determine the proportion of

minority voters needed in a district to allow those voters to usually elect their preferred

---

[4] Section 2 requires, in certain circumstances, that a minority group has an equal "opportunity . . . to elect representatives of their choice." 52 U.S.C. § 10301(b). This applies to redistricting when a "minority group" is "sufficiently large and geographically compact to constitute a majority" and voting is racially polarized such that a district's white majority votes "sufficiently as a bloc" to usually "defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 46–51 (1986).

candidates. *Bethune-Hill I*, 137 S. Ct. at 801.

Instead, the City set arbitrary racial thresholds for the Packed Districts. Early in the process, the Council repeatedly discussed the "percentages of [ ] minority per district" and "how to either keep them the same or reduce some." ECF 34-10 (9/9/21 Tr.) 14:18–21. It chose the first path, setting "mechanical racial targets" to maintain the Packed Districts' concentrations of Black residents. *Ala. Legis. Black Caucus v. Alabama* (*ALBC I*), 575 U.S. 254, 267 (2015). Narrow tailoring requires far more than just picking a number.

The Supreme Court has condemned this type of unjustified use of race as resembling "political apartheid." *Shaw I*, 509 U.S. at 647. Plaintiffs seek preliminary relief to ensure that these harms are not irreparably perpetuated in the 2023 Council elections. Specifically, they ask the Court to enjoin Defendants from holding those and future elections using the lines as drawn in the Enacted Plan.

## Historical Background

For at least thirty years, Jacksonville has racially gerrymandered its City Council and School Board districts. From one decade to the next, the Council has crafted maps to pack Black residents into Council Districts 7, 8, 9, and 10, stripping them from neighboring districts—a pattern the current Council chose to continue.

The historical record teems with evidence of this pattern. In 1991, the Council passed a plan officially called the "63% Plan," referring to a 63% Black population

quota set for the four packed districts. ECF 34-34 at 5 (1991 Ord. Ex. B).[5] It had

expressed its intent "to provide four minority access districts with approximately 60%

minority voting age population to meet the legal definition of fair opportunity." *Id.* at

38. To meet those quotas, the Council ignored all traditional redistricting criteria:

"after gerrymandering districts for race and incumbent protection, all other factors had

to be force-fitted into the plan." ECF 34-38 (12/11/91 Times-Union editorial).[6] At no

point did the Council analyze the Black voter percentage needed for these districts to

usually elect Black voters' preferred candidates—it made no attempt to tailor its use of

race to VRA compliance. The race-based sorting of the 63% Plan and its consequences

for fair representation continue today. There is a throughline from its packed districts

to the recently enacted Packed Districts challenged here. *Compare* ECF 34-58 (map of

63% Plan) *with* ECF 34-2 at 19 (Enacted Plan).

In 2001, the City again chose to pack Black residents. Councilmembers

instructed their mapping consultant to "look[ ] at the concentration of black voters in

each individual census block," to meet a 58% Black population threshold for the four

---

[5] Throughout this filing, exhibit page numbers (except transcripts) refer to the ECF pagination.
[6] *See also* ECF 34-34 (1991 Ord. Ex. A), at 24 ("The plan provides four minority access districts in which minority citizens comprise approximately 63 percent of the district population."); *id.* at 27 ("[A]n irregularly shaped portion of the district [7] extends south of the St. Johns River . . . [T]he inclusion of the portion south of the river allows deviation requirements to be fulfilled, while maintaining a minimum of 63 percent minority residents."); *id.* ("The district [8] is somewhat irregular in shape . . . . The district extends from the inner city north along the Trout River. The river is crossed to the north to meet deviation requirements while maintaining a minority access district of 72.66 percent."); *id.* at 28 ("This district [9] is an inner city minority access district with a black population of 63.20 percent. The district is situated both north and south of the St. Johns River . . . . The river is crossed to the south to meet deviation and minority access requirements."); *id.* ("The district [10] is an inner city minority access district with a black population of 62.58 percent.").

packed districts. ECF 34-43, (5/3/01 Times-Union article).[7] Again, the Council hit its targets at the expense of traditional criteria. *See* ECF 34-59 (2001 Plan). And again, there was no analysis to narrowly tailor the use of race.

In 2011, the Council again sought to pack four districts with as many Black residents as possible.[8] Several members of the Council indicated they would reject any plan that fell short of 60% Black population. ECF 34-53 at 99 (9/12/11 Minutes); *see also id.* at 62 (map designed to hit that target). Councilmembers rejected some proposals *because* they lowered the percentage. *Id.* at 66 (8/8/11 Minutes).[9] Black residents objected to the non-compactness and neighborhood splitting of their districts, to no avail. *Id.* at 100 (9/12/11 Minutes). The 2011 plan abandoned all traditional criteria to maximize the Black populations of Districts 7, 8, 9, and 10, stripping them from neighboring districts.[10]

### The 2021–22 Redistricting Process

Following the 2020 Census, the City Council chose to continue this pattern and

---

[7] The Council rejected early proposals with 52% to 54% Black population districts. One councilmember insisted after reviewing the drafts: "If we can get them [the percentages] higher in the white districts, we can get them higher in the black districts." ECF 34-42 (4/12/01 Times-Union Article) at 2 (alteration in original).

[8] Early drafts with lower populations gave way to subsequent versions with ever-higher numbers. ECF 34-51 (2011 Ord. Ex. 1) at 3, 8–9, 11, 13–14. In fact, the Black populations in the final Districts 8 and 9 were higher than in any draft map the Council considered. *Id.*; ECF 34-52 (2011 Ord. Ex. 2) at 1. The record shows the Council sought to preserve the existing gerrymandered districts. *See* ECF 34-53 at 82, 87, 91, 95, 104, 119 (public hearing minutes).

[9] *See also* ECF 34-60 (8/3/11 Tr.) 72:19–22 ("So what I'm hearing is a map that shows by precinct African Americans 60 percent or greater. . . . that I can certainly do by 2:00 o'clock tomorrow."); ECF 34-61 (8/4/11 Tr.) 7:17–20 ("54 percent in district nine . . . Fifty eight or 59 in seven and eight, those numbers are, in my opinion, not sufficient.").

[10] The circumstantial evidence of racial predominance in the Enacted Plan, *see infra* Argument Part I.A.2., is probative of the 2011 plan, too, because of the plans' similarities.

drew Jacksonville's latest racial gerrymander. Plaintiffs walk through many details of the process in their Argument section, but set forth a brief overview below:

Section 5.02(a) of Jacksonville's City Charter requires the Council to draw districts that "are as nearly equal in population and are arranged in a logical and compact geographic pattern to the extent possible." Jacksonville law also mandates that "the geographical arrangement and territorial boundaries of the districts must take into consideration other factors, particularly compactness and contiguity so that the people of the City, and their varied economic, social and ethnic interests and objectives, are adequately represented in the Council." Ordinance Code § 18.101(c). *See also* ECF 34-2 at 13 (Statement of Methodology).

The 2021–22 process began when the Council President convened the Special Committee on Redistricting ("Redistricting Committee" or "Committee"). As it began its work, the Committee appointed Director of Planning and Development Bill Killingsworth as its expert consultant. ECF 34-3 at 9 (8/18/21 Minutes). The Committee instructed him to start with the pre-existing map rather than begin anew, *id.*; to minimize crossings of the St. Johns River, *id.* at 14 (8/24/21 Minutes); and to avoid drawing City Council or School Board incumbents out of their districts, *id.* Finally, the Committee declined to adopt any partisan criteria. *Compare id.* at 6 (8/18/21 Minutes noting possibility of adopting party criterion) *with id.* at 14 (8/24/21 Minutes showing it was not adopted), ECF 34-2 at 13 (Statement of Methodology).

Committee members and other councilmembers met several times from July to December 2021 to workshop draft maps. Many of the important decisions on the

Challenged Districts were made not in Committee meetings, but in public "member-to-member" meetings of incumbents from those districts. Councilmember Brenda Priestly Jackson convened and chaired these meetings. ECF 34-3 at 25–30, 35–38, 48–50 (Notices and Minutes). She also served as a member of the Redistricting Committee, *see id*. at 5, and chaired the Rules Committee, *id*. at 60.

The Redistricting Committee approved a map in December 2021, referring it to the Rules Committee. The Rules Committee hosted four public meetings in early 2022 and approved the map on March 15, 2022. Following Rules Committee approval, the City Council passed the map on March 22, 2022, and Mayor Lenny Curry signed it into law. The Enacted Plan will first be used in the March 2023 City Council elections and the 2024 School Board elections. Charter § 5.02(a); Ordinance Code § 18.110.

## LEGAL STANDARDS

### I. Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs bear the burden of persuasion on each factor, and each is required for preliminary relief. *Id*.

At the preliminary injunction stage, courts "may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the

evidence is appropriate given the character and objectives of the injunctive proceeding." *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1276 (M.D. Fla. 2021) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F.3d 982, 985 (11th Cir. 1995)).

## II. Racial Gerrymandering

Racial gerrymandering claims involve "a two-step analysis." *Cooper*, 137 S. Ct. at 1463. First, plaintiffs must prove "race was the predominant factor motivating the . . . decision to place a significant number of voters within or without a particular district," *Miller*, 515 U.S. at 916, and "that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations," *Bethune-Hill I*, 137 S. Ct. at 797. To meet their burden, plaintiffs may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 137 S. Ct. at 1464 (quoting *Miller*, 515 U.S. at 916). Plaintiffs can also put forth district configurations that satisfy non-racial criteria as probative of racial predominance. *Easley v. Cromartie*, 532 U.S. 234, 249 (2001). The use of race "remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 137 S. Ct. at 1473 n.7.

"Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* at 1464. Courts assume that VRA compliance is a compelling interest. *Id*. "[T]o meet the 'narrow tailoring' requirement," the State must prove it "had 'a

strong basis in evidence' for concluding that the [VRA] required its action." *Id.* (quoting *ALBC I,* 135 S. Ct. at 1274). This requires a "functional analysis of the electoral behavior within the particular . . . election district." *Bethune-Hill I*, 137 S. Ct. at 801 (citation omitted). Where courts "have accepted a State's 'good reasons' for using race in drawing district lines, the State made a strong showing of a pre-enactment analysis with justifiable conclusions"—an "actual 'legislative inquiry' that would establish the need for its manipulation of the racial makeup of the district." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018).

## ARGUMENT

### I. Plaintiffs are Substantially Likely to Prevail on the Merits[11]

### A. Race Predominated in the Drawing of the Challenged Districts

Plaintiffs are likely to prevail on their racial gerrymandering claim because there is ample "'direct evidence' of legislative intent," and the "circumstantial evidence of [the Challenged Districts'] shape[s] and demographics" reveals racial predominance. *Cooper*, 137 S. Ct. at 1464. Below, Plaintiffs address each in turn.

---

[11] As a threshold matter, Plaintiffs demonstrate a substantial likelihood that they have standing. *United States v. Hays*, 515 U.S. 737 (1995), "set forth a bright-line standing rule for . . . cases alleging illegal racial gerrymandering with respect to voting districts: if the plaintiff lives in the racially gerrymandered district, she has standing." *Dillard v. Baldwin Cnty. Comm'rs*, 225 F.3d 1271, 1279 (11th Cir. 2000). Individual Plaintiffs have standing because they live in the Challenged Districts. ECF 34-24 to 34-32 (Plaintiff declarations noting residences). Organizational Plaintiffs have standing because they have members who live in the Challenged Districts and minority voting rights are germane to the organizations' purposes. ECF 34-20 (Rumlin Decl.) ¶¶ 3–5; ECF 34-21 (Frazier Decl.) at 1–2; ECF 34-22 (Shelton Decl.) ¶¶ 3–6; ECF 34-23 (Holder Decl.) ¶¶ 2–5; *Johnson v. Mortham*, 915 F. Supp. 1529, 1537 & n.11 (N.D. Fla. 1995).

## 1. *Direct Evidence of Legislative Intent*

The direct evidence shows that race was the determinative factor in the Challenged Districts' designs. The City Council was at times explicit when discussing race, but also used two rhetorical sleights-of-hand. First, it misused the term "communities of interest" as a thinly-veiled euphemism for race. In one instance demonstrating the Council's idiosyncratic use of the term, Priestly Jackson (the meeting chair) asked Killingsworth: "[W]e don't say minority access districts anymore. What is our unique term of art[?]" Killingworth responded: "Communities of interest"; Priestly Jackson replied: "Communities of interest. Okay. So I just wanted to start with that." ECF 34-10 (9/9/21 Tr.) 9:12–18; *see also id.* 18:3–6 (Priestly Jackson: "I am not interested in increasing any specific communities of interest ie African Americans"); ECF 34-17 (3/22/22 Tr.) 154:11–12 (discussing "three of what we call minority access council districts, historically now communities of interest").[12]

Second, the Council used political party as a proxy for race, even though it had expressly declined to adopt partisanship as a criterion.[13] In one example, when Councilmember Ju'Coby Pittman sought assurances about the racial makeup of her district, Priestly Jackson interrupted: "Can't use the ethno-racial identifier, so we [are] going to talk about some of the party stuff that we want, but we just have to be [ ] very

---

[12] To be sure, redistricting can and should appropriately account for true communities of interest. But that is not how the Council used the term. It instead used the term as a stalking horse for race, while sacrificing true communities of interest to racial goals. *See infra* at 19.

[13] *See* ECF 34-2 at 13 (Statement of Methodology without mention of partisan factors); *id.* at 57 (official Bill Summary without mention of partisan factors); ECF 34-14 (10/28/21 Tr.) 21:20–22:1 (Becton: "[I]n regards to political parties, even though you really haven't heard that discussion, it isn't improper to take that into account.").

clear for our communities of interest that we're identifying that." ECF 34-11 (9/23/21 Tr.) 30:13–16; *see also id.* 12:3–6 (Priestly Jackson: "So we're asking for the raw numbers, we're also going to ask that data disaggregated in terms of ethno racial identity, if we have it as well as party affiliation."). But, again, partisanship in and of itself was not a redistricting criterion; it was solely a proxy for race. ECF 34-4 at 2–3 (Council told it could account for "political factors" but did not adopt partisan criterion); *see also Cooper*, 137 S. Ct. at 1464 n.1 (race/party proxy triggers strict scrutiny); *Bush v. Vera*, 517 U.S. 952, 968 (1996) (same).

### a. The Council Set Racial Targets

The Council "prioritiz[ed] mechanical racial targets above all other districting criteria." *ALBC I*, 575 U.S. at 267. Specifically, it set the target of maintaining the Packed Districts' concentrations of Black residents. *See id.* at 273–74 (Alabama legislature sought to maintain existing racial percentages). At a September 9, 2021, member-to-member meeting, Killingsworth explained: "[T]here was a discussion that I heard multiple times about—about the [Black population] percentages and [ ] how to either keep them the same or reduce some. And so that played into it as well—the whole percentages of [ ] minority per district." ECF 34-10 (9/9/21 Tr.) 14:17–21; *see also id.* 57:7–12 (Killingsworth noting discussions about whether Black population percentage "should come down"); *id.* 9:3–11 (racial data provided to councilmembers); ECF 34-6 ("Minority Percentages per CD" provided to councilmembers).

At that meeting, there was extensive discussion about the ideal racial target for the Packed Districts, with Priestly Jackson acknowledging that they were packed. ECF

34-10 (9/9/21 Tr.) 25:4–22 (Killingsworth and Priestly Jackson discussing Black population share of Packed Districts, with Priestly Jackson noting "I'm particularly cognizant of not packing any more minorities in 7, 8, 9, or 10"), 57:6–58:14 ("I think the 68 percent of minority concentration in a district is [] challenging and problematic . . . it's kind of packed."). Killingsworth made a proposal to reduce District 8's Black population percentage, which was abandoned after Pittman told him "she's okay with her district staying at 68%." *Id*. 56:7–17.

The racial targets were met, with early councilmember statements about the need to unpack ignored and forgotten. *See supra* n.2. The legislative record shows "[r]ace was the criterion that, in the [Council's] view, could not be compromised," *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 907 (1996), with every proposal viewed through the lens of racial targets. Proposed district maps for the north and west of Jacksonville included only two demographic details: the total population and the racial makeup of each proposed district, with emphasis on the Black population percentage. ECF 34-4 at 11–12, 14–20; *see also id*. at 4–7 (dates on which each map presented); *id*. at 2, 27–28 (maps with race by precinct presented to Rules Committee). But this racial focus was true only in discussions about the Challenged Districts. Southside proposals included no racial data, *id*. at 8–10, 13, 22—suggesting its inclusion in Challenged District proposals was not standard practice, but a way to monitor targets. Several early proposals would have reduced the Black population percentage of one or more Packed Districts. Each was rejected. *Compare id*. at 11–12, 14–17 (proposals through September that reduced Black population percentage of one or more Packed Districts)

*with id.* at 18–20 (later proposals maintaining percentage of each).

And councilmembers were not subtle. For instance, Pittman discussed the interplay of her District 8 with neighboring District 7, explaining: "If [District 7] Councilman Gaffney wants to stay the same, I don't know how that impacts [ ]. But I want to ensure that, you know, the—[ ] what was the new word? 'community of interest'—[laughter]—stays and not losing it." ECF 34-10 (9/9/21 Tr.) 16:8–12. Indeed, race so pervaded the process that Redistricting Committee Vice Chair Danny Becton warned: "[W]e were talking whites, blacks, and [ ] percent . . . it just seems like we're honing in on a [ ] certain statistic that—it's my recollection by law, we're really not supposed to be working from that [ ] standpoint." ECF 34-15 (12/6/21 Tr.) 23:11–16; *see also id.* 25:5–7 ("we're continually making [race] a predominantly priority").

By the end of the process, councilmembers explicitly acknowledged the targets they had used. Moments before the Rules Committee approved the Enacted Plan, Priestly Jackson read out the historical racial makeup of Districts 7, 8, 9, and 10, noted a "gradual decline" in the Black population share of the districts, and expressed her desire to "[d]o no harm" by maintaining the racial makeup of these districts. ECF 34-16 (3/15/22 Tr.) 55:18–57:12. Days later, she Tweeted she would not "dilut[e]" the "Black voters" of the Packed Districts as they had existed "with majority Black populations . . . over 4 decades." ECF 34-9. And just moments before the full Council approved the Enacted Plan, Priestly Jackson again noted the historic decline of the Packed Districts' Black population and explained a "fundamental principle" was the "maintenance" and desire to "[d]o no harm" to the Districts' racial makeup. ECF

34-17 (3/22/22 Tr.) 159:9–17.[14]

The Council's use of racial targets is highly probative of race predominating. *See, e.g.*, *Bethune-Hill I*, 137 S. Ct. at 800; *ALBC I*, 575 U.S. at 267. It's especially powerful evidence where, as here, the result "produced boundaries amplifying divisions between blacks and whites." *Cooper*, 137 S. Ct. at 1469; *see* ECF 34-18 (Austin Rpt.) Part VI (detailing race-based borders between Packed and Stripped Districts).

### b. The Council Subordinated Core Preservation to Race

The Council's racial targets overrode all other considerations. Direct evidence shows several instances in which the Council abandoned for racial reasons its supposed desire to minimize changes—a criterion commonly called core preservation because it preserves the cores of existing districts. *See Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill II*), 326 F. Supp. 3d 128, 173 (E.D. Va. 2018).

As an initial matter, the decision to minimize changes to existing 2011 lines was itself racialized, because those lines already illegitimately sorted voters by race. *See supra* at 4–6; ECF 34-18 (Austin Rpt.) Part VI (detailing race-based borders between Packed and Stripped Districts); *id*. ¶ 63 ("no evidence that any factor influenced these district lines other than race"); ECF 34-10 (9/9/21 Tr.) 25:4–20, 57:7–58:13 (discussions on whether to maintain or reduce Black population percentages).

But even the preexisting racial gerrymander was insufficient for the Council. The Council's discussion of two borders in particular reveals how it dropped its core

---

[14] *But see supra* n.2 (numerous instances of Priestly Jackson acknowledging packing and its dilutive effect).

preservation criterion to hit its racial targets. First, the District 8/12 border: District 8 needed to gain population, while District 12 needed to shed population. ECF 34-12 (9/27/21 Tr.) 7:20–21 (Chair Bowman: "District 8 has to grow, and the likely donor is going to be District 12."); ECF 34-11 (9/23/21 Tr.) 27:11–15 (Priestly Jackson: "[W]e left last time saying we would look and see what we could give from our largest district which was 12 [ ] to our smallest district which was eight."). Second, the District 7/2 border. *See* ECF 34-12 (9/27/21 Tr.) 7:15–18 (Bowman: "I'm hoping that District 7 and 2 can agree on where they make those new lines go. District 7 will grow a little bit. District 2 will reduce in size a little bit.").

Killingsworth proposed multiple draft maps that minimized changes to the existing map but reduced the Black population percentages of District 8 or District 7. ECF 34-11 (9/23/21 Tr.) 7:4–11; *see also* ECF 34-4 at 11, 14–17 (proposed maps). At the September 23 member-to-member meeting about these proposals, councilmembers asked Killingsworth to read out the racial demographics of areas that might be moved from District 12 to District 8 and from District 2 to District 7. 9/23/21 Tr. 11:16–13:20, 17:21–18:16, 20:3–22:6, 23:18–24:7, 37:10–38:10, 39:2–10, 60:10–62:4.

Both Pittman (District 8) and Gaffney (District 7) objected to the proposals. Killingsworth reported Pittman had objected because the population didn't fit "her community of interest that's in her district, so we're really trying to find something in here that meets the population numbers in terms of 12 giving up and 8 getting; that also meets a community of interest that Ms. Pittman believes fits her district." ECF 34-12 (9/27/21 Tr.) 11:20–12:3. Gaffney, meanwhile, asked Killingsworth to look for

"a more closely aligned community of interest with his existing district." *Id.* 11:1–3; *see id.* 11:6–8 (Killingsworth effort to "find a community of interest that meets the numbers we have to have"); ECF 34-11 (9/23/21 Tr.) 42:8–14 (Gaffney noting preference for absorbing areas north of Killingsworth's proposal). *Compare* ECF 34-4 at 12, 14–17 (Killingsworth proposals) *with* ECF 34-18 (Austin Rpt.) fig.3 (showing that area north had higher Black voting-age population).

The record reveals a common goal of maximizing Packed Districts' Black populations while removing Black residents from Stripped Districts. Pittman explained regarding the 8/12 border: "I want to make sure [District 12 Councilmember Randy White] is comfortable and I'm comfortable in terms of the ethno-racial, Black and white." ECF 34-11 (9/23/21 Tr.) 30:9–11. Regarding the 7/2 border, Killingsworth noted: "[M]y expectation is if we can find something that works for Councilmember Gaffney, for the same reasons it works for Councilmember Gaffney, it would work for [District 2] Councilmember Ferraro." ECF 34-12 (9/27/21 Tr.) 11:12–15. *Compare* ECF 34-4 at 14–17 (District 2 with 20% Black population in proposals) *with* ECF 34-2 at 19 (Enacted District 2 with 18.3% Black population).

The Committee rejected Killingsworth's proposals "because there was disagreement on the new boundary between CD 8 and CD 12 and CD 7 and CD 2." ECF 34-2 (Ord. Ex. 1) at 14. In the Enacted Plan, District 8 ended up gaining nothing from District 12, instead adding population from Packed District 7 (which itself needed to grow, not shrink). And while Killingsworth's proposal to shift the 2/7 border united the Imeson Park neighborhood and ran along Main Street (a major boundary),

the Enacted Plan splits Imeson Park and features an irregular border. *See* ECF 34-18 (Austin Rpt.) ¶¶ 40–43 (discussing bizarre shape and race-based border).

These decisions show that the Council discarded core preservation when the criterion threatened its racial targets. It instead chose "*new* district inhabitants" based on race. *Bethune-Hill II*, 326 F. Supp. 3d at 173; *see also ALBC I*, 575 U.S. at 273 ("[I]f the legislature must place 1,000 or so additional voters in a particular district in order to achieve an equal population goal, the 'predominance' question concerns *which* voters the legislature decides to choose.").

### 2. *Circumstantial Evidence of Racial Predominance*

#### a. *The Council Subordinated Traditional Redistricting Criteria to Race*

The Challenged Districts themselves demonstrate that the Council "subordinated traditional race-neutral districting principles . . . to racial considerations." *Bethune-Hill I*, 137 S. Ct. at 797. This type of evidence is probative of racial intent because "[i]n general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles in order to do so." *Id.* at 799.

"[R]especting communities of interest, maintaining contiguity and compactness, [and] conforming to political subdivisions" are among the "[t]raditional considerations" that, if violated, indicate racial predominance. *Ala. Legis. Black Caucus v. Alabama* (*ALBC II*), 231 F. Supp. 3d 1026, 1044 (M.D. Ala. 2017); *see also* ECF 34-2 at 13 (Statement of Methodology emphasizing these criteria). Each of these criteria show the Challenged Districts' design cannot be explained by traditional criteria.

*Neighborhoods*: The Challenged Districts split far more neighborhoods than other districts in the Enacted Plan. Jacksonville includes officially designated neighborhoods and recognizes neighborhood associations with participatory rights in City decision-making.[15] *See also* ECF 34-10 (9/9/21 Tr.) 20:8–21:3 (Councilmember DeFoor "feel[s] bad" for Argyle neighborhood because "they get overlooked" by being split among four districts). Each Challenged District splits between six and seventeen neighborhoods. ECF 34-19 (Imai Rpt.) tbl.1. No other district splits more than six. *Id.* Three of the Challenged Districts split at least twice as many neighborhoods as the unchallenged district with the most splits. *See id.* Three of the seven unchallenged districts split only one or two neighborhoods. *Id.* The average Challenged District splits over seven more neighborhoods than the average unchallenged district. *See id.* The Council ignored that residents of "a common political subdivision[ ] are more likely . . . to share similar interests that can be represented by a common legislator," *Bethune-Hill II*, 326 F. Supp. 3d at 142, and splintered *actual* communities of interest to pack together as many Black residents as possible. *Cf. Covington v. North Carolina*, 316 F.R.D. 117, 145, 160 (M.D.N.C. 2016) (splitting of neighborhoods "strongly suggests" racial predominance), *aff'd*, 137 S. Ct. 2211 (2017); *see also Bethune-Hill II*, 326 F. Supp. 3d at 148 (split subdivisions indicate racial predominance); ECF 34-18 (Austin Rpt.) ¶¶ 39, 47, 52 (noting race-based splitting of neighborhoods).

---

[15] *See, e.g.*, City Charter ch. 34; Neighborhood Bill of Rights, Ord. 95-247-106, https://www.coj.net/departments/neighborhoods/docs/housing-and-community-development/neighborhood-initiatives/citizen-planning-advisory-committees-(cpacs)/neighborhood-bill-of-rights-1995.aspx.

| District | Polsby-Popper | Reock | Convex Hull | Neighborhood Splits |
|---|---|---|---|---|
| 1 | 0.532 | 0.502 | 0.821 | 4 |
| 2 | 0.284 | 0.489 | 0.753 | 12 |
| 3 | 0.203 | 0.311 | 0.671 | 6 |
| 4 | 0.498 | 0.495 | 0.810 | 5 |
| 5 | 0.457 | 0.367 | 0.752 | 4 |
| 6 | 0.501 | 0.454 | 0.793 | 2 |
| 7 | 0.179 | 0.299 | 0.624 | 6 |
| 8 | 0.310 | 0.489 | 0.733 | 11 |
| 9 | 0.148 | 0.189 | 0.543 | 13 |
| 10 | 0.192 | 0.202 | 0.608 | 17 |
| 11 | 0.671 | 0.508 | 0.943 | 1 |
| 12 | 0.563 | 0.546 | 0.904 | 9 |
| 13 | 0.441 | 0.351 | 0.791 | 2 |
| 14 | 0.222 | 0.316 | 0.643 | 8 |

ECF 34-19 (Imai Rpt.) tbl.1.

*Compactness*: The Challenged Districts also tend to be less compact than the Enacted Plan's other districts. A district boundary that is "'highly irregular and geographically non-compact,' is evidence of racial predominance." *Bethune-Hill II*, 326 F. Supp. 3d at 141 (quoting *Shaw II*, 517 U.S. at 905–06); *see also ALBC II*, 231 F. Supp. 3d at 1252–53 (finding non-compactness probative of racial intent). On the Convex Hull, Polsby-Popper, and Reock compactness metrics,[16] the Challenged Districts fare worse than their counterparts across the St. Johns River.[17] ECF 34-19 (Imai Rpt.) tbl.1. On both Polsby-Popper and Convex Hull, six of the Challenged Districts are among

---

[16] The Florida Supreme Court recently used these metrics to assess compactness. *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So.3d 1282, 1287 (Fla. 2022).

[17] Across all three metrics, a lower score indicates a less compact district. A district is likely to have a higher score (indicating more compactness) if it has smooth borders. Because Districts 8 and 12 abut Jacksonville's smooth western and southern city limits, their scores benefit. Those districts' other borders feature the type of bizarre shapes and jaggedness associated with lower scores.

the least compact seven districts in the Enacted Plan. *Id.* On Reock and Convex Hull, three of the Packed Districts are the least compact in the Enacted Plan. *Id.* District 9 is the least compact on all three metrics. *Id.* The difference between the Challenged Districts and other districts is significant. By Polsby-Popper, the average unchallenged district is over 70% more compact than the average Challenged District (by Reock and Convex Hull, it is over 16% more compact). *See id.*

**District Shapes**: The mathematical non-compactness stems from bizarrely shaped districts. Bizarre district shapes "may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." *Miller*, 515 U.S. at 913. The Challenged Districts have visually odd shapes, both on their own terms and relative to districts elsewhere in Jacksonville. *Cf. Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270, 1287 (10th Cir. 2019) ("odd and noncompact horseshoe-like shape of the district" probative of racial intent (punctuation omitted)); *ALBC II*, 231 F. Supp. 3d at 1253 (finding that bizarre district protrusions were racially motivated); *id.* at 1300 (same); *Bethune-Hill II*, 326 F. Supp. 3d at 161 (same).

Each of the Packed Districts is contorted to reach into Jacksonville's heavily-Black Urban Core with a "land bridge"—a single-precinct-wide strip of land that reaches into the core to connect Black population centers.[18] *See* ECF 34-18 (Austin Rpt.) fig.1, tbl.2 (heavy concentration of Black voters in Packed District precincts); *cf.*

---

[18] The land bridges are Precincts 701 (District 7); 803 (District 8); 901, 908, 903 (District 9); 1007, 1013, 1008 (District 10); and 1401 (District 14). *See* Austin Rpt. fig.2.

*Shaw I*, 509 U.S. at 635 (describing "unusually shaped" district, at times no wider than the I–85 corridor to connect pockets of Black voters). Stripped District 14 is the only other district with a precinct-wide land bridge; its bridge juts under Districts 9 and 10 to capture white voters. *See* ECF 34-18 (Austin Rpt.) ¶ 46 (border follows racial lines).

Race explains these bizarre shapes. Each Packed District "winds in snakelike fashion . . . until it gobbles in enough enclaves of black neighborhoods." *Shaw I*, 509 U.S. at 635–36; *see also* ECF 34-18 (Austin Rpt.) ¶¶ 24–28 ("The unusual shapes and how they interact with the racial populations by precinct lead me to believe the Council drew districts to snake through the city" along racial lines, *id.* at ¶ 28). Most precincts in the Packed Districts have more Black residents than white residents. *Id.* ¶ 30. Meanwhile, every single precinct in the Stripped Districts is plurality- or majority-white voting-age population. *Id.* tbl.3. In fact, the precinct with the largest Black voting-age population ("BVAP") in District 2 has only a 26.0% BVAP, *id.* ¶ 34; only three precincts in District 12 exceed 30% BVAP and only one precinct in District 14 crosses that mark, *id.* ¶¶ 34–35. Borders between Challenged Districts are jagged and "drawn . . . to concentrate larger [BVAP] into the Packed Districts." *Id.* ¶ 3.

District 7 has an hourglass shape to connect pockets of Black voters. "[T]he Council created district lines so that Precincts in District 2 would have a majority White makeup and those in District 7 would be relatively more Black/African American." *Id.* ¶¶ 38–40. At several points, the border curves along racial lines, creating an "unusual shape," *id.* ¶ 42, part of which stems from the Council's race-

based rejection of Killingsworth's proposal to smooth the borders, *see supra* at 16–18. It splits Precinct 205 along racial lines. Austin Rpt. ¶ 39, tbls.3 & 4; *cf. Bethune-Hill II*, 326 F. Supp. 3d at 148 & n.21 ("starkly racial splits of [voting precincts] are persuasive evidence of the predominant use of race"). The racial divisions and unusual shape "provide evidence of a purposeful drawing of district lines to pack Black voters into District 7 and reduce their population in District 2." Austin Rpt. ¶ 42.

The border between Districts 7 and 14 also follows racial lines. Precinct 713 in District 7 is 45.5% BVAP, while Precinct 1415 in District 14 is 4.9% BVAP. *Id.* ¶ 45. "The location of this border indicates . . . [a] split so that District 14's Black population would be smaller than District 7's." *Id.* ¶ 46.

District 9 snakes from the Urban Core nearly to Jacksonville's southern border. For a substantial length, it is only one precinct wide. This is attributable to race. *Id.* ¶¶ 26, 28, 51. The border between Districts 9 and 14 cuts along racial lines, with relatively Black areas placed in District 9 and relatively white areas placed in District 14; the precincts on District 9's side of the line tend to have higher BVAPs than those on District 14's side of the border. *Id.* ¶¶ 51–52, tbls.8 & 9.



*Id.* figs.5 & 8 (precincts along 9/14 and 10/12 borders shaded by BVAP percentage).

District 10 is also bizarrely shaped; some have compared it to a seahorse.[19] Like its District 9 neighbor, District 10 is often one precinct wide as it winds from the Urban Core toward the southern city limits. *See id.* figs.1 & 2. This bizarre shape is attributable to race. *Id.* ¶¶ 27–28, 31. Precincts on District 10's western border tend to have higher BVAP proportions than neighboring districts in District 12. *Id.* tbls.10 & 11; *see also id.* ¶ 31 (using 10/12 border as exemplar of racial divisions). The border divides adjacent precincts along racial lines, "drawn in a way to separate Black and White voters in packed and stripped districts." *Id.* ¶¶ 57–60.

Throughout north and west Jacksonville, the boundaries between Packed and Stripped Districts divide Black residents from white residents with surgical precision.

---

[19] *See, e.g.*, Andrew Pantazi, *City Council District 10: Open Race Brings Five Candidates Focused on Kids Issues*, Fla. Times-Union (Feb. 22, 2019), https://www.jacksonville.com/story/news/politics/elections/local/2019/02/22/5843780007/.

This is by design. There is "no evidence that any factor influences these district lines other than race." *Id.* ¶ 63.

### b. *Algorithmic Evidence Confirms Race Predominated*

The expert report of Dr. Kosuke Imai further shows that race predominated. Dr. Imai used a redistricting algorithm to assess whether race was a significant factor in the creation of the Challenged Districts.[20] ECF 34-19 (Imai Rpt.) ¶ 2. The algorithm combined geography and demography to sample, at random, ten thousand lawful ways in which Jacksonville could be divided into fourteen Council districts ("simulated plans"). *Id.* ¶¶ 2–3. Dr. Imai programmed the algorithm to *include* all the non-racial factors the Council claims informed the Enacted Plan, but to *preclude* any consideration of race beyond what is necessary to comply with Section 2 of the VRA.[21] *Id.* ¶¶ 21–23. This is instructive, because when an enacted plan's districts "unusually treat[ ] particular racial groups in a certain way . . . *when compared to* the set of simulated plans, this serves as empirical evidence that the enacted plan was likely drawn using race as a significant factor." *Id.* ¶ 16; *cf. League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-65, slip op. ¶ 124 (Jan. 12, 2022) ("The fact that

---

[20] Over the past two redistricting cycles, many courts have considered simulated maps randomly generated by computer algorithms to help assess gerrymandering claims. *See* Imai Rpt. ¶ 39 & n.6; *see also, e.g.*, *Singleton v. Merrill*, No. 2:21-cv-1291-AMM, 2022 WL 265001 (N.D. Ala. Jan. 24, 2022) (subsequent history omitted); *Harper v. Hall*, 868 S.E.2d 499, 553 (N.C. 2022) (same).

[21] Where VRA compliance is the State's compelling interest, narrow tailoring usually takes the form of a "functional analysis of the electoral behavior within the particular . . . election district" that shows that the concentration of minority voters was necessary to ensure an opportunity to elect their candidate of choice. *Bethune-Hill I*, 137 S. Ct. at 801. Consistent with best practice, Dr. Imai conducted a racially polarized voting analysis to determine VRA compliance. His report is thus probative of both racial predominance and a lack of narrow tailoring.

the adopted plan is an outlier among 5,000 simulated plans is strong evidence that the plan's result was by design."); *Easley*, 532 U.S. at 249 (alternative districts that satisfy non-racial criteria can be probative of predominance).

The algorithm's results diverge from the Challenged Districts in several key respects, demonstrating that race was a significant factor in drawing those districts. If the Challenged Districts had *not* been drawn based on race, their racial makeups would resemble those of the corresponding simulated districts. *See* Imai Rpt. ¶ 26. But they do not.

Many of the Challenged Districts are in fact racial outliers compared to the corresponding simulated districts. *Id.* ¶¶ 27–31 & fig.2. Consistent with standard practice, Dr. Imai matched each district in each simulated plan to an enacted district, based on its BVAP percentage relative to other districts.[22] *Id.* ¶ 27 & fig.2. The results show three of the four Packed Districts "have much higher BVAP proportion[s] under the enacted plan than the simulated plans." *Id.* ¶ 29. Enacted Districts 9 and 10 have a higher BVAP percentage than *any* of their ten thousand corresponding districts, while only 3.6% of corresponding districts have a higher BVAP percentage than District 7. *Id*. In other words, when the Council's non-racial criteria are accounted for, and race isn't a factor beyond what is necessary for VRA compliance, essentially no districts will pack Black voters as much as Districts 7, 9, and 10. These facts led Dr. Imai to

---

[22] So, for example, District 7 has the second-highest BVAP percentage among Enacted Districts, and Dr. Imai compares it to the simulated district with the second-highest BVAP percentage in each simulated plan.

conclude that "Districts 9 and 10 of the enacted plan are clear outliers in terms of their BVAP proportions while District 7 is also unusual with comparison to the simulated plans," indicating that "a disproportionately large number of Black voters are unnecessarily packed into these districts in comparison with the simulated plans." *Id*.

That dynamic is mirrored in a pair of the Stripped Districts, because the "packing of Black voters . . . leads to unusually low BVAP proportions" in adjacent districts. *Id*. ¶ 30. Specifically, Districts 2 and 12 are statistical outliers. *None* of the ten thousand corresponding districts have a lower BVAP percentage than District 2, and District 12 has a lower BVAP than all but sixty-six of its ten thousand corresponding simulated districts. *Id*. Put another way, unless race played a dominant role, neither district would be expected to have as few Black residents as it does in the Enacted Plan.

Further, "there is a wide gap in BVAP proportion" in the Enacted Plan between the Packed Districts and the next-highest BVAP district. *Id*. ¶ 31. "[N]o such gap exists under the simulated plans," which feature "BVAP proportion more smoothly changing" across districts. *Id*. This discrepancy "present[s] clear evidence that race played a significant role in determining these relevant district boundaries of the enacted plan" beyond the Council's stated purposes. *Id*. Otherwise, the difference in BVAP between the four Packed Districts and the district with the next-highest BVAP wouldn't be so dramatic.



**Difference between Enacted and Simulated**

BVAP % difference
−20%  0%  20%

*Id.* fig.4.

Dr. Imai also conducted a "dislocation analysis," which "identifies the areas of Jacksonville where Black voters are affected most by the enacted plan in comparison with the simulated plans." *Id.* ¶ 26. The Enacted Plan places each of Jacksonville's voting precincts (or portion thereof, in the case of split precincts) into one district or another. Dr. Imai's algorithm assigned each of these precincts (or portion thereof) to a single district in each simulated plan. *Id.* ¶ 32. Together, the ten thousand simulated plans reveal details of the type of *district* in which each precinct is likely to be contained. Dr. Imai compared this information to where each precinct is *actually contained* in the Enacted Plan. *Id.* If the Enacted Plan places a precinct into a district with a different

racial makeup than one would expect based on the simulations, that suggests *where* the impermissible racial motivation occurred. The image above shows the differences. Darker purple indicates the Enacted Plan places a precinct into a district with a whiter population than one would expect based on simulations. Darker tan, meanwhile, indicates the opposite—a precinct's placement in the Enacted Plan is in a higher-BVAP district than one would expect based on the simulations.

Each of the Challenged Districts includes precincts that the simulated plans usually place into districts with substantially different racial makeups. In District 2, precincts bordering District 7 are usually part of higher-BVAP districts in the simulated plans—it is improbable for them to be in a district as white as District 2. *Id.* ¶ 36. By contrast, in the simulations, the border precincts of District 7 are usually in whiter districts. *See id.* Precincts throughout District 14 (and especially in its northern portion) are in a far lower-BVAP district than they tend to be in the simulated plans. *See id*. ¶¶ 34, 37. The southern appendages of Districts 9 and 10, meanwhile, are in far *higher*-BVAP districts than in the simulated plans, reflecting stripping Black residents from Districts 12 and 14 to pack them into Districts 9 and 10. *Id*. ¶ 37 (results "in part because Districts 9 and 10, which are highly noncompact, pack Black voters, lowering the BVAP proportion of District 14 under the enacted plan"). The western portion of the map reveals similar evidence of race-based decision-making: across the simulations, residents of District 12 tend to be in higher-BVAP districts than in the Enacted Plan, while residents of District 8's western portion tend to be in whiter districts. *Id.* ¶¶ 33–34. *Accord* ECF 34-18 (Austin Rpt.) ¶¶ 39–44 (race determined 7/2

border), ¶¶ 45–46 (northern part of 14), ¶¶ 47–53 (southern parts of 9 and 10).

Put simply, a significant number of residents of each Challenged District are placed in a district with a different racial makeup than one would expect based on the Council's stated non-racial criteria (and VRA compliance). This doesn't happen across the St. Johns River, where residents tend to live in districts with racial makeups that align with what one might expect based on the simulations. *See* Imai Rpt. fig.4. That dissonance indicates that race played a role in shaping the Challenged Districts. Otherwise, the dislocation analysis in north and west Jacksonville would resemble that of south and east Jacksonville.

All told, Dr. Imai's report shows that among ten thousand alternatives to the Enacted Plan, most perform better on the Council's stated criteria while (1) including a lower Black population in several Packed Districts, (2) including a higher Black population in several Stripped Districts, and (3) complying with VRA. "[T]he enacted plan significantly departs from the simulated plans with respect to how Black voters are distributed across different districts, . . . constitut[ing] evidence of racial gerrymandering." *Id.* ¶ 26; *see also id.* ¶ 4 ("race played a significant role beyond the purpose of adhering to the traditional and other redistricting criteria").

Taken together, the evidence here demonstrates adherence to "announced racial target[s] that subordinated other districting criteria and produced boundaries amplifying divisions between blacks and whites." *Cooper*, 137 S. Ct. at 1469. Under similar circumstances, the Supreme Court observed that a factfinder "could hardly have concluded anything but" racial predominance. *Id.* For ease of analysis, Plaintiffs

categorize the evidence by Challenged District below:

| | 2 | 7 | 8 | 9 | 10 | 12 | 14 |
|---|---|---|---|---|---|---|---|
| Explicit racial targets for Black population of district | | X | X | X | X | | |
| Rejected proposals that would have reduced Black population percentage in Packed District, or increased percentage in Stripped District | X | X | X | | | X | |
| Race prevailed over core preservation | X | X | X | | | X | |
| Mathematically among the least compact half of all 14 districts | X | X | X | X | X | | X |
| More, or as many, neighborhood splits than any unchallenged district | X | X | X | X | X | X | X |
| Bizarre shape | X | X | X | X | X | X | X |
| Borders follow racial lines | X | X | X | X | X | X | X |
| Outlier district in Dr. Imai's outlier analysis | X | X | | X | X | X | |
| Outlier population in dislocation analysis | X | X | X | X | X | X | X |

## B. The Use of Race Does Not Satisfy Strict Scrutiny

Plaintiffs are substantially likely to prevail on the merits because Defendants cannot prove that the Council's race-based sorting of voters is narrowly tailored to a compelling interest. The Supreme Court "has long assumed that one compelling interest is compliance with the Voting Rights Act," *Cooper*, 137 S. Ct. at 1464, which was the Council's apparent interest here. To survive strict scrutiny, Defendants must prove the Council "had 'a strong basis in evidence' for concluding that the [VRA] required its action." *Id.* (quoting *ALBC I*, 135 S. Ct. at 1274).

Defendants had no strong basis here. The City Council failed to conduct any type of "functional analysis of the electoral behavior within the particular . . . election district[s]" to ensure Black candidates of choice could usually prevail. *Bethune-Hill I*, 137 S. Ct. at 801. Nor is there anything else in the record resembling "a strong showing

of a pre-enactment analysis with justifiable conclusions." *Abbott*, 138 S. Ct. at 2335.[23]

Instead, the Council set arbitrary racial thresholds and declined to perform *any* assessment of VRA compliance—let alone the "strong basis in evidence" necessary to show its use of race was narrowly tailored to comply with the VRA. Priestly Jackson admitted as much moments before the full Council passed the Enacted Plan:

> I don't know what [ ] percentage is needed to ensure that the voters in District 10 are able to actualize their preference, but I'm going to assume that since they had not complained to me about it, that it was not an issue. So my philosophy was to do no harm. Do no harm.

ECF 34-17 (3/22/22 Tr.) 159:12–17.

"Strict scrutiny requires much more" than an "uncritical" assumption free of "other evidence or analysis." *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1249 (2022); *see also id.* (insufficient tailoring where mapmaker conducted far more VRA analysis than the Council but "cannot say for certain"); *Navajo Nation*, 929 F.3d at 1282 (failure to satisfy strict scrutiny where there was "no evidence that . . . the county ever attempted to determine what § 2 required"). The Council fell far short of that bar.

To the extent the Council was ignorant of its obligations, that ignorance was willful. At every Rules Committee Public Hearing, commenters, including several

---

[23] Under certain circumstances, Section 2 requires the creation of districts in which minority voters have an equal "opportunity . . . to elect representatives of their choice." 52 U.S.C. § 10301(b). The minority population must be "sufficiently large and geographically compact to constitute a majority in a single-member district" and "politically cohesive," and white voters must vote "sufficiently as a bloc" to usually "defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 46–51. Here, the City assessed neither compactness nor racial polarization nor what racial percentages are necessary for minority voters to have the opportunity to elect their preferred candidates.

Plaintiffs, expressed concern about packing and even told the Council it risked violating the Constitution if it did not meaningfully assess the level of Black population necessary to achieve VRA compliance. ECF 34-3 at 65, 71–72, 78, 83–84 (public hearing minutes). Several Plaintiffs commissioned a racially polarized voting analysis and report that examined fourteen recent citywide elections. ECF 34-28 (McCoy Decl.) Exs. A–B. It indicated that the Packed Districts' Black population proportions far exceeded what was necessary for Black voters to have the opportunity to elect their preferred candidates. *See generally id*. Ex. B.

In other words, not only did the Council lack "good reasons" or a "strong basis in evidence" to conclude the VRA required its packing of Black voters, *Cooper*, 137 S. Ct. at 1464; it had "good reasons" to know the *opposite*—that the Packed Districts' Black population percentage exceeded what was necessary to comply with the VRA.

Plaintiffs are therefore substantially likely to succeed on the merits of their racial gerrymandering claim. As set forth above, there is myriad "direct evidence of legislative intent," and "circumstantial evidence of [ ] district[ ] shape and demographics," to establish the Council's predominant and unjustified racial motive. *Id.* at 1464 (quotation marks omitted). Between the racial targets, laser-like focus on race, disregard for traditional criteria, and clear divisions by race between Packed and Stripped Districts, there can be no doubt that race predominated here, and its use was not narrowly tailored to achieve a compelling interest.

## II. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

"Racial classifications with respect to voting carry particular dangers," *Shaw I*,

509 U.S. at 657, and Plaintiffs will suffer irreparable harm if elections are held under the Enacted Plan. Plaintiffs will be sorted into districts resembling "political apartheid." *Id*. at 647. And officials elected under the lines will be "more likely to believe that their primary obligation is to represent" only one racial group "rather than their constituency as a whole." *Id.* at 648. These are serious, irreparable harms.

Plaintiffs seek no less than their fundamental right "to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). "Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance." *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1348 (N.D. Ga. 2015).

### III. The Balance of The Equities Weighs in Favor of Plaintiffs and Injunctive Relief is in the Public Interest

The irreparable harm Plaintiffs face outweighs any burden an injunction might create for the City, and an injunction is in the public interest. The Supervisor of Elections' office can administer the March 2023 elections if it has district lines by December 16. *See* ECF 24-1. And "cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest," *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005), and allowing elections to proceed under unconstitutional lines "would be harmful to the public's perception of the election's legitimacy," *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). The public "has no interest in enforcing an unconstitutional law." *Scott v.*

*Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010). The balance here is not a close call.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction.

Respectfully submitted this 22nd day of July, 2022,

*/s/ Daniel J. Hessel*

Nicholas Warren (FBN 1019018)
**ACLU FOUNDATION OF FLORIDA, INC.**
336 East College Avenue, Ste. 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
**ACLU FOUNDATION OF FLORIDA, INC.**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Daniel J. Hessel*‡
Ruth Greenwood*
Theresa J. Lee*
Nicholas Stephanopoulos*
**ELECTION LAW CLINIC**
**HARVARD LAW SCHOOL**
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
dhessel@law.harvard.edu
rgreenwood@law.harvard.edu
thlee@law.harvard.edu
nstephanopoulos@law.harvard.edu

Krista Dolan (FBN 1012147)
Matletha Bennette (FBN 1003257)
**SOUTHERN POVERTY LAW CENTER**
P.O. Box 10788
Tallahassee, FL 32301-2788
(850) 521-3000
krista.dolan@splcenter.org
matletha.bennette@splcenter.org

Bradley E. Heard*
Jack Genberg*
**SOUTHERN POVERTY LAW CENTER**
150 East Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org

*Attorneys for Plaintiffs*

* *Special admission*    ‡ *Federal practice only*