**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

JACKSONVILLE BRANCH
OF THE NAACP, *et al.*,

    *Plaintiffs*,

                                Case No. 3:22-cv-493-MMH-LLL

v.

CITY OF JACKSONVILLE, *et al.*,

    *Defendants*.

                                      /

**PLAINTIFFS' BRIEF ON INTERIM REMEDIAL PROCESS**

In accordance with this Court's July 8 Order from the bench, Plaintiffs submit this brief in support of their Motion for Preliminary Injunction (ECF 36) regarding the interim remedial process following a ruling on that motion. A proposed order on Plaintiffs' proposed interim remedial process is attached.

**INTRODUCTION**

If the Court grants Plaintiffs' Motion for Preliminary Injunction, finding it substantially likely that one or more of the Challenged Districts will be found to be racially gerrymandered after trial, Plaintiffs sincerely hope the Jacksonville City Council will take its Fourteenth Amendment obligations seriously. Ideally, the Council will pass an interim remedial plan that places Individual Plaintiffs and Organizational Plaintiffs' members in districts that conform to the Constitution. Righting its wrongs is the Council's prerogative, and if successful, the Council will spare the Court the "unwelcome obligation" of having to draw a map itself. *Perry v.*

1

*Perez*, 565 U.S. 388, 392 (2012).

But time is of the essence. "[I]ndividuals . . . whose constitutional rights have been injured by improper racial gerrymandering have suffered significant harm. Those citizens are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (internal punctuation and citations omitted), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017). "[I]t would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under" a map held (or likely to be held) constitutionally invalid. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). The simplest way to ensure appropriate relief here is to have a Court-approved interim remedy by December 16—the date by which the City has said it needs a map in place to hold elections without disruption. *See* ECF 24-1.

As such, Plaintiffs propose that the Court:

1. Set a three-week deadline for the Council to act after an Order granting a preliminary injunction;

2. If the Council passes an interim remedial plan: Permit Plaintiffs an opportunity to object to the Council-passed interim remedial plan, if necessary, in the form of a brief and evidentiary submissions due nine days after the Council's submission, with a reply from Defendants due seven days later;

3. If the Council fails to pass an interim remedial plan: Permit the Parties

to submit one or more proposed interim remedial plans, with supporting

briefs, due no later than nine days after the Council's submission deadline

passes, with simultaneous responses due seven days later.

This schedule gives the Council ample time to act and is generous to Defendants relative to what other courts have done in similar situations. But it also allows time for the Court to step in if the Council fails to pass an interim plan that fully addresses the Court's preliminary injunction Order. Plaintiffs discuss this proposed interim remedial process and other options the Court might consider in further depth below.

## ARGUMENT

### I. Overview of Remedial Principles

"When a federal court declares an existing apportionment scheme unconstitutional, it is . . . appropriate . . . to afford a reasonable opportunity for the legislature to . . . adopt[ ] a substitute measure." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). But this rule has exceptions. First, when an imminent election makes it "impractical" for the legislature to act in time to pass an interim remedial plan, it is appropriate for a court to step in and do so. *Id*. Second, where the legislature has been so intransigent that it is unlikely to make a good-faith effort to craft an interim remedial plan, a court may do so to protect its authority. *See, e.g.*, *Hays v. Louisiana*, 936 F. Supp. 360, 372 (W.D. La. 1996).

Independently and when read together, the two exceptions reflect an important principle to guide the Court: although the legislature should have a "reasonable opportunity" to pass "a substitute measure," *Wise*, 437 U.S. at 540, that is true only

3

insofar as the legislature can meaningfully craft an interim remedy in time to right its wrongs. A court can and should assert itself where time is of the essence and/or there is "no real hope that further deference to the legislature . . . would yield any result other than continued protection of some members' self-interests to the exclusion of minorities' rights." *Terrazas v. Slagle*, 789 F. Supp. 828, 838–39 (W.D. Tex. 1991), *aff'd sub nom. Richards v. Terrazas*, 505 U.S. 1214 (1992), and *aff'd*, 506 U.S. 801 (1992). Here, according to Defendants, an interim remedy should be in place by December 16 to avoid disrupting the administration of the March 2023 elections. ECF 24-1.

## II. A Three-Week Deadline for Council Action is Appropriate

Plaintiffs do not contend that either the impracticability or intransigence exception applies in full force. It would be appropriate for the Court to allow the Council an opportunity to pass an interim remedial plan. That said, Plaintiffs respectfully request that the Court set a firm timeline and monitor the Council's "second bite at the apple" with a wary eye. The Council's public statements and past record suggest it might be unwilling or unable to act in time.

First, there is some indication the Council believes it may be "impractical" for it to act in time to meet the December 16 deadline. *Wise*, 437 at 540. Defense counsel has represented to Plaintiffs that, unless otherwise directed by the Court, Defendants would proceed to draw any new district lines in accordance with the procedures and requirements laid out by the City Charter, Ordinance Code and Florida law. Adhering to "the traditional process" in the Charter and ordinances "could take up to three months." ECF 27 (July 8, 2022, Hr'g Tr.) 14:12–14. *See also* Andrew Pantazi, *Voting-*

*Rights Groups Will Ask Judge to Toss City Council Districts Before 2023 Elections in Jacksonville Redistricting Lawsuit Case*, TRIBUTARY (July 11, 2022, updated July 12, 2022), https://jaxtrib.org/?p=2673 (councilmember statements regarding months-long process).

Second, there is ample evidence indicating the Council knew it was passing a racially gerrymandered map and proceeded anyway. *See* ECF 36 ("PI Br.") at 2 & n.2 (Councilmember Priestly Jackson acknowledging packing and Vice Chair Becton raising concerns about use of race); *id.* at 32–33 (noting that Council was warned at every public meeting that it risked racial gerrymandering); ECF 34-14 (10/28/21 Tr.) at 22:16 (Becton explaining Council was "grandfathered" in treatment of Packed Districts); *see also* PI Br. at 6 (noting community complaints in 2011). Plaintiffs do not contend that the Council's record rises to the level of intransigence present in *Hays* or *Terrazas*, but it is less than ideal. These two factors—the Council's apparent skepticism of its ability to act in time absent explicit Court direction and its dogged attachment to racially gerrymandered districts—give Plaintiffs pause about whether the Council will take seriously any interim remedial process.

Plaintiffs therefore propose that the Court set a deadline of three weeks from entry of an Order for the Council to pass and submit an interim remedial plan. This timeframe is longer than what other courts have given legislatures to craft *statewide* interim redistricting remedies. *See, e.g.*, *Harris*, 159 F. Supp. 3d at 627 ("[T]he Court will require that new districts be drawn within two weeks of the entry of this opinion."); *Singleton v. Merrill*, No. 2:21-cv-1291, 2022 WL 265001, at 81 (N.D. Ala.

Jan. 24, 2022) (two-week deadline balanced the legislature's "limited opportunity to enact a new map" with urgency of the forthcoming election after "Defendants [had] express[ed] some doubt as to whether the state [would] be able to draw a map that can garner sufficient support in two legislative chambers and secure the governor's signature given the time exigencies"), *probable jurisdiction noted and stay granted on other grounds sub nom. Merrill v. Milligan*, 142 S. Ct. 879 (2022);[1] *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004) (twenty days). *See also Calvin v. Jefferson Cnty. Bd. of Comm'rs*, 172 F. Supp. 3d 1292, 1326 (N.D. Fla. 2016) (sixteen days); *Vieth v. Pennsylvania*, 195 F. Supp. 2d 672, 679 (M.D. Pa. 2002) (twenty-one days); *United States v. Osceola Cnty.* (*Osceola Cnty. I*), 475 F. Supp. 2d 1220, 1235 (M.D. Fla. 2006) (thirty-five days); *Johnson v. Mortham*, 926 F. Supp. 1460, 1494 (N.D. Fla. 1996) (thirty-five days, but Legislature passed plan in fifteen).

A three-week timeframe will allow the Council to make a good-faith attempt to pass an interim remedy, including meaningful public input, while preventing delay that subverts the Court's Order. The task is achievable. Council rules anticipate and allow for emergency legislation where "time is of the essence and a delay in passage will thwart the purposes of the measure and the public interest." Rules of the Council

---

[1] The Supreme Court stayed that order, but nothing about that stay undermines the propriety of a two-week deadline. The Court's decision in *Milligan* turned on the so-called *Purcell* doctrine. 142 S. Ct. at 880 (Kavanaugh, J., concurring). The factors supporting the stay are not present here because the Supervisor of Elections has confirmed he will be able to run elections in the ordinary course so long as a remedy is in place by December 16. ECF 24-1.

Ch. 3, Part 9 (July 26, 2022).[2] For example, when councilmembers Reggie Gaffney

and Garrett Dennis submitted resignations on May 23, 2022, the Council used these

powers to introduce and pass legislation the very next day, calling special elections

with candidate filing to begin twenty days later. Resol. 2022-427-A.[3] The Council is

plainly able to move quickly when needed. And "the [Council] has been on notice

since at least the time that this litigation was commenced months ago (and arguably

earlier) that a new map might be necessary." *Singleton*, 2022 WL 265001, at 81; *see*

ECF 34-16 (3/15/22 Tr.) 38:6–7 (Councilmember DeFoor: "If there is a lawsuit,

which I suspect there might be on these maps, will we prevail?").[4]

A lengthier timeframe up to three months,[5] meanwhile, is more akin to what

courts have permitted when there are no imminent elections and no need for a

preliminary interim remedy. *See, e.g.*, *Bethune-Hill v. Va. State Bd. of Elections*, 326 F.

---

[2] *Available at*:
http://apps2.coj.net/City_Council_Public_Notices_Repository/Council%20Rules%20upda
ted%207.26.2022.pdf.

[3] *Available at*:
https://jaxcityc.legistar.com/LegislationDetail.aspx?ID=5661653&GUID=E2CCC0CA-
84DB-41F2-868E-68A8F3478241. The Council has considered over two dozen pieces of
emergency legislation so far this year.

[4] Observers of Jacksonville politics anticipated the lawsuit at least as early as February, when
several Plaintiffs notified the Council of the illegality of its proposal. Andrew Pantazi, *Activists
Warn of 'Legal Action' if City Council Keeps Jacksonville Redistricting Map*, TRIBUTARY (Feb. 14,
2022), https://jaxtrib.org/?p=1560. At that time, the City's Litigation Director began
preparation for the suit, according to an email apparently procured through a public records
request. Andrew Pantazi, *Jacksonville Sued for Council's Alleged Racially Gerrymandered
Redistricting*, TRIBUTARY (May 3, 2022), https://jaxtrib.org/?p=2280.

[5] To the extent that the Council believes courts typically allow legislatures to set their own
schedules after finding them liable (or likely liable) for constitutional violations, the cases cited
in this brief should make clear that's not the case. And nothing is stopping the Council from
beginning to prepare *now* for a potential interim remedial process (by, for example, conducting
an analysis to narrowly tailor the use of race in an interim plan).

Supp. 3d 128, 181 (E.D. Va. 2018) (four months when next elections over eleven months away); *Page v. Va. State Bd. of Elections*, No. 3:13-cv-678, 2015 WL 3604029, at 18 (E.D. Va. June 5, 2015) (three months when next elections over twelve months away); Order, ECF 327, *Ala. Legis. Black Caucus v. Alabama*, No. 2:12-cv-691 (M.D. Ala. Feb. 10, 2017) (approving parties' joint proposal of deadline four months from entry of liability order when elections over a year away). Moreover, something like an up-to-three-months timeline assumes the Council must pass an interim remedial plan following the same process the City Charter outlines for normal decennial redistricting. ECF 27 (July 8, 2022, Hr'g Tr.) 14:14; *see* Charter §§ 5.02(a), 13.03. But by their express terms, those Charter provisions govern redistricting only "[w]ithin 8 months after publication of each official federal census"—a timeframe which expired last April—not redistricting done to comply with orders of the federal courts enforcing the U.S. Constitution.

Additionally, waiting months would push the process beyond the December 16 date Defendants have indicated should guide the interim remedial phase of this case. Defendants have claimed that a delay past December 16 would undermine their ability to administer the March 2023 election, creating potential *Purcell* problems, unnecessarily complicating the case, and constraining the Court's ability to enforce an injunction. *See generally Purcell v. Gonzalez,* 549 U.S. 1 (2006).

And while some councilmembers have apparently told the press they need more time to engage the public, *see* Pantazi (July 11, 2022), *supra* at 4–5, Plaintiffs respectfully ask the Court to consider the sincerity of any such request in the context

of the Council's past behavior. In both 2011 and 2022, the public repeatedly lodged objections to the Packed Districts. *See* PI Br. at 6, 32–33. The Council ignored them. Councilmembers had countless opportunities to treat public input with the care and solemnity it deserved. They squandered each one, treating public comment as a box-checking exercise. Three weeks is enough time to meaningfully engage the public given the urgency of the election schedule and the imperative to enjoin ongoing constitutional violations. The Court should not allow the Council to invoke public involvement to delay enforcement of its Order.

All told, a three-week deadline is an achievable one. If the Council takes its task seriously, it will be able to pass an interim remedial plan. The timeframe ensures that, if the Council either fails to act or acts insufficiently, the Court will have time to step in to ensure its preliminary liability findings are remedied on an interim basis.

### III. Any Interim Remedy Must Fully Cure the Racial Gerrymandering

If the Court finds that Plaintiffs are substantially likely to prevail on their claims that the Council racially gerrymandered any of the Challenged Districts, the Council's central obligation will be to fully respond to the Court's preliminary injunction Order. The Council cannot just tinker around the edges. It must draw interim remedial districts that either (1) are not predominately based on race or (2) use race in a narrowly tailored way to achieve compliance with Section 2 of the Voting Rights Act ("VRA").

Because there is no dispute in this case that Section 2 applies to Jacksonville, the Council will need to consider race to ensure that Black residents have an equal "opportunity . . . to elect representatives of their choice." 52 U.S.C. § 10301(b); *see also*

ECF 34-3 (Minutes) at 13, 76–78, 82 (noting need to comply with VRA). To demonstrate that its use of race is narrowly tailored to that goal, the Council must have "a strong basis in evidence" to believe Section 2 requires its action. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 801 (2017). Most likely, this will involve a "functional analysis of the electoral behavior within the particular . . . election district[s]," to indicate what racial percentages are necessary for minority voters to have the opportunity to elect their preferred candidates. *Id.* (citation omitted). But whatever route the Council chooses, it will need to show an "actual legislative inquiry" to "establish the need for its manipulation of the racial makeup of the district." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018) (punctuation omitted).[6] And the Council will need to tie the findings of its inquiry to the share of Black adults in each district designed to comply with the VRA. Where the proportion of Black adults in a remedial district exceeds what is necessary for Black voters to usually elect their preferred candidate, the Council will not be able to justify its use of race based on VRA compliance.[7]

---

[6] To the extent Defendants will raise concerns about the time it will take to conduct such an analysis, Plaintiffs note that they offered to make available details of a functional analysis in February. ECF 34-28 Ex. A (Letter from Jacksonville Branch of the NAACP, Northside Coalition, Harriet Tubman Freedom Fighters, and ACLU of Florida Northeast Chapter to Council). Plaintiffs would also be happy to provide to the Council details of Dr. Kosuke Imai's racially polarized voting analysis. *See* ECF 34-19 (Imai Rpt.).

[7] The Council used total population throughout the redistricting process when assessing the racial makeup of districts. Voting-age population (VAP) is more appropriate when narrowly tailoring the use of race because it involves those who are of voting age. *See Bartlett v. Strickland*, 556 U.S. 1, 12 (2009); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1289 (11th Cir. 2020); *see also* ECF 34-3 (Minutes) at 13 (OGC told Committee it should

Crucially, in crafting an interim remedy, the Council should not be permitted

to prioritize preserving the cores of invalidated districts (let alone minimizing changes

to them). Whatever virtue core preservation may have in the abstract, in this context,

embracing it would perpetuate the unconstitutional racial gerrymanders. *See Covington*

*v. North Carolina* (*Covington II*), 283 F. Supp. 3d 410, 433 (M.D.N.C.), *aff'd in part, rev'd*

*in part on other grounds*, 138 S. Ct. 2548 (2018); *Personhuballah v. Alcorn*, 155 F. Supp.

3d 552, 561 & n.8 (E.D. Va. 2016).

Beyond these points, the Council is entitled to use whatever non-racial criteria

it wants, so long as it complies with all federal, state, and local laws.

### IV. Process if the Council Passes an Interim Remedial Plan

If the Council passes an interim remedial plan, it will need to submit the plan

to the Court for approval. *See Mortham*, 926 F. Supp. at 1494 ("The Court will therefore

review the Florida Legislature's plan, if any is forthcoming, to determine whether it is

in compliance with federal law. If the Court determines that the plan is lawful, the

Court will authorize the plan's use on an emergency interim basis for the 1996

congressional elections."); *Whitest v. Crisp Cnty. Ga. Bd. of Educ.*, No. 1:17-cv-109, 2021

WL 4483802, at 5 (M.D. Ga. Aug. 20, 2021) ("The Court will . . . give the pertinent

---

use VAP to assess VRA compliance); ECF 34-8 (OGC Memo) at 3 (same). Additionally, in measuring the Black population of districts, the Council counted only those residents who identified as Black alone, ignoring those who identified as Black and other races. An appropriate functional analysis would include the latter. *See* Guidance Under Section 2 of the Voting Rights Act, at 12 (U.S. Dep't of Just. Sep. 1, 2021), https://www.justice.gov/opa/press-release/file/1429486/download; Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58,782 (Off. of Management and Budget Oct. 30, 1997).

elected officials an opportunity to craft an appropriate remedial plan within a reasonable timeframe that will allow the Court to review any such remedy to ensure compliance . . . .").

To help it assess any plan passed by the Council, the Court should order the submission of all records of the enactment process. *See, e.g.*, *Covington v. North Carolina* (*Covington I*), 267 F. Supp. 3d 664, 668–69 (M.D.N.C. 2017) (listing records to be filed with plan). In particular, Plaintiffs respectfully ask that the Court require the Council to disclose all files and data it uses to develop its interim remedial plan, including the "pre-enactment analysis with justifiable conclusions" regarding the use of race to satisfy the VRA. *Abbott*, 138 S. Ct. at 2335.

Plaintiffs note that evaluating the districts themselves—their shapes, demographics, compactness, neighborhood splits, and comparison to the ten thousand alternative plans discussed in Dr. Imai's report, *see* ECF 34-19—will likely be the best way to assess whether the Council complied with the Constitution in enacting an interim remedial plan. These details often provide powerful circumstantial evidence of racial predominance, *see* PI Br. at 18–31, and are all the more important after a preliminary liability finding. The Council has already tried to hide its use of race through rhetorical proxies. *See* PI Br. at 11–12. If the Council again tries to use race impermissibly, it may be more effective in obscuring its intentions.

In terms of process, Plaintiffs respectfully ask the Court for an opportunity to object to the Council-passed interim remedial plan, in the form of a brief due nine days after the Council's submission of a plan. If Plaintiffs believe the plan does not cure the

deficiencies, they would use this opportunity to explain why, provide analysis, and propose their own interim remedial plans. Plaintiffs suggest that Defendants could then reply within seven days. *See, e.g.*, *Covington I*, 267 F. Supp. 3d at 668–69; Order, ECF 327, *Ala. Legis. Black Caucus*, No. 2:12-cv-691 (M.D. Ala. Feb. 10, 2017); Order, ECF 56, *Calvin v. Jefferson Cnty. Bd. of Comm'rs*, No. 4:15-cv-131 (N.D. Fla. Apr. 8, 2016). *Cf. United States v. Osceola Cnty.* (*Osceola Cnty. II*), 474 F. Supp. 2d 1254, 1254–55 (M.D. Fla. 2006) (simultaneous briefing regarding enacted interim plan).

## V. Process if the Council Fails to Pass an Interim Remedial Plan

If the Council fails to enact an interim remedial plan (or if the plan insufficiently remedies the substantially likely constitutional violations identified in a preliminary injunction Order), this Court will face the "unwelcome obligation" of crafting a plan itself that either (1) does not have race predominate in any district's design or (2) ensures the use of race is narrowly tailored to VRA compliance. *Perry*, 565 U.S. at 392. The Supreme Court has explained that, in this event, "'a court, as a general rule, should be guided by the legislative policies underlying' a state plan—even one that was itself unenforceable—'to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act.'" *Id.* at 393 (quoting *Abrams v. Johnson*, 521 U.S. 74, 79 (1997)).

In this case, the applicable legislative policies can be found in the Council's own Statement of Methodology, ECF 34-2 at 13, and Bill Summary, *id.* at 57, as well as the laws they cross-reference, City Charter § 5.02(a) and Ordinance Code § 18.101(c). *See*

13

PI Br. at 7 (noting the Council's criteria were: compactness, contiguity, respect for communities of interest as defined in municipal law, incumbent protection, and minimizing river crossings).

The Court may approach the incumbent protection criterion cautiously at the interim remedial phase. As a general matter, "when incumbent protection has been considered, courts have routinely treated this principle as 'a *distinctly subordinate* consideration' to the other traditional redistricting principles." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1363 (N.D. Ga. 2014) (collecting cases); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440–41 (2006). Here, the Council's decision not to pair incumbents is intrinsically linked to the racially gerrymandered districts and the bizarre, non-compact boundaries they feature.[8]

In terms of process, courts have taken a variety of approaches when forced to draw interim remedial plans because a legislature either failed to act or acted insufficiently. They often weigh submissions from the parties and the public (commonly aided by evidentiary hearings). That's what this Court did in *United States v. Osceola County*, for example. *Osceola Cnty. II*, 474 F. Supp. 2d at 1256. *See also, e.g.*,

---

[8] Additionally, many incumbents are not seeking re-election due to term limits and other reasons. Even if the Court decides it is appropriate to consider incumbent protection in an interim remedial plan, that criterion should apply only to incumbents actually seeking re-election. This approach is consistent with the Council's own stated explication of the incumbent protection criterion. ECF 34-2 (Bill Summary) at 57 ("The Special Committee charged the department to craft districts based on . . . not drawing multiple incumbents in office into districts *where they would compete against each other for reelection*." (emphasis added)).

*Whitest*, 2021 WL 4483802, at 6; *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 219 F. Supp. 3d 949, 951 (E.D. Mo. 2016); *Smith v. Cobb Cnty. Bd. of Elections & Registration*, 314 F. Supp. 2d 1274, 1283–84 (N.D. Ga. 2002); Order, ECF 327, *Ala. Legis. Black Caucus*, No. 2:12-cv-691 (M.D. Ala. Feb. 10, 2017) (anticipating plaintiff submissions if legislature failed to act). Other courts have appointed "independent technical advisor[s]," *Fayette Cnty.*, 996 F. Supp. 2d at 1359, or special masters, *see, e.g.*, *Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872, 873 (E.D. Va. 2019); *Personhuballah*, 155 F. Supp. 3d at 556, to draw plans at their direction. Courts often order special masters to consider submissions from the parties and the public, *see, e.g.*, *Bethune-Hill*, 368 F. Supp. 3d at 873–74; *Personhuballah*, 155 F. Supp. 3d at 556, or to give the parties opportunity to object, *see, e.g.*, *Sumter Cnty.*, 979 F.3d at 1300. Courts have sometimes asked magistrate judges to issue reports and recommendations on plans, pairing that process with a special master or technical advisor. *See, e.g.*, *Favors v. Cuomo*, No. 11-cv-5632, 2012 WL 928223 (E.D.N.Y. Mar. 19, 2012).

In this case, Plaintiffs believe the best path forward is for the Court to weigh submissions from the parties, due nine days after the Council deadline passes, and to choose from among them. The Court will be best positioned to evaluate the extent to which submissions fully remedy the constitutional violations and otherwise satisfy federal, state, and local law as well as the Council's permissible discretionary choices. The Court will also be able to articulate the criteria that should inform an interim remedy based on its preliminary injunction Order, and the parties can submit plans

that conform to those guideposts. Should the Court decide it best to adopt part but not all of a party's submission, the parties are equipped to assist the Court by adjusting their submitted maps to conform to the Court's direction. In the alternative, Plaintiffs propose that the Court designate a special master or magistrate judge to assess party submissions and make a recommendation to the Court. Should the Court wish to take that route, Plaintiffs propose the Parties confer and recommend several potential special masters for the Court's consideration.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to set a three-week deadline following any preliminary injunction Order for the City Council to pass an interim remedial plan; require the Council to submit the plan for Court review; give Plaintiffs the opportunity to submit a brief and evidence objecting to the plan, if necessary, nine days after the Council's submission; give Defendants seven days to reply; and hold a hearing as appropriate.

Should the Council fail to submit an interim remedial plan by the deadline, Plaintiffs propose that the parties be allowed to submit one or more proposed interim remedial plans, with a supporting brief and analysis, nine days after the deadline passes, aided by a hearing, as appropriate.

Respectfully submitted this 5th day of August, 2022,

*/s/ Daniel J. Hessel*

Nicholas Warren (FBN 1019018)
**ACLU FOUNDATION OF FLORIDA, INC.**
336 East College Avenue, Ste. 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
**ACLU FOUNDATION OF FLORIDA, INC.**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Daniel J. Hessel* ‡
Ruth Greenwood*
Theresa J. Lee*
Nicholas Stephanopoulos*
**ELECTION LAW CLINIC**
**HARVARD LAW SCHOOL**
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
dhessel@law.harvard.edu
rgreenwood@law.harvard.edu
thlee@law.harvard.edu
nstephanopoulos@law.harvard.edu

Krista Dolan (FBN 1012147)
Matletha Bennette (FBN 1003257)
**SOUTHERN POVERTY LAW CENTER**
P.O. Box 10788
Tallahassee, FL 32301-2788
(850) 521-3000
krista.dolan@splcenter.org
matletha.bennette@splcenter.org

Bradley E. Heard*
Jack Genberg*
**SOUTHERN POVERTY LAW CENTER**
150 East Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org

*Attorneys for Plaintiffs*

* *Special admission*      ‡ *Federal practice only*

17