1

2

3

4

5

6                    CITY OF JACKSONVILLE, FLORIDA

7                     OFFICE OF THE CITY COUNCIL

8

9           SPECIAL COMMITTEE MEETING ON REDISTRICTING

10

11                MEETING HELD ON AUGUST 24, 2021

12                           2:00 p.m.

13                      117 West Duval Street

14           Lynwood Roberts Room, 1st Floor, City Hall

15                   Jacksonville, Florida  32202

16

17

18

19

20

21                    Meeting transcribed by:

22

23          LEAH P. MALTZ, RPR, RMR, FPR
            LPM COURT REPORTING, INC.
                  P.O. BOX 1595
24       ST. AUGUSTINE, FLORIDA  32085-1595
                  (904) 434-7593
25              lpmreporting@gmail.com

```
 1                    IN ATTENDANCE

 2

 3   Aaron Bowman

 4   Danny Becton

 5   Garrett Dennis

 6   Brenda Priestly Jackson

 7   Randy White

 8   Randy DeFoor

 9   Ju'Coby Pittman

10   Kelly Coker

11   Darryl Willie

12   Jeff Clements

13   Paige Johnston

14   Mary Margaret Giannini

15   Eric Grantham

16   Bill Killingsworth

17   Maritza Sanchez

18   Jerry Holland

19

20

21

22

23

24

25
```

```
 1                          - - -
 2          AARON BOWMAN:  Okay.  Good afternoon.  Let's
 3     go ahead and get started.  It's my understanding
 4     Council Member Priestly Jackson is on her way.
 5          Welcome to our second meeting.  And I want to
 6     welcome Councilwoman DeFoor and Councilwoman in the
 7     back there.  I don't see any other Council members.
 8     I certainly recognize White and Becton and our
 9     School Board members, Darryl Willie and Kelly
10     Coker.  So thanks for being here.
11          So just real quickly, what I want to do today,
12     is we will do public comments up front.  I do have
13     one public comment card.  And then I will turn it
14     over to Mr. Killingsworth.
15          And, Mr. Killingsworth, I will ask you if you
16     have any early aha moments on the data you looked
17     at.
18          And then the real purpose today is for us to
19     give guidance to Mr. Killingsworth, kind of what we
20     talked about, on what's important to us as he
21     starts drawing the start of lines.
22          And then we will take any comments from
23     obviously Board members.  And, Board Members, you
24     are welcome to interrupt me at any time, and I will
25     recognize you.
```

1          And then we will close and do that.

2          Before we get started, we have such a small

3     group here.  If we could do introductions, I'd

4     appreciate it.

5          We will start with you, Mr. Clements.  And

6     thank you for doing all of the minutes and getting

7     that updated.

8          JEFF CLEMENTS:  Jeff Clements, Council

9     Research.

10          PAIGE JOHNSTON:  Paige Johnston, Office of

11     General Counsel.

12          UNIDENTIFIED FEMALE:  (Unclear audio.)

13          DANNY BECTON:  Danny Becton, District 11.

14          AARON BOWMAN:  Aaron Bowman, District 3.

15          RANDY WHITE:  Randy White, District 12.

16          KELLY COKER:  Kelly Coker, School Board

17     member, District 1.

18          DARRYL WILLIE:  Darryl Willie, School Board

19     District 4.

20          BILL KILLINGSWORTH:  Bill Killingsworth,

21     Planning Director.

22          MARY MARGARET GIANNINI:  Mary Margaret

23     Giannini, Office of General Counsel.

24          AARON BOWMAN:  Welcome, Mary Margaret.

25          UNIDENTIFIED MALE:  Who, me?  (Unclear audio.)

1          JU'COBY PITTMAN:  Ju'Coby Pittman, District 8.

2          JERRY HOLLAND:  Jerry Holland, Duval County

3     Property Appraiser.

4          AARON BOWMAN:  And over to my right.

5          KIMBERLY MILLER:  Kimberly Miller, Duval

6     County Public Schools.

7          AARON BOWMAN:  All right.  Thank you.

8          And Council Member Priestly Jackson.

9          BRENDA PRIESTLY JACKSON:  Good morning, good

10    morning, and good afternoon.  I'm Brenda Priestly

11    Jackson, District 10.

12         AARON BOWMAN:  You weren't late, so you're

13    good to go.  Thank you.

14         All right.  With that we will go to public

15    comments.  Please come up to the microphone and

16    introduce yourself, Mr. Carnell Oliver.

17         CARNELL OLIVER:  Yes, Carnell Oliver.  The

18    address is on file.

19         One of the things that I have real big

20    heartburn as of right now is that there is a lack

21    of transparency in the information.  Now, if the

22    Planning Department already had these numbers

23    developed already, it should have been placed on

24    the COJ website.  That's just the beginning stages

25    for me as far as getting a better understanding on

1    redistricting.  But from moving forward to this
2    very point, everything needs to be transparent and
3    open, please.
4          And I yield the rest of my time.
5          AARON BOWMAN:  Thank you.
6          Our next speaker is Brooks Andrews.
7          BROOKS ANDREWS:  Good afternoon.  Brooks
8    Andrews, 3623 Pine Street, in the
9    Riverside/Avondale area.
10         Thanks for the opportunity to speak for just a
11   few minutes.  I don't want to belabor this, but I
12   would like to make a comment relative to our
13   district.  I am (unclear audio) for the
14   Riverside/Avondale Preservation.  Our district is
15   very very important as it relates to our historic
16   overlay.
17         Many of the issues that we experience across
18   our district, particularly Riverside/Avondale, to a
19   certain degree Ortega, Murray Hill, are very very
20   common issues.  When I say that, I'm speaking of,
21   you know, an infrastructure that has (unclear
22   audio) on it.  So we have our fair share of
23   flooding issues.
24         We have a very very critical responsibility
25   and advocacy responsibility to our neighborhood,

1    our community, our merchants as it relates to the

2    historic fabric of our neighborhood.  And so

3    dealing with those issues and commonality of those

4    issues, as an advocate from Riverside/Avondale

5    Preservation, it's very very important that we keep

6    that district -- at least the historic fabric, the

7    inner portion of that district -- together as we go

8    forward from a redistricting perspective.

9        So thank you.  Thank you for your time this

10   afternoon.

11       AARON BOWMAN:  Okay.  All right.  Mr.

12   Killingsworth, over to you.  What have you

13   discovered in a week here?

14       BILL KILLINGSWORTH:  A week, Mr. Chairman?  I

15   think it's more like three working days.

16       AARON BOWMAN:  Awe, come on now (laughing).

17       BILL KILLINGSWORTH:  All right.  Good morning,

18   Committee.  Bill Killingsworth, Director of

19   Planning and Development.  Actually, it's good

20   afternoon, isn't it?  Sorry.

21       I think the purpose here is, you know, that we

22   looked at some considerations for guidance the last

23   time.  And I kind of want to clarify that I used

24   the word "criteria" last time.  For me, I will

25   treat them as criteria.  If you say to don't cross

1    the river, then I'm not going to present you a map

2    that crosses the river.  However, for you they are

3    really just considerations.  It's things that you

4    want to consider.  As you look at it, it may be

5    that the end result of crossing the river produces

6    something that's not tenable for Council.

7         So it's not a criteria.  I don't want to

8    establish like it's a criteria in terms of on the

9    zoning side in sections where you have to meet it

10   by ordinance or otherwise you can't do it.  For you

11   it's just a consideration.  For me, I treat them as

12   a criteria.

13        I think there are four things that I really

14   wanted to get answers on.  So I'm going to make the

15   assumption that, to the extent possible, you want

16   compact, contiguous districts, that you want

17   incumbents within the districts, at least

18   particularly the incumbents that potentially have

19   the ability to run for reelection and these being

20   active.

21        But there are four things that I would like to

22   have some guidance on.  One of them is whether or

23   not to cross the river, whether or not you believe

24   the two sides of the river are distinct communities

25   of interest in and of themselves.

1     You need to make a decision on total

2     population versus voting-age population.

3     I assume, but I would like to know for a fact,

4     whether or not there's a desire to continue to

5     preserve the four historic communities of interest

6     that the City has had in the past.

7     And then there was a discussion of a starting

8     point.  Looking at the data, I'm indifferent to the

9     starting point at this time.  I'm not sure that

10    it's going to make much difference in my work flow,

11    but for you it may make a difference in terms of

12    how you want to see it.

13    So with that, Mr. Chairman, I would be happy

14    to entertain any discussion on any one of the four.

15    AARON BOWMAN:  Thank you.  And just for

16    clarification, Mr. Killingsworth, I think if we

17    divide the number by 14, we've got 71,107.  Right?

18    That should be our --

19    BILL KILLINGSWORTH:  For total population,

20    that's correct.

21    AARON BOWMAN:  Total population.

22    BILL KILLINGSWORTH:  If you are going to use

23    voting-age population, it would be 55,825.

24    AARON BOWMAN:  Okay.

25    BILL KILLINGSWORTH:  And I will point out that

1        if you use voting-age population, it comes out

2        almost exactly six districts north of the river and

3        eight districts south of the river.

4            If you use total population, then you get

5        basically six and four districts north of the

6        river, and seven-and-three-quarters districts south

7        of the river.

8            AARON BOWMAN:  Okay.

9            BILL KILLINGSWORTH:  So the mechanics of

10       making it balance becomes harder to total, but I

11       think it's doable either way.

12           AARON BOWMAN:  Okay.  And I think you kind of

13       mentioned, looking for General Counsel

14       confirmation, trying to get equal populations.  The

15       rough rule of thumb is plus or minus 10 percent?

16           BILL KILLINGSWORTH:  The courts have -- my

17       understanding -- and if I'm wrong OGC can jump

18       in -- but my understanding is the courts have

19       generally said if you are less than 10 percent,

20       that you are good.

21           So what I can tell you for total population,

22       assuming a 5-percent variance on either side, that

23       that would allow for the smallest district to be

24       67,551 and the largest district to be 74,662.

25           AARON BOWMAN:  Using total?

```
 1            BILL KILLINGSWORTH:  Using total population.
 2       The voting-age population will be a range of 53,034
 3       to 58,616.
 4            AARON BOWMAN:  Can you repeat those, Mr.
 5       Killingsworth?
 6            BILL KILLINGSWORTH:  Each of them?
 7            AARON BOWMAN:  Yes, please.
 8            BILL KILLINGSWORTH:  Okay.  So total
 9       population -- the target number would be 71,107.
10            The -- assuming a 5-percent spread on either
11       side of that target, the lower would be 67,552 if
12       you round up.  And then the upper boundary would be
13       74,662, if my eyes can see that far away.  Yes.
14            And then on voting age, if you're ready?
15            AARON BOWMAN:  Yes.
16            BILL KILLINGSWORTH:  Voting age, the ideal
17       population for a district would be 55,825.  The
18       lower range would be 53,074.  And the upper range
19       would be 58,616.
20            AARON BOWMAN:  Okay.  And just to -- and the
21       four issues, you said one was crossing the river?
22            BILL KILLINGSWORTH:  Crossing the river.
23            AARON BOWMAN:  The second was total versus the
24       population?
25            BILL KILLINGSWORTH:  Correct.
```

1          AARON BOWMAN:  And then I got a little fuzzy

2     on the third and fourth.  I think third was

3     maintaining historic communities?

4          BILL KILLINGSWORTH:  Correct.

5          AARON BOWMAN:  And what was the fourth one?

6          BILL KILLINGSWORTH:  And then the fourth one

7     was that there was some discussion about the

8     starting point, whether we should start from the

9     existing boundaries or whether we should just craft

10    from new.

11         In looking at the data, I'm ambivalent.  From

12    a work-flow position, I'm not sure that it will

13    make much difference.  From your position in terms

14    of seeing how it evolves, it may make a difference

15    to you.

16         AARON BOWMAN:  Well, I mean, I think we gave

17    you guidance on that last meeting, that we're going

18    to start with the --

19         BILL KILLINGSWORTH:  With the starting, yeah,

20    I think you're right.

21         AARON BOWMAN:  Okay.  With that, I'm just

22    going to recognize any of my fellow colleagues that

23    have other issues that we should consider, and we

24    will go through those one at a time and discuss

25    them.

1        BRENDA PRIESTLY JACKSON:  Thank you, Mr.

2    Chairman.  I think the only question I have

3    relative to the issues, one when you mentioned

4    about compactness and contiguous, and you said

5    "incumbents."  I just spoke to General Counsel.  My

6    understanding is that's not a criteria; that's a

7    consideration that has to be factored in.  So it's

8    not an optional thing.  And I think it's a bit more

9    than incumbents running for elective office.

10    If you change the boundary while someone is in

11    office, then you make them ineligible for their

12    seat while they are still in office, and our

13    statute requires continuous residency.

14    But the General Counsel can just chime in

15    there.  But I think that's important.

16    PAIGE JOHNSTON:  I'll take a shot at it, and

17    if I don't answer it correctly, Mary Margaret can

18    jump in or she can add more, because she actually

19    worked on the memo that Peggy had discussed last

20    go-around.

21    So, yes, there are a series of considerations,

22    like Bill had mentioned, that case law has

23    established our appropriate considerations.  And

24    Bill mentioned the river being one that fits into

25    the major physical-boundary analysis.

1        Schools, notable major structures, are other
2    types of considerations.
3        We have talked about incumbents.  You can look
4    at existing incumbencies as they represent
5    communities of interest, but there's not a mandate
6    that you have to keep an incumbent in office, I
7    don't believe.
8        Is that correct, Mary Margaret?
9    MARY MARGARET GIANNINI:  I think the other
10   thing is that there is no prohibition against
11   drawing lines that favor one party over another.
12   So to the extent we're talking about protecting a
13   party, the law does not prohibit that activity.
14       I think we discussed that to the extent that
15   there are genuine changes in population that would
16   warrant changing the lines of districts, that there
17   is still commission to ensure that we don't draw
18   someone out of their current status as a Council
19   person.
20   BRENDA PRIESTLY JACKSON:  So that's my
21   question.  I'm not talking about party.  I'm
22   talking about incumbency as an option or a
23   requirement.  If you don't know today, you are free
24   to go back and research it and come back.
25       Because my reading of incumbency was it had to

1    be factored in.  Because even if I was termed out

2    in 2023 or someone was termed out in 2024, at that

3    point we're going to propose boundaries for

4    redistricting that go into effect at that time,

5    even though they won't be on the next election in

6    2022.

7         Theoretically, if you drew an incumbent out of

8    their district and they are still in their elected

9    office, i.e. City Council or School Board, that

10   would then make them ineligible for the office

11   because Ordinance Code says continuance,

12   maintaining continuance residency for those

13   positions.

14        But if you want to look into that further, I

15   would -- I asked the question because I wanted us

16   to understand what we have as criteria to, you

17   know, negotiate and what we don't have as criteria.

18   My read and understanding is we don't have

19   incumbency as a criteria to negotiate.  City

20   Council and School Board must be in their districts

21   for this process.

22        AARON BOWMAN:  And, if I may -- and I

23   appreciate the question.  As I read the Charter,

24   you can't get drawn out of your district as a

25   sitting Council member, was the way I understood

1    it.  So, for example, if somebody was in office and

2    then we drew them out, and that was affected when

3    we voted it as a Council, they would still be able

4    to serve until the end of their term, is how I read

5    the Charter.

6         Now, a completely different discussion if

7    that's a good thing to do and the right thing to

8    do, but I think to address your question, the way I

9    read it is you can't get -- the Charter cannot --

10   the redistricting cannot discontinue your service

11   as an elected official until at least the next

12   time.

13        BRENDA PRIESTLY JACKSON:  And that's my

14   question.  That's my question.

15        PAIGE JOHNSTON:  So within the Charter there

16   is language.  I believe it's 18.108 for Council and

17   18.110 for School Board.  It speaks to not

18   affecting the current existing term.

19        But then for the -- when the redistricting

20   plan takes effect, it would obviously be toward --

21   it would take effect for those future terms.  So,

22   obviously, for someone who is in office in a

23   current term, it can't affect them, but it is

24   effective to the next term.  Mary Margaret and I

25   can look more into the incumbency question that you

1    asked.

2        And, again, the memo addresses what courts

3    have found permissible.  So we speak in a lot of

4    what is permissible or in negatives.  Like, you

5    cannot -- you know, courts have said you cannot do

6    this.  So, you know, by logical, you know,

7    attachment you say, well, you can't do this -- you

8    know, you can't do this, you can't do that.  So it

9    gets a little difficult, because sometimes the

10   exact question hasn't been answered, and we have to

11   kind of extrapolate from the case law what we think

12   is permissible.  And in some cases in the memo it

13   says we found you can do this.

14       So, again, incumbency has been a consideration

15   in the case law, but I don't know that it's been

16   specifically addressed to your point, and we will

17   do that research.

18       BRENDA PRIESTLY JACKSON:  Mr. Chairman, I

19   think it's important.

20       AARON BOWMAN:  Absolutely, and, of course,

21   we're going to talk about that criteria here

22   shortly.  So it might kind of be not applicable,

23   depending on what we decide.

24       Mr. Becton.

25       DANNY BECTON:  Thank you, through the Chair.

1    So one topic that we did discuss in our first

2    meeting, and we kind of got wrapped around that

3    axle, and it's causing us to think our schedules

4    and so forth, that I'm not sure the right

5    information was communicated for which I had a

6    discussion afterwards about.  I can't remember who

7    it was, but it was regarding the School Board races

8    in '22.  I'm guessing that follow-up conversation

9    that I had might have been maybe with Peggy, or

10   somebody, that in 2011 nor here in 2021 were the

11   School Board races the following year ever part of

12   the redistricting process, therefore would not be

13   part of the redistricting process whether we did

14   this last year or right now for next year.

15        So can we get to an answer on that that

16   everyone can be on the same page?  Because we

17   talked about expediting the process, and so forth,

18   because we have the School Board race this next

19   year kind of in our thought process.  But it was my

20   understanding in the conversations that I had that

21   that wasn't even the case in 2011 when they

22   finished in November.  The School Board race in '12

23   was not part of the redistricting.

24        Is that true?  Or what is (unclear audio)?

25        PAIGE JOHNSTON:  I think the information that

1    you were discussing is some research that Jeff

2    Clements had prepared.

3          Jeff, can you highlight what you found over

4    the prior Census?

5          JEFF CLEMENTS:  Yeah.  At the time of the last

6    meeting, I went back and looked at the last four

7    redistrictings in 2011, 2001, '91 and '81.  What I

8    was more concentrating on was how long did the

9    process take from the time that the Census data was

10   released until the Special Committee reported a

11   plan to the Council and then the Council adopted

12   the plan.  I did not specifically look at the

13   timing of the next School Board election.  I was

14   looking at the City Council election.

15         So I can tell you in 1981 the plan was adopted

16   in June of '82.  Clearly, it wouldn't have applied

17   to even-year elections that year.

18         In '91 the plan was adopted on November 4th of

19   '91.

20         In 2001 the plan was adopted on November 13th

21   of 2001.

22         And in 2011 it was adopted November 8, 2011.

23         DANNY BECTON:  And that's consistent with what

24   I know.

25         But the question in the room is:  Using 2011

1    as an example, were the School Board elections in

2    2012 part of that redistricting?  Can anybody

3    answer that question?

4         And if they were not, why not?  Because they

5    were finished in November of 2011; legislation was

6    passed, to your point.  But it's my

7    understanding -- and I think the conversation I had

8    was with Peggy after our meeting.  So she's

9    obviously not here and I can't --

10        PAIGE JOHNSTON:  She is not, but Jeff has the

11   information that she had.  So I don't think she

12   looked specifically --

13        DANNY BECTON:  Yes.  I mean, this was

14   specifically the 2022 school race.  We can find

15   out.

16        PAIGE JOHNSTON:  She is listening.  She is not

17   in the room right now, but she's listening.

18        DANNY BECTON:  She can check --

19        PAIGE JOHNSTON:  Yes, so I --

20        DANNY BECTON:  Was it you, Peggy?  And if it

21   wasn't you, then I guess we'll go to our School

22   Board colleagues and ask do you have information

23   that we're looking for?

24        KELLY COKER:  Off the top of my head, I was

25   with the district at the time, but I don't recall.

1        I'm looking, actually.  Board Member Priestly

2    Jackson was one of our School-Board-member

3    historians of record.

4        Anyway, we can go back to the office.  They do

5    keep all of that in the office, so we could

6    research it from our end.  I will remind the

7    Committee we have three that are up for election.

8    All of them are incumbents.  No one is terming out

9    at that point for next year.

10        DANNY BECTON:  Right, that was pointed out.

11    So if we don't have the answer, I think that's very

12    important that we get that.

13        BRENDA PRIESTLY JACKSON:  Yeah, I'm just

14    looking on Page 5 of the memorandum that was

15    originally prepared February 23, 2021, and that's

16    what I base my understanding of, of not being

17    applicable to the next Duval County School Board

18    elections, as it has historically been.

19        If you look at the bottom paragraph, it gives,

20    "Therefore, if the redistricting plan were to be

21    enacted by December 1, 2021" -- which is not a date

22    that we have for our plan to be enacted -- at that

23    time it would not -- "the new district maps would

24    not apply to the School Board elections occurring

25    in 2022, as the initial election falls inside,

1        rather than outside, of the nine-month window."

2              KELLY COKER:  Right.

3              BRENDA PRIESTLY JACKSON:  So it's outside of

4        it, so it --

5              PAIGE JOHNSTON:  Well, due to the delay of the

6        information from the Census Bureau, our office

7        anticipated that it would not apply to the School

8        Board election next year unless something had

9        changed in the timing of such.

10             So the timeline that Mrs. Sidman prepared --

11       well, I prepared but she presented to you at the

12       last meeting -- indicated that on the normal

13       schedule it would not impact the School Board

14       election.

15             AARON BOWMAN:  And that was certainly my

16       understanding, is it goes to qualifying date, which

17       I think is in July for the next School Board

18       election, and then you back that from nine months

19       earlier, and you get to October, and there's no way

20       we could --

21             DANNY BECTON:  Maybe that was the map that --

22       in 2011 obviously they finished on time, and it

23       didn't affect it.

24             So I just know when we left the meeting last

25       time, that elephant in the room was we were somehow

1    trying to make that election.  And then it was

2    noted to me after the meeting that we didn't do it

3    in 2012 for probably exactly the same reason as

4    Chair Bowman just mentioned.

5         So I don't want to sit here and say -- I mean,

6    we don't have to have our foot on the gas

7    artificially, you know, that we can do this as the

8    process allows, and just know that at the end of

9    the day we are only working for the first races

10   that will occur in March of 2023 for the City

11   Council races.

12        PAIGE JOHNSTON:  Yes, unless the Council

13   wanted to expedite the process to try and meet the

14   School Board election.  It may be possible, but it

15   may not be practical.

16        So I could give you -- so there's two timing

17   considerations to keep in mind.  So once you

18   receive the information from the Census Bureau, the

19   Council Redistricting Committee has that -- or the

20   Council has eight months to enact the redistricting

21   plan.  So you have to do that within eight months;

22   however, how it ties into the School Board election

23   and the other election is that in order for it to

24   apply to the School Board election, the

25   redistricting plan would have to be in effect nine

1    months prior to the School Board election.  So

2    again --

3         AARON BOWMAN:  The election or the qualifying?

4         PAIGE JOHNSTON:  Well, here's the thing:  So

5    the primary election is August 23, 2022.  The

6    general election is November 8, 2022.  The language

7    in the Charter says the next School Board election.

8    It doesn't distinguish between the primary and the

9    general.

10        And when I looked into this, in 2020 all of

11   the School Board election races were determined in

12   the primary.  You didn't even have any in the

13   general.

14        So with that being said, I think you have to

15   go with the August 23rd date.

16        DANNY BECTON:  So but we're working from the

17   election date, not the qualifying?

18        PAIGE JOHNSTON:  Yes.

19        DANNY BECTON:  That was my only question.

20        PAIGE JOHNSTON:  Yes.  We're going with --

21        DANNY BECTON:  Before the election --

22        PAIGE JOHNSTON:  And so then that means that

23   the Council would have to adopt a redistricting

24   plan by November 23rd.

25        DANNY BECTON:  Well, once again, not trying to

1    create new precedent in terms of trying to squeeze

2    in this 2022 election.  I'm just trying to say this

3    is what's happened in the past, and we shouldn't

4    feel obligated to change any of that just because

5    we think we can by rushing.

6         PAIGE JOHNSTON:  Yes.

7         DANNY BECTON:  All right.  So my next point

8    is -- through the Chair, if you don't mind me

9    continuing.  I've got several points.

10        So, Mr. Killingsworth, you said -- in your

11   first statement you were talking about compact and

12   contiguous.  I want to also add in our 2011

13   analysis there were three, and actually the third

14   one was communities of interest.

15        I thought what's equally important, along with

16   compact and contiguous -- and maybe even more

17   important is we found a lot of communities

18   sometimes being split down the road where one side

19   of the street was in one district and the other

20   side of the street is in another district.  So I

21   did want to bring that up.

22        So total population versus voter population,

23   which of these columns on the spreadsheet that you

24   did forward to us can we find voter population, if

25   it's on there?

1        BILL KILLINGSWORTH:  I believe -- so I don't

2    know that I have that one with me, but I believe it

3    was the first column.

4        DANNY BECTON:  I found those -- so it goes

5    district total population?

6        BILL KILLINGSWORTH:  Right.

7        DANNY BECTON:  I didn't see any voter-age

8    population.

9        BILL KILLINGSWORTH:  On the one that I sent

10    you, at the time we did not have voter-age

11    population.

12        DANNY BECTON:  So if we go that direction, you

13    can send that?

14        BILL KILLINGSWORTH:  Actually, if you look --

15    so you are talking about the one that I sent that

16    had like --

17        DANNY BECTON:  The only one I have is --

18        BILL KILLINGSWORTH:  Voter age is towards the

19    back, just before you get to total housing units.

20        DANNY BECTON:  Well, I have a total 18 years

21    and older.

22        BILL KILLINGSWORTH:  That's voting age.

23        DANNY BECTON:  So that would be the column

24    that we would decide -- that column for the total

25    population?

1          BILL KILLINGSWORTH:  Correct.

2          DANNY BECTON:  If I remember your comments in

3     the last meeting, though, you favored total

4     population?

5          BILL KILLINGSWORTH:  So it depends -- for me

6     it depends on whether or not you choose to cross

7     the river or not cross the river.

8          If you choose not to cross the river, the math

9     works out in such a way that with voting-age

10    population, it's six districts to the north and

11    eight districts to the south of the river.  That

12    makes it easier for me, so just to be frank.

13         If you use total population, it will be six

14    and a quarter and seven and three quarters, so then

15    it's -- it becomes harder to try to maintain that

16    10-percent spread.

17         But either way I think we can do it if that's

18    the consideration.

19         DANNY BECTON:  What did we use in 2011?

20         BILL KILLINGSWORTH:  Historically, I think the

21    City has always used total population.

22         DANNY BECTON:  Yeah.  And so what I did, I

23    took your spreadsheet and modified it quite a bit.

24         BILL KILLINGSWORTH:  Okay.

25         DANNY BECTON:  But I divvied it up among the

1    west side of the river and another, and when it

2    came to District 2, I gave it to the west.  And as

3    I was mentioning to you, the numbers came out in

4    total population 52 percent versus 48 percent, the

5    52 being the south part of the river.

6        As I suspected when we had that conversation,

7    (unclear audio) versus -- but it's still only

8    4 percent, about a 4-percent disparity.

9        BILL KILLINGSWORTH:  So if I may, I think you

10   are congregating large geographies versus

11   districts.

12       So if you look at north of the river with

13   total population, there was a -- and I will just do

14   the math while I'm sitting here -- there was

15   443,044 north of the river.  If you divide that by

16   the 71,107, that's where you get 6 and a quarter.

17       The challenge, I think, is if you get the

18   average.  So if you do 443,044 divided by 7, seven

19   districts under your scenario, the average is then

20   63,000 per Council district, which goes below the

21   threshold of 67,000.

22       So your average Council district north of the

23   river, if we made them seven and seven, would be

24   63,292, which is well below the 71,000.

25       DANNY BECTON:  Well, here's -- I did some

1    further analysis.  I don't think it's as simple as

2    that.  I think you have to look at the pluses and

3    minuses.  And, to your point, I came up with a

4    71,107 average.

5        Now, now when I divvied up the two sides of

6    the river, if I didn't mention this earlier, I gave

7    District 2 all of the Westside when I gave you

8    those numbers.  So even though District 2 is the

9    only one that bleeds over to the south, I gave it

10   all to the Westside.  Okay?

11       So what I continued to do was to take the

12   71,000 average, and then I compared it to the

13   existing districts' averages.  And on the Southside

14   I'm showing two districts under the average.  I'm

15   showing the Beaches by a 6,171 deficit, and I'm

16   showing Ms. Cumber's District 5 as 3,000.

17       Now, one of the big issues on the size is

18   actually my district.  I'm actually right at 20,000

19   over that.  So when I look at the map, to me

20   it's -- I'm just trying to help my colleagues.

21   What I've already started thinking is when you look

22   at that side of the river, District 11 by its

23   spin-off of 20,000 people is, to me, the most

24   logical starting point, because once that happens,

25   those folks have to go somewhere.  And they are

1    going to expect -- and the logical effect is

2    Mandarin to the west.

3         And then Ms. Cumber's district, which is

4    short -- remember I said 3,000 -- bleeding down

5    into Mandarin, picking up what Mandarin will --

6    which is right now flat.  They are actually pretty

7    much right on the average.  But when they pick up

8    how many folks -- and I've given Mr. Killingsworth

9    about four options to kind of trim down District

10   11.  And once that's done, it will really start the

11   domino of how redistricting takes place to help

12   District 5 achieve its equality to the average.

13        And but the bigger -- then the next bigger

14   issue on the Southside is the Beaches.  How do they

15   find 6,000 folks?  And my answer to your crossing

16   the river is saying that (unclear audio) my

17   position back in 2011 (unclear audio) that is it

18   should not happen unless it's just, you know,

19   totally necessary.  That's what it ended up when we

20   did District 2 in 2011; it was just totally

21   necessary.

22        Now, the question is can District 2 stay to

23   the west, and perhaps how is the Beaches going to

24   grab its 6,000?  Might it cross the river and go up

25   and be at the Intracoastal?  That was a

1    conversation that we had back in 2011, could it

2    just be a coastal community that goes all the way

3    up to Nassau County?  Just a thought.

4        But I think a representative, including Chair

5    Bowman here, is -- those are going to affect those

6    districts over there, most specifically the

7    Beaches, and District 3, and looking down District

8    1, and how those are.

9        So that was just kind of my nickel tour of

10   what I've already seen and the expertise that I

11   have on our side of the river.  But then when I

12   looked at the other side of the river, there's five

13   districts out of the seven that are under that

14   average, but it's not big numbers.  There's like --

15   it ranges from, like, 3,000-4,000.

16       Then there's two districts which is Councilman

17   Ferraro's taking all of the Westside, and then Mr.

18   White, that are at (unclear audio).  So that was

19   just kind of my score card when I took the data

20   that he had already sent us.

21       And I guess I'm kind of favoring the total

22   population at this point until, I guess, there's a

23   more compelling reason to go to the voter

24   population.  But I will stay open to that

25   discussion in kind of seeing how this plays out in

1       smaller -- like I mentioned it earlier -- smaller

2       subcommittees where it might be the south Council

3       members getting -- the Southeast Council members

4       getting together and figuring out how this works

5       and the west-of-the-river Council members getting

6       together to figure out how those opportunities

7       might be worked out.  So I hope that just provides

8       some analysis that I've already initiated by my

9       spreadsheet.

10          AARON BOWMAN:  Thank you, Mr. Becton.  And

11      just real quick, don't worry about it now, but I do

12      want to say the analogy of the river is the same as

13      the Intracoastal.  And I can tell you my district

14      is along the Intracoastal, and in the last

15      redistricting we lost a portion of that over to the

16      Beaches, and those are two completely different

17      communities.  So it's not just the river; it's also

18      the Intracoastal.

19          Ms. Jackson.

20          BRENDA PRIESTLY JACKSON:  Thank you, Chair

21      Bowman.

22          Just I guess to highlight or kind of lift up

23      what Council Vice Chair Becton shared, it's a

24      little different for us that's north and northwest.

25      And so, interestingly enough, I did the numbers as

1    well as the percentages, and if you deal with the

2    7, 8, 9 and 10, then 7, 9 and 10 are all close

3    enough to the 5-percent-average deviation, the

4    67,552.  In fact, 10 and 9 are right at it, and 7

5    is a little bit low.

6         Our lowest district of the 7, 8, 9 and 10 is

7    actually 8.  And so 8 has the second lowest

8    population -- total population right now after the

9    Beaches, which has the No. 1.

10        12 has the most.  And if we throw 2 in, 2 is

11   at the average.  I will share that -- and this is

12   kind of my honest opinion -- it's really not an

13   issue for those of us who are on the west and north

14   part of the seven bridges; it's really not, other

15   than District 8.

16        And so the beauty of District 8 for us is that

17   it runs up with District 12 -- probably not needed

18   for Council Member White -- but there's some clean

19   ways that there can be a population shift for the

20   districts right there without, I don't think,

21   really damaging communities of interest and all of

22   that as well.

23        And I also think that one of the challenges of

24   District 8 -- and I'll just say we call it now the

25   four communities of interest, which were formerly

1    known as minority access districts.  I love our

2    words stepping around here.  But the reality is

3    that District 8 actually has more -- a larger

4    percentage of African-Americans than any of them,

5    and that is really like -- it's like an imbalance;

6    right?  So it has 68 percent.

7         And then District 7 has 60 percent.

8         District 9 has 57.

9         And 10 has 58 percent.

10        So I think that when we talk about communities

11    of interest, we also must talk about those

12    communities that we believe that they have similar

13    concerns relative to the city as a whole.  But I

14    don't really see the challenges for those of us on

15    the west and the north.  (Unclear audio.)

16        The only thing I will add is if you do to 2

17    and you make 2 on the north, that's actually what

18    you got out from under in 11.  And what happened,

19    District 2, which was actually (unclear audio), it

20    had this weird thing to looping all around the

21    city.  It was the most bizarre configuration.

22        And, actually, school -- City Council District

23    7 from 2000 to 2010 jumped across the Mathews

24    Bridge.  How do I know this?  Because I represented

25    School District 4.  And so, interestingly enough,

```
1        you jumped across the Mathews Bridge, and you
2        had -- when you turned on University, on the right
3        side of the street, which was Arlington Heights,
4        but you didn't have (unclear audio), which is right
5        on the water, because that community didn't want to
6        be a part of it.  I loved that you all cleaned all
7        that up in 2010 and '11.
8             If you move District 2, you might be in danger
9        of creating that same outer band of all over the
10       city issue again, which I would just say we
11       probably need to be informed about why we moved
12       away from that, which I think was a good thing in
13       all of that.
14            I am in support of total population,
15       particularly with a city that has -- what? -- about
16       24 percent of our young people are under 18; right?
17       So we need total population, because it's not as if
18       (unclear audio) a major factor in everything we do,
19       and we've historically done that.
20            So I will just -- I appreciate this
21       information.  And I think there's much of our
22       colleagues that participated in this process, and
23       going forward they can also know what numbers we're
24       looking at and what we're doing and what our
25       thoughts are as far as that.
```

1          The only thing I would like to add is, you

2     know, I am not in support at all for expediting

3     anything to have the School Board races included,

4     because I just don't think it's fair, and I think

5     we need to decide, whatever we do.

6          And when you expedite things, you tend to not

7     necessarily follow all of the noticed and other

8     consideration requirements that you usually would.

9     I back things up from the work of the Redistricting

10    Committee to when it goes to the Rules Committee,

11    which has hard timelines of what it has to have and

12    what it has, and that would -- definitely has the

13    potential to move it further along.

14         But those are the only things that I would

15    like to add, Mr. Chairman.  And I think Ms.

16    Coker Daniels has her -- Dr. Coker Daniels has her

17    hand up.

18         KELLY COKER:  Just to Council Person Brenda

19    Priestly Jackson's point, I reached out to (unclear

20    audio) just this moment ago.  They both

21    independently confirmed that it was -- that, as you

22    said, the election right after the 2011, that one

23    was the same.  And then it was changed for the one

24    after that, the plan that you are speaking to.

25         AARON BOWMAN:  Okay.

1        KELLY COKER:  It stayed the same in 2020, if

2    my memory serves me correct.

3        AARON BOWMAN:  As I read the tea leaves, this

4    is going to be a nonissue anyway, but we will talk

5    and make sure we vote on schedule.

6        MARY MARGARET GIANNINI:  I just wanted to

7    clarify legal things.  I haven't heard anything

8    that makes me concerned, but I just wanted to say

9    that "total population," if you go the

10   total-population route, I don't think there will be

11   any valid challenge taking that method, because the

12   Supreme Court has not definitively said, "You have

13   to count this way."

14       But when the Supreme Court has discussed

15   redistricting in the one person/one vote rubric, as

16   we're talking now, the Supreme Court has used

17   language that is total-population language.  So if

18   you go total-population route, you have a very

19   strong basis upon which to ground that approach.

20       I do want to add an important caveat, however:

21   A layered process or a layered step to this process

22   is anticipating any Section 2 Voting Rights

23   amendment -- or Voting Rights Act challenges.  And

24   that is where you have to make sure that if you

25   potentially had a minority majority district, that

1      you don't draw lines that, in essence, dilute the
2      votes of those citizens.
3           In the process of analyzing whether or not
4      your voting districts are defense-worthy to a
5      Section 2 Voting Rights Act challenge, at that
6      point the Supreme Court has used language that
7      indicates that you need to use citizen-voting-age
8      population, so even more narrow than voting-age
9      population.  And so -- but that is several steps
10     down into the process as you are sort of
11     anticipating potential challenges as you are
12     drawing the lines that are distinct from the
13     10-percent deviation, the conversation we're having
14     right now.
15          So there are two metrics that you will have to
16     keep in mind.  The total population, I think right
17     now for this conversation, is well-grounded and
18     well-supported in the law.  But as you are
19     considering how you may draw minority majority
20     districts, then looking at the numbers and how the
21     Supreme Court has laid out how you evaluate the
22     validity of those districts, in that situation
23     citizen-voting-age population is the language the
24     Court has used.  The Court hasn't definitively
25     said, but the language the Court is using is

1  leaning and hinting towards citizen voting age.  So

2  I just want that to be hovering out there as you

3  continue your conversations.

4          AARON BOWMAN:  Thank you.

5          I recognize Councilman Dennis has joined us.

6          Do we have any other comments?  Mr. Willie?

7          DARRYL WILLIE:  Yeah, a quick thought, just a

8  question.  So if the School Board elections won't

9  matter for this round -- I'm just doing a scenario:

10 Someone new gets into that seat; district is

11 already drawn; they don't live in that seat

12 anymore.  Would they be eligible to stay in their

13 seat in that following next term?  So we're not

14 counting them, and then we have -- the

15 redistricting is drawn after they get elected, and

16 then we draw it and they are drawn out.  Then what

17 happens to their seat based on what the Charter

18 says and where we are?

19         MARY MARGARET GIANNINI:  I --

20         DARRYL WILLIE:  Because that could potentially

21 happen.

22         MARY MARGARET GIANNINI:  And I think that goes

23 back to Councilwoman Priestly Jackson's incumbency

24 question, where I think we want to be able to do a

25 little bit more homework to make sure that we

1       accurately answer your question.

2           DARRYL WILLIE:  Correct.  And it relates to

3       incumbency -- not incumbency, actually, as much as

4       it does for a person unseating an incumbent, being

5       in a seat, and then in the middle of that having

6       the redistrict to be drawn -- districts to be

7       drawn, and then being drawn out.

8           MARY MARGARET GIANNINI:  Okay.

9           BRENDA PRIESTLY JACKSON:  I think, through the

10      Chair, then that actually does not happen, because

11      when we're saying it doesn't apply, it's -- we

12      would have completed the redistricting process.

13      We're just simply saying for the purposes of the

14      next election, that doesn't.  So I don't think,

15      under your scenario -- if the 2022 folks are

16      included, your question is what happens for the

17      2026 --

18          DARRYL WILLIE:  Right --

19          BRENDA PRIESTLY JACKSON:  -- with an

20      incumbent?  Well, at that point I think we've

21      already said, I guess, with the three of you all,

22      they are termed out anyway.

23          But arguably -- we will already know the

24      boundaries, because if we plug in incumbents, if

25      that's the process that we use, that's going to be

1    for all of the incumbents in City Council or School

2    Board at this time.

3        My issue, actually, is not forward looking as

4    much as it is an impact on the eligibility of folks

5    who are in an area right now comporting with the

6    Charter for residency requirements.

7        DARRYL WILLIE:  Right.

8        BRENDA PRIESTLY JACKSON:  When we say doesn't

9    apply to 2022, it doesn't mean that we don't have

10   new districts then.  We're just saying -- we better

11   be done by then; we are required to be done by

12   then.  We're simply saying it won't be applicable

13   to those elections.  Does that make sense?  So the

14   district boundaries will be drawn.

15       DARRYL WILLIE:  It does, but if I'm a

16   candidate, a new candidate, and I decide to jump

17   in, I have to live in the old boundaries or the new

18   boundaries?  That's the question.  Because if I

19   live in the old boundaries and then it changes to

20   the new boundaries, then that's where it gets --

21       BRENDA PRIESTLY JACKSON:  Well, there has to

22   be some new boundaries.  If they are not an

23   incumbent, they are not protected in any kind of

24   way, I think.  That's the whole (unclear audio).

25       DANNY BECTON:  Yeah, so let me give a real

1    real situation.  I think our School Board Member

2    Willie does have a point.

3        So I've got to lose 20,000 folks; right?  So

4    one of my suggestions is, is when District 12 is

5    trimmed out -- and I've got some thoughts -- is

6    I've got this northern area here that's UNF and

7    Kernan, above JTB.  Let's say that happens and that

8    trims out.  Well, right now my School Board

9    district is District 6 Mandarin and District 11.

10   This no way would go into 6, and it wouldn't be

11   staying in 11, so it would be spun off.

12       So my School Board race for 2022 is an open

13   seat.  What if somebody in that area in Kernan ran

14   for -- what's that, District 7 -- School Board, Ms.

15   Hershey's seat, and won?  To his point, what would

16   happen to that person in four years in '26?  Right?

17   22 plus four.  Yeah.  Would they run again?  They

18   would not be in district -- School Board District

19   7.  And I think that's an interesting point.  The

20   likelihood of it happening in most other districts

21   is probably small, because, you know, depending on

22   how the lines change.

23       But I can tell you there's going to have to be

24   some drastic cuts to get 20,000 people out of, you

25   know, my area.  And it possibly could happen

1    because I have an open seat.  And I can't tell you

2    if there's any candidates for the next election in

3    that area, but it could happen.  And there's some

4    other areas that are going to be cut, but they

5    would likely stay in District 6.  This is the only

6    one that has the potential of moving out of School

7    Board District 7 in a real-world situation.

8        BRENDA PRIESTLY JACKSON:  That's why I think

9    we haven't had an incumbency question answered so

10   we can know when to consider that.

11       AARON BOWMAN:  And we will get there.  And

12   certainly I think that the basic answer to your

13   question, Mr. Willie, is that the next School Board

14   race will be under the current districts we have.

15   The one four years after that will be all based on

16   where you live, how many districts we are about to

17   do.

18       So it could be, like Mr. Becton said, somebody

19   runs for a seat and then four years later finds out

20   they are no longer in that district.  But they'll

21   be able to continue to serve.

22       Yes, Ms. Coker Daniels.

23       KELLY COKER:  I just want to make reference to

24   the incumbency question that keeps coming up.

25       I will say District 1 -- City Council District

1   1 and School Board District 1 has been in that

2   scenario in the past when the incumbent was always

3   running.  You may recall that when we originally

4   started this process, they actually discussed it.

5   (Unclear audio).

6        If you look at that district in particular,

7   Empire Point, Colonial Point on Atlantic Boulevard

8   are included in an odd shape or the tail end of

9   that district.  It should probably have Atlantic

10  and University, but because of each time of the

11  Census, each of us all lived in that area, so the

12  boundaries to keep those in there.

13       So just there is a historical reference on a

14  School Board race and a City Council race in

15  progress under those scenarios.

16       AARON BOWMAN:  All right.  Before we start

17  taking these issues one by one --

18       RANDY WHITE:  I have one question.

19       AARON BOWMAN:  Yes, sir.

20       RANDY WHITE:  Yes, sir, through the Chair, if

21  it's permissible, I know I'm very happy with Mr.

22  Killingsworth; he's done this many many times, and

23  so has Mr. Holland.  Could we see, if he's heard

24  everything we've said, if he has any suggestions of

25  what he's heard that might make it easier on us?

1    So would that be appropriate?

2         AARON BOWMAN:  I'm sorry.  Can you repeat

3    that?

4         RANDY WHITE:  Would it be appropriate -- Mr.

5    Holland has done this also, and I'm certainly happy

6    with Mr. Killingsworth; he's done it also -- if he

7    has any suggestions of what he's heard that we've

8    been talking about, to make life easier on us?

9    Would you let him come to the podium, if that's

10   proper?

11        AARON BOWMAN:  Yes, Mr. White, I'm happy to

12   honor your request.

13        JERRY HOLLAND:  Thank you, Mr. White, and

14   thank you, through the Chair.

15        I just will reflect on a few things.

16   Obviously, having been involved 10 years ago and 20

17   years ago, some of the things you talked about are

18   things that we did experience and do know.  For

19   example, the question about, you know, does

20   incumbency of a current member, you know, affect it

21   by the decisions of your redistricting, meaning

22   that you may be a member that is termed out, but do

23   you have a new district?

24        Well, obviously, 10 years ago District 11 was

25   on the other side of the river.  20 years ago

1  District 13 was on the other side of the river.

2  And I'll never get -- because I represented the

3  Beaches at that time -- some of my constituents

4  said to Council Member (unclear audio), "We're so

5  glad you are our Council person now," but she

6  wasn't.

7      But from that standpoint, your decisions and

8  your redistricting will affect the next election.

9  It doesn't change any lines between now and the

10 next election.  So it doesn't affect any incumbency

11 now and the next election as far as you no longer

12 represent that or you no longer live in the

13 district.  It is a matter of the next election

14 where the new electees will be elected.

15     The other perspective as you talked about --

16 and I like the direction you are going on total

17 age -- and one of the reasons we've gone total age

18 since consolidation is also because what we've

19 reflected in the last 10 years and 20 years is, is

20 that it's helped keep those historical Districts 7,

21 8, 9 and 10 back then, as you called them, minority

22 access districts.  Because in lower-income areas --

23 it had nothing to do with race -- but in

24 lower-income areas, there was a higher population

25 of families with children; so, therefore, the size

1      of the district geographically, it was to the

2      benefit to go total age.

3          If you go 18 and older, what you'll see is, is

4      that in order to meet those numbers and those

5      averages and means, you will have to geographically

6      be larger, and it will lower your minority numbers.

7          The other perspective to remember is -- and

8      Councilman Becton talking about 20,000 on your

9      number -- is really you need to look at not the

10     mean.  You need to look at, as you were,

11     Councilwoman, the low end and the high end.  Your

12     16,000 over is what your concentration should be,

13     not 20,000, because 16,000 meets the number and

14     you've met what you need to do.

15         And in the same way, as you look at numbers,

16     Councilman Garrett wouldn't have to change a single

17     number; he's met that.

18         And, like you said, other than Councilman

19     Pittman, she's the one that's got to grow.  But

20     really when you look at it, it's going to --

21     obviously, one district, as in Councilman Becton's

22     district, is going to put 16,000 people in other

23     districts; no doubt about it.  It has to in order

24     to balance the system.  Even though Mandarin is

25     almost even and the other ones are off only a few

1     hundred, but it will make the changes.

2          But the reality is, is that I totally

3     appreciate going total age.  I totally think from

4     an incumbency you don't have to worry about the

5     current members as far as those who are termed out

6     if they are in another district, and hopefully

7     that's a perspective that helps from that

8     standpoint.  So thank you for that opportunity.

9          RANDY WHITE:  Thank you, Mr. Chair.  Thank

10     you.

11          AARON BOWMAN:  Okay.  Thanks.

12          DANNY BECTON:  Well, can I comment on Mr.

13     Holland's?

14          AARON BOWMAN:  Yes.

15          DANNY BECTON:  Mr. Holland, you bring up a

16     good point about, you know, looking at the minimum

17     and the max on that curve.  I guess I also factored

18     in a third dimension, and that is future growth.

19     Okay?  And I -- so I'm thinking 20 -- just like I

20     did in 2011, I was already thinking if this rose,

21     where would be the logical -- you know, how would

22     this be reshaped easily, rather than difficultly?

23          And one of the things I underestimated last

24     time we met was how much more growth I have in my

25     area.  And I still have a thousand acres on the

1     southeast quadrant.  I still have eTown.  We just

2     changed the land use of 5,000 acres on the west

3     side of the Dee Dot.  I mean, I still see a

4     population explosion continuing, not to say that it

5     won't be in competition with the Westside, Mr.

6     White's district, and then Mr. Ferraro's district,

7     because we've seen an awful lot of rezoned

8     neighborhoods in those areas.

9          So while I totally got what you said and

10    thought about it, I'm still thinking, well, you

11    know, if we don't get rid of too much, then that

12    90,000 will again be 90,000.  You know what I mean?

13    The next time around it will even make it more

14    difficult if we don't try to get it closer to the

15    min, rather than the max, just for the future, you

16    know.  That was another thought that I had.

17         JERRY HOLLAND:  Obviously, in a perfect world,

18    everything at the median will be the perfect world.

19    But the reality is to get there, you have to affect

20    other districts more than you have to if you stay

21    with the minimum or maximum.  So you may get a

22    perfect world where you go, "I'm prepared for the

23    future and growth."

24         Realize that a Census is a snapshot in time.

25    And the requirement by the law is to deal with that

1    snapshot, not to deal with what's projected in the

2    future, whether it be a loss or gain of population.

3        But realize that if you deal with the minimum

4    and max, you are going to affect your colleagues in

5    a least manner so that their communities of

6    interest can stay together more like they are today

7    than what the future may hold.  That's the reason I

8    always go deal more with the minimum and the max

9    than the median, because that's truly going to make

10    less of an impact to your colleagues that are

11    around you.

12        Thank you.

13        DANNY BECTON:  Thank you for being here and

14    your thoughts.

15        AARON BOWMAN:  Thank you.  And if I could, if

16    you guys are all right with it, what I would like

17    to do is I think we've got about three issues of

18    guidance that we can go ahead and address right

19    now.  Obviously, we're not going to say we're

20    closed until everybody has had a chance to add one

21    if they want to.

22        But if we could do that, if everybody is all

23    right with it, if you take these three, the three

24    I'm thinking about is:

25        Schedule.  Do we want to try to expedite this?

1          Two is total population versus voting.

2          And three is incumbent.

3          So I would like to go ahead and take those up

4     right now and give those some guidance.

5          DANNY BECTON:  Well, through the Chair, I'll

6     be glad to make a motion.  It sounds like

7     everybody's favoring total population, so I will be

8     glad to do that for certainly a consideration.

9          GARRETT DENNIS:  I second that.

10         DANNY BECTON:  And that was to favor total

11    population.

12         AARON BOWMAN:  There was a second.

13         Anybody want to talk about total population?

14         And I agree, and I think Ms. Priestly Jackson

15    and I think alike, because on my notes coming down

16    here I said, "It is absolutely not fair to the

17    people nine years" -- well, nine to 17 right now --

18    "counting them out of where they're going to be

19    over the next few years."

20         So all in favor of total population?

21         (Members indicating.)

22         All right.  Total population, Mr.

23    Killingsworth, is your guidance.

24         We did talk a little bit about -- but now Mr.

25    Dennis is here.  He brought up last week do we try

1    to expedite this process or let it flow.  So is

2    there anybody who wants to make --

3        BRENDA PRIESTLY JACKSON:  I make a motion that

4    we adhere to traditional timelines and not expedite

5    the process.

6        DANNY BECTON:  I second that.

7        AARON BOWMAN:  A second.  Any discussion on

8    that?

9        DANNY BECTON:  Through the Chair, just to the

10   fact that we have acknowledged today that whether

11   we expedite this, it will almost be impossible for

12   us to beat a nine-month timeline before August 23,

13   '22.  We would have to finish up and have

14   everything done, voted on by Council by some date

15   in probably even earlier than October, because I

16   guess there's public hearings -- I mean, public

17   meetings that have to -- I mean, we're talking

18   right now trying to finish by December.  So there

19   would be community involvement the first of the

20   year.

21        And then traditionally we have, I think,

22   uncovered the fact that that's -- you know, the

23   next School Board election was never -- even under

24   perfect conditions where they finished where they

25   were designed to do so in November, that it was

1     even a consideration.

2          So with that, I think it's just at this point

3     pragmatic to say that these School Board races in

4     '22 were not and continue to be not part of the

5     redistricting decisions made.  But the City Council

6     races the following year are the target objectives

7     of the first elections to be affected.  So with

8     that I'll --

9          BRENDA PRIESTLY JACKSON:  And I just want to

10    add, Mr. Chairman, I think -- I appreciate

11    your (unclear audio) all of this.  I think if you

12    shorten anything or expedite anything, we already

13    have neighbors who are distrustful, and so if we

14    deviate -- any deviation you make from what we have

15    historically done, I think we need to be very clear

16    on the record that it's warranted.

17          And I see us ripe for challenges if we

18    expedite anything to accelerate things,

19    particularly since we still have the COVID-19

20    pandemic hovering above us with things going on.

21    So we want to make certain that we are able to let

22    our neighbors know throughout the process what

23    we're doing in having these public hearings.

24          AARON BOWMAN:  Mr. Dennis.

25          GARRETT DENNIS:  Through the Chair, just

1      asking the Committee as far as expediting, my

2      thoughts on expediting was to not string out

3      meetings once a month, versus us having our working

4      group maybe twice a month, and not speeding up

5      having the community meetings or anything like

6      this, because it's still going to have to go

7      through a process once it goes to Rules.

8          I was just thinking about having a working

9      group, per se, in expediting.  That's what, you

10     know, I don't want us to kind of stretch out.

11         AARON BOWMAN:  Okay.  And thank you, Mr.

12     Dennis.  We had given the goal of before we go on

13     break in December, and I think once we work with

14     Mr. Killingsworth on how do we get there -- and I

15     agree with you; just saying we're going to meet

16     every month until we are done is not the right

17     answer.  So I appreciate your support on that.

18         And I appreciate all of you.  We stepped on

19     this one pretty quickly because I know we had to,

20     and thank you for showing up.

21         Mr. Becton, did you want to add something?

22         DANNY BECTON:  Yeah.  I just want to add that

23     even if this committee just met once a month to

24     make the big decisions, I think it's still

25     incumbent upon members here to have smaller group

1    meetings, have noticed meetings with your

2    colleagues that you want to bounce ideas off of or

3    get into a specific issue that affects multiple --

4    call a noticed meeting.  That's how -- I think it

5    was tremendously successful last time as well.  So

6    those can occur many times during the month.

7         And then if it is only a month that we feel --

8    that the Chair feels like, "Hey, we got some big

9    decisions or some outcomes that we need to, through

10   the Director, make a decision on," those are, you

11   know, obviously the meetings that you were

12   referring to.

13        But I would certainly personally think about,

14   you know, how a noticed meeting might -- you might

15   round up with your colleagues and address smaller

16   issues and try to come to some conclusions.

17        So I hope that's appropriate.

18        AARON BOWMAN:  That is.  Thank you.  And you

19   are absolutely right; the five of us cannot draw 14

20   districts.  So we absolutely have to have our

21   colleagues involved with that, and I agree with

22   that.

23        All right.  So we have a motion just to

24   maintain the scheduled status quo, not to expedite,

25   and a second.

1           All in favor of that?

2           (Members indicating.)

3           AARON BOWMAN:  So we're not going to expedite

4      the schedule.

5           The third one I talked about was the

6      incumbents.  So I think on this the motion would

7      be, if somebody wants to offer it, that we try --

8      that we not draw current Council members outside --

9      or School Board members outside of their districts.

10     Is that what I'm hearing?

11          BRENDA PRIESTLY JACKSON:  I would just have a

12     caveat, Mr. Chairman.  I think that that would be

13     the understanding, but I don't know if you got a

14     little far ahead.  Did you maybe not maybe want

15     (unclear audio) what we are required to do.  We can

16     look at that on September 9th, whatever your

17     pleasure.

18          DANNY BECTON:  Through the Chair, I think

19     that's very appropriate for a City Council member.

20     That's the first election that this applies to in

21     any non-open seat.  Any incumbent absolutely needs

22     to be -- reside and stay resided in their district

23     for the 2020 group.

24          And I believe, based on my spreadsheet, I have

25     noted how many open seats, and that was on a

```
 1      separate sheet of paper.  And there's one, two,
 2      three, four, five, six, seven open seats out of 19.
 3      So the remainder are incumbents that, yes, should
 4      not be written out of the district.
 5           Now, as far as School Board, I think that
 6      answer lies in that question I proposed, and I'm
 7      not sure how I can anticipate who is going to run
 8      in District 7.
 9           AARON BOWMAN:  I think both of you are in good
10      guidance.  So I think, then, the motion would be
11      to -- and remember these are considerations.  These
12      are not -- if we have to come back and say,
13      "Whoops, this wasn't a legal thing we told you to
14      do," we can.  So I think based on my colleagues, I
15      think the motion would be -- if somebody wants to
16      give it -- is that we do not draw incumbents
17      outside of their current districts for City
18      Council.
19           Do we have a motion?
20           RANDY WHITE:  I will make that motion.
21           DANNY BECTON:  Correct.  Yes, I will second
22      that, Mr. White having moved it.
23           AARON BOWMAN:  Yes.
24           BRENDA PRIESTLY JACKSON:  You know, I often
25      say I'm just a School Board member pretending to be
```

1    a Council member right now.  I would like to expand

2    it to the current School Board members.  And if we

3    find out from General Counsel's Office that that's

4    not a consideration or a factor -- I just would not

5    want to undertake this work drawing current School

6    Board members out of the districts at this point.

7    That's a consideration to me.  That's pretty major,

8    I would think.

9         DANNY BECTON:  Through the Chair, to Ms.

10   Jackson, I need more information on the question

11   we're proposing.  By just saying City Council

12   members at this point doesn't preclude us coming

13   back and adding School Board, because I think --

14   personally, I want to know the answer.

15        '22 doesn't matter.  There's going to be

16   elections based on the current maps.  It's the '26

17   races where it's going to matter.  And I'm not sure

18   how we can know who those incumbents necessarily

19   are, because there's going to be -- out of the '22

20   race, there's going to be incumbents for 2026;

21   right?  So we don't know who's going to win or

22   who's going to lose.  It's just they're going to

23   run knowing that in '26 these lines could be

24   different, and they are going to know that.

25        I mean, somebody (unclear audio) to run in

1   School Board race for '22 for next year.  They

2   don't know what the new lines are, and they run a

3   risk in certain areas for our city that in '26 they

4   may not all fall in the exact same district.

5   That's kind of a risk.  And we're trying to find

6   out what happens at that point and what the

7   legality of that is.  And until we know that, I

8   think it's just still an open question that we can

9   come back to in our next meeting if we get some

10   answers.

11       BRENDA PRIESTLY JACKSON:  And I guess there's

12   two things I'll share about that.  One, the issue

13   is for '22, because they are all incumbents.  So

14   any new lines drawn after that, they will be termed

15   out anyway in 2026.  But there's also a group for

16   2024.  And so those have a hybrid, I think.  Two

17   are termed and two are not termed.

18       And I know it would never be the intent of

19   this committee, but I think if we drew or had a

20   consideration that marginalized School Board

21   districts in this process at all, that could send

22   an unintended message to the public in terms of

23   incumbents.  And so that's why I wanted to know is

24   it a factor to consider, is it a legal requirement

25   to consider, is it a valid legal requirement to

1    consider anyone, which is why I ask if we might not

2    want to look at that on September 9th for

3    incumbency, in general, to round it all out.

4         And I will share with you one thing, that, you

5    know, we are trying to not be engaged in the

6    politics of what we're doing, but there's a big

7    backdrop of politics to what we're doing.  And

8    there is a current move afoot to have our School

9    Board races be -- no longer be nonpartisan, which,

10   to me, is the most important and valuable thing of

11   that, for them (unclear audio) partisan.

12        I think that our work here impacts all of

13   that, which is why I would like to look at both of

14   those questions, and ones in terms of incumbents

15   who are on City Council and incumbents on the

16   School Board, just to know what our parameters are.

17   I wouldn't want anyone to take our actions as a yea

18   or a nay, one of the other issues that are (unclear

19   audio).

20        AARON BOWMAN:  So based on both your comments,

21   I see three ways we can go with this.  One way is

22   to say Council members should not be drawn out of

23   their lines.

24        The second way would be that, barring any

25   legal determinations that we don't know, Council

1       members and School Board members should not be

2       drawn out of their lines.

3           Is that --

4           DANNY BECTON:  And that is non-open seats?

5           AARON BOWMAN:  That's correct.

6           DANNY BECTON:  So I wouldn't count, you

7       wouldn't count?

8           AARON BOWMAN:  Right.  It's incumbents.

9           DANNY BECTON:  Right.  Incumbents.  Right.

10      Okay, just to clarify.

11          AARON BOWMAN:  So is everybody comfortable if

12      we did that?

13          PAIGE JOHNSTON:  Just for clarification, I do

14      think if you are just going by the language in the

15      charter, I would read it to say that it does not

16      affect the School Board for this upcoming election

17      in '22, but for '24 it would impact them.

18          So, again, to the point that someone had made,

19      before the next election they will actually know

20      what the new district is; it just will not impact

21      their being able to run in '22.  It would impact --

22          DANNY BECTON:  '24.

23          PAIGE JOHNSTON:  -- '24, even if someone was

24      an incumbent if they were drawn out of a district,

25      I believe.

```
1              But I think what Mary Margaret and I want to
2         do is look at case law and make sure that we're
3         interpreting that correctly, but by the language in
4         the Charter, I think it is meant to apply to the
5         '24 election.
6              AARON BOWMAN:  Okay.  And I think what we
7         really need to do is give Mr. Killingsworth some
8         stuff to go work on.
9              So I think if we word it that way, that
10        barring any legal determination that does not allow
11        Mr. Killingsworth's guidance, is to not draw
12        incumbents out of districts for City Council and
13        for the School Board.
14             RANDY WHITE:  Yes, sir, that's my motion.
15             BRENDA PRIESTLY JACKSON:  Second.
16             AARON BOWMAN:  Discussion?
17             All in favor?
18             (Members indicating.)
19             AARON BOWMAN:  Okay.  All right.  Those were
20        the first three.
21             And then just throwing stuff that I've heard
22        we've talked about that we probably ought to
23        address, is crossing the river, Intracoastal,
24        historic communities, schools, community interests,
25        and one I have an issue with a little bit in mind
```

1      is also neighborhoods.  I've got a community that

2      goes right down the middle of it, which is with

3      you, Mr. Becton, Glen Kernan.

4           RANDY WHITE:  Mr. Chairman?

5           AARON BOWMAN:  It's all yours.

6           RANDY WHITE:  Mr. Chair, did we consider

7      giving him the direction that we would start from

8      existing boundaries?  Did we give him that already?

9           AARON BOWMAN:  Yes, we did.

10          RANDY WHITE:  Okay.  Thank you.

11          AARON BOWMAN:  So anybody want to make a

12     motion on any of these motions?

13          RANDY WHITE:  Mr. Chair, I would like to make

14     a motion that we do express to the Director to

15     minimize river crossings, to keep river crossings

16     minimized.

17          AARON BOWMAN:  Okay.  Do I have a second?

18          BRENDA PRIESTLY JACKSON:  Second.

19          AARON BOWMAN:  Any discussion?

20          All in favor?

21          Did you want to discuss?

22          GARRETT DENNIS:  Well, he said "minimize."

23     It's not possible that -- yeah, so, no, I'm good.

24          DANNY BECTON:  I said "minimize" instead of

25     "eliminate," knowing that we might have to do it.

1      I'm not opposed to, like, one, you know, but I

2      don't want to be adding, you know, unless it became

3      deathly necessary.

4           AARON BOWMAN:  And I think it goes without

5      saying that I think that's part of the Charter,

6      that you've already got guidance to be compact and

7      contiguous; correct?  We don't need to give you

8      guidance on that?  That's part of your guidance as

9      well, right, or do you need us to give you guidance

10     on that one?  That might be a better legal question

11     to --

12          BILL KILLINGSWORTH:  To the Chair, I mean,

13     that's guidance in general.  In the end, the

14     communities of interest that you are trying to

15     protect will come out when we meet individually.

16          I mean, we know broad communities, but when it

17     comes down to individual districts, the Council

18     member may say this community should not be

19     separated from this one, and it may come down to

20     reasons that are not obvious to the Planning

21     Department.

22          AARON BOWMAN:  Yeah.  I think what you are

23     saying, Mr. Killingsworth, though, is I don't think

24     there's harm of giving you that guidance?

25          BILL KILLINGSWORTH:  No, there's not.  We do

1       take that, just like compacting.
2             AARON BOWMAN:  I think I probably --
3             DANNY BECTON:  Well, I tell you what, I will
4       move that --
5             PAIGE JOHNSTON:  Mr. Chair, if I might, I can
6       read to you what the Charter states.
7             AARON BOWMAN:  Yes, please.
8             PAIGE JOHNSTON:  So there are two -- this is
9       under Section 18.101, Legislative Findings.  It
10      states "The Council is obligated to insure that all
11      districts are as nearly equal in population and are
12      arranged in as logical and compact a geographical
13      pattern as it is possible to achieve and to insure
14      that all federal and state constitutions, laws, and
15      requirements are complied with."
16            And then in addition, there's additional
17      language below that, that says "While the Council
18      districts are based upon population with respect to
19      their size, the geographical arrangement and
20      territorial boundaries of the districts must take
21      into consideration other factors, particularly
22      compactness and contiguity, so that the people of
23      the City and their varied economic, social, and
24      ethnic interests and objectives are adequately
25      represented in the Council."

1          So that is what he would have to do.

2          AARON BOWMAN:  So your nonlegal description is

3     that Mr. Becton's motion is redundant?  Is that

4     true?  That's already covered in the Charter so we

5     don't need to tell Bill to --

6          PAIGE JOHNSTON:  That is the language in the

7     Charter, so he should -- so Mr. Killingsworth --

8          AARON BOWMAN:  I don't always talk lawyerese

9     [sic].  I just want to make sure.

10          All right.  Are there any other -- and can we

11     give Mr. Killingsworth -- once again, I'm asking

12     you what guidance you need, and I also understand

13     you've done this before, and you're a pretty smart

14     guy.  Schools is one we talked about, you know,

15     UNF, Edward Waters.  Do we need to give you

16     guidance not to cut those in half?

17          BILL KILLINGSWORTH:  No, Mr. Chairman.

18          AARON BOWMAN:  Okay.

19          BILL KILLINGSWORTH:  So I'm not intimately

20     familiar with how the school does their attendance

21     zones, but my suspicion is that regardless of how

22     we do this, we'll probably mess up attendance, so

23     that won't be exactly School-Board related.  But to

24     the extent that you would like us to look at that,

25     we could do that as well.  Last time we did not

1      look at attendance at all.

2          BRENDA PRIESTLY JACKSON:  I would just

3      encourage you to work with the School Board,

4      because normally they have their whole tax and

5      sales tax and facilities, which is (unclear audio)

6      schools and all that.  So you might want to look at

7      that.  They probably have done some background, I

8      would think, on where those, you know, communities

9      of interest, schools communities of interest that

10     could be consolidated just as a factor.  But we

11     have a (unclear audio).

12         AARON BOWMAN:  Yes, Ms. Coker.

13         KELLY COKER:  I just wanted to make reference

14     that she is absolutely spot-on.  We've now had a

15     ten-year facilities ban.  There are a number of

16     schools that potentially could be consolidated and

17     will geographically change things as well.  We

18     would be happy to coordinate a meeting with our

19     Operations Division so you can sit down with them

20     and go through with any questions you have.  I can

21     make that happen.

22         AARON BOWMAN:  Mr. Dennis.

23         GARRETT DENNIS:  I do have one suggestion to

24     Mr. Killingsworth, through the Chair and Committee.

25         I know that, Mr. Killingsworth, you've been

1    reaching out to Council members and everything, and

2    I know that our next meeting is on the 9th.  But

3    not to micromanage you, but I think it should be a

4    priority -- this should be a priority so Council

5    members like Council Member Becton should be a

6    priority since we know he has 20,000 that will have

7    to move out of his district.  And Councilwoman

8    Pittman, she has that to gain.  So I think those

9    Council members should be a part of that.

10        You are probably already doing that.  So going

11   back to the 9th -- because I would love to start

12   seeing maybe -- I know I was late, so I apologize

13   about that, but I would love to see a preliminary

14   map sometimes soon on -- you know, on the potential

15   configuration.

16        So I don't know how the rest of the committee

17   feels, but, you know, just prioritizing those

18   meetings.

19        AARON BOWMAN:  No, I think you are spot-on,

20   Mr. Dennis, because I think if Mr. Killingsworth

21   worked in a vacuum and started drawing new lines

22   for Mr. Becton -- he's losing at least 16,000

23   people -- and didn't talk to him about it, that

24   probably will not go over real well.  As well as

25   Ms. Pittman that looks to grow, she may have

1    communities she thinks are of interest that need to

2    be pulled in more so than others.

3         So I agree with you that you could prioritize,

4    you know, on the ones on the losers and the gainers

5    probably first because they are going to be the

6    ones that -- you know, a lot of our districts you

7    could probably just say "It is what it is and it's

8    not going to change, and we'll go on our way."

9         BRENDA PRIESTLY JACKSON:  And the other thing

10   is the actual lowest is the Beaches; it's 13, you

11   know.

12        So I think that -- I'm so grateful for Council

13   Member Becton's work, because you were in on that

14   work that changed the shift that now has to be

15   contemplated.  And so that's the lowest district.

16   It's not the -- it's District 13.  It is those

17   individuals who wanted to just have a Council

18   member that was only at the Beaches.  And contrary

19   to those of us that sat across the bridges, it's

20   all about crossing a ditch.  So they had a whole

21   different spin on that.

22        So I think that needs to be a priority as well

23   to understand what give and take that has to happen

24   for those in the Beaches community's expectations,

25   when they are the lowest district right now.

1        AARON BOWMAN:  All right.  Thank you.

2        And the only other one that I've got is -- I'm

3    looking for colleagues here -- I mean, to me it is

4    kind of redundant.  You talked historic

5    communities.  I mean, that, to me, is a community

6    of interest.  Is there a difference between -- I

7    mean --

8        BILL KILLINGSWORTH:  So the reason I brought

9    that up, Mr. Chairman, is last time initially we

10   were not asked to look at that.  The desire was we

11   want 14 as compact, regular-shaped districts as we

12   can.  And that's where we started, and then it went

13   from there.

14       So initially last time we did not look at --

15   though, I think we recognized long-term.  That's

16   probably where we're going.  We didn't start from a

17   place of recognizing that we were going to maintain

18   the four historic communities of interest.

19       AARON BOWMAN:  Okay.  So I think what you told

20   me is that you've got marching orders and are

21   sufficient on that.

22       Does any other member have any other

23   considerations to give Mr. Killingsworth?

24       And, Mr. Killingsworth, we scheduled the 9th

25   of September.  We do want to make sure that we're

1    moving forward at the right order, but I also don't

2    like to have meetings that are meaningless.

3        Is the 9th of September, you think, a good day

4    to get together to kind of roll out what you think

5    you may -- based on the marching orders you've got

6    today?

7        BILL KILLINGSWORTH:  So Mr. Chairman, I

8    believe so.  If I could ask for the consideration

9    that I get back with the Chair like a week from now

10   to see how far we're along, just so that if there

11   is an issue, that we're not scheduling a meeting

12   that we would end up postponing anyway.  But it

13   would be my desire to have something for you by the

14   9th.

15       AARON BOWMAN:  Okay.  Great.

16       Yes, ma'am?

17       BRENDA PRIESTLY JACKSON:  Mr. Chair, you may

18   have done this, and so I may be behind and didn't

19   see it, but have we sent -- and, Mr. Killingsworth,

20   thank you so much for this information.

21       Have we sent all of our colleagues on the

22   Council?  They've all received it?  Okay.  That was

23   the only thing.  Wonderful.

24       Thank you.

25       AARON BOWMAN:  All right.  Anything from

1      Legal?  School Board?  Members?

2           Okay.  It's been a great meeting today.  Thank

3      you so much.  This meeting is adjourned.

4           (End of meeting at 3:31 p.m.)

5                          - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE
 2    STATE OF FLORIDA )
 3    COUNTY OF DUVAL  )
 4            I, Leah P. Maltz, RPR, RMR, FPR, do hereby
 5    certify that I was authorized to and did
 6    stenographically rewrite and then transcribe the
 7    foregoing meeting from a video recording; and that the
 8    foregoing transcript was produced to the best of my
 9    ability.
10            I further certify that I am not a relative,
11    employee, attorney, or counsel of any of the parties,
12    nor am I a relative or employee of any of the parties'
13    attorneys or counsel connected with the action, nor am
14    I financially interested in the action.
15            DATED this 12th day of July, 2022.
16
17
18
19                          Leah P. Maltz
20
21            _____
22            Leah P. Maltz, RPR, RMR, FPR
23            Court Reporter and Notary Public
24
25
```