

AUGUST 11, 2022

CITY OF JACKSONVILLE
COMMISSION REDISTRICTING CONSULTING SERVICES

# REPORT ON CITY OF JACKSONVILLE REDISTRICTING

DARIO MORENO INC.
STRATEGY CONSULTING

822 Venetia Av.
Coral Gables, FL 33134
P: 305.323.7786

Dr. Dario Moreno
Principal/*Project Director*
darmrn@aol.com   C: 305.323.7786

## I. PROPOSER'S EXPERIENCE, QUALIFICATIONS, PAST PERFORMANCE AND CAPABILITIES

**QUALIFICATIONS**

My testimony is based on over 30 years of professional and academic experience in Florida elections and politics. Over that time, I have conducted intensive factfinding and research in preparation of my books and publications. I was director of the FIU Metropolitan Center (2002-10) and still direct research projects for the center on elections, redistricting, and public opinion. I have used newspapers only to the extent necessary for historical context and dates.

During this time, I have published twenty-five scholarly articles and book chapters dealing with elections and politics in Florida, as well as two books: A Divided Union: Structural Challenges to Bipartisanship in America, co-edited with Eduardo Gamarra, Representative Patrick Murphy, and Representative David Jolly (New York Routledge, 2021), and Florida Politics: Ten Media Markets, One Powerful State, co-edited with Kevin Hill and Susan McManus (Tallahassee: Florida Institute of Government, 2004).

**PRINCIPAL INVESTIGATOR**

I have served as the Principal Investigator for various research projects at the Florida International University Metropolitan Center dealing with elections and redistricting.

- Co-Principal Investigator, Broward Board of County Commission, $210,000, 2021-2.
- Co-Principal Investigator, Miami-Dade School Board, $135,000, 2021.
- Co-Principal Investigator, Broward School Board, $125,000; 2021.
- Co-Principal Investigator, Survey of Citizens, Miami Beach, $15,500; 2017.
- Principal Investigator, Earned Income Credit Outreach Program, City of Miami, $793,000, 2003-2006.
- Co-Principal Investigator, Miami-Dade Voter Confidence Poll, Miami-Dade County, $35,000, 2006.
- Co-Principal Investigator, Broward Exit Poll, Broward Election Department, $30,000, 2006.
- Principal Investigator, Broward Voter Confidence Poll, Broward Election Department, $25,000, 2005.
- Principal Investigator, Annexation Feasibility Study, City of Opa-Locka, $25,000, 2006.
- Co-Principal Investigator, Miami-Redistricting, City of Miami, $40,000, 2003.
- Principal Investigator, EITC Poll, Human Service Coalition, $10,000, 2002.
- Research Team member, Miami Annexation, City of Miami, $49,500, 2002.
- Co-Principal Investigator, Miami Annexation II, City of Miami, $25,000 2003.
- Principal Investigator, Key Biscayne Visioning Project, Village of Key Biscayne, $15,000.
- Principal Investigator, Earned Income Credit Outreach Program, City of Miami, $205,000, 2004.

**PRINCIPAL OF DARIO MORENO INC., A PUBLIC OPINION AND SURVEY FIRM IN SOUTH FLORIDA FROM 2002-2019**

Dario Moreno Inc. has conducted over 150 public opinion surveys and polls. It has collaborated with candidates at the state and local level such as Mario Diaz Balart, Carlos Curbelo, Manny Diaz, David Rivera for Congress, the Codina Group and Carlos Gimenez for Miami-Dade County Mayor, Inc, including:

- Consultant Carlos Gimenez campaign for Miami-Dade, 2011, 2012, 2016. Duties included designing and helped direct the absentee ballot campaign of the Carlos
- Gimenez campaign for Miami-Dade County in 2016.
- Consultant for Norman Braman on the efforts to recall Miami-Dade Mayor Carlos Alvarez.
- Consultant for Michael Bileca for State Representative 2010, 2012, 2014, and 2016. Duties included designing and helped direct the absentee ballot campaign for the Michael Bileca campaign for State House 2010.
- Consultant for Yes for a Greater Miami Dade on County Question No 3 January 2008.

**EXPERT WITNESS ON VARIOUS FEDERAL AND STATE CASES INVOLVING ELECTIONS OR REDISTRICTING**

- Consultant, Florida Rising v. Lee, 2021-2
- Consultant, Florida Senate, 2022
- DeGrandy vs. Wetherall.
- Suarez vs. Miami-Dade School Board.
- Diaz vs. City of Miami Beach.
- Martinez vs. Bush.

**OTHER PROFESSIONAL ACTIVITIES**

Involvement in uncovering the 1997 City of Miami Voting Fraud case. The election results were overthrown by the courts.

Chairman and Co-Founder of One Nation Inc.

**PUBLICATIONS**

- *Books*
    - A Divided Union: Structural Challenges to Bipartisanship in America, co-edited Eduardo Gamarra, Patrick Murphy, David Jolly (New York: Routledge, 2020)
    - Florida Politics: Ten Media Markets, One Powerful State, co-edited Kevin Hill, Susan McManus (Tallahassee: Florida Institute of Government, 2004).

- ✓ The Struggle for Peace in Central America: The Arias Plan (Gainesville: University Press of Florida, 1994)
- ✓ U.S. Policy in Central America: The Endless Debate (Gainesville: University Press of Florida, 1990)

- *Articles and Book Chapters*
  - ✓ The Geography of Polarization" (with Patrick J. Villalonga) in a A Divided Union: Structural Challenges to Bipartisanship in America.
  - ✓ "The Structure of Primaries" (With Steve Vancore, Glenn Burhans, Anthony Kusich, Patrick Villolonga) in A Divided Union: Structural Challenges to
  - ✓ Bipartisanship in America.
  - ✓ "Carlos Gimenez Conservative Reforms in Miami Dade County, (With Maria Ilcheva) In Marion Orr and Domingo Morel (eds) Latino Mayors: Political Change
  - ✓ in the Postindustrial City, Philadelphia: Temple University Press, 2018.
  - ✓ Cuban American Partisanship: A Secular realignment?" (With James Watts) In Kyle L. Kreider and Thomas J. Baldino (eds) Minority Voting in the United States,
  - ✓ Vol 1: 254-269. Santa Barbara: Praeger, 2016
  - ✓ "The Obama Doctrine in Cuba" (With Maria Ilcheva) in Hanna S. Kassab and Jonathan Rosen (eds) The Obama Doctrine in the Americans Lanham MD:
  - ✓ Lexington Books, 2016.
  - ✓ "Miami." In Oxford Bibliographies in Latino Studies. Ed. Ilan Stavans. New York: Oxford University Press, 2014. Refereed
  - ✓ Ch 4: Latino in Florida Politics (with Maria Ilcheva) in Edwin Benton 5 edition of Government and Politics in Florida 2014
  - ✓ "The Miami Renaissance" in The Roots of Latino Interurban Agency" Rodolfo Rosales and Sharon Navarro (ed o s) (Dallas: North Texas Press, 2013)
  - ✓ "Cuban-Americans." In Oxford Bibliographies in Latino Studies. Ed. Ilan Stavans. New York: Oxford University Press, 2013.
  - ✓ "Fool Me Once: Voter Confidence in Florida" (with Maria Ilcheva and Vanessa Brito) Florida Political Chronicle V19, Winter 2008-2009.
  - ✓ "Cuban Political Power: Challenge and Consequences" Cuban Affairs Quarterly Vol. 2, No. 1 (October 2006). (Electronic Journal)
  - ✓ "Hispanic Vote in Florida: 2004 Election" (with J.C. Flores and Maria Ilcheva) In De la Garza, Rodolfo O., Louis DeSipio, and David L. Leal (eds.). Beyond the

- Barrio: Latinos in the 2004 Elections. South Bend, IN: University of Notre Dame Press, forthcoming 2009.
- "Politics and the Challenge of Ethnicity" (with Kevin Hill) In J. Edwin Benton (ed.) Government and Politics in Florida, (3rd ed.) Gainesville: Florida: University Press of Florida, forthcoming 2007.
- "Cuban American Political Power: Challenges and Consequences," Cuban Affairs, Vol. 1, Issue 4 (October 2006).
- "Exiles Power: Cubans in the U.S. Political System" in Ernesto Verdeja, Jorge Romero, and David Plotke (eds.) Cuba and the Valrela Initiative from Dissent to
- Democratization, (New York: New School for Social Research, 2004)
- "Simulating Globalization," International Studies Perspectives, Vol: 5 (August 2004)
- "Florida Hispanic Voters: Regional Concentration, National Origin Diversity, and Partisanship" in Florida's Politics: Ten Media Market, One powerful State in Hill, MacManus, and Moreno (eds.) (Tallahassee: Florida Institute of Government) 2004
- "South Florida" (with Kevin Hill) in Florida's Politics: Ten Media Market, One powerful State in Hill, MacManus, and Moreno (eds.) (Tallahassee: Florida
- Institute of Government) 2004
- "Battleground Florida," Co-authored with Kevin A. Hill. In Rudy de la Garza and Louis DeSipio (eds.) Muted Voices: Latinos and the 2000 Elections, Boulder,
- Colorado: Westview Press, 2003.
- "Power without a Program: Hispanic Incorporation in Miami," Co-authored with Christopher L. Warren in Ruphus Browning, Dale A. Marshall, and David H. Tabbs (eds.) Racial Politics in American City (third edition) Boston: Massachusetts: Longman, 2003.
- "A Community or a Crowd: Racial, Ethnic, and Regional Bloc Voting: The Florida House of Representative 1989-98." Co-authored with Kevin A. Hill in Politics and Policy, March 2002.
- "Racial and Partisan Voting in a Tri-Ethnic City: The 1996 Dade County, Florida Mayoral Race." Co-authored with Kevin A. Hill and Lourdes Cue in Journal of
- Urban Affairs, Winter 2001.
- "Second Generation Cubans." Coauthored with Kevin A. Hill in Susan McManus (ed.) Florida Redistricting, Tallahassee FL: Institute of Government, 2001.
- "Language as a Variable: English, Spanish, Ethnicity and Political Opinion Polling in South Florida." Coauthored with Kevin A. Hill, Journal of Hispanic Behavioral Science, May 2001.
- "Teaching, Using Role Playing Simulation: Bureaucratic Bargaining Revisited. Coauthored with Heidi H. Hobbs in John Bohrer (ed.) New Techniques for

6

- Teaching Political Science, New York: Random House, 1999.
- "The Limits of Sovereignty in a Bifurcated World," In Heidi H. Hobbs (eds.) Pondering post-Internationalism, Albany, New York: State University of New
- York Press, 1999.
- "Cuban-Americans in the 1996 Election." Coauthored with Christopher Warren in Rudy Garcia and Luis DeSipio (eds.) Awash in the Mainstream: Latinos in the 1996 Election, Boulder, Colorado: Westview Press, 1998.
- "Florida Politics and the Challenge of Ethnicity," Coauthored with Christopher Warren and John Stack in Robert Huckshorn (ed.) Government and Politics in
- Florida (second edition) Gainesville: Florida: University Press of Florida, 1998.
- "Cuban-American Political Empowerment." In Chris Garcia (ed.) Latinos and the United States Political System, Notre Dame, Indiana: University of Notre Dame
- Press, 1997.
- "Second Generation Cubans." Coauthored with Kevin A. Hill, Hispanic Journal of Behavioral Science, May 1996.
- "Cuban-Americans in Miami Politics: Understanding the Cuban Model." In Wilbur Rich (ed.) The Politics of Minority Coalitions: Race, Ethnicity, and Shared
- Uncertainties, Westport Connecticut: Greenwood Press, 1996.
- "Nicaragua," In James Malloy and Eduardo Gamarra (eds.) Latin American and the Caribbean Contemporary Record, New York: Holmes & Meier, 1996.
- "The Endless Debate Revisited: U.S. Policy in Central America." Coauthored with Dario Perez in David Dent (ed.) Handbook of U.S. Latin American Policy,
- Westport Connecticut: Greenwood Press, 1995.
- "Respectable Intervention: The United Stated and Central American Elections." In John Both and Mitchell Seligson (eds.) Elections and Democracy in Central
- America, Chapel Hill, North Carolina: University of North Carolina Press, 1995.
- "The Conservative Enclave Revisited: Cuban Americans in the 1992 Election. Coauthored with Christopher Warren in Rudy de la Garza and Luis DeSipio (eds.)
- Ethnic Ironies: Latino Politics in the 1992 Election, Boulder, Colorado: Westview Press, 1995.
- The Cuban Community in the 1992 Presidential Election." Harvard Journal of Hispanic Policy, 1992-1993.
- "Ethnicity & Partisanship: The Case of the 18th Congressional District in Miami," Coauthored with Nicol Rae in Guillermo Gerner Miami Today, Miami, Florida,

- Florida International University Press, 1992.
- "The Conservative Enclave: Cubans in Florida," Coauthored with Christopher Warren in Rudolfo de la Garza, From Rhetoric to Reality: Latino Politics in the
- 1988 Election, Boulder, Colorado: Westview Press, 1992.

## II.     PROPOSER'S COMPENSATION

I am being compensated $250 per hour for my work in this case.

### III. CITY OF JACKSONVILLE 2010 AND 2022 REDISTRICTING MAP BOUNDARIES



## IV.  REPORT BRIEF

Plaintiff's experts argued that the redistricting plan passed by Jacksonville City Council and signed by Mayor Lenny Curry in March 2022 is in violation of the Voting Rights Act and the United States Constitution.  They challenge seven City Council districts (the "Challenged Districts") as racially gerrymandered in violation of the Fourteenth Amendment to the United States Constitution. Plaintiff's claim that the Enacted Plan "packs" African American residents into just four districts (7, 8, 9, and 10). As a natural corollary of this "packing," three adjacent districts (2, 12, and 14) were stripped of their African American residents. Plaintiffs claim the alleged racial gerrymandering affects their ability to impact city politics.

After reviewing the enacted map, the baseline map, the redistricting process in the city of Jacksonville, the reports of Plaintiff's experts, I conclude that the 2022 enacted plan does not dilute African American political power, nor does it prevent them from fair representation on the Jacksonville City Council with the ability to elect candidates of their choice.

***First, the redistricting process was transparent and open to the public.*** The first meeting of the Redistricting process was August 19, 2011, just a week after the census released its official data made specifically for redistricting (Public Law 94-171) on August 12, 2021.

The Special Committee on Redistricting clearly articulated redistricting principles that would guide the City of Jacksonville redistricting process. On August 12, 2021 a first meeting was held where the redistricting committee voted unanimously to (*a*) start the redistricting process from the premise of working from the current council districts rather than starting from scratch when developing proposals.[1] The committee also voted to authorize the Planning and Development Department under director Bill Killingworth to be the Special Committee's consultant for the purpose of analyzing the Census data and producing proposed districts.[2]

Additional redistricting principles were adopted at the August 26, 2021 meeting. The redistricting committee voted (*b*) unanimously to use *total* population as the basis for redistricting instead of *voting age* population. The committee also voted (*c*) unanimously that they shall not draw sitting City Council members or School Board members out of their districts. It should be noted that some school board legal departments have interpreted Florida Statutes 101.36 as prohibiting drawing out sitting school members of their districts. The Redistricting

---

[1] Special Committee on Redistricting, August 18,2021
[2] Ibid

11

committee (d) unanimously approved a motion minimizing the drawing of district boundaries across the St. John River to the extent possible. [3]

The special committee on redistricting unanimously approved a motion to adopt the district map (dated October 27, 2021). It also presented an at-large residence area map (dated October 26, 2021). Both maps were recommended to the City Council as the 2022 redistricting plan and authorized the General Counsel's Office to begin drafting the necessary legislation.

***Second, throughout the process African American elected officials participated and played an active part in the deliberations.*** Two of the seven members of the Special Committee on Redistricting were African Americans: School Board member Darryl Willie and Jacksonville City Council member Brenda Priestly Jackson. In fact, Priestly-Jackson would play an instrumental part in the process as both the chairman of the Rules Committee and as a member of the Redistricting Committee. She made the motion in the redistricting process to recommend the October 27 map to the commission. She chaired the four public Rules Committee meetings (January 27, 2022; February 3, 2022; February 10,2022; and February 17, 2022). Those meetings were organized to encourage public comment on the proposed plan.

During the redistricting process, the four African American councilmembers were supportive of the proposed plan and fully participated in both the committee process and the notice meetings of the north/west commissions that developed the proposed plan. Three of the four African American councilmembers voted for the adopted plan, one was absence from the vote.

*Third, the redistricting process reflects the demographic realities and trends in Jacksonville.* The population of Jacksonville increased by 16% between 2010 and 2020, but the demographic composition of the city remained stable.[4] The City of Jacksonville did not experience the dramatic demographic shifts that have occurred in other parts of Florida.

---

[3] Special Committee on Redistricting August 25,2021
[4] Quick Facts: City of Jacksonville, Florida. United States Census Bureau, Retrieved August 8, 2022.

TABLE ONE: CITY OF JACKSONVILLE DEMOGRAPHICS: RACE AND ETHNICITY[5]

|  | 2020 | 2010 | % DIFFERENCE |
|---|---|---|---|
| Non-Latin Whites | 51.2% | 55.1% | -3.9% |
| African Americans | 31.0% | 30.1% | 0.9% |
| Hispanics | 10.0% | 7.7% | 2.3% |
| Asian | 5.0% | 4.2% | 0.8% |
| Mixed | 4.6% | 2.2% | 2.4% |

The population of Jacksonville did shift slightly. Between 2010 and 2020, more growth occurred in the traditional non-Latin white neighborhoods South/East of the river than in the historic African American neighborhood's northwest of the St. John River. This forces the commission to allow one of the enacted districts to cross the river, namely, District 2. Allowing District 2 to cross the river made the districting process considerably easier, as it permitted some of the population to be shifted north of the river to help equalize the relative over-population of the districts to the South/East of the river.

This population shift to the South/East was the critical issue confronting Jacksonville's mapmaking in the current redistricting process. District 11 on the far southeast corner of the city was overpopulated by nearly 20,000 residents (See Table 2). This district was 27.6% above the target deviation. District 1, a coastal district, was the most underpopulated district; it was missing 6,171 residents below the ideal population, which is 8.7% below the target deviation. The four minority-majority districts in central/north Jacksonville were all underpopulated. District 8 was the most underpopulated, being nearly 6,000 residents below the target population, which is an 8% deviation below the target. Districts 7, 9, and 10 had more modest deviations ranging from 3,401 (-4.8%) to 3,777 (-5.3) below the ideal population (See Table 2).

The changes proposed by the redistricting committee to address these demographic and geographic challenges adhered to the "one person one vote" legal requirement and upheld the redistricting principles adopted by the committee. One of the first decisions made in the redistricting process was to use the current map (dated 2012) as a benchmark for adjusting the districts, rather than starting from a blank slate. Logically, the major changes made between the enacted and benchmark maps was in the South/East. *This area of the city had both the most overpopulated district and the most underpopulated*. The population of District 11 was reduced from 90,757 (Table 1) to 73,463. The excess population in District 11 was partitioned among two neighboring districts (6, 3). Consequently, District 5 picked up a portion of District 6, and District 13 (the most underpopulated district)

picked up nearly 9,000 residents from District 3.  Adjustments were also made in the boundary between District 4 and District 3. The most dramatic changes between the old map and the enacted map were in the South/East part of the city where District 11 lost nearly 20,000 residents while District 13 gained 9,000 residents. These changes were worked out in a publicly noticed meeting between the South/East councilmembers and the consultants on September 7, 2022, and September 22, 2022.

**TABLE 2: BENCHMARK DISTRICT DATA (BEFORE REDISTRICTING)**

| DISTRICT | TOTAL POPULATION | TARGET POPULATION | TARGET DEVIATION | TARGET DEVIATION % |
|---|---|---|---|---|
| 1 | 72,718 | 71,107 | 1,611 | 2.3% |
| 2 | 71,501 | 71,107 | 394 | 0.6% |
| 3 | 72,561 | 71,107 | 1,454 | 2.0% |
| 4 | 76,829 | 71,107 | 5,722 | 8.0% |
| 5 | 68,055 | 71,107 | (3,052) | -4.3% |
| 6 | 71,346 | 71,107 | 239 | 0.3% |
| 7 | 67,330 | 71,107 | (3,777) | -5.3% |
| 8 | 65,166 | 71,107 | (5,941) | -8.4% |
| 9 | 67,706 | 71,107 | (3,401) | -4.8% |
| 10 | 67,567 | 71,107 | (3,540) | -5.0% |
| 11 | 90,767 | 71,107 | 19,660 | 27.6% |
| 12 | 71,617 | 71,107 | 510 | 0.7% |
| 13 | 64,936 | 71,107 | (6,171) | -8.7% |
| 14 | 67,398 | 71,107 | (3,709) | -5.2% |
| | | **TOTAL POPULATION** | | 995,497 |

Compared to the South/East area of the city, the changes enacted in the North/West were relatively minimal. The most underpopulated district in the area was District 8, which was nearly 6,000 residents below its target population – a deviation of only 8.4% from its ideal population.  The other three majority minority districts were all underpopulated by relatively modest margins of between 3,401 to 3,777 residents. District 14, also in the North/East, was underpopulated by a similar number of residents 3,709 votes. The geographic challenge of equalizing the districts in the North/West was that none of districts were significantly overpopulated. District 12 was overpopulated by only 510 residents and District 2 by only 394. In order to equalize the population in the North/West while minimizing river crossing boundaries, the Commission agreed to keep District 2 crossing the St. John River and also the district slightly south, which would take a little over 4,300 residents from District 4. This provided enough residents to equalize the population in North/West area.

**TABLE 3: ENACTED PLAN DISTRICT DATA**

| DISTRICT | TOTAL POPULATION | TARGET POPULATION | TARGET DEVIATION | TARGET DEVIATION % |
|---|---|---|---|---|
| 1 | 72,718 | 71,112 | 1,606 | 2.3% |
| 2 | 72,283 | 71,112 | 1,171 | 1.6% |
| 3 | 74,402 | 71,112 | 3,290 | 4.6% |
| 4 | 71,902 | 71,112 | 790 | 1.1% |
| 5 | 74,201 | 71,112 | 3,089 | 4.3% |
| 6 | 72,247 | 71,112 | 1,135 | 1.6% |
| 7 | 68,060 | 71,112 | (3,052) | -4.3% |
| 8 | 67,916 | 71,112 | (3,196) | -4.5% |
| 9 | 67,793 | 71,112 | (3,319) | -4.7% |
| 10 | 68,777 | 71,112 | (2,335) | -3.3% |
| 11 | 73,463 | 71,112 | 2,351 | 3.3% |
| 12 | 67,696 | 71,112 | (3,416) | -4.8% |
| 13 | 73,964 | 71,112 | 2,852 | 4.0% |
| 14 | 70,145 | 71,112 | (967) | -1.4% |
| | | TOTAL | | 995,567 |

The enacted plan only made minor adjustments from the benchmark plan in the North/West section of the city. The biggest change was an added 2,500 residents to District 8. These residents were added because of a boundary change with District 7, which had received additional population from District 2. Part of the chain reaction in the North/West was a transfer of 2,400 residents from District 12 to District 14. There were only marginal adjustments made to the boundaries between Districts 9 and 10 involving less than 1,100 residents. These minor changes in North/West section of the city had only minimal impact on the demographic make-up of the districts in this area (See Table 4 and 5).



**TABLE 4: DISTRICT DEMOGRAPHICS BENCHMARK PLAN (BEFORE REDISTRICTING)**

| DISTRICT | TOTAL POPULATION # | % | WHITE # | % | BLACK # | % | OTHER* # | % | HISPANIC LATINO # | % | VOTING AGE POP. # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 72,718 | 7% | 31,693 | 6% | 25,542 | 9% | 15,483 | 10% | 11,546 | 10% | 56,490 | 7% |
| 2 | 71,501 | 7% | 44,574 | 9% | 13,997 | 5% | 12,930 | 6% | 6,857 | 6% | 55,157 | 7% |
| 3 | 72,561 | 7% | 48,198 | 9% | 6,514 | 2% | 17,849 | 8% | 8,906 | 8% | 57,524 | 7% |
| 4 | 76,829 | 8% | 40,120 | 8% | 13,296 | 5% | 23,413 | 13% | 14,595 | 13% | 61,597 | 8% |
| 5 | 68,055 | 7% | 39,543 | 8% | 11,892 | 4% | 16,620 | 10% | 11,728 | 10% | 53,190 | 7% |
| 6 | 71,346 | 7% | 52,627 | 10% | 5,090 | 2% | 13,629 | 7% | 7,479 | 7% | 57,376 | 7% |
| 7 | 67,330 | 7% | 20,051 | 4% | 40,516 | 14% | 6,763 | 4% | 4,230 | 4% | 52,345 | 7% |
| 8 | 65,166 | 7% | 15,793 | 3% | 44,406 | 15% | 4,967 | 2% | 2,726 | 2% | 48,908 | 6% |
| 9 | 67,706 | 7% | 18,898 | 4% | 38,711 | 13% | 10,097 | 6% | 6,302 | 6% | 50,896 | 7% |
| 10 | 67,567 | 7% | 18,455 | 4% | 39,313 | 13% | 9,799 | 5% | 6,192 | 5% | 50,547 | 6% |
| 11 | 90,767 | 9% | 52,759 | 10% | 13,906 | 5% | 24,102 | 11% | 11,930 | 11% | 74,973 | 10% |
| 12 | 71,617 | 7% | 37,171 | 7% | 21,970 | 8% | 12,476 | 7% | 7,841 | 7% | 54,228 | 7% |
| 13 | 64,936 | 7% | 51,587 | 10% | 4,509 | 2% | 8,840 | 4% | 5,059 | 4% | 54,111 | 7% |
| 14 | 67,398 | 7% | 43,250 | 8% | 12,675 | 4% | 11,473 | 6% | 7,295 | 6% | 54,201 | 7% |
| TOTAL | 995,497 | 100% | 514,719 | 52% | 292,337 | 29% | 188,441 | 19% | 112,686 | 11% | 781,543 | 79% |

**TABLE 5: DISTRICT DEMOGRAPHICS ENACTED PLAN**

| DISTRICT | TOTAL POPULATION # | % | WHITE # | % | BLACK # | % | OTHER* # | % | HISPANIC LATINO # | % | VOTING AGE POP. # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 72,718 | 7% | 31,693 | 6% | 25,542 | 9% | 15,483 | 8% | 11,546 | 10% | 56,490 | 7% |
| 2 | 72,283 | 7% | 44,913 | 9% | 13,210 | 5% | 14,160 | 8% | 7,404 | 7% | 55,941 | 7% |
| 3 | 74,402 | 7% | 47,720 | 9% | 8,028 | 3% | 18,654 | 10% | 9,578 | 8% | 60,219 | 8% |
| 4 | 71,902 | 7% | 37,899 | 7% | 12,404 | 4% | 21,599 | 11% | 13,618 | 12% | 57,187 | 7% |
| 5 | 74,201 | 7% | 43,600 | 8% | 12,497 | 4% | 18,104 | 10% | 12,547 | 11% | 58,001 | 7% |
| 6 | 72,247 | 7% | 52,933 | 10% | 5,366 | 2% | 13,948 | 7% | 7,502 | 7% | 58,130 | 7% |
| 7 | 68,060 | 7% | 20,827 | 4% | 40,253 | 14% | 6,980 | 4% | 4,389 | 4% | 52,925 | 7% |
| 8 | 67,916 | 7% | 16,594 | 3% | 46,044 | 16% | 5,278 | 3% | 2,934 | 3% | 50,825 | 7% |
| 9 | 67,793 | 7% | 18,917 | 4% | 38,745 | 13% | 10,131 | 5% | 6,330 | 6% | 50,976 | 7% |
| 10 | 68,777 | 7% | 18,706 | 4% | 40,051 | 14% | 10,020 | 5% | 6,282 | 6% | 51,457 | 7% |
| 11 | 73,463 | 7% | 42,199 | 8% | 11,220 | 4% | 20,044 | 11% | 9,553 | 8% | 60,408 | 8% |
| 12 | 67,696 | 7% | 35,356 | 7% | 20,671 | 7% | 11,669 | 6% | 7,324 | 6% | 51,206 | 7% |
| 13 | 73,964 | 7% | 58,625 | 11% | 4,987 | 2% | 10,352 | 5% | 5,988 | 5% | 61,499 | 8% |
| 14 | 70,145 | 7% | 44,800 | 9% | 13,319 | 5% | 12,026 | 6% | 7,694 | 7% | 56,339 | 7% |
| TOTAL | 995,567 | 100% | 514,782 | 52% | 292,337 | 29% | 188,448 | 19% | 112,689 | 11% | 781,603 | 79% |

***Fourth, the enacted plan maintains stable majority-minority districts that have performed in electing the candidates of choice for Jacksonville's African American communities.*** The plaintiffs claim that, since 1991, redistricting in Jacksonville has sorted its residents by race. The city classified African American residents to pack them into just four of the fourteen single member City Council districts.[6] The basic structure of the 1991 redistricting was confirmed during the redistricting process in 2002, 2012 and in 2022. These historically

---
[6] Plaintiffs Motions for Preliminary, NAACP v. City of Jacksonville, p.1-2

consistent district boundaries have allowed African Americans to increase their influence in city politics. Today, there are six African American City Council members: four from single member districts and two who were elected at-large. Moreover, since the 1991 redistricting, two African Americans have served as President of the Jacksonville City Council – the second most powerful office in city government after the mayor. Currently, both the President of the City Council, Sam Newby, and the Vice President, Terrance Freeman, are African American.

***The Redistricting Plan does not dilute African American political power through packing.*** Plaintiffs claim that Jacksonville's 2022 redistricting plan violates the Voting Rights Act and the Fourteenth Amendment to the U.S. Constitution because it packs African American residents into just four districts. They argue that the four majority African American districts (7, 8, 9, and 10) are unnecessarily overpopulated with African American residents. Three of the districts (7, 9, and 10) have African American populations over 56%, while District 8 is nearly 70% African American. They claim that three neighboring districts (2, 12, and 14) were stripped of African American population, thus making them more non-Latin white. Consequently, this alleged racial gerrymandering affects the Plaintiffs' ability to impact city politics. Dr. Hannah Walker, after doing a functional analysis of Jacksonville elections concluded that African Americans could elect a candidate of their choice when they comprise 44% of the voters.

I disagree with the Plaintiffs' interpretation of packing. Packing consists of drawing districts to concentrate voters of a particular race into one or two districts to diminish their numbers and therefore their ability to elect candidates of their choice in other districts. The anti-packing provisions of the Voting Rights Act was enacted to ensure that jurisdictions were not packing minorities in a few districts to prevent the drawing of more minority-majority districts. Nowhere in the Plaintiffs' complaints, their motion for preliminary injunctions, or the three expert reports do they claim that reducing the African American population of the four allegedly "packed districts" would permit the drawing of a fifth majority-minority district. Dr. Imai submitted a report describing the simulation of 10,000 possible alternative redistricting plans; he did not offer one case of a redistricting plan with five majority-minority districts.

Plaintiffs are demanding significant adjustments to the seven North/West districts, but the North/West has lost population relative to the South/East area of the city. It is very difficult to make population adjustments beyond a couple of percentage points. Councilmember Priestly Jackson recognized this when she acknowledged the decline of the African American populations in the North/West districts: "Those numbers have gone down from the 70s to three of them being in the upper 50s now to one still in the 60s."

17

## V. KEY FINDINGS

- The redistricting process was transparent and open to the public.

- Throughout the process, African American elected officials participated and played an active part in the deliberations.

- The redistricting process reflects the demographic realities and trends in Jacksonville.

- The Redistricting Plan does not dilute African American political power through packing.

- I conclude after reviewing the enacted map, the baseline map, the redistricting process in the city of Jacksonville, the reports of Plaintiffs' experts, that the 2022 enacted plan does not dilute African American political power, nor does it prevent them from fair representation on the Jacksonville City Council with the ability to elect candidates of their choice.

## VI. SIGNATURE

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of August 2022.

*DocuSigned by:* [signature]  8/11/2022
B7284F649940488...