# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JACKSONVILLE BRANCH OF THE
NAACP, *et al.,*

      Plaintiffs,                        Case No.:  3:22-cv-493-MMH-LLL

v.

CITY OF JACKSONVILLE, *et al.,*

      Defendants.

_____/

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

      Defendants, City of Jacksonville, and Mike Hogan, in his official capacity as Duval County Supervisor of Elections (SOE), respond to Plaintiffs' Motion for Preliminary Injunctive Relief (Doc. 36).  Plaintiffs cannot demonstrate they are entitled to the relief they seek.  Defendants therefore respectfully request that this Court deny Plaintiffs' Motion.[1]

## MEMORANDUM OF LAW

### I.    INTRODUCTION

      "Politics can sometimes be a very messy business, and nowhere is that more true than in the decennial process of redistricting."  *Barnett v. City of Chicago*, 969 F. Supp. 1359, 1412 (N.D. Ill. 1997), *aff'd in part, vacated in*

---

[1] Defendants do not request an evidentiary hearing on Plaintiffs' Motion.

*part,* 141 F.3d 699 (7th Cir. 1998). Likewise, with any political process, there are disagreements, needed clarifications, and, ultimately, compromises. All this was true of Jacksonville's recent redistricting process. Here, Plaintiffs are not happy with the new lines for districts 2, 7, 8, 9, 10, 12 and 14 (challenged districts). Those boundaries, however, are entirely constitutional. When the City Council passed Ordinance 2022-01-E establishing new district lines, the Council was not predominantly motivated by race. Accordingly, the Court should reject Plaintiffs' request for relief.

## II.    FACTS

When the Council set out to draw new district lines after the 2020 census, its biggest challenge was to address the immense population growth in District 11, located in the City's southern area. *See* Doc. 34-16 at 29-31; Doc. 40-13 at ¶¶9-10, 18-23; Doc. 40-14 at ¶¶8-10; Doc. 40-15 at ¶¶7-8; Doc. 40-18 at ¶7; Doc. 40-31 at ¶¶6, 21-22. The City had grown by about 100,000 residents to a total of 995,497. *See* Doc. 34-3 at 12; Doc. 40-2 at 32; Doc. 40-31 at ¶5. Each of the City's fourteen districts, therefore, would need to contain approximately 71,000 residents (allowing for a ten percent deviation), in order to satisfy the Constitutional requirement of "one person, one vote." *See generally Reynolds v. Simms*, 377 U.S. 533, 568 (1964). *See also* Doc. 34-3 at 6, 12; Doc. 40-2 at 6-7, 9-13, 32, 37; Doc. 40-3 at 9-11; Doc. 40-31 at ¶5.

The census results further indicated District 11 had increased to 90,767 individuals. Doc. 40-13 at ¶19. Accordingly, the Council needed to shift 17,304 residents from that district to other districts, causing various ripple effects throughout the City. *Id.* at ¶23; Doc. 40-31 at ¶¶6, 21-22. The Council's most notable district line changes, therefore, occurred in the City's southern areas. *See* Doc. 40-1;[2] Doc. 40-31 at ¶¶21-22. The remaining district changes, including those to the challenged districts, were negligible. Doc. 40-1.

At the outset of its process, the Council voted on a series of foundational criteria to guide its deliberations including (1) starting with existing lines, (2) drawing lines to protect incumbents, (3) minimizing crossing the St. Johns River to the extent possible, (4) using total population numbers, (5) respecting existing communities of interest, and (6) not expediting the process. *See* Doc. 34-3 at 5-9, 11-15; Doc. 34-4 at 2-3; Doc. 34-10 at 2, 65; Doc. 40-13 at ¶¶12-17; Doc. 40-14 at ¶¶4, 8, 11-17; Doc. 40-20 at ¶¶6-9; Doc. 40-28 at ¶¶7-11; Doc. 40-30 at ¶¶7-11. *See also generally* Doc. 40-2; Doc. 40-3; Doc. 40-31 at ¶¶19-20. Then, with assistance from William Killingsworth, Director of Planning and Development, the Council set on its task. It was not always easy or straightforward but at no point did the Council subordinate its voted upon criteria to racial considerations. *See* Doc. 40-13 at ¶34; Doc. 40-14 at ¶37; Doc.

---

[2] The PDF version of the map filed electronically with the Court allows the viewer to zoom in and view specific boundaries with particularity.

3

40-15 at ¶14; Doc. 40-19 at ¶25; Doc. 40-20 at ¶30; Doc. 40-21 at ¶20; Doc. 40-23 at ¶32; Doc. 40-27 at ¶25; Doc. 40-28 at ¶41; Doc. 40-30 at ¶35.

For example, the Council realized early on that districts would need to cross the St. Johns River as attempting to avoid river crossings created numerous redistricting problems. *See* Doc. 34-3 at 17-23; Doc. 40-4 at 3-15; Doc. 40-5 at 4-32; Doc. 40-14 at ¶¶21-24. Moreover, any district boundary shifts, whether including or avoiding river crossings, created a domino effect on surrounding districts, including those challenged by Plaintiffs.

As to the challenged districts, the ultimate boundary changes were minimal, adhered to the Council's voted-on foundational criteria, and did not subordinate that criteria to race. Only District 8 needed to gain residents in order to comply with the acceptable ten percent population deviation. Accordingly, the Council had to consider District 8's boundaries with Districts 7 and 10, along with evaluating how any changes to Districts 7 and 10's boundaries might implicate the boundaries with their adjoining neighbors, particularly Districts 2 and 9. *See* Doc. 40-31 at ¶6.

The most notable changes to the challenged districts occurred along the borders of Districts 7 and 8 and Districts 2 and 7. District 8's upper border shifted north to Lem Turner Road, a natural boundary line, creating a more

regular boundary with District 7.[3]  In so doing, the new line eliminated the previously existing western "claw" that formerly reached into District 8.  *See* Doc. 40-1; Doc. 40-31 at ¶35.  Likewise, District 7's northeastern border with District 2 moved slightly east past Main Street, picking up constituents near Yellow Bluff Road.  *See* Doc. 40-1.  Council members agreed to this new border based on the party affiliation of residents in that area.  *See* Doc. 34-11 at 40-64; Doc. 40-23 at ¶¶20-25.

The changes to Districts 9 and 10 were negligible and predicated largely on census block shifts initiated by the Census Bureau.  Doc. 34-11 at 5-7; Doc. 40-31 at ¶¶6b, 17-18; *see also generally* Doc. 40-31 at ¶¶8-18 (describing census data hierarchy).  District 10's border also expanded to include a neighborhood that was only accessible through District 10.  **See** Doc. 34-14 at 11-12; Doc. 40-31 at ¶¶6c.  Likewise, a tiny pocket from District 12, which under the 2011 lines had been included in that district so that the then-council member's in-laws could vote for him, was added to District 10, again making District 10's boundaries more uniform.  *See* Doc. 40-1; Doc. 40-28 at ¶¶ ¶¶ 27-29.

The primary change to District 12 represented a shift along its southern boundary in the Argyle area, which was previously represented by multiple

---

[3] The Council considered several proposals which would have moved population from District 12 to District 8.  Each were rejected for a variety of reasons, including taking into consideration the Council's voted-on criteria: party affiliation of the proposed constituents, and not splitting communities of interest (i.e., the Town of Baldwin).  *See* Doc. 34-10 at 29; Doc. 34-11 at 15; Doc. 34-12 at 14-15; Doc. 40-27 at ¶14, 17-19; Doc. 40-30 at ¶¶ 24-29.

council members.  *See* Doc. 34-10 at 20; Doc. 40-1; Doc. 40-19 at ¶¶11-12, 14-15; Doc. 40-30 at ¶¶19-23.  This change resulted in a population shift from District 12 to District 14 that partially unified a previously fractured community of interest.  *See* Doc. 34-13 at 6; Doc. 40-30 at ¶¶19-23.

When the Council voted on the new lines, one member objected.  He did so, not because he believed his colleagues drafted the district lines on the basis of race, but because he objected to the Council's goal of protecting incumbents and maintaining the status quo.  *See* Doc. 34-17 at 147; Doc. 34-16 at 37.  Of those who voted favor of the new lines, none did so predominantly because of race.  Plaintiffs are therefore wrong that Defendants violated the Fourteenth Amendment by racial gerrymandering. The Court should deny their Motion.

## III.   PRELIMINARY INJUNCTION STANDARD

Plaintiffs understate the burden they must satisfy in order to obtain a preliminary injunction.  *See generally Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1290–91 (11th Cir. 2022) (listing preliminary injunction factors).  They fail to acknowledge that a higher standard of review is required when seeking to enjoin the enforcement of otherwise lawfully passed legislation.  *See Ne. Fla. Chpt. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("[P]reliminary injunctions of legislative

enactments . . . must be granted . . . only upon a clear showing that the injunction . . . is definitely demanded . . . .").

The Supreme Court's recent order in the redistricting case of *Merrill v. Milligan*, 142 S. Ct. 879 (2022), supports a heightened standard.  Justice Kavanaugh, concurring in the result, indicated that plaintiffs should not be entitled to an injunction close to an election unless

> (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Id.* at 881 (Kavanaugh, J., concurring).  Such "dicta from the Supreme Court carries strong persuasive value." *Alpha Phi Alpha Frat. Inc. v. Raffensperger*, No. 1:21-CV-5337-SCJ, 2022 WL 633312, at *8 (N.D. Ga. Feb. 28, 2022).  *See also Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) ("We have previously recognized that dicta from the Supreme Court is not something to be lightly cast aside.").

Here, Plaintiffs seek to enjoin otherwise lawfully passed redistricting legislation and ask the Court to order Defendants to draft new maps in a compressed time frame.  *See, e.g.*, Doc. 36-2 (asking Court to prohibit defendants from conducting elections with the challenged maps); Doc. 39 at 2 (order Council to draw new maps in twenty-one days).  Plaintiffs are therefore required to make a "clear showing" that an injunction is "definitely demanded."

7

*Ne. Fla. Chpt. of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285.  *See also People's Party of Fla. v. Fla. Dep't of State*, No. 8:22-cv-1274-TPB-AEP, 2022 WL 2238439, at *2 (M.D. Fla. June 22, 2022) (right to preliminary injunction must be "entirely clearcut").  Plaintiffs cannot satisfy their burden.  The Court should deny their Motion.[4]

## IV.  ANALYSIS

### A. Likelihood of Success on the Merits

For Plaintiffs to show a clear-cut likelihood of success on the merits, they must establish that "race was the predominant factor motivating [the Council's] decision to place a significant number of voters within or without a particular district."  *Cooper v. Harris*, 137 S. Ct. 1455, 1463–64 (2017).  Plaintiffs "must prove that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations."  *Miller v. Johnson*, 515 U.S. 900, 916 (1995).  These principles include "compactness, contiguity . . . , respect for political subdivisions or communities defined by actual shared interests," *id.*, and protection of incumbents and political parties.  *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506-07 (2019); *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Bush v. Vera*, 517 U.S. 952, 959 (1996).

---

[4] Defendants waive Plaintiffs' bond obligation otherwise required by Rule 65(c).

Redistricting differs "from other kinds of state decisionmaking [sic] in that the legislature always is *aware* of race when it draws district lines, just as it is aware of . . . a variety of other demographic factors." *Shaw v. Reno*, 509 U.S. 630, 646 (1993) (emphasis in original). *See also Miller*, 515 U.S. at 916 ("Redistricting legislatures will . . . almost always be aware of racial demographics . . . ."). Accordingly, race consciousness in the redistricting process "does not lead inevitably to impermissible race discrimination." *Shaw*, 509 U.S. at 646. It follows that the Council's good faith in the redistricting process must be presumed. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Miller*, 515 U.S. at 915. Plaintiffs, therefore, must establish that race was "*the predominant* factor motivating the legislature's [redistricting] decision," rather than merely *a* factor. *Bush*, 517 U.S. at 959 (emphasis in original).

Plaintiffs' "direct evidence" is anything but. Direct evidence establishes a fact without needed "inference or presumption." *E.E.O.C. v. Austal USA, LLC*, 447 F. Supp. 3d 1252, 1264-65 (S.D. Ala. 2020). *See also Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla.*, 256 F.3d 1095, 1105 (11th Cir. 2001) (same), *overruling rec'g on other grounds by Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 n.15 (11th Cir. 2011). Here, Plaintiffs' "direct evidence" requires the Court to draw multiple inferences, read statements out of context, and ignore swaths of the record. Regardless of how one defines Plaintiffs' evidence,

it does not demonstrate in a clear fashion that race was "*the predominant* factor motivating the legislature's decision." *Bush*, 517 U.S. at 959 (emphasis in original).

### 1. Explicit Racial Targets

Nothing supports Plaintiffs' assertion that the Council set explicit racial targets for redistricting. Plaintiffs highlight isolated statements made by particular Council members regarding the racial populations in their potential districts, but at no point identify when the Council agreed upon a specific racial target, or what that target was. Nor can they because the Council never did so. *See* Docs. 34-10 to 34-17; Docs. 40-2 to 40-10; Doc. 40-13 at ¶26; Doc. 40-14 at ¶34; Doc. 40-15 at ¶11; Doc. 40-16 at ¶5; Doc. 40-18 at ¶12; Doc. 40-19 at ¶21; Doc. 40-20 at ¶26; Doc. 40-21 at ¶17; Doc. 40-23 at ¶28; Doc. 40-25 at ¶12; Doc. 40-27 at ¶21; Doc. 40-28 at ¶37; Doc. 40-30 at ¶31; Doc. 40-31 at ¶27. Rather, the record demonstrates the Council voted upon specific criteria to guide their process, none of which included consideration of race or specific targets associated thereto.

True, some Council members referenced racial percentages in an effort to ensure that any given district neither packed nor diluted minority voters. *See* Doc. 34-10 at 9, 14, 18-19, 25-27, 32, 57-58; Doc. 34-11 at 12, 18, 20-21, 23-24, 27-30; Doc. 34-16 at 53-57; Doc. 40-13 at ¶¶27; Doc. 40-23 at ¶29; Doc. 40-27 at ¶¶15, 23; Doc. 40-28 at ¶39; Doc. 40-31 at ¶42. Nothing prohibited them

from doing so. *See, e.g.*, *Shaw*, 509 U.S. at 642; *Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 353 (4th Cir. 2016). Additionally, those conversations occurred within the context of the Council's previously settled redistricting principles. *See* Doc. 34-10 at 2-3, 4-5, 8, 12, 24-25, 29; Doc. 34-11 at 5, 11, 18, 29, 38-39, 43, 46, 53, 61. *See also e.g.*, *Chen v. City of Houston*, 206 F.3d 502, 519 n.13 (5th Cir. 2000) (consideration of a factor in the redistricting process does not mean that factor predominated over others).

Most importantly, the entire Council voted on the district lines, not just the individual council members whose statements Plaintiffs emphasize. *See* Doc. 34-17 at 162. "[T]he opinions of individual council members are not material; the relevant inquiry concerns the intent of the City through its City Council as a legislative body." *Chen v. City of Houston*, 9 F. Supp. 2d 745, 761 (S.D. Tex. 1998). *See also Lee v. City of Los Angeles*, 908 F.3d 1175, 1183-84 (9th Cir. 2018) (statements by individual council members indicate that race was a motivation, but not the predominant factor); *Dem. Nat'l Comm. v. Reagan*, 904 F.3d 686, 720 (9th Cir. 2018) ("What motivates one legislator to make a speech about a statute is not necessarily what motives scores of others to enact it." (internal citations omitted)); *Bishop of Charleston v. Adams*, No. 2:21-cv-1093-BHH, 2022 WL 407405, at *12 (D. S.C. Feb. 10, 2022) (cautioning against granting weight to "extraneous comments of a few individual legislators"); *Raleigh Wake Citizens Ass'n*, 827 F.3d at 353 (same). Those who

11

voted in favor of the new lines did not do so predominantly because of race. *See, e.g.*, Doc. 40-13 at ¶34; Doc. 40-14 at ¶¶36-37; Doc. 40-15 at ¶14; Doc. 40-19 at ¶25; Doc. 40-20 at ¶30; Doc. 40-23 at ¶32; Doc. 40-27 at ¶25; Doc. 40-28 at ¶41; Doc. 40-30 at ¶35.

Likewise, to the extent Council members questioned the existence of racial numbers included on some maps, the Court should not infer that the Council was making decisions predominantly on the basis of race. That data was taken directly from data provided by the Census Bureau. Doc. 34-15 at 26-27; Doc. 40-31 at ¶¶36-39. Moreover, a full review of the record demonstrates the Council did not subordinate their voted-upon and traditional redistricting criteria to race. *See* Doc. 40-13 at ¶¶28-33 (explaining discussion racial demographics on map proposals). *See also Ga. State Conf. of NAACP v. Ga.*, 312 F. Supp. 3d 1357, 1367-68 (N.D. Ga. 2018) (where request for relief turns on a credibility determination, City should prevail).

In the absence of evidence that in this most recent redistricting process the Council set explicit racial targets, Plaintiffs attempt to prop up their argument by asserting that since at least 1991, the City has racially gerrymandered. Doc. 36 at 4-6, 15. Plaintiffs suggest that the intent of Councils from as far back as thirty years ago should be folded into an analysis of whether, during this most recent redistricting cycle, race was the predominant factor driving the Council's determinations. Despite this issue

12

not having been raised in their Complaint nor ever previously litigated in a court of law, Plaintiffs ask the Court to make the unfounded inferential leap that the purported discriminatory taint from prior redistricting cycles should be imputed into the present process and attributed to current Council members.

The Complaint, however, does not challenge the constitutionality of the last thirty years of redistricting in Jacksonville.  Instead, Plaintiffs allege that in March of 2022, the present Council approved district lines that unlawfully sorted citizens by race.  Doc. 1 at ¶264.  Plaintiffs have not presented direct evidence to support that claim and Defendants have pointed to evidence showing otherwise.  *See supra* Section II.  As such, the Court should reject Plaintiffs' proffered history.  *See, e.g.*, *Abbott*, 138 S. Ct. at 2324 (alleged "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful").  *See also* Doc. 40-34 at 16-17.

### 2.  Communities of Interest

Plaintiffs' assertion that the Council used the phrase "communities of interest" as a euphemism for race is unfounded.  "'Community of interest' is a term of art that has no universal definition in the redistricting context." *Robinson v. Ardoin*, No. 22-211-SDD-SJD, 2022 WL 2012389, at *8, 40 (M.D. La. June 6, 2022).  Such communities exist "by commonalities of socio-economic status, education, employment, health, and other characteristics." *Alpha Phi*

*Alpha Frat. Inc.*, 2022 WL 633312 at *26 (citing *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 432 (2006)).   Other definitions consider "location (rural, urban, coastal, or mountain), occupation (industrial or agricultural), political ties, social similarities, or cultural connections." *Ala. State Conf. of NAACP v. Ala.*, No. 2:16-CV-731-WKW, 2020 WL 583803, at *19 (M.D. Ala. Feb. 5, 2020) (citing *Miller*, 515 U.S. at 908).   Here, the City's code directs that "the geographical arrangement and territorial boundaries of the districts must take into consideration other factors, particularly compactness and contiguity, *so that the people of the City, and their varied economic, social and ethnic interests and objectives, are adequately represented in the Council*." § 18.101(c), Jacksonville Ord. Code (emphasis added).

A full review of the record indicates that when Council members used the term "communities of interest," their definitions varied.   Many derived their understanding of the term from the City code. *See, e.g.*, Doc. 40-17 at ¶10; Doc. 40-18 at ¶10; Doc. 40-19 at ¶12; *see also* Doc. 40-31 at ¶¶23-25.   Other Council members described the phrase as including individuals with shared religious beliefs; similar neighborhood characteristics (e.g., "the tree-lined streets and historic areas of Mandarin"); geographic areas like the beaches; and military communities.   Doc. 40-15 at ¶10; Doc. 40-24 at 6; Doc. 40-25 at ¶10; Doc. 40-28 at ¶32.   Likewise, there were numerous instances when Council members discussed keeping specific communities together without

14

any reference to race.  *See* Doc. 34-10 at 20, 24, 29, 34, 37; Doc. 34-12 at 11;
Doc. 34-14 at 5, 13; Doc. 40-2 at 39, 47; Doc. 40-3 at 8-9, 68-69; Doc. 40-4 at
10-11, 13, 15-16; Doc. 40-5 at 10, 13, 15, 20, 21, 35; Doc. 40-6 at 4; Doc. 40-19
at ¶¶11-12, 14-15; Doc. 40-27 at ¶¶18; Doc. 40-30 at ¶¶19-28.

It does not follow, therefore, that because a handful of Council members
out of an entire body of nineteen may have included a racial component in
their definition of "communities of interest," the entire Council used this
phrase as a synonym for race.  As noted earlier, "the relevant inquiry concerns
the intent of the City through its City Council as a legislative body," rather
than through the statements of individual members.  *Chen*, 9 F. Supp. 2d at
761.  The challenged districts were voted on by the whole deliberative body,
not just by the select Council members Plaintiffs quote.

### 3.  Party as Proxy for Race

Plaintiffs also cannot "disentangle race from politics and prove that the
former drove" the Council's decision-making.  *McConchie v. Scholz*, No. 21-cv-
3091, 2021 WL 6197318, at *23 (N.D. Ill. 2021).  Again, Plaintiffs take Council
member statements out of context and ignore many statements in the record
to the contrary.[5]  When the broader record is considered, the Council did not

---

[5] Plaintiffs mischaracterize the record when they state the Council "expressly declined to
adopt partisanship as a criterion."  Motion at 11.  Rather, the Council simply did not
formally adopt partisanship as a core criterion for the process.  *See* Doc. 34-3 at 9, 14-15.
The law, however, does not prohibit consideration of party affiliation.  *See generally Rucho*,
139 S. Ct. at 2506-07; *Bush*, 517 U.S. at 959.

categorically treat party as proxy for race.  *See* Doc. 34-11 at 11-12, 17-18, 24, 29, 38-39, 53.

In particular, when Council members discussed where to draw the boundaries between Districts 7 and 2, Mr. Killingsworth noted "there's going to have to be some give and take between seven and two . . . ." Doc. 34-11 at 40.  *See also id.* at 39-53 (detailing broader discussion regarding Districts 7 and 2).  Throughout this conversation, members focused on citizen party affiliation.  For example, one Council member stated: "What are [the] breakdowns in terms of Republicans versus Democrats?  . . . Let's just cut to the chase.  That's what you want to know." *Id.* at 46.  *See also* Doc. 40-19 at ¶¶16-18.  And indeed, the Council member who was concerned about the boundaries between Districts 7 and 2 stated his reluctance to take on a "highly Republican" area.  Doc. 34-11 at 53.  *See also* Doc. 40-6 at 4 (noting proposed lines would align with areas that share political preferences); Doc. 40-14 at ¶20; Doc. 40-23 at ¶¶15, 20-25.  It should also be acknowledged that two of the City's five at-large members are African American Republicans. Doc. 40-22 at ¶3; Doc. 40-26 at ¶3.  To the extent, therefore, Plaintiffs suggest that the Council treated politics and race as one-and-the-same, they are incorrect.  Finally, it is constitutional for the Council "to redraw lines for partisan purposes . . . so long as the redistricting did not explicitly discriminate on race, or was unexplainable on grounds other than race."

*Atkins v. Sarasota Cty.*, 457 F. Supp. 3d 1226, 1237 (M.D. Fla. 2020).  Plaintiffs have not demonstrated something unconstitutional happened here.

### 4. Core Preservation

Plaintiffs' core preservation argument also fails.[6]  "[R]etaining previous occupants in new legislative districts" is a traditional redistricting criterion. *Baumgart v. Wendelberger*, No. 01-C-0121, 2002 WL 34127471, at *3 (E.D. Wis. May 30, 2002).  *See also Larios v. Cox*, 300 F. Supp. 2d 1320, 1334 (N.D. Ga. 2004).  At the start of its process, the Council's first explicit redistricting criteria decision was to start by working off present district lines.  *See* Doc. 34-3 at 9; Doc. 34-10 at 2; Doc. 40-2 at 40-42, 61-62, 64-65; Doc. 40-13 at ¶¶ 8, 10, 12; Doc. 40-14 at ¶¶7-10; Doc. 40-23 at ¶8; Doc. 40-28 at ¶¶7, 18.  In light of how the City's population grew since the last census, the only major line changes were required in the City's southern areas.  As for the rest of the City, including the challenged districts, population growth was minimal, and only required small changes along district boundaries. *See supra* Section II.

For example, when evaluating how to preserve the core of districts 7, 8, 9 and 10, Mr. Killingsworth noted that

> the play comes down to district 2, 7, 8, and 12. So those – those are the ones that are really in play, [ . . . . ] 9, 10, and 14 don't have to change at all.  But depending upon what you do with eight, it can impact

---

[6] It is curious that here, Plaintiffs accuse the City of subordinating core preservation to race, but in their remedy brief, they argue this principle be discarded should the Court order the City to draw entirely new district lines.  *See* Doc. 39 at 11.

> seven[;] what happens there could require an impact to two or . . . 12 – 7 – 8 has to pick up.

Doc. 34-10 at 10-11; *id.* at 28.  As Council members wrestled with how to equalize population in this area, much of what drove their desire to maintain boundaries emanated from their individual knowledge of, and intimacy with, their present constituents, and the desire to maintain those relationships and associated geographical boundaries.  *See generally* Doc. 34-10 *passum*; Doc. 34-11 at 9, 43, 53.  *See also* Doc. 34-10 at 18 ("zero desire to change . . ."); *id.* at 28 (noting keeping same boundaries for districts 9, 10 and 14); *id.* at 59 ("prefer not to have any changes"), *id.* at 61 ("willing to make whatever tweaks around the edges of a negligible nature"), *id.* ("I don't want any changes . . ."); Doc. 40-14 at ¶29; Doc. 40-25 at ¶8.

A comparison of the 2011 district lines with the 2022 district lines further demonstrates there were very few changes to the challenged districts. *See* Doc. 40-1; *see also supra* Section II.  The Council predicated its minor changes on population shifts, political party preference, maintaining communities of interest, protecting incumbents, and responding to new census blocks.  *See id.*  *See also* Doc. 40-34 at 12-15.  There is no direct evidence to prove Plaintiffs' allegation of racial gerrymandering.

### 5. Circumstantial Evidence

#### a. Plaintiffs' Experts

Plaintiffs rely heavily on the opinions of Dr. Sharon Austin and Dr. Kosuke Imai to contend that ample circumstantial evidence supports their claim of racial gerrymandering.  Neither expert opinion, however, meets the requirements of Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and fail to advance Plaintiffs' case.

Expert testimony is admissible if the proponent of the testimony satisfies its burden of showing that it meets the criteria of "qualification, reliability, and helpfulness." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The expert must be qualified to testify about the matters addressed, use reliable methodology as outlined in *Daubert*, and give testimony that will be helpful to the trier of fact. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). For purposes of the preliminary injunction, Defendants do not dispute the experts' qualifications.  Neither of Plaintiffs' expert opinions, however, meet the criterion of reliability.

An expert opinion is reliable if it is based on scientifically valid reasoning and methodology that can be applied properly to the facts of the case. *Frazier*, 387 F. 3d at 1261-62 (*quoting* Daubert, 509 U.S. at 592-93).  Other reliability factors include "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4)

whether the technique is generally accepted in the scientific community." *Id.*
at 1262 (citations omitted).

Dr. Austin's report presents nothing more than unsupported conclusions
with no link between premise and conclusion. She admits she is simply making
observations and drawing conclusions, both being that "district lines were
intentionally drawn in such a way as to concentrate large Black voting-age
populations (BVAP) into the Packed Districts and removed them from Stripped
Districts." Doc. 34-18 at ¶3. She also observes districts with "unusual shapes."
*Id.* However, none of her conclusions are supported by any methodology or
requires the use of an expert. *Id.* at ¶2 (observed and drew conclusions).

> Although experts commonly extrapolate from existing data, nothing in
> either *Daubert* or the Federal Rules of Evidence requires a district court
> to admit opinion evidence that is connected to existing data only by the
> *ipse dixit* of the expert. Rather, the trial court is free to conclude that
> there is simply too great an analytical gap between the data and the
> opinion proffered.

*Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183, 1195 (11th Cir. 2010) (cleaned up)
(*quoting General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). There are too
many analytical gaps in Dr. Austin's report to warrant reliance.

Dr. Austin never explains how she rules out alternative causes for the
district lines, such as partisan packing, natural boundaries, or any of the voted-
on criteria selected by the Council. Her failure to consider alternative causes
is analogous to the concept of differential etiology, in which an expert must

first set forth a list of possibly hypotheses that could explain the salient findings (general causation) and then eliminate all causes except one (specific causation). *Hendrix*, 609 F.3d at 1195; *see also In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 759 (3d Cir. 1994) (considering alternative causes should be required in "any technique that tries to find a cause of something"). Each step of proving causation – general and specific – should be supported by a scientifically valid methodology. Here, however, Dr. Austin's conclusions are not supported by any methodology, and are simply her own *ipse dixit*. *Hendrix*, 609 F.3d at 1195.

For instance, she says that she used "standard methodology . . . when investigating precinct and census data," *id.* at ¶8, but expounds no further on that methodology or how it led to her conclusions. In addition, she makes the conclusory statement that she "can identify no factor other than race that explains" the alleged packing of the challenged districts, *id.* at ¶33, but fails to mention why she did not consider the factors voted on by the Council. *See also id.* at ¶35 (asserting, without explanation, why race can be the only reason for the district boundaries). Likewise, when challenging the shape of precinct lines in Districts 8 and 12, she states that the border between Precincts 814 and Precinct 1203 "could have been a straight line instead of its hook northward" and then makes another unsupported inference that "race was a

factor." *Id.* at ¶62.  She fails, however, to account for the fact that Old Plank Road forms this border and naturally curves northward.  *See* Doc. 40-1.

Finally, Dr. Austin's unsupported conclusions are flawed because they are legal conclusions that invade the province of the finder of fact. *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1128–29 (11th Cir. 2018).  She simply restates the ultimate legal conclusion desired by Plaintiffs – that the lines were drawn based on race.  Even if this conclusion were supported by scientifically valid methodology and reasoning, it is an improper legal conclusion that this Court should disregard.

The Court should also reject Dr. Imai's opinion.  Dr. Imai analyzes whether the City could have drawn district boundaries that do not over-concentrate black voters, but still allow for at least four Voting Rights Act (VRA) compliant districts.  He also analyzed whether the challenged districts could exist but for race.  His report, however, does not meet the criteria for admissibility.

Dr. Imai does a better job than Dr. Austin of explaining his methodology, but several flaws nonetheless render his opinion unreliable. For instance, in an effort to ensure his simulated plans are complaint with the VRA, his racially polarized voting analysis (RPV) relies on an estimate of "the proportions of Black voters who voted for Democratic, Republican, and other candidates" in seventeen city-wide elections since 2014.  Doc. 34-19 at ¶19.  He does not

explain why he chose those elections and omitted others, such as the 2015 First Election for Mayor, and the 2015 and 2019 First and General Elections for other city-wide offices such as Sheriff, thereby ignoring Black Republicans running in several of those races. *Id.* at ¶20.

Similarly, Dr. Imai's "10,000 alternative redistricting plans," *id.* at ¶2, are not as robust as he suggests. By his own admission, his algorithm was unable to consistently produce simulated plans that comported with all his stated requirements, including complying with the VRA and the Council's voted-on criteria. He explains in the appendix of his report that he attempted to duplicate the criteria used by the City Council by "freez[ing] three irrelevant districts in the southeast (Districts 5, 6, and 11)." *Id.* at ¶48. However, Dr. Imai ignores the substantial impact of the population growth in District 11 that drove the boundaries of the other thirteen districts and that the Council also departed from its initial "avoid river crossings" stance. Further, although he designed the simulations to "avoid pairing incumbents in city council and school board elections," *id.* at ¶48, out of his initial run of 40,000 iterations, which he then narrowed to 28,000 draws, he had to "remove 3950 plans that fail[ed] to generate School Board districts without incumbency pairing." *Id.* at ¶50. He then had to remove additional plans that did not comply with his VRA criteria. In other words, he had to manually eliminate plans that did not comply with the algorithm.

Dr. Imai also fails to note whether, even though the algorithm was designed to not pair incumbents, the generated plans actually kept incumbents in their previous district to provide continued representation to most of their original constituents.  For instance, incumbents living on the southern border of their districts could find themselves placed on the northern border of a new randomly generated district.   Hence, the simulated plans do not protect incumbents or further core preservation.  His example of a simulated plan at part A of the Appendix shows that such displacement could actually happen in the case of the District 9 incumbent. Because Dr. Imai eliminated 14,000 of the simulated plans, however, it is impossible for the Court to know whether any of those simulated plans did not have measurements more similar to those of the Enacted Plan. As such, even though Dr. Imai's opinion seems to be supported by scientific methodology, it is not sufficiently reliable to be admissible under Rule 702 and *Daubert*.

Dr. Imai's graphs are also misleading.  Several of the x-axes on his graphs measure a very narrow set of values, thereby creating exaggerated depictions of otherwise miniscule differences. *See id.* at ¶50 (figures 6-9).  For instance, the graph at Figure 6 appears to show that the City's lines are on the opposite end of the spectrum from forty percent of the simulated plans. Looking at the x-axis, however, the scale does not start at zero and has a very slight increase in the values. The x-axis appears to start at 0.043, with the highest

24

value just over 0.048, where the City's lines are represented. In short, although his statement that "all simulated plans have a smaller maximum population deviation than the enacted plan" is technically correct, *id.* at ¶50, there is only a minimal difference of 0.0048 between the lowest maximum population deviation (forty percent of the plans are approximately 0.0432) and the highest maximum population deviation (the City lines at 0.0480).  The same is true of the x-axis in Figure 7, which shows that the City's district lines lie in the middle of the bell curve and have the same average score as approximately forty percent of the simulated plans.  Dr. Imai's simulations therefore support a finding that the City's districts are compact.

The robustness analysis at Figure 13 also shows that most of the simulations have only one majority black seat (District 8).  *Id.* at ¶50 (figure 13).  This analysis additionally demonstrates that based on the boxplots contained therein, the simulated plans pack more Black voters than do the City's lines.  Moreover, Figure 13 demonstrates that only the City's lines create a majority Black district in District 9, as the boxplot does not reach the forty-four percent threshold noted in the Walker report and offered to the City by Plaintiffs prior to filing their lawsuit.  *See* Doc. 34-28 at 8.

In short, neither the conclusory opinion of Dr. Austin nor the unreliable methodology of Dr. Imai meet the admissibility requirements of Rule 702 and

Daubert. This Court therefore should not rely on their opinions in support of Plaintiffs' argument regarding circumstantial evidence.

### b. Split Neighborhoods and Precincts

The Council did not consider neighborhood or precinct boundaries in its redistricting process for good reason. Jacksonville residents may individually claim any number of self-identified neighborhoods, but the City does not formally recognize established neighborhoods or rights afforded to the same. Doc. 40-11 (noting that Neighborhood Bill of Rights was not fully implemented or enforceable); Doc. 40-12 (same). The City's prior attempts to do so were met with citizen resistance and were ultimately sidelined. Doc. 40-31 at ¶¶30-33. To the extent the City had a neighborhood map, it has not been used or updated since the mid-1990s. *Id.* at ¶32.

In this regard, Plaintiffs' proffered neighborhood map is a mystery to the City. *See* Doc. 34-63. Plaintiffs declare they crafted their map from neighborhoods "as designated by the City of Jacksonville" and based on a "shapefile of neighborhood boundaries created by the City of Jacksonville." Doc. 34-62 at ¶2. The City, however, does not maintain a designated neighborhood list, nor did it create a shapefile of neighborhood boundaries. Rather, shapefiles and any associated designations contained therein were created and provided by the Census Bureau. *See generally* Doc. 40-31 at ¶¶28-34. *See also* Doc. 40-19 at ¶19; Doc. 40-20 at ¶25; Doc. 40-23 at ¶26; Doc. 40-

27 at ¶19; Doc. 40-28 at ¶35; Doc. 40-30 at ¶30.  Even if one could identify and verify the origins of Plaintiffs' neighborhood map, it does not name the neighborhoods outlined therein.  Hence, it is wholly unhelpful for evaluating Plaintiffs' allegations regarding neighborhood splits.

Plaintiffs also mischaracterize the record.  In response to a Council member's concern about the Argyle area having multiple representatives, *see* Doc. 34-10 at 20, the Council fixed rather than exacerbated that problem. Doc. 34-13 at 6; Doc. 40-19 at ¶14; Doc. 40-30 at ¶¶19-23.  Likewise, other members addressed how the new lines brought together other areas throughout the City.  Doc. 34-16 at 39; Doc. 40-5 at 30-31, 34.  As such, Plaintiffs' neighborhood arguments carry no weight.

Additionally, precincts do not control the City's redistricting process. Precincts come into being only after the Census Bureau's identification of census blocks and the City's fashioning of district lines around the same.  *See* FLA. STAT. § 101.001(1), (3)(e) (Council has power to alter precinct lines at any time which are to be bounded by "census block boundaries from the most recent United States Census."); § 352.101, Jacksonville Ord. Code (SOE "may from time to time amend, modify, or revise" precinct locations).  *See also* Doc. 40-32 at ¶¶13-15.  As referenced earlier, the Census Bureau altered the City's census blocks as a result of the 2020 census, impacting the Council's drawing of district lines as well as creation of new precincts. Doc. 34-11 at 5-7; Doc.

40-31 at ¶¶6b, 17-18, 40; Doc. 40-32 at ¶¶13-15.   Therefore, Plaintiffs'

invocation of precinct irregularities and splits is of no moment.  *Cf. e.g., Ala.*

*Legis. Black Caucus v. Ala.*, 575 U.S. 254, 274 (2015) (local precinct splits

relevant in context of state redistricting process); *Easley v. Cromartie*, 532

U.S. 234, 248 (2001) (same); *Bush*, 517 U.S. at 964 (same); *Miller*, 515 U.S. at

918 (same).[7]

In conclusion, none of Plaintiffs' evidence makes a clear showing that

the City subordinated traditional redistricting considerations to race.  *Miller*,

515 U.S. at 916; *Ne. Fla. Chapt. of Ass'n of Gen Contractors of Am.*, 896 F.2d

at 1285.  The Court's analysis of this factor, therefore, should end here.  *See*

*generally Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800-01

(2017) (plaintiffs must first demonstrate race was the predominant factor

before burden shifts to defendants to prove redistricting is narrowly tailored to

achieve compelling interest).  Because Plaintiffs have not made a clear-cut

showing of a substantial likelihood of success on the merits, this Court should

deny their Motion. *People's Party of Fla.*, 2022 WL 2238439 at *2.

### B. Public Interest and Balance of Harms

Plaintiffs cannot show that the balance of harms or public interest weigh

in their favor.  *See Fla. v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1293

---

[7] Neither of Plaintiffs' experts opinions regarding neighborhoods or precincts therefore warrants consideration.

(11th Cir. 2021) (public interest and balance of harms analyzed together where government is a party).   In this context, Defendants acknowledge racial gerrymandering can constitute irreparable harm. *See Alpha Phi Alpha Frat., Inc.* 2022 WL 633312 at \*70.  However, given Plaintiffs' delay in bringing this action and seeking preliminary relief, this delay undermines weighing the harms in their favor.  "[A] party seeking a preliminary injunction must generally show reasonable diligence.  That is true in election law cases as elsewhere." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018).  Yet, Plaintiffs waited two months after the City passed the new lines to file their lawsuit. They then waited an additional two months to seek preliminary injunctive relief, and only after being specifically ordered by the Court to do so. *See generally* Doc. 27.

Additionally, to the extent Plaintiffs assert that the districts at issue have been gerrymandered since at least 1991, their failure to challenge district lines in prior years undermines their claim of irreparable harm.  Nor have they sought to challenge the legality of the 2010-11 district lines and the present use of those lines in the City's Special Elections for Districts 7 and 9, held in August 2022.  If, as argued by Plaintiffs, the lines for those districts have been unconstitutional since at least 1991, it is hard to understand why they are able to bear that decades-old harm during the present special election cycle, but require injunctive relief as protection from the alleged harms of the newly

29

drawn lines.  *See, e.g.*, *Antoine v. Sch. Bd. of Collier Cty.*, 301 F. Supp. 3d 1195, 1202 (M.D. Fla. 2018) (plaintiff's delay in seeking relief undermines irreparable harm); *People's Party of Fla.*, 2022 WL 2238439 at *2 (same).

Plaintiffs knew the City was drawing districts from which they anticipated harm, and suggest they were suffering harm from them as early as 1991.  Plaintiffs also participated in the redistricting deliberations, and prior to suing, presented arguments to the City challenging the process, which included an academic analysis.  *See* Doc. 34-3 at 78 (Northside Coalition, NAACP, and ACLU speakers), 84 (same); Doc. 34-17 at 187, 199, 214 (noting speaker on behalf of Northside Coalition); Doc. 34-28 (McCoy declaration). Plaintiffs nonetheless waited for a month and a half after the new lines were enacted to file their action, and even longer before formally detailing for the Court and Defendants the contours of their request for preliminary relief. Now, however, Plaintiffs ask this Court to order Defendants to proceed in an expedited manner to draw new district lines.  *See* Doc. 39 at 2 (asking Court to command Defendants draw new maps in three weeks).  Plaintiffs' "harm to their case is entirely self-inflicted," and should not warrant preliminary relief. *Flores v. Town of Islip*, 382 F. Supp. 3d 197, 250 (E.D. N.Y. 2019).

Plaintiffs also overlook a host of harms suffered by the City, SOE, candidates, and the public, should Plaintiffs prevail.  Individuals intending to run for Council in 2023 will be harmed if the Court issues an injunction, as

certain deadlines have already passed regarding candidate eligibility. To qualify as a candidate, a person must pay a fee or file a petition, the latter requiring the individual to obtain a statutorily defined number of citizen signatures. *See* FLA. STAT. §§ 99.061; 99.095(2)(a); Doc. 40-33 at ¶¶5-6, 9-10. Candidate petitions must be submitted no later than December 12, 2022. FLA. STAT. § 99.095; Doc. 40-32 at ¶6; Doc. 40-33 at 5-6. Likewise, the individual must reside in the district they wish to represent "for at least 183 consecutive days immediately before the date on which the candidate qualifies to run for the office." § 5.04, JACKS. CHARTER; Doc. 40-33 at ¶4. Accordingly, no later than July 14, 2022, aspiring candidates had to establish residency in the district they hope to represent and gather signatures from individuals residing therein. That deadline expired prior to Plaintiffs filing their Motion.

Furthermore, if, as Plaintiffs propose, the Council must draw entirely new district lines, aspiring candidates may find themselves drawn out of the geographic areas they seek to represent. *See Favors v. Cuomo*, 881 F. Supp. 2d. 356, 371 (E.D. N.Y. 2012) ("It is best for candidates and voters to know significantly in advance of the petition period who may run where."); *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 843 (E.D. Cal. 1992) (noting harm when "deadline for candidates to establish residence in the districts they want to run in has passed"). Moreover, even if new district lines do not impact candidate residency, the designated geographic population from

31

which an aspiring candidate is required to obtain signatures may change. FLA. STAT. § 99.095(2)(a). If an aspiring candidate has already obtained – or is close to obtaining – the required number of signatures pursuant to geographic boundaries laid out in the challenged plan, that candidate may find that under a new set of lines, he or she is at a deficit and unable to make up the difference.

Presently, sixty-one candidates have filed to run for a Council seat in the 2023 elections. Doc. 40-33 at ¶7. This number is likely to increase by December 12, 2022. *Id.* at ¶ 8. Likewise, many candidates seek to qualify through the petition process instead of paying a fee, requiring time to collect citizen signatures. *Id.* at ¶9-10. As such, an injunction will harm candidates by disrupting residency requirements and the signature collection process. *See generally Sw. Voter Regis. Educ. Proj. v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003); *Alpha Phi Alpha Frat., Inc.* 2022 WL 633312 at *75; *Cardona*, 785 F. Supp. at 843.

The City also "indisputably has a compelling interest in preserving the integrity of its election process," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), and suffers irreparable harm when it is unable to "enforce its duly enacted plans." *Abbott*, 138 S. Ct. at 2324 n.17. Likewise, "elections are complex to administer, and the public interest [is] not served by a chaotic, last-minute reordering of . . . districts." *Favors*, 881 F. Supp. 2d at 371. "[A] quick plan . . . is not necessarily a good plan." *Alpha Phi Alpha Frat. Inc.*, 2022 WL 633312 at *75.

32

Likewise, "confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Id.* at *74.

An injunction requiring the Council to draw new lines will also harm the SOE. *See generally* Doc. 40-32. It normally takes between three to four weeks for the SOE to create and send out new voter cards as the result of district boundary changes. *Id.* at ¶¶7-8. This timeframe may be further impacted by the availability of external vendors, who when faced with county-wide changes, may require even more time to complete the task. *Id.* at ¶9. Similar burdens arise regarding the time and costs associated with printing new ballots. *Id.* at ¶11. Additionally, should the City be commanded to hold separate special elections for the challenged districts, a second election would cost the City an additional $1.5 million. *Id.* at ¶12. Finally, instituting any such changes when candidates and voters have already begun to plan for the March 2023 elections, could cause great confusion to the voting process. *Id.* at ¶7-8, 11-12.

The Supreme Court has therefore indicated that "where an impending election is imminent and a State's election machinery is already in progress, equitable considerations justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid." *Reynolds*, 377 U.S. at 585. *See also Sw. Voter Regis. Educ. Proj.*, 344 F.3d at 919; *U.S. v. Upper San Gabriel Valley Mun. Water Dist.*, No. CV007903 AHM BQRX, 2002 WL

33254228, at *2 (C.D. Cal. Sept. 8, 2000); *Diaz v. Silver*, 932 F. Supp. 462, 466 (E.D. N.Y. 1996); *Cardona*, 785 F. Supp. at 842.  Accordingly, "lower federal courts should not ordinarily alter the election rules on the eve on an election." *Repub. Nat'l Comm. v. Dem. Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell*, 549 U.S. at 1); *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey* v. *Perry*, 574 U.S. 951 (2014)).  *See also People's Party of Fla.*, 2022 WL 2238439 at *2-3 (denying injunctive relief pursuant to *Purcell*); *Alpha Phi Alpa Frat.*, 2022 WL 633312 at *74-76 (same).  Finally, while Defendants dispute the viability of Plaintiffs' claims, Defendants acknowledge their claims are "not just important, but legally and factually complicated." *Favors*, 881 F. Supp. 2d at 371.  Hence, a "great[] public interest must attach to adjudicating these claims fairly—and correctly." *Id.*

In light of the above, Plaintiffs have not made the necessary showing that the balance of harms and public interest weigh in their favor.

## V.    CONCLUSION

Plaintiffs have not demonstrated they are entitled to preliminary relief. Plaintiffs failed to establish a clear-cut likelihood of success on the merits, delayed bringing their action, and delayed seeking relief.  Plaintiffs failed to show that the balance of harms and public interest weigh in their favor. Because Plaintiffs cannot meet their required burden, Defendants, City of

Jacksonville, and Mike Hogan, in his official capacity as Duval County Supervisor of Elections, respectfully request this Court deny Plaintiffs' Motion.

Respectfully submitted,
**OFFICE OF GENERAL COUNSEL**
**CITY OF JACKSONVILLE**

**_/s/Mary Margaret Giannini_**
**Sonya Harrell**
Chief, Tort and Employment Litigation
Florida Bar No. 0042803
SonyaH@coj.net; BOsburn@coj.net
**Mary Margaret Giannini**
Assistant General Counsel
Florida Bar No. 1005572
MGiannini@coj.net; SStevison@coj.net
**Helen Peacock Roberson (lead counsel)**
Assistant General Counsel
Florida Bar No.: 0016196
HRoberson@coj.net; CStephenson@coj.net
117 West Duval Street, Suite 480
Jacksonville, FL 32202
Phone: (904) 255-5100
Facsimile: (904) 255-5120
_Attorneys for Defendants, City of Jacksonville and Mike Hogan, in his official capacity as Duval County Supervisor of Elections_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of August, 2022 a copy of this document was filed electronically through the CM/ECF system and furnished by email to all counsel of record.

_/s/  Mary Margaret Giannini_
Attorney

35