IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JACKSONVILLE BRANCH
OF THE NAACP, *et al.*,

    *Plaintiffs*,

v.

    Case No. 3:22-cv-493-MMH-LLL

CITY OF JACKSONVILLE, *et al.*,

    *Defendants*.

_____/

## **PLAINTIFFS' REPLY IN SUPPORT OF PRELIMINARY INJUNCTION**

Defendants' Response, ECF 41 ("Opp."), does nothing to undermine Plaintiffs' case. They concede key facts, categorically dismiss facts they dislike, and all but admit liability due to an apparent misunderstanding of the law. Their brief makes clear that Plaintiffs are likely to succeed, and their attempted about-face on hardships falls flat.

### I. Defendants Concede Crucial Evidence of Racial Predominance

Defendants' brief is important for what it does not say. Defendants do not dispute the Challenged Districts are noncompact. ECF 36 ("PI Br.") at 20–21. They do not dispute the Challenged Districts have bizarre shapes. *Id.* at 21–25. They do not dispute each Packed District has an odd land bridge connecting pockets of Black residents. *Id.* at 21–22. They do not dispute district boundaries cut along racial lines. *Id.* at 22–25. All these facts are probative of racial intent. *Id.* at 18, 20–25.

### II. Defendants' Principal Defense Misapprehends the Law

What Defendants *do* say does nothing to help them. Defendants primarily justify the Challenged Districts on the grounds that they maintain the cores of prior

1

districts. *See* Opp. 17–18; ECF 40-13 to 40-30 (councilmember declarations).[1] But courts have repeatedly held that core preservation cannot immunize racial gerrymanders from scrutiny. In *North Carolina v. Covington*, for example, the Supreme Court affirmed a rejection of remedial districts that "retained the core shape of districts that [the trial court] had earlier found to be unconstitutional." 138 S. Ct. 2548, 2551 (2018) (per curiam) (internal punctuation omitted). Even "[t]he defendants' insistence that the . . . legislature did not look at racial data in drawing remedial districts d[id] little to undermine the District Court's conclusion—based on evidence concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race." *Id.* at 2553; *see also Easley v. Cromartie*, 532 U.S. 234, 265 n.7 (2001) ("Of course, considering that District 12 has never been constitutionally drawn, Dr. Weber's criticism—that the problem with the district lies not just at its edges, but at its core—is not without force.") (Thomas, J. dissenting). Many other courts have also held that core preservation cannot shield racial gerrymanders from scrutiny, even where predecessor districts were never challenged.[2]

---

[1] Notably, Defendants discarded core preservation when it threatened their racial goals. For example, along the borders of Districts 8 and 12, and Districts 2 and 7, Defendants made more changes than were necessary to achieve equal population, all to increase the Black populations of Packed Districts 7 and 8 and to reduce the Black populations of Stripped Districts 2 and 12. *See* PI Br. 15–18.

[2] *See, e.g.*, *Chen v. City of Houston*, 206 F.3d 502, 518 (5th Cir. 2000) ("[E]vidence that impermissible racial intent had tainted the plan upon which the challenged plan was based has been allowed, even when enough time has elapsed for a substantial degree of familiarity and political reliance to emerge."); *Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505, 544–45 (E.D. Va. 2015) ("[W]here 'core retention' seems to predominate, courts should also examine the underlying justification for the original lines or original district" because "core retention may be used to insulate the original basis for the district boundaries.") (subsequent history omitted); *Polish Am. Cong. v. City of Chicago*, 226 F. Supp. 2d 930, 937 (N.D. Ill. 2002) ("Adherence to established boundary lines . . . may or may not be a legitimate redistricting objective, depending in part on how the lines were drawn

Against this backdrop, Defendants' proffered evidence helps *Plaintiffs*. Defendants do not attempt to refute Plaintiffs' historical evidence, eliding that after *Defendants* made history relevant by raising a core preservation defense, ECF 20 ¶ 279, Plaintiffs had every prerogative to probe the cores ostensibly being preserved.[3] Defendants' own expert confirms that the 1991 districting plan—officially titled the "63% Plan" after its overt racial targets, PI Br. 4–5—formed the basis of subsequent plans, including the Enacted Plan. ECF 40-34 at 16–17. Councilmember declarations claim that their primary motivation was maintaining existing lines, without ever considering that race defined those lines. ECF 40-13 to 40-30. Finally, Defendants concede circumstantial evidence of racial predominance. *See supra* at 1. The facts as put forth by Defendants—conceded circumstantial indicia of race-based lines paired with a defense of preserving earlier districts that were themselves race-based—are

---

originally."); *see also Clark v. Putnam Cnty.*, 293 F.3d 1261, 1267 n.16, 1271–72 (11th Cir. 2002) (racial gerrymander where previous plan was "preserved as much as possible"); *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1065 (M.D. Ala. 2017) (striking down district that "maintained . . . core" of previous one); *Navajo Nation v. San Juan Cnty.*, 162 F. Supp. 3d 1162, 1177 (D. Utah 2016) (striking down district where "the overriding consideration . . . was to preserve [it] without any modification"), *aff'd*, 929 F.3d 1270 (10th Cir. 2019). *Cf. Singleton v. Merrill*, No. 2:21-cv-1291, 2022 WL 265001, at *66 (N.D. Ala. Jan. 24, 2022) (explaining in Section 2 context that core preservation defense "would turn the law upside-down, immunizing states from liability under Section Two so long as they have a longstanding, well-established map") (subsequent history omitted); *Robinson v. Ardoin*, No. 3:22-cv-211, 2022 WL 2012389, at *42 (M.D. La. June 6, 2022) (making similar point) (subsequent history omitted).

Defendants' invocation of incumbent protection (closely related to core preservation) also can't save illegal districts. *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 440–41 (2006); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778–79 (9th Cir. 1990) (Kozinski, J., concurring); *Ketchum v. Byrne*, 740 F.2d 1398, 1407–08 (7th Cir. 1984); *Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291, 313–14 (D. Mass. 2004).

[3] Nor does *Abbott v. Perez* help Defendants. Opp. 13. *Abbott* holds that a court may not place the evidentiary burden onto a legislature, but never says past discrimination is irrelevant. 138 S. Ct. 2305, 2326–27 (2018) ("[W]e do not suggest either that the intent of the 2011 Legislature is irrelevant or that the plans enacted in 2013 are unassailable."). Plaintiffs do not seek to shift any burden here. They have put forth substantial, unrebutted evidence that Jacksonville has long sorted its residents by race. And Defendants have conceded that they preserved these race-based districts.

materially the same as in *Covington* and the other caselaw discussed *supra* at 2 & n.3. What's more, Defendants admit the throughline from the facially race-based "63% Plan" to the Enacted Plan. Defendants' brief and evidence put to rest any serious questions about substantial likelihood of success on the merits.

### III. Defendants' Other Contentions are Meritless

Defendants' other contentions are belied by the record or entirely beside the point. First, Defendants try to categorically exclude explicit discussions of racial targets,[4] *see* PI Br. 2 n.2, 12–15, as the irrelevant words of individual legislators, Opp. 11–12. But as Defendants' own expert notes, Councilmember Priestly Jackson "play[ed] an instrumental part in the process as both the chairman of the Rules Committee and as a member of the Redistricting Committee." ECF 40-34 at 12. She convened and chaired the member-to-member meetings at which councilmembers made critical decisions about the Challenged Districts. PI Br. 7–8; *see also* Opp. 11–12 (minimizing statements by the Redistricting Committee Vice Chair and relevant incumbents). Courts appropriately consider the statements of key legislators when assessing racial predominance. *See, e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1468 (2017). Defendants similarly falter in discussing "communities of interest," attempting to gloss over councilmembers' use of the term as a racial proxy by highlighting that the term

---

[4] Defendants confess discussing racial percentages "to ensure that any given district neither packed nor diluted minority voters." Opp. 10–11 (citing councilmember declarations). They cite *Shaw v. Reno*'s holding that "race-conscious redistricting is not always unconstitutional." 509 U.S. 630, 642 (1993). But race consciousness is a far cry from the legally untethered checking of arbitrary racial percentages. *See id.*; *see also* ECF 34-17 at 159:12–14 ("I don't know what [ ] percentage is needed to ensure that the voters in District 10 are able to actualize their preference.").

4

wasn't used *exclusively* as a racial proxy. Opp. 13–15. The record speaks for itself: an "instrumental" figure in the process, ECF 40-34 at 12, opened a meeting in which key decisions were made by announcing "communities of interest" as a "unique term of art" to refer to "minority access districts," PI Br. 11 (quoting ECF 34-10 at 9:12–18), and other members followed her lead, *id.* at 14. Plaintiffs accept that councilmembers didn't use the term as a racial proxy when discussing districts that are *not* race-based. *See* Opp. 15 (citing meetings on districts in racially homogenous south/east). The difference between how councilmembers used the term when discussing Challenged Districts versus other districts does not weaken Plaintiffs' case; it strengthens it.

Next, Defendants argue partisan politics somehow informed the process. *Id.* at 15–17. Defendants cannot have it both ways: they cannot ask the Court to ignore evidence of racial targets because they were never formally adopted as a criterion, *id.* at 10, but then insist the Court credit *post hoc* claims of partisanship, even though the Council chose *not* to adopt (after explicit advice that it could) any partisan criterion, *see* PI Br. 11–12. More fundamentally, the "fact that other considerations may have played a role in . . . redistricting does not mean that race did not predominate." *Putnam Cnty.*, 293 F.3d at 1270. Even if party played some role for some councilmembers, it was secondary to race. Defendants never explain, for example, why the Council paired partisan with racial data. *See* ECF 34-11. As for Councilmember DeFoor's attempt to "cut to the [partisan] chase," Opp. 16: she proposed moving heavily white and Democratic Riverside precincts from her Stripped District 14 to Councilmember

5

Gaffney's Packed District 7 because Riverside voted "more in line with Brooklyn and Springfield than . . . with the rest of [District 14]." ECF 40-6 at 4:7–19; *see also* ECF 34-18 tbl.3 (precinct racial makeup); ECF 34-65 to 34-82 (precinct election results). But that proposal was *rejected*. Those precincts (1415, 1407, and part of 1413) remain in District 14 alongside predominately white, Republican precincts, rather than in districts with heavily Black and Democratic populations. Instead, District 7 gained *less* Democratic territory with a higher Black population. PI Br. 17–18; ECF 34-18 tbls.3 & 4 (Precinct 205 demographics); ECF 34-65 to 34-82 (election results).[5] Whatever DeFoor thought the "chase" was, her colleagues were thinking race, not party.[6]

### IV. Plaintiffs' Expert Reports are Sound

Defendants invoke *Daubert* to urge the Court to reject Plaintiffs' expert reports

---

[5] This case shows why courts are often wary of self-serving, *post hoc* testimony. *See, e.g.*, *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) ("[A] district court can certainly take into account the self-serving nature of a litigant's testimony."). Gaffney claims that partisanship drove his decisions, ECF 40-23 ¶¶ 20–23, but neglects to mention that he rejected the opportunity to have a more Democratic electorate; DeFoor discusses her proposal, ECF 40-19 ¶¶ 17–18, but doesn't share that it was rejected. *Compare* 40-28 ¶ 33 (Priestly Jackson: "I never used the term 'communities of interest' as a euphemism solely for race"), *with* ECF 34-10 at 18:3–6 ("I am not interested in increasing any specific communities of interest ie African Americans"); *compare* ECF 40-28 ¶ 37 ("At no point . . . did I aim to set a racial target population"), *with* PI Br. 2 n.2, 14; *compare* ECF 40-13 ¶ 33 (Becton: "I was not concerned that race was the factor"), *with* PI Br. 14; *compare* ECF 40-16 ¶ 6, *with* ECF 34-57 at 4–5 (Carlucci conclusions on whether partisanship or race drove maps); *compare* ECF 40-14 ¶ 20 (Bowman: "political affiliation of the constituents . . . shifted" a factor), *with* David Bauerlein, FLA. TIMES-UNION (Dec. 6, 2021), https://bit.ly/3pEaO9l ("Bowman said that . . . the committee . . . didn't consider party affiliation of residents") *and* ECF 34-14 at 21:20–22 (Becton: "you really haven't heard that discussion" "in regards to political parties"); *see infra* Part V (omissions re: hardships).

[6] Defendants' arguments about neighborhoods and precincts are equally feeble. Regardless of the Neighborhood Bill of Rights' status, neighborhoods play some role in Jacksonville civic life. In fact, during the 2011 process, Mr. Killingsworth himself suggested using them to define "geographical communities of interest." ECF 34-53 at 32. That communities in the north and west are split at a much higher rate than elsewhere is probative of racial predominance, regardless of the precise contours of neighborhood rights. Similarly, Defendants miss the point about precinct splits. The issue isn't that the Council split precincts. Opp. 27–28. It's that the Council split precincts *along racial lines*. *See* PI Br. 22–23. And Plaintiffs' counsel retrieved the "mystery" neighborhood map, Opp. 26, from the City's own website, here: https://maps.coj.net/coj/rest/services/JCC/JCCBackLayers/MapServer.

wholesale.[7] Opp. 18–26. This tactic ignores that "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005). Dr. Austin's methods and expert opinions (including on the *factual* question of whether race determined district borders, *contra* Opp. 22) are consistent with how other experts have assessed whether lines are race-based. *See, e.g., Bethune-Hill*, 326 F. Supp. 3d 128, 147 (E.D. Va. 2018). And Defendants never dispute any of the facts in Dr. Austin's report, which show district borders cutting along racial lines. Defendants' quibbles with Dr. Imai's report fare no better. They suggest he froze District 11 as it was in the 2011 Plan. Opp. 23. But he froze District 11 as it is in the *2022* Enacted Plan to respect the Council's permissible choices. ECF 34-19 ¶ 21. That's also why Dr. Imai eliminated algorithm-generated plans that paired incumbents. *Id.* ¶¶ 21, 50. The point is that even when one accounts for all the Council's permissible choices (before or after running the algorithm), the districts' racial concentrations remain unexplained. PI Br. 25.[8]

---

[7] Plaintiffs see no need to request a *Daubert* hearing for the Court to give Dr. Moreno's report the weight it deserves. The report's few relevant parts are deficient. Most importantly, the report begs the question by treating the race-based 2011 Plan as a "benchmark" (a VRA Section 5 term of art) and not examining it at all, focusing only on changes to that "benchmark." ECF 40-34 at 13. This approach reveals nothing about "the shape and demographics of those districts." *Covington*, 138 S. Ct. at 2553. *See also League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258, 284, 318 (Fla. 2015) (finding Moreno testimony of "little probative value" for similar deficiencies). Beyond that, Moreno fundamentally misapprehends this case. This is not a VRA case, so Plaintiffs need not show that an additional Black-opportunity district could be drawn to prevail on their racial gerrymandering claim. And the transparency of the process is irrelevant.

[8] As for Dr. Imai's VRA analysis: Dr. Imai *did* include elections featuring Black Republicans. ECF 34-19 fig.1 (including 2019 City Council Groups 1 and 5). Some of the elections that Defendants complain are excluded, Opp. 23, did not even elect a winner, instead going to runoffs. But most notably, Defendants and their expert conflate Black candidates with Black-preferred candidates. *Id.* at 16, 22; ECF 40-34 at 16–17. While there are indeed Black Republican officeholders in Jacksonville,

## V. The Balance of the Equities Favors Preliminary Relief

Defendants have previously represented that they will be able to conduct the March 2023 elections if a map is in place by December 16, ECF 24-1, but now seek to backtrack. Just days ago, the Supreme Court in *Rose v. Raffensberger* reversed the 11th Circuit for accepting a similar gambit "in light of . . . previous representations to the district court that the schedule on which [it] proceeded was sufficient to enable effectual relief" in time for the elections.[9] Moreover, the Supervisor's Office declarations don't meaningfully undercut that initial representation and instead describe ordinary administrative burdens. First, both the Phillips declaration,[10] ECF 40-32 ¶ 6, and Defendants' brief, Opp. 30–31, emphasize Fla. Stat. § 99.095's petition signature requirements. But this provision allows candidates to collect signatures from voters *citywide* (not just in their district) in elections after redistricting. Fla. Stat. § 99.095(d).[11] Second, the ostensible burdens that Phillips identifies reflect discretionary policy choices, not legal requirements. ECF 40-32 ¶¶ 7–11. The law requires the Supervisor to issue new voter information cards only when *polling locations*

---

*see, e.g.*, ECF 40-26 ¶ 6, they were not favored by Black voters, ECF 34-19 fig.1 (over 81% of Black voters supported opponents of Councilmembers Freeman and Newby in 2019). The relevant VRA question is not whether candidates are Black, but whether they are preferred by Black voters.

[9] No. 22A136 (Aug. 19, 2022), www.supremecourt.gov/orders/courtorders/081922zr_6537.pdf.

[10] In a similar case, Mr. Phillips recently made heightened claims of election administration difficulties that he subsequently softened. *See* Andrew Pantazi, *DeSantis-Appointed Judge Blocks Part of Florida Congressional Redistricting Map*, TRIBUTARY (May 11, 2022), https://jaxtrib.org/?p=2324. Moreover, the Supervisor had no apparent trouble implementing a congressional map signed into law (April 22) less than a month before the petition deadline (May 16) and seven weeks before the start of candidate qualifying (June 13). Fla. S.B. 2-C (2022); Fla. Stat. § 99.061(1)–(2), (9).

[11] *See also* Directives 2015-01 and 2015-02, Fla. Sec'y of State (Aug. 14, 2015) ("year of apportionment" includes any year in which redistricting occurs and statute applies when candidate qualifying happens in the year after redistricting), https://files.floridados.gov/media/695355/sos_directive_2015-01.pdf; https://files.floridados.gov/media/695356/sos_directive_2015-02.pdf.

change, not when district lines or precincts change. Fla. Stat. § 97.071(3). Nor does the law require the Supervisor to change polling locations or precinct boundaries when districts change. Ord. Code § 352.101 (Supervisor *may* change precinct boundaries); ECF 40-32 ¶ 11 (polling places *may* change, without further explanation). And even if the Supervisor *chooses* to send new cards, he recently did so less than three weeks before the state primary.[12] Similarly, he submitted new precincts to the Council 13 days after this year's congressional map was enacted, and on January 14, 2020, before the March 17 primary.[13] Defendants do not explain why a similar timeline is problematic now.

Finally, Defendants cite inapposite cases to lament the litigation timeline. Opp. 29–30 (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018), where plaintiffs "did not move for a preliminary injunction in the District Court until six years, and three general elections, after the 2011 map was adopted, and over three years after the plaintiffs' first complaint was filed," and *Flores v. Town of Islip*, 382 F. Supp. 3d 197, 250 (E.D.N.Y. 2019), where plaintiffs waited almost eight months after their complaint to seek preliminary relief to enjoin *the entire election*). In a more comparable case, where plaintiffs took *longer* to seek relief and did so *closer* to the election, the Sixth Circuit rejected a similar argument: "Defendants have not explained how Plaintiffs could have more quickly produced the voluminous record evidence in this case in support of their motion for a preliminary injunction, nor have Defendants produced

---

[12] Travis Gibson, *All Registered Duval County Voters to Receive New Voter Information Cards*, NEWS4JAX (Aug. 4, 2022), https://perma.cc/3YC7-6BFU.
[13] Ordinance 2022-384-E, https://bit.ly/3CrTrjP; Ordinance 2020-25-E, https://bit.ly/3SZtZrw.

any evidence that Plaintiffs purposefully delayed." *Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 561 (6th Cir. 2014) (subsequent history omitted).[14] Here, too, Plaintiffs (relying on the Dec. 16 date) expeditiously compiled the voluminous evidence required by racial gerrymandering challenges, particularly after Defendants' answer made relevant decades of history and election data. *See Bethune-Hill*, 137 S. Ct. 788, 799 (2017) (such suits demand "holistic analysis" of direct and circumstantial evidence).

In any event, the question of Plaintiffs' timeline is germane only insofar as it shifts the balance of equities. Defendants concede that elections held under illegal lines cause irreparable harm, Opp. 28, and nothing undermines their past representation that they could hold elections with districts in place by December 16. Notably, on March 23, the Supreme Court struck down racially gerrymandered districts in a *statewide* plan, with primary elections scheduled for August 9 and a June 1 candidate filing deadline. *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245 (2022). A similar schedule here provides ample time for interim relief.

Respectfully submitted this 23rd day of August, 2022,

/s/ Daniel J. Hessel

Daniel J. Hessel
**ELECTION LAW CLINIC, HARVARD LAW SCHOOL**
6 Everett St, Cambridge, MA 02138 | (617) 495-5202 | dhessel@law.harvard.edu

*Attorney for Plaintiffs; special admission; federal practice only*

---

[14] *See also Lower Brule Sioux Tribe v. Lyman Cnty.*, No. 3:22-cv-3008, 2022 WL 3274236, at *21 (D.S.D. Aug. 11, 2022) (rejecting delay claims on similar timeframe); *NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*, 858 F. Supp. 2d 516, 528 (M.D.N.C. 2012) (longer timeframe); *Ind. State Conf. of NAACP v. Lawson*, 326 F. Supp. 3d 646, 655 (S.D. Ind. 2018) (granting PI filed 6 months after complaint), *aff'd sub nom. Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019); *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 710 (M.D. Tenn. 2019) (over 3 months after complaint).