1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2                       JACKSONVILLE DIVISION

3                  CASE NO. 3:22-CV-493-MMM-LLL

4    JACKSONVILLE BRANCH               Jacksonville, Florida
     OF THE NAACP, *et al.*,
5                                      Friday, September 16, 2022
           Plaintiff,
6                                      10:09 a.m. - 12:54 p.m.
     v.
7                                      Courtroom 10B
     CITY OF JACKSONVILLE, *et al.*,
8
           Defendant.
9    _____

10

11              **PRELIMINARY INJUNCTION HEARING**

12

           BEFORE THE HONORABLE MARCIA MORALES HOWARD
13                  UNITED STATES DISTRICT JUDGE

14

15

16

     OFFICIAL COURT REPORTER:
17
        Katharine M. Healey, RMR, CRR, FPR-C
18      PO Box 56814
        Jacksonville, FL 32241
19      Telephone: (904) 301-6843
        KatharineHealey@bellsouth.net
20

21
                              (Proceedings reported by stenography;
22                             transcript produced by computer.)

23

24

25

1                          A P P E A R A N C E S

2    COUNSEL FOR PLAINTIFF:

3      **DANIEL HESSEL, Esquire**
       **RUTH M. GREENWOOD, Esquire**
4           Harvard Law School
            3085 Wasserstein Hall
5           6 Everett Street
            Cambridge, MA 02138
6           (917) 403-4976
            Dhessel@law.harvard.edu
7
       **NICHOLAS WARREN, Esquire**
8           ACLU Foundation of Florida, Inc.
            336 East College Street, Suite 203
9           Tallahassee, FL 32301
            (786) 363-1779
10          NWarren@aclufl.org

11     **MATLETHA BENNETTE, Esquire**
            Southern Poverty Law Center
12          4210 Camden Road
            Tallahassee, FL 32303
13          (850) 408-4840
            Matletha.bennette@slpcenter.org
14
       **KRISTA ANN DOLAN, Esquire**
15          Southern Poverty Law Center
            106 East College Avenue, Suite 1010
16          Tallahassee, FL 32301
            (850) 688-3908
17          Kristadolan@splcenter.org

18
     COUNSEL FOR DEFENDANTS:
19
       **MARY MARGARET GIANNINI, Esquire**
20     **HELEN PEACOCK ROBERSON, Esquire**
       **SONYA HARRELL, Esquire**
21     **JASON R. TEAL, Esquire**
            Office of General Counsel
22          117 West Duval Street, Suite 480
            Jacksonville, FL 32202
23          (904) 255-7762
            MGiannini@coj.net
24          HRoberson@coj.net
            JTeal@coj.net
25          Sonyah@coj.net

```
 1              P R O C E E D I N G S
 2    September 16, 2022                        10:09 a.m.
 3                      -   -   -
 4         COURT SECURITY OFFICER:  All rise.  The United States
 5    District Court in and for the Middle District of Florida is now
 6    in session.  The Honorable Marcia Morales Howard presiding.
 7              Please be seated.
 8         THE COURT:  Give me one moment to get my computer to
 9    cooperate with me.
10              All right.  This is Case No. 3:22-cv-493-MMH-LLL.  It
11    is the Jacksonville Branch of the NAACP; the Northside
12    Coalition of Jacksonville; the ACLU of Florida Northeast
13    Chapter; Florida Rising Together, Inc.; and a number of
14    individual plaintiffs that rather than take up all our time, I
15    will just say "et al." vs. the City of Jacksonville.  And I
16    will ask plaintiffs -- and the Supervisor of Elections.
17              I'll ask plaintiffs' counsel to make their
18    appearances for the record and then defense counsel to do the
19    same.
20         MR. HESSEL:  Daniel Hessel for the plaintiffs, Your
21    Honor.  And with me at counsel table are Nicholas Warren,
22    Matletha Bennette, Ruth Greenwood, and Krista Dolan.
23              And we have certain plaintiffs in the room.  We have,
24    among the individual plaintiffs, Sheila Singleton; Janine
25    Williams; Rosemary McCoy, who is also the vice president of the
```

1    ACLU Chapter; and then President Isaiah Rumlin of the NAACP;

2    and Mike Ludwick on behalf of the Northside Coalition.

3          THE COURT:  All right.  And on behalf of the

4    defendants, City of Jacksonville and Mike Hogan.

5          MS. GIANNINI:  Good morning, Your Honor.  I'm Mary

6    Margaret Giannini.  With me at counsel table I have Helen

7    Roberson.  We also have at the end of the first counsel table

8    is Jacksonville Council President Freeman.  Behind me I have

9    counsel Sonya Harrell; General Counsel Jason Teal; and previous

10   president of the Jacksonville Council, Previous President

11   Newby.

12          We may also have current Vice President of the

13   Jacksonville Council, Salem, joining us a little bit later on

14   in the day.

15          THE COURT:  All right.  So we are here today on

16   plaintiffs' motion for preliminary injunction, which was filed

17   on July 22nd of 2022.  The defendants have responded -- well,

18   the motion is document number 36.  Defendants have responded in

19   document number 41, along with a number of exhibits.  And we

20   have plaintiffs' reply, document number 43.

21          And at issue is the districts drawn in the upcoming

22   election which is scheduled to occur in March of 2023.  And it

23   is the plaintiffs' contention that Districts 7, 8, 9, and 10

24   are racially packed and gerrymandered, and asking the Court to

25   enjoin the use of the maps for purposes of the upcoming

1   election.  And the argument by plaintiff is that race was a

2   predominant factor motivating the Council's drawing of the

3   lines.  And, of course, we sort of start with the fact that

4   they started with the 2011 lines.  And I have some questions

5   about that, but I think in fairness, I'll let -- I'll hear from

6   counsel for the plaintiff first.

7          I've obviously read all of your filings and the

8   expert reports.  And I would have appreciated these blow-ups

9   before because we've been using magnifying glasses.  And I

10  found that looking at the maps on the iPad, where I could blow

11  them up to actually see things, was a little bit helpful.  So

12  if you see me pull it out, it's that I'm trying to follow your

13  arguments with the ability to actually see those little tiny

14  precinct numbers.

15         But let me hear from plaintiff with your strongest

16  arguments, understanding that I've read everything that you've

17  presented to me.

18         MR. HESSEL:  Should I come up here?

19         THE COURT:  Yes, please.

20         MR. HESSEL:  Thanks very much.  Do you mind if I

21  bring a glass of water up?

22         THE COURT:  I do not mind; in fact, I encourage it.

23  In fact, I, too, will have a glass of water.

24         MR. HESSEL:  Good morning, Your Honor.  May it please

25  the Court.  Daniel Hessel on behalf of the plaintiffs.

1           Your Honor, we're here today because earlier this

2    year Jacksonville City Council chose to classify its residents

3    and put them into or out of --

4           THE COURT:  Let me interrupt you and ask you to --

5    there's a button that will let you raise that -- because I'm

6    not -- the microphone isn't really picking you up very well.

7    There we go.

8           MR. HESSEL:  Earlier this year Jacksonville City

9    Council chose to classify its residents and put them into or

10   out of certain City Council districts because of their race.

11   That was unconstitutional.  The Council did this in spite of

12   plaintiffs' and others' repeated imploring for them not to do

13   so despite repeated warnings that doing so would violate the

14   Fourteenth Amendment and, in the face of a significant amount

15   of evidence, showing that the packing of Districts 7, 8, 9, and

16   10 far exceeded what was necessary to comply with the Voting

17   Rights Act or achieve any other compelling government interest.

18          Plaintiffs were met with silence, and because of

19   that, plaintiffs have to come to this Court today to protect

20   their rights.  Plaintiffs and their members and just about half

21   the City of Jacksonville face up to four years of

22   unconstitutional representation in the elections that are

23   scheduled about a half year from now.

24          Because we're in a PI posture, Your Honor, I wanted

25   to address the merits very quickly and a couple of points on

1    the merits and then turn to the balance of the equities and

2    discuss some of the Purcell principle arguments that defendants

3    raise largely in their remedial brief.

4            THE COURT:  Why don't you go ahead and address the

5    timing Purcell argument first and then let's get back to the

6    merits, just since you mentioned it.

7            MR. HESSEL:  Sure, Your Honor.  So I think it bears

8    noting just how extraordinary, and in some ways extreme,

9    defendants' position is here.  They're asking the Court for the

10   single earliest -- the single most aggressive application of

11   the Purcell doctrine in the 16 years since Purcell came down.

12           I would point Your Honor to a couple of recent

13   observations, one by the Fifth Circuit, the other by the

14   Eleventh Circuit.  The Fifth Circuit in Robinson vs. Ardoin and

15   the Eleventh Circuit in League of Women Voters of Florida vs.

16   Florida Secretary of State.  And both those courts observed

17   that Merrill v. Milligan sits at the outer bounds of how

18   Purcell's been applied to date.  The Fifth Circuit actually

19   calls it an outlier.

20           And Merrill, Your Honor, dealt with an injunction

21   issue four months before Alabama's congressional primary and

22   about six weeks before early voting started through absentee

23   balloting.

24           As we meet here today, Your Honor, we are more than

25   six months from Jacksonville's first election, and the earliest

1  voting can't start until 40 days before then, when, under

2  Florida law, the supervisor is entitled to begin sending

3  mail-in ballots to mail voters.  So 40 days before that, Your

4  Honor, is February 9th, which is 21 weeks from yesterday.

5         So it's not just that we're beyond the outer bounds

6  of Purcell, we're quite far beyond the outer bounds of Purcell.

7  It's the difference, Your Honor, between four months and six

8  months; six weeks versus 21 weeks.  And there's simply no

9  precedent for applying Purcell this far ahead of an election.

10        I think there are quite a few reasons why this case

11  is not the appropriate vehicle for such a profound and

12  unprecedented expansion of Purcell.

13        First, Your Honor, Your Honor would not have to move

14  any statutory deadlines in order to effectuate relief here,

15  which is different from what happened in Merrill v. Milligan.

16        Second, Your Honor, if you look at Justice

17  Kavanaugh's concurrence in Merrill, he places great emphasis on

18  the fact that Merrill enjoined a statewide plan, and that

19  required a lot of coordination between state and local

20  authorities.  Here there's a single office, the Supervisor's

21  office, that has to administer these elections.

22        Third, Your Honor, Merrill turned, at least in part,

23  on some uncertainty about Section 2 doctrine.  There is no

24  similar uncertainty about racial gerrymandering doctrine.  And

25  I would note that after Merrill was issued, the Supreme Court

1    had no problem, in Wisconsin Legislature vs. Wisconsin

2    Elections Comission, striking down a statewide plan with

3    racially gerrymandered districts, and it did so on March 23rd

4    when the election was scheduled for August 9th.

5            And finally, and perhaps most importantly, Your

6    Honor, there are just no Purcell problems here.  The defendants

7    previously represented the December 16th date, as Your Honor

8    knows, and nothing that was contained in Mr. Phillips's --

9    Robert Phillips's declaration that was submitted by defendants

10   in any way undermines that.

11           And I think it bears going through the four election

12   administration issues that Mr. Phillips discusses in looking at

13   the very recent practice of the Supervisor's office, because I

14   think it's revealing about the December 16th date.

15           I'm just going to grab a drink of water.  Pardon me.

16           By my count, Your Honor, Mr. Phillips discusses four

17   election administration issues:  Reprecincting; the sending of

18   new voter information cards, which is required when a polling

19   place changes; UOCAVA; and ballot printing.

20           Starting with the first, in reprecincting.  It bears

21   noting that just last month, on August 23rd, the Supervisor's

22   office chose to hold an election in which 20 precincts did not

23   line up perfectly with legislative district boundaries.  And

24   the election for the City Council District 7 and City Council

25   District 9, the special elections, and the School Board

1   elections were held under the old district lines but the new

2   precinct boundaries.  And so, for example, you had a situation

3   in which a precinct associated with a new City Council District

4   8 was voting for the old City Council District 7.  And that was

5   a choice that the Supervisor's office made.  So they ask the

6   Court to care deeply about aligning precincts when they

7   themselves don't always adhere to that as a matter of policy.

8           Even if they don't want to make that same choice,

9   Your Honor, for the March 2023 elections, they have plenty of

10  time to do the reprecincting.

11          Mr. Phillips, in the last paragraph of his

12  declaration, cites the two most recent instances of

13  reprecincting, and I think examining them and looking at the

14  timeline on which they occurred reveals where this

15  December 16th date came from.

16          So the first happened earlier this year, Your Honor.

17  On April 22nd, Governor DeSantis signed into law the new

18  congressional plan, and that began the reprecincting process to

19  account for the congressional lines, the state legislative

20  lines, and the City Council district lines, and the School

21  Board lines.  By May 5th, which is 13 days later, the

22  Supervisor's office had in front of the Council proposals for

23  reprecincting.  It took 13 days just a few months ago.

24          The other example that he cites, Your Honor, comes

25  from early 2020.  On January 14th, 2020, the Supervisor's

1    office presented the Council proposed shift in precinct

2    boundaries, and actually the creation of a new precinct for the

3    March 17th, 2020, presidential primary election.

4            Your Honor, if there were an interim remedy in place

5    by December 16th of this year, you would have to more than

6    double the time it took earlier this year -- the 13 days -- to

7    get to January 14th, 2023.  And if January 14th was good enough

8    for a March 17th election in 2020, I think it bears some

9    clarity on why sometime before January 14th is not good enough

10   for a March 21st, 2023, election.

11           Turning to the voter information cards, Your Honor,

12   which are required when a polling place changes, just last

13   month the Supervisor's office sent these voter information

14   cards on August 4th, before the August 23rd primary, which is a

15   high-turnout election.  I'm not aware of any mass voter

16   confusion on August 23rd.

17           If you go back to earlier this year, Your Honor, in

18   the special election following Tommy Hazouri's death, on

19   January 11th the Supervisor's office presented to the Council a

20   plan to shift polling placing for that election.  The Council

21   approved it on February 8th and the election was held on

22   February 22nd.  So sometime between February 8th and 22nd these

23   voter information cards must have gone out.

24           And then third, I would go back, again, to that 2020

25   date, Your Honor.  Along with shifting the precinct boundaries

1   on January 14th, 2020, there was a shift in polling locations.

2   And at some point those voter information cards, between

3   January 14th, 2020, and March 17th, 2020, were sent out.

4         So you have a bit of a pattern here, Your Honor,

5   where Mr. Phillips's declaration involves a premise, a factual

6   premise, of something that the Supervisor's office would like

7   to do, a conclusory assertion that it's too late, and there's a

8   gap in between.  And once you start to probe the gap and see

9   the recent behavior of the Supervisor's office, it's clear that

10  there is no Purcell problem if there is a remedy in place by

11  December 16th.

12        And the same thing holds for UOCAVA, Your Honor.

13  UOCAVA's deadline is 45 days before the election.  45 days

14  before March 21st is February 4th, Your Honor.  So it's totally

15  unclear why a remedy in place about a month and a half before

16  that in any way undermines the ability to comply with UOCAVA.

17        The ballot printing, Your Honor, Mr. Phillips

18  suggests that ballots have to be sent to the printer by

19  January 20th.  We have no reason to doubt that, but they can't

20  be finalized until January 13th, which is when the candidate

21  qualifying period ends.

22        So all that to say, Your Honor, that there is nothing

23  that defendants have presented to suggest that their initial

24  representation to this Court about December 16th is at all

25  problematic or that it would cause the type of complications or

1   burdens that courts have recognized in Purcell.  And given the

2   fact that defendants are asking for the single most aggressive

3   application and earliest application of Purcell to date, I

4   think they simply need to show more.

5        THE COURT:  Let me ask you, because we are in

6   preliminary injunction posture, and it's sort of a question

7   that I asked at the beginning and it became more of a question

8   as I read through your evidence, and the extent to which that

9   the plaintiffs are relying on the redistricting that occurred

10  in 2011, and that is, why is something as important as the maps

11  for an individual's ability to vote being addressed by the

12  Court on an expedited preliminary injunction basis when the

13  lion's share of the evidence that you're challenging really

14  goes all the way back to the 2011 lines?

15       Why wouldn't this have been -- because the changes

16  that were made in 2021 were relatively minor.  So it seems -- I

17  have some hesitation about the Court stepping in on an

18  expedited basis to address what has been in place and we've had

19  the opportunity to address in a more robust manner for quite

20  some time.

21       MR. HESSEL:  Sure, Your Honor.

22       First, we're challenging the 2022 enactment.  The

23  2022 enactment, while it, of course, reflects the race

24  predominance of 2011, hasn't yet taken effect.  So we're

25  challenging the irreparable harm that will come with that.

1    It's undisputed here that each election in which elections are

2    held under unconstitutional lines constitutes irreparable harm.

3         And I would note, Your Honor, that some of the

4    organizations that I represent were not around in 2011.  Three

5    of the four were founded in the last decade.  They were founded

6    in part to combat some of the stasis in Jacksonville politics.

7    And I think in many ways they've done everything that you'd

8    want them to do in terms of advocating instead of immediately

9    running to the federal courthouse.

10        So they advocated.  They tried to get the Council to

11   reverse course, so to speak, to end this practice.  And when

12   the Council met them with silence, they decided it was time to

13   file a federal lawsuit.

14        But what we're challenging is the 2022 enactment and

15   the harms that come from that.  And I would note, Your Honor,

16   in this context that the 2011 plan, which is, indeed, the basis

17   of this plan in many ways, clearly has race predominating.  You

18   have open discussions of the 60-percent racial target.  You

19   have Mr. Holland, Jerry Holland, saying, you know, don't worry

20   about the shape of districts or compactness if you want to get

21   to 60 percent.

22        So the course of those districts as formed in 2011

23   and formed earlier pretty unequivocally were drawn based on

24   race.  And the Council chose to move that forward in 2022.  So

25   they enacted race-based districts, perpetuating the race-based

1    cores.  So they have to show narrow tailoring in 2022.

2         The Council was under apparently the mistaken belief

3    that having once drawn districts in which race predominated,

4    that they were entitled to perpetuate those race-based

5    districts again and again and again, decade after decade after

6    decade, with no attempt at tailoring, and escape judicial

7    scrutiny, or scrutiny of any sort, because of core

8    preservation.  And that's just not what the law says.  The

9    defendants haven't cited a single case to support that.

10        If Your Honor looks at Footnote 2 of our reply,

11   there's quite a bit of law that rejects that notion, that core

12   preservation can insulate a racial gerrymandering.

13        And the harms that stem from the 2022 plan will begin

14   on the March election, and plaintiffs seek to prevent four

15   years of irreparable unconstitutional representation.

16        THE COURT:  With respect to the reliance or -- or to

17   the fact that they opted to start with the 2011 plan, one of

18   the things that I kept looking at in the case law is that the

19   Supreme Court recognizes that there -- that the burden is --

20   the legislature begins -- there's a presumption of good faith,

21   and what the plaintiff has to show is that the legislature was

22   motivated by a desire to put people within or without a

23   district based on race.  And the court points out that there's

24   a difference between being aware of the racial composition and

25   a motivation.

1        And to the extent that the City Council members

2   started with the 2011 plan, what is your evidence that they did

3   that with an intention to pack the districts as opposed to

4   simply an awareness that, yes, this is -- these districts are

5   more heavily black, as -- all the charts use "black" and

6   "white," so I'm just going to use "black" and "white."  What's

7   the evidence that as opposed to being aware of the districts,

8   that they were motivated by a desire to perpetuate that

9   discrimination.

10        MR. HESSEL:  Sure, Your Honor.  I would point Your

11   Honor to Footnote 2 of our opening brief.  You have several

12   quotes from Councilmember Priestly Jackson talking about the

13   fact that these districts, Districts 7, 8, 9, and 10, were kind

14   of packed.

15        And at the September 9th member-to-member meeting,

16   which really set the stage for the process for North and West

17   Jacksonville, Mr. Killingsworth, William Killingsworth, refers

18   to several conversations that he was a part of about whether

19   the black population percentage of what we're calling the

20   packed districts should stay the same or should come down.  So

21   there was a clear awareness of the level of packing and the

22   fact that it was unnecessary.

23        I would also point Your Honor to -- and it was the

24   nature of the districts --

25        THE COURT:  The fact that it was unnecessary,

1    where -- there was discussion about the percentages in those

2    districts, yes.  That's evidence of awareness.  But is it

3    evidence of motivation?

4              MR. HESSEL:  So I think one thing on the motivation

5    point, Your Honor.  I'd point Your Honor to Covington and

6    Bethune-Hill and some of the other cases, which is the question

7    here is perhaps a little bit more complicated than just

8    motivation; it's about the nature of the districts themselves.

9              And so in Covington, for example, it was accepted by

10   both the District Court and by the Supreme Court that the

11   legislature, the North Carolina legislature in 2017, didn't

12   look at race at all.  And that just didn't matter because they

13   perpetuated districts that divided voters by race.

14             So I don't think -- and Bethune-Hill -- I would point

15   Your Honor to a quote in the first Bethune-Hill case in 2015

16   that we cite in Footnote 2 of our reply where the court says

17   something along the lines of -- and I'm paraphrasing here --

18   you know, "'This is how we've always done it' may be a neutral

19   answer, but it's not a meaningful one."

20             And so I think all of that reflects the fact that a

21   Council can hypothetically very legitimately think that they

22   are not perpetuating race-based districts, that they think

23   they're doing something else, but if they, in fact, are

24   perpetuating race-based districts into a new decade, they are

25   functionally using race and passing district cores in which

1    race predominated, and they have to justify that through

2    tailoring now.  That's their burden.

3           So it goes a little bit beyond the question of did

4    the Council have in their heads, let's perpetuate this

5    discrimination?  It's the fact of did they, in uncritically

6    moving forward the district cores that were race-based,

7    effectively continue the division of Jacksonville voters by

8    race?  I think the answer on this record is clearly yes.  And

9    because they in 2022 passed a race-based -- passed race-based

10   districts, they have to justify that in 2022 based on 2022

11   narrow tailoring.

12          Were it otherwise, Your Honor, you'd have a situation

13   where they could in perpetuity take race-based districts that

14   were enacted initially in 1991 as part of the 63% Plan and move

15   them forward and forward and forward.  And not just this year,

16   but in 2030 and into 2040 and 2050.  And the case law just

17   doesn't countenance that.

18          THE COURT:  Sorry, I'm just looking at my notes.  Go

19   ahead.

20          MR. HESSEL:  So yeah, I would point Your Honor -- so

21   to sort of kind of squarely answer Your Honor's question, I

22   think that there's a lot of talking about the level of

23   concentration of black voters and black residents and these

24   districts being packed, being kind of packed.  There's no

25   attempt to suggest that the level of black population in these

1    districts is narrowly tailored to any type of compelling

2    government interest.

3            To the contrary, Ms. Priestly Jackson announced that

4    she doesn't know the level of BVAP necessary for these

5    districts to comply with the VRA in a narrow tailored way.  And

6    so the Council, even on their telling of the facts,

7    uncritically took these past lines, perpetuated them forward.

8    And because these past lines were race based, the effect of

9    that was to perpetuate race-based districts this year.  And

10   they need to justify that this year.

11           THE COURT:  In your briefing you say that they -- you

12   suggest that they affirmatively rejected partisan issues as

13   being part of their criteria and that they didn't discuss

14   partisan issues.  But it's true that partisanship is not listed

15   as a criteria, but, of course, then again, neither is race.

16   That doesn't mean that they rejected either as a criteria.

17           And there are -- they -- there were certainly

18   discussions about the number of Republicans and the number of

19   Democrats in some of the districts that ended up being redrawn,

20   or in some of the areas of the districts that ended up being

21   redrawn.  And your -- the expert report, Austin, unequivocally

22   says, "Well, of course it was race, it was only race," but she

23   doesn't account for whether or not it could have been politics.

24           MR. HESSEL:  So, Your Honor, I think there are three

25   buckets of evidence that show this wasn't about partisanship.

1    The first, as Your Honor alluded to, is the record itself.

2    There was no vote to accept partisanship as a criterion.

3              THE COURT:  There was no vote to accept race either.

4              MR. HESSEL:  That's right, but courts I think

5    rightfully don't require a legislature to announce that it

6    might be violating the law before finding that they violated

7    the law.  And if Your Honor looks at the Singleton case, courts

8    tend to hold the legislature to its announced -- its announced

9    criteria amongst the permissible choices.

10             And I would note, Your Honor, in this context that

11   the record of the meeting that I believe Your Honor is

12   referencing, the September 23rd meeting, quite clearly shows

13   that race was a proxy here.  You have Ms. Priestly Jackson

14   cutting off Councilmember Pittman when Ms. Pittman mentions the

15   ethnoracial divisions.  And Ms. Priestly Jackson cuts her off

16   and says -- Councilmember Priestly Jackson, excuse me, cuts her

17   off and says, "We can't talk about race.  So we're going to

18   just be very, very clear for our communities of interest that

19   we're going to talk about the party stuff."

20             I would point Your Honor as well to the fact that

21   even after that meeting, if at some point during the process

22   the Council started to consider partisanship, you would expect

23   that to be referenced or reflected in, for example,

24   Mr. Killingsworth's memo to the Rules Committee on March 14th

25   or the Statement of Methodology or the Summary of the

1    Legislation that accompanied the final legislation on
2    March 22nd, and it's nowhere to be found.
3          The second bucket of evidence, Your Honor, is the
4    October 4th meeting that we reference in our reply.
5    Councilmember DeFoor, who represents stripped District 14,
6    presented a plan in which she was going to move three
7    precincts -- or suggested moving three precincts from her
8    stripped District 14 to Councilmember Gaffney's packed District
9    7.  Those precincts are in Riverside.  They are precincts 1407,
10   1415, and part of 1413.  They are overwhelmingly white.  The
11   BVAP, the Black Voting Age Population, percentage of these
12   precincts is 15.1 percent, 6.4 percent, and 4.9 percent.  But
13   they're overwhelmingly Democratic as well.  So President Biden
14   got 74 percent, 64 percent, and 61 percent in these precincts.
15   And so there was a proposal made to make Councilmember
16   Gaffney's District 7 more Democratic and Councilmember DeFoor's
17   District 14 more Republican, and it was rejected.
18         THE COURT:  Well, but isn't the more logical reason
19   why that was rejected was it didn't help with the problem?
20   Because putting -- District 7 needed to give up territory so
21   that it could take from District 2.  So adding what was in --
22   that wouldn't have helped the problem that this Council was
23   trying to address in terms of equalizing the population in the
24   various districts.
25         MR. HESSEL:  Well, so Council 7 actually drew from

1    Council -- District 2 instead of that.  So instead of taking

2    the population that was overwhelming Democratic but also

3    overwhelmingly white from 14, the choice was made to move a

4    population from District 2 to District 7.

5         THE COURT:  Right.  But they needed to move from 2

6    because 2 needed -- they were absorbing from 11, and that had

7    to move up.  From that map it had to move up.  So District 2

8    had to take -- had to be able to absorb from further south.  So

9    why would that have helped?

10        MR. HESSEL:  Well, in any event, Your Honor, there

11   was an offer made to make more Democratic District 7, and it

12   was rejected.  And it could have worked either way.

13        And I think, Your Honor, the other key point here is

14   that focusing just on those groups that were moved kind of I

15   think in some ways misses the key point, which is the third

16   bucket of evidence that I wanted to talk about, which is the

17   cores of these districts were race based, not party based.  The

18   63% Plan refers to 63 percent black concentration.

19        THE COURT:  But that's back in 1991.

20        MR. HESSEL:  That's right.  But they formed the

21   cores -- as defendants' own expert suggests and indicates, they

22   formed the cores of all subsequent districts.  So you had 1991

23   race-based districts that were moved forward and forward and

24   forward, such that when they were reenacted in some form in

25   2021, they continued to be race-based cores.  And because of

1    that, you need narrow tailoring now.

2           I would also point, Your Honor, that -- I would point

3    Your Honor to several precincts on the border between 9 and 14,

4    which is 1404 and 1405.  These are, like the other districts in

5    Riverside, precincts in Riverside, heavily white and heavily

6    Democratic.  And if this were about the partisan sorting of

7    voters as opposed to the racial sorting of voters, you would

8    expect them to be placed in District 9.  You could draw a much

9    cleaner, much -- essentially concentric circle around them, or

10   a circle around them and make District 9 more Democratic and

11   make District 14 more Republican.  But this wasn't about the

12   partisan sorting of voters, it was about the racial sorting of

13   voters.  And that's why you have white Democratic precincts

14   replaced with white Republican precincts as opposed to with

15   black and Democratic precincts.

16           THE COURT:  Give me a second to find something that I

17   know I wrote but I just can't find it in all the pages that

18   you-all have given me.  Give me a second.

19       (Pause in proceedings.)

20           THE COURT:  All right.  Well, I'm not finding it

21   right now, but go ahead.

22           MR. HESSEL:  Yeah, and on the party-versus-race point

23   I would also just note, Your Honor, that there's no explanation

24   given at any point of why at that September 23rd meeting if

25   this were just about party they had to read racial data as

1   well.

2          And I would point Your Honor to Cooper v. Harris and

3   Bush v. Vera, that make very clear that the use of race as a

4   proxy still triggers strict scrutiny.  It is totally unclear if

5   this were about the partisan sorting of voters why they needed

6   to read out the racial data.  It's totally unclear why if this

7   were about an earnest consideration of parties you had a

8   situation in which, as Ms. Pittman is saying, "I want to make

9   sure I'm comfortable with ethnoracial population and I want to

10  make sure that Councilmember White is as well," she's cut off

11  quite abruptly by Ms. Priestly Jackson saying -- and I have the

12  quote here -- "Can't use the ethnoracial identifiers, so we're

13  going to talk about some of the party stuff that we want, but

14  we just have be to very, very clear for our communities of

15  interest that we're identifying that."

16         So I think it's not a particularly subtle attempt to

17  use party to talk about race.

18         And I'd also note, Your Honor, that after all of that

19  happened you had Vice Chair Beckton on October 28th saying,

20  "We're allowed to use party, but you haven't seen much of

21  that."  You have a quote from Chair Bowman given to a

22  Times-Union reporter saying, "We didn't look at the partisan

23  affiliation of residence."

24         So there's quite explicit disclaiming of this being

25  the partisan sorting of voters.

1      THE COURT:  To the extent that you're relying on the

2 statements by Councilmembers Priestly Jackson and Pittman,

3 there are certainly a handful of statements that they made.

4 How much can plaintiffs rely on that as being reflective of the

5 intention of the Council as a whole in adopting the plan?

6      MR. HESSEL:  So I would point Your Honor -- "very,"

7 is the answer.  I would point Your Honor --

8      THE COURT:  I'm not surprised that that's your

9 answer.

10      MR. HESSEL:  I would point Your Honor to Cooper v.

11 Harris.  And in Cooper v. Harris the Supreme Court focussed

12 heavily on exactly this type of evidence.  There was no

13 explicit vote to adopt racial targets.  The Supreme Court

14 focussed on the floor statements of -- I believe the

15 legislators' names in those cases were Lewis and Rucho and what

16 they were saying to their colleagues.  They relied heavily on

17 the instructions given to the redistricting consultant.

18      And I think the context here matters because these

19 conversations are in the meetings in which the relevant

20 incumbents are talking to Mr. Killingsworth.  They are

21 reviewing the work he has done.  They are sending him back with

22 more tasks.  And so this is not just some back-bencher giving a

23 floor speech to a C-SPAN camera somewhere.  This is at the core

24 of the process; councilmembers who, by defendants' expert, own

25 expert's words, Ms. Priestly Jackson was instrumental to this

1    process, instructing Mr. Killingsworth to do this.

2         And with regard to the broader Council, Your Honor, I

3    would note that what happened here was really a situation in

4    which each incumbent had apparently near veto power over

5    changes to their districts in some ways.  And I would point

6    Your Honor to the declarations submitted by Councilmember

7    Freeman and Councilmember Salem that both say:  I trusted the

8    Redirecting Committee, I trusted the staff, and essentially

9    indicate that they basically -- I don't want to use -- they

10   basically entrusted the member-to-member meetings and the

11   Redistricting Committee to determine the lines here.  So there

12   was a situation in which there was a lot of reliance put on the

13   decision made in those meetings.

14        And it's exactly the type of evidence that the

15   Supreme Court weighed heavily in Cooper v. Harris.

16        THE COURT:  All right.  I think I should probably

17   hear from the City, unless there's any additional point that

18   you want to bring up before I recognize Ms. Giannini.  I will

19   hear from you again.

20        MR. HESSEL:  Wonderful.  Thank you.  I meant to say

21   that at the beginning, or request that.  Thank you.

22        THE COURT:  Okay.  Ms. Giannini, I'll let you choose

23   which of his arguments you want to respond to first, but I do

24   have some additional questions even beyond some of the

25   arguments that were raised -- that were spoken about here based

1  on some of the arguments that were in the papers.

2          MS. GIANNINI:  Yes, Your Honor.  Mary Margaret

3  Giannini on behalf of the City of Jacksonville and Supervisor

4  of Elections, Mike Hogan.

5          At the outset I would say, Your Honor, that

6  plaintiffs' argument about -- about whether or not they satisfy

7  the likelihood of success on the merits to show that race was

8  the predominant factor in the City Council's drawing of the

9  district lines, they've not made their case.  They talk about

10  inferences.  They talk about the fact that this present City

11  Council has accepted, without consideration, the rules -- or

12  the lines drawn in prior years.

13          Indeed, in plaintiffs' own remedy brief they state,

14  "Councilmembers' declarations claim that their primary

15  motivation was maintaining existing lines without ever

16  considering that race defined those lines."

17          So to go to your question of was it a consideration

18  versus was it a motivation, we do not have the record

19  demonstrating that here, which is what is required to show

20  racial gerrymandering under the Fourteenth Amendment, that race

21  was the predominant purpose.  Plaintiffs have not demonstrated

22  that.

23          Certainly race was a purpose, and race can be a

24  purpose.  Certainly councilmembers discussed race.  The City is

25  in no manner suggesting that those conversations did not go on.

1   But plaintiffs have not demonstrated that race was the

2   predominant purpose that drove the Council in making the

3   decisions for -- that were passed in 2022.

4           I would address their argument in terms of harm to

5   the Supervisor of Elections, and the Purcell argument, Your

6   Honor --

7           THE COURT:  Can we put Purcell -- that to the side

8   for a moment?

9           MS. GIANNINI:  Certainly.

10          THE COURT:  Let me just talk to you about the -- so

11  you don't appear to dispute the plaintiffs' evidence that in

12  2011 the lines were drawn predominantly based on race.

13          MS. GIANNINI:  Your Honor, I would not say that we

14  are conceding that in 2011 the lines were drawn predominantly

15  on the basis of race.  We're acknowledging that in 2011,

16  language was used, percentages were addressed, but whether or

17  not that rises to the level of that being the predominant

18  purpose -- and more importantly, Your Honor, it's not just

19  predominant purpose, it's that what happened in 2011 was racial

20  gerrymandering.  And plaintiffs are contending that what the

21  City Council is doing is perpetuating something that is

22  unconstitutional.  But there has been no finding at any point

23  in Jacksonville's history that the Jacksonville Council, when

24  it has drawn district lines, has violated the Constitution or

25  violated federal law under the Voting Rights Act in terms of

1    drawing its lines.

2           So certainly there are conversations in 2011.  As

3    there were in '91, as there were in 2001.  And plaintiffs are

4    attempting to draw a through-line, but they're asking the Court

5    to make an inference that these prior conversations, one, make

6    an inference that these prior conversations absolutely

7    demonstrate not only that race was the predominant purpose, but

8    that it was an unlawful use of race, and that impute that

9    purported conclusion into the motivations of the Council in

10   2021 and 2022.  And the law doesn't allow the Court to make

11   that kind of inferential leap.

12          THE COURT:  Let me ask you this.  If -- the City,

13   having opted to start with the 2011 lines, there doesn't have

14   to have been a prior determination that that was racial

15   gerrymandering.  If the Court looks at it now and determines

16   that it was, then the fact that they didn't challenge it before

17   the City Council decided to reaffirm those lines, that doesn't

18   then protect those lines ever after, right?

19          MS. GIANNINI:  Your Honor, I am by no means saying

20   that the invocation of core preservation means that once

21   something has happened it can never be changed.  And the law is

22   clear about that.  But what the law says, what the courts say

23   when they're looking at invocations of core preservation as a

24   reason -- and indeed here, it was the first, primary

25   redistricting decision or goal set by the Council in its

1    process, to preserve the districts as best as possible -- that

2    the -- you must begin with a presumption of that being in good

3    faith, as opposed to a presumption that the Council knew that

4    it was perpetuating something that was unlawful.

5            Moreover, the Court, I suppose, could engage in an

6    analysis as to whether or not what happened in 2011, what

7    happened in 2001, and what happened in 1991 was

8    unconstitutional.  But that is not something that plaintiffs

9    have put into their complaint.  It is something that they've

10   raised in the course of these proceedings.  Which means that

11   now the City is in a position of responding to potentially

12   having to prove a negative, or having to prove a negative

13   positive.  It's not the City's job at this point, nor does the

14   burden fall on the City, to demonstrate that race was the

15   predominant purpose.  That's plaintiffs' burden.

16           And so bringing up past legislation, which heretofore

17   has never been subject to challenge, has never been subject to

18   a strict scrutiny analysis, raises the questions of:  Well, now

19   who has the burden to prove that the lines were constitutional

20   in the past?

21           When courts have looked to core preservation and

22   questioned whether or not that is a valid argument for

23   retaining prior lines, you see several examples where, indeed,

24   the Supreme Court has looked at a very messy situation where

25   prior lines were, in fact, deemed unconstitutional but still

1 held back.  And that is in Abbott vs. Perez, which came out of

2 Texas.  So there you have a situation where the court says, you

3 know, the past sins should not forever taint future

4 legislation.

5          And certainly the Bethune-Hill cases that plaintiffs

6 have cited say that it is very important that the court looks

7 at core preservation to ensure that it isn't merely a

8 perpetuation of an unlawful status quo.  But the court also

9 says, "Still, the very relevant question and consideration is

10 what was the motivation of the present Council," and that

11 that's what you have to look at when you're asking about the

12 motivation for the present Council.

13          Similarly, I would commend to the Court Chen vs. City

14 of Houston.  It's 206 F.3d 502.  There the court is examining a

15 situation where you have plans that have -- it's a mixture of

16 Fourteenth Amendment claims as well as Voting Rights Act claims

17 and any number of evolving maps, but where a prior map that

18 gets used that is subsequently deemed to be unconstitutional,

19 but because of the timing, the parties -- the defendants used

20 the map prior to the map being deemed unconstitutional and now

21 their use of that map is getting challenged.  Even though the

22 court recognizes that in that case we have an infirm map, they

23 say, "This is a close call, but in this situation, we're not

24 going to impute bad will to the new legislature."

25          So when we look at the reasons given by the Council

1    for wanting to start from the 2011 lines, their reasons were

2    largely efficient.  They were recognizing that the population

3    in Jacksonville had changed predominantly in the southeastern

4    part of the city.  So but for that dramatic population change,

5    all things being equal, the City didn't necessarily need to

6    make any changes to their lines because the --

7            THE COURT:  Didn't they have an obligation, though,

8    to look at the map -- you had Killingsworth acknowledge that

9    the four particular districts had been minority-access

10   districts.  So clearly race played a large role in the drawing

11   of those districts historically.

12           And you look at the districts, and they're not

13   compact, and they are -- they are sprawling.  And when you look

14   at the population distribution -- and I'm -- just a moment.

15           I'm looking at -- in Dr. Austin's report, which is

16   Document 34-18, the Voting Age Population map, which is Figure

17   1 on page nine, did the City Council not -- before just saying

18   "we're going to start with the prior lines," not have some

19   obligation to look at whether these lines were properly drawn

20   to begin with?  To look at the distribution of black versus

21   white vote in the way these lines are drawn?

22           MS. GIANNINI:  Well, the City Council started from a

23   proposition that the lines were properly drawn because they had

24   no reason to think they had not been.  They had no reason to

25   think that those lines had been improperly drawn in 2011.

1        And, indeed, when you look at where a majority of the

2   black population exists in the City of Jacksonville, a majority

3   of the black population exists in Districts 7, 8, 9, and 10.

4   So you start from a premise that you can't move your voters.

5   You have to find -- you have to take your voters from where

6   they live and then draw lines accordingly.  And there is

7   nothing wrong with starting from existing lines.

8        And there was no reason for the Council to believe

9   that what existed in 2011 was infirm.  At no point has the City

10  of Jacksonville ever been subject to Section 5 preclearance

11  under the Voting Rights Act, which I know is now no longer in

12  force but has been in force for many years, and never been

13  subjected to any type of Fourteenth Amendment claim or to a

14  Section 2 Voting Rights Act claim.

15       THE COURT:  What about the concerns that were raised

16  by voters at the meetings when they said, "Look at the extent

17  to which the black voters are being packed into these

18  districts"?  It was raised.

19       MS. GIANNINI:  It certainly was raised.  It was

20  raised very late in the process, Your Honor.  And those voters

21  were complaining about lines that had been in existence since

22  2011.  And as Councilmember Priestly Jackson notes several

23  times in the record, she went back to check her records to see

24  if she had received complaints from the individuals within her

25  districts.  She consulted with her colleagues to see if they

1  had heard any complaints since the 2011 redistricting.  And
2  they had not received complaints.
3        And when you look at the lines drawn, as you noted
4  earlier, for Districts 7, 8, 9, and 10, the changes are very,
5  very small.  And so to the extent that voters are complaining
6  or raising concerns about potentially being packed in 9 and 10
7  and potentially 8 and 7, that is a status that has existed for
8  at least ten years up to the present situation.
9        THE COURT:  That doesn't make it okay, though, if it
10  was in violation of the Fourteenth Amendment to begin with,
11  right?
12        MS. GIANNINI:  Certainly, but we don't have that
13  finding.  And when we -- and so when we begin with a
14  presumption that the Council has to have the presumption of
15  good faith, that they were starting from good faith, and when
16  you read the entirety of the record, when you see
17  councilmembers talking about packing, they are talking about
18  not packing too much.  They are saying, "We need to be careful
19  about putting too many citizens of a like fashion within a
20  given district."
21        So you see a very clear intent on behalf of the
22  Council not to create something that is unlawful, but operating
23  from the starting position that their belief, their good-faith
24  belief, that the 2011 lines are appropriate, that not to make
25  anything worse.  Councilwoman Priestly Jackson says, "I came

1   here with the goal to do no harm."  To do no harm.

2           THE COURT:  But when she's saying -- talking about

3   doing no harm in that, she's specifically talking about not

4   allowing a reduction of the number of black voters in her

5   district.

6           MS. GIANNINI:  But I think the other important thing

7   to look at, Your Honor, is that at the end of the day, the

8   percentages of African American citizens in 7, 8, 9, and 10 as

9   compared to 2010 went down.

10          THE COURT:  Yeah, I had -- I did recognize that.  Can

11  I -- let me go back to the suggestion that packing was raised

12  late in the process, because it does appear that it was, but is

13  that not a function of the way the City Council went about the

14  redistricting process?  Because the determination was made at

15  the beginning to start with the 2011 lines, and then it appears

16  to have been left largely to the members to horse trade of

17  who's going to take what precinct in order to make the

18  population shift that needed to be accomplished.  And then only

19  after that's all agreed to -- and as you say, late in the

20  process -- that's when the voters find out what's happening.

21  And as soon as the voters found out what's happening, they

22  object.  Is it late in the process?  Perhaps.  But it's late in

23  the process perhaps because they didn't know at the beginning

24  that the Council was going to start with the lines that perhaps

25  they would have challenged if they had known.

1          MS. GIANNINI:  Your Honor, the City of Jacksonville,

2    being part of the State of Florida, has to have all these types

3    of meetings in public.  And so all of the Council meetings were

4    publicly noticed.  There were several members of the public who

5    came to almost all of the redistricting meetings where the

6    initial goals were set; where this, I think you said horse

7    trading, I may have -- where the horse trading was going on.

8    And so there were citizens involved throughout the entire

9    process.  And at some of those early meetings there were not

10   objections raised.

11         And so certainly there may be room for the City to

12   rethink its process, but this is not a procedural due process

13   claim.  This is a claim about whether or not race was the

14   predominant purpose, and plaintiffs have not demonstrated that,

15   and therefore have a hard time showing, as what is required

16   under the standard of review for preliminary injunction, a

17   clearcut -- entirely clearcut ability to show a substantial

18   likelihood of success on the merits.

19         THE COURT:  And let me just ask this.  Your entire

20   argument really focuses on the racial predominance.  You don't

21   go on to talk about compelling interest or narrow tailoring.

22   The City's defense rises and falls on whether or not the

23   plaintiffs have made the clear showing that race predominated

24   in the Council's districting decisions; is that right?

25         MS. GIANNINI:  You're right, Your Honor.

1          THE COURT:  Okay.  So I can take one of the things

2     off the table.

3          MS. GIANNINI:  Could I say something about packing?

4          THE COURT:  Absolutely.

5          MS. GIANNINI:  Plaintiffs talk a lot about packing

6     and use evidence that what is going on particularly in 7, 8, 9,

7     and 10, that these are packed with African American citizens,

8     to then impute that this packing is unlawful to demonstrate the

9     predominant purpose for these lines to be drawn to be raised.

10          The first thing I would note is that, again, there

11     have been no changes, or the changes that exist to Districts 9

12     and 10 are absolutely minuscule and are demonstrably not

13     because of race.

14          THE COURT:  Why do you say that?  Oh, I know one was

15     a in-law thing.

16          MS. GIANNINI:  One was an in-law and the other one

17     was driven by census block changes.  So the districting process

18     is predicated by census blocks, which are created by the Census

19     Bureau.  So the City, as a redistricting entity, cannot split

20     census blocks.  So if a census block line changes, then that

21     predicates a change in the line to a district.  So that's what

22     you have going on -- I'll use my little pointer here -- over

23     here in this tiny little part on -- between 9 and 14.  There's

24     this funny little triangle, and that -- where -- when you look

25     at the map -- if you could see it up close, I apologize -- the

1   purple bit demonstrates the new line.  And that new line is

2   actually smoother than the old line and is -- so if you can see

3   up here.  So you see where the purple, that demonstrates the

4   present line.  The prior line is the red line.  That purple

5   line, which actually makes this little bit of District 9

6   smoother, was driven by census blocks.

7          THE COURT:  I don't see purple up there.

8          MS. GIANNINI:  Oh, I'm sorry.  Well, blue-y, blue-y,

9   purple-y.

10          THE COURT:  I see that it's more purple.  Thank you.

11          MS. GIANNINI:  I'm sorry, yes.  And then over here,

12   this is District 10 as it aligns 8.  And it is -- right.  This

13   line now is far more regular in nature.  I believe this little

14   pocket had to do with the in-law from 2011.  And this pocket

15   was included because how the roads are designed in such a way,

16   it was difficult to get to this neighborhood but for including

17   it into District 10.

18          So these changes to the lines -- and when courts talk

19   about core preservation they say, "All right.  We understand

20   you can have an argument about preserving the lines as they

21   existed, but the more important question is why are some voters

22   then included in or out?"

23          So for 9 and 10, race is not part of the conversation

24   at all.

25          The other important thing when one is talking about

1   packing is that the inverse of packing would be to break up the

2   districts in one manner or another; not to dilute, but to

3   ensure that the voters who are otherwise concentrated might

4   have a better opportunity to --

5           THE COURT:  Elect more than just four members.

6           MS. GIANNINI:  Than just four members.  Nothing in

7   the record that plaintiffs have presented has demonstrated that

8   it is possible to design another district.  So to the extent

9   that plaintiffs are alleging there is packing, they haven't

10  demonstrated the harm of packing.

11          They have said, "You're packing."  And so if we're

12  packing, theoretically we would have to unpack.  But if you

13  have to unpack, then you have to show that this packing not

14  only is intentional, but has an impact.

15          THE COURT:  Well, wait.  So in your view, in order

16  for them to prevail on their packing claim, they have to show

17  that but for the packing, there would be the ability to have a

18  sufficient number of Black Voting Age Population in five

19  districts for them to elect their candidate of choice?

20          MS. GIANNINI:  What I'm saying, Your Honor, is that

21  plaintiffs have combined two species of Fourteenth Amendment

22  voting rights claims.  When one talks about Fourteenth

23  Amendment, the courts have recognized that there can be two

24  types of Fourteenth Amendment claims.  One is a dilution, or

25  packing, type of claim, and the other is racial gerrymandering.

1          By all accounts, it appears that plaintiffs are

2    making the racial gerrymandering claim because they're talking

3    about racial gerrymandering; they're citing the relevant case

4    law; they're talking about predominant purpose.

5          If one is trying to make an allegation of packing or

6    dilution, the standard of review is a little bit different.

7    The standard of review requires a showing of intent -- but it

8    need not be predominant intent -- as well as impact.

9          What plaintiffs are doing here is in an attempt to

10   demonstrate that race was the predominant purpose.  They are

11   saying, "The City Council packed citizens."  But they've only

12   shown that there is a high concentration of African Americans

13   in Districts 7, 8, 9, and 10.  They haven't demonstrated what

14   the harm of that packing is.

15         And while they are not obliged under a racial

16   gerrymandering claim to demonstrate that a fifth district would

17   be possible, which is what they would need to do if they

18   decided to bring a Section 2 Voting Rights Act claim, which

19   they didn't, but they've not demonstrated that if, indeed, the

20   City is packing, what the harm is from that packing.  What is

21   the impact of that packing but for the density in and of itself

22   of those citizens?

23         THE COURT:  So if I'm understanding their argument,

24   and Mr. Hessel will tell me later if I'm wrong, it seems to be

25   that the argument is that by packing or gerrymandering -- and I

1   think that the claim is a gerrymandering case -- by drawing the

2   districts in the way that they have, the City is perpetuating a

3   circumstance in which, yes, there will be four black

4   representative districts, but only four.  Instead of if that

5   population were allowed to be spread into more than just four

6   districts, there would be more opportunities for that voice,

7   that racial voice, to be heard, and perhaps you would have more

8   than four representatives of that community.

9          MS. GIANNINI:  And if that's the argument that the

10  plaintiffs wanted to make, then that would have been better

11  framed under a Section 2 Voting Rights Act claim, but they

12  haven't done that.

13         And for your benefit, the case law that provides a

14  little bit of edification on this distinction between

15  Fourteenth Amendment and the dilution and packing versus

16  gerrymandering is the Bethune-Hill decision, 141 F.Supp.3d,

17  505.  That comes out of the Eastern District of Virginia.  And

18  then League of United Latin American Voters vs. Abbott.  It's

19  2022 Westlaw 140729, Western District of Texas, 2022.

20         THE COURT:  So in terms of saying it wasn't race, so

21  I'm looking back at Dr. Austin's report.  On page 20 she talks

22  about the splitting of precincts, and the example of precinct

23  205 that is split with more heavily black percentage being

24  moved into District 7 in sort of an odd curve, and then the

25  other part of that being left in District 2, and the part

1    that's left in District 2 is predominantly white.  The

2    census -- the precinct data wouldn't show -- or what's the

3    reason for that -- for splitting that precinct in a way that

4    appears to be along racial lines?

5            MS. GIANNINI:  Your Honor, I would start with the

6    premise that using precincts is the wrong puzzle piece to

7    evaluate how the Council drew lines.  The Council's

8    determinations on what lines to draw and where or how to shift

9    from the 2011 lines was based off of census block data, not

10   precinct data.  There are only two instances in the entire

11   record of many pages, as you know --

12           THE COURT:  Lots, lots.

13           MS. GIANNINI:  Lots.

14           THE COURT:  This is clearly not -- we're clearly not

15   in --

16           MS. GIANNINI:  The trees are angry.

17           THE COURT:  The trees are not happy with you-all,

18   yes.

19           MS. GIANNINI:  Right.  There are only two instances

20   in the entire record, I think, where precincts come up.  One is

21   it gets referenced in Mr. Killingsworth's white paper, and it

22   gets referenced, as plaintiffs have already noted, in the

23   conversation with Councilwoman DeFoor noting precincts in terms

24   of which precincts might be shifted into District 8 or 7.

25           Precincts can certainly provide valuable information

1   about race and party demographics.  And so -- and it is an easy

2   and an accessible piece of data.  But it is not the puzzle

3   piece, it is not the data unit, that the Council used to draw

4   its lines.

5          Moreover, precincts do not predicate districts;

6   rather, districts predicate precincts.  And as opposing counsel

7   even noted, precincts get changed on a regular basis for any

8   number of reasons.  But one predominant reason that precincts

9   get changed is they get changed after districting.

10          Once the City districts -- redistricts, it changes

11   its precinct lines.  And so looking at precincts as a

12   measurement tool to try to reevaluate why decisions were made

13   or not made is misplaced in this situation because the City

14   Council was not working off of precinct data; they were working

15   off of census block data.

16          THE COURT:  Okay.  But the census block -- so you're

17   saying that the portion of precinct 205 that goes to 7 is one

18   census block and the part that stays in District 2 is a

19   separate census block, right?

20          MS. GIANNINI:  I believe so.  I do not have my hands

21   around all the census blocks or groups.

22          THE COURT:  You don't have this committed to memory?

23          MS. GIANNINI:  Could I bring up another visual aid

24   for your reference, Your Honor?

25          THE COURT:  Sure.  And while you're getting that up,

1  it just doesn't -- isn't sort of the -- that effect on looking

2  at 205, isn't -- and that's what was -- that's part of what was

3  moved from 2 to 7 in order to allow 2 to absorb from further

4  south.  Circumstantially, it appears that it's along racial

5  lines.  The part that's located in District 2 is 60 percent

6  white and the part that moves to District 7 is -- I lost the

7  number, but it's significantly black.

8        MS. GIANNINI:  All right.  So, Your Honor, up here on

9  the screen we have -- this is what is called a heat map.  And

10  so we're talking about this space up here.  And so this is the

11  space that gets transferred from District 2 into 7.  And the --

12  what -- what this tells you here is the green is least

13  concentrated of African American voters and the red tells you

14  high concentration of African American voters.

15        So what you can see is as the City of Jacksonville is

16  laid out, the majority of African American voters are in the

17  center of the map.  And as we spread out and we look to the

18  east and to the west of the city, it gets greener and greener.

19        So when we look at this area over here where this

20  transfer happened, you see that this is not a predominantly

21  African American place.  And even a little closer over it's in

22  the yellow, which shows that it's sort of a mix of residents.

23        So this is a picture of a heat map of the voters by

24  party.  And again, just so we have a visual reference, the

25  redder is the more Democratic in this image; the green is more

1    Republican; the yellow is sort of half and half or middle of
2    the road.
3         So again, when we're talking about -- and I think
4    we're up here in this area.  Where we're talking about citizens
5    that got moved from 2 into 7, we're talking about a mixture of
6    citizens in terms of their political outlook.
7         So when you go and you look at the meeting I believe
8    from September 23rd where there's a lot of discussion about --
9    about politics and race -- and this is the meeting where
10   Councilwoman DeFoor says to Councilman Gaffney, "You're
11   concerned about politics.  You're concerned about what the
12   Republican and the Democrat numbers are."
13        That is a part of that conversation.  And the
14   final --
15        THE COURT:  One of the very, very few times that
16   politics is actually mentioned, right?
17        MS. GIANNINI:  But it is packed into this meeting.
18   And this is where the plaintiffs are saying that the
19   Councilmembers were using party as proxy -- wait -- party as
20   proxy for race.
21        But I think when you look at the numbers and you look
22   at the maps, it makes sense that the Council would be
23   considering the racial characteristics of these districts.  The
24   Council can consider racial characteristics.  The Supreme Court
25   has said, "We expect there to be consideration of racial

1   districts."

2          And so as the Council is looking, yes, they're

3   talking about race and racial numbers, and voter party

4   preference numbers are being discussed, but the conversation

5   about how to draw the lines for 7, 2, and 8, there's a lot of

6   conversation about politics.

7          And I think when you read the September 23rd meeting

8   minutes as a whole -- and certainly you can pick out racial

9   comments, but when you see what is driving that conversation,

10  it is party demographics above racial demographics.  So without

11  question, race is part of the mix.

12         The very test that we're working under here is was

13  race the predominant factor.  So by the very phrasing of the

14  test, the test presumes or assumes that race may be a factor,

15  may be involved in the conversation, but the question is

16  whether in the conversation everything else was subsumed to

17  race.

18         And, in fact, there's another place during that

19  meeting, I believe, where Councilman Gaffney says, "I'm really

20  concerned about picking up a high Republican area."

21         So I think when you look at the heat map, when you

22  look at the distribution of Democratic voters, when you look at

23  the distrubution of Republican voters in the city of

24  Jacksonville -- none of which the Council is trying to move,

25  right, these are sort of immutable traits, as it were, that we

1   get every ten years.  And then the Council is trying to draw

2   lawful lines based on the demographic information it has

3   received.

4          And given that there wasn't a lot of change between 9

5   and 10 from 2011, except for the little census block changes

6   and the funny little thing that went on on the side with 9 and

7   14, the real battle here is what happens on the boundaries --

8   on the boundary here between 8 and 7.

9          And I need to say that there -- this map is

10  frustrating because that "7" is misplaced.  So just pretend

11  that "7" is in the blue-y part.  And the purple is District 8

12  and the blue is District 7.  So what we're really looking at is

13  this boundary.  And the red represents the prior boundary.  So

14  we've straightened a line.

15         And when you read the transcript, you see

16  Councilwoman Pittman's concern of not wanting to move over here

17  into 12 because, in part, it could result in splitting up a

18  community of interest, the City of Baldwin.  So it's this

19  little block over here.  And that Councilman Ferraro -- Ferraro

20  for 12? -- Councilman White in District 12 doesn't want to give

21  up that community of interest either.  So if District 8 is

22  going to pick up new population or new geography, it's going to

23  have to be from 7.  And so -- and so they -- we pick up this

24  former claw, which now creates a more uniform line.

25         And then at the same time, as we look at the border

1  of 7 and 2, which we've already discussed in terms of the

2  racial as well as party demographics of this area, I think the

3  record demonstrates that party drove this and the record

4  demonstrates that race was not the predominant factor.

5        THE COURT:  And your position the party drove that,

6  the line between 7 and 2, is based on the September 23rd

7  meeting and the discussion between -- well, it was more than

8  just DeFoor and Gaffney, but predominantly them; is that right?

9        MS. GIANNINI:  In part on that, but then I would also

10  direct you to the -- to these heat maps that exist in

11  Mr. Killingsworth's white paper, and that's Document 34-4,

12  pages 26 through 27.

13        THE COURT:  Did they -- did they have those heat

14  maps?  I mean, so --

15        MS. GIANNINI:  So in part, this is why we see during

16  some of these meetings Mr. Killingsworth is reading off racial

17  and party demographic information.  So -- and we need to

18  remember that the councilmembers know their city and they are

19  familiar with constituents; they're familiar with certain

20  areas.

21        And so as they are examining where to draw lines and

22  where really the big fight is what to do with what needs to get

23  moved from 2 and then how it gets distributed into 7 and 8, and

24  given that Councilwoman Pittman felt like moving further west

25  in Jacksonville into District 12 was not going to fit within

1   the communities of interest she already served, we were going

2   to -- instead, there was a decision to regularize? -- to --

3   whatever -- smooth out -- I apologize -- smooth out the line

4   that we see on 7, and then we have this extra little bump

5   on the east side of -- smooth out 8 and then a little bump on

6   the east side of 7.

7        The other thing I would commend to you, Your Honor,

8   is that in Mr. Killingsworth's white paper on page 23 he has

9   two different charts that demonstrate the distribution -- the

10  losses and gains of Republican and Democratic voters from the

11  different districts.  And when you extrapolate and you do the

12  math from these two charts, then you can see what the gains and

13  losses were from a party perspective.

14        THE COURT:  Remind me where this --

15        MS. GIANNINI:  This is Document 34-4 at 23.

16        THE COURT:  And what is it that you're . . .

17        MS. GIANNINI:  So what I wanted to share with you is,

18  for example, when you do the math -- and you can check my

19  math -- is that, for example, District 2 loses -- you subtract

20  Democrats from the top part for District 2 compared to -- or

21  subtract the bottom from the top, District 2 loses 144

22  Democrats, it gains 134 Republicans.

23        District 7 gains 89 Democrats, and it gains 346

24  Republicans.

25        District 8 gains 1066 Democrats, 377 Republicans.

1           District 12 loses 1029 Democrats, gains 869

2    Republicans.

3           District 14 gains 682 Democrats and gains 718

4    Republicans.

5           I had to make a chart.

6           THE COURT:  And so to the City's view, that supports

7    that it was party perspective, not race?

8           MS. GIANNINI:  That it was party perspective, and

9    that race was not the predominant factor.  It was in the mix.

10   But when we're starting from a good-faith presumption that the

11   prior lines were okay and that there was not a reason to sort

12   of start from scratch and that the majority of changes really

13   had to happen in the southeastern part of the city, but those

14   changes create small domino effects throughout the rest of the

15   city, that when it -- and given that we have a desire to

16   protect incumbency, which -- yes, ma'am?

17          THE COURT:  The desire to protect incumbency, I sort

18   of wondered how much of a factor that really was because at

19   least on the Northside, it -- so Ferraro's term limited,

20   Gaffney's term limited, Dennis was term limited, Priestly

21   Jackson wasn't running, White wasn't running.  Looks like it

22   was just Pittman.

23          MS. GIANNINI:  There was also a concern about those

24   who were running for School Board positions, Your Honor.  And I

25   think it represents an ongoing -- even though it may not have

1  specifically impacted given councilmembers in this

2  redistricting process, their recognition, one, that the School

3  members may have been impacted by changed lines, and a

4  recognition that someone who is representing a district

5  knows their -- knows their constituents, and if we're going to

6  change lines and one of the goals of a representative is to

7  continue to further a strongly Democratic district or a

8  strongly Republican district, that the question of how to

9  enhance protecting incumbency, which first and foremost is

10 don't draw your representative out of their district, but

11 another way to further that goal is to, when you are deciding

12 where to draw lines, draw the lines based on party so that, as

13 Councilman Gaffney at one point says, "I'm not real keen on

14 taking on a highly Republican area."  So, instead, the Council

15 moves northeast to this pocket.  And two, that is a more

16 balanced group of voters that he can take into his district.

17        THE COURT:  Were there actually City Council

18 members -- or, pardon me, School Board members that would have

19 been impacted by this in terms of protecting incumbencies?

20 You-all didn't -- the record didn't appear to provide a --

21        MS. GIANNINI:  We did not -- you are right, Your

22 Honor, we did not talk a lot about, if at all, about school

23 districts.

24        One of the reasons that Councilwoman Priestly Jackson

25 included among her core preservation -- not core

1    preservation -- some of her key goals of why she talks so much

2    about protecting incumbency and not wanting to speed this

3    process up was that she wanted to ensure that the Council took

4    into account the impact that redrawing the lines would have on

5    School Board members, in part because of her prior service on

6    the School Board, and that if they tried to rush getting the

7    lines done in time for the more recent School Board elections,

8    that could have undermined the incumbency of certain School

9    Board members.  So it was in the mix.  I would not say that

10   incumbency was the predominant factor here, but it certainly

11   was part of the conversation, especially then when you look at

12   councilmembers looking at the constitution of their districts

13   and asking:  Who are the voters in these districts by party,

14   and if there's a desire to have a strongly Democratic district

15   that could last for another ten years looking at who those

16   voters might be.

17             THE COURT:  Give me one moment.  Just a moment.

18             To the extent that you're relying on Purcell, and I

19   know you've thought about it and I said let's hold off on that,

20   given the Supreme Court's recent decision and the fact that the

21   City represented at the prior status conference that I have

22   that as long as there were maps in place by December 16th it

23   could proceed, can you really argue that Purcell warrants a

24   denial of the motion for preliminary injunction if the

25   plaintiffs have made a sufficient showing of substantial

1    likelihood of success?

2         MS. GIANNINI:  Yes, Your Honor.  The plaintiffs need

3    to do more than just show a clearcut likelihood of success on

4    the merits.  They must also show that all the other preliminary

5    injunction factors definitively show that equitable relief is

6    warranted here.

7         I think the other part about Purcell is that one

8    needs to read Purcell in conjunction with Reynolds vs. Simms.

9    And those two cases are often cited hand in hand together.

10   Reynolds vs. Simms says, in conjunction with Purcell, that

11   federal courts should be very wary about becoming involved in

12   local legislation -- I mean local election affairs when the

13   election machinery is already in gear.

14        So the City Council, the City of Jacksonville, if it

15   is -- and the Supervisor of Elections knows what the new

16   district lines are by December 15th, the elections in March of

17   2023 can go forward.

18        However, the election machinery is also already in

19   gear.  For example, candidates who are running have to have

20   already demonstrated that they reside within the district that

21   they wish to represent.  That deadline passed in July, prior to

22   plaintiffs filing their motion for preliminary injunctive

23   relief.  So if the Court were to order that new districts be

24   drawn, there could be candidates who find themselves drawn out

25   of the districts that they are seeking to represent.

1        So I think in that context, where the election

2   machinery is already in gear and when the Court is now

3   beginning to think about the balance of harms, that there are a

4   variety of harms at issue here.  First, to the candidates.

5   Moreover, the amount of time that it will take to get a new

6   plan in place means that the Court and the defendants are

7   having to work under potentially a very compressed schedule;

8   that compressed schedule being created by the plaintiffs.

9        This legislation was passed in March of 2021;

10  March 22nd of 2021.  Plaintiffs filed their action on May 5th

11  of 2021, so about five weeks after the fact.  It wasn't until

12  July 22nd, at this Court's direction, plaintiffs filed their

13  motion for preliminary injunction.  So we are four months out

14  from the passage of this legislation, which, if plaintiffs had

15  filed their motion for preliminary injunction with their

16  complaint, there's a chance we would have already had this

17  hearing and we would have already had some sort of

18  determination, and should the Court have determined that these

19  lines were unconstitutional, the City could have been in the

20  process of trying to draw new lines.  But now we're all having

21  to rush because the plaintiffs took time.

22       And when you look at Merrill vs. Mulligan, Justice

23  Kavanaugh also says that granting injunctive relief in this

24  situation not only requires a clearcut likelihood of success on

25  the merits, but a demonstration that the plaintiffs have not

1    unduly delayed in seeking relief.

2            THE COURT:  But that's in a concurrence, right?

3            MS. GIANNINI:  That is absolutely concurrence, but

4    you also have direct Eleventh Circuit precedent that says that

5    when the Supreme Court talks in a concurrence or in a dicta,

6    that information should be taken seriously.  And, in fact, you

7    have Eleventh Circuit precedent which has adopted the Merrill

8    vs. Mulligan language and, in essence, said:  Merrill vs.

9    Mulligan directs that an injunction should not issue unless in

10   the, most extraordinary of circumstances.

11           And so here, plaintiffs -- plaintiffs suggest that

12   somehow we're backtracking on the December 15th date.  And in

13   no way is the City backtracking on that date.  If the Council

14   is able to get lines in place by December 15th, then the

15   March '23 elections will go as planned.

16           However, getting to December 15th is the Purcell

17   problem; is can we, with the election machinery already in

18   gear, potential confusion to voters, harm to the candidates,

19   and harm to the City where the City has a compelling interest

20   to enforce lawfully-passed legislation -- so if plaintiffs

21   can't show a clearcut likelihood of success on the merits, nor

22   that the equities balance in their favor, courts make very

23   clear that this is a situation where federal courts should step

24   back, let the elections proceed, and even if you determine that

25   what has happened here is unconstitutional, give the City the

1   proper time to remedy its error.

2          THE COURT:  But isn't the harm then irreparable?

3   Because the individuals that are going to be elected in the

4   March election will have been elected and they will be

5   representing individuals that perhaps would not have been their

6   candidate of choice.

7          MS. GIANNINI:  There is a potential that there is

8   irreparable harm.  The City is not for a moment going to

9   disavow that the courts have said that racial gerrymandering

10  represents irreparable harm.

11         I think the Court should take into account the delay

12  that the plaintiffs have exercised in bringing their action.  I

13  would recognize that the plaintiffs did not seek to challenge

14  these special elections that happened in August of this year

15  for two of the districts that they are presently challenging

16  for whom those lines have changed very little.  So they were

17  able to withstand that harm --

18         THE COURT:  But, of course, those people are --

19  they'll run for reelection again in March of '23, so it's a

20  pretty short time.

21         MS. GIANNINI:  Okay, but it's -- I'm not talking

22  about harm to candidates right now, we're talking about harm to

23  voters.  What's the irreparable harm to voters?  The voters

24  have lived under these lines for ten years and lived under

25  these lines for the August 2022 elections, will live under the

1    lines again for the run-up election in November.

2           And if plaintiffs' argument is that the 2011 lines

3    are infirm, then there's a harm there that they have delayed by

4    ten years.  Even if there is irreparable harm from racial

5    gerrymandering, the Court here also has to balance the other

6    harms to the City, to candidates, to voters who could be faced

7    with confusion of:  Wait, what district am I in?  Are we using

8    the old lines?  Are we using the new lines?

9           And so even if the Court finds irreparable harm, I

10   think that the balance of the equities, based on what is

11   required by the standard of review in this case, based on the

12   prevalence and the ascendency of the Purcell doctrine --

13          THE COURT:  So I guess I'm struggling with

14   understanding how, after reading the Supreme Court's

15   August 19th, 2022, decision in Rose reversing the Eleventh

16   Circuit's reliance on Purcell, given the fact that the

17   Supervisor of Elections had said -- had given a date and said

18   they could do it, if they had maps by that date, essentially

19   they could do it, and the Eleventh Circuit granted the stay

20   because the election was sufficiently close at hand, and the

21   Supreme Court said:  No, that the Supervisor of Elections

22   didn't even say that, so you can't rely on it.  And we had a

23   hearing, we had an opportunity to discuss this.  Is it

24   really -- are you really relying on the Purcell principle, or

25   are you more suggesting that those factors should be taken into

1  account in the balance of harms and in that respect they weigh

2  against the granting of an injunction?

3        MS. GIANNINI:  I would say, Your Honor, that Purcell,

4  read alongside with Reynolds vs. Simms, read with how the

5  Supreme Court has talked about these precedents in Merrill vs.

6  Mulligan, brings together the -- one of the many complications

7  in this case that a merits question also dovetails with a

8  remedies question, and that when you look at the case law,

9  there are some circumstances in which courts find that, indeed,

10  there may be a constitutional violation, but because the

11  election machinery is already in gear, it is improvident for a

12  federal court to create additional confusion in a local

13  election process, and so the Court refuses to grant an

14  injunction and lets the parties continue their process and

15  perhaps even has the -- has the offending party remedy the

16  problem but not in the context of an injunction.

17        THE COURT:  So what would that look like?  That would

18  mean saying, "City Council, you fouled up, but we're going to

19  go ahead and allow this election to go forward and expect that

20  you'll fix it for the next one"?  Is that what --

21        MS. GIANNINI:  There's certainly case law where the

22  courts say:  We are going to let the present upcoming election

23  go pursuant to either election rules that perhaps may be

24  unconstitutional or apportionment lines that the court says may

25  be unconstitutional.  But then the court orders the

1    redistricting entity, under an expeditious-but-not-three-week

2    timeline, to fix the problem for upcoming elections.

3          Or when one looks at the body of case law talking

4    with Purcell and Reynolds, sometimes courts flat out say,

5    "Because the election machinery is already in gear, no

6    injunction."  And then the parties proceed to the next stages

7    of litigation.

8          THE COURT:  And the only part of the election

9    machinery that's really already in gear is the establishment of

10   their residents in a district, because the -- they have to get

11   signatures, but they can -- they don't have to get the

12   signatures from their district; they can be citywide.  So it

13   doesn't interfere with that.  It's really just the potential

14   for someone being drawn out of their -- the district for which

15   they intend to run; is that right?

16         MS. GIANNINI:  There is certainly the potential of

17   the candidate being drawn out of the district they intend to

18   run.

19         The question of the collection of signatures is a

20   fluid question for which there is not an absolute definitive

21   legal answer because it's not entirely clear what constitutes a

22   year of apportionment.  But if, indeed, we are right now in a

23   year of apportionment, you are correct that a candidate, in

24   collecting signatures for their petition to run, can collect

25   signatures from the entire county.

1    THE COURT:  Why wouldn't this be a year of
2    apportionment?
3        MS. GIANNINI:  So the state statute which guides what
4    is a year of apportionment uses language "year of
5    apportionment" but doesn't define what that means.  So a year
6    of apportionment potentially could be 365 days, regardless of
7    when those 365 days fall.  A year of apportionment could be the
8    calendar year in which the State begins its apportionment
9    process but then may not last 24 months -- 12 months.
10   12 months.  Because maybe the apportionment process takes fewer
11   time, less time, or it could extend.  It could be 18 months.
12        THE COURT:  And whose determination is that?  Is that
13   the Supervisor of Elections' discretion or . . .
14        MS. GIANNINI:  We are in a place of fluidity.  The
15   Florida Secretary of State has a definition.  The Supervisor of
16   Elections, based on my understanding, is presently informing
17   candidates that they should try to collect signatures not only
18   based on an entire countywide, but also based on the district
19   that they hope to represent.  Because if during this litigation
20   we fall out of the year of apportionment -- and it's still not
21   entirely clear what that is -- then the rules may change.
22        THE COURT:  What has Duval County done in the past in
23   terms of defining a year of apportionment?
24        MS. GIANNINI:  In the past the Supervisor of
25   Elections has indicated that they think it aligns with what the

1     State has done.

2                THE COURT:  And --

3                MS. GIANNINI:  And so pursuant to the State, we are

4     still in a year of apportionment.  But Your Honor, the

5     challenge is what if the lines, for whatever reason, aren't

6     drawn until -- based on this litigation, we're in January of

7     2023.  We are now outside a year of apportionment, provided we

8     all agree on the definition of what a year of apportionment is.

9                THE COURT:  Would we be outside of a year of

10    apportionment in the way it's defined by the State of Florida

11    in January of 2023?

12               MS. GIANNINI:  I believe so, Your Honor.  I could get

13    back to you on that.

14               But I think the other thing to talk about, candidate

15    harm.  Yes, candidates could be drawn out of this district.

16    That -- candidates may also have filed a petition saying

17    they're wanting to run for a given district, that district

18    changes, and so they may have to refile their paperwork.

19               The other challenge for the Supervisor of Elections

20    and why the December 15th date is the date we picked is that it

21    gives the Supervisor of Elections time to check the information

22    received from candidates thus far so that it can be clear who

23    has qualified within a month of the January 13th -- 12th, 2023

24    date, so that then it can proceed to print ballots.

25               So we have no problem with the December 15th line

1    moving forward.  It's can we get to December 15th in time given

2    what is at issue here and taking into consideration the harms

3    that are already incurred by other individuals not including

4    the plaintiffs.

5         THE COURT:  All right.  Give me one moment,

6    Ms. Giannini.

7         (Pause in proceedings.)

8         THE COURT:  All right.  Ms. Giannini, is there

9    anything else you want to address before -- and I'm going to

10   hear from each of you one more time.  So I'll hear from

11   Mr. Hessel and then I'll hear from you.  But is there anything

12   else that you want to address before I give you-all a brief

13   comfort break and then we'll return?

14        MS. GIANNINI:  One thing, Your Honor, thank you.

15   Based on your line of questioning, I can appreciate that you

16   may view this as being a close case, and I want to acknowledge

17   that.

18        To that measure, I want to refer you to a case coming

19   out of the Northern District of Georgia in 2018.  It's

20   Georgia's NAACP vs. the State of Georgia, 312 F.Supp.3d 1357.

21   Certainly this is not binding precedent, but it's certainly

22   persuasive precedent that guides.  That when the court is

23   finding itself wrestling with credibility determinations, when

24   it's wrestling with a very close call -- this Georgia case has

25   to do with where a legislator said party was the predominant

1  driving factor and not race.  And the court admits in the

2  Georgia decision:  We think this is a close one, and we think

3  plaintiffs have presented a lot of compelling evidence.  But

4  because a lot of this is coming down to credibility and because

5  the matter is so close, this is not something that warrants

6  injunctive -- preliminary injunctive relief.

7          THE COURT:  And I think I did see that case.  It was

8  on a more developed record, wasn't it?  That they had

9  depositions and --

10          MS. GIANNINI:  Yes, they had a more developed record

11  than what we have at this instance.

12          THE COURT:  Okay.  It's about ten minutes to 12.  Why

13  don't we take about a ten-minute recess and then we'll return

14  at 12 o'clock.

15          COURT SECURITY OFFICER:  All rise.

16          (Recess from 11:51 a.m. to 12:13 p.m.)

17          COURT SECURITY OFFICER:  All rise.  This Honorable

18  Court is back in session.

19          Please be seated.

20          THE COURT:  Excuse me one moment.  They changed our

21  computer systems, and so it's locked me out.  Ms. Wiles, may I

22  see you?

23      (Pause in proceedings.)

24          THE COURT:  All right.  Mr. Hessel, I promised you

25  the opportunity to respond to some of Ms. Giannini's -- well,

1  whatever you want to respond to, and then I do have a few more

2  questions for you.  But I'll let you address the pertinent

3  matters that you want to bring up first.

4          MR. HESSEL:  Thank you, Your Honor.  I wanted to

5  note, first, that a couple more plaintiffs joined us in the

6  courtroom:  Moné Holder of Florida Rising, Inc.

7          THE REPORTER:  I'm sorry . . .

8          MR. HESSEL:  Oh, I'm sorry.  I'll slow down.  Moné

9  Holder of Florida Rising Together, Inc., Eunice Barnum, and

10  Ayesha Franklin, have joined us as well.

11          THE COURT:  I can't under- --

12          MR. HESSEL:  Oh, Ayesha Franklin.  I'm sorry.  I

13  slowed down and I also lowered my voice.

14          Thank you very much, Your Honor.  I wanted to go

15  through some of the points that Ms. Giannini raised and

16  hopefully add some clarity because I think in some ways they

17  complicated things more than was necessary.

18          With regard to the harm here, the harm has been the

19  same since -- the standing harm, the constitutional harm, since

20  Shaw v. Reno.  The harm is the classification of voters based

21  on race and the signal that sends both to the voter and to the

22  resident and to their representative.  That's the beginning of

23  the end of the racial gerrymandering harm.  That's well

24  established, and that's not really called into question in any

25  case law.

1    Much of what Ms. Giannini was talking about was about

2    shifts from the 2011 cores.  But in some ways I think that

3    misses the forest for the trees.  And I think this goes to Your

4    Honor's questions about history.  And I think it's important to

5    note that the key history question here is not whether what

6    happened in 2011 or 2001 or 1991 was a racial gerrymander, but

7    whether race-predominant, because regardless of whether the use

8    of race was justified in those past decades, it's clear on this

9    record that race formed those cores.  And so when the Council

10   this year chose to reenact those cores, they were reenacting

11   race-based districts, and they must show that the tailoring is

12   appropriate now.  And that doesn't depend on whether what

13   happened historically was permissible or impermissible.  It's

14   just the key question of whether race defined these cores and

15   whether that's justified now.

16         And I think that answers a lot of the questions, as I

17   intimated earlier, about partisanship because the cores were

18   very much race based.  The 63% Plan talks about race.  The

19   discussion of 60 percent in 2011 was about race.  It was not

20   about party.

21         And to kind of put a finer point on that note, Your

22   Honor, I would note that much of the question here isn't about

23   what was in the head of a particular councilmember at the time.

24   The question is the nature of the districts themselves.

25         And I would read the quote from North Carolina v.

1    Covington where the Supreme Court affirmed a rejection of
2    districts that, quote, retained the core shapes of districts
3    that the District Court had found to be unconstitutional and
4    noted that even the defendants' insistence that the legislature
5    did not look at racial data in drawing districts did little to
6    undermine the conclusion, based on evidence concerning the
7    shape and the demographics of those districts, that the
8    districts unconstitutionally sort voters on the basis of race.
9            THE COURT:  But there the prior district had been
10   determined to be unlawful, unconstitutional.
11           MR. HESSEL:  In that case, but there are other cases,
12   Your Honor, in which that wasn't the case.  So I would read,
13   Your Honor, from Bethune-Hill, from the 2015 opinion:  Where
14   core retention seems to predominate, courts should also examine
15   the underlying justification for the original lines or original
16   districts because core retention may be used to insulate the
17   original basis for the district boundaries.
18           THE COURT:  And which of the Bethune-Hill decisions
19   is that?
20           MR. HESSEL:  That is the 2015 Eastern District of
21   Virginia one that went up to the Supreme Court and was reversed
22   and remanded on other grounds.  And that's 141 F.Supp.3d 505.
23   And the pincite is 544 to 545.  And that's also where that
24   court noted the paraphrase that I gave earlier, which is,
25   "'This is the way we've always done it' may be a neutral

1    response, but it's not a meaningful one."

2           So it bakes in the idea that the Council could have

3    not had any idea that what they were doing was perpetuating

4    race-based districts, but as a matter of fact, they still

5    perpetuated race-based districts by uncritically taking the

6    prior cores which were, on this record, indisputably race-based

7    and advancing them for the next decade.

8           On that note, Your Honor, I also wanted to note that

9    Your Honor does not have to conclude that there was any

10   discriminatory intent or animus here.  Abbott v. Perez, which

11   seems to be the only case the defendants rely on with regard to

12   their history argument, has a racial gerrymandering component.

13   But the component that defendants cite is not about racial

14   gerrymandering at all.  It's about a different Fourteenth

15   Amendment theory:  Intentional discriminatory animus.

16          So Abbott v. Perez, the portion there about past

17   discrimination cannot condemn legislations in the future, it

18   says nothing about this relationship between core preservation

19   and racial predominance.

20          I would also note, Your Honor, just a couple of kind

21   of factual points.  With regard to the awareness that the

22   Council had, in addition to the points that I made earlier

23   about all of Councilmember Priestly Jackson's comments and all

24   of the discussion at the September 9th meeting and the nature

25   of the districts themselves and the fact that if you look at

1    them, it's quite clear that they cut precisely along racial

2    lines, several plaintiff groups and other civil rights

3    organizations provided the Council with a report showing that

4    the concentration of black voters in District 7 and District 8

5    and District 9 and District 10 far exceeded what was necessary

6    for those districts to comply with the Voting Rights Act.

7            And I would also note, Your Honor, that --

8            THE COURT:  Are you talking about the February 10,

9    2022, report on Racially Polarized Voting, document number

10   34-28?

11           MR. HESSEL:  That's right, Your Honor.  And that

12   makes clear that the level of packing here far exceeds what's

13   necessary.

14           And I would note, Your Honor, that there were also

15   concerns raised in 2011.  And that's in the official -- the

16   official minutes from 2011, at ECF 34-53 -- dash 53 at pincite

17   100.  That's ECF pagination.  And those are the September 12th,

18   2011, meeting minutes where community members --

19           THE COURT:  Remind me of that.

20           MR. HESSEL:  Pardon me?

21           THE COURT:  Remind me of what was --

22           MR. HESSEL:  It was community members were

23   protesting, complaining about the lack of compactness of the

24   districts in North and West Jacksonville and the fact that it

25   split their communities.  So, you know, I don't know that there

1 were explicit claims of unconstitutionality made at the time,

2 but there were serious concerns about the subordination of what

3 folks cared about.  And so I just wanted to note that in

4 response to this suggestion that somehow none of these issues

5 were raised prior to early 2023.

6 I would also note in this context, Your Honor, and I

7 think this is important in considering the point about race

8 versus party, a mixed-motive suit, I would point Your Honor to

9 Bush v. Vera and to Clark v. Putnam County, which is the

10 Eleventh Circuit decision that makes quite clear that even if

11 there are other factors at play, that does not preclude a

12 finding that race was the predominant factor.

13 And Clark, if I'm recalling correctly, explicitly

14 talks about how incumbent protection in particular is one of

15 those criteria that should be looked at with a wary eye because

16 it can be so tied to a preservation of historic

17 race-predominant cores.

18 The other points I wanted to make, Your Honor, were

19 in the context of the balance of the equities.  I want to note

20 here that defendants have made an issue in this case of

21 plaintiffs' litigation timeline.  I just want to note that

22 plaintiffs had to put together a sizeable record here because

23 of the nature of this type of claim.  And defendants haven't

24 cited a single case in which a timeline of this sort was held

25 to preclude relief that plaintiffs were otherwise entitled to.

1      THE COURT:  Well, I am concerned about the timeline.

2  And it's not a new concern.  As you know, when we had the

3  status conference, early on in the case, I questioned the

4  timeline.  And the lawsuit was filed in March.  The motion for

5  preliminary injunction wasn't filed until July.  Ordinarily, a

6  motion for preliminary injunction is filed along with the

7  complaint.  And so if you think about it -- and I think I

8  prompted you-all to go ahead and file the motion -- the motion

9  was filed on July 22nd, and here we are September 15th having a

10  hearing on it.  So maybe six weeks or so.

11      If the complaint had -- if the preliminary injunction

12  had been filed with the complaint in March, Ms. Giannini has a

13  point that we could have had a resolution before the deadline

14  for candidates to establish their residency.  And we

15  wouldn't -- we wouldn't be doing this on an expedited basis.

16      And so I do have a significant concern that -- well,

17  two concerns.  One, that to the extent that you're saying

18  relying on mistakes, shall we say, that may have been made in

19  2011, by not raising it until after the 2022 cycle, by not

20  raising those concerns, it sort of deprives the City Council of

21  the opportunity to address it and puts it in the lap of the

22  Court.  But I'm also concerned that by waiting until July to

23  file the motion for preliminary injunction, it is creating harm

24  to the electoral process.  And I'm wary of the cautions that

25  courts not interfere in that manner.

1    And so that is something that -- and to the extent

2  that you're talking about needing a substantial record, it's

3  not clear to me what you didn't have, because the complaint

4  lists -- talks about almost everything that ultimately is in

5  the motion for preliminary injunction.  You would have to point

6  me to what was new and different that you didn't have at the

7  time you filed the complaint because the split districts and

8  the -- you must have already engaged Dr. Austin because the

9  very -- the very split districts and stuff that she talks about

10 are in the original complaint.

11    MR. HESSEL:  So, Your Honor, the Imai report and the

12 Imai simulations -- and I'd also note, Your Honor, that all of

13 the history -- so the racial gerrymandering claim, of course,

14 requires a holistic analysis of all of the direct evidence and

15 all of the circumstantial evidence, and once -- upon receipt of

16 the answer and the clarity that this was about the preservation

17 of historic districts, that opened up three other cycles.

18    And I would note here, Your Honor, that all of this

19 is part and parcel of the balance of the equities.  And this

20 is -- I appreciate that in the ordinary -- or in some instances

21 when there's a motion for preliminary injunction it accompanies

22 a complaint, but that's because the harm is both irreparable

23 and ongoing.

24    In the election law context, it's a little bit

25 different.  What we're challenging is the ordinance enacted

1   earlier this year.  That hasn't yet taken effect.  So the harm

2   will be irreparable.  That's undisputed.  But it hasn't yet

3   started.  And so it's undisputed in this case that having these

4   elections, if these lines are, indeed, unconstitutional,

5   constitutes irreparable harm.

6           And with regards to the balance of the equities, I

7   went through in my initial statement, Your Honor, all of the

8   issues that Mr. Phillips raises in his declaration.

9           With regards to candidate petitioning, Your Honor, I

10  would note three points on the issue of candidate residential

11  duration.

12          So the July 14th date comes from a charter provision

13  that requires a candidate to move into a district 183 days

14  prior to the election in which he or she seeks to be elected to

15  that district.  The charter also requires a special election to

16  be held within six months of a vacancy, which is less than

17  183 days.  So there's plainly -- as a matter of city policy,

18  there are categories of elections in which certain types of

19  candidates who would like to move into a district to represent

20  it are not able to run.  And the City -- it's not uncommon.

21  There have been three special elections this year.  So there

22  are these categories of candidates who couldn't run.

23          I would also note in this context, Your Honor --

24          THE COURT:  I guess I'm not sure I understand your

25  point with that.

1          MR. HESSEL:  So the point amounts to this is
2    something that as a matter of city policy, the Council and the
3    City don't always care about the fact that there are categories
4    of candidates who might not be able to run because of
5    residential duration requirements, because anytime there's a
6    special election, a candidate living outside of a district who
7    would seek to move into that district in order to seek
8    election --
9          THE COURT:  I don't think that's your strongest
10   argument.  You might want to move on.
11         MR. HESSEL:  I would note in this context also, Your
12   Honor, that there are 27 states that have duration requirements
13   of a year or more for state legislative races, where a
14   candidate has to live there for a year or more.  There are an
15   additional four in which a candidate has to live in a district
16   for two years.
17         So defendants' position amounts to the idea that
18   based on these essentially anti-carpetbagger provisions, the
19   federal courts in this country would be unable to remedy
20   constitutional violations in half -- more than half the states
21   in this country.
22         And I think this brings to bear an important point,
23   which is the standard for Purcell and the balance of the
24   equities is not is there some complication, it's whether the
25   complication is so severe that -- and so burdensome that it

1   would sew true chaos.

2          As I noted, Your Honor, no other court has ever held

3   that an injunction issued this far ahead of an election causes

4   that kind of chaos.  And I noted why I don't think this Court

5   should be the first to do that.

6          And I would note, Your Honor, with regard to the

7   remedial timeline, it's important to note that legislative

8   convenience and legislative preference is not one of the

9   equities to be balanced.  In other words, what defendants are

10  seeking here is they're seeking a second bite at the apple.

11  And we don't resist that.  But they're also saying, "We get to

12  set the timeline for that such that we can manufacture a

13  Purcell problem."

14          That's not how it works.  It works in -- they have --

15  they get a second bite at the apple, but they have to chew

16  quickly, so to speak.

17          THE COURT:  Again, we've looked back at the delay of

18  filing the motion for preliminary junction until July, which

19  that's what's compressed everything.

20          MR. HESSEL:  So Your Honor, I think that the timeline

21  that we propose, the three weeks, is something that we would

22  have proposed under any set of circumstances.  That's the -- in

23  line with what courts have given legislatures in the

24  preliminary injunction context.  We cite in our reply quite a

25  few cases in which it's been less than that.  I would note that

1    in Osceola County and in -- U.S. vs. Osceola County and in

2    Johnson v. Mortham in Florida the timeline was about this long.

3    The amount of time that we propose giving the legislature turns

4    entirely on the fact that -- it's rooted in what other courts

5    have done.

6              And I would note here that defendants' position of

7    essentially they need six months to do this, there was no

8    circumstance in which taking that position we would have a

9    remedy in place by December 16th, regardless of when we may

10   have filed anything.

11             And so what they're trying to do, it seems to me, is

12   to turn Purcell into something that it's very much not.  It is

13   not a get-out-of-jail-free card.  It is not a hall pass for a

14   legislature to violate the Constitution and still be entitled

15   to hold at least one set of elections -- here for a four-year

16   term -- no matter how bad that constitutional violation.  It's

17   a serious equitable doctrine to be applied sparingly.

18             I would note the Reynolds v. Simms, which

19   Ms. Giannini quoted from quite a few times, also says -- let me

20   just get this quote out.

21             THE COURT:  Take your time.

22             MR. HESSEL:  Thank you.  Sorry, Your Honor.

23             THE COURT:  No worries.  You-all have had to wait for

24   me plenty of times.

25             MR. HESSEL:  I want to make sure to quote the Warren

1  court correctly.

2           "It would be the unusual case in which a court would

3  be justified in not taking appropriate action to ensure that no

4  further elections are conducted under illegal plans."  And

5  that's from Reynolds.

6           So it's important to note here that Purcell is an

7  important doctrine.  It's a doctrine that has never been

8  applied this early.

9           Your Honor noted the Supreme Court's decision in Rose

10  v. Raffensperger, which in addition to the broader point of it

11  never being applied this early indicates why in this specific

12  case it shouldn't be applied.  And it is not what defendants

13  want it to be.  It is not an inability to hold an election

14  based on relatively minor complications.

15           If Your Honor doesn't have any further questions for

16  me, I would just make a couple of final points, if I may.

17           THE COURT:  Give me one second.

18           MR. HESSEL:  Sure.

19           THE COURT:  You don't challenge the City's

20  characterization of the preliminary injunction standard, that

21  being that in this case you would need to make a clear showing

22  that race predominated, right?

23           MR. HESSEL:  We do, Your Honor.  We don't think that

24  that's the appropriate standard.  The appropriate standard is

25  the balance of the equities, Nken v. Holder.

1          Purcell is a gloss on that that applies only on the
2   eve of the election.  And as I noted in my opening, the eve of
3   the election has never been held to be more than four months
4   before the election or about six weeks before voting started.
5   That's the outer bounds that the Fifth Circuit and Eleventh
6   Circuit observed.  So no court has ever said that we're -- that
7   this far ahead of election, 21 weeks from the earliest voting,
8   is an eve of the election such that Purcell applies.
9          And I would note that, you know, we certainly take
10  seriously Justice Kavanaugh's concurrence I quoted in the
11  opening, but it's not binding precedence.  It's a concurrence.
12  And it doesn't displace the Eleventh Circuit standards.
13          One point of clarification, Your Honor.  We filed in
14  May and we filed our PI two months later.  And I would just
15  note the size of the record here again and the fact that these
16  are -- in many ways I don't think this is a complicated case,
17  but it is fact heavy, and we wanted to make sure that we
18  provided Your Honor with a record and briefing that would
19  assist Your Honor.
20          And on that final point --
21          THE COURT:  And, I'm sorry, let me -- just because I
22  made a mess of the record.  It was enacted in March.  You filed
23  in May.  So there's the two -- there's the two-month delay in
24  the filing of the complaint, but then the additional two-month
25  delay in the filing of the motion for preliminary injunction.

1          MR. HESSEL:  Maybe it was just the word "delay," Your
2    Honor.

3          THE COURT:  Yeah.

4          MR. HESSEL:  Yes.  And I point Your Honor also to the
5    Eleventh Circuit shotgun pleading rule that makes the point
6    that it's not appropriate for folks to come in and, you know,
7    dump a less-than-precise complaint on the Court's lap.

8          THE COURT:  You know, technically your complaint is a
9    shotgun, I just didn't strike it for that basis.  But my
10   recollection is that Count Two reincorporates all of Count One.
11   But under the circumstances, I didn't think it warranted
12   striking.  I think that's my recollection.  Am I remembering --
13   yeah, because we had a conversation about whether it should be
14   stricken on that basis, and under the -- I felt like the City
15   had ample ability to respond and didn't think it needed to be
16   stricken, but I -- just since you mentioned "shotgun."

17         MR. HESSEL:  Well, I'm glad that didn't happen, Your
18   Honor, what can I say.

19         Yeah, and I just want to kind of close by noting that
20   the defendants' position on both the merits and the balance of
21   the equities is quite extreme.  They're asking this Court to
22   hold, in the face of all the precedent and all the persuasive
23   authority we cite in Footnote 2 of our reply, that core
24   preservation can insulate a racially-predominant district from
25   the need for narrow tailoring.  There's no basis for that in

1    the case law that I'm aware of.

2           And on the balance of the equities, as I've noted

3    several times now, they're asking for the most aggressive

4    application of Purcell in the 16 years since Purcell came down.

5    And they're doing it without much support and after -- after

6    their representation to this Court and to plaintiffs about

7    December 16th.

8           THE COURT:  All right.  Thank you.

9           MR. HESSEL:  Thank you.

10          THE COURT:  Ms. Giannini.  So a couple things.  I

11   understand the premise that the City Council started from

12   wanting to preserve these lines, the lines that were drawn in

13   2011.  But if, in fact, those lines were drawn -- if, in fact,

14   the evidence is that the predominant factor in drawing the

15   lines in 2011 was race, then by choosing to keep those lines in

16   place, isn't the City Council carrying forward race as a

17   predominant factor for the redistricting?

18          MS. GIANNINI:  I disagree, Your Honor.  The test is

19   what is the predominant purpose, and race has to be the

20   predominant purpose.  And inherent in the term "purpose" is

21   intent.  And so even plaintiffs' counsel is saying, "They may

22   have adopted these lines unwittingly, without knowledge of

23   their racial import or racial genealogy."

24          What plaintiffs have not demonstrated is that the

25   reason that the Council picked these -- picked as a predominant

1  purpose to further their redistricting process was to start

2  with the 2011 lines was because of whatever racial

3  characteristic existed with those previous lines.

4          THE COURT:  So then if the Court says, "Okay, you

5  haven't shown that race was the predominant factor," are these

6  lines now considered blessed?  Are they now -- now it's -- in

7  2021, the -- if we go to trial and ultimately I'm persuaded

8  that they unwittingly adopted these lines and race wasn't a

9  predominant factor, then is the City -- are the voters of the

10  City of Jacksonville now left with these arguably

11  racially-packed districts forever after?

12          MS. GIANNINI:  Absolutely not, Your Honor.  And as

13  plaintiffs' counsel has identified, and as we have as well,

14  when courts talk about the role of core preservation in

15  evaluating the validity of district lines, the courts make

16  clear that you cannot bless into perpetuity lines.  You must

17  always look at what was the purpose of the given legislature.

18  And certainly you can look to the past to clarify whether or

19  not that purpose was drawn forward.

20          And, indeed, as with every census, you are going to

21  have population shifts and population changes, which are also

22  going to impact whether or not a core can or cannot be

23  retained.  So no line is inviolable.  Every line could be

24  changed depending on the demographics retained by the next

25  decennial process.

1      THE COURT:  But if the 2011 maps were drawn with race

2  as the predominant factor, then when you say "core

3  preservation," what are you preserving other than the

4  racially-drawn lines from 2011?

5      MS. GIANNINI:  Which -- we are preserving the lines

6  that have never been challenged in court for which there were

7  very little complaints during the 2011-till-2022 redistricting

8  process that plaintiffs believed -- or citizens believed that

9  these lines were unconstitutional.

10      And when you look at cases where courts reject that

11  core preservation argument, more often than not the lines have

12  been reviewed by a court, or if they haven't been reviewed by a

13  court, plaintiffs' adherence to a core preservation argument is

14  based -- I mean, I'm sorry, defendants' adherence to a core

15  preservation argument is borne out of a misunderstanding of a

16  court decree.

17      So, for example, plaintiffs cite to the Navajo Nation

18  vs. San Juan County, I believe, decision out of the district of

19  Utah of 2016.  And there the court said:  We're not going to

20  let the redistricting body sort of raise up a core preservation

21  argument, especially in that situation because the districting

22  body misunderstood -- misinterpreted and misunderstood a court

23  decree about having to shift from all-member districts to

24  single-member districts and somehow misinterpreted that to mean

25  that they could never change the shapes of the districts.  And

1   the court was like, "You guys have got that wrong.  You need to

2   change the shapes of your districts."

3          So where courts are relying on core preservation as a

4   reason to reject the present lines, there's been far more of a

5   legal testing.  Right now -- at this instance we have not had

6   that legal testing.  And we are at this --

7          THE COURT:  So because they didn't complain it's okay

8   to carry -- if the evidence is in 2011 that race predominated,

9   the fact that nobody raised their hand allows the legislature

10  to carry that forward for another decade?

11         MS. GIANNINI:  I'm not saying that the legislature

12  has the grounds to perpetuate something that is

13  unconstitutional.  What I am saying is that a preliminary

14  injunction setting is not the appropriate setting for this

15  Court to make a conclusion about something that happened ten

16  years ago without more testing.  And if the Court wants to draw

17  that conclusion, a preliminary injunction position and

18  procedural posture is not the right position or place to make

19  that determination.  It needs to be interrogated and litigated

20  in far more of an in-depth manner than what we have done this

21  far here today.

22         THE COURT:  So the Council's stated goals were:

23  Start with the existing lines, protect incumbents, minimize

24  river crossings, use total population numbers, and respect

25  communities of interest.

1          The protect incumbents, it looks to me like there

2    was -- that that does not appear to have been a significant

3    factor.

4          Minimizing river crossings did not change.

5          Using total population numbers doesn't really go one

6    way or another.

7          But respecting communities of interest and starting

8    with existing lines, both of those seem to boil down to race.

9          MS. GIANNINI:  Your Honor, there is nothing wrong

10   with a legislature using race in some instances to identify a

11   community of interest.

12          So again, we're at a position here where plaintiffs

13   have to prove that race was the predominant factor.  When the

14   Council decided, as its initial guidepost, to not alter the

15   lines any more than it needed to from 2011, it was based on a

16   recognition that but for -- and I know we've talked about this

17   earlier -- but for the extensive growth in the southeast of the

18   city, not much needed to be done to depart from the one

19   person/one vote principle, which is sort of the foundational

20   part of the redistricting process.  So their first goal was to

21   ask, like:  In terms of one person/one vote, are we -- where

22   are we most in need of change?  And let's focus or energies on

23   that.  And if our populations are appropriate otherwise, as

24   Councilman Gaffney at one point says, why not -- let's not fix

25   something that isn't broken, and that the Council is coming in

1   with that presumption of good faith, that where they are

2   beginning their process is at a neutral stasis, and then making

3   changes as need be from there.

4            THE COURT:  But when you have councilmembers talking

5   about "I'm at 58 percent and I'm happy with that," is that --

6   and some of the other comments, is that really "if it isn't

7   broke, don't fix it" or is it just "nobody's complained about

8   the fact that it's broken, so let's just keep it going"?

9            MS. GIANNINI:  Your Honor, this goes back to this

10  point of if we're going to try to determine for the purposes --

11  determine what the intent and the outcome was in 1991, 2001,

12  and 2011, we are now guessing based on what we're reading in

13  transcripts, without being able to talk to people from '91, and

14  we are trying to draw inferences from statements made by

15  councilmembers in the 2021-'22 process as to what they meant

16  and why the numbers were picked and under what basis in '91 and

17  per- --

18           THE COURT:  In 2011, though, they were pretty

19  specific about target percentages, right?

20           MS. GIANNINI:  Indeed they were, Your Honor.  And

21  what we don't know, because we haven't been able to interrogate

22  or litigate it, is perhaps that clear percentage was out of a

23  concern of complying with Section 2 of the Voting Rights Act.

24  And so whether or not that percentage was inappropriate has not

25  been determined.  And so the goal, or whatever the intent was

1    in 2011 regarding those specific percentages, may have been for

2    reasons to comply with the law, to -- and if you look at the

3    transcripts from this most present process, as councilmembers

4    are talking about percentages, a lot of their conversation is

5    couched in a premise of:  We don't want to pack any further.

6    We recognize that our numbers might be high --

7                THE COURT:  That's in 2021, not in 2011, right?

8                MS. GIANNINI:  Not in 2011.  Because my concern, the

9    City's concern, was what was the intent of the legislatures in

10   2021, not what was the intent of legislatures in 2020 --

11   2019? -- 1991, 2010, and 2011.

12               So when we focus on what the intent of the

13   legislatures were and whether or not race was the predominant

14   factor, certainly they discussed race, which they are permitted

15   to do, which case law expects that race will be part of the

16   conversation, but when you look at the fact that they are

17   starting from a premise that there's no reason to think that

18   what currently exists is unlawful and they are trying to, first

19   and foremost, comply with the one person/one vote principle,

20   they don't have any complaints about the existing districts as

21   they were, and there's a recognition that they shouldn't put

22   more individuals into these districts, and there is no evidence

23   that removing -- changing the district lines to further

24   disperse the black voters in Jacksonville is going to make a

25   difference -- a demonstrated difference in terms of candidate

1    selection, there's no reason for --

2         THE COURT:  Well, I think Mr. Hessel has a point that

3    the constitutional harm -- I don't think they have to show that

4    they would get another district.  I think the harm is being

5    racially packed to --

6         MS. GIANNINI:  The harm is being sorted by race.  But

7    to demonstrate that, they have to show that race is the

8    predominant factor.  And they have demonstrated that race was a

9    factor, but not that it predominated and, in fact, subordinated

10   all other factors of the process.

11        THE COURT:  Isn't the only evidence that I have with

12   respect to the 2011 process wholly supportive of the idea that

13   race predominated, that it was the main focus of the

14   decision-making in 2011?

15        MS. GIANNINI:  Your Honor, you have what the

16   plaintiffs have given to you because the City is concentrating

17   on what the motivations were and what the purpose was of the

18   2021-'22 councilmembers.  The City has not delved into the

19   history, has not delved into asking former councilmembers what

20   was their predominant purpose.

21        So again, I would say, Your Honor, that in a

22   situation like this where it's a close case, plaintiffs are

23   wrong about the standard of review.  The standard of review is

24   a higher review, whether it is in an election context or in any

25   context where a legislative enactment is being challenged.  And

1    if you have these questions, Your Honor, plaintiffs have not

2    demonstrated a clearcut likelihood of success on the merits of

3    their claim, which then follows that the extraordinary relief

4    which they are asking in this expedited process is

5    inappropriate.

6              THE COURT:  All right.  Give me one moment,

7    Ms. Giannini.

8              I haven't looked at Census data and I don't recall

9    what questions are on it.  When they have data regarding a

10   census block, does it give party affiliation as well or is it

11   just the demographics?

12             MS. GIANNINI:  Your Honor, I do not know the answer

13   to that question, but I can get you the answer.  Well, I know

14   they have racial demographics because that is the information

15   that is --

16             THE COURT:  Well, I know they have racial

17   demographics.  My question is do they have party affiliation.

18             MS. GIANNINI:  The Supervisor of Elections is the

19   entity from which we've received our partisan data.

20             THE COURT:  So that wouldn't -- when you were looking

21   at census blocks, to the extent that, what was it, 205 was

22   split and the majority black went to District 7, the majority

23   white went to District 2, you would have had demographic data,

24   race, but you would not have had party data?

25             MS. GIANNINI:  Not from the Census, but

1   Mr. Killingsworth definitely had party data because he shared

2   it with the Council members.

3           THE COURT:  Down to census block or to precincts?

4           MS. GIANNINI:  I do not believe that precincts were

5   used at all during the process; rather, the information that

6   was relayed was pursuant to census block data.  And so

7   Mr. Killingsworth, in the meetings, was reading off

8   demographics based on race and then information that he may

9   have received from the Supervisor of Elections and then imputed

10  into the census blocks.

11          THE COURT:  Oh, I see what you're saying.  So it

12  might not have been Census data, but then overlaid with

13  information from the Supervisor of Elections?

14          MS. GIANNINI:  That is my understanding, Your Honor.

15          THE COURT:  Okay.

16          MS. GIANNINI:  And if I'm incorrect, I'll let you

17  know.

18          THE COURT:  Okay.  All right.  I think that you-all

19  have answered my questions, although I would -- I would be -- I

20  would not be telling the truth if I had said you made it clear.

21  But I do thank you-all for really, really good briefing and

22  thorough materials.  And you were both very, very well

23  prepared.  It's a pleasure to have good advocacy.

24  Unfortunately, good advocacy just makes it harder to be the one

25  that has to make the decision.  So thanks a lot.  But thank you

1    all very much.

2          I'm going to take it under advisement.  I think I had

3    you-all hold the 29th; is that right?  So I want you to

4    continue to hold that.  There's a possibility that I'll want to

5    revisit some issues that we've talked about today, or there's a

6    possibility that I will have made a determination and we'll see

7    if we need that time.  I don't know, but I want you to continue

8    to hold the 29th to the extent that I need additional argument

9    on any of these matters.

10          And, of course, I will give you some notice about

11    what the specific issues are.  I can't guarantee that I'll give

12    you as much notice as you would like because it's going to take

13    me a little while to figure that out.

14          But thank you-all for your good work on this and we

15    are in recess.

16          COURT SECURITY OFFICER:  All rise.

17       (Proceedings concluded at 12:55 p.m.)

18                    -    -    -

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3   UNITED STATES DISTRICT COURT)

 4   MIDDLE DISTRICT OF FLORIDA )

 5

 6        I hereby certify that the foregoing transcript is a true

 7   and correct computer-aided transcription of my stenotype notes

 8   taken at the time and place indicated herein.

 9

10        DATED 21st day of September, 2022.

11

12                        /s/ Katharine M. Healey
                          Katharine M. Healey, RMR, CRR, FPR-C
13                        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```