## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JACKSONVILLE BRANCH
OF THE NAACP, et al.,

      Plaintiffs,

                                  Case No. 3:22-cv-493-MMH-LLL

vs.

CITY OF JACKSONVILLE, et al.,

      Defendants.

_____/

# O R D E R

**THIS CAUSE** is before the Court on Plaintiffs' Motion for Preliminary Injunction (Doc. 36; Motion), filed on July 22, 2022.[1]  Defendants City of Jacksonville and Mike Hogan in his official capacity as Duval County Supervisor of Elections (collectively, the City), filed a response in opposition to the Motion on August 12, 2022.  See Defendants' Response to Plaintiffs' Motion for Preliminary Injunctive Relief (Doc. 41; Response).[2]  And, on August 23, 2022,

---

[1] The exhibits to the Motion are filed separately at docket entry 34.  See Notice of Filing Exhibits in Support of Plaintiffs' Motion for Preliminary Judgment (Doc. 34).

[2] The exhibits to the Response are filed separately at docket entry 40, along with a corrected exhibit at docket entry 47.  See Defendants' Notice of Filing Exhibits (Doc. 40); Defendants' Notice of Filing (Doc. 47).

Plaintiffs[3] filed Plaintiffs' Reply in Support of Preliminary Injunction (Doc. 43; Reply).  In accordance with the Court's briefing schedule, see Minute Entry (Doc. 26), on August 5, 2022, Plaintiffs also filed a separate brief addressing the potential remedial process.  See Plaintiffs' Brief on Interim Remedial Process (Doc. 39; Plaintiffs' Remedies Brief).  As instructed by the Court, and without waiving its contention that the Motion is due to be denied, the City similarly filed a brief on an appropriate remedy if the Motion were to be granted.  See Defendants' Remedy Brief (Doc. 45), filed August 24, 2022.  On September 16, 2022, the parties came before the Court for a hearing on the Motion, the record of which is incorporated herein by reference.  See Minute Entry (Doc. 48).  Accordingly, this matter is ripe for review.

## I.   Overview

Following completion of the decennial federal census, the Jacksonville City Charter requires the City Council to redistrict the fourteen City Council districts, five at-large residence areas, and seven School Board districts.  See Jacksonville City Charter §§ 5.02(a), 13.03.  The purpose of redistricting is to ensure that the various districts and residence areas are, to the extent possible, "nearly equal in population" and "arranged in a logical and compact geographic

---

[3] Plaintiffs in this action are the Jacksonville Branch of the NAACP, the Northside Coalition of Jacksonville, Inc., the ACLU of Florida Northeast Chapter, Florida Rising Together, Inc., Marcella Washington, Ingrid Montgomery, Ayesha Franklin, Tiffany Roberts, Rosemary McCoy, Sheila Singleton, Eunice Barnum, Janine Williams, Haraka Carswell, and Dennis Barnum.  See Complaint (Doc. 1), filed May 3, 2022.

pattern . . . ."  Id. § 5.02(a).  On March 22, 2022, the City Council passed Jacksonville Ordinance 2022-01-E (the Ordinance) setting forth the new district maps (the Enacted Plan).  See Ordinance (Doc. 2).[4]  Plaintiffs filed this lawsuit challenging the Enacted Plan on May 3, 2022, see Complaint (Doc. 1), and on July 22, 2022, filed the instant Motion seeking a preliminary injunction enjoining the implementation of the Enacted Plan and requiring new district lines to be drawn prior to the next election, scheduled for March 21, 2023.[5]

The Plaintiffs in this action include organizational Plaintiffs whose members live in the City of Jacksonville as well as individual Black resident voters.  The organizational Plaintiffs are the Jacksonville Branch of the NAACP, the Northside Coalition of Jacksonville, Inc., the ACLU of Florida Northeast Chapter, and Florida Rising Together, Inc.  As relevant to this action, the Jacksonville Branch of the NAACP states that it advocates "for the voting rights of African American and other voters of color in Jacksonville," the Northside Coalition explains that it "has been heavily involved in Jacksonville's redistricting process to ensure fair map and democratic equality for Black

---

[4] The Court includes the relevant map from the Enacted Plan in Part VI.A. of this Order.  For ease of reference, a copy is attached as an appendix as well.

[5] Specifically, the Jacksonville First Election will be held on March 21, 2023, at which time voters will cast votes for Mayor, Sheriff, Supervisor of Elections, Tax Collector, Property Appraiser, and all City Council seats.  See Declaration of Robert Phillips (Doc. 40-32) ¶ 5.  If no candidate for an office receives a majority of the votes, the General Election will be held May 16, 2023.  Id.

residents," the ACLU of Florida Northeast Chapter states that its "mission is to defend civil liberties and freedoms" and that it engages in activities that "focus on voting and voting reform in Jacksonville," and Florida Rising Together Inc. seeks to "increase the voting and political power of marginalized communities." The individual Plaintiffs each describe themselves as a "Black resident" of one of the districts created in the Enacted Plan that are challenged in this action.

Plaintiffs contend that certain districts in the Enacted Plan are improper racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment. Specifically, Plaintiffs maintain that Black voters were stripped from Districts 2, 12, and 14, and packed into Districts 7, 8, 9, and 10 (together, the Challenged Districts).[6] According to Plaintiffs, the City Council drew the lines of these districts predominately based on race. As such, Plaintiffs maintain that the City must satisfy strict scrutiny review of its race-based decision-making; that is, the City must show that the race-based redistricting: 1) serves a compelling interest and 2) is narrowly-tailored to serve that end. According to Plaintiffs, the City cannot satisfy strict scrutiny because even if the City had a compelling interest, such as compliance with § 2 of the Voting Rights Act, its line drawing was not narrowly tailored to serve that

_____

[6] Plaintiffs also challenge School Board Districts 4, 5, and 6. Plaintiffs challenge these School Board Districts only insofar as they are comprised of the challenged City Council Districts. See Complaint ¶ 13. As such, it is not necessary to separately discuss the School Board Districts.

interest.  As such, Plaintiffs assert that the Enacted Plan violates the Equal Protection Clause.  For that reason, Plaintiffs argue that preliminary injunctive relief is warranted in advance of the upcoming election because the Enacted Plan packs Black voters into just four of fourteen districts, the result of which is to dilute and depress the influence of Black voters in City Council elections across the rest of the City.  <u>See</u> Complaint at 4.

The City opposes the Motion and argues that the Ordinance is lawful because consideration of race did not predominate the redistricting process. Notably, the City makes no attempt to argue that it could satisfy strict scrutiny review.  Indeed, at the Preliminary Injunction Hearing, the City conceded that its defense of the Enacted Plan rests on its contention that race did not predominate the redistricting process.  <u>See</u> Transcript of Preliminary Injunction Hearing (Doc. 50; Hrg. Tr.) at 36.  Regardless, the City maintains that a preliminary injunction is not appropriate given Plaintiffs' delay in challenging the Ordinance and the harm that would come from disrupting the election process given the approaching March election.  For the reasons that follow, the Court finds that Plaintiffs have satisfied the heavy burden necessary to obtain a preliminary injunction directed at a legislative act.  As such, the Motion is due to be granted.

## II.    Standard of Review

### A. Generally

A preliminary injunction is an extraordinary and drastic remedy. See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998); see also Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."); Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1300 (11th Cir. 2001). Indeed, "[a] preliminary injunction is a powerful exercise of judicial authority in advance of trial." Ne. Fla. Chapter of Ass'n of Gen Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1284 (11th Cir. 1990). This is particularly true with respect to preliminary injunctions of legislative enactments, which "must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts." Id. at 1285 (emphasis added). This is because such injunctions "interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits . . . ." Id.; see also Robinson v. Attorney General, 957 F.3d 1171, 1178-79 (11th Cir. 2020) ("The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." (internal quotations and citation omitted)).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." <u>Winter</u>, 555 U.S. at 20. The Eleventh Circuit recently described the heavy burden on a party seeking preliminary injunctive relief as follows:

> A district court may grant a preliminary injunction only if the moving party establishes that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest.

<u>Gonzalez v. Governor of Georgia</u>, 978 F.3d 1266, 1270-71 (11th Cir. 2020); <u>see also</u> <u>Siegel v. LePore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). However, the court also instructed that "the third and fourth factors merge when, as here, the Government is the opposing party." <u>Id.</u> at 1271 (internal quotations and citation omitted).

The movant, at all times, bears the burden of persuasion as to each of these requirements. <u>See</u> <u>Ne. Fla.</u>, 896 F.2d at 1285. In deciding whether a party has met its burden, "[a] district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." <u>Levi Strauss & Co. v. Sunrise Int'l Trading Inc.</u>, 51 F.3d 982, 985

(11th Cir. 1995) (internal quotations and citation omitted); see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167, 1171 (11th Cir. 2002) ("Preliminary injunctions are, by their nature, products of an expedited process often based upon an underdeveloped and incomplete evidentiary record."). Notably, a party's failure to establish any one of the essential elements will warrant denial of the request for preliminary injunctive relief and obviate the need to discuss the remaining elements. See Pittman v. Cole, 267 F.3d 1269, 1292 (11th Cir. 2001) (citing Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994)).

### B. Purcell[7]

In its briefing and at the Hearing, the City invokes the Purcell principle to argue that Plaintiffs must satisfy a higher burden in this case. Generally, "the Purcell principle teaches that 'federal district courts ordinarily should not enjoin state election laws in the period close to an election.'" League of Women Voters of Florida, Inc. v. Florida Secretary of State (LOWV), 32 F.4th 1363, 1371 (11th Cir. 2022) (citation omitted). Where the Purcell principle applies, it "'heightens' the standard that a plaintiff must meet to obtain injunctive relief that will upset a state's interest in running its elections without judicial interference." Id. (citing Merrill v. Milligan, 142 S. Ct. 879, 880 (2022)

---

[7] Purcell v. Gonzalez, 549 U.S. 1 (2006).

(Kavanaugh, J., concurring)).  According to the City, this heightened standard requires Plaintiffs to demonstrate that their position on the merits is "clearcut." <u>See</u> Response at 7-8, 28, 34 (citing <u>Merrill</u>, 142 S. Ct. at 881).  Significantly, although "the Supreme Court has never specified precisely what it means to be 'on the eve of an election' for <u>Purcell</u> purposes," the Eleventh Circuit Court of Appeals has found that where an election is set to begin in less than four months, the <u>Purcell</u> principle applies.  <u>LOWV</u>, 32 F.4th at 1371.

The Court does not find it appropriate to apply the <u>Purcell</u> principle to this case.  As a preliminary matter, the Court notes that on July 1, 2022, the City represented to the Court that "in order to proceed with the 2023 general consolidated government elections, the Supervisor of Elections needs to know the City Council district boundaries no later than Friday, December 16, 2022." <u>See</u> Joint Motion for a Preliminary Pretrial Conference (Doc. 24), Ex. A. Likewise, the Court heard from the City regarding a schedule for these preliminary injunction proceedings at the Preliminary Pretrial Conference on July 8, 2022.  <u>See</u> Minute Entry (Doc. 26); <u>see</u> <u>also</u> Preliminary Pretrial Conference Transcript (Doc. 27; PPC Tr.).  The Court and the parties worked backwards from the City's December 16, 2022 deadline to craft a briefing schedule in this case, recognizing the need to allow time for a remedy if warranted by the merits of the Motion.  <u>See</u> PPC Tr. at 8-13.  The City agreed to the schedule without caveat.  <u>See</u> <u>id.</u> at 13.  Thus, under the circumstances,

the Court does not find it appropriate to apply <u>Purcell</u>'s heightened standards. <u>See</u> <u>Rose v. Raffensperger</u>, ___ S. Ct. ___, 2022 WL 3568483, at *1 (Aug. 19, 2022) <u>vacating</u> No. 22-12593, 2022 WL 3572823, at *1-2 (11th Cir. Aug. 12, 2022).

Even without the City's representation, application of the <u>Purcell</u> principal is not warranted in this case.  Here, the candidate qualifying period is still nearly three months away and the election itself is over five months away. The City has not identified a single case where the Eleventh Circuit or the Supreme Court has applied <u>Purcell</u> under similar timeframes.  <u>Cf.</u> <u>Merrill v. Milligan</u>, 142 S. Ct. 879 (Feb. 7, 2022) (applying <u>Purcell</u> where absentee voting was to begin in "just seven weeks"); <u>LOWV</u>, 32 F.4th at 1371 (applying <u>Purcell</u> where "statewide election was set to begin in <u>less</u> than four months" and voter registration, which the injunction implicated, was already underway).[8]

---

[8] The Court acknowledges that in <u>Ardoin v. Robinson</u>, the Supreme Court stayed an injunction issued five months before a statewide election after the Fifth Circuit declined to do so.  <u>See</u> <u>Robinson v. Ardoin</u>, 37 F.4th 208 (5th Cir. 2022) <u>stayed by</u> <u>Ardoin v. Robinson</u>, 142 S. Ct. 2892 (June 28, 2022).  But notably, it is unclear whether the Supreme Court stayed the injunction based on an application of <u>Purcell</u>.  The <u>Ardoin</u> Court's stay decision states only that the case "is held in abeyance pending this Court's decision in [<u>Merrill</u>] or further order of the Court."  <u>See</u> <u>Ardoin</u>, 142 S. Ct. at 2892.  Regardless, there are significant differences between the instant case and <u>Ardoin</u>.  In <u>Ardoin</u>, the injunction was issued about two weeks before the start of the petition qualifying period, requiring the court to extend that deadline, and the fee qualifying period was only six weeks away.  <u>See</u> <u>Robinson</u>, 37 F.4th at 228, 229-30.  In addition, the court provided the Louisiana legislature only fourteen days to enact a remedial plan which, given certain timing limitations in the Louisiana Constitution, amounted to only five working days.  <u>See</u> <u>id.</u> at 231-32.  And importantly, <u>Ardoin</u> involved a challenge to a statewide congressional map, <u>id.</u> at 215, whereas the injunctive relief sought here implicates a single county.

Although the Court does not discount that there could be a scenario where application of <u>Purcell</u> would be warranted five months prior to an election, this case does not present that circumstance given the status of the pertinent election deadlines and the fact that the City Council would be required to redraw lines for only a single county.  Indeed, as discussed in the balance of harms section below, the risk of voter confusion or harm to the election process from changes to the district maps at this time is slight.

Nevertheless, the Court emphasizes that because Plaintiffs ask the Court to interfere with the democratic process and enjoin a legislative enactment, without the additional safeguards that come from a full trial on the merits, they face a significant burden even absent application of <u>Purcell</u>.  As stated above, Plaintiffs must make a clear showing that such relief is definitely demanded.

## III.   Applicable Law

### A. Racial Gerrymandering

The Equal Protection Clause of the Fourteenth Amendment prohibits the government, "without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'"  <u>See</u> <u>Bethune-Hill v. Va. State Bd. of Elections</u>, 137 S. Ct. 788, 797 (2017) (quoting <u>Miller v. Johnson</u>, 515 U.S. 900, 911 (1995)).[9]  Indeed, "[u]nder the Equal Protection Clause, districting

---

[9] Although <u>Bethune-Hill</u> concerned the state, political subdivisions of a state, such as the City here, must also comply with the Fourteenth Amendment.  <u>See</u> <u>Avery v. Midland Cnty., Tex.</u>, 390 U.S. 474, 480 (1968) ("The actions of local government are the actions of the State. A

maps that sort voters on the basis of race 'are by their very nature odious.'" <u>Wis. Legislature v. Wis. Elections Comm'n</u>, 142 S. Ct. 1245, 1248 (2022) (quoting <u>Shaw v. Reno</u> (<u>Shaw I</u>), 509 U.S. 630, 643 (1993)). "This is true whether or not the reason for the racial classification is benign or the purpose remedial." <u>See</u> <u>Shaw v. Hunt</u> (<u>Shaw II</u>), 517 U.S. 899, 904-05 (1996).

The Supreme Court has identified the harms that flow from such racial sorting to include "being personally subjected to a racial classification as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group." <u>See</u> <u>Bethune-Hill</u>, 137 S. Ct. at 797. When the government "assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" <u>See</u> <u>Miller</u>, 515 U.S. at 911-12. The Supreme Court also has noted broader, societal harms that stem from racial gerrymandering, even for remedial purposes, including its concern that such classifications "may balkanize us into competing racial factions . . . ." <u>Id.</u> at 912.

Nevertheless, application of equal protection principles to electoral districting "is a most delicate task." <u>See</u> <u>Miller</u>, 515 U.S. at 905. In <u>Miller</u>, the Supreme Court cautioned that "[f]ederal-court review of districting legislation

_____

city, town, or county may no more deny the equal protection of the laws than it may abridge freedom of speech, establish an official religion, arrest without probable cause, or deny due process of law.").

represents a serious intrusion on the most vital of local functions." Id. at 915. The Supreme Court repeated the admonition in Abbott v. Perez, observing again that "[r]edistricting 'is primarily the duty and responsibility of the [legislature].'" See Abbott v. Perez, 138 S. Ct. 2305, 2324 (2018) (quoting Miller, 515 U.S. at 915). The Abbott Court instructed that courts "'must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus.'" Id. (internal citation omitted) (quoting Miller, 515 U.S. at 915-16). As such, "[a]lthough race-based decisionmaking is inherently suspect, until a claimant makes a showing sufficient to support that allegation the good faith of a . . . legislature must be presumed." See Miller, 515 U.S. at 915 (internal citations omitted).

Ordinarily, "[w]hen a voter sues [government] officials for drawing such race-based lines," a two-step analysis applies. See Cooper v. Harris, 137 S. Ct. 1455, 1463 (2017). First, "the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" See id. If the plaintiff succeeds in showing that racial considerations predominated over others, the burden shifts to the government "to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." Id. at 1464. However, here, as previously noted, the City maintains that race did not predominate the redistricting process and makes no attempt to demonstrate

that it could otherwise satisfy strict scrutiny.[10]  As such, for purposes of resolving the instant Motion, the Court need only address the first prong of the analysis—whether Plaintiffs have met their burden of establishing that race predominated the drawing of the Challenged Districts.

## B. Racial Predominance

Courts must exercise "extraordinary caution in adjudicating claims that a [legislature] has drawn district lines on the basis of race." See Miller, 515 U.S. at 916; see also Easley v. Cromartie (Cromartie II), 532 U.S. 234, 242 (2001). The legislature is entitled to a presumption of good faith and "[t]he distinction between being aware of racial considerations and being motivated by them may be difficult to make." Miller, 515 U.S. at 916 (emphasis added). Indeed, "[r]edistricting legislatures will . . . almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process." Id. To prove that race was the predominant motivating factor, a plaintiff bears the burden of demonstrating that the legislature "'subordinated traditional race-neutral districting principles . . . to racial considerations.'"

---

[10] The Supreme Court has "long assumed that one compelling interest is complying with operative provisions of the Voting Rights Act of 1965 . . . ." Id. "When a [government] invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action." Id. The City does not contend that the VRA justifies the shape of the Challenged Districts or that it considered any evidence pertinent to that issue.

Bethune-Hill, 137 S. Ct. at 797 (quoting Miller, 515 U.S. at 916).[11]  A plaintiff may rely on "'circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose . . . ."  See Miller, 515 U.S. at 916.  While a plaintiffs' burden is a "demanding" one, no one specific type of evidence is required to prevail.  See Cooper, 137 S. Ct. at 1479.  And significantly, the Court must inquire into the "actual considerations that provided the essential basis for the lines drawn, not post hoc justifications the legislature in theory could have used but in reality did not."  See Bethune-Hill, 137 S. Ct. at 799.

The Supreme Court has instructed that in conducting the predominance analysis, "legislative efforts to create districts of approximately equal population" is not one of the factors to be weighed in the balance.  See Ala. Legis. Black Caucus v. Alabama (ALBC), 575 U.S. 254, 271-72 (2015) ("[A]n equal population goal is not one factor among others to be weighed against the use of race to determine whether race 'predominates.'").  In ALBC, the Court explained that equal population "is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to how equal population objectives will be met.  See id.  The

---

[11] Traditional, race-neutral factors include: compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation.  See Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 272 (2015).

predominance question is about <u>which</u> voters the legislature decides to move in or out of a district to meet its equal population obligations, and whether race, as opposed to other, "traditional" factors, predominated the decision.  <u>Id.</u> at 273.

To determine legislative intent, the Court is guided by the Supreme Court's decision in <u>Village of Arlington Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S. 252, 266-68 (1977).  <u>See</u> <u>Reno v. Bossier Parish Sch. Bd.</u>, 520 U.S. 471, 488-89 (1997) (instructing courts to look to <u>Arlington Heights</u> for guidance in determining whether a legislature acted with discriminatory intent in cases brought under the Equal Protection Clause); <u>see also</u> <u>Shaw v. Reno</u> (<u>Shaw I</u>), 509 U.S. 630, 643 (1993) (citing <u>Arlington Heights</u> in a racial gerrymandering case); <u>Miller</u>, 515 U.S. at 913-14 (same); <u>Abbott</u>, 138 S. Ct. at 2325 (same).  The Eleventh Circuit Court of Appeals has summarized the <u>Arlington Heights</u> factors as follows:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators.

<u>See</u> <u>Greater Birmingham Ministries v. Sec'y of State for State of Ala.</u>, 992 F.3d 1299, 1321-22 (11th Cir. 2021); <u>see also</u> <u>LOWV</u>, 32 F.4th at 1373.  The Eleventh Circuit has also recognized that "these factors are not exhaustive," and supplemented the list with three additional factors: "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less

discriminatory alternatives." See Greater Birmingham Ministries, 992 F.3d at 1321-22; LOWV, 32 F.4th at 1373.

As relevant to redistricting cases in particular, a bizarre shape may be "'persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale.'" Bethune-Hill, 137 S. Ct. at 798 (quoting Miller, 515 U.S. at 913). Likewise, evidence demonstrating a conflict or inconsistency between an enacted plan and traditional districting criteria may be "persuasive circumstantial evidence tending to show racial predomination . . . ." Id. at 799. But neither a bizarre shape, nor a conflict with traditional principles are "threshold requirement[s]" or "mandatory precondition[s]" necessary "for a challenger to establish a claim of racial gerrymandering." Id. at 798-799; see also Miller, 515 U.S. at 913. Indeed, "[r]ace may predominate even when a reapportionment plan respects traditional principles . . . if '[r]ace was the criterion that, in the [government's] view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" Bethune-Hill, 137 S. Ct. at 798-99 (quoting Shaw II, 517 U.S. at 907).

Notably, where the government raises partisanship as a defense, the court faces a "formidable task." See Cooper, 137 S. Ct. at 1473. The Supreme Court has recognized that "political and racial reasons are capable of yielding similar oddities in a district's boundaries," given that "'racial identification is highly

-17-

correlated with political affiliation.'" See id. (quoting Cromartie II, 532 U.S. at 243).  As such, the usual forms of evidence, such as a conflict with traditional criteria or a bizarre shape, may lose much of their value.  Id.  In such a case, the court "must make 'a sensitive inquiry' into all 'circumstantial and direct evidence of intent' to assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove a district's lines." Id. (quoting Hunt v. Cromartie (Cromartie I), 526 U.S. 541, 546 (1999)); see also Cromartie II, 532 U.S. at 242 (explaining that "[c]aution is especially appropriate" in cases "where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated").  One way a plaintiff can accomplish this task is through an alternative map showing that "the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group into the district." Cooper, 137 S. Ct. at 1479.  Nevertheless, such a map is not required if a plaintiff has other evidence sufficient to resolve the race versus politics question.  Id.

In reviewing a claim of gerrymandering, a court must consider the question of racial predominance on a district-by-district basis.  See Bethune-Hill, 137 S. Ct. at 799-800 ("[T]he basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district.").  Thus, here the Court must determine whether "race

was improperly used in the drawing of the boundaries" of the "specific electoral districts" challenged.  See Bethune-Hill, 137 S. Ct. at 800 (quoting ALBC, 575 U.S. at 262-63).  In this case, this means that the City cannot defeat Plaintiffs' claims by showing that race did not predominate the drawing of the City's districts when considered as an undifferentiated whole.  See ALBC, 575 U.S. at 263-64.  This is so because "[a] showing that race-based criteria did not significantly affect the drawing of some [City] districts," does "little to defeat a claim that race-based criteria predominantly affected the drawing of other [City] districts, such as [the City's] majority-minority districts primarily at issue here."  See ALBC, 575 U.S. at 264.  Likewise, the Court may not limit its analysis to only certain portions of the lines within an individual district.  See Bethune-Hill, 137 S.Ct. at 799-800.  The Supreme Court instructs that courts must consider "the legislature's predominant motive for the design of the district as a whole."  Bethune-Hill, 137 S. Ct. at 800 (emphasis added).  Thus, while the Court may consider evidence regarding particular portions of a district's lines, the Court cannot "divorce any portion of the lines—whatever their relationship to traditional principles—from the rest of the district."  Bethune-Hill, 137 S. Ct. at 800.  As summarized in Bethune-Hill:

> A court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue; any explanation for a particular portion of the lines, moreover, must take account of the districtwide context. Concentrating on particular portions in isolation may obscure the significance of relevant districtwide

evidence, such as stark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target. A holistic analysis is necessary to give that kind of evidence its proper weight.

Id. at 800.

## IV.   Factual Background

### A. Charter Requirements for Redistricting

Section 5.02 of the Jacksonville City Charter, requires the City Council to "redistrict the 14 council districts and 5 at-large residence areas" within 8 months of the publication of the official federal census.  See Jacksonville City Charter § 5.02(a).  The Charter requires the City Council to draw districts that are "nearly equal in population and are arranged in a logical and compact geographic pattern to the extent possible."  Id.  The redistricting process is also governed by the Jacksonville Ordinance Code (the City Code).  Specifically, section 18.101 of the City Code instructs that:

> (b) In making this redistricting, the Council is obligated to insure [sic] that all districts are as nearly equal in population and are arranged in as logical and compact a geographical pattern as it is possible to achieve and to insure [sic] that all federal and state constitutions, laws and requirements are complied with;

> (c) While the Council districts are based upon population with respect to their size, the geographical arrangement and territorial boundaries of the districts must take into consideration other factors, particularly compactness and contiguity, so that the people of the City, and their varied economic, social and ethnic interests and objectives, are adequately represented in the Council.

See Jacksonville Ordinance Code § 18.101(b)-(c) (emphasis added).

The Code requires the creation of a Redistricting Committee which has 150 days after the census is published to transmit a plan to the City Council. Id. § 18.104-106.  The plan is then referred to the Rules Committee which is required to hold "not less than three public hearings" on the plan.  Id. § 18.107(b).  The Rules Committee then reports the plan to the Council.  Id. § 18.107(c).  If any substantial changes are made, further public hearings are required.  Id.  If the Council has not enacted a redistricting plan "within eight months after the official publication of the census," then it falls to the Circuit Court of Florida's Fourth Judicial Circuit to make the redistricting.  Id. § 18.109.[12]

### B. Historical Record

#### 1. 1991-2001

To understand the discussions surrounding the Challenged Districts as drawn in the 2021 redistricting cycle, and to place statements made in that process in proper context, one must have an understanding of the historical origins of those districts.  In 1991, the City Council adopted a redistricting plan in which Districts 7, 8, 9, and 10 were intentionally drawn to have populations with close to or in excess of 63% Black residents.  See 1991 Map (Doc. 34-58);

---

[12] According to the Office of General Counsel's presentation to the Redistricting Committee, the 2020 census data was released on August 12, 2021, such that the City Council needed to complete the redistricting process by April 12, 2022, or the task would fall to the state court.  See 8.18.21 Mtg. Minutes (Doc. 34-3 at ECF p. 6).

see also Ordinance 91-1075-446, Ex. A (Doc. 34-34 at ECF p. 7).  This historical truth is essentially beyond dispute.  Indeed, the Ordinance itself is titled the "63% Plan" and includes a narrative explaining the redistricting process which placed "Racial fairness—districts that provide a minority population a meaningful opportunity to elect a preferred representative" as second only to the requirement of equal population.  Id. at ECF p. 5, 23.  This narrative explains that "[t]he plan provides four minority access districts in which minority citizens comprise approximately 63 percent of the district population." Id. at ECF p. 24.  And, as to Districts 7, 8, and 9, the narrative notes that certain line-drawing decisions were made "to meet [population] deviation and minority access requirements."  Id. at ECF p. 27-28 (emphasis added).  The Chairwoman of the Rules Committee at the time, Councilmember (CM) Denise Lee of District 8 (D8), is quoted in the newspaper as stating "[w]e obviously must have four minority access districts.  That is just the fact."  See Beth Reese, Panel Braces for Reapportionment Task, Fla. Times-Union, Aug. 5, 1991 (Doc. 34-35 at ECF p. 2).  The article also reports that "[t]he Rules Committee, in its request for proposals from the [redistricting] consultant, said its goal was to maintain the four minority districts."  Id. (emphasis added).[13]

---

[13] The Court pauses to note that there is no indication that this racial gerrymandering was done with bad intent.  Rather, it appears more likely that the City Council at the time believed such gerrymandering was necessary to ensure minority representation on the City Council and to comply with the requirements of the VRA.

Contemporaneous local reporting on the 2001 redistricting cycle reflects that maintaining the four minority access districts was a significant consideration during that cycle as well.  Although the racial gerrymandering was not explicitly incorporated into the ordinance as it had been in 1991, newspapers at the time reported that maintaining the minority access districts was a top priority, particularly for the councilmembers representing those districts.  See, e.g., Doc. 34-41 at ECF p. 3; Doc. 34-42 at ECF p. 2; Doc. 34-43 at ECF p.3.[14]  And, ultimately, oddly shaped Districts 7, 8, 9, and 10 maintained high percentages of Black residents, ranging from 58.25% in District 10 to 68.79% in District 7.  See Ordinance 2001-675-E, Ex. A (Doc. 34-40 at 12); 2001 Map (Doc. 34-59).

## 2. The 2011 Redistricting Cycle

Prior to the 2021 redistricting, the most recent redistricting cycle occurred in 2011.  During that cycle, the Challenged Districts took on the shapes that they largely maintain in the Enacted Plan.  Transcripts of member-to-member meetings from 2011 demonstrate that, as to Districts 7, 8, 9, and 10, the racial

---

[14] For example, Councilwoman Pat Lockett-Felder of District 7 is quoted as saying: "I hope it won't be a fight, but I'm ready to fight if I need to. We are going to have those four minority districts."  See Doc. 34-41 at ECF p.3.  In another article she is quoted as asserting: "We've got four minority-access districts now.  We're going to have four at the end."  See Doc. 34-42 at 2.  The Times-Union also reported that Lockett-Felder and Reggie Fullwood of District 9 met with the City's consultant about the percentage of Black voters in the minority access districts, "trying to edge those numbers up by looking at the concentration of [B]lack voters in each individual census block."  See Doc. 34-43 at 3.  According to the reporting, then-mayor John Delaney also expressed his view that the final plan should retain the four minority access districts.  See Doc. 34-42 at ECF p. 3.

percentage of a district's residents was a significant factor. For example, at an August 3, 2011 meeting, CM Reginald Brown (D10) who was chairing the meeting stated: "I think it would be a good reference point to move us forward, if we can first agree on the percentages." See 8.3.11 Mtg. Tr. (Doc. 34-60) at 21. The Councilmembers discussed the current percentage of Black residents in their districts and what those percentages would be under the proposed maps. Id. at 21-22. CM Denise Lee looked at the numbers for District 7 and stated: "So from 74 to 66, that's a great loss." Id. at 23. Brown agreed: "Right. That's –that's too much." Id. at 23. Lee continued to express her opposition to any reduction or "dilut[ion]" of the current percentages. Id. at 33-34. Brown added: "You're reducing the numbers tremendous amounts of minorities." Id. at 36.

From the Office of General Counsel (OGC), Jason Gabriel[15] interjected that "[w]e need—the predominant motive here is not race. . . . Can we all agree to that? And so I need to understand what are the community interests?" Id. The following exchange then occurs:

> Lee:     Okay. We're not supposed to say minority access. Technically, you're not supposed to say that. But let's be real. You got to address minorities access.
>
> Gabriel: Absolutely. Race is a motive –

---

[15] According to the transcripts, this statement and the following exchange are attributed to "Bill" which would be Bill Killingsworth. However, according to the Minutes from this meeting, it was Jason Gabriel of OGC who made this point. See 8.3.11 Mtg. Minutes (Doc. 34-53 at ECF p. 56). Because the transcripts were generated from an audio-recording, the Court finds the contemporaneous minutes to be a more reliable indicator of who was speaking and attributes the statements here to Gabriel.

| Lee: | Now, we could call -- you could - - |
|---|---|
| Gabriel: | It's -- it's a factor. |
| Lee: | You could call it – |
| Gabriel: | <u>But it's not a primary factor</u>. |
| Lee: | <u>Well, we can be technical</u>. |
| Gabriel: | Right. |
| Lee: | <u>But it is going to be a factor</u>. |
| Gabriel: | Absolutely. |
| Lee: | <u>Now, you can call it anything you want to. But it is a factor. It is a -- it is a big fac- -- if it weren't, we would not be sitting here</u>. And it's redistricting that allow us for the sitting here today to sit here. That's – |
| Gabriel: | Absolutely. |
| Lee: | That's all I'm saying. |

<u>Id.</u> at 37 (emphasis added).  Lee reiterated after this exchange that she "just want[s] to make sure what's existing is not diluted."  <u>Id.</u> at 38.  The Councilmembers ended the meeting by directing the in-house redistricting consultant, Bill Killingsworth, Director of the Planning and Development Department, and Jerry Holland, the Supervisor of Elections at the time, to go identify "where all the precincts are that have 60 percent minorities." <u>Id.</u> at 68-70, 72-73.[16]

The focus on minority percentages continued at a meeting the next day. <u>See</u> 8.4.11 Mtg. Tr. (Doc. 34-61) at 3, 6-9.  In response to a proposed map, CM Warren Jones (D9) asked: "What impact does that have on the minority districts? Because historically we've always tried to ensure that there was diversity on the council and historically that has not been achieved with one or

---

[16] Notably, the City used Killingsworth as their redistricting consultant again in 2021.

two exceptions without districts that were -- had communities of interest that were 60 percent or higher." Id. at 6. Jones stated that one of the challenges for the redistricting committee was to ensure that the City Council continued to have minority representation, "And without those communities of interests, having percentages that are consistent with what we had in the 2000 census, it makes it very difficult to maintain that." Id. at 7. Jones explained that he had been working with Killingsworth and the Supervisor of Elections to increase the percentage of Black voters "because 54 percent in district nine, won't get it. Bottom line. And I doubt that it -- what is it? Fifty eight or 59 in seven and eight, those numbers are, in my opinion, not sufficient." Id. The committee continued to discuss the percentage of minority voters in Districts 7, 8, 9, and 10. Id. at 7-14, 21-25, 31-32.

Notably, a member of the public spoke at this meeting and urged the Councilmembers to focus on communities, arguing that there was no longer a need to maintain such a high percentage of Black residents in particular districts. He asserted that perhaps it was no longer necessary to maintain four minority access districts and three might be more appropriate. Id. at 55-57. In response to this commentary, Jones responded:

> What you're saying then is it's good to have communities of interest together, even at the expense of eliminating minority representation, because I know we've made progress and I don't want to debate. We made progress. No question about that. The question is can we have minority representation without minority

> districts? And I -- I guess you answered the question when you look around this council and there's no one representing a nonminority district at this time. Some point I hope we get there, but I don't know if we're there at this point in 2011.

See id. at 59 (emphasis added).  Later in the process CM Matthew Schellenberg (D6) proposed a map that Jones opposed stating "that the proposal favors compactness over representation of the minority community of interest."  See 9.22.11 Mtg. Minutes (Doc. 34-53 at ECF p. 109).  The record contains numerous other examples of the Councilmembers in 2011 insisting that Districts 7, 8, 9, and 10 must maintain high percentages of Black residents.  See 8.8.11 Mtg. Minutes (Doc. 34-53 at ECF p. 66); 10.6.11 Meeting Minutes (Doc. 34-53 at ECF p. 123); 10.31.11 Meeting Minutes (Doc. 34-53 at ECF p. 136).

As required by the City Code, the City Council held public hearings on the proposed maps where members of the public repeatedly complained about racial packing and the gerrymandered minority access districts.  See 8.24.11, 8.25.11, 8.29.11, 9.1.11 Public Hrg. Minutes (Doc. 34-53 at ECF pp. 83-89, 92-93, 96-97).  Local news media at the time reported that maintaining the four minority access districts was a major factor in redistricting.  See Doc. 34-54 at ECF pp. 2-3; Doc. 34-56 at 3 ("A plan that Schellenberg offered would have drawn more compact districts but allowed just three minority-access areas.  A core of both white and black supporters had supported that idea.  But others, including longtime political figures of both races, said keeping all four seats should be an important

goal.").[17]  And ultimately, the 2011 maps maintained significant majorities of Black residents in Districts 7, 8, 9, and 10.  <u>See</u> Map of the 2011 Plan (Doc. 34-52).

### C. Legislative History 2021 Redistricting

#### 1. 2020 Census

According to the 2020 census, the population of Duval County was 995,497.  <u>See</u> Declaration of William Killingsworth (Doc. 40-31; Killingsworth Decl.) ¶ 5.  As such, in keeping with the principal that voting districts must be drawn with as nearly equal population as practicable, the target population for each District was 71,107.  <u>Id.</u>; <u>see also</u> February 23, 2021 Office of General Counsel Redistricting Memorandum (Doc. 34-8; OGC Memo) at 8.  Based on advice given by the OGC, the Redistricting Committee operated with the understanding that mathematical perfection was not required, but they must keep the difference in population between the smallest and largest districts under ten percent.  <u>See</u> OGC Memo at 8-9; Killingsworth Decl. ¶ 5.

Upon initial review of the census data, it was immediately apparent that equalizing the district populations would not require drastic changes.  According

---

[17] Plaintiffs include a September 27, 2011 guest column written by Schellenberg advocating for his proposed map with "compact, common-sense districts" and criticizing the Rules Committee for "perpetuating the myth that Jacksonville must have four minority districts and must draw long, snake-like districts to obtain them."  <u>See</u> Doc. 34-55 at ECF p.3. He writes: "We do not need, as espoused by Councilman Warren Jones, the minority districts packed with 60 percent or more minorities in order for minorities to win elections."  <u>Id.</u>

to the 2020 census, only District 11 had grown substantially and would need to reduce its population.  See Killingsworth ¶ 6.  Reducing District 11's population would necessitate changes to the districts in the southeast quadrant of Jacksonville, south of the St. Johns River (the River).    The census data also showed that on the north and west side of the River, District 8 had the lowest population and would need to expand to reduce the overall deviation.  See id; see also 9.9.21 Mtg. Tr. (Doc. 34-10) at 6.

### 2.  Redistricting Committee

Following the 2020 census, the City Council set out to fulfill its responsibility under the City Charter.  CM Aaron Bowman (D3) chaired the Special Committee on Redistricting (the Committee).  See Bowman Declaration (Doc. 40-14) ¶ 4.[18]  When the Committee held its first meeting on August 18, 2021, the OGC made a presentation on the legal requirements for redistricting, as well as the procedures and timeline for the redistricting process.  See id. ¶ 6; see also 8.18.21 Mtg. Tr. (Doc. 40-2) at 7-18.  Additionally, Killingsworth explained the mechanics of the process and potential redistricting criteria for

---

[18] The Court notes that the record contains some evidence of an earlier Special Redistricting Committee that met prior to the release of the census data and was chaired by CM Garrett Dennis (D9).    See Killingsworth Redistricting White Paper (Doc. 34-4; Killingsworth Memo) at 1 (referring to a "prior" Special Redistricting Committee that operated from January 2021 through May 2021, and received data from an expert regarding race and party affiliation by precinct); see also 3.22.22 Mtg. Tr. (Doc. 34-17) at 154.  However, the Court has no information about the work of this first redistricting committee and the parties do not mention that committee in their briefs.  See Motion at 7; Response at 3.

the Committee's consideration. Id. at 35-44. The specific criteria he mentioned were: 1) whether to use total population or voting age population; 2) geographic constraints; 3) communities of interest; and 4) protecting incumbencies. Id. at 37-39.

As part of his presentation, Killingsworth gave the Committee an overview of the 2011 redistricting process. With regard to communities of interest, Killingsworth explained that "[l]ast time there was a strong desire to maintain the historic communities of interest that existed in the City in prior Council districts." Id. at 39. According to Killingsworth, "the decision was made to maintain the four communities of interest that historically existed as Council districts and then protect incumbencies, and that's all they chose out of communities of interest." Id. at 39 (emphasis added). He also observed that politics did not initially factor into the constraints during the 2011 redistricting cycle although "[i]n the end everybody wanted to know that information . . . ." Id. In his account of the 2011 redistricting cycle, Killingsworth explained that the districts on the south and east of the River were able to reach consensus relatively quickly, while the discussion on "how to achieve the four communities of interest" took "a lot more time." Id. at 41-42.

Killingsworth requested that the Committee provide guidance on "whether or not you would like the [Planning] Department just to go nuts and come up with entirely new boundaries and start from there, which is what the

last Council committee did on this." Id. at 40.  Because District 11 was the only

district to experience significant population growth, Killingsworth

recommended that the Committee "start from existing boundaries . . . ." Id. at

40-41.  After unanimously agreeing to select Killingsworth as the redistricting

consultant, id. at 54, on a motion by CM Garrett Dennis (D9), the Committee

unanimously approved guidance to Killingsworth that he start the redistricting

process based on the current maps, not from scratch, id. at 61-65.[19]

_____

[19] The City submits a Declaration from Bowman in which he states that he voted to start from the 2011 District boundaries because:

> (1) the Department had started from scratch in 2010 and created new district boundaries; (2) only one of the 14 City Council Districts—District 11—had substantial growth which needed to be accounted for in the 2022 redistricting process; and (3) it would help protect incumbents from being drawn out of their current districts. I was also concerned about minimizing the impact of redistricting on School Board Districts, which are based on the City Council District boundaries.

See Bowman Decl. ¶ 9.  CM Danny Becton (D11), the Vice-Chair of the Committee, provided similar reasons in his Declaration.  See Declaration of Danny Becton (Doc. 40-13; Becton Decl.) ¶ 10.  Dennis, who made the initial motion, explains in his Declaration that he advocated for starting from the existing District boundaries because:

> City Council had started from scratch in the 2010 redistricting process, in part because the location of the County's population growth had dramatically shifted over the prior ten years.  The 2020 census data, however, showed only one District—District11—gaining a large number of constituents that needed to be accounted for in the 2022 redistricting process.

See Declaration of Garrett Dennis (Doc. 47-1; Dennis Declaration) ¶¶ 11-12.  CM Brenda Priestly Jackson (D10) explains in her Declaration that she voted to start from the existing boundaries because:

> (1) the Department had started from scratch in 2010 and created new district boundaries; (2) to the best of my recollection, I had not received any complaints from the constituents of District 10 regarding the 2011 district boundaries; (3) District 11 was the only district with substantial growth that needed to be accounted for in 2022; and (4) it would help protect incumbent City Council and School Board members from being drawn out of their current Districts.

See Declaration of Brenda Alexis Priestly Jackson (Doc. 40-28; Priestly Jackson Decl.) ¶ 19.

The next Committee meeting took place on August 24, 2021.  See 08.24.21 Mtg. Tr. (Doc. 40-3).   At this meeting, Killingsworth began by stating his assumption that "to the extent possible, you want compact, contiguous districts" and that "you want incumbents within the districts, at least particularly the incumbents that potentially have the ability to run for reelection and these being active."  See 8.24.21 Mtg. Tr. at 8.  Killingsworth then asked for guidance on: 1) "whether or not to cross the river," 2) "total population versus voting-age population," 3) "whether or not there's a desire to continue to preserve the four historic communities of interest that the City has had in the past," and 4) "a starting point."  Id. at 8-9.

Following a conversation about the changes that would need to be made to account for population growth on the south side of the River, CM Brenda Priestly Jackson (D10) offered her thoughts on the north and northwest districts.  See id. at 32.  She noted that Districts 7, 8, 9, and 10 are within or close to the target population.  Id. at 33.  She observed that District 8 has the lowest population for that area and that District 12 has the most, and noted that these two Districts are next to each other.  Id.  As such, she remarked that "there's some clean ways that there can be a population shift for the districts right there without, I don't think, really damaging communities of interest and all of that as well."  Id. (emphasis added).  She went on to say:

And I also think that one of the challenges of District 8 -- <u>and I'll just say we call it now the four communities of interest, which were formerly known as minority access districts. I love our words stepping around here</u>. But the reality is that District 8 actually has more -- a larger percentage of African-Americans than any of them, and that is really like -- it's like an imbalance; right? So it has 68 percent. And then District 7 has 60 percent. District 9 has 57. And 10 has 58 percent.

<u>So I think that when we talk about communities of interest, we also must talk about those communities that we believe that they have similar concerns relative to the city as a whole</u>. But I don't really see the challenges for those of us on the west and the north.

<u>Id.</u> at 33-34 (emphasis added).[20]

---

[20] In her Declaration, Priestly Jackson maintains that she "never used the term 'communities of interest' as a euphemism solely for race, nor do[es] [she] understand the term to be defined so narrowly." <u>See</u> Priestly Jackson Decl. ¶ 33. She explains that she understands the term to:

> encompass numerous and various descriptors, including the criteria stated in the Ordinance Code—the varied, economic, social and ethnic interests and objectives of the citizens of Jacksonville—as well as people with similar political affiliation, people who share similar concerns, shared racial or ethnic backgrounds, communities with a common history, cultural communities, economic communities, and geographical communities such as the Beaches, or pre-existing political subdivisions like Baldwin.

<u>Id.</u> ¶ 32. Notably, Priestly Jackson makes no attempt to identify what "communities of interest" she believes are encompassed by District 10. Nor does she address or attempt to clarify her use of the term "communities of interest" in the context of her specific remarks at City Council meetings. Thus, while Priestly Jackson may have a broad understanding of what communities of interest can be, it is apparent from the transcripts that she also used the term to refer to the four City Council Districts that were historically known as the minority access districts. To the extent she believed the minority access districts were united by a community of interest other than one defined by race, those shared interests were never identified or discussed in any of the redistricting meetings. Nor are they identified in her Declaration.

Following Priestly Jackson's remarks there was a lengthy discussion about incumbents and the potential impact of redistricting on incumbents, particularly school board incumbents. The Committee members discussed the impact of redistricting on those running for school board seats in August 2022, and whether to expedite the process to have a new map in place prior to that election. Id. at 52-56. Ultimately, the Committee decided against an expedited process. Id. at 55-56. In addition, after much discussion, they agreed on providing guidance to Killingsworth that he should avoid drawing incumbents out of their City Council or School Board Districts. Id. at 62.[21] Notably, incumbency protection only applied to members who were eligible to run in the next election—Becton pointed out that there were seven open City Council seats out of 19, so incumbency protection would not apply to those seats. Id. at 56-61.[22]

---

[21] In her Declaration, Priestly Jackson emphasizes that incumbency was "a major consideration" and was "an important factor" to her, even though she was not running for re-election in District 10. See Priestly Jackson Decl. ¶¶ 11-13. According to Priestly Jackson, as a former school board member, she was particularly concerned about protecting incumbent school board members. See id. ¶ 14.

[22] Indeed, the Court notes that only two of the seven councilmembers for the Challenged Districts are running for re-election. Gaffney (D7), Dennis (D9), and Al Ferraro (D2) were initially elected in 2015 and re-elected in 2019. See Declaration of Reggie Gaffney (Doc. 40-23; Gaffney Decl.) ¶ 2; Dennis Decl. ¶ 2; Declaration of Al Ferraro (Doc. 40-21; Ferraro Decl.) ¶ 2. As such, these councilmembers faced term limits. See Code § 5.041 ("No person elected for two consecutive full terms as a member of the council shall be eligible for election as a council member in the next succeeding term."). On May 23, 2022, Gaffney and Dennis both resigned to run for other offices. See Gaffney Decl. ¶ 2 (Florida Senate); Dennis Decl. ¶ 2 (Florida State House of Representatives). Although not term-limited, Priestly Jackson (D10) stated at the March 15, 2022 Rules Committee meeting that she was not running again such that incumbency was not an issue for her personally in the redistricting process. See 3.15.22

-34-

Returning to Killingsworth's initial questions, the Committee agreed to use total population numbers for purposes of the one person/one vote standard. See id. at 51; see also Declaration of Aaron Bowman (Doc. 40-14; Bowman Decl.) ¶ 12. The Committee also agreed that Killingsworth should attempt to minimize River crossings. See 8.24.21 Mtg. Tr. at 63-66; see also 8.24.21 Meeting Minutes (Doc. 34-3 at ECF p. 14). Next, Bowman determined that it was not necessary to provide Killingsworth with formal guidance to draw districts that are compact and contiguous given that those requirements are already in the Charter. See 8.24.21 Mtg. Tr. at 64-66. The Committee also discussed school attendance zones as something to be considered and Priestly Jackson encouraged Killingsworth to work with the School Board. See 8.24.21

---

Mtg. Tr. (Doc. 34-16) at 57; Priestly Jackson Decl. ¶ 13. Additionally, in her Declaration, CM Randy DeFoor (D14) states that she is "not running for re-election." See Declaration of Randy DeFoor (Doc. 40-19; DeFoor Decl.) ¶ 2. Thus, as to the north and west side of the River, it appears that only Districts 8 and 12, represented by CM Ju'Coby Pittman (D8) and CM Randy White (D12), actually had City Council incumbents running for re-election whose residences needed to be factored in to the redistricting process.

   As to School Board incumbents, Priestly Jackson states in her Declaration that a member of the School Board advised the Committee that "three School Board members whose terms were set to expire in 2022 could nonetheless run for re-election." See Priestly Jackson Decl. ¶ 16. According to Priestly Jackson, "[i]n order to ensure that those individuals could run for re-election, I was committed to drawing lines that would protect their incumbency status." Id. However, as discussed at the August 24, 2021 Committee Meeting, protecting the incumbents running in 2022 was accomplished by not accelerating the redistricting process such that those individuals would face re-election on the then-existing map. See 8.24.21 Mtg. Tr. at 58-59; see also Priestly Jackson Decl. ¶ 15. With regard to the four other School Board seats that are up for election on the new map in 2024, Priestly Jackson stated at the August 24, 2021 meeting that two of those members were term-limited, and two would be incumbents running again. See 8.24.21 Mtg. Tr. at 59. Thus, it appears that at the time of the redistricting there were only two School Board incumbents whose residences needed to be considered in the process.

Mtg. Tr. at 66-67.  Committee members advised Killingsworth that he should prioritize meeting with the Councilmember for District 11 (Danny Becton), as the district with the highest population that needed to reduce, as well as the Councilmembers for Districts 8 (Ju'Coby Pittman) and 13 (Rory Diamond), as the districts that need to gain population.  Id. at 68-69.

Finally, returning to Killingsworth's question regarding the "historic communities," the discussion was limited to the following exchange:

Bowman:          And the only other one that I've got is -- I'm looking for colleagues here -- I mean, to me it is kind of redundant. You talked historic communities. I mean, that, to me, is a community of interest. Is there a difference between -- I mean –

Killingsworth:   So the reason I brought that up, Mr. Chairman, is last time initially we were not asked to look at that. The desire was we want 14 as compact, regular-shaped districts as we can. And that's where we started, and then it went from there. So initially last time we did not look at -- though, I think we recognized long-term. That's probably where we're going. We didn't start from a place of recognizing that we were going to <u>maintain the four historic communities of interest.</u>

Bowman:          Okay. So I think what you told me is that you've got marching orders and are sufficient on that.

<u>See</u> 8.24.21 Mtg. Tr. at 70 (emphasis added).  In the absence of any contrary evidence, and given the prior discussion on starting from existing lines, it appears Killingsworth understood his "marching orders" to mean that he should

-36-

maintain the minority access districts given that his subsequent map proposals all kept those districts as intact as possible.

In the weeks that followed, smaller meetings occurred between groups of Councilmembers in adjacent districts. On September 2 and 7, 2021, Councilmembers for the districts on the south and east side of the River met to discuss proposed changes to their districts. Much of these discussions centered around whether District 2 should cross the River. The Councilmembers discussed similarities and differences in the types of neighborhoods and communities they represent, and whether particular areas fit with the character of one district or another. See, e.g., 9.2.21 Mtg. Tr. (Doc. 40-4) at 3-9, 17; see also 9.7.21 Mtg. Tr. (Doc. 40-5) at 10, 14-15, 24-25, 30, 33-35. The Councilmembers also discussed factors such as whether a particular district had a school, library, or other community center within its boundaries that could serve as a public meeting place. See 9.2.21 Mtg Tr. at 19-22; see also 9.7.21 Mtg. Tr. at 22, 35. Although there was some discussion of demographics, it did not predominate the conversation. See 9.7.21 Mtg. Tr. at 17-19, 26, 30. The Councilmembers in attendance at the September 2 and 7, 2021 meetings ultimately reached the conclusion that it would be necessary for District 2 to include areas on both the north and south side of the River in order to avoid drastically changing those districts in a way that divided communities of actual

shared interests.  Id. at 30-33, 36-38; see Bowman Decl. ¶¶ 21-24; Declaration of Al Ferraro (Doc. 40-21; Ferraro Decl.) ¶¶ 12-14.[23]

The Councilmembers representing the districts on the north and west side of the River also held meetings amongst themselves.  The first such meeting occurred on September 9, 2021, with the Councilmembers for Districts 7, 8, 9, 10, 12, and 14 in attendance, among others.  See 9.9.21 Meeting Minutes (Doc. 34-3 at ECF p. 26).  The meeting opened with a discussion of the population numbers on that side of the River, and the recognition that District 8 had the lowest population and District 12 had the highest.  See 9.9.21 Mtg. Tr. (Doc. 34-10) at 4-9.  Killingsworth provided a map with proposed changes for discussion. See Killingsworth Memo, Map 4 (Doc. 34-4 at 4-5, 11).  Priestly Jackson noted that Killingsworth had provided "a sheet that gave the percentages of the ethno-racial subgroups that are in each."  See 9.9.21 Mtg. Tr. at 9.  The following exchange then occurred:

> Priestly Jackson: And – and – and just to be clear, we don't say minority access districts anymore.  What is our unique term of art –
>
> Killingsworth:      Communities of interest?

---

[23] As discussed above, the Court must determine whether race predominated the line-drawing process for the specific Challenged Districts on the north and west sides of the River.  Thus, this evidence that race did not predominate the discussions between the Councilmembers on the south and east sides of the River has little bearing on the issue at hand.  Nevertheless, when comparing the discussions in these meetings to those that concerned the Challenged Districts, the contrast in the way Councilmembers discussed identifiable "communities of interest" is stark.  These Councilmembers discussed specific facts, identifiable neighborhoods, types of housing, and the location of schools and libraries.

> Priestly Jackson: Communities of interest.  Okay.  And so I just wanted to start with that, and then I think the best way is to kind of go around [and share concerns.]

See 9.9.21 Mtg. Tr. at 9-10.

Killingsworth started by explaining that on this side of the River, "the play comes down to district[s] 2, 7, 8, and 12," whereas "9, 10, and 14 don't have to change at all."  Id. at 10-11; see also Killingsworth Memo, Map 4.  Although, "depending upon what you do with eight, it can impact seven, what happens there could require an impact to two . . . ."  See 9.9.21 Mtg. Tr. at 11.  CM Reggie Gaffney (D7) questioned the need to make any changes to his district, given that his population was within the target range.  Id. at 11-12.  Killingsworth stated:

> So one of the reasons that we looked at seven changing aside from just numbers was—there was a discussion that I heard multiple times about—about the percentages and—and—and how to either keep them the same or reduce some.  And so that played into it as well, the whole percentages of—of minority per district.

Id. at 14.  A few minutes later, CM Ju'Coby Pittman (D8) shared her thoughts:

> So I have had an opportunity to meet with Mr. Howard and Mr. Killingsworth and have looked at map [sic] and looks like if I can pick up some from Councilman White [D12] as well as Councilman Gaffney [D7], that will make me whole. So, you know, I'd like to have a discussion on that.
>
> If -- if Councilman Gaffney wants to stay the same, I don't know how that impacts, but I want to . . . ensure that, you know, the -- the -- what was the -- what was the new word? Community of interest -- [laughter] -- stays and not losing it. You know, the area was looking at on the west side, it may take a little bit to grow and it may not be

> during the next 10 years or so. So I want to make sure that the urban core and just outside of the core that is represented.
>
> So I just kind of need, you know, the -- the support of my colleagues and what they're willing to give up to make me whole, and that's kind of what we're here today.

See id. at 16 (emphasis added).  Dennis (D9) shared his position next and stated that he was satisfied with his population numbers and had no desire to change. Id. at 17.  Priestly Jackson then gave her view of District 10.  Id. at 17-18.  After noting that District 10 was also within the target population range, she stated:

> I have always maintained since I was elected that district 10 is extremely diverse with half of the district in the Southwest and half of the Northwest. And as Jacksonville becomes more ethno-racially diverse, district 10 reflects that.
>
> I have zero desire to change, I am not interested in increasing any specific communities of interest ie African Americans or any others in that group. I don't want them packed into district 10. We are currently at 58 percent and I think that that's a good number. It can go down, but again, I -- I -- I'm very satisfied with district 10 as it currently exists . . . .

See id. at 17-18 (emphasis added).  CM Randy White (D12) spoke next, acknowledging that he had the highest population for the area and would need to reduce his population.  Id. at 19.[24]  CM Randy DeFoor of District 14 then

---

[24] After White spoke, he and Priestly Jackson had the following exchange:

| Priestly Jackson: | And I just want to tell you that you are [a] beacon because you have the most ethno-race diverse district on our side. So you have 52 percent white neighbors and 30 percent African American neighbors and you also have 11 percent Latino neighbors and 4 percent Asian. |
|---|---|
| White: | There's—there's something to that. |

shared that she liked her current boundaries, but was open to expanding into the Argyle area "just because they get tired of having so many representatives . . . I go to their meetings and kind of feel bad for them. . . . [T]hey feel like they're in so many different. They don't—they get overlooked." Id. at 20.[25]

Later on in the meeting, Priestly Jackson spoke about the Committee's previous decision to minimize River crossings and her understanding that, as a result, the districts on her side of the River only needed to be concerned with resolving the population deficiency of District 8, and those districts south of the River would work within their own parameters. Id. at 24. Priestly Jackson stated that she was "particularly cognizant of not packing any more minorities in 7, 8, 9 or 10," and noted that "with certain scenarios, council member Pittman currently has the largest percentage of African American. She has 68 percent." Id. at 25. She went on to say:

> Seven has 60 percent -- seven has 60 percent, nine has 57 percent, and 10 has 58. Why do I know these numbers? I came on the school board during the No Child Left Behind era. So all we did was just navigate numbers back and forth. Well, there's no racial identities. So our goal would be to get everybody, you know, down to 60 percent or below and I think we can do that because that is unfair to our neighbors that they are packed in one particular group, particular

---

Priestly Jackson:        That is magic.

Id. at 19-20.

[25] In the 2011 map, parts of Argyle fell within Districts 9, 10, 12, and 14. The Enacted Map does attempt to address DeFoor's concern in that District 14 expands by taking part of the Argyle area from District 12. In her Declaration, DeFoor asserts that "[k]eeping the Argyle community in one district was the most important factor leading to my advocacy for District 14's new boundaries." See Declaration of Randy DeFoor (Doc. 40-19; DeFoor Decl.) ¶¶ 8, 14.

> is Jacksonville continues to ethnoracially diversify. So that -- that
> any other –

<u>Id.</u> at 25-26 (emphasis added).  In response to a suggestion that perhaps areas

of 12 could be moved into 9 and 10, Priestly Jackson responded that:

> What happens if you try to change 9 and 10, you run the risk of
> further packing minorities, African Americans in there and we need
> to be moving away from that.  <u>You can keep majority as much as
> you can as a community of interest</u>. But in 2021, we must be
> cognizant of perceptions of packing African Americans in any
> district because it further dilutes their voice and vote throughout
> the rest of the city. So that was one of the issues and one of the
> scenarios for us to consider it. Yeah.

<u>See</u> <u>id.</u> at 26-27 (emphasis added).

The conversation moved on from there to address potential areas that

could be moved into District 8 to resolve its population deficit.  White (D12)

stated his opposition to the proposed map because it split the Town of Baldwin

explaining that "I really don't think a small town of 638 people should have two

district councilpeople."  <u>Id.</u> at 29.  Gaffney also expressed his opposition to the

map because of the large chunk on the west side of his district that was being

moved into District 8.  <u>Id.</u> at 30-32.

Killingsworth then noted a proposed change in the downtown area where

Districts 7, 8, and 9 meet.  <u>Id.</u> at 32.  Killingsworth's proposal moved a portion

of District 8 in a "principally African American" area around Myrtle Avenue to

District 7.  <u>Id.</u>  He explained that moving that population from District 8 to

District 7 accomplished two things: "It balanced you [Gaffney] out.  And it also

lowered the minority to for [sic] council district eight is 64 percent as opposed to 68 percent." Id. at 33.  Pittman immediately opposed this change: "I'm not willing to give that, so you know, based on our conversation." Id.[26]  She also stated that she does not "want all the way to Baldwin.  That doesn't make sense, you know." Id. at 34.[27]  The conversation continued with discussions of areas that Councilmembers would be willing to give up to meet District 8's population needs with most Councilmembers expressing a desire not to change anything about their districts.

Towards the end of the meeting, Killingsworth asked for clarification:

So one of the things when I met -- so I met with everybody here individually and was -- and I spoke with Ms. Pittman this morning, and she's okay with her district staying at 68 percent but I heard from some that perhaps that number should come down.

And one of the reasons we crossed right here was to help bring those numbers down to 64 percent. Is that a concern or is it not a concern?

---

[26] In summarizing the position of the Councilmembers later, Priestly Jackson appears to reference this as having been Pittman's position because "she did not want to lose her poor area." Id. at 44.

[27] In her Declaration, Pittman explains that she did not want the City of Baldwin because it:

> would not fit the community of interest in that Baldwin is heavily Republican whereas the surrounding areas of District 8 are more Democratic.  In addition, the Council member [sic] in District 12 is already very familiar with Baldwin, and I believe that is important for all citizens of Jacksonville—not just those in District 8—to maintain continuity of representation and have a good relationship with their representatives.  In addition, District 8 is one of the geographically larger districts with a diverse mix of urban, suburban, and rural areas, which requires several types of community meetings on a regular basis.  Adding the concentrated population area of Baldwin would require another set of regular meetings to adequately represent and serve the population.

See Declaration of Ju-Coby Pittman (Doc. 40-27; Pittman Decl.) ¶ 18.  She does not, however, address her opposition to the Myrtle Avenue change.

-43-

Because if it's not a concern, I won't look at that and quite frankly, that solves a big problem.

See id. at 57-58.  Priestly Jackson responded:

I would just speak on behalf. I -- I think the 68 percent of minority concentration in a district is -- is challenging and problematic. It's . . . kind of packed whether intentional or not, I would like to see what those numbers are with the populations that everybody said that they could still consider if it brings it down some, I think it's incumbent upon us as Jacksonville ethno-racially diversifies and grows, then we make certain all districts are doing that and we don't unfairly pack any ethno-racial minority in a -- in a district. So for me, you know, and I don't think Councilwoman Pittman has an issue with people, but if she's 68 and we have seven at 60 and nine is at 57 and mine at 58, we need to try to bring it down. We -- we have an obligation to try to look at bringing that down, particularly as Jacksonville becomes ethno racially diverse.

Id. at 58-59 (emphasis added).  Killingsworth appears to have understood from this that he should focus on equalizing the population based on the discussions at the meeting, and the Councilmembers would then decide what they thought about the racial percentages.  Id. at 58-59 ("Okay.  So what you want to do is see the right number of people in the right boxes and then you'll decide how you want to decide.").  Priestly Jackson continued: "And the reality is communities of interest are ethno racially diverse [in] Jacksonville now, and they should be. So I would say an ethno-racially diverse neighborhood does not want to be separated or split up or anything else. That's -- that's ideally what we're looking and better together."  Id. at 59.  At this point, Priestly Jackson asked for everyone to go around and state what areas they were willing to put into play.

-44-

DeFoor (D14) responded by stating that she would prefer not to change her district but if there "has to be changes in 10 and nine," that would impact her district, she would be willing to look at giving up the area north of College Street, if she could then gain in the Argyle area. Id. at 59-60. Pittman (D8) and White (D12) discussed some potential changes along their shared border. Id. at 60-61. Priestly Jackson (D10) stated that she was willing to make "negligible" tweaks along the edges, id. at 61, and Dennis (D9) repeated his desire not to change. Id. Interestingly, he also noted that he supported Pittman "about that Myrtle Avenue because that's been historically in eight just like [Grand] park has been historically in nine. And so . . . I support her on, you know, on keeping that area and I'll be the same way about [Grand] Park . . . ." Id. at 61-62.

This group met again on September 23, 2021, and considered three map proposals from Killingsworth. See Killingsworth Memo, Maps 7, 8, and 9 (Doc. 34-4 at ECF p. 14-16); see also 9.23.21 Mtg. Tr. (Doc. 34-11). The discussions centered around how to increase District 8's population. As different areas were considered, Killingsworth provided the statistics regarding the number of Black and White people in each area, as well as the number of Democrats and Republicans. See, e.g., 9.23.21 Mtg. Tr. at 18, 20-24, 38-39. At one point, Priestly Jackson commented to Killingsworth that:

> I appreciate the ethnoracial identifiers. I'm not as focused on that
> I do think it's—it's—it's we're trying to make certain that we don't
> disproportionately pack any districts with any ethnoracial

minorities or groups. I am concerned and wanted consideration of what we know in terms of the registered voters in that area.

Id. at 27-28.  At that time, much of the discussion centered on areas along the border between Districts 8 and 12.  Pittman rejected out of hand a map proposal moving the Town of Baldwin entirely into her district so the focus was on the areas along their shared border west of Otis Road in the Chaffee Road area.  See id. at 7-8; see also Killingsworth Memo, Map 7 (Doc. 34-4 at ECF p. 14).  White expressed his opposition to losing certain areas along the border reflected in two other proposed maps.  See 9.23.21 Mtg. Tr. at 8-9; see also Killingsworth Memo, Maps 8-9 (Doc. 34-4 at ECF p. 15-16).  As different pieces along their border were considered, Killingsworth provided the statistics for the White, Black, Democratic, and Republican populations in each area under consideration.  See 9.23.21 Mtg. Tr. at 9-29.  At one point, after White expressed his willingness to accept certain changes, Pittman responded as follows:

> Right. I mean, I still like to have a discussion so we can go back. I mean, as of today because it makes the numbers right but I want to make sure that he's comfortable and I'm comfortable in terms of the ethnoracial black and white.

Id. at 29-30 (emphasis added).  Priestly Jackson immediately cut her off:

> MS. PRIESTLY JACKSON: [talking over each other] Can't use the ethnoracial identifier, so we going to talk about some of the party stuff that we want, but we just have to be very -- very clear for our communities of interest that we're identifying that.

Id. at 30.

The conversation then turned to the proposed changes along the border of District 7 (Gaffney) and District 2 (Ferraro). Gaffney expressed his displeasure with the area of District 2 that Killingsworth had proposed to move into District 7. Id. at 31-33. Although Gaffney did not want to take anything from District 2, Killingsworth explained that it was necessary to achieve the equal population goals. Because the districts on the south side of the River had more people than those on the north, to help balance the population numbers, District 2, which crosses the River, needed to take in more people from south of the River. In order to have room to do that and stay within the target population, District 2 needed to give some of its population north of the River to District 7. See id. at 33-35, 40. As the CMs weighed this proposal, Killingsworth provided the Black, White, Democrat, and Republican population statistics for the piece under discussion. Id. at 38.[28] Understanding that he would need to take some population from District 2, but unhappy with the current proposal, Gaffney asked Killingsworth to "go up this line right here and see what community I can pick up . . . . [A]nything on the border line straight up this line right here, okay,

---

[28] Killingsworth initially stated only the number of Black and White people in that area. Priestly Jackson and Gaffney then asked:

| Priestly Jackson: | "Do you have the party registration that's—that actually is more germane, I think then—" |
|---|---|
| Gaffney: | "Can you get the party breakout?" |

Id. at 38.

that may make the numbers work.  Okay?"  Id. at 42.  Priestly Jackson also acknowledged the need for District 7 to take population from District 2 due to the ripple effect south of the River and added:

> Now that's what we have to do that's -- that's so, but I think what Councilman Gaffney's concerns are, if you are going to put 3,300 new individuals in seven, and those are 3,300 new individuals in that are leaving two, he is concerned about the overall impact his district for those numbers in terms of who they are and familiarity.

See id. at 43 (emphasis added).

The conversation then returned to the portion of District 7 that Killingsworth's proposals had moved to District 8 and whether it would alleviate some of his concerns to take that portion back.  See id. at 45-46.  DeFoor offered:

> Put the piece that's taken out from Pittman. Say, put that back, you give that back. Right? So we solve that, that one goes back in with the new D what is his total numbers? What are his breakdowns in terms of Republicans versus Democrats? That's what you want to know. That's that's what you want to know. Let's just cut to the chase. That's what you want to know.

See id. at 46 (emphasis added).  But White (D12) raised his concern about that idea if it would necessitate giving up more of his District 12 to District 8 to reach District 8's population goals.  Id. at 49, 55.

The Councilmembers discussed the give and take on the population numbers of proposed changes to Gaffney's district.  At one point, Gaffney expressed concern about the partisan impact on his district if he were required to lose area to District 8 and gain area from District 2.  He stated:

-48-

> Well, you know what? I might need to keep that if I look at the demographic, <u>if I'm going to pick up as how a highly Republican disciplinary [ph] and maybe this might be 50-50 to make sure the numbers work</u>, I may be -- I may be like on the . . . east side of the water now that <u>my numbers might be a little higher than y'all demographics may still work</u>. I don't know.
>
> So I think -- I think Mr. Killing[s]worth my -- my ask for you is take a look at this again for me, what I gave up and then when you and I and Mr. Ferraro meet, we can figure out either this community or one of these communities up here. So that would allow him to keep this, that that could be if he's willing to give up something and, you know, we may come back and it might be enough, but hopefully that working out for both [sic].

<u>Id.</u> at 53 (emphasis added).  The meeting ended with further exploration to be had regarding changes to the borders between Districts 12 and 8, Districts 7 and 8, and Districts 7 and 2.

A meeting of the full Redistricting Committee occurred on September 27, 2021, to provide everyone with a status update on the process.  <u>See</u> 9.27.21 Mtg. Tr. (Doc. 34-12).  At that meeting, Chairperson Bowman (D3) provided the following summary:

> I think from perception and where I see we are today, is that the south of the river is far more populous than the north of the river, so where we are is we needed, the smartest thing to do is probably make District 2 give up some of its property, an area above the river, north of the river; otherwise, it would probably be a domino effect that all eight districts south of the river would have to have some major moves of their district borders and different communities. So I think we've got work between District 7 and 2 -- 7 abuts 2, so I'm hoping that District 7 and 2 can agree on where they make those new lines go. District 7 will grow a little bit. District 2 will reduce in size a little bit.

> On the other side, up in the north side as well of the river, we've got District 8 has to grow and the likely donor is going to be District 12, so if we can get District 8 and 12 to agree on the shifting of those boundaries, then I think we're actually in a position that we're going to be in pretty well alignment with everybody being positioned to do the legislation . . . .

See 9.27.21 Mtg. Tr. at 7-8.  Killingsworth also provided an update on the status

of his work:

> My understanding is Councilmember Gaffney believes that this area might make a more closer aligned community of interest to his existing district or maybe continuing up on 17 there may make a more closely aligned community of interest with his existing district than the piece to the south, so that discussion is going on.

> I expect to meet with Councilmember Gaffney sometime this week. My expectation is if we can find a community of interest that meets the numbers that we have to have so that we can have that little area, some little area from the north push down and add about 4000 people south of the river, if we can come to a compromise with Councilmember Ferraro and Gaffney, and my expectation is if we can find something that works for Councilmember Gaffney for the same reasons it works for Councilmember Gaffney, it would work for Councilmember Ferraro.

> So that's one area that is under negotiation, but in general I think the map is a close approximation. I would also say that this area as of Thursday was an area that Councilmember Pittman said she doesn't really think Baldwin fit her community of interest that's in her district, so we're really trying to find something in here that meets the population numbers in terms of 12 giving up and 8 getting; that also meets a community of interest that Ms. Pittman believes fits her district.

> It may result, depending upon what happens here, in some compromise having to be made here, but at this point, I do not know that and I am hoping that just on the line between 8 and 12 and 7 and 2, a compromise can be made, in which none of the other districts are affected. If that can happen, then other than little changes that

may result along the edges, I believe the 14 council district maps would be largely done.

See 9.27.21 Mtg. Tr. at 11-12.  White (D12) again expressed his opinion that having agreed to provide two areas to District 8, he was not amenable to ceding any more territory.  Id. at 12-13.  Killingsworth explained that the two areas moved from District 12 to District 8 were not sufficient for District 8 to reach its population goals and White suggested that District 8 needed to look to its border with District 7, rather than returning to take more from District 12.  Id. at 13-14.  The discussion then turned to the logistics for further negotiations.

The north and westside districts met again on October 4, 2021.  See 10.4.21 Mtg. Tr. (Doc. 40-6).  At this meeting, DeFoor (D14) offered to give Gaffney (D7) the Riverside area at the north end of her district.  See id. at 4. She explained that "Riverside is more in line with Brooklyn and Springfield than it really is with the rest of my district," noting that "the voting is very similar in all of those areas." Id.[29]  Based on this proposal, Gaffney was willing to cede more area on the west side of his district (Rolling River) to District 8.  Id. at 9.  Gaffney's concession would have made it unnecessary for District 12 to give any areas to District 8, and instead, District 12 could give a piece of its area

---

[29] In her Declaration, DeFoor mentions this proposal and states that she "was referring to the political affiliation of the persons living in that area as support for why it may be more appropriate in District 7." See DeFoor Decl. ¶¶ 17-18.  She does not address why the proposal was not pursued further.

to District 14.  Id. at 8-9, 10-11, 15.  Bowman expressed concern that this proposal would not work because District 7 needed to take population from District 2, id. at 12, and DeFoor said she would talk to Killingsworth about her proposal. Id. at 12-13.

By the next meeting, on October 21, 2021, these Councilmembers had reached an agreement.  See 10.21.21 Mtg. Tr. (Doc. 34-13).  Killingsworth explained that with regard to the border of Districts 7 and 2, Gaffney had found a "population" along the border that he felt was "more appropriate in his district" than the area previously proposed.  Id. at 3-4.[30]  In addition, an

---

[30] In his Declaration, Gaffney explains that he rejected the initial proposed change along the border with District 2 because it was a "highly Republican area." See Declaration of Reginald Gaffney (Doc. 40-23) ¶ 20.  He then states: "I had concerns that absorbing a highly Republican area into District 7 would not be a good fit.  However, I was told that the area was evenly split between Republicans and Democrats." Id. ¶ 21. Gaffney's meaning here is unclear as he does not identify the evenly split area to which he refers.  In the next paragraph he states: "Ultimately, the area gained by District 7 included what I considered a community of interest which fit within the District, including more of the Oceanway area, which was already in the District." Id. ¶ 22.

The Court notes that Gaffney's reference to Oceanway as a community of interest for his district conflicts with statements Ferraro (D2) made at one of the first Committee meetings. See 9.2.21 Mtg. Tr. (Doc. 40-4) at 8-9.  At that meeting, Ferraro specifically noted that his constituents in Oceanway had complained that "it was kind of divided in half to where what happened in Springfield [District 7]—which it's not bad; it's just two different types of living— it doesn't really kind of work with the Oceanway area." Id.  "So the Oceanway and the Black Hammock Island and all of that, they were asking when redistricting happened if we could kind of join it instead of splitting it like it was." Id. at 9. Rather than alleviate these concerns, the Enacted Plan apparently exacerbates them—further dividing the Oceanway area by moving more of it into District 7, where what was described as a different type of community, Springfield, is located.  Indeed, at one of the public hearings held later in the process, a member of the public complained about this specific change. See 2.10.22 Public Hrg. Minutes (Doc. 34-3 at ECF p. 77).  Her comments directly contradict Gaffney's representation that this area was a "community of interest" that fit in District 7.  As summarized in the minutes, the commenter "expressed concern about the change in District 2 assigning Yellow Bluff Landing to District 7, which she sees as an example of packing of Black population into District 7 unnecessarily and splitting the neighborhood from the adjacent more similar neighborhoods in the Yellow

agreement had been reached that District 7 would provide to District 8 the areas both east and west of New Kings Road.  Id. at 4.  As a result, District 8 did not need to take any population from District 12.  Id. at 4.  District 12 then had room to give, so an area of District 12 was moved to District 14, "which was an area that 14 thought the community of interest was more in line with their district." Id.  DeFoor (D14) explained that the Argyle area was added to her district to address complaints from people living there that they had four representatives and would like to be more consolidated.  Id. at 6.  DeFoor's previous proposal to move Riverside into District 7 had apparently been abandoned and there was no discussion regarding that proposal at this meeting.  Id.[31]  The remainder of the meeting was devoted to a discussion of the process moving forward.

---

Bluff corridor.  Keeping that neighborhood in District 2 represents a unified community of interest."  Id. (emphasis added); see also 2.10.22 Public Hrg. Tr. (Doc. 40-9) at 23-25.

      Nevertheless, Gaffney states in his Declaration that "the changes along the border of District 2 and District 7 were driven solely by the political makeup of the potential constituents."  See Gaffney Decl. ¶ 23.  He states that he "agreed to the final border between District 2 and District 7 because District 7 would maintain a strong Democratic population while making other districts whole with an acceptable population deviation."  Id. ¶ 25.  Notably, in his Declaration, Ferraro acknowledges that "there were several proposals to equalize District 7's population, which included moving constituents from District 2 to District 7," see Ferraro Decl. ¶ 15, but does not address the reasons why any particular area along the border was or was not chosen.

     [31] In the Reply, Plaintiffs cite the rejection of DeFoor's proposal as evidence that race predominated over partisanship because DeFoor's proposal would have moved a heavily White and Democratic area into District 7, but instead District 7 gained a less Democratic area with a higher Black population.  See Reply at 5-6.  However, as discussed at the Hearing, the Court cannot draw this inference.  The record reflects that the more likely reason DeFoor's proposal was not adopted, as Bowman stated at the time, is that it did not resolve the population problem at issue—District 7 needed to take population specifically from District 2.

The full Committee met on October 28, 2021.  See 10.28.21 Mtg. Tr. (Doc. 34-14).  Becton (D11), as Vice Chair, led the meeting because Bowman was not in attendance.  See 10.28.21 Mtg. Minutes (Doc. 34-3 at ECF p. 52).  The meeting opened with a presentation from Killingsworth on the proposed changes to the districts, see 10.28.21 Mtg. Tr. at 4-14, followed by public comment, id. at 15-20.  Becton then gave a brief presentation in response to the public comments:

> I want to point out that the fundamental principles for which redistricting is based on is looking at areas that, number one, are contiguous, number two are compact, and number three have communities of interest, which could be economic or social.
>
> And number four is to consider natural boundaries and borders and entities like water bodies, subdivision boundaries, major roadways, . . . geographic population distribution. Also considered, I've heard among my colleagues, is wanting public facilities like libraries and schools within geographic areas.
>
> And also to be considered in those principles, and -- and all of these are not necessarily in any particular order, but is to consider existing incumbencies and that is to include city council and school board. Populations must be within a plus or minus 10 percent deviation from the least to the highest population. And when in regards to political parties, even though you really haven't heard that discussion, it isn't improper to take that into account.[32]
>
> And -- and also at the core of redistricting is -- is not to consider the -- the primary purpose of consideration as to be race, gender or

---

[32] Plaintiffs cite this statement as evidence that partisanship was not a redistricting criterion.  See Motion at 11 n.13.  The Court is not convinced.  Becton represents District 11 and was not at any of the member-to-member meetings between the north and west side Councilmembers.  Thus, his comment that "you really haven't heard" much discussion of political parties may well be true with regard to the negotiations on the south side of the River in which he was involved.  But, it cannot be understood as a comment on the negotiations that were happening around the Challenged Districts, especially given the political party discussions that are recorded in the transcripts of those meetings.

economic status. And we cannot dilute or enhance the interests of racial minorities.

But given the traditional districts that we've had seven, eight, nine, and 10, which were formed in 2000, redistricting, while those can be modified based on the new census data, there is a fine line between the Voting Rights Act and the Equal Protection Clause that we may -- that we go back and we can't consider race, gender or economic status as a sole reason for doing that.

But -- but given that these were grandfathered, the general counsel has told us that that can be defended. So in our very first meeting, we set out directives to Mr. Killingsworth as he drew the map that we were going to use total population versus - - versus voting age population. We gave him the instructions to minimize river crossings and we also . . . directed the process not to start from scratch, but to use existing districts and expand and shrink.

So that just kind of summarize how this -- this process fundamentally was walked through and -- and the instructions given to the staff in terms of how the maps have been drawn -- and to the comments that I've already heard, that certainly they've done an outstanding job in -- in the short amount of time that they've had, given the -- the lateness that we got the census data to get us where we are here today.

See 10.28.21 Mtg. Tr. at 20-23 (emphasis added).  The rest of the meeting was devoted to discussion of the procedures going forward and what would be included in the legislation.  The Committee voted to adopt the maps presented at the meeting and authorized the OGC to begin drafting the necessary legislation.  The Committee met again on December 6, 2021, to approve the draft legislation.  See 12.6.21 Mtg. Tr. (Doc. 34-15).  The discussion at this meeting

centered on the timelines going forward and the content of the draft ordinance itself.[33]

### 3. Rules Committee

The draft ordinance then moved to the Rules Committee which held four hearings at various locations throughout the City for public comment.  See Public Hearing Notices and Minutes (Doc. 34-3 at ECF p. 60-85); Public Hearing Transcripts (Docs. 40-7; 40-8; 40-9; 40-10).  The minute entries from these public hearings reflect that members of the public repeatedly raised complaints about racial gerrymandering and racial packing in Districts 7, 8, 9, and 10.  See Public Hrg. Minutes (Doc. 34-3 at ECF p. 63-85).  The public complained about the packed districts and the fact that the effect of such districts is to dilute minority influence in the rest of the City.  A few noted the need for a functional analysis

---

[33] Notably, at this meeting, there was a conversation about the presence on the proposed map of a table with the breakdown of the White and Black populations and percentage of Black people.  See id. at 18.  The representative from OGC explained "that's what's been done before. That's what code requires to be included the table with the map."  Id.  Becton questioned the presence of the table given that "it just feels like we're continually making it a—a predominantly priority by putting it out there."  Id. at 19, 25.  Initially, the Committee asked Killingsworth to take the table off the map itself and attach it as an exhibit, but later the decision was made to put the table on the bottom of the map.  Id. at 25-30, 39-40.  The Committee also decided to add more demographic data to the table to track the census information.

Plaintiffs cite Becton's comment at the meeting as an acknowledgment of racial predominance, see Motion at 2, but the Court does not draw that inference from his remark. In context, Becton's comment appears to reflect his belief that race had not predominated the process and by including the table on the map it would give the incorrect impression that it had.  And indeed, in his Declaration, Becton explains that he "was concerned that the inclusion of narrow racial categories on the proposed maps made it inadvertently appear that the Committee was considering race."  See Becton Decl. ¶ 28.

of minority voting.  Some speakers also complained about the overemphasis on protecting incumbents.

Significantly, at the February 10, 2022 Public Hearing, Plaintiff Rosemary McCoy, President of the Harriet Tubman Freedom Fighters (HTFF), addressed the Committee and stated that the ACLU, Northside Coalition, NAACP, and HTFF had "sent a detailed report to the City Council members earlier today" from an expert analyzing racial voting patterns in Jacksonville. See 2.10.17 Public Hrg. Minutes (Doc. 34-3, ECF p. 78).  McCoy presented a letter from these organizations, along with the expert report, to the Rules Committee at this Public Hearing.  See Declaration of Rosemary McCoy (Doc. 34-28; McCoy Decl.) ¶ 6.[34]  In the Letter, the authors acknowledged the need for the City Council to comply with section 2 of the VRA as well as the Constitution's prohibition against racial gerrymandering.  See 2.10.22 Letter at 2.  The authors explained that they commissioned an expert, Dr. Hannah L. Walker, to perform a racially polarized voting analysis of Jacksonville, as well as "a functional analysis of the level of Black Citizen Voting Age Population (BCVAP) that a district would need for it to usually allow Black voters the opportunity to elect candidates of their choice."  See id., Ex. A at 1-2, Ex. B: Walker Report. According to the Walker Report, the level of BCVAP on average that would be

---

[34] McCoy attaches the letter, as well as the expert report, to her Declaration submitted in this action.  See id., Ex. A: 2.10.22 Letter; Ex. B: Walker Report.

necessary to allow Black voters to elect the candidate of their choice was 41 percent.  Id., Ex. A at 2.

Given these findings, the authors of the Letter asked the Rules Committee and City Council to "redraw the currently proposed neighborhood seat plan such that Black voters are properly and lawfully represented in the final plan."  Id. The authors observed that "[i]n the last two public hearings, many residents expressed concern about what appears to be the intentional and unnecessary packing of Black voters into proposed Council Districts 7, 8, 9, and 10; and School Board Districts 4 and 5."  They implored the Committee to "create districts that avoid this overconcentration of Black voters and the representational and legal problems that would follow."  Id., Ex. A at 1.

Notably, given the concerns raised at the February 10, 2022 Public Hearing, Priestly Jackson stated that she would have a presentation at the next meeting on the history of how the current districts came to be.  See 2.10.22 Public Hrg. Minutes (Doc. 34-3 at ECF p. 78).  But, as one of the public commenters pointed out at the next meeting, no such presentation happened. See 2.17.22 Public Hrg. Minutes (Doc. 34-3 at ECF p. 84).  At the conclusion of the February 10th public hearing, Priestly Jackson informed those in attendance that the Rules Committee was debriefed every Monday morning on what occurred at the public hearings and that "all comments and concerns

raised will be documented and presented to the Council." See id. (Doc. 34-3 at ECF p.84-85).

After all the public hearings had concluded, the Rules Committee held a meeting on March 15, 2022, at which the Committee approved the Ordinance six votes to one. See 3.15.22 Mtg. Tr. (Doc. 34-16) at 66. Before the vote, the Rules Committee heard from the OGC on the legal requirements for redistricting and the process going forward. Killingsworth made a presentation on how the proposed maps were developed, and then Priestly Jackson, the Rules Committee chair, opened the meeting up to comment from the committee members. CM Rory Diamond (D13) spoke first and observed that his constituency at the beaches would be pleased with the map but that he had concerns about the process. See 3.15.22 Mtg. Tr. (Doc. 34-16) at 37. He explained:

> As far as process goes, I don't love that we started with the original map and protecting incumbents really had no value in my mind. In fact, I felt very strongly that we should not have that as a focus, but rather to draw a map that represents neighborhoods and keeps them together. And so I'm likely a no today, but I'm certainly going to listen to the rest of my colleagues.

Id. DeFoor (D14) stated that she shared some of this frustration and then asked "[i]f there is a lawsuit, which I suspect there might be on these maps, will we prevail?" Id. at 38. Paige Johnston of OGC responded that the OGC was "comfortable with the process so far and with the maps that have been generated

and the legal advice that have [sic] been given.  So we feel strongly . . . that we're comfortable with this from a legal perspective if we're sued, then we will defend it and likely prevail." <u>Id.</u>

Bowman spoke next and responded to Diamond's concern about preserving the districts by noting that their actions also would impact the School Board Districts and that "we could have put ourselves in a situation where we would have had 100 percent new council members and I don't think that would have served the public any good as well as impacting the school districts." <u>Id.</u> at 39-40.  Bowman and Killingsworth also clarified that the desire to protect incumbents did not actually play a role in the redistricting process at all, other than in the drawing of At Large Residence Area 3, where 4 candidates were running to fill the seat of a recently deceased Councilmember. <u>Id.</u> at 40.  Dennis (D9) responded to the concern about starting from existing Districts by pointing out that:

> If you look at the entire process, we were at a disadvantage, because I know when I was chair of the redistricting committee, I wanted to start from scratch. . . . [B]ut as you know, we didn't receive the—the numbers, the census data, until late.  And so there were time constraints that we were up against.  And so I think that we ended up going with the current map and making sure that we—we stayed in the margin of error as it related to—relates to the law . . . up or minus populations. . . . [I]t's probably not the—maybe the most ideal, how everybody might have wanted it, but I think the outcome is—is a good outcome with a lot of compromise.

<u>Id.</u> at 40-41.  Several other Councilmembers spoke in support of the maps, complimenting the strong leadership and the transparency of the process.  <u>See</u> <u>id.</u> at 42, 45, 46-49.  DeFoor later echoed Dennis's remark about getting the census data late.  <u>Id.</u> at 48 ("And I too, it was a difficult process, because of the fact that the numbers weren't given to us until late.").[35]

Priestly Jackson spoke last.  She opened her remarks by sharing that when she ran for City Council, she wanted to be Chair of the Rules Committee specifically for redistricting because she "wanted to make certain that the community that I represent had a seat at the table and that <u>those historic gains</u> <u>that had been made were not lost.</u>"  <u>Id.</u> at 50 (emphasis added).  She acknowledged some of the criticisms they had received from the public and then gave a speech directed at the allegations of racial packing in Districts 7, 8, 9, and 10.  <u>Id.</u> at 51-60.  She first observed that these concerns had not been raised during "the redistricting special committee meetings chaired by Councilmember

---

[35] The Councilmembers reliance on the late census data as the reason for their decision not to start from scratch is curious.  The deadlines for the City Council to act are set forth by City Ordinance and run <u>from</u> the publication of the census.  <u>See</u> Code § 18.109 (giving the council 8 months "after the official publication of the census" to enact a plan); <u>id.</u> § 18.106 (requiring the Redistricting Committee to transmit to the City Council a proposed plan "[n]ot later than 150 days after the census is published").  As such, the eight-month timeframe provided in the City Code for redistricting was not impacted by the late arrival of the census data.  Early on, the Redistricting Committee considered trying to expedite the process to finish in time for the August 2022 School Board elections and decided against it.  And indeed, the City Council used nearly the full eight-month period to enact the plan.  Notably, the City makes no mention of the late census data in its Response, and neither Dennis nor DeFoor mention the late receipt of census data in their Declarations.

Dennis." Id. at 51-52.[36]  In addition, she asserted that these concerns did not come up in August of 2021 when the Redistricting Committee chaired by Bowman first met.  According to Priestly Jackson: "It didn't come up at that time and at the very first meeting, a motion was made by Councilmember Dennis that we operate from the districts as they were and let me tell you why I feel that that's been germane to this entire process."  Id. at 51.  She explains:

> There are 267,769 neighbors in the census count before we redistrict in districts seven, eight, nine and ten.  I went back to look through constituent concerns and neighbor's emails to see if any neighbor in district 10 raised an issue to me about the percentage of African Americans in their district and I did not find an email. Not one. Not one.  Again, for the five months that Councilmember Dennis had the committee, the concern didn't come up, so when the issue was raised in late September or October, relative to were African Americans being disproportionately packed into certain districts, I was surprised and shocked by the question, because it hadn't been raised . . . .  So on August the 18th when we met, it wasn't an issue for me.  So saying -- when I said during Councilmember Dennis' tenure as redistricting chair and I restated during Councilmember Bowman's, I am comfortable with my district as it is, it was because I know the neighbors and I had no one make concerns or raise those issues.
>
> No one. Because let me be clear with you. Had that come up, that would have required Councilmember Dennis, Councilmember Gaffney and Councilmember Pittman and I to meet with those 267,769 neighbors to see how they felt.

---

[36] As noted above, the parties make no other reference to these earlier Committee meetings.  Priestly Jackson states there were "five meetings over five months," but records of those meetings are not in evidence.  Id. at 52.

But it didn't come up. So I was shocked by the concept of packing in the districts, because here are the historical numbers.[37]

| Districts | 1990 Census | | 1991 | | 2001 | | 2011 | |
|---|---|---|---|---|---|---|---|---|
| | Black | White | Black | White | Black | White | Black | White |
| 7 | 66.1 | 33 | 63.5 | 35.6 | 68.8 | 26.1 | 63.9 | 31.7 |
| 8 | 86.5 | 13.2 | 72.7 | 26.7 | 66.4 | 31.2 | 68.3 | 28.5 |
| 9 | 69.8 | 29.2 | 63.2 | 35.2 | 58.4 | 35.7 | 58.4 | 33.9 |
| 10 | 65.8 | 33.5 | 62.7 | 35.1 | 58.3 | 35.5 | 57.4 | 34.5 |

Which brings us to where we are now. With the decision being made to leave the districts that were the southwestern portion and northwestern portion of the districts seven, eight, nine and ten, largely unchanged, after the historic numbers that I just shared with you and the gradual decline, my focus, I will be quite candid, was we would try to not pack anymore [sic] African Americans in the district.

We would try to increase the level of ethnoracial diversity of Jacksonville, but I was ever mindful and cognizant of the ladder that I climbed on that created opportunities for many that sat on the council before me.

And again, we hadn't had an issue or a concern. So when we said we wanted to leave the districts the same, I can speak for one council member from one of those districts. It was because there were no concerns articulated.

My understanding, similarly, with Councilmembers seven and eight and nine were they did not hear concerns articulated about the percentage of African Americans in those districts.

We have something called residential segregation in Jacksonville and over 40 percent of the African Americans live in the northwestern portion of Jacksonville. Those are the facts. Those are

---

[37] Although Priestly Jackson read these statistics as part of her speech, for ease of reference the Court has created this chart based on the numbers she cited in her speech. Priestly Jackson represented that these numbers were the percentage of Black and White population in each district, starting with the data from the 1990 census, followed by the statistics after each redistricting cycle.

the facts.  And is it time for us to look at some other way of doing it? Perpaps.  <u>But to make an argument now that historically, you know, this council did something inconsistent with the trends, is disingenuous at best and just not supported by the record</u>.

And again, if I knew it was an issue, I don't know that Councilman Dennis nor I have a history of running away from a fight or a battle we would have raised it, but it wasn't raised then.  <u>It wasn't raised at the process at that time. And so I believed that you did no harm. Do no harm by what? The districts are as they are. Neighbors are not complaining</u>.

I am happy going southwest and northwest. That's what we will do. And so I operated from that premise. <u>I didn't operate from any other premise of incumbency. It doesn't matter to me</u>, I'm not running for district 10 again, [inaudible].

<u>It's not a factor</u>. My home has been in district 10 as long as there has been a district 10. There's really no way to cut you out of it. But is it time for us to look at some of those things? Perhaps.

<u>Id.</u> at 54-57 (emphasis added).

Priestly Jackson went on to explain that she would be willing to introduce legislation to look at the City Code and possibly make changes based on the comments from the public.  <u>Id.</u> at 58.  But she maintained that such action would be "future looking" and not relevant to what the City Code required in this cycle. <u>Id.</u>  She also stated her support for the NAACP and the Urban League and commented:

So I, by all means, believe if the factors are present to show that the process undertaken by this council was in any way violative of the 14th Amendment, I would expect those organizations to bring litigation.  It's required of you. I will tell you, as one councilmember sitting up here, I don't see those facts and that was not what led me in this process.

Id. at 58-59.  She again reiterated that the public comments did not "fall on deaf ears," but her view was to implement those suggestions in the future, rather than reject the current maps.  Id. at 59.  She concluded with her support for the proposed maps, and her hope that constituents would stay "engaged going forward on whatever the process needs to be," but repeated that the concerns were not raised during the early Redistricting Committee meetings.  Id. at 59-61.  Following her speech, a few minor housekeeping amendments were made to the Ordinance and it passed 6-1.  Id. at 66.

Notably, a few days after her speech at the Rules Committee meeting, Priestly Jackson tweeted about the redistricting issue.  On March 19, 2022, she published the following two tweets:

> I see protecting the vote & preferences of Jax neighbors by protecting what were known as "minority access districts" in Jax-Districts 7, 8, 9, & 10.  I will not dilute the votes of any neighbors, especially Black neighbors.  I wasn't raised to pull up the ladder that allowed . . .

> others & me to climb.  Promises made during Jax consolidation still matter today.  That's why I serve.  I try to both serve & lead by example.  Dilution of the Black vote will never be supported by me.  If you didn't know, now you do. #ajust jax #promisesmade #EEQ4d10 #EEQ4Jax

See Doc. 34-9 (emphasis added).  She tweeted again later that afternoon about her commitment to "not diluting neighbors votes, esp Black voters in D-7, 8, 9

& 10…or any of the other 10 districts," and asserted that "These votes are not the entitlement of any political party…not Dems, Repubs or NPA." Id.

Priestly Jackson also responded to a tweet from Representative Angie Nixon who criticized her for not working to fix "something" Priestly Jackson knew was "wrong," merely because "concerns weren't raised by your constituency." Id. Priestly Jackson defended herself by tweeting that: "Districts 7, 8, 9 & 10 with majority Black populations are not wrong & have been in existence over 4 decades.  I will not dilute their vote." Id.  She went on to say that neither her constituents, nor those living in Districts 7, 8, and 9 had complained. Id.  She noted that Nixon had not previously raised any concerns either and said "[i]t's particularly disconcerting that you raise this issue now after the legislative session has ended & the local redistricting process is nearing conclusion after more than 14 months of work. #ajustjax." See id.  She tweeted again the next day, stating in pertinent part: "No to a Black City Council caucus and no to diluting Black voters choice & self determination." Id. at 2.

### 4. City Council

The Ordinance then moved to the full City Council on March 22, 2022. See 3.22.22 Mtg. Tr. (Doc. 34-17).  Diamond shared his thoughts on the Ordinance first.  He outlined his opposition to the plan and stated in pertinent part:

> I feel that these maps look almost exactly the same from what we started with to what we have now. And to me, that was essentially done to preserve the status quo and to protect incumbents. And given that that's the result, I certainly can't support it. But again, I cast no dispersions [sic] and certainly love my colleagues. But I'll be [a no] today because I think that in order to move Jacksonville forward we're going to have to let go a little bit of the status quo and have a little bit of newness happening in our city council in order to make it happen.

See id. at 147 (emphasis added).  Howland, Becton, and Bowman spoke in favor of the Ordinance.  Howland commended Priestly Jackson for her efforts and expressed his approval of the "methodical and transparent" process.  Id. at 148-49.  Becton's comments largely focused on his support for what occurred on the southeast side of the River.  Id. at 149-51.  Bowman spoke about the process and thanked the people involved in the work.  Id. at 152-53.  He also commended Priestly Jackson on her leadership.  Id. at 153.  Priestly Jackson spoke last and gave a lengthy speech on the matter responding to the allegations from the public of racial packing.  The Court summarizes her speech below.

Priestly Jackson began by reiterating that the redistricting process had actually started with a committee chaired by Dennis, with "three of what we call minority access council districts, historically now communities of interest, members on that committee."  Id. at 154 (emphasis added).  She noted that "during that time we didn't receive any public comments or issues or concerns" regarding the boundaries of Districts 7-10.  Id.  Priestly Jackson acknowledged the awkward position she now found herself in given the NAACP's opposition to

the maps on the basis of racial packing in Districts 7-10.   Id. at 155.
Significantly, Priestly Jackson asserted that the racial percentages in these
Districts were due to: 1) residential segregation in Jacksonville, and 2) the
"promises made from consolidation" that there would be "four minority access
districts."  Id. at 155 (emphasis added).  She noted that when she ran for office
she expressed her unequivocal support for maintaining the minority access
districts.  Id. at 155-56.

Priestly Jackson then returned to the fact that the Committee decided not
to throw out the prior districts and to build on what they had and defended this
decision because no one had complained to her about the configurations of
Districts 7-10.  Id. at 156.  She stated that none of her colleagues in these
districts had received any complaints from their constituency, and that before
any changes were going to be made to those districts, they would have needed
to meet with their constituents first.  Id. at 157-58.  As an aside, she noted that
"[t]o be clear, the current four communities of interest are historically known as
minority access districts.  We now call them . . . communities of interest
together."  Id. at 158 (emphasis added).  Next, she pointed out that these
districts have had majority Black populations for four decades and that "those
numbers have gone down" over the years.  Id. at 158-59.  She noted that no one
had complained about the fact that there were high majority White populations

in other Districts.  Id. at 159.  And again, attributed these percentages to "natural housing patterns."  Id.  Significantly, she then stated:

> And so as a body politic, we work together representing diverse constituencies but <u>trying to fulfill the promises of consolidation</u> for all of those. I share with you that <u>a fundamental principle to me was the maintenance of minority access districts</u>. I don't know what a percentage is needed to ensure that the voters in District 10 are able to actualize their preference, but I'm going to assume that since they had not complained to me about it, that it was not an issue. <u>So my philosophy was to do no harm. Do no harm.</u>

Id. at 159 (emphasis added).

Responding to a criticism that the public hearings had served no purpose, Priestly Jackson noted that the public hearings are required by ordinance and explained that the point was only to find out if they had missed or divided any communities, "[n]ot a radical repurposing of the minority access districts."  Id. at 159-60.  She stated her position that:

> Attempts to dilute the African American neighbors in Districts 7, 8, 9, and 10 is inherently unfair and unjust. We're not trying to dilute the neighbors any place else. I would also go on to say that, you know what it reminded me of, just how would we do that? If the majority of African Americans live in the Northwestern portion of the district, if four of every 10 live over there, what are we going to do?

Id. at 160.  She then likened the situation to the bussing that happened in the 1970s stating it would "be unfair and unjust to bolster other communities at the expense of 7, 8, 9, and 10."  Id.  She acknowledged the threat of litigation and stated that she did not see any violation of the 14th Amendment.  Id. at 161.  In

the end Priestly Jackson concluded by asserting her belief that: "these proposed maps adequately and fairly represent the needs of all of our neighbors, and <u>it allows the neighbors in 7, 8, 9, and 10 to maintain self-determination</u> and decide who they vote for and we're their voice is in the communities where they live." <u>Id.</u> at 162 (emphasis added).  The Council then voted and approved the Ordinance with only one dissenting vote.  <u>Id.</u>  As enacted, Black residents maintain significant majorities in Districts 7 (58.4%), 8 (67.2%), 9 (56.3%), and 10 (57.4%).  <u>See</u> Austin Report (Doc. 34-18) at 10.

### D. Declarations

#### 1. City Council

The City submits Declarations from the eighteen Councilmembers who supported the Ordinance.  The importance of maintaining the "existing District boundaries" in the redistricting process is a common theme.  <u>See</u> Becton Decl. ¶¶ 10, 22; Bowman Decl. ¶¶ 9-10; Dennis Decl. ¶¶ 11-13; Gaffney Decl. ¶ 9; Newby Decl. (Doc. 40-26) ¶ 5; Pittman Decl. (Doc. 40-27) ¶ 9; Priestly Jackson Decl. ¶¶ 18-20.  Similarly, some Councilmembers state that minimizing the impact to their constituents was an important factor to them.  <u>See</u> Becton Decl. ¶ 35; Bowman Decl. ¶ 29; Cumber Decl. (Doc. 40-18) ¶ 8; Morgan Decl. (Doc. 40-25) ¶ 8.  Some mention the need to protect incumbents or maintain "continuity of representation" as an important factor.  <u>See</u> Becton Decl. ¶ 10; Bowman Decl.

¶ 9; Newby Decl. ¶ 5; Pittman Decl. ¶ 18, 20; Priestly Jackson Decl. ¶¶ 11-14.[38]
In addition, several Councilmembers assert that politics played a role in the
drawing of the lines.  See DeFoor Decl. (Doc. 40-19) ¶ 15-16; Bowman Decl. ¶
20; Carlucci Decl. (Doc. 40-16) ¶¶ 5-6; Gaffney Decl. ¶¶ 23, 25; Pittman Decl. ¶
15.

Common themes regarding the lack of racial predominance are repeated
throughout the Declarations:

- The absence of any racial target.  See, e.g., Ferraro Decl. ¶ 17; Dennis
  Decl. ¶ 26; DeFoor Decl. ¶ 21; Bowman Decl. ¶ 34; Becton Decl. ¶ 26;
  Gaffney Decl. ¶ 28; Pittman Decl. ¶ 21; Priestly Jackson Decl. ¶ 37;
  White Decl. (Doc. 40-30) ¶ 31; see also Killingsworth Decl. ¶¶ 27, 41.

- The race of the constituents was not an important factor and to the
  extent race was discussed it was just one of many concerns and did not
  predominate.  See, e.g., Bowman Decl. ¶ 35; Boylan Decl. (Doc. 40-15)
  ¶ 12; Carrico Decl. (Doc. 40-17) ¶ 13; Ferraro Decl. ¶ 18; Cumber Decl.
  ¶ 13; DeFoor Decl. ¶¶ 22-23; Dennis Decl. ¶¶ 27-28; Gaffney Decl. ¶¶
  29-30; Pittman Decl. ¶¶ 23-24; Priestly Jackson Decl. ¶¶ 38-39; White
  Decl. ¶¶ 32-33; see also Killingsworth Decl. ¶ 42.

- Race was not the predominant reason for his/her vote in favor of the
  ordinance.  See, e.g., Bowman Decl. ¶ 37; Ferraro Decl. ¶ 20; DeFoor
  Decl. ¶ 25; Dennis Decl. ¶ 30; Gaffney Decl. ¶ 32; Newby Decl. ¶ 7;
  Pittman Decl. ¶ 25; Priestly Jackson Decl. ¶ 41; White Decl. ¶ 35.[39]

---

[38] Notably, neither Dennis (D9) nor Gaffney (D7) mention a desire to protect incumbents
as a factor for them.

[39] The Councilmembers' assertions that race was not a predominant factor in their vote
for the Ordinance is not terribly helpful.  As previously explained, the relevant question is not
whether race predominated the redistricting process as a whole.  Indeed, race plainly was not
a driving force in the line-drawing on the southeast side of the River.  The pertinent question
is whether race was the predominant motive driving the inclusion and exclusion of voters of
the Challenged Districts.

The Councilmembers uniformly state that they did not use or understand the term "communities of interest" as a "euphemism solely for race." <u>See</u>, <u>e.g.</u>, Priestly Jackson Decl. ¶ 33; White Decl. ¶ 21; Pittman Decl. ¶ 12; Gaffney Decl. ¶ 17; Dennis Decl. ¶ 24; DeFoor Decl. ¶ 13; Bowman Decl. ¶ 33; Becton Decl. ¶ 25. And, they each describe their understanding of the term to be broader, encompassing various descriptors. <u>See</u>, <u>e.g.</u>, Priestly Jackson Decl. ¶ 32; Pittman Decl. ¶ 11; Gaffney Decl. ¶ 16; Dennis Decl. ¶ 23; DeFoor Decl. ¶ 12; Bowman Decl. ¶ 32; Becton Decl. ¶ 24.

### 2. Plaintiffs

In support of the Motion, Plaintiffs submit declarations from Black community leaders and residents of the Challenged Districts. <u>See</u> Motion, Exs. 20-32. Generally, these declarations demonstrate that Plaintiffs have standing to challenge these districts, which the City does not contest. <u>See</u> <u>ALBC</u>, 575 U.S. at 269-71; <u>Shaw II</u>, 517 U.S. at 904. But, these declarations are also notable in their account of the harms they perceive to result from living in the Challenged Districts.

For example, Ben Frazier, President of Plaintiff Northside Coalition of Jacksonville, Inc. asserts that: "The sprawling, noncompact districts make it more difficult for our members to establish meaningful relationships with their Council and School Board members, and mean that those elected officials are less responsive to the needs of the varied and geographically dispersed

communities that they try to serve."  See Frazier Decl. (Doc. 34-21) at 1-2.

According to Frazier, the maps make it difficult to advocate at the local level

because "[o]rganizing action that relates to a specific neighborhood or section of

the city, for example, may require interfacing with numerous Council members

whose districts cut across that geographic area."  Id.  In addition, he explains

that:

> Because of Florida's public meetings laws, elected officials are
> usually reluctant to meet together with members of the public, or
> even hear from the public what other elected officials have said in
> other meetings on a particular issue. Therefore, when Northside
> Coalition members from the same community try to advocate
> around a common issue of interest, it often requires organizing
> multiple, inseriatim meetings-at which discussions of what
> happened at other meetings are forbidden-with the different
> Council or School Board members who represent that one
> community. If each neighborhood or community were kept whole in
> a logical and compact district, our members' advocacy on the issues
> they care about would be easier and more effective.

Id.  Representatives from the ACLU and Florida Rising echo these concerns and

explain that in contrast, their members in more logical and compact Districts

such as 1 and 13 experience "more responsive representation around issues that

impact their community" and find it "easier to organize around those common

issues."  See Shelton (ACLU) Decl. (Doc. 34-22) ¶10; Holder (Florida Rising)

Decl. (Doc. 34-23) ¶ 7.

Among other concerns, the Black residents of the Challenged Districts point out in their declarations how little they have in common with the residents of other, distant parts of their district.  For example,

- "In my view, it is more logical to adhere to the St. Johns River when drawing Council districts, since the neighborhoods on my side of the river in and around East Arlington share a lot in common, while the areas on the north side of the river have different interests."  <u>See</u> Washington (D2) Decl. (Doc. 34-24) ¶ 11.

- "Shoving distant neighborhoods into the same district (like LaVilla, Downtown, and Midtown far to the south with my own Biscayne) hurts the representation I have in my Council and School Board districts." <u>See</u> Montgomery (D7) Decl. (Doc. 34-25) ¶ 8.

- "I have more in common with other Mid-Westside residents and New Town (just a block south of my house) than I do with folks up by Sherwood Forest far to the north, the new subdivisions out past I-295, or people living on Otis Road far to the west."  <u>See</u> Franklin (D8) Decl. (Doc. 34-26) ¶¶ 9-10; <u>see</u> <u>also</u> Roberts (D8) Decl. (Doc. 34-27) ¶¶ 9-11.

- "I reside in the Hyde Park neighborhood. The neighborhood is split between three different Council districts. My daughter also lives in Hyde Park, about a five-minute drive from me, but her home is in District 10. This split makes it harder for me to advocate for issues that affect Hyde Park, since councilmembers aren't too concerned about the sliver of the neighborhood included in their district."  <u>See</u> McCoy (D9) Decl. (Doc. 34-28) ¶ 10; <u>see</u> <u>also</u> Singleton (D9) Decl. (Doc. 34-29) ¶¶ 7-9 ("I am paired with areas in the Urban Core of Jacksonville a 15-mile drive away, with whom I have little in common.").

- "Sherwood Forest and its neighbor Osceola Forest were divided between City Council Districts.  It remains divided between Districts in the new maps.  The majority of Sherwood Forest/Osceola Forest was and remains at the northern-most part of a sprawling district that reaches far to the south, nearly hitting the southern city limits.  The splitting of the neighborhood and its placement in a non-compact district made advocacy on behalf of our neighborhood issues harder. . . . I am worried that these maps treat Sherwood Forest/Osceola Forest

residents as interchangeable with residents in far-flung neighborhoods with different concerns, simply because we are all predominantly African American neighborhoods." <u>See</u> E. Barnum (D10) Decl. (Doc. 34-30) ¶¶ 9-11, 15; <u>see also</u> Williams (D10) Decl. (Doc. 34-31).

- "[M]y Riverside neighborhood is split into two different Council and School Board districts, plus the contiguous and closely associated neighborhood of Murray Hill is similarly split between different districts. This cracking of my community impairs the quality of my representation on the City Council and School Board." <u>See</u> D. Barnum (D14) Decl. (Doc. 34-32) ¶ 9.

Although anecdotal, these declarations lend support to Plaintiffs' contention that Districts 7, 8, 9, and 10 are non-compact and do not encompass actual communities of shared interest.  And notably, on the current record before the Court, the City has offered no evidence to the contrary.  Moreover, the declarations demonstrate that the harms from non-compact districts are more than just theoretical.

## V.    Expert Reports

Plaintiffs submit reports from two experts who conclude from their analyses that the design of the Challenged Districts can only be explained on the basis of race.  In the Response, the City asserts that these experts fail to meet the requirements of <u>Daubert</u>.[40]  <u>See</u> Response at 19-26.  At this stage in the proceedings, the Court need not conduct a <u>Daubert</u> analysis because the Court can determine the appropriate weight, if any, to give the various opinions

_____

[40] <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 589 (1993).

expressed by each expert.  The Court has considered the City's critiques of the expert reports and for the reasons that follow, the City's arguments do not significantly undermine the import of their findings.

### A. Sharon Austin, Ph.D.

Sharon Austin, Ph.D. is a professor of political science at the University of Florida.  See Expert Report of Dr. Sharon Austin (Doc. 34-18; Austin Report) ¶ 4.  In her Report, she analyzes precinct data to make observations and draw conclusions about the role of race in the drawing of the Challenged Districts. See Austin Report ¶ 2.  For example, Austin observes that most of the voting precincts in Districts 7, 8, 9, and 10 have majority Black voting-age populations (BVAP), whereas there is not a single precinct with a majority BVAP in any of the neighboring Districts 2, 12, and 14.  Austin then examines the borders between the Black-majority Districts (7, 8, 9, and 10) and the neighboring White-majority Districts (2, 12, and 14).  She observes that district lines are consistently drawn in a manner such that the precincts in Districts 7-10 have higher BVAP than the neighboring precincts on the other side of the line in Districts 2, 12, and 14.  While the Court will not summarize all her findings, the map below is illustrative of the pattern Austin observes:





See Austin Report at 35.  The same pattern is observable along the border of

Districts 7 and 2.  See id. at 23.

Austin also highlights portions of the district lines that are particularly bizarre.  For example, Austin notes the strange hook protruding from District 9 into District 14.  She includes a dot map of the racial demographics in this area which demonstrates how the protrusion extends to surround Black adults in the area, while leaving White adults in District 14.



FIGURE 6
PRECINCTS 913, 914, 1409

See Austin Report at 34.  In this figure, each orange dot represents 25 White adults and each purple dot represents 25 Black adults.  Precinct 913 in District 9 which forms the hook has a BVAP of 45.8%, whereas Precinct 1409 in District 14 which surrounds the hook has a BVAP of 24.5%.

Austin also points to evidence that Precinct 205 was split along racial lines in the 2021 redistricting cycle.  <u>See</u> Austin Report ¶¶ 39, 42.  This precinct encompasses the area that was moved from District 2 into District 7 in the 2021 redistricting.  Austin's data shows that the portion of Precinct 205 that was moved to District 7 has a 39.9% BVAP, whereas the portion that remained in District 2 has a 21.9% BVAP.

In response to this evidence, the City contends that "precincts do not control the City's redistricting process" and "come into being only after the Census Bureau's identification of census blocks and the City's fashioning of district lines around the same."  <u>See</u> Response at 27; <u>see</u> <u>also</u> Declaration of Robert Phillips (Doc. 40-32) ¶¶ 13-15.  Thus, according to the City, Plaintiffs' "invocation of precinct irregularities and splits is of no moment."  <u>See</u> Response at 28.  However, that the City did not use precincts to guide its redistricting process does little to undermine the fact that the lines selected appear to result in the consistent racial patterns reflected in the precinct data.  While the Court draws no particular inference from the fact that a precinct was split, what is significant is the data showing that <u>where</u> the precinct was split moved an area with a higher BVAP into District 7, and left an area with a lower BVAP in District 2.[41]

---

[41] As to the other precinct splits along the border of the Challenged Districts, the Court is satisfied that these minor alterations were made in 2021 merely to conform to changes in the shape of the census blocks or to correct specific anomalies from the 2011 cycle.  <u>See</u>

Based on the demographic data and the unusual shape of the Challenged Districts, Austin opines that the challenged lines were drawn based on race. Indeed, in various places throughout her Report, she asserts that she "can identify no factor other than race" to account for the line drawing and thus concludes "that the Council drew district lines based on race." <u>See</u>, <u>e.g.</u>, Austin Report ¶¶ 33, 35, 37, 39, 41, 43, 48, 52, 63. However, Austin never identifies what other factors, if any, she considered, or how she was able to rule out those factors. It is of particular concern that Austin never explains why partisan gerrymandering could not account for the unusual shapes of the Challenged Districts or how she was able to rule that factor out. As such, the Court gives little weight to Austin's ultimate conclusions that the patterns she observes are attributable to intentional, race-based line-drawing. Nevertheless, to the extent the City asserts that the Court should disregard the Austin Report in its entirety, this argument is not well-taken. The City does not dispute the validity of any of the data set forth in the Austin Report. As such, while disregarding Austin's ultimate conclusions, the Court will consider the demographic data and patterns described in the Report.

---

Killingsworth Decl. ¶¶17-18; 1.27.22 Public Hrg Notice (Doc. 34-3 at ECF p. 62) (summarizing changes); 10.28.21 Mtg. Tr. at 11-12; Dennis Decl. ¶¶ 21-22; Priestly Jackson Decl. ¶¶ 27-31.

## B. Kosuke Imai, Ph.D.

Plaintiffs also submit an Expert Report by Kosuke Imai, Ph.D., a Professor in the Department of Government and the Department of Statistics at Harvard University. See Expert Report (Doc. 34-19; Imai Report) ¶ 1. Imai "simulated 10,000 alternative redistricting plans while adhering to a set of redistricting criteria." Id. ¶ 2. Specifically, Imai explains that his 10,000 simulated alternative redistricting plans have the following properties:

- "All simulated districts are geographically contiguous." Id. ¶ 21. Imai notes that his plans allow for a River crossing in the Mill Cove area (Dames Point Bridge) as the Enacted Plan did. Id. ¶ 21 n.4.[42]

- "All simulated plans keep Districts 5, 6, and 11 of the enacted plan as they are." Id. ¶ 21. According to Imai, "[t]hese Districts are of little relevance" to the simulation analysis because they are relatively compact and do not border the challenged Districts. Id. ¶ 21 n.5.[43]

- "All simulated districts do not exceed an overall population deviation of +/- 4.8%, which is the maximum population deviation under the enacted plan." Id.

---

[42] The City criticizes Imai's decision to restrict water crossings because "the Council . . . departed from its initial 'avoid river crossings' stance." See Response at 23. As described in the legislative history above, the Committee did decide to depart from its initial stance against River crossings, in that it made a reasoned decision to allow District 2 to cross the River given the population disparities between districts north and south of the River. But the City's critique of Imai's Report on this basis is misplaced because, in keeping with the Enacted Plan, Imai allows his simulated plans to make the same crossing. See Imai Report ¶ 48.

[43] The City critiques this decision because Imai "ignores the substantial impact of the population growth in District 11 that drove the boundaries of the other thirteen districts . . . ." See Response at 23 (citing Imai Report ¶ 48). The City's critique is again misguided. Imai froze Districts 5, 6, and 11 as they were drawn in the Enacted Plan. See Imai Report at 8, 18. As such, he adopted the City's decisions in 2021 on how to account for the population growth in District 11.

- "Districts under the simulated plans are similar to or more compact than those under the enacted plan, on average." Id.

- "All simulated plans have fewer split precincts than the enacted plan." Id.

- "Almost all simulated plans have fewer split neighborhoods than the enacted plan." Id.[44]

- "All simulated plans place incumbents in separate districts." Id.

- All simulated plans are compliant with the VRA, meaning the plans have at least four districts where "the candidate of choice for Black voters is predicted to win at least two thirds of the time and the votes cast by Black voters are likely to form a majority of the votes received by such candidate." Id. ¶ 22.[45]

Imai asserts that his 10,000 simulated plans "constitute a representative set of alternative plans that comply with these redistricting criteria." Id. ¶ 16.[46]

---

[44] This is a point of contention between the parties because, according to the City, it does not formally recognize established neighborhoods and has not updated its neighborhood map since the mid-1990s. See Response at 26-28 & n.7; Killingsworth Decl. ¶¶ 30-32. In the Reply, Plaintiffs include the link to a City website where they procured the neighborhood map. See Reply at 6 n.6. Because the evidence regarding neighborhood splits has no impact on the outcome of the Motion, the Court declines to consider it at this stage in the proceedings.

[45] To ensure compliance with the VRA, Imai conducted a racially polarized voting (RPV) analysis "using the official election data from a total of 17 city-wide elections." See Imai Report ¶ 19, fig. 1. The City argues that Imai's VRA analysis is flawed because he fails to explain "why he chose those elections and omitted others such as the 2015 First Election for Mayor, and the 2015 and 2019 First and General Elections for other city-wide offices such as Sheriff, thereby ignoring Black Republicans running in several of those races." See Response at 22-23. In their Reply, Plaintiffs point out that Imai "did include elections featuring Black Republicans," such as the 2019 election for City Council Groups 1 and 5, and that "[s]ome of the elections that Defendants complain are excluded . . . did not even elect a winner, instead going to runoffs." See Reply at 7. While the City is correct that Imai does not explain what criteria he used in the selection of these elections and not others, see Imai Report ¶¶ 46-47, the City offers no argument as to how it would alter the outcome of his analysis to include these additional elections. Notably, the City offers no RPV analysis of its own.

[46] To obtain the 10,000 simulated plans, Imai first generated "40,000 iterations," and thinned out this result to a "final set of 28,000 draws." See Imai Report ¶ 50. He then "subset

Next, Imai compared the Enacted Plan to the simulated plans to determine whether the Enacted Plan "unusually treats particular racial groups in a certain way (e.g. packing and cracking Black voters) <u>when compared to</u> the set of simulated plans . . . ." <u>Id.</u>  Imai then used statistical theory to "quantify the degree to which the enacted plan is extreme in terms of racial composition, relative to the ensemble of simulated plans." <u>Id.</u> ¶ 17.  Based on his analysis, Imai opines that "the enacted plan draws its boundary lines such that a

---

[this] sample to plans that do not pair incumbents for City Council or School Board districts." <u>Id.</u>  Next, Imai eliminated 3950 plans that "fail[ed] to generate School Board districts without incumbency pairing." <u>Id.</u>  He explains "[t]his is done by using the enumeration algorithm to generate all possible ways to create valid School Board districts using given [sic] each simulated plan." <u>Id.</u>  He also removed 41 plans that did not meet his VRA criteria.  <u>Id.</u>  Finally, he "randomly subset [the] remaining 24009 valid simulated plans down to a final sample of 10,000 plans, which is sufficiently many to give statistical precision needed for my analysis." <u>Id.</u>

The City critiques Imai's algorithm because "he had to 'remove 3950 plans that fail[ed] to generate School Board districts without incumbency pairing,'" as well as 41 "additional plans that did not comply with his VRA criteria."  <u>See</u> Response at 23; <u>see also</u> Imai Report ¶ 50.  The City appears to contend that because "he had to manually eliminate plans that did not comply with the algorithm," his algorithm may be flawed.  <u>See</u> Response at 23.  In the absence of more detailed analysis or evidence, the Court is not persuaded that this criticism undermines the validity of Imai's algorithm.  Notably, the City provides no rebuttal expert or citation to support the assertion that this additional winnowing was unusual or indicative of a flaw.  The Court is also uncertain, on the current record, whether the City's description of Imai's process is accurate.  It is unclear whether Imai had to "manually" remove 3950 plans that slipped through his algorithm or whether he had to run a separate "enumeration algorithm" to generate all possible pairs of districts in his simulated plans and then eliminated the plans where, when combining districts, it was impossible to avoid a School Board incumbency pairing.

The City also argues that "[b]ecause Dr. Imai eliminated 14,000 of the simulated plans . . . it is impossible for the Court to know whether any of those simulated plans did not have measurements more similar to those of the Enacted Plan."  <u>See</u> Response at 24.  But this argument appears to ignore the point of statistics.  Imai could have generated more than 10,000 plans but it would "not materially affect the conclusions of [his] analysis" because 10,000 plans are sufficient to generate statistically precise conclusions."  <u>See</u> Imai Report ¶ 24.  Thus, even if some of the 14,000 eliminated plans were more similar to the Enacted Plan, it would not have changed the statistical outcome of Imai's analysis.

disproportionately large number of Black voters are placed into Districts 7, 9, and 10, leading to unusually high Black voting-age population (BVAP) proportions in these districts in comparison to the simulated plans." Id. ¶ 4. Indeed, Imai observes that Districts 9 and 10 have higher BVAP proportions than any of their corresponding districts in his 10,000 simulated plans, making them statistical outliers. Id. ¶¶ 27-29.  He also notes that only 3.6% (360 of 10,000) of the simulated districts corresponding to District 7 had higher BVAP proportions, such that District 7 is also unusual in comparison with his simulated plans. Id. ¶ 29. And conversely, Imai observed that "Districts 2 and 12 of the enacted plan have much lower BVAP proportions than the simulated plans." Id. ¶ 4.  Given these statistical results, Imai opines that "race played a significant role beyond the purpose of adhering to the traditional and other redistricting criteria including compliance with the VRA." Id. ¶¶ 4, 31 ("These results present clear evidence that race played a significant role in determining these relevant boundaries of the enacted plan beyond the purpose of satisfying the redistricting criteria . . . including compliance with the VRA.").

The City raises various critiques to Imai's analysis and contends that "several flaws" render his opinions unreliable. See Response at 22-25.  Having presented no competing evidence, however, the City's position is overstated.  As noted above, it is unclear on the current record whether some of the City's critiques are accurate or based upon a mistaken understanding of Imai's

process.   The remainder of them, which are discussed below, do little to undermine the weight of this evidence.

The City argues that Imai's graphs are misleading because the x-axes on figures 6-9 "measure a very narrow set of values," thereby creating exaggerated depictions of "otherwise miniscule differences."  See id. at 24-25.  This is true insofar as it goes.  But the argument fails because it misses the point Imai is making with these three graphs.  Imai uses these particular graphs to highlight the similarities, not the differences, between his plans and the Enacted Plan. Specifically, each of these figures compares the simulated plans to the Enacted Plan on various traditional redistricting criteria.  Figure 6 compares population deviation, figure 7 compares compactness on the Polsby-Popper score, figure 8 compares compactness on the Reock score, and figure 9 compares compactness based on the "fraction of edges kept score."[47]  As depicted on these graphs, Imai's simulated plans tend to have smaller population deviations, greater average Reock compactness scores, greater average compactness scores on the fraction of edges kept, and similar average Polsby-Popper compactness scores to the Enacted Plan.[48]  The relevance of these graphs is to show that the simulated

---

[47] Polsby-Popper and Reock are "two commonly used measures of a district's compactness."  See Alpha Phi Alpha Fraternity v. Raffensperger, __ F. Supp. 3d ___, 2022 WL 633312, at *24 (N.D. Ga. Feb. 28, 2022); see also Caster v. Merrill, No. 2:21-cv-1536-AMM, 2022 WL 264819, at *25 n.9 (N.D. Ala. Jan. 24, 2022) (describing these metrics).

[48] The City also cites these graphs as evidence that its own districts are compact.  But this argument is not well-taken.  These graphs are measuring the compactness score of the 14

plans are no worse than the Enacted Plan on these traditional redistricting criteria. <u>See</u> Imai Report at 10 ("Districts under the simulated plans are similar to or more compact than those under the enacted plan, on average."); <u>id.</u> ("All simulated districts do not exceed an overall population deviation of +/- 4.8%, which is the maximum population deviation under the enacted plan."). Having established that the simulated plans and the Enacted Plan are at least equivalent on these traditional redistricting criteria, Imai then evaluates how the Enacted Plan treats Black residents as compared to the simulated plans. <u>See</u> Imai Report at 7. In Imai's view, the fact that the treatment of Black residents in the Enacted Plan is statistically unusual when compared to the simulated plans presents "empirical evidence that the [E]nacted [P]lan was likely drawn using race as a significant factor." <u>Id.</u>

The City also challenges Imai's conclusion that his simulated plans comply with the VRA. <u>See</u> Response at 25. The City argues:

> The robustness analysis at Figure 13 also shows that most of the simulations have only one majority black seat (District 8). [<u>See</u> Imai Report ¶ 50 (figure 13).] This analysis additionally demonstrates that based on the boxplots contained therein, the simulated plans pack more Black voters than do the City's lines.[49] Moreover, Figure

---

Districts <u>as a whole</u>, such that the City's score benefits from the relatively compact districts on the south side of the River. The graphs do not speak to the compactness of the Challenged Districts. Compactness scores by District are set forth in Table 1. <u>See</u> Imai Report at 19. On all three scales, Districts 7, 9, and 10 rank as the least compact of all 14 Districts.

[49] The contention that the simulated plans pack "more Black voters than do the City's lines," appears to concern the fact that the simulated district with the highest BVAP percentage has a higher percentage of Black voters than any of the City's Districts. <u>See</u> Imai Report at 28, fig. 13 (showing simulated district B1 with an average BVAP at or above 75%).

> 13 demonstrates that only the City's lines create a majority Black district in District 9, as the boxplot does not reach the forty-four percent threshold noted in the Walker report and offered to the City by Plaintiffs prior to filing their lawsuit. See Doc. 34-28 at 8.

See Response at 25. In so arguing, the City appears to fault Imai's simulated plans for not factoring in race more. But this ignores Plaintiffs' contention that the fact that only the Enacted Plan "create[s] a majority Black district in District 9" and has more than one "majority black seat" is the evidence that race must have been a greater factor in the City's Enacted Plan than in the simulated plans.[50] Thus, rather than undermine Imai's opinions, the City's arguments, in the absence of evidence supporting another explanation, support a conclusion— that it was race, and not other traditional factors, that predominated the drawing of the Challenged Districts.

---

But the Supreme Court has recognized that there is nothing inherently wrong with having a district with lopsided racial demographics if that is the natural result of residential segregation in Jacksonville. See Miller, 515 U.S. at 920 ("'[W]hen members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes.'" (citation omitted)). Given the large percentage of Black voters living in the urban core, it may well be that a compact district encompassing that actual community of interest would have a high BVAP percentage. The City fails to mention that the 2nd, 3rd, and 4th ordered district (B2-B4) have lower BVAP percentages than the corresponding enacted district.

[50] The City's critiques of Imai's VRA analysis on this point are more pertinent to the strict scrutiny prong of the analysis, which as explained above, is not at issue here. The City does not argue much less present evidence that it drew the Challenged Districts in an effort to comply with the VRA or that it conducted the relevant analysis to determine what the VRA required. Such evidence could show that the VRA required the City to maintain four districts with significant Black majorities, such that Imai's maps would be insufficient. But, absent such evidence, the City's suggestion that the VRA required more than what is reflected in Imai's simulations is unavailing.

Last, the City argues that Imai's simulated plans do not adequately protect incumbents in that they do not necessarily keep "incumbents in their previous district to provide continued representation to most of their original constituents." See Response at 24.  Thus, an incumbent living on the southern border of his or her district could be placed on the northern border of a new district.[51]  According to the City, for this reason "the simulated plans do not protect incumbents or further core preservation." Id.  Although this argument does not undermine the validity of Imai's statistical analysis, it suggests that alternative factors—core preservation and incumbency protection—could account for the racial patterns reflected.  Of course, core preservation and incumbency protection do not address the question of how the "cores" of these oddly shaped districts came to be in the first place, only why they have remained so.  See Bethune-Hill v. Va. State Bd. of Elections, 141 F. Supp. 3d 505, 544-45 (E.D. Va. 2015) ("[T]he inquiry in a racial sorting claim examines the basis upon which voters were placed 'within or without a particular district.' 'That's the way we've always done it' may be a neutral response, but it is not a meaningful answer." (internal citation omitted)) aff'd in part and vacated in part, 137 S. Ct. 788 (2017).  Given that the 2011 and 2022 lines are substantially the same, the

---

[51] As an example of this potential problem, the City points to the District 9 incumbent. See Response at 24.  This is an odd choice given that the District 9 incumbent at the time of redistricting was Garrett Dennis who faced term limits and was not eligible to run for reelection.  Indeed, Dennis announced his resignation on May 23, 2022.

Imai Report would seem to confirm what the uncontested historical evidence shows—that race predominated the 2011 design of the Challenged Districts. The Imai Report also shows that the 2022 Enacted Plan maintains this statistically anomalous racial sorting—a fact that the City does not contest. To the extent the City argues that it reenacted the Challenged Districts in 2022 for race-neutral reasons—namely, core preservation and incumbency protection— the Court will address that argument below.

### C. Dr. Dario Moreno

With its Response, the City submits a report from its own expert, Dr. Dario Moreno of Dario Moreno Inc. Strategy Consulting.  <u>See</u> Report on City of Jacksonville Redistricting (Doc. 40-34; Moreno Report).  Moreno was a director of the FIU Metropolitan Center from 2002-2010, and has "published twenty-five scholarly articles and book chapters dealing with elections and politics in Florida, as well as two books . . . ."  <u>See</u> <u>id.</u> at 3.[52]

Despite his demonstrated keen interest in Florida election history, it appears that Moreno fails to understand the relevant legal issue before the Court in this particular case.  For example, he identifies this as a case alleging violations of both the Voting Rights Act and the United States Constitution.  <u>Id.</u> at 11.  This is significant because Moreno's analysis focuses on issues that would

---

[52] Although he states that he has "over 30 years of professional and academic experience in Florida elections and politics," his educational background is not included in the Report.  <u>Id.</u>

be relevant to a VRA claim but have no bearing on the equal protection claim presented in this case.  The main points of his Report are: 1) "the redistricting process was transparent and open to the public;" 2) "African American elected officials participated and played an active part in the deliberations;" 3) "the redistricting process reflects the demographic realities and trends in Jacksonville;"[53] 4) "the enacted plan maintains stable majority-minority districts that have performed in electing the candidates of choice for Jacksonville's African American communities;"[54] and 5) the "Redistricting Plan does not dilute African American political power through packing."[55]  See Moreno Report at 11, 12, 16, 17.  Based on his understanding of Plaintiffs' claims, Moreno opines that

---

[53] This section of the Moreno Report is a summary of the 2021 legislative history.  See Moreno Report at 12-16.  However, Moreno's mere summary of the changes that were made to achieve equal population among the districts provides no insight into why specific areas were selected over others to achieve the equal population goals.  See ALBC, 575 U.S. at 273.  Notably, Moreno opines that the Redistricting Committee "upheld the redistricting principles" that they adopted but provides no analysis in support of that statement.  See Moreno Report at 13-14.  And, while he identifies those principles as: 1) start from existing lines, 2) use total rather than voting age population, 3) do not draw City Council or School Board incumbents out of their districts, and 4) minimize district boundaries that cross the St. Johns River to the extent possible, see id. at 11-12, he ignores the requirements of the City Charter and the City Code that the districts be as compact and contiguous as possible.  See Jacksonville City Charter § 5.02(a); Jacksonville Ordinance Code § 18.101 (b)-(c); 8.24.21 Mtg. Tr. at 64-66.

[54] Moreno opines that "[t]he basic structure of the 1991 redistricting was confirmed during the redistricting process in 2002, 2012 and in 2022" and asserts that "[t]hese historically consistent district boundaries have allowed African Americans to increase their influence in city politics."  Id. at 16-17.  This opinion, however, does nothing to undermine Plaintiffs' contention that race has—since 1991 and continuously through 2021—been the predominant concern in the drawing of the Challenged Districts.

[55] Moreno appears to contend that racial packing has not occurred because Plaintiffs fail to demonstrate that they would otherwise be entitled to a fifth majority-minority district.  See Moreno Report at 17.  While such a contention would be relevant to a VRA claim, Plaintiffs' equal protection claim does not require such a showing.

"the 2022 enacted plan does not dilute African American political power, nor does it prevent them from fair representation on the Jacksonville City Council with the ability to elect candidates of their choice." Id. at 11. Even assuming these specific opinions are supported by the evidence, they do not address the relevant question in this case—whether race predominated the drawing of the Challenged Districts. This is largely due to the fact that Moreno evaluated the facts as if this were a VRA claim or as if the City defended the Enacted Plan as having been narrowly drawn to satisfy its obligations under the VRA. But, that is not the claim pursued here, nor is it the City's defense. Plaintiffs contend that the City Council violated the Equal Protection Clause by predominately relying on race to draw the Challenged Districts. And the City contends that race did not predominate, not that compliance with the VRA permitted it to focus on race as a primary consideration. Thus, Moreno's Report does very little to address the issues before the Court here.

## VI.   Substantial Likelihood of Success

The question for the Court is whether Plaintiffs have made a clear showing that "'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" See Cooper, 137 S. Ct. at 1463 (citation omitted). In conducting this analysis, the Court must look to the predominant factor driving the shape of the specific Challenged Districts, not the Enacted Plan as a whole. Thus, evidence

that race did not predominate the redistricting process overall, or that it played no role in the southeast quadrant of the City, is of little import.  See ALBC, 575 U.S. at 264.  Also, while evidence regarding particular lines within a district may be helpful in the analysis, the Court must consider the predominant factor for the design of each Challenged District as a whole.  Bethune-Hill, 137 S. Ct. at 800.  With this in mind, the Court turns to consideration of the Arlington Heights factors.

In considering the Arlington Heights factors, the Court begins with the presumption that the City Council acted in good faith.  Even without the presumption, the Court emphasizes that nothing in the record suggests or supports an inference that the City Council acted with ill motive or bad intent.  As the historical record establishes, minority access districts in Jacksonville were created in an effort to ensure minority representation on the City Council.  In each redistricting cycle over the last thirty years, the Councilmembers representing those districts fought hard and succeeded in preserving that representation by assuring majority-minority populations in the subject districts.  It may well be that to the extent the City Council endeavored to maintain the high BVAP percentages in the minority access districts it did so based on a belief that it was legally required or that it was in the best interest of the constituents of those districts or the community.  But whether such efforts would ultimately help the Black community in Jacksonville is not the question

before the Court.  Nor is the question of what the VRA might have required. The City presents no evidence or argument that the Enacted Plan resulted from an attempt to comply with the VRA or that there was some other compelling need for race-based districts.  Instead, the City steadfastly maintains that, at least in 2022, no such racial sorting occurred.  Thus, the sole and dispositive question before the Court at this stage in the proceedings is whether, regardless of the reason, race was the predominant factor driving the design of the Challenged Districts.  Plaintiffs contend that it was and that the result of focusing on race is that Black voters are packed into Districts 7-10, pulled from Districts 2, 12, and 14, diluting the Black vote in these latter Districts, and diminishing the efficacy of the elected officials' ability to provide meaningful representation to the geographically disparate population in all of the Challenged Districts.  Plaintiffs face a heavy burden in establishing that race predominated this process such that the Equal Protection Clause demands relief, and especially so at this preliminary stage of the proceedings. Nevertheless, the Court is convinced that Plaintiffs have met that heavy burden.

### A. The Impact of the Challenged Law

The first <u>Arlington Heights</u> factor asks the Court to consider the impact of the challenged law.  In the context of redistricting, the Court judges the impact of the law by examining the Challenged Districts' shapes and

demographics.  In doing so, the Court begins by observing that the Challenged Districts, particularly Districts 7-10, and 14, are bizarrely shaped.  Both the City Charter and the City Code require that voting districts be drawn as compact and contiguous as possible.  But, no matter how many ways one might try to describe the shape of Districts 7-10, and 14, the word compact would not apply, elongated, or sprawling, perhaps—but certainly not "compact."  <u>See</u> Ordinance, Ex. 1 (Doc. 34-2).[56]



---

[56] The districts enacted in 2022 are shown by color, the preexisting 2011 districts are marked by red lines.  A larger version of this map is attached as an appendix to this Order.

The odd and illogical shape of the Challenged Districts is particularly apparent to anyone familiar with the Jacksonville area. Districts 7, 8, 9, and 10 stretch from in and around the central urban core in downtown Jacksonville all the way, or nearly so, to the Duval County line at its north, south, and west edges. The shapes of the districts also prompt obvious questions. Why does District 8, the bulk of which encompasses the rural northwest side of Jacksonville, forego compactness to incorporate an appendage reaching deep into downtown? Why must District 7 jump the Trout River, in order to connect a slice of Jacksonville's northside to the downtown? Why do Districts 9 and 10 use narrow land bridges, each only one voting precinct wide, to connect their disparate sections? And why must District 9 incorporate a bizarre claw that reaches into District 14 to divide neighborhoods in a manner that, intentionally or not, separates Black residents from their White neighbors?

The Court's observation that these districts appear to be bizarrely shaped and non-compact is supported not just by the optics, but by data as well. In the Imai Report, Imai provides a table of district-level compactness scores on three different scales: Polsby-Popper, Reock, and Convex Hull. See Imai Report at 18-19, tbl 1. On all three scales, Districts 7, 9, and 10 rank the least compact of all City Council Districts. Id. District 14 also ranks consistently near the bottom. Notably, the City makes no attempt to explain the overall peculiar shapes of these Districts on the basis of compactness, contiguity, natural geography,

communities of actual shared interests, or any other traditional redistricting factor.

The precinct demographic data in the Austin Report also presents strong evidence that the borders of the Challenged Districts follow racial lines. As summarized above, the demographic data along the borders between Black-majority Districts 7-10 and their White-majority neighbors Districts 2, 12, and 14 reveals a pattern where every single precinct on the District 7-10 side of the line has a higher BVAP percentage than the corresponding precinct on the District 2, 12, or 14 side of the line.

Not <u>some</u> precincts along the line, not <u>many</u> precincts along the line, but <u>every single one</u>.

Moreover, there is <u>not a single</u> precinct in Districts 2, 12, or 14 with a majority BVAP, while <u>most</u> of the precincts in Districts 7-10 have a majority BVAP. <u>See</u> Austin Report at 12-15. While it is true, as the City notes, that precincts are created after redistricting, such observation fails to suggest an explanation for how such consistent racial sorting would result if the border lines were not drawn on the basis of race.

Further, the statistical analysis in the Imai Report supports the conclusion that it is statistically improbable that the Challenged Districts would be drawn as they are absent race as a predominant factor. For example, Imai shows that, out of his 10,000 simulated plans, the three districts with the second

to fourth highest BVAP proportions have consistently lower BVAP proportions than the corresponding districts (Districts 7, 10, and 9) in the Enacted Plan. Indeed, Districts 10 and 9 are statistical outliers on this point, meaning <u>none</u> of the 10,000 plans have a third and fourth ordered district with a BVAP proportion as high as is present in Districts 10 and 9. While not a statistical outlier, District 7's BVAP proportion is also unusual in that only 360 of the 10,000 plans have a corresponding district with higher BVAP proportions. <u>See</u> Imai Report at 12-13. On the converse side, District 12 has an unusually low BVAP proportion when compared to its corresponding district in the simulated plans. And District 2 is an outlier on this point—not a single one of the 10,000 simulated plans had a corresponding district with a lower BVAP proportion than District 2. Based on his statistical analysis, Imai opines that "race played a significant role in determining these relevant district boundaries of the [E]nacted [P]lan beyond the purpose of satisfying the redistricting criteria specified [in the Report], including compliance with the VRA. <u>Id.</u> at 13-14. Notably, the City provided no alternative statistical analysis leaving Imai's opinion largely unrefuted.

Nevertheless, although both Imai and Austin conclude from their analyses that race in and of itself determined the shapes of the Challenged Districts, the Court does not go quite so far. Instead, the Court draws the conclusion from the Austin and Imai Report that Jacksonville voters in the

Challenged Districts are racially segregated and that traditional factors such as compactness, equal populations, or the avoidance of incumbency pairing, cannot explain this segregation. Given the bizarre shapes of these districts and the results of Imai's statistical analysis, the Court is also convinced that this segregation is not mere coincidence or simply a reflection of existing housing patterns. But, before concluding that the segregation present in the Challenged Districts is the result of intentional race-based line-drawing, the Court must consider whether other factors could account for the patterns reflected in the Austin and Imai Reports. See Arlington Heights, 429 U.S. at 266 (explaining that cases with "a clear pattern, unexplainable on grounds other than race," are rare such that typically, "impact alone is not determinative, and the Court must look to other evidence").

The most obvious alternative factor that could account for these patterns is partisan gerrymandering. Indeed, Plaintiffs present evidence that voting in Jacksonville is racially polarized between Black and White voters. See Imai Report at 8; Walker Report at 1. And, neither Austin nor Imai discuss whether partisan politics could explain the patterns and statistical anomalies they observe. Notably, the City does not raise partisan gerrymandering as an explanation for the shape of the Districts as a whole. Rather, the City points to politics only as the explanation for the minor tweaks that were made in 2022 along the border of Districts 7 and 8, and Districts 2 and 7. At this stage of the

proceedings, and presuming legislative good faith, the Court accepts the City's explanation that politics, not race, was the driving force behind those minor changes.   Nevertheless, the relevant unit of analysis is the shape of each Challenged District as a whole.   So, the Court must look beyond these minor changes to determine "the legislature's predominant motive for the design of the district as a whole."   See Bethune-Hill, 137 S.Ct. at 800.

On this point, the City asserts that the City Council's predominant motive was not race, but rather, a desire to maintain the existing lines.   See Hearing Tr. at 29-30 (asserting that the City's "first, primary redistricting decision or goal . . . [was] to preserve the districts as best as possible").   It appears that given the results of the 2020 census, it was not necessary to make significant changes to the maps so the City Council decided to start from the existing lines and tweak only as necessary to equalize the district populations.    The City contends that maintaining existing lines served the twin goals of core preservation and protection of incumbents.   And, because Imai did not include core preservation in his simulated plans, the City's position appears to be that the Enacted Plan's statistical improbability is the result of core preservation, not racial gerrymandering.   In essence, the City's response to the question of why a significant number of voters are placed within or without the particular Challenged Districts in the Enacted Plan is—because that is the way it was done

in 2011.  This contention takes the Court to the second <u>Arlington Heights</u> factor—the historical background.

## B. Historical Background

In weighing the historical background, the Court is cognizant of the Eleventh Circuit's admonition in <u>LOWV</u> that this factor "should be 'focus[ed] . . . on the specific sequence of events leading up to the challenged decision' rather than 'providing an unlimited lookback to past discrimination.'"  <u>See</u> <u>LOWV</u>, 32 F.4th at 1373.  The Court makes no attempt to study or recount the history of race discrimination in Jacksonville.  Indeed, the Court does not tarry long on the events that occurred in 1991 and 2001, except as necessary to understand the Councilmembers' frequent references in the 2021 redistricting cycle to "minority access districts."  But, because the City Council in 2022 expressly decided to maintain the lines that were drawn in 2011, the Court finds the history of what occurred in 2011 is part of the "specific sequence of events" that led to the Enacted Plan.

Indeed, to the extent the City argues that the Court should disregard Plaintiffs' historical evidence entirely, the Court is not persuaded.  In <u>Arlington Heights</u>, the Supreme Court expressly acknowledged that the historical background of a legislative enactment is one "evidentiary source" in determining legislative intent.  <u>See</u> <u>Arlington Heights</u>, 429 U.S. at 267 ("The historical background of the decision is one evidentiary source, particularly if it reveals a

series of official actions taken for [race-based] purposes.").  The Supreme Court reiterated this point in <u>Abbott</u>.  <u>See</u> <u>Abbott</u>, 138 S. Ct. at 2305, 2327.  Moreover, as other courts have recognized, by invoking core retention and incumbency protection as the predominant motive behind the shape of the Challenged Districts, the City makes the historical foundation for these districts particularly relevant.  <u>See</u> <u>Chen v. City of Houston</u>, 206 F.3d 502, 521-22 (5th Cir. 2000); <u>Bethune-Hill</u>, 141 F. Supp. 3d at 544 ("[W]here district lines track a path similar to their predecessor districts or where "core retention" seems to predominate, courts should also examine the underlying justification for the original lines or original district."); <u>Polish Am. Congress v. City of Chicago</u>, 226 F. Supp. 2d 930, 937 (N.D. Ill. 2002) ("Adherence to established boundary lines, like the drawing of districts to protect incumbent officeholders, may or may not be a legitimate redistricting objective, depending in part on how the lines were drawn originally.").  As stated in the underlying <u>Bethune-Hill</u> decision, core retention "holds a special place in the predominance balance" because, among other reasons, it "may be used to insulate the original basis for the district boundaries."  <u>See</u> <u>Bethune-Hill</u>, 141 F. Supp. 3d at 544-45; <u>see</u> <u>also</u> <u>Cromartie II</u>, 532 U.S. at 262 n.3 (Thomas, J., dissenting) (questioning whether protection of incumbents is a legitimate goal where "individuals are incumbents by virtue of their election in an unconstitutional racially gerrymandered district") and <u>id.</u> at 265 n.7 (noting an expert's critique that because a district had "never been

constitutionally drawn" the "problem with the district lies not just at its edges, but at its core" was "not without force").

The evidence discussed above of what occurred in 2011, which the City has not disputed, unabashedly points to racial gerrymandering. The meeting transcripts reflect that the Councilmembers representing the majority-minority districts were very focused on maintaining high BVAP percentages in those districts and ensuring that "what's existing is not diluted." See 8.3.11 Mtg. Tr. at 38.[57] Those Councilmembers were adamant in their stance that any proposal reducing the number of majority-minority districts from four to three was unacceptable.[58] At an August 4, 2011 meeting, CM Jones asserted that 58 or 59 percent BVAP in Districts 7 and 8 was insufficient, and 54 percent in District 9 "won't get it." See 8.4.11 Mtg. Tr. at 7. And indeed, the map enacted in 2011 had BVAP proportions in Districts 7-10 significantly higher than those Jones rejected. See Doc. 34-52. For purposes of resolving the Motion, the Court is

___

[57] Similar comments were made in the 2021 redistricting cycle. See 9.9.21 Mtg. Tr. at 16 (Pittman (D8): "I want to . . . ensure that, you know, the . . . what was the new word? Community of interest . . . stays and not losing."); see also Priestly Jackson Tweets (Doc. 34-9) ("Districts 7, 8, 9 & 10 with majority Black populations are not wrong & have been in existence over 4 decades. I will not dilute their vote.").

[58] Priestly Jackson expresses similar views in the 2021 redistricting cycle. See, e.g., 3.22.22 Mtg. Tr. at 159 ("[A] fundamental principle to me was the maintenance of minority access districts."); 3.15.22 Mtg. Tr. at 50 (explaining that her desire to chair the Rules Committee was for redistricting so she could "make certain that the community that I represent had a seat at the table and that those historic gains that had been made were not lost." (emphasis added)); Doc. 34-9 (indicating in a tweet that reducing the Black majorities in the minority access districts would "never be supported by me").

-102-

convinced that the 2011 evidence, which the Court again notes is uncontradicted by the City,[59] shows that in 2011 race was the factor that could not be compromised, at least with respect to the drawing of Districts 7, 8, 9, and 10.  In other words, in 2011 race predominated the drawing of those districts.  And, it is undisputed, that the lines drawn in 2011 were reenacted in 2022 with only minor changes to the Challenged Districts.

On the current record, the circumstantial evidence considered in combination with the historical evidence presents a virtually unrebutted case that the Challenged Districts exist as they do in the Enacted Plan as a result of racial gerrymandering.  In response to this evidence, the City contends that in making its decisions in 2022, the City Council was not predominantly motivated by race.  According to the City, the Court should reject the record of what occurred in 2011 as "past discrimination" which cannot "'in the manner of original sin, condemn governmental action that is not itself unlawful.'"  See Response at 12-13 (quoting Abbott, 138 S. Ct. 2324).

The City is certainly correct that historical evidence alone will not carry the day.  While the intent of the City Council in 2011 is relevant, it is certainly

---

[59] The City contends that the Court should not consider Plaintiffs' historical evidence, an argument which the Court will address below.  But otherwise, the City makes no attempt to rebut Plaintiffs' account of what occurred in 2011.  Notably, Killingsworth was the redistricting consultant in both the 2011 and 2021 cycles.  Although the City submits a Declaration from Killingsworth, he does not make any attempt to dispute Plaintiffs' account of what occurred in 2011.  Despite Plaintiffs' significant reliance on those events, he does not discuss the events of 2011 at all.

the intent of the 2022 City Council that matters.  See Abbott, 138 S. Ct. at 2325, 2327; see also Chen, 206 F.3d at 521 ("[W]hile the district court erred in categorically and totally dismissing evidence of intent garnered from prior plans, it was correct to point out that the state of mind involved in the prior plans is not of itself what is precisely and directly the ultimate issue before the Court in this case. . . . [T]he state of mind of the reenacting body must also be considered.").[60]  As such, the Court considers the 2011 historical evidence only to the extent it gives rise to inferences regarding the intent of the City Council in 2022.  See Abbott, 138 S. Ct. at 2327.  Indeed, the Court faithfully adheres to the Supreme Court's direction in Abbott that "[t]he allocation of the burden of proof and presumption of legislative good faith are not changed by a finding of past discrimination."  See Abbott, 138 S. Ct. 2324.  Thus, the Court emphasizes that the City is not required to show that the City Council "purged" any improper racial "taint" from the 2011 redistricting cycle.  Id. at 2324.  Instead, as explained in Abbott, the burden rests always on Plaintiffs to "overcome the

---

[60] To the extent the City relied on Chen at the Preliminary Injunction Hearing, the Court notes that careful consideration of Chen weighs in favor of Plaintiffs.  In Chen, the Fifth Circuit upheld the maps in part due to weaknesses in the circumstantial and historical evidence of racial intent, and because the city had "valid reason" to adhere to existing lines given that an upcoming census would soon require substantial revisions to the boundary lines.  See Chen, 206 F.3d at 518-522.  Even so, the court viewed the matter as an "extremely close" case.  Id. at 521.  In contrast, here, the circumstantial and historical evidence is much stronger than that in Chen, and the need to maintain existing lines cannot be justified by an impending census.

presumption of legislative good faith and show" that in <u>this</u>, the 2021 redistricting process, race predominated.  <u>Id.</u> at 2325.

In this case, it is not the historical evidence alone that points to racial predominance.  Rather, it is the historical evidence together with Plaintiffs' other direct and circumstantial evidence that makes a strong showing that the City Council in 2022 reenacted the 2011 lines not despite their racial components but specifically to maintain them.  Indeed, although the City invokes core preservation as a racial-neutral factor to explain the lines, Plaintiffs have presented substantial evidence showing that from 2011 through the present the only "core" to be protected for Districts 7, 8, 9, and 10 is its Black racial majority, a fact well-known to the Councilmembers.  As discussed further below, the evidence here is not that the City Council failed to "purge" the racial "taint" from 2011, it is that the City Council reenacted the Challenged Districts to maintain the racial make-up of those districts.

To apply core preservation in the way the City asserts in this case would mean that once enacted, a legislature could perpetuate racially gerrymandered districts into the future merely by invoking a "neutral" desire to maintain existing lines.[61]  This is not what <u>Abbott</u> holds.  <u>Abbott</u> concerned the

---

[61] While expressing no view on the ultimate opinion, the Court notes that one legal commentator has referred to this as "gerrylaundering."  <u>See</u> Robert Yablon, <u>Gerrylaundering</u>, 97 N.Y.U. L. Rev. 985 (2022).

congressional districting maps adopted by the Texas legislature in 2013. Importantly, the maps drafted by a prior legislature in 2011 had been challenged in court and as part of that litigation, a Texas court developed interim plans "pursuant to instructions from the [Supreme] Court 'not to incorporate . . . any legal defects.'" See Abbott, 138 S. Ct. at 2325. In an effort to resolve the litigation, the 2013 Texas legislature then adopted the court-approved interim maps with minimal changes. Id. Nevertheless, the district court struck down the 2013 maps based "entirely on its finding that the 2013 Legislature had not purged its predecessor's discriminatory intent." Id. at 2318. The Supreme Court found that the district court erred in doing so because it "disregarded the presumption of good faith and improperly reversed the burden of proof . . . ." Id. at 2326-27.[62]

---

[62] The Court notes that the Abbott Court refers to a plaintiff's burden of showing "invidious intent" or "bad faith." See Abbott, 138 S. Ct. at 2325, 2327. Significantly, in Abbott, in addition to a Shaw-based racial gerrymandering claim like that brought by Plaintiffs in this action, the Abbott case included intentional "vote dilution" claims under the Equal Protection Clause. See Perez v. Abbott, 274 F. Supp. 3d 624, 636 (W.D. Tex. 2017). Such claims require proof that the legislature's purpose was to "invidiously . . . minimize or cancel out the voting potential of racial or ethnic minorities." See City of Mobile, Ala. v. Bolden, 446 U.S. 55, 66 (1980) (plurality opinion) superseded in part by statute on other grounds Thornburg v. Gingles, 478 U.S. 30, 35 (1986); Abbott, 138 S. Ct. at 2314. Plaintiffs do not assert an intentional vote dilution claim in this case. Rather, the racial gerrymandering claim at issue here is based on Shaw and a showing of "invidious" intent is not required. Where race predominates the redistricting process, strict scrutiny applies regardless of whether a legislature acted with benign or remedial intent. See Shaw II, 517 U.S. at 904-05. Indeed, many of the Supreme Court cases addressing this type of racial gerrymandering arise out of a legislature's attempt to comply with the VRA and improve minority representation. See, e.g., Shaw II, 517 U.S. at 902; Miller, 515 U.S. at 906-08; Bethune-Hill, 137 S. Ct. at 795-96.

Significantly, in finding that the district court had improperly relied on the 2011 legislature's discriminatory intent, the <u>Abbott</u> Court distinguished the case before it from one "in which a law originally enacted with discriminatory intent is later reenacted by a different legislature." <u>See</u> <u>Abbott</u>, 138 S. Ct. at 2325.  It also noted that the <u>Abbott</u> case did not involve a situation where a legislature had "use[d] criteria that arguably carried forward the effects of any discriminatory intent on the part of the [prior] legislature." <u>Id.</u> This is because, as the <u>Abbott</u> Court explained, the 2013 legislature "did not reenact the plan previously passed by its 2011 predecessor," but rather enacted the interim plan developed by the Texas court in accordance with the Supreme Court's instructions.  <u>Id.</u>  And certainly, "no one would claim that the court acted with invidious intent when it" adopted the interim plan.  <u>Id.</u> at 2328.

The facts before the Court here are more akin to the two scenarios distinguished in <u>Abbott</u> than they are to the facts of <u>Abbott</u> itself.  Here, the race-based districts in the 2011 maps were reenacted by the 2022 legislature with, in the City's words, "very few" changes.  <u>See</u> Response at 18; <u>see</u> <u>also</u> <u>id.</u> at 4 ("ultimate boundary changes were minimal"); <u>id.</u> at 5 (describing the changes to Districts 9 and 10 as "negligible").  Likewise, by prioritizing the maintenance of existing lines, the City adopted a criterion that would inevitably carry forward the effects of the race-based lines originally drawn in 2011.  The intent here was to preserve what was done in 2011, making the evidence of what

occurred in 2011 particularly relevant. In contrast, in <u>Abbott</u>, the Supreme Court found that the legislature's intent was to expedite the end of ongoing litigation by enacting a court-approved interim plan. <u>See</u> <u>Abbott</u>, 138 S. Ct. at 2327-28. Most importantly, unlike <u>Abbott</u>, in this case the historical record combined with all the <u>other</u> direct and circumstantial evidence points to race as a continuing predominant factor <u>in 2022</u>. The Court proceeds to the remaining <u>Arlington Heights</u> factors which support this finding.

### C. Specific Sequence of Events Leading to its Passage & Procedural and Substantive Departures

In some respects, these factors are race neutral. Plaintiffs point to no evidence of any specific events in 2021 and 2022 that shed light on the City Council's purpose in formulating the Enacted Plan. Likewise, the City Council fully complied with the <u>procedures</u> for redistricting set forth in the City Code. As the City Councilmembers expressed at the March 15 and 22, 2022 meetings, the <u>process</u> of redistricting was smooth and transparent insofar as the meetings and process were open to the public. In addition, to the extent the Redistricting Committee's stated goal was to maintain existing lines as much as possible, the Enacted Plan firmly adheres to that goal. Certainly, the Enacted Plan also comports with the Redistricting Committee's criterion of protecting incumbents, albeit, more than was necessary given the number of incumbents at the time who were not seeking or eligible for re-election. Thus, in these respects, the

Enacted Plan does not evidence any "substantive departures" from the City Council's express redistricting criteria.

However, the Court finds that the sequence of events concerning public criticism of the Enacted Plan does point to an intent to perpetuate the sorting of voters based on race. When the Rules Committee held its first public hearing on January 27, 2022, members of the public complained about the lack of public involvement in the redistricting process. See 1.27.22 Public Hrg. Minutes (Doc. 34-3 at ECF p. 65).[63] In addition, most of the fifteen members of the public who offered comments at the meeting spoke about perceived racial packing, the odd shape of the districts, and divided communities. Id. The public also criticized perceived partisan gerrymandering and the overemphasis on protecting incumbents. Id. At the conclusion of the hearing, Priestly Jackson responded to this criticism on the lack of public involvement by explaining that the role of the public hearings is to involve the public in the redistricting process. Id.; see also 1.27.22 Public Hrg. Tr. (Doc. 40-7) at 52-53 ("I can tell you, as one of the team, that you've got the process, and that's the role of the public hearing with the Rules Committee now."). She also asserted her belief that self-interest was not what drove the process and that, for her, "maybe it was a lack of knowledge and understanding of what matters . . . ." See 1.27.22 Public Hrg. Tr. at 53. She

_____

[63] Notably, similar complaints were raised at the public hearings regarding the 2011 maps.

gave those in attendance her word that the Rules Committee would "look at those things you have recommended and see if those adjustments can be made. We will address all those questions."  See id.

The Rules Committee held three additional public hearings throughout the community where similar concerns were raised.  As summarized in the minutes from those meetings, the public comments included:

- "Districts 7, 8, 9 and 10 were packed with minority votes so they don't have influence citywide."  See 2.3.22 Public Hrg. Minutes (Doc. 34-3 at ECF p. 72).

- "Several of the minority access districts don't look compact."  Id.

- A critique of the City Council for failing to conduct a "functional analyses of their proposed districts to determine what percentage of what kind of voters was needed to elect candidates of their choice."  See 2.10.22 Public Hrg. Minutes (Doc. 34-3 at ECF p. 78).

- "[R]esidents of the Northside have more in common with their neighbors to the east and west than they do with the residents of the portion of District 2 lying south of the St. Johns River."  Id.

- "We don't need the 4 packed minority districts any more."  See 2.17.22 Public Hrg. Minutes (Doc. 34-3 at ECF p. 83).

- "It's time to quit 'packing' districts and quit using historical practices that perpetuate disparity."  Id.

- "[T]he community is demanding that the gerrymandered plan being presented today be scrapped and replaced because of the overt 'packing.'"  Id. at 84.

Many similar comments, as well as others criticizing the lack of public involvement in the process, perceived partisan gerrymandering, and a perceived

overemphasis on incumbency protection are recorded in the minutes.  And, as discussed above, at the February 10, 2022 Hearing, McCoy presented the Letter and Walker Report which sets forth Walker's racially polarized voting analysis and conclusion that on average a 41% BVAP would be sufficient.  Priestly Jackson assured the public at the end of these hearings that their comments would be communicated to the full Rules Committee and the City Council.

The Court finds it significant that despite this public outcry, neither the Rules Committee nor the City Council made <u>any</u> attempt to address or alleviate their concerns.  On the record before the Court, it appears that as to the Challenged Districts, no adjustments, great or small, were even proposed, much less adopted, to unify communities, reduce BVAP percentages, or increase compactness.  If maintaining the high BVAP percentages in the minority access districts was <u>not</u> intentionally done, if it was <u>not</u> a significant factor to the City Council, then it is puzzling why the City Council would fail to respond to these public concerns at all.[64]  Significantly, the answer to this question was provided

---

[64] The Court recognizes that at the time of the public hearings the City Council was up against an April 12, 2022 deadline to complete the redistricting process.  But, to the extent the City argues that members of the public waited too late to raise these concerns, the City ignores that the timeline was dictated by the City's process.  And, although the Committee meetings in the fall of 2021 were open to the public, those meetings took place during the workday. Importantly, when the public complained about the failure to involve them in the process, Priestly Jackson reassured them in January of 2022, that the purpose of the public hearings was to involve the public in the process—"to respond and address your concerns."  <u>See</u> 1.28.22 Public Hrg. Tr. at 53.  Yet there appear to have been no changes made to respond and address the concerns voiced at the hearings regarding the Challenged Districts.

by Priestly Jackson, the only Councilmember to directly respond to the public criticism in this regard. As discussed below, her justification does not deny that race was a priority but confirms it. This sequence of events supports a finding that the racial percentages in the historic minority access districts were not subject to compromise. Indeed, this finding is further supported by consideration of the next factor—the contemporary statements of key legislators.

### D. Contemporary Statements and Actions of Key Legislators

Consideration of the evidence on this factor certainly points toward race. In particular, the statements from Priestly Jackson set forth below make it apparent that maintaining Districts 7, 8, 9, and 10 as majority-minority districts was of utmost importance. The City asserts that the comments of certain Councilmembers are not indicative of the intent of the City Council as a whole. See Response at 11-12.[65] However, for the reasons that follow the Court

---

[65] The cases the City cites on this point are all distinguishable. Democratic Nat'l Comm. v. Reagan, 904 F.3d 686, 719-20 (9th Cir. 2018) is a case about laws designed to prevent voter fraud, not redistricting. The court there was not persuaded that one legislator's possibly racist motives for raising the problem of voter fraud could be imputed to the entire Arizona legislature when the evidence showed that the legislative discussion focused on the danger of fraud. In Lee v. City of Los Angeles, 908 F.3d 1175 (9th Cir. 2018), the court found that race may have been the motivation for two of the commissioners, but plaintiffs failed to show that it was the predominant factor motivating the legislature's decision on the final boundaries. However, unlike in this case, the map proposed by those commissioners was not enacted "as is" but underwent substantial rounds of revisions. See Lee, 908 F.3d at 1183-84. In Bishop of Charleston v. Adams, 584 F. Supp. 3d 131, 2022 WL 407405, at *12 (D.S.C. Feb. 10, 2022), the court found the "extraneous comments of a few individual legislators" were insufficient to show discriminatory intent. The law at issue there was a provision in the South Carolina constitution that after its committee recommendation still "had to be proposed by a

finds that the comments made by this Councilmember are particularly relevant in answering the question of whether race predominated the decision to reenact the Challenged Districts in substantially the same form as they were drawn in 2011.

Significantly, in the 2022 redistricting process, the focus of the Councilmembers was on their own districts or regions of Jacksonville. The districts took shape through a series of smaller member-to-member meetings where the Councilmembers for the particular area under consideration discussed and negotiated changes. The Court is hard-pressed to find instances in the record of the redistricting process where a Councilmember offered any opinion of substance on aspects of a district outside his or her own region.[66] Indeed, Bowman described the process as such at the March 22, 2022 City Council meeting:

> And I -- I think it's a true example of how we best function as a council, because certainly the five of us could have had our meetings and decided what the districts were going to be. And

_____

supermajority of the House and Senate, adopted by the people, and ratified by the General Assembly." Id. at *12. And last, in Raleigh Wake Citizens Assoc. v. Wake Cnty. Bd. of Elections, 827 F.3d 333, 353 (4th Cir. 2016), the court recognized that legislator comments are evidence of legislative intent, but found the comments in that case insufficient to demonstrate that race predominated. Here, the comments of Priestly Jackson and other Councilmembers are merely one form of evidence, among others, on which Plaintiffs rely to show racial predominance.

[66] One notable exception being Rory Diamond who, despite satisfaction with his own District 13, voted in opposition to the Ordinance due to his disagreement with the decision to prioritize protecting incumbents and maintaining the status quo. See 3.15.22 Mtg. Tr. at 37; 3.22.22 Mtg. Tr. at 147.

> that's not the way we did it. And -- and I think we all agreed the
> right way to do it was to give some principal guidelines to Mr.
> Killingsworth and then follow that with every district council
> meeting, every at large council meeting. <u>Have independent
> meetings with their neighbors and who it impacted, and they come
> up to roll that up into what we came up with the final product</u>.

<u>See</u> 3.22.22 Mtg. Tr. at 152 (emphasis added).  And notably, when Becton spoke

at the March 15, 2022 Rules Committee meeting in favor of the Ordinance he

emphasized that his area of expertise was the southeast side of the River.  He

explained why he supported the changes to that area, and then "for the rest of

the [C]ity" expressed the view that "that's where councilmembers who represent

their areas have to be involved in the process and – and do what they

understand to be the changes that they need in order for those pillars[67] to work

for their area."  <u>See</u> 3.15.22 Mtg. Tr. at 44.  While the Court does not fault the

City Council for proceeding in this way, it nevertheless demonstrates that to

understand what motivated decisions regarding the shape of districts in a

particular region, one must look to the views of the specific Councilmembers

who represented those districts and negotiated those lines.

In this regard, Priestly Jackson is a key legislator, even more so than the

other Councilmembers representing the Challenged Districts.  Priestly Jackson

not only advocated for the shape of her district, she served on the Redistricting

---

[67] He earlier describes the "pillars" of redistricting as districts that are compact,
contiguous, and most importantly, reflective of "neighborhoods of interest."  <u>Id.</u> at 43.

Committee, she led the member-to-member meetings between Councilmembers representing the Challenged Districts, and she chaired the Rules Committee whose responsibility it was to present the proposed maps to the public and then report the plan to the City Council.  Significantly, the final shapes of the Challenged Districts that were agreed upon at the member-to-member meetings under her guidance, proceeded through the Redistricting Committee and Rules Committee to the final vote of the City Council with minimal, inconsequential changes.  Moreover, nothing in the record suggests that Priestly Jackson was a rogue legislator in the redistricting process.  To the extent the Councilmembers spoke at all about the Enacted Plan before the final vote, they did so to compliment Priestly Jackson on her leadership.  Indeed, the City's own expert acknowledges that Priestly Jackson "play[ed] an instrumental part in the process . . . ."  See Moreno Report at 12.  Thus, the Court finds the comments of Priestly Jackson to be important evidence relevant to the question of legislative intent.  See Cooper, 137 S. Ct. at 1468-69.

One of Priestly Jackson's first comments about the changes needed on the north and west side of the River reflects that first and foremost she was concerned with maintaining the minority access districts.  Priestly Jackson expressed her view that the population adjustments on the north and west side of the River could be made "without, I don't think, really damaging communities of interest and all of that as well."  See 8.24.21 Mtg. Tr. at 32.  She promptly

-115-

clarified what she meant here by "communities of interest," stating "we call it now the four communities of interest, which were formerly known as minority access districts." Id. at 33. Indeed, she repeatedly drew this equivalency throughout the redistricting process. See 9.9.21 Mtg. Tr. at 9-10; 3.22.22 Mtg. Tr. at 154, 158; see also 9.9.21 Mtg. Tr. at 17-18; 26-27. Pittman similarly stated at the outset of the redistricting process that she wanted to ensure that her "what was the new word? Community of interest . . . stays and not losing it." See 9.9.21 Mtg. Tr. at 16.

While Priestly Jackson at times expressed a recognition that perhaps the BVAP proportions, at least in District 8, were too high, it was only to the extent those numbers exceeded 60%. See 8.24.21 Mtg. Tr. at 33-34; see also 9.9.21 Mtg. Tr. at 25-26 ("So our goal would be to get everybody, you know, down to 60 percent or below."); id. at 58-59. Observing that her own District 10 was "currently at 58 percent" and "that's a good number," she expressed "zero desire to change . . . ." See 9.9.21 Mtg. Tr. at 17-18. It appears Pittman (D8) did not share Priestly Jackson's concerns as Killingsworth stated during this same meeting that he had met with Pittman that morning "and she's okay with her district staying at 68 percent . . . ." Id. at 57-58.

Most significantly, Priestly Jackson's speeches before the Rules Committee vote and the final City Council vote demonstrate unequivocally that she was determined to maintain the minority access districts and the significant

BVAP majorities contained in them.   It was, as she says, a "fundamental principal" to her.  See 3.22.22 Mtg. Tr. at 159.  Indeed, as she stated, preserving the minority access districts was the reason she sought to become chair of the Rules Committee.  See 3.15.22 Mtg. Tr. at 50.  Days before the final vote she tweeted her view that protecting the vote of her constituents meant "protecting what were known as 'minority access districts' in Jax-Districts 7, 8, 9, & 10." See Doc. 34-9.  And she added that "[d]ilution of the Black vote," by which she meant reducing the majority Black population of the minority access districts, "will never be supported by me."  See Doc. 34-9 (emphasis added).   Her statements plainly reflect that for Priestly Jackson, maintaining high BVAP percentages in the minority access districts was the criterion that could not be compromised.  See Bethune-Hill, 137 S. Ct. at 799.  And given the 2020 census numbers, this goal was easily achievable by simply reenacting, with minor revisions, the 2011 maps.

Notably, Priestly Jackson made these speeches and tweets in response to significant public criticism of the map preserving what critics at the public hearings identified as racially gerrymandered districts.  Although the entire City Council was informed of these criticisms, Priestly Jackson was the only Councilmember to directly address them.  As previously noted, Dennis (D9) did appear to defend the decision not to start from scratch because of the late census numbers, which DeFoor (D14) echoed.  But the late census numbers had no

actual impact on the amount of time for redistricting as the deadline ran from the release of the census numbers.  Bowman defended the plan by noting that the Council's actions also impacted the School Board Districts and that "we could have put ourselves in a situation where we would have had 100 percent new council members and I don't think that would have served the public any good as well as impacting the school districts." Id. at 39-40.  But, as previously noted, any perceived difficulty posed by the need to protect incumbents is overstated given how few incumbents were eligible and running for reelection in the Challenged Districts.  Thus, Priestly Jackson's defense of the plan was the only real response offered and she was unequivocal in her position that the minority access districts, with significant Black voter majorities, must be maintained.

In light of the foregoing, the Court finds this factor weighs in favor of a finding that race predominated the decision to reenact the Challenged Districts in substantially the same form as enacted in 2011.

### E. The Foreseeability & Knowledge of the Disparate Impact

In deciding to maintain existing lines, the Redistricting Committee and City Council were fully aware that Districts 7, 8, 9, and 10 had been intentionally created with Black voter majorities to serve as minority access districts. See 3.22.15 Mtg. Tr. at 155 (Priestly Jackson explaining that the racial percentages in Districts 7, 8, 9, and 10 trace back to the promises made at

consolidation that there would be four minority access districts); 8.18.21 Mtg. Tr. at 39, 42; see also 8.24.21 Mtg. Tr. at 33-34 (Priestly Jackson noting that the "four communities of interest" were "formerly known as minority access districts"); 10.28.21 Mtg. Tr. at 20-22.   Indeed, at the first Redistricting Committee meeting Killingsworth recounted the 2011 redistricting cycle and explained that "the decision was made to maintain the four communities of interest that historically existed as Council districts and then protect incumbencies, and that's all they chose out of communities of interest."  See 8.18.21 Mtg. Tr. at 39.  The Committee was likewise aware that these Districts continued to have large majorities of Black residents following the 2020 census. Indeed, Priestly Jackson cited the Black population percentages for Districts 7, 8, 9, and 10 at the second meeting of the Redistricting Committee on August 24, 2021.  See 8.24.21 Mtg. Tr. at 33-34; see also Doc. 34-6 (August 18, 2021 email to Killingsworth with Black population percentages per district).  And notably, at the full Redistricting Committee meeting on October 28, 2021, in his summary of the redistricting factors, Becton discussed the "traditional" districts, acknowledged that the Redistricting Committee could not consider race, but explained that these Districts were defensible because they were "grandfathered" in.  See 10.28.21 Mtg. Tr. at 20-22.  Despite this advice, the City has cited no legal authority to support the proposition that the law allows the City Council to "grandfather in" districts that were previously drawn on the

basis of race.  The Committee's knowledge that Districts 7, 8, 9, and 10 as they stood following the 2011 redistricting process were race-based districts in combination with the fact that it was plainly foreseeable they would remain that way if the Committee maintained existing lines are indicative of legislative intent.  See LOWV, 32 F.4th at 1373 (identifying "the foreseeability of the disparate impact" and "knowledge of that impact" as relevant factors in determining legislative intent).

### F. Availability of Less Discriminatory Alternatives

Through the Imai Report, Plaintiffs have presented evidence, which stands unrebutted, that it was possible to draw district lines in a manner that equalized populations, minimized River crossings, and resulted in compact and contiguous districts.   These 10,000 alternative maps also avoid pairing incumbent Councilmembers or School Board members.  But, unlike the Enacted Plan, Imai's simulated plans do not result in packing artificially large numbers of Black voters into Districts 7, 8, 9, and 10.  Indeed, even the small adjustment that Killingsworth initially proposed, which would have reduced the overall BVAP percentage in District 8 and unified more of the urban core into District 7, was summarily rejected.  See 9.9.21 Mtg. Tr. at 32-33; see also Killingsworth Memo, Map 4.  Plaintiffs' evidence that it was possible for the City Council to enact a map that more closely adhered to the goals stated in the City Charter, without reaffirming the historical segregation of Black voters, supports a

finding that race still played a predominate role in the redistricting process in 2021.

### G. Summary

Consideration of the <u>Arlington Heights</u> factors together with those identified in Eleventh Circuit precedent, presents a compelling case that race was the predominant factor in the drawing of the Challenged Districts. <u>See</u> <u>Shaw II</u>, 517 U.S. at 905-06 (finding racial predominance established where court had evidence of the districts' irregular shapes and demographics, as well as express statements from the state that the two districts were created in order to assure Black voter majorities); <u>Cooper</u>, 137 S. Ct. at 1469 (finding district court did not err in finding that race predominated where state's mapmakers established a goal of ensuring that the district had a majority BVAP and this criteria produced a district with "stark racial borders").   Plaintiffs present powerful and, at least at this stage of the proceeding, largely unrebutted circumstantial evidence that the shape of the Challenged Districts was dictated by race.  The historical record confirms that impression, and the contemporary statements of key legislators in the 2021 redistricting cycle convey an unequivocal intention to maintain the shape of these Challenged Districts not despite their racial demographics, but expressly to preserve them.

To be sure, consideration of race as the predominant factor in the City's redistricting process would be constitutionally permissible if it could withstand

a strict scrutiny analysis.  That is, if the City Council had a compelling justification for using race, and did so only to the extent necessary to serve that compelling interest. But, that is not what the City Council says it did.  Instead the City Council says race was not the predominant consideration.  The record shows otherwise.  And the decision to maintain the Challenged Districts as they were drawn in the 2011 redistricting cycle meant that in 2021, once again, race determined how voters were sorted on the north and west sides of Jacksonville. The Court does not suggest that the City Council acted with ill motive or bad intention in seeking to preserve the majority-minority access districts. To the contrary it appears that the very understandable desire to assure continued minority representation on the City Council was the most likely goal.  However, the Supreme Court has been unequivocal in its direction that racial sorting— even when done with good intention—violates the Constitutional mandate of the Equal Protection Clause if it cannot survive strict scrutiny.

Here, as Plaintiffs maintain, by focusing on race and packing more Black voters than necessary into Districts 7, 8, 9, and 10, the Enacted Plan does more than just assure minority representation on the City Council in those Districts. It also confines the voice of Black voters to those four districts on the north and west sides of the city.  Because the Black voters are pulled out of Districts 2, 12, and 14, the Enacted Plan assures that in those Districts there will not be a sufficient number of Black voters for them to have a meaningful impact on any

election or a meaningful voice on any issue of concern.  In addition, as Plaintiffs describe in their Declarations, dividing communities to prioritize race in the drawing of district lines undermines the quality of representation for the people living in those communities and districts.  <u>See</u>, <u>e.g.</u>, Frazier Decl. at 2 ("The sprawling, noncompact districts make it more difficult for our members to establish meaningful relationships with their Council and School Board members, and mean that those elected officials are less responsive to the needs of the varied and geographically dispersed communities that they try to serve.").

In consideration of the foregoing, the Court is convinced that Plaintiffs have made the requisite clear showing that they are substantially likely to succeed on the merits of their Equal Protection claim.

## VII.  Irreparable Harm

Plaintiffs assert that they will suffer irreparable harm in the absence of a preliminary injunction.  <u>See</u> Motion at 33-34.  Notably, the City concedes that "racial gerrymandering can constitute irreparable harm."  <u>See</u> Response at 29.  As the Supreme Court recognized in <u>Reynolds v. Sims</u>:

> The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

See <u>Reynolds</u>, 377 U.S. 533, 555 (1964).  Moreover, "[c]lassifications of citizens

on the basis of race 'are by their very nature odious to a free people whose

institutions are founded upon the doctrine of equality.'"  <u>See</u> <u>Shaw I</u>, 509 U.S.

at 643 (quoting <u>Hirabayashi v. United States</u>, 320 U.S. 81, 100 (1943)).  As to

racial gerrymandering in particular, the Supreme Court described the harms in

<u>Shaw I</u> as follows:

> [Racial gerrymandering] reinforces the perception that members of
> the same racial group—regardless of their age, education, economic
> status, or the community in which they live—think alike, share the
> same political interests, and will prefer the same candidates at the
> polls.  We have rejected such perceptions elsewhere as
> impermissible racial stereotypes. By perpetuating such notions, a
> racial gerrymander may exacerbate the very patterns of racial bloc
> voting that majority-minority districting is sometimes said to
> counteract.
>
> The message that such districting sends to elected representatives
> is equally pernicious. When a district obviously is created solely to
> effectuate the perceived common interests of one racial group,
> elected officials are more likely to believe that their primary
> obligation is to represent only the members of that group, rather
> than their constituency as a whole. <u>This is altogether antithetical to
> our system of representative democracy.</u>

<u>Id.</u> at 647-48 (emphasis added) (internal citations omitted).  Plainly these are

egregious harms that cannot be redressed once an election has occurred.  <u>See</u>

<u>League of Women Voters of N.C. v. North Carolina</u>, 769 F.3d 224, 248 (4th Cir.

2014) ("[O]nce the election occurs, there can be no do-over and no redress. The

injury to these voters is real and completely irreparable if nothing is done to

enjoin this law.").  Plaintiffs have easily satisfied their burden of establishing

that, in the absence of an injunction, they will suffer irreparable harm.  See Alpha Phi Alpha Fraternity v. Raffensperger, __ F. Supp. 3d ___, 2022 WL 633312, at *70 (N.D. Ga. Feb. 28, 2022).

## VIII. Balance of Harms

As a final consideration in determining the need for a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (quoting Amoco Production Co. v. Village of Gambell, AK, 480 U.S. 531, 542 (1987)); see also Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017) (noting "[i]t is ultimately necessary ... to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large" before ruling on the necessity for a preliminary injunction). In exercising this "sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24 (quoting Weinberger v. Romero–Barcelo, 456 U.S. 305, 312 (1982)). This is particularly true where the potential injunctive relief impacts a legislative enactment. Ne. Fla., 896 F.2d at 1284.

### A. Arguments

The City argues that the balance of equities weighs against an injunction. First, the City asserts that Plaintiffs unreasonably delayed in bringing this

action.  The City points out that Plaintiffs participated in the redistricting process prior to suing, and presented arguments to the City, including academic analyses, during that process.  Id. at 30.  Yet, Plaintiffs waited six weeks after the City passed the Ordinance to file suit, and then waited an additional two and a half months to seek preliminary injunctive relief.  See Response at 29. Moreover, the City observes that Plaintiffs' allegations are premised on alleged harms dating back to 1991.  Id. at 29-30.  Yet, Plaintiffs never sought to challenge the legality of the 2011 maps, nor did they seek to enjoin the use of those maps prior to the August 2022 special election cycle. Id.  According to the City, "it is hard to understand why they are able to bear that decades-old harm during the present special election cycle, but require injunctive relief as protection from the alleged harms of the newly drawn lines." Id. at 29-30.[68]  In the Reply, Plaintiffs respond to the City's delay arguments by explaining that "Plaintiffs (relying on the Dec. 16 date) expeditiously compiled the voluminous evidence required by racial gerrymandering challenges, particularly after Defendants' answer made relevant decades of history and election data." See Reply at 10.

---

[68] Plaintiffs' rationale on this particular point is not hard to understand.  The two Councilmembers who were elected in the August 2022 election cycle will stand for reelection in March 2023.  It is certainly not unreasonable for Plaintiffs to decide to focus their resources on the March 2023 election when all City Council seats are up for election.

In addition, the City contends that the City, Supervisor of Elections (SOE), candidates, and the public will suffer a "host of harms" if an injunction is issued.  See Response at 30.  According to the City, as of July 14, 2022, candidates for City Council had to establish their residency in the district they hope to represent.  In addition, the City asserts that to qualify as a candidate by petition, a candidate must "obtain a statutorily defined number of citizen signatures" from individuals residing in that district which must be submitted no later than December 12, 2022.  Id. at 31-32.  Thus, the City contends that a potential candidate may find herself drawn out of the district she seeks to represent, or that the signatures she has gathered are not within the geographic boundaries required.  Id.[69]

---

[69] To the extent the City relies on the petition signature requirement as a potential harm, the Court finds it to be insufficient.  While section 99.095(2)(a) of the Florida Statutes, cited by Defendants, provides that "a candidate must obtain the number of signatures of voters in the geographical area represented by the office sought . . . ," subsection (d) provides that "[i]n a year of apportionment, any candidate for county or district office seeking ballot position by the petition process may obtain the required number of signatures from any registered voter in the respective county, regardless of district boundaries."  See Fla. Stat. § 99.095(2)(a), (d) (emphasis added).  Because it appears that candidates can collect signatures from anyone in Duval County, changing district lines will not impact their ability to qualify via petition so long as they have "at least the number of signatures equal to 1 percent of the total number of registered voters. . . divided by the total number of districts of the office involved."  See Fla. Stat. § 99.095(2)(d).  At the Hearing, the City posited that an issue may arise if the lines are not drawn until January 2023, which may, although not necessarily, be outside the legal definition of a "year of apportionment."  See Hearing Tr. at 60-61.  However, the Court conducts this balance of harms analysis based on the view that new maps must be in place no later than December 16, 2022.  And, the Court has no intention of altering the December 12, 2022 statutory deadline, unquestionably within the year of apportionment, by which candidates qualifying by petition must submit their signatures to the SOE.  See Fla. Stat. § 99.095(3).  Regardless, to avoid any confusion, the Court sees no reason that it could not exercise its equitable authority to order that for purposes of the City's March 2023 election, the year of apportionment runs from March 2022-March 2023.  To the extent either party believes such

The City also invokes potential harms to the SOE.  According to the City, the SOE normally takes "three to four weeks" to send out new voter cards when district boundaries change, and may need additional time depending on the "availability of external vendors, who when faced with county-wide changes, may require even more time to complete the task." Id. at 33.  The City notes "similar burdens" for printing new ballots. Id.  And the City maintains that if the Court were to require a separate special election, it could cost the City an additional $1.5 million. Id.  Plaintiffs maintain that these harms are overstated and that "nothing undermines [the City's] past representation that they could hold elections with districts in place by December 16." See Reply at 9-10.

## B. Delay

In Benisek v. Lamone, 138 S. Ct. 1942 (2018), the Supreme Court affirmed a three-judge district court's decision to deny a request for preliminary injunction in a political gerrymandering case.  "[I]n election law cases as elsewhere," the Supreme Court explained, "a party requesting a preliminary injunction must generally show reasonable diligence." Id. at 1944.  The Court observed that plaintiffs "did not move for a preliminary injunction in the District Court until six years, and three general elections, after the 2011 map was adopted, and over three years after the plaintiffs' first complaint was filed." Id.

---

action to be necessary or appropriate, a motion requesting such relief, after conferral, may be filed.

This delay, combined with a "due regard for the public interest in orderly elections," as well as the "legal uncertainty surrounding any potential remedy," warranted the denial of their request, even assuming that plaintiffs were likely to succeed on the merits.  Id. at 1944-45.[70]

To the extent the City contends that injunctive relief is not warranted because the alleged harms have been in existence since at least 2011 if not before, the Court is not persuaded.  Plaintiffs in this case complain about a new harm—the maps enacted in 2022, and the harms posed by those maps, as described above, are irreparable and ongoing.  Moreover, for purposes of the March 2023 election that is the focus of this lawsuit, Plaintiffs likely had to wait until the new maps were enacted before they could file suit.[71]  The Court also notes Plaintiffs' counsel's representation at the Hearing that some of the Plaintiff organizations he represents did not exist in 2011 when the prior maps were passed.  See September 16, 2022 Hearing Tr. (Doc. 50) at 14.  Under the

---

[70] In Benisek, the original plaintiffs filed suit in 2013, new plaintiffs joined and they amended the complaint in 2016, plaintiffs moved for a preliminary injunction in May 2017, and represented to the court that they needed a ruling by August 18, 2017, to ensure completion of a new districting scheme before the 2018 election season.

[71] The Court notes that Plaintiffs may have also faced difficulty in seeking to enjoin the pre-existing version of the Challenged Districts for purposes of the 2019 City Council election. For the reasons stated in Chen, a court may have been hesitant to require wholesale redrawing of the maps just prior to the census when redistricting was set to occur again with more updated information.  Avoiding the repeated disruption of new maps back-to-back would have weighed against an injunction.  See Flores v. Town of Islip, 382 F. Supp. 3d 197, 248 (2019) ("If the Court were to issue a preliminary injunction and institute a single-member district system, Islip would have to re-draw the district boundaries after the 2020 census. This would cause additional confusion and preclude the continuity required in local elections.").

-129-

circumstances, the Court is not persuaded that Plaintiffs have unreasonably "delayed" in challenging the new implementation of the Challenged Districts for the March 2023 election merely because those districts have existed in substantially the same form since 2011.

However, Plaintiffs' delay in filing the Complaint after the Ordinance was passed, and more significantly, their further delay in filing the Motion, does weigh against an injunction. Although the timeframes themselves are not egregious, in the particular context of this case where Plaintiffs seek to have the City Council entirely redraw the district maps prior to the March 2023 election, every single day matters. Nevertheless, given Plaintiffs' high evidentiary burden and the voluminous record they developed, including the comprehensive reports of two experts, the Court accepts that Plaintiffs were moving expeditiously under the circumstances in compiling their evidence. See, e.g., Ohio State Conference of N.A.A.C.P. v. Husted, 768 F.3d 524, 560-61 (6th Cir. 2014) ("Defendants have not explained how Plaintiffs could have more quickly produced the voluminous record evidence in this case in support of their motion for a preliminary injunction, nor have Defendants produced any evidence that Plaintiffs purposefully delayed.") injunction stayed 135 S.Ct. 42 (2014). The Court has no reason to believe Plaintiffs' delay was intentional, strategic, or even negligent. Thus, while this factor weighs against an injunction, it must be balanced with the other harms.

## C. Harms

The City cites four types of harms in its Response: harms to the candidates, harms to the SOE, harms to the public, and harms to the City. Redrawing the district maps at this stage in the proceedings will harm candidates in that the deadline to establish residency in a district has passed. Thus, a candidate may find herself resident in a district substantially different from the one in which she had intended to run or facing a different opponent than she had expected.  Nevertheless, a candidate will not be left without any district in which to run, and presumably, the district will be redrawn in a more logical and compact manner, such that "campaigning should be easier, not harder, in the newly configured districts." See Vera v. Bush, 933 F. Supp. 1341, 1351 (S.D. Tex. 1996) (issuing new maps in August and requiring a special election in conjunction with general election in November).  Candidates will also have notice of any new district maps prior to the candidate qualifying period in January, such that candidates will have ample time to campaign in the newly configured district.[72]

As to the harms to the SOE, the City presents declarations from Robert Phillips, the Chief Elections Officer for the SOE, and Lana Self, the Candidate Services Director for the SOE.  See Declaration of Robert Phillips (Doc. 40-32;

---

[72] The Court notes that none of the Councilmembers running for reelection include in their declarations any assertions regarding the potential hardships that he or she would suffer if the districts are redrawn at this time.

Phillips Decl.); Declaration of Lana Self (Doc. 40-33; Self Decl.).   Phillips identifies various administrative harms that will stem from changing the districts at this time.  According to Phillips, new precincts will need to be drawn and polling places may change, which may cause voter confusion.  He appears primarily concerned with the time it takes to reissue, print, and mail new voter registration cards, as well as the cost associated with that effort.  See Phillips Decl. ¶¶ 7-8.  According to Phillips, this process could take several weeks due to the SOE's stringent measures for ensuring accuracy, as well as printer capacity issues.  Id.  He also cites the need to print ballots by January 20, 2023, but does not describe what is needed to prepare the ballots for printing or otherwise assert that the SOE will be unable to have the ballots ready by that date if the districts are revised by December 16, 2022.  See Declaration of Robert Phillips (Doc. 40-32) ¶ 11.[73]  While the Court recognizes that changing the district lines would be burdensome to the SOE, the Court is also cognizant of the City's representation that the SOE needed to know the district lines by December 16, 2022, in order to proceed with the March 2023 election.   Thus, these

---

[73] In contrast, where a candidate qualifying date is moved, the Court recognizes potential harm to "the accuracy of the primary because of the required timelines for building ballot combinations, proofing draft ballots, and preparing ballots for printing by the deadline for overseas and military voters."  See Alpha Phi Alpha Fraternity Inc., 2022 WL 633312, at *75.  But here, no one has asked the Court to move the candidate qualifying date, such that the SOE's process for preparing ballots should remain unaffected.

administrative burdens are not so great as to interfere with the actual administration of the election.

As to the public harms, the Court recognizes a potential risk of public confusion. However, the only actual example of such confusion offered by the City is that which could result from a change in polling places. See Phillips Decl. ¶ 8. In addition, the public interest would not be served by a chaotic or overly hasty reordering of the districts. See Alpha Phi Alpha, 2022 WL 633312, at *76. The Court also recognizes that the public and the City have an interest in preserving the integrity of the election process and enforcing the City's duly enacted plans. See Abbott, 138 S. Ct. at 2324 n.17. However, given the Court's findings that the Ordinance is substantially likely to be unconstitutional, this potential harm is largely negated as neither the City nor the public have an interest in enforcing unconstitutional plans. Indeed, the Eleventh Circuit has held "the public interest is served when constitutional rights are protected." Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1327 (11th Cir. 2019); see also Fla. Businessmen for Free Enterprise v. City of Hollywood, 648 F.2d 956, 959 (11th Cir. 1981) ("The public interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional.").

### D. Balance

In light of the foregoing, the Court is convinced that the balance of harms necessitates the issuance of an injunction.  The harms to Plaintiffs are significant and the ramifications of allowing the election to proceed on the Enacted Plan means that Jacksonville voters living in the Challenged Districts will likely be subject to representation premised on impermissible racial classifications for four more years.  While the Court recognizes the potential harm to candidates and the administrative burden on the SOE, these harms simply do not outweigh the grievous constitutional harm to the voters of Jacksonville.  The City has not shown any substantial risk of harm, confusion, or disruption in the March 2023 election.  Moreover, as stated above, neither the City nor the public have an interest in enforcement of an unconstitutional ordinance.

### IX.   Conclusion

Upon careful review of the entire record, and cognizant of Plaintiffs' high burden in seeking an injunction against a legislative enactment, particularly one concerning an election, the Court is convinced that Plaintiffs have made a clear showing that the injunctive relief they seek is definitely demanded. Indeed, the evidence that the Challenged Districts are the product of intentional race-based decision-making is largely unrebutted and compelling.  And absent an injunction, the irreparable Constitutional harm caused by the unnecessary

racial segregation of voters in the Challenged Districts will be complete and perpetuate for years into the future.  See League of Women Voters of N.C., 769 F.3d at 248.  For this reason, new maps must be drawn in advance of the next election.

In determining that the City must not be permitted to proceed with an election based on the maps in the Enacted Plan, the Court treads cautiously, recognizing the belief expressed by concerned Councilmembers that Districts with a significantly high BVAP percentage are necessary to maintain the current level of minority representation on the City Council. The concern that newly drawn Districts may negatively impact the level of minority representation on the City Council is real and not insignificant. But the Court has no authority or ability to address that concern in resolving the Constitutional challenge presented by the Plaintiffs here.

The organizational and individual voter Plaintiffs bringing this action are all firmly committed to protecting voting rights and in this action seek to vindicate the rights of  Black voters in the Challenged Districts. They contend that the City's Enacted Plan intentionally sorts voters in the Challenged Districts on the basis of race in violation of the Equal Protection Clause of the United States Constitution. They identify real and significant harms that stem from this racial sorting and demand that the City be required to redraw the maps without consideration of race as the predominant factor (or at least

considering race no more than necessary to comply with the VRA). Thus, questions that the Court addresses here are limited to: (1) whether Plaintiffs have shown a substantial likelihood of success on their claim that the Enacted Plan, regardless of the likely benign intention, commits the "odious" harm of separating citizens into voting districts on the basis of race, see Wis. Legislature, 142 S. Ct. at 1248; Shaw I, 509 U.S. at 643; Shaw II, 517 U.S. at 904-05; and (2) if so, whether given the significant requirements for obtaining the preliminary injunctive relief they seek, Plaintiffs have shown that such relief is definitely demanded. The answer to both of these questions is Yes.

The Court is fully cognizant that interfering with a legislative body's districting plan is a serious intrusion on the responsibility of the legislative branch. And a court should do so only upon a clear showing that such interference is demanded. Here, although the Court acts with reluctance, the Court is convinced that failing to act would be an even more serious failure of the responsibility of the judicial branch.

Thus, the Court will grant the Motion and provide the City with a reasonable opportunity to enact new district lines ahead of the upcoming election. With voting maps drawn in a manner that comports with the Constitutional mandate of the Equal Protection Clause, the voters of Jacksonville must decide their representation.

Below the Court sets forth a schedule for the preparation of a plan with new district lines. In setting the schedule, the Court has reviewed the parties' remedies briefs and taken into consideration the parties' positions on the appropriate timeframes.

Accordingly, it is

**ORDERED:**

1. Plaintiffs' Motion for Preliminary Injunction (Doc. 36) is **GRANTED**.

2. Defendants the City of Jacksonville; and Mike Hogan, in his official capacity as Duval County Supervisor of Elections; as well as their officers, agents, employees, and attorneys who receive actual notice of this Order by personal service or otherwise, are **immediately enjoined** from conducting any elections using the Jacksonville City Council and Duval County School Board districts enacted in Ordinance 2022-01-E, until entry of a final judgment in this case.

3. The City shall have up to and including **November 8, 2022** to enact and file with the Court an interim remedial plan for use in all City Council and School Board elections to be held pending final judgment in this case.

4. Any interim remedial plan the City enacts must not use race as a predominant factor in the design of any district unless that use of race

is narrowly tailored to comply with a constitutionally permissible compelling government interest.

5. If at any point prior to **November 8, 2022**, the City Council determines that it will not pass an interim remedial plan, the City must notify the Court immediately.

6. If, after the City Council passes and submits a proposed interim remedial plan, Plaintiffs determine that they have no objections to the plan, Plaintiffs must notify the Court immediately.

7. No later than three (3) days after it files its interim remedial plan, the City must file with the Court all files, data, correspondence, transcripts, and analyses relating to the enactment process, not otherwise exempt from disclosure pursuant to Florida's Public Records Law, Florida Statutes § 119, et seq.

8. On or before **November 18, 2022**, Plaintiffs may file objections to the City's proposed plan and may submit alternative remedial plans.

9. On or before **November 28, 2022**, the City may file a reply in support of the Council's proposed interim remedial plan and in opposition to Plaintiffs' alterative remedial plan.

10. As part of their submissions, the parties must indicate whether they desire an evidentiary hearing or oral argument. The Court will set this

matter for evidentiary hearing or oral argument, if necessary, by further order.

11. If the City fails to enact and file with the Court a proposed interim remedial plan by **November 8, 2022**, the parties may each file a brief proposing interim remedial plans for the Court's review.  These submissions are due by **November 18, 2022**, or the **ninth day** after the City files the notice described in paragraph 4 above, whichever is earlier.  Each party shall have **seven days** to file a response to the brief.

12. As agreed to by the City, Plaintiffs are not required to provide a bond or other security before this preliminary injunction becomes effective.

**DONE AND ORDERED** in Jacksonville, Florida this 12th day of October, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

lc11
Copies to:

Counsel of Record