IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JACKSONVILLE BRANCH
OF THE NAACP, *et al.*,

    *Plaintiffs*,

v.

CITY OF JACKSONVILLE, *et al.*,

    *Defendants*.

                                 /

Case No. 3:22-cv-493-MMH-LLL

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR STAY PENDING APPEAL**

    Defendants ask this Court to stay pending appeal its thorough and well-reasoned Order enjoining elections under racially gerrymandered district lines. *See* Mot. for Stay, ECF 57 ("Mot."). In making that request, Defendants never once suggest that they are likely to succeed in their appeal. They don't contend that the Court misunderstood any facts. Nor do they argue that the Court misapplied the law. These omissions are dispositive and fatal to Defendants' motion. So is the absence of any argument that they will be irreparably harmed without a stay.

    Defendants' motion instead mostly retreads issues this Court has already considered and settled. They provide no new information or argument that undermines the Court's previous conclusions that Plaintiffs will suffer irreparable harm absent an injunction and that *Purcell* does not apply to this case. Defendants' one new argument—that the decision in *Merrill v. Milligan* may affect this case—is meritless because *Merrill* is a Voting Rights Act Section 2 case and Defendants have repeatedly

1

conceded that Section 2 does not justify their use of race.

## BACKGROUND

On October 12, 2022, this Court granted Plaintiffs' Motion for a Preliminary Injunction (ECF 36), enjoining Defendants from holding elections for Jacksonville City Council or School Board under the lines enacted in Ordinance 2022-01-E. Order, ECF 53 ("Order"). In its thorough 139-page Order, the Court assessed the overwhelming circumstantial evidence that race predominated in the drawing of City Council Districts 2, 7, 8, 9, 10, 12, and 14 (together, the "Unconstitutional Districts"). It also examined the substantial direct evidence that councilmembers drew these districts to maintain their racial makeups, choosing to preserve the pre-existing district cores *because* they were race-based. As the Court noted, "the circumstantial evidence considered in combination with the historical evidence presents a virtually unrebutted case that the Challenged Districts exist as they do in the Enacted Plan as a result of racial gerrymandering." Order at 103. And, because Defendants made no attempt to show that the use of race in drawing the Unconstitutional Districts satisfied strict scrutiny, *id.* at 5, the Court concluded that these districts likely violated the Fourteenth Amendment as racial gerrymanders.

The Court declined to apply the *Purcell* principle for three independent reasons. First, the Court noted that it had set its schedule based on Defendants' representation "without caveat" that an interim remedy in place by December 16 would allow the Supervisor of Elections to run the March 2023 elections. *Id.* at 9. The Court explained that any attempted about-face was precluded by *Rose v. Raffensperger*, No. 22A136,

2022 WL 3568483 (U.S. Aug. 19, 2022). Order at 9–10. Second, the Court explained that even without these representations, Defendants had not justified what they sought: an unprecedented expansion of *Purcell*. Specifically, the Court noted that *Purcell* had never been applied so long before an election. *Id.* at 10–11. Third, the Court explained that Defendants had made no showing of significant harms to the concerns *Purcell* implicates. *Id.* at 10–11, 127–34.

The Court noted the irreparable and "grievous" harm Plaintiffs would face if elections were allowed to proceed using the Unconstitutional Districts. *Id.* at 134; *see also id.* at 123–25. It explained that the balance of the equities clearly weighed in favor of enjoining elections and ordering an interim remedy. *Id.* at 134.

The Court's Order included a schedule for establishing an interim remedial map by December 16—the date provided by Defendants.[1] *Id.* at 137–39. The schedule gave the City Council nearly a month to enact an interim remedy and submit it to the Court for approval. *Id*. Defendants noticed their appeal six days after the Court's Order, ECF 54, and the following day moved to stay the Order pending appeal, ECF 57.

Meanwhile, City Council President Terrance Freeman has established a Special Committee on Redistricting, chaired by him, to develop an interim remedy. Ex. 1. The Committee met for the first time on October 20, 2022, and has scheduled meetings for

---

[1] To avoid doubt: While Defendants assert that "[a]ll parties agree that, to avoid electoral disruption, a new map needs to be in place by December 16, 2022," Mot. at 2, Plaintiffs agree only that if a map is in place by December 16, there would be no electoral disruption. Plaintiffs do not concede that a remedy put in place after that date would necessarily cause disruption. As Plaintiffs explained at the preliminary injunction hearing, recent practice suggests the Supervisor's Office could run the elections with minimal disruption even if a remedy is put in place in the weeks after December 16. *See* ECF 50 at 9:11–13:4.

November 1, 2, and 3. Exs. 1–2. According to its public statements, the Committee plans to approve an interim remedy by November 3, for a full Council vote on the morning of November 4. *See, e.g.*, Ex. 3 at 2:1–7.

## STANDARD OF REVIEW

The "burden of meeting the [Federal Rule of Civil Procedure 62(c)] standard" for a stay pending appeal "is a heavy one." Wright & Miller, 11 Fed. Prac. & Proc. Civ. 2d § 2904. Rule 62 is governed by the same standards as Federal Rule of Appellate Procedure 8(a) and "is an 'extraordinary remedy.'" *Fla. v. Dep't of Health & Hum. Servs.* ("*HHS*"), 19 F.4th 1271, 1279 (11th Cir. 2021) (quoting *Touchston v. McDermott*, 234 F.3d 1130, 1132 (11th Cir. 2000) (en banc)).

A stay-pending-appeal request requires a court to "evaluate four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *7 (11th Cir. Sept. 21, 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)).

The first two factors are "the most critical." *Nken*, 556 U.S. at 434. And while courts sometimes accept "a lesser showing of a substantial case on the merits when the balance of the [other factors] weighs heavily in favor of granting the stay," *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986) (internal quotations omitted), "[i]t is not enough that the chance of success on the merits be better than negligible," *HHS*, 19

4

F.4th at 1279 (quoting *Nken*, 556 U.S. at 434). The applicant must still "present a substantial case on the merits" in such circumstances. *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981). "Similarly, as to the second prong, it is not enough simply to 'show[ ] some possibility of irreparable injury.'" *HHS*, 19 F.4th at 1279 (quoting *Nken*, 556 U.S. at 434). The third and fourth factors—the harm to the non-movant and where the public interest lies—merge where the government is a party. *Id*. at 1293.

Because a stay pending appeal is an "'extraordinary and drastic remedy,' [a court] may not enter one 'unless the movant clearly establishe[s] the burden of persuasion as to each of the four prerequisites.'" *HHS*, 19 F.4th at 1279 (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)).

## ARGUMENT

### I. Defendants Are Not Entitled to a Stay

Defendants cannot meet the heavy burden required for a stay pending appeal. The first two factors—the movants' likelihood of success on appeal and any irreparable harm they face absent a stay—are "the most critical." *Nken*, 556 U.S. at 434. Defendants make no showing on either. The third and fourth factors, meanwhile, also cut sharply against granting Defendants' motion.

**A. Defendants are not likely to succeed on the merits of their appeal**

Defendants make *no argument* that they are likely to succeed on the merits of their appeal. At no point do they suggest that this Court misconstrued the facts or erred in applying the law when it concluded "the evidence that the Challenged Districts are

the product of intentional race-based decision-making is largely unrebutted and compelling." Order at 134.

This Court's Order makes plain why Defendants are not likely to succeed in their appeal. By Defendants' own telling of the facts, preserving the 2011 districts was a key criterion in the 2021–22 redistricting. And, as the Court explained, "[t]he evidence . . . of what occurred in 2011, which the City has not disputed, unabashedly points to racial gerrymandering." *Id*. at 102. Courts have repeatedly found that the unjustified perpetuation of race-based districts violates the Constitution. *See e.g.*, *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018) (per curiam); *Chen v. City of Houston*, 206 F.3d 502, 518 (5th Cir. 2000); *Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505, 544–45 (E.D. Va. 2015) (subsequent history omitted); *Polish Am. Cong. v. City of Chicago*, 226 F. Supp. 2d 930, 937 (N.D. Ill. 2002). This is so even when previous district cores were re-enacted without *any* reference to race. *Covington*, 138 S. Ct. at 2553. Here, the Court went further and concluded that the Council *intentionally* chose to preserve 2011 cores *because of* and not despite their racial makeup. Order at 105, 121.

The Unconstitutional Districts themselves are "bizarrely shaped," "elongated," "sprawling," "odd and illogical[ly]" shaped, visually "non-compact," and mathematically less compact than districts elsewhere in the City. *Id.* at 94–95. These shapes reflect borders between Packed and Stripped Districts that "reveal[ ] a pattern where every single precinct on the District 7–10 side of the line has a higher BVAP percentage than the corresponding precinct on the District 2, 12, or 14 side of the line.

6

Not *some* precincts along the line, not *many* precincts along the line, but *every single one*." *Id.* at 96. All this circumstantial evidence is probative of race-based decision-making. *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 300–01 (2017). And, as this Court noted in its Order, "the City makes no attempt to explain the overall peculiar shapes of these Districts on the basis of compactness, contiguity, natural geography, communities of actual shared interests, or any other traditional redistricting factor." Order at 95–96. Defendants' latest motion, like their merits briefing, includes no attempt to explain away this evidence.

As the Court is well aware, the preceding details reflect a small fraction of the overwhelming direct and circumstantial evidence of racial predominance. As the Court explained:

> Plaintiffs present powerful and, at least at this stage of the proceeding, largely unrebutted circumstantial evidence that the shape of the Challenged Districts was dictated by race. The historical record confirms that impression, and the contemporary statements of key legislators in the 2021 redistricting cycle convey an unequivocal intention to maintain the shape of these Challenged Districts not despite their racial demographics, but expressly to preserve them.

*Id.* at 121.

And, of course, the City has disclaimed any justification for its enactment of race-based districts in Ordinance 2022-01-E. *Id.* at 5. As a result, the only question in this case is whether race predominated in the drawing of the Unconstitutional Districts. Defendants' motion makes no attempt to show the Court erred in concluding that it did. That failure is dispositive of their present motion.

## B. Defendants will not suffer irreparable harm absent a stay

Defendants' arguments on "the second 'most critical' factor," *HHS*, 19 F.4th at 1291 (quoting *Nken*, 556 U.S. at 434)—that they will face irreparable harm absent a stay—are equally absent. At no point do Defendants affirmatively argue they will be irreparably harmed without a stay.

Had Defendants made arguments about irreparable harm, they wouldn't have gotten far because this Court correctly concluded the districts they drew are likely unconstitutional. While both the Supreme Court and the Eleventh Circuit have indicated that an injunction barring enforcement of election laws can constitute irreparable harm to the government, both courts have carved out an exception where the law is unconstitutional. In *Abbott v. Perez*, the Supreme Court explained: "*Unless that statute is unconstitutional*," an "injunction[ ] barring the State from conducting . . . elections pursuant to a statute enacted by the Legislature . . . would seriously and irreparably harm the State." 138 S. Ct. 2305, 2324 (2018) (emphasis added); *see also New Ga. Project v. Raffensperger,* 976 F.3d 1278, 1283 (11th Cir. 2020) (noting irreparable harm in such a scenario "unless the statute is unconstitutional"). Put simply, where, as here, the City is enjoined from enforcing an *unconstitutional* election statute, it can claim no irreparable harm from the injunction. That makes sense: because "the city has no legitimate interest in enforcing an unconstitutional ordinance," it *cannot* be harmed by being barred from doing so. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006); *see also Scott v. Roberts,* 612 F.3d 1279, 1297 (11th Cir. 2010).

### C. A stay will harm Plaintiffs and the public interest

Defendants' stay request isn't supported by the third or fourth stay-pending-appeal factors either. These two factors—whether a stay will substantially injure the stay opponent and where the public interest lies—merge where the government seeks to stay an injunction against its legislative enactment. *HHS*, 19 F.4th at 1293.

These factors weigh against a stay. Defendants have conceded that elections held under unconstitutional lines cause irreparable harm. *See* Order at 123. Granting a stay now will cause that harm, not just to Plaintiffs, but to all the residents of the Unconstitutional Districts. They would be forced to live in districts unnecessarily based on racial "[c]lassifications . . . [that] 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)); *see also Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam). Their "elected representatives," meanwhile, will receive a "pernicious" message that will make them "more likely to believe that their primary obligation is to represent only the members of [one racial] group." *Shaw*, 509 U.S. at 648. These serious harms are "altogether antithetical to our system of representative democracy." *Id*. Additionally, "the public . . . has no interest in enforcing an unconstitutional law," *Scott*, 612 F.3d at 1297, and it is always in the public interest to ensure the Constitution is followed, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).

The harm of granting a stay now cannot be overstated: this Court issued a thorough Order detailing how Plaintiffs met their high bar of showing that the

Unconstitutional Districts violated the Fourteenth Amendment; the Court noted repeatedly that Defendants did little to rebut or otherwise challenge the evidence of constitutional violations. That decision understandably garnered significant attention among the public and in the media. To now stay that decision would have deleterious effects: it "would be harmful to the public's perception of the election's legitimacy" to permit the election of seven councilmembers to four-year terms under unconstitutional lines. *Id.* It would also mar the legitimacy of the Council once the victors take office: over a third of the Council would be elected from illegally drawn districts. *See Ala. Legis. Black Caucus v. Alabama* ("*ALBC*"), 575 U.S. 254, 283 (2015) (Scalia, J., dissenting) ("Racial gerrymandering strikes at the heart of our democratic process, undermining the electorate's confidence in its government as representative of a cohesive body politic in which all citizens are equal before the law.").

## II.  Defendants' Other Arguments for a Stay are Meritless

Instead of showing they are entitled to a stay pending appeal using the established legal framework, Defendants advance three broad arguments. Two of the three retread arguments the Court has already considered and rejected. Each is meritless.

### A. *Merrill v. Milligan* will not salvage the Unconstitutional Districts

First, Defendants suggest the Supreme Court's forthcoming decision in *Merrill v. Milligan* might change the legal landscape governing this case. As an initial matter, this argument would have been better suited to a request for a stay of proceedings *before*

the Court rendered its Order. *See* Mot. at 6 (citing cases involving prejudgment stay requests). It has no place in the *Nken* framework that governs Defendants' motion.

More importantly, the argument is unavailing, because *Merrill* will do nothing to alter the relevant law. *Merrill* is simply not a Fourteenth Amendment racial gerrymandering case; instead, it involves a claim under Section 2 of the Voting Rights Act. 142 S. Ct. 1105 (Mem.) (2022) ("The question presented in this case is: Whether the District Courts in this case correctly found a violation of section 2 of the Voting Rights Act.").[2]

Any change in Section 2 doctrine will not disturb this Court's preliminary injunction ruling, because "[t]he City does not contend that the VRA justifies the shape of the Challenged Districts or that it considered any evidence pertinent to that issue." Order at 14 n.10. In other words, Section 2 can play *no role* in the Court's determination of whether Defendants violated the law, because Defendants have explicitly foregone any argument that their use of race was justified by Section 2. *Merrill* will have no bearing on what Defendants have explicitly asserted is their sole defense on the merits: that race did not predominate in the district-drawing. ECF 50 at 36:19–37:2. The Court, considering all "direct evidence of legislative intent" and "circumstantial evidence" of the Unconstitutional Districts' "shape[s] and demographics," concluded that race predominated. *Cooper*, 581 U.S. at 291 (punctuation omitted). Nothing in

---

[2] The plaintiffs in *Merrill v. Caster*, consolidated with *Milligan*, pled a racial gerrymandering claim in addition to their Section 2 claim. The district court did not address that claim, *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1035 (N.D. Ala. 2022) (subsequent history omitted), and it is not at issue before the Supreme Court.

11

*Merrill* can disturb that finding, because nothing in *Merrill* implicates how to assess racial predominance. At most, *Merrill* may make it *harder* to justify race-based decision making, *see, e.g.*, Br. for Appellants, *Merrill v. Milligan*, Nos. 21-1086, 21-1087 (Apr. 25, 2022), at 47–48—which would have made Defendants *less likely* to prevail had they attempted to justify their use of race at all. And, of course, the use of race must be narrowly tailored through a "*pre*-enactment analysis." *Abbott*, 138 S. Ct. at 2335 (emphasis added). No *Merrill* outcome can turn back time in a way that justifies the Council's line-drawing.[3]

In fact, the Supreme Court had no issue striking down a racial gerrymander in *Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245 (2022) (per curiam), shortly after it granted *certiorari* in *Merrill.* The Court thus declined to follow exactly the procedure that Defendants now advocate. The Court did hold in abeyance *Ardoin v. Robinson*, a ruling on which Defendants rely in seeking a stay. *See* Mot. at 5–6. Critically, however, *Ardoin* is a *Section 2* case presenting nearly identical issues to *Merrill*. Unlike *Wisconsin Legislature*—and unlike this litigation—*Ardoin* is *not* a racial gerrymandering case. Lower courts, too, have had no qualms allowing racial gerrymandering claims to proceed. *See, e.g.*, Docket, *S.C. State Conf. of NAACP v.*

---

[3] Sporadic references to core retention don't change *Merrill*'s irrelevance to this case. Those references pertain exclusively to plaintiffs' obligations under the first *Gingles* prong. They are wholly unrelated to the assessment of racial predominance. Moreover, nothing in *Merrill* suggests that core retention can insulate race-based districts from the need to satisfy strict scrutiny. And, in any event, this Court concluded that cores were retained *because* of race, meaning that core retention was simply a stalking horse for race-based line-drawing in the Unconstitutional Districts. *See, e.g.*, Order at 105 ("[I]t is the historical evidence together with Plaintiffs' other direct and circumstantial evidence that makes a strong showing that the City Council in 2022 reenacted the 2011 lines not despite their racial components but specifically to maintain them.").

12

*Alexander*, No. 3:21-cv-03302 (D.S.C.) (racial gerrymandering claim with recently concluded trial); Docket, *Finn v. Cobb Cnty. Bd. of Elections & Registration*, No. 1:22-cv-02300 (N.D. Ga.) (racial gerrymandering claim entering discovery).

### B. Past constitutional violations do not justify new constitutional violations

Second, Defendants focus on a question this Court already answered: whether the City's *past* constitutional violations preclude the Court from enjoining the *new* irreparable constitutional violations enacted in Ordinance 2022-01-E. This Court explained in great detail why barring relief now would be inappropriate, Order at 129–30, and Defendants make no new arguments to call that analysis into question. Instead, although they concede that elections held under racially gerrymandered lines irreparably harm Plaintiffs, Defendants ask the Court to make Plaintiffs suffer that harm yet again. Their support for that request is to point out that the City has racially gerrymandered in the past and gotten away with it. Mot. at 7. That's an astonishing position for a government to take and does not support a stay.

### C. *Purcell* does not support a stay

Finally, Defendants' invocation of *Purcell* fares no better than their other arguments. In its Order, the Court discussed three independent reasons why *Purcell* does not apply to this case. First, Defendants repeatedly informed the Court that an interim remedy in place by December 16 would allow the elections to proceed without significant disruption. As the Court recounted, the Court set its schedule based on this representation, and the Defendants agreed to it "without caveat." Order at 9. Second, there is no precedent for *Purcell* precluding relief so far before an election. *Id.* at 10

13

("The City has not identified a single case where the Eleventh Circuit or the Supreme Court has applied *Purcell* under similar timeframes."). Finally, Defendants made no showing that relief now would be so disruptive as to warrant expanding *Purcell*.[4] *Id.* at 11 ("[T]he risk of voter confusion or harm to the election process from changes to the district maps at this time is slight.").

Rather than attempt to refute these findings, Defendants try to expand *Purcell* in a *different* way: to encompass the Council's preferred timeline for remedying its own constitutional violations. But *Purcell* is about election administration and avoiding voter confusion. *See, e.g.*, *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022). Defendants do not point to a single case in which a court understood *Purcell* to bar relief because a legislature wanted more time to comply with its order.[5] To the contrary: the Supreme Court has been clear that if a legislature

---

[4] With Defendants again confirming that the Supervisor's Office will be able to run elections with a remedy in place by December 16, Mot. at 2, and after the Court's conclusion that Florida law does not require candidates to submit district-specific petition signatures in a "year of apportionment," Order at 127 n.69, Defendants' motion establishes that their sole election-administration *Purcell* concern is the City Charter's durational residency requirement for candidates, Mot. at 9.
 Previously, Defendants complained that this anti-carpetbagging provision would preclude would-be candidates from running in certain districts because they could not know where to move by July 2022 in order to establish residency in a not-yet-drawn district. ECF 41 at 31. They now appear to argue the exact opposite: that new maps present a problem because they would for some reason "effectively negate this requirement," thus somehow harming voters. Mot. at 9. In any event, as Plaintiffs noted in oral argument, many states have such requirements. ECF 50 at 73:11–21. If Defendants' invocation of this provision were enough to preclude relief, *Purcell* would prevent the federal courts from curing constitutional violations across the country. And it amounts to an argument in this case that the City is entitled to a free pass to hold an election (to four-year terms) under unconstitutional lines: the July 14th date is 114 days from when the Council enacted the Unconstitutional Districts. There is virtually no set of circumstances in which a preliminary injunction motion and interim remedial process could be completed in that timeframe—certainly not with the multi-months-long remedial process that Defendants insist is necessary.
[5] Such a rule would lead to absurd results. It would allow a legislature to avoid remedying constitutional violations by doing exactly what Defendants attempt to do here—manufacture a *Purcell*

14

is unable or unwilling to pass an interim remedy, a court should step in and do so. *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978).

Defendants try to evade this principle and shoehorn legislative convenience into the *Purcell* doctrine by suggesting, without explanation, that a Court-approved interim remedy may "threaten to undermine voter confidence." Mot. at 9. First, it's dubious *Purcell* reaches so far: *Purcell* and its progeny discuss voter confidence in the specific context of avoiding voter *confusion* (because voter confusion and election administration chaos can undermine confidence in the election). *See, e.g.*, *Democratic Nat'l Comm. v. Wis. State Legislature,* 141 S. Ct. 28, 30 (2020) (Gorsuch, J., concurring) (discussing impact on voter confidence of voter *confusion* from changes to election administration mechanics); *id*. at 31 (Kavanaugh, J. concurring) (same); *New Ga. Project,* 976 F.3d at 1284 (voter confusion from late change in absentee balloting rules might undermine confidence). This Court has already held that Defendants haven't shown any substantial risk of voter confusion. Order at 11.

But to the extent that voter confidence in the legitimacy of a legislative mapmaking process is indeed a *Purcell* issue, that weighs *against* a stay.[6] This Court

---

problem by insisting that the time it needs to pass an interim remedy is just long enough to eclipse an election deadline, such that election administration would be thrown into disarray. To the extent there exists any scenario in which such a gambit might be appropriate, the legislature would presumably need to do more than simply assert, without evidence, that it needs several months to comply with a court order.

[6] It is especially galling that Defendants now complain that about a "compressed schedule that will limit [the Council's] ability to receive and respond to public input." Mot. at 9. The Council had every opportunity to meaningfully engage the public in its ordinary process, but instead treated public comment as a box-checking exercise. If non-responsiveness to public input should doom a map, the Enacted Plan would be the first to go. In this Court's words: "[D]espite . . . public outcry, neither the

methodically explained how the Unconstitutional Districts illegally prioritized race above other considerations, with the effect of "confin[ing] the voice of Black voters." Order at 122. To grant a stay would be to allow the election to proceed under unconstitutionally "racially segregated" districts, *id.* at 98, permitting a "grievous constitutional harm to the voters of Jacksonville" in the form of "representation premised on impermissible racial classifications for four more years," *id.* at 134. It is hard to imagine anything more damaging to voter confidence than *granting* Defendants' request despite those findings and allowing this segregation to continue for another four years. *Cf. ALBC*, 575 U.S. at 283 (Scalia, J., dissenting) ("Racial gerrymandering . . . undermin[es] the electorate's confidence"); *Shaw*, 509 U.S. at 647–48 (noting harm from unnecessary race-based districting includes message sent to voters and elected officials); *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1327 (public knowledge of unfair voting practice "would be harmful to the public's perception of the election's legitimacy.").

### III. The Court gave Defendants ample time to enact an interim remedy

The Court gave the Council twenty-eight days to fix its error. Contrary to

---

Rules Committee nor the City Council made *any* attempt to address or alleviate their concerns. On the record before the Court, it appears that as to the Challenged Districts, no adjustments, great or small, were even proposed, much less adopted, to unify communities, reduce BVAP percentages, or increase compactness." Order at 111; *see also id.* at 109 n.63 (noting similar concerns raised in 2011).

In any event, the redistricting process laid out by Council President Freeman affords opportunities for in-person public input at four Redistricting Committee meetings, two City Council meetings, and one special town hall "map chat," plus written input that can be sent to a dedicated email address, which will be collected and shared with councilmembers before each redistricting meeting. Arguably, President Freeman's plan already rivals the opportunities for public input in the monthslong 2021–22 process.

Defendants' intimations, that is a more than "reasonable opportunity" to enact an interim remedy. *Wise*, 437 U.S. at 540. The time allotted is generous relative to the timeframes other courts have given legislatures to remedy violations, including in statewide plans.[7]

Moreover, to the extent the Council sincerely[8] believes twenty-eight days is insufficient time, that is a problem of the Council's own making. First and most importantly, the Council would not be in this position if it had not violated the Constitution—something Plaintiffs and others warned about during the redistricting process. Councilmembers could have avoided an interim remedial process altogether if they had complied with the Constitution during their seven-month ordinary process.

---

[7] *See, e.g.*, *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (internal punctuation and citations omitted), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017) (fourteen days); *Singleton*, 582 F. Supp. 3d at 937 (fourteen days), *probable jurisdiction noted and stay granted on other grounds sub nom. Merrill v. Milligan*, 142 S. Ct. 879 (2022); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004) (twenty days); *Calvin v. Jefferson Cnty. Bd. of Comm'rs*, 172 F. Supp. 3d 1292, 1326 (N.D. Fla. 2016) (sixteen days); *Vieth v. Pennsylvania*, 195 F. Supp. 2d 672, 679 (M.D. Pa. 2002) (twenty-one days); *Johnson v. Mortham*, 926 F. Supp. 1460, 1494 (N.D. Fla. 1996) (thirty-five days, but legislature passed plan in fifteen); *United States v. Osceola Cnty.*, 474 F. Supp. 2d 1254, 1254 (M.D. Fla. 2006) (thirty-five days, but legislature passed plan in twenty-six).

[8] It appears councilmembers themselves are not worried the Council has too little time to comply with the Court's order; their public statements do not reflect the City's litigation posture on that point. Council President Freeman has unequivocally stated that a map will be passed by November 4th. *See, e.g.*, Ex. 3 at 2:1–7 ("This Committee will meet the Court's established timeline, pass a new map on November 3rd, and then go to the council on November 4th for a full vote. . . . This Committee is prepared to accomplish the task."); *id.* at 21:23–22:1 (Vice Chair Diamond: "[W]e're gonna follow the law and when we are done I am so confident that we are going to come up with a map that will pass constitutional muster. And one that represents this City."); Ex. 2 at 1 ("Mr. Freeman described the committee charge and committed to developing a new redistricting plan by November 3rd for consideration by the City Council on November 4th."); *id.* at 3 ("Council Member Diamond said the Council is bound to follow the law and produce new districts in a very short time frame and he is very confident that a good map will be created and presented to the court in a timely manner."). Notably, the redistricting consultant assisting the Council has been retained since July. *See* Andrew Pantazi, Twitter (Oct. 21, 2022), https://twitter.com/apantazi/status/1583492174913544193.

Second, the Council has been on notice of the potential need to craft an interim remedy since May (if not sooner). And since early February, Plaintiffs have repeatedly offered to provide functional analyses to inform the constitutionally appropriate use of race in an interim remedy. Nothing prevented the Council from preparing for the eventuality of a time-sensitive remedial process. Third, the Council's schedule hardly reflects Defendants' litigation posture that passing an interim remedy is near impossible: the Council's new Redistricting Committee first convened more than a week after the Court's Order, won't convene again for almost two weeks after that, and has scheduled a total of five-and-a-half hours of meetings. Ex. 1. Against this backdrop—ignoring clear and accurate warnings that Ordinance 2022-01-E was unconstitutional, failing to prepare for the Court's eventual Order, and dawdling in complying with that Order—the Council now insists that the timeframe in the Court's Order is unreasonable, that drawing an interim remedy is too hard, and that it must be allowed to enforce its unconstitutional districting plan. The Court should reject those claims. If the Council faces difficulty in remedying the constitutional violation, that difficulty is manufactured and self-inflicted.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for a Stay Pending Appeal.

Respectfully submitted this 25th day of October, 2022,

*/s/ Daniel J. Hessel*

Nicholas Warren (FBN 1019018)
**ACLU FOUNDATION OF FLORIDA, INC.**
336 East College Avenue, Ste. 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU FOUNDATION OF FLORIDA, INC.**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Daniel J. Hessel*‡
Ruth Greenwood*
Theresa J. Lee*
Nicholas Stephanopoulos*
**ELECTION LAW CLINIC**
**HARVARD LAW SCHOOL**
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
dhessel@law.harvard.edu
rgreenwood@law.harvard.edu
thlee@law.harvard.edu
nstephanopoulos@law.harvard.edu

Krista Dolan (FBN 1012147)
Matletha Bennette (FBN 1003257)
**SOUTHERN POVERTY LAW CENTER**
P.O. Box 10788
Tallahassee, FL 32301-2788
(850) 521-3000
krista.dolan@splcenter.org
matletha.bennette@splcenter.org

Bradley E. Heard*
Jack Genberg*
**SOUTHERN POVERTY LAW CENTER**
150 East Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org

*Attorneys for Plaintiffs*

*\* Special admission   ‡ Federal practice only*

19