## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JACKSONVILLE BRANCH
OF THE NAACP, et al.,

       Plaintiffs,

                                Case No. 3:22-cv-493-MMH-LLL

vs.

CITY OF JACKSONVILLE, et al.,

       Defendants.

_____/

### O R D E R

**THIS CAUSE** is before the Court on Defendants' Time-Sensitive Motion for Stay and Incorporated Memorandum of Law in Support (Doc. 57; Motion for Stay), filed on October 19, 2022.  In accordance with the Court's order, Plaintiffs filed a response in opposition to the Motion for Stay on October 25, 2022.  See Plaintiffs' Response in Opposition to Defendants' Motion for Stay Pending Appeal (Doc. 59; Response).  In the Motion for Stay, Defendants ask the Court to stay the Court's October 12, 2022 Order (Doc. 53; Preliminary Injunction Order) enjoining Defendants from conducting any elections using the Jacksonville City Council and Duval County School Board districts enacted in Ordinance 2022-01-E, until resolution of their appeal in this action.  See Motion

for Stay at 1; Preliminary Injunction Order at 137.  Upon review, and for the reasons set forth below, the Court finds that the Motion for Stay is due to be denied.

## I.   Background[1]

On March 22, 2022, the Jacksonville City Council passed Jacksonville Ordinance 2022-01-E setting forth the Enacted Plan.  On May 3, 2022, Plaintiffs initiated this action challenging the constitutionality of certain City Council and School Board Districts in the Enacted Plan.  See Complaint (Doc. 1).  On July 1, 2022, the parties filed a Joint Motion for a Preliminary Pretrial Conference (Doc. 24; Joint Motion) in which they jointly requested a hearing to set an appropriate schedule for the anticipated preliminary injunction proceedings.  In the Joint Motion, the parties stated that "in order to proceed with the 2023 general consolidated government elections, the Supervisor of Elections needs to know the City Council district boundaries no later than Friday, December 16, 2022." See Joint Motion at 1.  The Court held a status conference with the parties on July 8, 2022, and based on the timeframes proposed by the parties, set a briefing schedule.  See Minute Entry (Doc. 26), filed July 8, 2022; see also Transcript of Preliminary Pretrial Conference (Doc. 27; PPC Tr.).

---

[1] In the interest of expediency, the Court adopts the same defined terms set forth in the Preliminary Injunction Order.

In accordance with the briefing schedule, Plaintiffs filed Plaintiffs' Motion for Preliminary Injunction (Doc. 36; Plaintiffs' Motion) on July 22, 2022. Simultaneously with the Motion, Plaintiffs filed over 2400 pages of exhibits. See Notice of Filing Exhibits in Support of Plaintiffs' Motion for Preliminary Judgment [sic] (Doc. 34). Defendants filed a response to Plaintiffs' Motion on August 12, 2022, which attached over 600 pages of exhibits. See Defendants' Response to Plaintiffs' Motion for Preliminary Injunctive Relief (Doc. 41). As directed by the Court, the parties also submitted briefs on a potential interim remedy in the event the Court were to grant Plaintiffs' Motion. See Plaintiffs' Brief on Interim Remedial Process (Doc. 39); Defendants' Remedy Brief (Doc. 45). The Court heard oral argument on Plaintiffs' Motion on September 16, 2022. See Minute Entry (Doc. 48).

As expeditiously as possible thereafter, the Court prepared the 139-page Order in which, despite its reluctance to restrain a legislative enactment, the Court determined that the Constitution and the equities demanded preliminary injunctive relief. See Preliminary Injunction Order at 134-36. Accordingly, the Court preliminarily enjoined Defendants from conducting any election using the districts as drawn in the Enacted Plan until entry of a final judgment in this case. Id. at 137. Based on the SOE's representation that he must know the district lines by December 16, 2022, in order to proceed with the March 2023 election, the Court gave the City Council until November 8, 2022—twenty-seven

days—to enact a new, constitutionally permissible, plan.  About a week after entry of the Court's Preliminary Injunction Order, Plaintiffs filed a Notice of Appeal (Doc. 54) and on the next day filed the instant Motion for Stay.

## II.    Standard of Review

Rule 62(d), Federal Rules of Civil Procedure (Rule(s)), provides that "[w]hile an appeal is pending from an interlocutory order or final judgment that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."  See Rule 62(d).  Courts consider the following factors to determine whether a stay pending appeal is warranted:

> "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

See Nken v. Holder, 556 U.S. 418, 434 (2009) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)); see also Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1317 (11th Cir. 2019)).  The party seeking the stay bears the burden and "must show more than the mere possibility of success on the merits or of irreparable injury."  See Democratic Exec. Comm. of Fla., 915 F.3d at 1317 (emphasis added).  Indeed, "[t]he first two factors are the most critical."  Id. Nevertheless, "'when the balance of equities . . . weighs heavily in favor of granting the stay'—[the Eleventh Circuit has] relax[ed] the likely-to-succeed-

-4-

on-the-merits requirement." Id. (quoting Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986)).

## III.   Summary of the Arguments

In the Motion for Stay, Defendants assert that a stay is warranted for three reasons.  First, Defendants argue that it would be prudent to stay the case pending the Supreme Court's decision in Merrill v. Milligan, 142 S. Ct. 1358 (Mar. 21, 2022).  According to Defendants, the Merrill decision will have a direct impact on this case because the Supreme Court will determine "when, if ever, race can be considered, and when racial predominance runs afoul of the Constitution."  See Motion for Stay at 5.  Second, Defendants assert that the equities tilt in favor of a stay because "Plaintiffs' alleged harms stem from configurations that are decades old." Id. at 6.  Specifically, Defendants maintain that because, according to Plaintiffs, the Enacted Plan perpetuates a pattern of discrimination that has been in place for decades, Plaintiffs should have challenged the maps in previous redistricting cycles. Id. at 7.  Third, Defendants assert that a stay is warranted under the Purcell[2] principle because Defendants do not have adequate time to draw a new map.  Id. at 8-9.  According to Defendants, the compressed schedule will limit the opportunity for debate as well as the Council's ability "to receive and respond to public input . . . ." See id.

---

[2] Purcell v. Gonzalez, 549 U.S. 1 (2006).

at 9.  Defendants also assert that because the deadline has passed for candidates to establish residency in their districts, candidates may find themselves running in new, unfamiliar districts, potentially harming constituents.  Id.  These issues, in Defendants' view, "threaten to undermine voter confidence and thus trigger the concerns at the heart of Purcell."  Id.

## IV.   Discussion

Having reviewed the Motion for Stay, the Court begins with the rather remarkable observation that Defendants have failed to present any argument that they are likely to succeed on the merits of their appeal.  Defendants do not point to any error of fact or law in the Court's analysis.  Nor do they make any attempt to identify a substantial question for appeal.  Despite recognizing that demonstrating a likelihood of success on the merits of the appeal is one of the most critical factors that a party seeking a stay pending appeal must satisfy, see Motion for Stay at 4, Defendants ignore this element altogether.   The absence of any such argument is significant.

Rather than address their likelihood of success on appeal, Defendants instead maintain that a stay is warranted because the Supreme Court's decision in Merrill may have an impact on this case.  According to Defendants, Merrill "will tell us when, if ever, race can be considered, and when racial predominance

runs afoul of the Constitution." <u>See</u> Motion for Stay at 5.  But, Defendants' reliance on <u>Merrill</u> is entirely misplaced.[3]

The question presented in <u>Merrill</u> is: "Whether the State of Alabama's 2021 redistricting plan for its seven seats in the United States House of Representatives violated <u>section 2 of the Voting Rights Act</u>, 52 U.S.C. § 10301." <u>See</u> <u>Merrill v. Milligan</u>, 142 S. Ct. 1358 (Mar. 21, 2022) (emphasis added).  Here, unlike in <u>Merrill</u>, Plaintiffs' challenge to the Enacted Plan does not arise under the Voting Rights Act (VRA), nor do Defendants rely on the requirements of the VRA to defend the Enacted Plan.  <u>See</u> Preliminary Injunction Order at 4-5, 14 n.10, 91.  Rather, this case solely concerns the Equal Protection Clause of the Fourteenth Amendment.[4]  As such, it is difficult to conceive how the outcome in <u>Merrill</u> could substantively impact the merits of this case.

In <u>Merrill</u>, the district court found that the plaintiffs were substantially likely to prevail in showing that the State of Alabama's congressional district map violated § 2 of the VRA.  <u>See</u> <u>Singleton v. Merrill</u>, 582 F. Supp. 3d 924, 1026

---

[3] Even to the extent Defendants contend that <u>Purcell</u>'s "entirely clearcut" standard applies, Defendants fail to identify any reason, other than the pendency of <u>Merrill</u>, why the merits of Plaintiffs' constitutional challenge to the Enacted Plan are not "entirely clearcut" in Plaintiffs' favor.  <u>See</u> Motion for Stay at 10.  Defendants' reliance on <u>Merrill</u> to show that the issues in this case are not "clearcut" is unavailing because, as explained below, <u>Merrill</u> concerns an entirely different claim than is at issue here.

[4] Notably, to the extent the plaintiffs raised constitutional claims in the <u>Merrill</u> consolidated cases, the district court did not address them.  <u>See</u> <u>Singleton v. Merrill</u>, 582 F. Supp. 3d 924, 1035 (N.D. Ala. 2022) ("[W]e decline to decide the constitutional claims asserted by the <u>Singleton</u> and <u>Milligan</u> plaintiffs at this time.").

(N.D. Ala. 2022).  The court enjoined Alabama's use of the map, which contained one majority-minority district, and required the state to draw a new map with two districts in which Black voters "either comprise a voting-age majority or something quite close to it." Id. at 935, 1033; see also Singleton v. Merrill, Nos. 2:21-cv-1291-AMM, 2:21-cv-1530-AMM, 2022 WL 272636, at *10 (N.D. Ala. Jan. 27, 2022) (order denying motion to stay).  On appeal, Alabama argues that complying with the district court's order would require it to prioritize race over traditional redistricting principles, something, in its view, the VRA does not require.  See Emergency Application for Administrative Stay, Merrill v. Milligan, No. 21-1086, 2022 WL 385302, at *1-4 (filed Jan. 28, 2022). Essentially, Alabama is arguing against what it perceives to be a VRA-imposed emphasis on the consideration of race such that it results in racial gerrymandering.  Id.  Thus, a ruling in Alabama's favor would not assist Defendants because it would further restrain the use of race in the redistricting process.  However, a ruling in favor of the plaintiffs in Merrill is also unlikely to change the outcome of this case because Defendants did not rely on the VRA to justify the race-based line-drawing present in the Enacted Plan.  Thus, even if Defendants are correct that Merrill will address "when, if ever, race can be considered, and when racial predominance runs afoul of the Constitution," see Motion for Stay at 5, the Court can discern no foreseeable outcome in which Merrill overturns prior precedent to allow the type of race-based

-8-

gerrymandering present in <u>this</u> case—that is allowing race to predominate in the absence of any purpose of complying with § 2 of the VRA.[5]   As such, Defendants have not shown that the <u>Merrill</u> decision is in any way "likely to have a substantial or controlling effect on the claims and issues" in this case. <u>See</u> <u>Miccosukee Tribe of Indians of Fla. v. S. Fla. Water Mgmt. Dist.</u>, 559 F.3d 1191, 1198 (11th Cir. 2009).[6]

Defendants next argue that the equities weigh in favor of a stay because the harm is "decades in the making." <u>See</u> Motion for Stay at 6.   However, for the reasons set forth in the Court's Preliminary Injunction Order, this argument is without merit.   <u>See</u> Preliminary Injunction Order at 128-130.   Notably, Defendants have not shown that Plaintiffs in this action were aware of the constitutional problems with Jacksonville's maps in previous decades, had standing to challenge the maps at that time, or had the resources to bring a lawsuit.   Regardless, as explained in the Preliminary Injunction Order, the

---

[5] Notably, Defendants do not argue in the Motion for Stay that this Court erred in finding that race predominated the drawing of the Challenged Districts.

[6] The Court acknowledges that, regardless of its outcome, <u>Merrill</u> will likely provide guidance relevant to the process of drawing a remedial map that complies with § 2 of the VRA (something Defendants in this case have conceded was not their purpose in selecting the boundaries of the Enacted Plan).   Nevertheless, given that <u>Merrill</u> is unlikely to undermine the Court's preliminary determination that the Enacted Plan is unconstitutional, and in light of the significant, irreparable harms that would stem from implementation of such an unconstitutional Plan, the Court does not find <u>Merrill</u>'s potential impact on the <u>remedial</u> process sufficient to warrant proceeding with an election on what the Court has found substantially likely to be an unconstitutional map.

Enacted Plan inflicts a <u>new</u> harm on these Plaintiffs, and it is the actions of the <u>current</u> City Council in passing this Plan, the Enacted Plan, which warrant injunctive relief.  Moreover, in the Court's view, a lawsuit should be a voter's last resort in seeking to correct allegedly improper districting maps.  Adopting Defendants' argument would penalize Plaintiffs for allowing the 2022 City Council the first opportunity to consider Plaintiffs' advocacy and pass constitutional maps.[7]

Last, Defendants contend that a stay is warranted pursuant to <u>Purcell</u>.  <u>See</u> Motion for Stay at 8.  However, for the reasons stated in the Preliminary Injunction Order, the Court is not persuaded that the <u>Purcell</u> principle applies under the circumstances of this case.  <u>See</u> Preliminary Injunction Order at 8-11.  Even so, the Court has carefully weighed the considerations specific to election cases that <u>Purcell</u> describes.  <u>See</u> <u>Purcell</u>, 549 U.S. at 4-5; <u>see also</u> <u>Merrill v. Mulligan</u>, 142 S. Ct. 879, 880-81 (Kavanaugh, J., concurring).  In the Preliminary Injunction Order, the Court found that "the risk of voter confusion or harm to the election process from changes to the district maps at this time is

---

[7] Defendants argue that Plaintiffs' "decision to wait" in this case is akin to that of the challengers in <u>Benisek v. Lamone</u>, 138 S. Ct. 1942, 1944 (2018).  <u>See</u> Motion for Stay at 7.  But <u>Benisek</u> is entirely distinguishable.  In that case, the plaintiffs waited <u>six years</u> to challenge a congressional district map.  <u>See</u> <u>Benisek</u>, 138 S. Ct. at 1943 ("In May 2017, six years after the Maryland General Assembly redrew the Sixth District, plaintiffs moved the District Court to enjoin Maryland's election officials from holding congressional elections under the 2011 map.").  Here, Plaintiffs challenged the Enacted Plan within a matter of months.

slight," <u>see</u> Preliminary Injunction Order at 11, 133, and notably, Defendants do not challenge this finding in the Motion for Stay.   Rather, Defendants maintain that a stay is warranted because it will be difficult for the City Council to draw a new map in the limited timeframe available and the compressed schedule "threaten[s] to undermine voter confidence . . . ." <u>See</u> Motion for Stay at 8-9.  Defendants argue that the short deadline will "limit [the City Council's] ability to receive and respond to public input," and limit the opportunity for debate.  <u>See</u> <u>id.</u> at 9.  Defendants also suggest that constituents may be harmed by candidates unfamiliar with the new districts.  <u>Id.</u>  Defendants' arguments are not persuasive.

Significantly, despite defense counsel's arguments to the contrary, the City Council itself appears confident in its ability to meet the Court's deadline.  Indeed, at the first meeting of the newly formed Special Committee on Redistricting, City Council President and Chair of the Committee Terrance Freeman opened the meeting by declaring that "[t]his Committee will meet the Court's established timeline and pass a new map on November 3rd, and then go to the [C]ouncil on November 4th for a full vote." <u>See</u> Response, Ex. 3: October 20, 2022 Special Committee on Redistricting Meeting Transcript (Doc. 59-3; Mtg. Tr.) at 2.  He emphasized that he named a Committee "that could meet the short deadline" and stated that the Committee, which he chose to lead himself, "is prepared to accomplish the task . . . ." <u>Id.</u> at 2.  Councilmember Rory

Diamond, Co-Vice-Chair of the Committee, also expressed his view that despite the limited timeframe, he was confident the Committee would accomplish the task "because we are smart and because we work hard and I know this Committee." Id. at 21-22.

Notably, to accomplish the task they are committed to achieving, the Special Committee found it necessary to schedule only four meetings, over a total of only five and a half hours. See Response, Ex. 1. The first meeting took place on October 20, 2022, when the above statements were made, after which the Committee did not plan to meet again until November 1, 2022, over ten days later. Id. Given that the Committee charged with creating a new map is confident it can accomplish the task in just four meetings of only five and a half hours total, the Court is unable to place much weight on defense counsel's assertion that the City Council does not have enough time to redraw the map.[8]

---

[8] Defendants emphasize that it took the City Council seven months to pass the Enacted Plan. See Motion for Stay at 8, 9. While this is true, the Court notes that it took the Redistricting Committee only about two months to agree on the maps that, with only minor changes, were ultimately enacted. Although the new Committee must act expeditiously, the City Council has been on notice of this potential outcome for several months. Indeed, it appears the Office of General Counsel retained a redistricting expert in July who is now assisting the City Council with drafting the remedial plan. See Response at 17 n.8; Mtg. Tr. at 4. The Committee also has the benefit of Plaintiffs' racially polarized voting analyses and the simulated plans of Plaintiffs' expert. Moreover, if it so chooses, the Committee can largely retain the adjustments agreed upon in the 2021 redistricting cycle for the districts on the south side of the River. See Preliminary Injunction Order at 81 n.43. Thus, while the City Council no doubt faces a difficult task, the Court is confident, as the City Council is itself, that enacting a new, constitutional plan within the timeframe provided is entirely possible.

In addition, at the October 20, 2022 Meeting, Freeman explained that he was "committed to this process being as transparent and as open as possible." Id. To that end, the City Council established a "dedicated email address and a website so that the public can submit their comments and ideas throughout this process," and "every Committee meeting will have a designated time for public comment." Id. The Court notes that the City Council also has the benefit of the significant public input provided during the 2021 redistricting cycle. Thus, contrary to the arguments in the Motion for Stay, the City Council appears fully capable of engaging the public in the timeframe provided for drawing remedial maps.[9]

Defendants also assert that the public will be harmed because, given the residency requirements of the Jacksonville Charter, a new map will impact who is running in the new districts. See Motion for Stay at 9 (citing Jacksonville Charter § 5.04). According to Defendants, "candidates running in the new districts may not be familiar with the needs and interests of their constituents." Id. While this may be true, the Court notes that the remedial plan will implement districts that are more logical and compact, with due consideration to keeping actual communities of shared interests together. Presumably, it will be easier for candidates to familiarize themselves with the needs and interests

---

[9] It is also difficult to find that the need to allow for public comment weighs in favor of proceeding on the Enacted Plan given that the City Council largely disregarded the public input it received concerning that Plan. See Preliminary Injunction Order at 109-112.

of constituents in such districts than it was in the sprawling and illogical districts included in the Enacted Plan. <u>See</u> Preliminary Injunction Order at 131 (observing that it should be easier to campaign in more compact and logically shaped districts).

Nevertheless, the Court acknowledges that some harm to the legislative process and the public may result absent a stay. However, the Court must balance those potential harms against those which would result from proceeding with the March 2023 election on a map which the Court has found is substantially likely to be unconstitutional. As summarized in the Preliminary Injunction Order, Plaintiffs have presented evidence that the historical racial gerrymandering present in the Challenged Districts undermines the quality of representation for the people living in those districts. <u>See id.</u> at 72-75, 122-23. In addition, the packing of Black voters into Districts 7, 8, 9, and 10 "confines the voice of Black voters" to those districts and thereby limits the ability of Black voters "to have a meaningful impact on any election or a meaningful voice on any issue of concern" in the surrounding districts. <u>Id.</u> at 122-23. And significantly, as described by the Supreme Court, racial gerrymandering inflicts substantial damage on our system of representative democracy. <u>See id.</u> at 123-24. These harms are egregious and allowing the election to proceed on the Enacted Plan would perpetuate these harms for years into the future, likely until the next City Council election in 2027. For these reasons, on the current

record, the Court is convinced that the balance of equities weighs against a stay of the injunction.  See id. at 122-24.

## V.     Conclusion

In light of the foregoing, the Court finds that the Motion for Stay is due to be denied.  Significantly, Defendants have not made any showing, much less a "strong showing," that they are likely to succeed on appeal.  Indeed, Defendants do not attempt to show even the "mere possibility" that they will prevail on appeal.  Democratic Exec. Comm. of Fla., 915 F.3d at 1317.  Defendants have not challenged the findings of fact or conclusions of law set forth in the Preliminary Injunction Order at all.  Nor have Defendants addressed how they are likely to suffer irreparable harm in the absence of a stay.  On these "most critical" factors, Defendants are silent.  Id.  The Court could deny the Motion for Stay for this reason alone.

However, even setting aside these failures, the balance of the equities also weighs heavily against a stay.  As explained in the Preliminary Injunction Order, the harm to Plaintiffs and the constituents of the Challenged Districts absent a stay are significant and irreparable.  While Defendants contend that enacting a remedial plan in the limited timeframe available threatens to "undermine voter confidence," the harms Defendants describe pale in comparison to the substantial constitutional harm to Jacksonville voters that would result from proceeding with an election on an unconstitutionally

gerrymandered map.  Indeed, the Court is convinced that allowing the election to proceed with districts that the Court has found are substantially likely to be unconstitutional, a finding Defendants do not challenge in the instant Motion for Stay, poses a significant threat to voter confidence in the legitimacy of the election.  Because Defendants have failed to satisfy any of the factors necessary to obtain a stay, the Court finds that the Motion for Stay is due to be denied. Accordingly, it is

ORDERED:

Defendants' Time-Sensitive Motion for Stay and Incorporated Memorandum of Law in Support (Doc. 57) is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida this 1st day of November, 2022.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record