**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

JACKSONVILLE BRANCH
OF THE NAACP, *et al.*,

     *Plaintiffs*,

v.

CITY OF JACKSONVILLE, *et al.*,

     *Defendants*.

_____/

Case No. 3:22-cv-493-MMH-LLL

## PLAINTIFFS' OBJECTIONS TO THE CITY'S PROPOSED REMEDIAL PLAN AND SUBMISSION OF ALTERNATIVE PLANS

In accordance with this Court's Order, ECF 53 ("Order"), Plaintiffs submit their objections to the City's proposed interim remedial plan, ECF 81 ("Ordinance 2022-800"). That plan does not cure the substantially likely constitutional violations the Court identified. Plaintiffs also offer and describe three alternative remedial plans; two fully cure the violations while one is based on Ordinance 2022-800 and corrects its most egregious errors. A proposed order is attached. Plaintiffs do not request an oral argument or evidentiary hearing, but are prepared for either at the Court's convenience.

## INTRODUCTION

Last month, this Court found that Ordinance 2022-001 ("Enjoined Plan") "pack[ed] artificially large numbers of Black voters into Districts 7, 8, 9, and 10" ("Packed Districts"). Order at 120. Under Ordinance 2022-800, *89%* of those four districts' residents remain there. ECF 89-1 (Fairfax Rep.) at 114. The 11% that were

1

moved out are disproportionately white. *Id.* at 137. Meanwhile, Districts 2, 12, and 14 ("Stripped Districts") feature high core-retention rates, meaning they are largely unchanged. Fairfax Rep. 113. Ordinance 2022-800 thus resembles a shell game—a sleight-of-hand that shuffles Black residents within D7–10 but still maroons them there.

The result is a map that calcifies, rather than cures, the constitutional violations this Court identified. The Council had the opportunity and obligation to do better. It was required to abandon the race-based choices underlying the Enjoined Plan. It failed to do so. Instead, councilmembers focused their energy on protecting themselves and retaining the cores of the Enjoined Plan's districts. They started with a proposal that "pretty much maintain[ed] a lot of what [they] like[d] about the original map," 11/1 Tr. 42:22–23,[1] and then made adjustments to backslide even more.

Because this Court has "its own duty to cure illegally gerrymandered districts," it cannot accept Ordinance 2022-800. *North Carolina v. Covington* ("*Covington II*"), 138 S.Ct. 2548, 2553 (2018) (per curiam). While the Council's map does not remedy the violations the Court identified, Plaintiffs present several maps that do. Those maps also comply with all other legal requirements and honor the Council's legitimate policy choices. The Court should thus reject Ordinance 2022-800 and adopt a plan that

---

[1]   Meeting transcripts are filed at ECF 70-3 at 13–55 (10/20), 70-4 (10/25), 72-1 at 138–216 (11/1), 74-1 at 162–238 (11/2), 77-1 at 143–264 (11/3), 78-1 at 43–106 (Town Hall), and 80-1 at 41–265 (11/4). Herein, citations to transcripts use transcript pagination, not ECF pagination.

The transcripts sometimes reflect transcription errors, as clarified by the video recordings. Citations with errors are noted with asterisks, and any quotations are to the *corrected* language. The Parties expect to jointly file an agreed errata sheet within several days.

actually "comports with the Constitutional mandate of the Equal Protection Clause."

Order at 136.



**2022-800 Plan**
Enjoined Plan: Districts 7-10 Merged and District 1-6 & 11-14 Merged

Fairfax Rep. 102.

### THE CITY'S DEVELOPMENT OF ITS PROPOSED REMEDY

The Council's interim remedial process suffered from many of the same shortcomings as its original process. It started with criteria closely tied to the status quo and replicated race-based aspects of the Enjoined Districts. To the extent the Council's consultants began with non-racialized criteria, those fell by the wayside as the Council deliberated. Individual members horse-traded over specific changes, many of which were directly aimed at decreasing the Stripped Districts' BVAPs, increasing the Packed Districts' BVAPs, or otherwise hewing closer to the Enjoined Districts'

shapes. When presented with ways to change the districts to avoid packing Black voters into D7–10, the Council rejected the proposals. Unsurprisingly, the plan they approved replicates many of the Enjoined Plan's unconstitutional features.

## I. Overview of Process

Council President Freeman appointed the Special Committee on Redistricting on October 18. ECF 70-2 at 1 (Committee Memo). He charged the Committee with "prepar[ing] a map consistent with the legal guidance" "about what is required by local, state, and federal law." *Id.*

The Committee first met on October 20. The Office of General Counsel ("OGC") began the meeting by noting that "legal considerations for the special committee include: [] complying with the requirements of the City Charter and Ordinance Code, and state and federal law regarding nearly equal population, contiguous and compact districts, and adequately representing the varied interests of the community." ECF 70-3 at 4–5. OGC also explained that the Council couldn't "start with the premise that the 2011 lines are okay and merely tinker around the edges" but must involve "wholesale review of the city districts … deemed constitutionally infirm by the Court." 10/20 Tr. 9:3–9. Additionally, OGC announced that Dr. Douglas Johnson, whom the City had retained in July, would assist City Planning Director Bill Killingsworth in developing maps. *Id.* 7:14–8:2; Andrew Pantazi, TWITTER (Oct. 21, 2022), https://twitter.com/apantazi/status/1583492174913544193 [https://perma.cc/8XF6-7KAF]; Andrew Pantazi, *Jacksonville Hires Redistricting*

*Expert to Draw New Maps*, TRIBUTARY (Oct. 21, 2022), https://jaxtrib.org/?p=3303 [https://perma.cc/6JK2-TVRC].

The Committee next met on November 1. At that meeting, OGC presented a memo with legal guidance, ECF 72-1 at 102–04 (Legal Memo), and Johnson and Killingsworth presented four maps, 11/1 Tr. 8:24–9:7. The first was the "Plaintiffs' Unity Map," *see id*. 17:8–20:8, which Plaintiff Dr. Marcella Washington had introduced at the full Council's October 25 meeting. 10/25 Tr. 18:13–20:14. The second, "Orange," was modeled off that map. 11/1 Tr. 23:24–25:14. The third and fourth were titled "Lime" and "Maroon." *Id*. 20:9–23:23. After an initial round of discussions, the Committee jettisoned the first two, advancing Lime and Maroon. *Id.* 58:18–20. Several councilmembers expressed strong support for Maroon, including Vice-Chair Diamond, who explained "it pretty much maintains a lot of what we like[d] about the original map." *Id.* 42:22–23.

Over the next two days, the Committee workshopped the maps, focusing on refining Maroon. On November 3, Johnson presented three new versions of Maroon ("IIA," "IIB," "IIC") based on the Committee's instructions. 11/3 Tr. 15:24–20:5. The Committee voted to advance the original Maroon while requesting additional changes. *Id.* 120:5–121:21. A town hall for public comment was held that evening. *See generally* Town Hall Tr. At the November 4 Council meeting, Johnson presented six new maps incorporating various councilmember requests ("Maroon IIIA" through "IIIF"). 11/4 Tr. 31:1–8; 39:3–41:22; 43:5–46:4. Only IIIE incorporated every request. *Id*. 43:18–19. A small refinement during the meeting resulted in the "Fix" series of

maps, including Maroon IIIE Fix, which the Council eventually passed, 16-1. *Id.* 216:3–223:12.

## II. The City Treated the Voting Rights Act as Optional

The City treated the Voting Rights Act ("VRA") as an optional measure jurisdictions *could* invoke to justify race-based districts, rather than as a mandatory federal statute. Although the City had retained Johnson in July, at the November 1 meeting, General Counsel Jason Teal claimed "we just don't have time to go through a … Voting Rights Act analysis," so "race can't be a predominant factor," 11/1 Tr. 11:25–12:8.* Johnson similarly asserted he did not have time to analyze VRA compliance. *Id.* 11:25–12:4.

Teal and Johnson continued to treat VRA compliance as optional in subsequent meetings. On November 2, Teal described Section 2 as "a tool that local governments *can* use to make the case, if you will, for having a race based or minority district." 11/2 Tr. 12:16–19 (emphasis added). Teal and Johnson repeated that they didn't have time to do a defensible analysis. *Id.* 12:21–13:6. Diamond noted that the City wasn't sued under the VRA, so the Council's "sole job" was to "write a *constitutional* map," not one that complied with the VRA.[2] *Id.* 50:20–21 (emphasis added).

---

[2]    This contrasted with OGC's legal advice, 10/20 Tr. 8:11–23; Legal Memo at 103, Freeman's charge for the committee, Committee Memo at 1, and Diamond's own earlier statements, Lucia Viti, *A Court Blocks City Council and School Board Maps*, ACTIONNEWSJAX (Oct. 18, 2022), https://www.yahoo.com/video/court-blocks-city-council-school-142947674.html [https://perma.cc/K4LF-W3DC] (describing a view that "you place African American Democrats into a district in order to ensure that an African American Democrat can elect someone who can represent them."); Andrew Pantazi, *Plaintiffs Propose New Jacksonville City Council Map*, TRIBUTARY (Oct. 28, 2022), https://jaxtrib.org/?p=3339 [https://perma.cc/7DJ3-3J3J] ("I think if [Plaintiffs'

Nevertheless, on November 3, Teal and Johnson claimed that Johnson's maps complied with what they characterized as "Plaintiffs' Voting Rights Act analysis." 11/3 Tr. 7:17–9:5*. Johnson even adjusted one draft, purportedly to comply with the VRA. *Id.* 18:21–19:7. There is no documentation of how Johnson determined that the VRA required this shift, or what he understood "Plaintiffs' VRA analysis" to mean. *See generally* ECF 70–86.

Despite the adjustment made the previous day—ostensibly based on a VRA analysis—at the November 4 Council meeting, Teal again lamented that the City didn't have time to do the "math exercise you have to go through, if you want to use a race based approach." 11/4 Tr. 124:17–125:6.

### III. The City Disregarded Other Legal Requirements

The VRA was not the only legal requirement the Council cast aside. On both October 20 and November 1, OGC stated that districts must be "arranged in as logical and compact [a] geographic[] pattern as possible." 11/1 Tr. 11:10–22;* 10/20 Tr. 8:16–9:2. As its meetings progressed, the Committee strayed from that initial commitment. By November 2, Teal had abandoned compactness: "[I]t's okay to have funny looking districts. It's okay that they look … oddly shaped." 11/2 Tr. 63:21–23; *see also id.* 32:1–10,* 64:10–13; 11/4 Tr. 125:9–13, 125:17–23. Indeed, the Council's adopted map featured several noncompact districts with bizarre shapes, drawn that way for racial reasons.

---

Unity Map] were passed, African American Democratic representation on the Council would go down and cause a new set of plaintiffs to file suit.").

## SCOPE OF REVIEW

In assessing the City's proposed interim remedial plan, the Court "has a 'duty' to ensure that [the] remedy 'so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future.'" *Covington v. North Carolina* ("*Covington I*"), 283 F.Supp.3d 410, 424 (M.D.N.C. 2018), *aff'd in part, rev'd in part*, 138 S.Ct. 2548 (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965)). The Court may approve Ordinance 2022-800 only if it provides a "full and adequate remedy" to the race-based sorting of voters. *United States v. Osceola Cnty.*, 474 F.Supp.2d 1254, 1256 (M.D. Fla. 2006).

"When…the districting plan is offered as a replacement for one invalidated by the [C]ourt and will be implemented solely by virtue of the [C]ourt's power," Plaintiffs no longer bear the burden they "[o]rdinarily" would in launching a racial gerrymandering claim." *Wilson v. Jones*, 130 F.Supp.2d 1315, 1322 (S.D. Ala.), *aff'd sub nom. Wilson v. Minor*, 220 F.3d 1297 (11th Cir. 2000). Instead, the Court has an "independent duty to assess its constitutionality." *Id.*

As a consequence, it is no longer Plaintiffs' burden to "disentangle race from politics and prove that the former drove a district's lines." *Cooper v. Harris*, 137 S.Ct. 1455, 1473 (2017). Instead, in exercising "its own duty to cure illegally gerrymandered districts," *Covington II,* 138 S.Ct. at 2553, the Court must be wary when remedial districts are drawn "through reliance on political data closely correlated with race," *Covington I*, 283 F.Supp.3d at 431. Where, as in Jacksonville, party and race are closely

correlated, Defendants must do the disentangling, because the use of partisan data has "the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander in a proposed remedial districting plan," *id.*, and risks "carr[ying] forward the effects of the identified racial gerrymanders," *id.* at 434.

Similarly, incumbent-protection is the type of political goal that must "give way to [the] duty to completely remedy the constitutional violation." *Id.* at 433; *see also Jeffers v. Clinton*, 756 F.Supp. 1195, 1199–1200 (E.D. Ark. 1990), *aff'd*, 498 U.S. 1019 (1991). Before approving the remedy, the Court must therefore ensure that the Council's desire to account for certain "political consideration[s]" has not eclipsed "the need to remedy a *Shaw* violation." *Personhuballah v. Alcorn*, 155 F.Supp.3d 552, 561 n.8 (E.D. Va. 2016).

While the Court must otherwise defer to the Council's *legitimate* policy choices, it need not—and cannot—defer to a plan that is not "consistent with constitutional norms and is [] itself vulnerable to legal challenge." *LULAC, Council No. 4434 v. Clements*, 986 F.2d 728, 763 (5th Cir. 1993) (quoting *White v. Weiser*, 412 U.S. 783, 791 (1973)). This Court may defer to legislative judgments only insofar as they "do[] not detract from the requirements of the Federal Constitution." *Upham v. Seamon*, 456 U.S. 37, 41 (1982).

Additionally, the Court must ensure that Ordinance 2022-800 complies with other federal legal requirements. It must "consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original

challenge of a legislative plan in place." *McGhee v. Granville Cnty.*, 860 F.2d 110, 115 (4th Cir. 1988). These requirements include the VRA. *Personhuballah*, 155 F.Supp.3d at 564 (court must consider Section 2 compliance when remedying racial gerrymander). *See also* ECF 34-03 at 13, 76–77, 82 (OGC explaining that Section 2 applies to Jacksonville); ECF 34-08 at 12–15 (OGC memo discussing Section 2).

If the Court determines that Ordinance 2022-800 is not a suitable remedy, it must order one of its own. In doing so, the Court "should be guided by the legislative policies underlying the existing plan, to the extent [they] do not lead to violations of the Constitution or the Voting Rights Act of 1965." *Abrams v. Johnson*, 521 U.S. 74, 79 (1997). But the Court should not adhere to legislative policies closely correlated with the underlying violation, *see Covington I*, 283 F.Supp.3d at 422, "partisan or political objectives, even when the state redistricting body expressly adopted such objectives," *id*. at 452, or any legislative policies that stand in the way of "so far as possible eliminat[ing] the discriminatory effects of the racial gerrymander," *id*. at 435 (citation omitted). "[A]t some point political concerns must give way when there is a constitutional violation that needs to be remedied." *Personhuballah*, 155 F.Supp.3d at 564.

## DEFENDANTS' MAP DOES NOT CURE
## THE RACIAL GERRYMANDERING

### I. Incumbent-Protection Perpetuated the Racial Gerrymandering

Ordinance 2022-800 continues Jacksonville's decades-long practice of packing Black voters into four districts in the City's north and west. It makes relatively minimal

changes to the Stripped Districts and swaps Black residents *between* the Packed Districts. This continued race-based sorting fails to fully and adequately remedy the racial packing of the Enjoined Plan.

### A. Black Voters Are Still Packed into Districts 7–10, and Stripped from Districts 2, 12, and 14

Most of the Black residents who were packed into D7–10 remain there. 89% of residents of the Enjoined Plan's D7–10 are *still* in D7–10 in Ordinance 2022-800. Fairfax Rep. 114. This, of course, means Black voters remain kept *out* of D2, 12, and 14. The Stripped Districts retain 98.5%, 81.1%, and 69.7%, respectively, of their populations from the Enjoined Plan—populations this Court determined were artificially white because of race-based decision-making. *Id.* at 113. These are high core-retention rates. *See In re SJR 1176*, 83 So.3d 597, 662, 665, 669 (Fla. 2012) (describing 82.6% retention as "overwhelming" and 69.7% as "high"). By contrast, the Packed Districts' individual retention rates range from 19.5% to 51.9%. Fairfax Rep. 113. In short: white voters are mostly kept in the Stripped Districts and Black voters are shuffled among—but not out of—the Packed Districts.

The makeup of the 11% of residents moved from a Packed to a Stripped District confirms the continued race-based nature of the districts. *See id.* at 114, 137. 25,682 people were moved from D7–10 in the Enjoined Plan to D2, 12, or 14 in Ordinance 2022-800. *Id.* at 137. 12,241 of them—47.66%—were white; only 9,579 (37.3%) were

Black.[3] *Id.* These figures stand in stark contrast to the demographics of the districts themselves. The Enjoined Plan's D7–10 included as many Black residents as possible—ranging from 60.6% to 70.3% Black. *Id.* at 117. It is an understatement to say that the population moved out of these districts was disproportionately white. *See Bethune-Hill v. Va. State Bd. of Elections*, 326 F.Supp.3d 128, 173 (E.D. Va. 2018) (finding that "*which* voters the legislature decides to choose" in redrawing districts is the relevant question to assess racial predominance and that disproportionate racial shifts are probative of predominance); *Ketchum v. Byrne*, 740 F.2d 1398, 1407 (7th Cir. 1984) (disproportionate movement of African Americans out of districts is "strong evidence of intentional discrimination").

District Core Retention
of Enjoined Plan
Grouped Districts 7-10 & 2-12-14

| District | Enjoined | 2022-800 | P1 | P2 | P3 |
|---|---|---|---|---|---|
| 2-12-14 | 100.00% | 87.42% | 65.71% | 79.46% | 78.63% |
| 7-10 | 100.00% | 88.63% | 72.86% | 83.10% | 83.54% |

Fairfax Rep. at 114.

Consequently, Black residents remain packed in D7–10. The total population of the seven Challenged Districts that lies north and west of the St. Johns River[4] ("NW Jacksonville") is 443,044, including 218,213 Black residents and 168,275 white residents. Fairfax Rep. 117. In the Enjoined Plan, 173,101 Black residents (79.3% of all Black residents in NW Jacksonville) were in the Packed Districts. *Id.* The portion

---

[3]    These figures represent "Any Part Black"—anyone who identifies as Black alone or in combination with another race. *See Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003).
[4]    Fairfax made comparisons using only the north and west side of the St. Johns River so that he kept the denominator constant for comparisons across all the plans he analyzed.

of Stripped Districts in NW Jacksonville, meanwhile, included 96,875 white residents (57.6% of white residents). *Id*. In Ordinance 2022-800, D7–10 include 77.5% of Black residents of the area (169,050), and D2 (NW part), 12, and 14 include 52.1% of white residents (87,657). *Id*. at 118. The effect is to keep D2, 12, and 14 artificially white while continuing to pack Black voters into D7–10. Ordinance 2022-800 is thus not "a full and adequate remedy," *Osceola Cnty.*, 474 F.Supp.2d at 1256, that "completely remedies the identified constitutional violation," *Covington I*, 283 F.Supp.3d at 424, and its *effects*, *id*. at 435.

### B. The Council Leaned into Both Incumbent-Protection and Core-Preservation, and in Both Cases Race Predominated

The retention figures should come as no surprise given that the Challenged Districts retain many of the features this Court found indicative of racial predominance. *See infra* p. 27–34. During the remedial process, the mapmakers conceded that these districts subordinate traditional criteria, but assured the Council that this noncompliance was valid because it reflected incumbent-protection, not race. 11/2 Tr. 63:21–23; *see also id*. 32:1–10,* 62:3–10, 64:10–13; 11/4 Tr. 125:9–11, 125:20–23.

While there is nothing inherently unlawful about protecting incumbents, that does not mean that *all* incumbent-protection is legitimate.[5] Courts have repeatedly

---

[5]   Courts have been skeptical of the type of incumbent-protection at play here. Protecting incumbents is a legitimate interest insofar as it is designed to further "the interests of the constituents." *LULAC*, 548 U.S. at 441. In *LULAC*, the Supreme Court explained the virtue of incumbent protection is "to keep the constituency intact so the officeholder is accountable for promises made or broken." *Id*. It is

noted that incumbent-protection (like core-preservation) cannot insulate illegal districts from review. *See, e.g.*, *LULAC*, 548 U.S. at 441 (incumbent-protection could not justify "the effect on Latino voters" of drawing them out of district); *Easley v. Cromartie*, 532 U.S. 234, 262 n.3 (2001) (Thomas, J., dissenting) ("questionable proposition" that incumbent-protection is a legitimate goal if "individuals are incumbents by virtue of their election in an unconstitutional racially gerrymandered district"); *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1271 (11th Cir. 2002) (unconstitutional to "protect [] two [B]lack incumbents by maximizing the [B]lack population in their districts"); *Garza v. Los Angeles Cnty.*, 918 F.2d 763, 778–79 (9th Cir. 1990) (Kozinski, J., concurring); *Ketchum*, 740 F.2d at 1408; *Black Pol. Task Force v. Galvin*, 300 F.Supp.2d 291, 313–14 (D. Mass. 2004); *Polish Am. Cong. v. City of Chicago*, 226 F.Supp.2d 930, 937 (N.D. Ill. 2002); *Rybicki v. Ill. State Bd. of Elections*, 574 F.Supp. 1082, 1109 (N.D. Ill. 1982). This Court has explained the same. Order at 88 ("[C]ore preservation and incumbency protection do not address the question of how the 'cores' of these oddly shaped districts came to be in the first place, only why they have remained so."); *id.* at 101 ("[B]y invoking core-retention and incumbency protection as the predominant motive behind the shape of the Challenged Districts, the City makes the historical foundation for these districts particularly relevant.").

---

*not* to benefit the officeholder. Here, the chasm between core-retention rates shows the problematic nature of incumbent protection in this context. The Packed Districts retain 19.5%, 35.4%, 37.2%, and 51.9% of their populations; the Stripped Districts retain 69.7%, 81.1%, and 98.5%. Fairfax Rep. 113. If incumbency protection here were about accountability, there wouldn't be such a gap between the core-retentions of the Packed Districts and those of the Stripped Districts. *Cf. Larios v. Cox*, 314 F.Supp.2d 1357, 1369 (N.D. Ga. 2004) (retaining incumbent cores was not a legitimate goal where "it was done in a thoroughly disparate and partisan manner.").

Here, the Council sought to ensure the plan paired no incumbent residences in the same district, yielding district shapes the City conceded are bizarre and noncompact. *See* 11/2 Tr. 26:6–17 (Johnson noting D9's "long extended shape" with an "upper neck" was due to incumbent-protection); 11/4 Tr. 52:14–53:8 (Priestly Jackson asking about irregular D9/10 border given the focus on "compactness" and Johnson explaining it "entirely" reflects "keeping each council member[] in their own district"). But here, incumbency is inextricable from the underlying violations that the City had to cure. Incumbency only exists as it does *because of racial gerrymandering*. Incumbents who would have lived together in compact districts were instead separated into different districts by slicing the Urban Core's neighborhoods. *See* Order at 95 ("Districts 7, 8, 9, and 10 stretch from in and around the central urban core in downtown Jacksonville all the way, or nearly so, to the Duval County line at its north, south, and west edges."). Pittman and Priestly Jackson live about two miles (a five-minute drive) from each other. Gaffney lives just a few minutes from each. Clark-Murray is within five miles of Priestly Jackson. All four incumbents live within a four-mile radius. *See* ECF 72-1 at 105–108; ECF 80-1 at 1–9 (maps with incumbent addresses). To *start* the process with where incumbents live ensured the replication of key features of the racial gerrymandering.[6] As Johnson and Council staff noted, this

---

[6]   It's not inherently inappropriate to consider incumbency in this remedial context, but there's a right way to do so—to consider it *after* ensuring the racial gerrymandering was cured such that traditional redistricting criteria weren't subordinated to race or race-correlated criteria. "[W]hen incumbent protection has been considered, courts have routinely treated this principle as 'a *distinctly subordinate* consideration' to the other traditional redistricting principles." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 996 F.Supp.2d 1353, 1363 (N.D. Ga. 2014) (quoting *Larios*, 314 F.Supp.2d

choice led to "weirdly shaped districts" that are "stretched out" instead of logical, compact, and respectful of communities of interest.

Further, there is reason to think the Council's emphasis on incumbent-protection was pretextual. First, Ordinance 2022-800 protects incumbents who aren't even seeking reelection. In fact, Johnson explained that "the long extended shape of District 9"—perhaps the most conspicuously problematic feature of Ordinance 2022-800—was a product of shielding *incumbents who are term-limited*:

> If we are not going to worry about the council members who are termed out, that upper neck can be—the upper part of that neck can be kind of made more compact and we rotate with all the council members. So each council member who is not termed out would still be in their own district, and we can get rid of that neck there.

11/2 Tr. 26:10–17.

Second, even once incumbents were separated, the Council insisted on changes to claw back aspects of the original unconstitutional districts—since, in the words of one Committee member, "the map we had was fine." Pantazi, *Plaintiffs Propose*, *supra* n.2. For example, although Pittman was not paired with anyone in the Lime or Maroon maps, she complained she was "drawn out of [her] district." 11/2 Tr. 51:6–7; *see also* Jim Piggott, *City Council Committee Narrows Down New District Maps*, NEWS4JAX

---

at 1362) (collecting cases). There, the court accounted for incumbency, but only *after* ensuring the violation was cured, other federal law was complied with, and traditional redistricting criteria were followed. Only *then* could changes be made to avoid pairing incumbents, so long as "doing so would not affect the plan's remedial effect, alter the plan's constitutional commitments, or sacrifice the plan's emphasis on the other traditional redistricting principles." *Fayette Cnty.*, 996 F.Supp.2d at 1363; *accord Covington I*, 283 F.Supp.3d at 422 (Special Master instructed *not* to avoid pairing incumbents, but welcoming submissions about how to separate incumbents paired *after* violation cured).

(Nov. 2, 2022), https://www.news4jax.com/news/local/2022/11/02/city-council-committee-narrows-down-new-district-maps-to-one-choice-but-pushback-continues/ [https://perma.cc/2LGK-WRZK]. Johnson explained how Pittman's district could be changed to look more like her existing one, and Pittman requested that change. 11/2 Tr. 53:15–54:7.* The Committee approved her request unanimously. *Id.* 58:21–59:9. By November 3, Johnson had accommodated Pittman's request "to be kept more with her current district's population to the north," exchanging territory between Pittman and Gaffney, and bringing both districts closer to the Enjoined Map's unconstitutional cores. 11/3 Tr. 14:7–9. After that meeting, Pittman told a reporter "the reduction in the Black population in one of the districts was a significant factor for her," saying, "Do the math…. You can count from four to three districts. It's a real concern for me." Andrew Pantazi, *City Lawyer: Jacksonville Doesn't Need Compact City Council Districts*, Tributary (Nov. 3, 2022), https://jaxtrib.org/?p=3396 [https://perma.cc/5G29-A3R9]. Pittman confirmed that she "want[ed] a district that looks more like [her] current district." Andrew Pantazi, Twitter (Nov. 3, 2022), https://twitter.com/apantazi/status/1588151967733481472 [https://perma.cc/2AXR-QH24].[7]

A similar dynamic informed the Committee's decision to move D7 closer to its enjoined configuration. Multiple councilmembers supported changes that returned to D7 more of its unconstitutional core, tying that request to a concern for the *future* D7

---

[7]   *Contra* ECF 82-1 at 29 ("The race of the potential district constituents was not considered when creating the interim remedial district boundaries, nor were the 2011 district lines preserved.")

officeholder to be elected on November 8. *See* 11/3 Tr. 57:8–58:11,* 58:16,* 79:12–13, 20–22* (Gaffney), 78:10–11 (Howland), 70:22–23 (Cumber), 71:23–72:3, 74:15–16, 74:22–25,* 75:1–3,* 100:19–20 (Salem), 72:24, 95:18–20 (Ferraro), 80:21–23 (Newby), 83:7–10 (White).

When incumbency is tied to the violations to be remedied, courts *must* be skeptical. "[A] redistricting body's desire to protect [] incumbents must give way to its duty to completely remedy the constitutional violation," especially when "a state redistricting body relies on redistricting criteria closely correlated with race in its pursuit of the far more suspect goal of seeking to ensure that incumbents elected in a racially gerrymandered district prevail in their remedial district." *Covington I*, 283 F.Supp.3d at 433; *see also Jeffers*, 756 F.Supp. at 1199–1200. Here, the foundation of Ordinance 2022-800 was closely wedded to the Enjoined Plan because its starting point was keeping incumbents in their own districts *whether or not they were eligible to run again*. Incumbent-protection was not a legitimate goal in this context, but a fig leaf for minimizing changes. As a result, the remedial districts continue to bear the indicia of racial gerrymandering.



Fairfax Rep. 43.



Fairfax Rep. 27.

### C. Partisanship Played a Limited Role, and to the Extent It Shaped the Council's Decisions, it Entrenched the Racial Gerrymandering

Despite some efforts to push partisanship to the fore, the record reflects partisan considerations played a limited role in the Council's mapmaking. And to the extent the Council used partisan data, it just embedded the effects of the constitutional violations.

Race and party are closely correlated in Jacksonville. During the remedial process, councilmembers of both parties treated the two interchangeably. *See* 11/1 Tr. 32:19–34:20* (Gaffney asking about "minority" seats lost, being interrupted by Freeman and Teal, and rephrasing to "Democrat"); Viti, *supra* n.2 (Diamond discussing "African American Democrats"); Pantazi, *Plaintiffs Propose*, *supra* n.2 (same). Additionally, few decisions reflected partisan goals. Each of the maps included partisan data, but with one exception, councilmembers never cited them as a reason for preferring one map over another. 11/1 Tr. 42:7–9*; *see* Piggott, *City Council Committee Narrows*, *supra* p. 16 (Freeman statements on video). Teal advised the councilmembers that they could consider the "political make-up of [their] districts" when reviewing the proposed maps, but councilmembers rarely did so. *Id.* 13:3–4. The sole exception centered on D12: one of Killingsworth's initial instructions was to "keep 12 R." *Id.* 38:25–39:2.* And Diamond, an early proponent of the Maroon map, explained that the Plaintiffs' Unity Map was unacceptable because it "flip[ped]" D12, mentioning the partisanship of no other districts. 11/1 Tr. 42:7–11. He continued that he liked Maroon because "it pretty much maintains a lot of what we like[d] about the

original map." *Id.* 42:22–23.

Ordinarily, these partisan calculations—limited though they were—might be defensible. *See Rucho v. Common Cause*, 139 S.Ct. 2484, 2503 (2019). But the Council was not in an ordinary posture. Even if the Council could "use political data for certain purposes when initially drawing district lines," in this remedial context, "the consideration of political data" is inappropriate if it "carr[ies] forward the discriminatory effect of the original violation." *Covington I*, 283 F.Supp.3d at 433; *see also Personhuballah*, 155 F.Supp.3d at 564 (rejecting need to maintain partisan balance in curing racial gerrymander, because "at some point political concerns must give way when there is a constitutional violation that needs to be remedied"). Whatever may have been permissible in a different posture, the Council's responsibility now was to enact "a full and adequate remedy." *Osceola Cnty.*, 474 F.Supp.2d at 1256. That meant relieving the effects of the racial gerrymandering, *Covington I*, 283 F.Supp.3d at 424, and passing a plan that permitted the Court to fulfill "its own duty to cure illegally gerrymandered districts," *Covington II*, 138 S.Ct. at 2553.

Therein lies the problem with the Council's consideration of party: because race and party are so closely correlated, any partisan makeup the Council sought to preserve was a direct consequence of the racial gerrymandering. Absent the past packing of "African American Democrats," the party baseline could well have been different. Preserving the partisan status quo thus prevented the Council from "so far as possible eliminat[ing] the discriminatory effects of the racial gerrymander," *Covington I*, 283 F.Supp.3d at 435 (citation omitted), because it preserved the racial status quo as

21

well. This led to districts with Republican incumbents retaining high percentages of their white populations, and Black Democrats being shifted among D7–10 as described above. Consider D12: shifts to its boundaries made Plaintiffs' Unity Map a "nonstarter" because of partisan effects, and one of the few instructions to Killingsworth and Johnson was to "keep 12 R." The result? Ordinance 2022-800's D12 retains 81.1% of the Enjoined Plan's racially gerrymandered D12. Fairfax Rep. 113; *see also* Robert Yablon, *Gerrylaundering*, 97 N.Y.U. L. REV. 985, 994 n.36 (2022) (using 80% core-retention as threshold).

Between incumbent-protection, partisanship, and core-retention, the remedial process here resembles that in *Covington*. There, after the district court struck down racially gerrymandered districts, the legislature passed a remedy purportedly without considering race *at all*. Instead, it invoked incumbent-protection and core-preservation to draw remedial districts. There, like here, the remedial districts bore the features of the original districts that suggested racial predominance—including odd shapes and divided communities. And there, like here, the remedial process centered on "efforts to protect incumbents … through use of political data," *Covington I*, 283 F.Supp.3d at 433, that was "closely correlated with race," *id*. at 431. The district court rejected this remedy, explaining that the legislature could not prioritize "seeking to ensure incumbents will prevail in their remedial districts—if doing so would prevent it from completely remedying the identified constitutional violation." *Id.* at 435.

The Supreme Court affirmed that portion of the district court's decision. It explained that even "[t]he defendants' insistence that the … legislature did not look at

racial data in drawing remedial districts d[id] little to undermine the District Court's conclusion—based on evidence concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race." *Covington II*, 138 S.Ct. at 2553.

The Council repeated the *Covington* defendants' errors by prioritizing incumbent-protection and partisanship over eliminating the Enjoined Plan's racial gerrymandering. The Council's political desires had to "give way to the need to remedy a *Shaw* violation." *Personhuballah*, 155 F.Supp.3d at 561 n.8. But they didn't. Instead, those considerations led to conceded noncompactness, bizarre shapes, neighborhood-splitting, and above all, Packed and Stripped Districts that, collectively, closely resemble their predecessors. Incumbent-protection and partisanship thus continued the race-based sorting of voters, "embed[ding], rather than remedy[ing]" the Enjoined Plan's constitutional violations. *Covington I*, 283 F.Supp.3d at 431.

## II. Race Predominated in Ordinance 2022-800 Despite Defendants' Purported Colorblindness

The City's process diverged from *Covington*'s in one critical way—here the remedial mapmakers *did* consider race. The City argues that, because its *initial* draft plans were purportedly drawn without using racial data, race necessarily did not predominate in Ordinance 2022-800. Not so. Here, not only did the City—by its own telling—use racial data to develop its plan, but race predominated in other ways as well. The only place where race apparently *did not* factor into the Council's analysis is the only place where it *should have*: ensuring VRA compliance.

### A. Defendants Used Racial Data in Developing Ordinance 2022-800

The City used racial data when considering and modifying its draft plans. In developing his initial drafts, Johnson observed that the number of "majority [B]lack, African-American" districts went from four under the Enjoined Plan to three in the drafts. 11/1 Tr. 18:12–15. He claimed he didn't "draw[] for that … [b]ut we did look at it." *Id.* 18:20–21. Johnson specifically noted that he "want[ed] to mention that as a factor [for consideration] in terms of the results." *Id.* 18:19–20. Several councilmembers expressed concern that one of the four Packed Districts would drop below a 50% BVAP, *id.* 32:20–24*; 11/2 Tr. 74:23–75:6*; Pantazi, *City Lawyer*, *supra* p. 17, prompting Johnson to observe that "there's a lot of debate about the effective number." 11/2 Tr. 75:13–14.

Moreover, after calculating their racial makeups, Johnson adjusted the D9/10 border in one draft supposedly "to ensure that we stay safe on the Voting Rights Act." 11/3 Tr. 18:22–23.* He did not explain how he assessed VRA compliance, and the City provided no rationale for these changes *except* racial data. The justification for these race-based decisions is dubious, given Johnson and Teal's repeated claims that the City didn't have time to do a VRA analysis. *See, e.g.*, 11/1 Tr. 12:1–5.*

Unlike the *Covington* defendants, the City never claimed it did not consider racial data in developing its remedial maps—only that it did not use racial data when it *started* this process. *Compare Covington II*, 138 S.Ct. at 2553, *with* 11/4 Tr. 222:18–21. Under the City's supposedly colorblind approach, then, the racial composition of districts was "a factor in terms of the results," a subject of "debate," and a rationale

for adjusting district lines—but not a component of a VRA analysis, which the City says it could not do. 11/1 Tr. 18:19–20, 12:1–5; 11/2 Tr. 75:13–18.

### B. The Council Pretextually Used the Terms "Rural" and "Urban" to Reject the Unity and Orange Plans

When introducing the Maroon, Lime, Orange, and Plaintiffs' Unity Plans, Killingsworth explained that he and Johnson had considered neighborhoods' "urban or rural" character to draw districts. 11/1 Tr. 38:5–13.* For example, Johnson described the Unity Map's D8 (the corollary to Maroon's D12) as an "unusual mix" of "rural" areas and dissimilar "Sherwood Forest, Osceola Forest." 11/2 Tr. 9:23–10:5.* He contrasted that with Maroon's D12. 11/1 Tr. 20:12–15. In reality, both the Unity Map's D8 and Maroon's D12 combined the City's less densely populated southwestern edges—which are not populous enough to form their own district—with dense suburbs. 11/2 Tr. 41:17–18 (public comment disputing the characterization of D12 as rural "when it's suburban in many of its portion[s]"). The difference? Unity's D8 included predominantly Black suburbs like Sherwood Forest (91% BVAP; 3,908 pop/mi$^2$), Osceola Forest (73% BVAP; 2,275 pop/mi$^2$), and adjacent Harborview (95% BVAP; 2,060 pop/mi$^2$) and Edgewood Manor (95% BVAP; 2,518 pop/mi2). Fairfax Rep. 91–94. Maroon's D12 included whiter (and sometimes denser) suburbs like Rolling Hills (19% BVAP; 2,541 pop/mi$^2$), Normandy Manor (34% BVAP, 2,681 pop/mi$^2$), and Normandy Estates (31% BVAP; 3,591 pop/mi2). *Id.*[8]

---

[8]   All these suburbs contrast markedly with true urban areas like Downtown (7,528 pop/mi$^2$). Fairfax Rep. 92.



*Id.* at 105.

Johnson also used the terms rural and urban as codewords for white and Black, respectively, when discussing the Orange plan. Johnson described "the relatively rural District 10[9] also outside of 295." That district, modeled on the Unity Plan's D12, was not rural (it was the third most densely populated of the Challenged Districts), but it *was* majority white. 11/1 Tr. 24:19–20; Fairfax Rep 109, 132.

Freeman, too, engaged in this pretextual discussion. He echoed Johnson's criticism of the Unity Map for combining "rural and urban communities." 11/2 Tr.

---

[9]   Johnson numbered this D10 in Orange and discusses it as such during the meeting, but the PDF map provided to the Council (ECF 67-1 at 25) erroneously labeled it as D7. ECF 70 at 4 n.4.

5:7–8; *see also* 11/1 Tr. 59:23–25.[10]

Once the Committee used the pretextual urban/rural criterion to eliminate the Orange and Unity Maps, these terms were not used again.

### III. A District-by-District Analysis Shows That the Challenged Districts Continue to Bear Hallmarks of Racial Predominance

A district-by-district analysis reveals that the Council perpetuated, rather than remedied, the Enjoined Plan's racial gerrymandering. As described above, the Council began from an already flawed starting point: the Maroon map with its focus on incumbent-protection and its continued segregation of voters by race. The Council then made decision after decision to claw back even more features of the Enjoined Plan.

As a result, districts continue to have strange shapes and split communities. As this Court noted in its Order, bizarre shapes, noncompactness, and the splitting of communities are hallmarks of racially gerrymandered districts; the subordination of traditional criteria is strong circumstantial evidence of racial predominance in the design of those districts. Order at 78, 89, 93–95, 100–103; *see also Bethune-Hill v. Va. State Bd. of Elections*, 137 S.Ct. 788, 799 (2017) ("In general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles in order to do so."); *Miller v. Johnson*, 515 U.S. 900, 913 (1995) (Bizarre,

---

[10]   This ham-fisted usage of "urban" and "rural" as racial codewords contrasts with the usage of one councilmember, who has previously distinguished between "black suburbs, rural, [and] urban" areas in the past. Brenda Priestly Jackson, TWITTER (Sep. 17, 2019), https://twitter.com/Priestjax/status/1174150867928473601 [https://perma.cc/SUY2-8FZH].

noncompact shapes "may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.").

### A. District 2

Ordinance 2022-800's D2 is almost identical to D2 in the Enjoined Plan—almost. The debate regarding D2's border focused on Ferraro's insistence that San Mateo (80.2% WVAP) be put back into D2 (like in the Enjoined Plan). 11/1 Tr. 55:1–5. Ferraro also asked that Oceanway (55.7% WVAP) be united in D2. *Id.*; Fairfax Rep. 93–94.[11] Ultimately, the Council chose again to include the whiter San Mateo neighborhood in D2, leaving more of mixed Oceanway in a Packed District—a similar division to the one in the Enjoined Plan. *See* Order at 50 (quoting Killingsworth: "for the same reasons it works for Councilmember Gaffney, it would work for Councilmember Ferraro").

### B. District 7

Johnson drew D7 in the Maroon map compactly north of the Trout River, crossing south only to equalize population, making it quite different from its predecessor in the Enjoined Plan. 11/1 Tr. 20:15–19; *see* Order at 95 ("Why must District 7 jump the Trout River, in order to connect a slice of Jacksonville's northside to the downtown?"). Gaffney expressed concern about Maroon's "taking away from 7" the following day. 11/2 Tr. 73:23–24. After the Committee instructed Johnson to

---

[11] The Oceanway request reflected genuine communities-of-interest considerations Ferraro expressed last year. Order at 52 n.30.

ignore incumbents not seeking reelection, Johnson dramatically reconfigured D7 in the city's southwest, resulting in "a whole new District 7." 11/3 Tr. 54:11–55:10. Gaffney objected to this "very unfortunate" decision and complained that Johnson's Maroon II maps all "draw out District 7." *Id.* 58:15, 60:6–7. Other councilmembers weighed in expressing similar concerns that D7 was drastically reshaped and expressed a desire to ensure "we are keeping District 7 to where people understand District 7." *Id.* 95:18–20 (Ferraro); *see also supra* pp. 17–18.



Fairfax Rep. 32.

 As with the other Challenged Districts, the changes made between the Maroon Plan and Ordinance 2022-800 were a march back toward a D7 resembling the one in

the Enjoined Plan. *Compare* Fairfax Rep. 43 (Maroon) *with* 27 (2022-800). The only reason D7 is not even more similar to its unconstitutional predecessor is that Teal stated that the City would ask this Court to waive the Charter's candidate residency requirement, prompting Gaffney to stop fighting for D7 to include his address (shared with his son, now-Councilmember Reggie Gaffney Jr.). Andrew Pantazi, *Jacksonville City Council Passes New District Map*, TRIBUTARY (Nov. 7, 2022), https://jaxtrib.org/?p=3444 [https://perma.cc/PSV3-8ZY6].

### C. District 8

The Maroon version of D8 was also met with hostility by the Council—and in particular by the D8 incumbent, Pittman. As discussed in more detail *supra* pp. 16–17, Pittman fought for this change so that her district looked more like the Enjoined Plan's D8, and she got what she wanted.

### D. District 9

Introducing the Maroon map, Johnson noted D9's ostentatiously bizarre shape: "Now, 9 is obviously the district that jumps out on the map." 11/1 Tr. 21:8–9. He later summarized the feedback he got on Maroon and noted that he needed to address D9's "long extended shape" with an "upper neck." 11/2 Tr. 26:6–17. That neck was retained to keep incumbent Clark-Murray in D9. 11/4 Tr. 52:8–53:21.* *See also supra* p. 15.



Fairfax Rep. 72.

Johnson may have smoothed out some of D9's roughest edges, but the district retains its snaking shape and neck because race predominated in the choice of areas to include within it. Like its predecessor, it includes a precinct-wide "land bridge" connecting pockets of Black voters. Johnson explained that he kept Woodstock (where Clark-Murray lives) together with communities immediately adjacent to I-295 running south because they are "similar in many ways." 11/1 Tr. 22:5–11. Other than their proximity to either side of the Beltway, however, Johnson did not specify how these communities are related to the Woodstock neck. Indeed, the similarity is nothing more than race. Jacksonville Heights, McGirt's Creek, and Duclay have more in common, as neighborhoods, with Argyle Forest and Chimney Lakes. *See, e.g.*, *id.* 67:19–68:9;* 11/3 Tr. 93:5–9, 93:15–16. The only thing they have in common with Woodstock—the home of incumbent Clark-Murray and the northernmost part of the district—is that they are predominantly Black areas. Fairfax Rep. 91–94.

### E. District 10

D10 is an afterthought—curling around the top of D9 so Clark-Murray can remain alone in D9, squished below D8 so Pittman's district can flow northward as it did in the Enjoined Plan. It only stretches slightly further south than the Enjoined Plan's D10 boundary, such that it includes predominantly white Riverside and Avondale, but not Lakeshore, Fairfax, or Ortega. *Id.* at 91–94 By barely changing the D10/14 boundary, Ordinance 2022-800 does not cure the racial gerrymandering of the Enjoined Plan.

### F. District 12

D12 has a very high core-retention rate of 81.1%. *Id.* at 113. Race explains which areas were moved into and out of D12. The district's northern border was moved further north by pulling white neighborhoods out of the enjoined D8: Cisco Gardens (84.7% WVAP), Otis (76.2% WVAP), Bulls Bay (80.3% WVAP), and Marietta (78.5% WVAP). *Id.* at 91-94. At D12's southern end, more mixed Chimney Lakes (46.5% WVAP, 31.0% BVAP) was removed. Fairfax Rep. 91-94; *see supra* pp. 22, 25–27.

### G. District 14



Fairfax Rep. 69, 74.

Race continued to predominate in the choice of borders for D14 in Ordinance 2022-800. Indeed, D14's general shape is maintained from the Enjoined Plan. Johnson explained that he made D14 "the riverfront seat," but also decided to keep Argyle Forest and add Chimney Lakes, to connect areas on either side of the D9 "corridor." 11/1 Tr. 22:12–24.* The resulting D14 continues to be V-shaped, retaining its "land bridge" to wrap around D9's southern end and connect white voters on either side.

Johnson admitted that D14 "obviously is an odd-looking district." *Id.* 22:1–2. Yet the Council chose to maintain that strange shape;

Attempts to remove the V-shape and unite communities were ignored because of race. Public commenters explained that all of Argyle[12] should be united in D14. *Id.* 63:16–64:2,* 64:15–17, 67:19–68:9,* 76:16–23. Even DeFoor noted a "little dip in Argyle that didn't really make sense." 11/3 Tr. 92:21–93:7, 93:15–16. Adding Argyle to Maroon's D14 would have created a highly compact district without dividing riverfront neighborhoods like Riverside/Avondale. Indeed, when the Committee voted to move heavily white Riverside/Avondale out of D14 and into D10, DeFoor suggested making up the population in Argyle—areas Johnson had put into D9's "dip" like Duclay (33.8% WVAP) and McGirt's Creek (38.7% WVAP). 11/3 Tr. 92:21–93:7, 93:15–16, Fairfax Rep. 91-94. Johnson said he would start with Argyle, 11/3 Tr. 93:21–22, but in fact, he hardly touched that area, choosing instead to move a 30.4% Black part of Cedar Hills into D14. ECF 67-1 at 34, Fairfax Rep. 140. There was no explanation for why the Maroon III series moved a heavily white neighborhood nobody had ever mentioned, deviating from Blanding Boulevard which otherwise made up the D9/14 border, instead of the more racially mixed areas DeFoor had specifically asked for. The remainder of Argyle (31.1% White) remained in D9 as well. *Id.*

---

[12]   Defined by the Argyle Area Civil Council as extending from I-295 to Chimney Lakes, south of 103rd Street. 11/1 Tr. 67:25–68:5; *see also* http://www.neighborhoodlink.com/Argyle_Area/map [https://perma.cc/2X9N-BUBZ].

The portion of Cedar Hills moved into D14 to make up for the lost Riverside/Avondale population was noticeably more white (51.6% White) than either of the areas of Argyle DeFoor proposed to move (29.4% and 37.3% White). *Id.*

## THE COURT SHOULD ADOPT
## ONE OF PLAINTIFFS' PROPOSED PLANS

Plaintiffs present several plans that fully remedy the City's constitutional violations while comporting with local, state, and federal law and respecting the Council's legitimate policy choices.[13] They stand in stark contrast to Ordinance 2022-800's failure to cure the substantially likely constitutional violations the Court identified in its Order.

Plaintiffs' maps P1 and P2 were drawn with communities in mind. They group together communities that had expressed a desire to be paired during the original redistricting process; they also pair communities identified in the Council's remedial process (by councilmembers or the public) as closely united. In so doing, they feature compact districts with smooth edges that are otherwise logical and respect the Council's legitimate criteria. P1 differs from Ordinance 2022-800 only in D2, 7–10, 12, and 14. P2 differs only in D7–10, 12, and 14. P2 does not address the continued stripping of D2, while P1 does.

Plaintiffs' map P3 starts with Ordinance 2022-800 and adjusts D7–10 and 14 to try to rectify the Council's most problematic decisions. P3 cannot fully undo all the

---

[13] Besides the images herein, Plaintiffs' plans can be viewed on Google Maps, here: https://bit.ly/3Guydnr (P1); https://bit.ly/3XcdMBh (P2); https://bit.ly/3V161Nr (P3).

impermissible choices the Council made, but to the extent the Court does not agree with all of Plaintiffs' arguments regarding Ordinance 2022-800's failures to cure the Enjoined Plan's constitutional infirmities, P3 at least remedies the more glaring violations. P3 remedies the stripping of D14, packing of D9, and D7/8's adherence to their unconstitutional cores. It does not address the continued stripping of D12 or D2.

All three of Plaintiffs' maps comply with Section 2 of the VRA, as federal law requires. *See infra* pp. 42–44.



**P1.** Fairfax Rep. 48.



**P2.** *Id.* at 49.

### I. P1 and P2 Comply with the Council's Lawful Stated Objectives

Ordinance 2022-800 lists seven relevant criteria purportedly used to create the interim remedial plan:

(1)　creating nearly equally-populated districts;

(2)　arranging districts in as logical and compact a geographic pattern as possible;

(3)　creating compact and contiguous districts so that the people of the City, and their varied economic, social and ethnic interests and objectives, are adequately represented;

(4)　following Citizens Planning Advisory Committee (CPAC) region boundaries, freeways, waterways, and major roads;

(5)     accounting for residences of incumbents who can run for reelection;

(6)     considering the political and socio-economic demographics of the districts;

(7)     avoiding changes to unchallenged districts.

ECF 67-1 at 17–18.

Plaintiffs explain above why criteria 5 and 6 are improper starting points, *see supra* pp. 10–23, but confirm that P1 and P2 respect the other five criteria, as set out below.

### A. Equal Population

All Plaintiffs' maps are within the population equality limits set by the Council in Ordinance 2022-800. P1 and P2 have total population deviations of 9.59% and 9.25% respectively. Fairfax Rep. 55–56. These are lower than the total deviation of Ordinance 2022-800, at 9.95%. *Id.* at 54.

### B. Redrawn Districts in P1 and P2 Are Logical and Compact

The Redrawn Districts in P1 and P2 are logical because they adhere to traditional communities of interest, as outlined in the next section.

The Redrawn Districts in P1 and P2 are compact, with average Polsby-Popper scores of .46–.44; Convex Hull of .80. or .79; and Reock of .46 or .44. *Id.* at 61–62. In contrast, Ordinance 2022-800's Challenged Districts have lower average compactness scores across all three metrics, at .42, .78, and .42. *Id.* at 60. The least-compact of the Redrawn Districts in P1 and P2 have Reock scores of .30 and .36, compared to Ordinance's 2022-800's .27. *Id.* at 60–62.

### C. Redrawn Districts in P1 and P2 Are Compact and Contiguous so that the People of the City Are Adequately Represented

Respecting neighborhood boundaries ensures residents are represented according to their varied economic, social, and ethnic interests and objectives. Ord. Code § 18.101(c). The City defines Municipal Code Compliance (MCC) Zones, which track most commonly understood neighborhoods,[14] including all the neighborhoods mentioned by councilmembers and the public in both the original and remedial redistricting processes.[15] Mr. Fairfax reports on the number of split neighborhoods using this definition of neighborhoods. *Id.* at 95.

P1 and P2 outperform the Enjoined Plan and Ordinance 2022-800 when it comes to neighborhood splits. P1 splits 30 neighborhoods, while P2 splits 28. *Id.* Ordinance 2022-800 and the Enjoined Plan split 39 and 47 neighborhoods, respectively. *Id.*

Importantly, the Plaintiffs' maps seek to make whole or unite neighborhoods that the Council desired to keep together, like Riverside/Avondale and Murray Hill (plus, in P2, Ortega); Robinson's Addition and Woodstock; Springfield, Downtown, and the Eastside; and Argyle.

---

[14] The City's MCC Zones are identical to the neighborhoods map Plaintiffs submitted earlier in this case. The MCC Zone map is available on the City's Civil Planning GIS portal: https://maps.coj.net/DuvalCivilPlanning/ [https://perma.cc/T4AK-V393].
[15] One exception is Argyle, *see supra* n.12.

### D. P1 and P2 Follow CPAC and Major Geographic Boundaries



**P1, P2, and CPACs.** *Id.* at 99–100.

#### 1. P1 and P2 Better Follow CPAC Boundaries

Just one of the seven redrawn districts (D14) in Ordinance 2022-800 is contained entirely within one CPAC; three districts (2, 8, 9) overlap with two CPACs, and three districts (7, 10, 12) overlap with three CPACs. *Id.* at 97-100.

In P1, two districts (12, 14) are within a single CPAC; one district (2) overlaps with two CPACs; and four districts (7, 8, 9, 10) overlap with three CPACs. *Id.*

In P2, one district (14) is inside a single CPAC; five districts (2, 8, 9, 10, 12) overlap with two CPACs; and one district (7) overlaps with three CPACs. *Id.*

Additionally, significant portions of district borders in P1 and P2 align with CPAC boundaries, even if districts themselves cross them in other places. *Id.*

#### 2. P1 and P2 Follow Major Geographic Boundaries

P1 and P2 adhere to major geographic boundaries like waterways, highways, and railroads. For example, D8 in both maps is bounded on the west by the railroad and on the south by the Trout River or CPAC lines, except where needed to achieve

equal population (picking up portions of Riverview, as Ordinance 2022-800 does).[16] Other major boundaries followed include interstates and expressways; other railroads; arterial roads like 103rd Street, Cassat Avenue, Herlong Road, Hammond Boulevard, San Juan Avenue, Beaver Street, King Street, and Edgewood Avenue; major tributaries like the Ortega River, Cedar River, Fishing Creek, and Dunn Creek; and the Naval Air Station boundary.

## II. P3 Cures 2022-800's Most Egregious Violations[17]

P3 takes Ordinance 2022-800 and adjusts D7–10 and 14 to partially remedy the continued constitutional violations present in that area of the map, by not stripping Black residents from D14, not packing them into the other districts, and not otherwise aligning these five districts to their unconstitutional cores.

P3 has a total population deviation of 9.95% and therefore complies with equal population requirements. *Id.* at 57. The compactness scores for P3's redrawn districts range from 0.36-0.55 (Reock), 0.27-0.69 (Polsby-Popper), and 0.67-0.97 (Convex-Hull), with averages of 0.44, 0.45, and 0.80, respectively, compared to averages of 0.42, 0.42, and 0.78 respectively for Map 2022-800. *Id.* at 60, 63. P3 splits only 30 neighborhoods. *Id.* at 95. In P3, one district (14) is inside a single CPAC, four districts (2, 8, 9, 12) overlap with two CPACs, and two districts (7, 10) overlap with three

---

[16]   D8's border with D2 is adjusted and regularized in P1 so as not to perpetuate the race-based stripping of Black voters from D2 described *supra* p. 28. P2 adopts Ordinance 2022-800's border for D2. Either choice could be used in P1 or P2, depending on the Court's findings regarding the Council's D2.

[17]   To avoid doubt: Plaintiffs are not convinced that P3 will fully cure the constitutional violations, though it will come closer than Ordinance 2022-800. Plaintiffs' position is that, of the maps presented to the Court, only P1 and P2 are certainly curative of the underlying problem.

CPACs. *Id.* at 98. Additionally, significant portions of district borders in P3 align with CPAC boundaries, even if districts themselves cross them in other places. *Id.*



**P3.** *Id.* at 50.

### III. Where Possible, Plaintiffs' Maps Minimize Incumbent Pairings

When Plaintiffs submitted P1's earlier iteration to the Council as the Unity Map, *see* ECF 67-1 at 3, it paired only two incumbents running for reelection: Pittman and White. A day later, Councilmember Priestly Jackson announced that she would also seek reelection, meaning P1 puts the three of them in one district. Pantazi, *Plaintiffs Propose*, *supra* n.2.

Similarly, P2 and P3 pair only Pittman and Priestly Jackson—who live two miles from each other, as discussed *infra* p. 15. Changes could be made to either P2 or

P3 to separate them—to the detriment of other criteria like compactness—if the Court desired to do so. None of Plaintiffs' maps pair any School Board members eligible for reelection in 2024.

### IV. Plaintiffs' Maps Comply with Section 2 of the VRA

The City admits (as it must) that Section 2 of the VRA applies to Jacksonville. *See* ECF 34-03 at 13, 76–77, 82 (OGC explaining Section 2 applies here); ECF 34-08 at 12–15 (OGC memo discussing Section 2). Yet the City declined to provide a VRA analysis during the remedial process. ECF 76-1 at 17. Plaintiffs therefore offer expert testimony from Mr. Fairfax and Drs. Imai and Austin to show that Section 2 requires four Black opportunity districts to be included in Jacksonville's fourteen-district Council map.

#### A. Application of Section 2 to Jacksonville

Section 2 applies to a jurisdiction if three preconditions are met: "(1) the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate." *LULAC*, 548 U.S. at 425. If all three factors are established, "the statutory text directs us to consider the 'totality of circumstances' to determine whether members of a racial group have less opportunity than do other members of the electorate." *Id.* at 425–26. At this stage, "[a]nother relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area." *Id.* at 426.

Plaintiffs' experts provide evidence as to each of these elements. First, Fairfax confirms that the "Demonstration Plan" includes four reasonably compact districts with BVAPs over 50%. Fairfax Rep. 111. Second, Imai confirms that elections in Jacksonville are highly racially polarized between white and Black voters. Imai Rep., ECF 89-2 4–5. Imai expands his initial analysis of 17 probative elections, examining all 31 elections since 2012 where at least one Democrat ran against at least one Republican, yielding a single winner.[18] *Id.*

Third, Austin provides a report assessing the totality of the circumstances with respect to Jacksonville. Austin concludes that there is overwhelming evidence that Black voters in Jacksonville face historical and ongoing discrimination in voting and other areas like education, employment, and health. Austin Rep. at 2.

### B. Performance Analysis of Plaintiffs' Maps

Experts commonly assess whether a district plan complies with the VRA by conducting a reconstituted election analysis. *See, e.g.*, *LULAC*, 548 U.S. at 488 (Souter, J., concurring) (*citing* Bernard Grofman, Lisa Handley & David Lublin, *Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence*, 79 N.C. L. REV. 1383 (2001). That involves re-aggregating historical election results in the newly drawn districts and counting how many votes would have been cast for the various candidates in the elections. If a district would usually elect the minority community's candidate of choice, then it is considered a minority opportunity (or

---

[18]   Imai offers the results for all 31 elections to respond to Defendants' critiques. ECF 41 at 22–23. The results are substantially the same, showing the soundness of Imai's initial analysis.

performing) district. *See, e.g.*, *id.* The Supreme Court has been careful to note that the VRA is not a guarantee of electoral success, meaning a district need not allow minority voters to elect their preferred candidates in every election. *See LULAC*, 548 U.S. at 428. But they should at least regularly be able to do so. *See, e.g.*, *Robinson v. Ardoin*, No. 22-cv-211, 2022 WL 2012389, at *22 (M.D. La. June 6, 2022), *cert. granted before judgment,* 142 S.Ct. 2892 (2022) (districts allowing Black-preferred candidates to prevail in 17/18, 15/18, and 14/18 elections deemed performing districts).

Imai performed a reconstituted elections analysis for D7–10 in each of P1, P2, and P3. His results confirm that these districts would usually allow Black voters to elect their preferred candidates. Therefore, these plans each include four reasonably compact Black opportunity districts, ensuring VRA compliance.

## CONCLUSION

For the foregoing reasons, the Court should reject Ordinance 2022-800 as an interim remedy and adopt one of Plaintiffs' alternative remedial plans until entry of final judgment in this case.

## CERTIFICATE OF WORD COUNT

This memorandum contains 9,977 words, including titles, headings, footnotes, and quotations, but excluding case style and signature block.

Respectfully submitted this 18th day of November, 2022,

*/s/ Nicholas Warren*

Nicholas Warren (FBN 1019018)
**ACLU FOUNDATION OF FLORIDA, INC.**
336 East College Avenue, Ste. 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU FOUNDATION OF FLORIDA, INC.**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Daniel J. Hessel*[†]
Ruth Greenwood*
Theresa J. Lee*
Nicholas Stephanopoulos*
**ELECTION LAW CLINIC**
**HARVARD LAW SCHOOL**
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
dhessel@law.harvard.edu
rgreenwood@law.harvard.edu
thlee@law.harvard.edu
nstephanopoulos@law.harvard.edu

Krista Dolan (FBN 1012147)
Matletha Bennette (FBN 1003257)
**SOUTHERN POVERTY LAW CENTER**
P.O. Box 10788
Tallahassee, FL 32301-2788
(850) 521-3000
krista.dolan@splcenter.org
matletha.bennette@splcenter.org

Bradley E. Heard*
Jack Genberg*
**SOUTHERN POVERTY LAW CENTER**
150 East Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org

*Attorneys for Plaintiffs*

* *Special admission*      [†] *Federal practice only*

45