## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JACKSONVILLE
BRANCH OF THE
NAACP, et al.,

      Plaintiffs,

                      Case No. 3:22-cv-493-MMH-LLL

v.

CITY OF JACKSONVILLE, et al.,

      Defendants.

_____/

## DEFENDANTS' SUBMISSION IN SUPPORT
## OF INTERIM REMEDIAL PLAN
## AND REPLY TO PLAINTIFFS' CORRECTED OBJECTIONS
## AND ALTERNATIVE PLANS

The City of Jacksonville and Mike Hogan, in his official capacity, oppose Plaintiffs' Corrected Objections and Alternative Plans, Doc. 92-2. The City's Interim Remedial Plan, Doc. 67 ("IRP"), cures the Enjoined Plan's constitutional infirmities, *see* Doc. 53 (Order), and Plaintiffs fail to demonstrate otherwise. They do not carry their burden showing race predominates in the IRP. Even after this Court deemed the City's prior plan unconstitutional, "the burden of proof lies with the challenger, not the [City.]" *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). Without any direct or

1

circumstantial evidence of racial predominance, Plaintiffs ask this Court to presume bad faith in the Council's remedial process, and deny the Council the deference it is due. *Id.* at 2324-25 (discussing burden of proof and extending "presumption of good faith" to [legislature] though it made "only very small changes" from prior unlawful plan).[1]   Plaintiffs' position is unfounded and Defendants respectfully request this Court to deem the IRP constitutional.

## I.   THE REMEDIAL ORDER

Plaintiffs filed the instant suit alleging the City Council, when it passed new council districts in response to the 2020 census, violated the Fourteenth Amendment by racially gerrymandering several council seats (Challenged Districts).   Doc. 1 at ¶¶ 261-69 (Complaint).   Plaintiffs allege the Council intentionally sorted residents by race, packing Black residents into Districts 7, 8, 9, and 10 (Packed Districts), and stripping Black residents from Districts 2, 12, and 14 (Stripped Districts). *Id.* at ¶¶ 7-9, 261-69.   Plaintiffs subsequently sought preliminary injunctive relief, asking the Court to enjoin Defendants from using the district lines established by Ord. 2022-01-E.   Doc. 36 at 1.   The Court granted Plaintiffs' Motion and immediately enjoined Defendants from using Ord. 2022-01-E (Enjoined Plan) in any future elections pending final

---

[1] As developed in more depth below, *see infra* Section III.B.1, unless the Court has reason to question the City's map expert, Dr. Johnson, as to whether race predominated in his drafting process, Defendants do not request an evidentiary hearing or oral argument.

entry of judgment in this case, and further ordered Defendants to submit an interim remedial plan no later than November 8, 2022.  Order at 137-38.

In framing the scope of its interim Order, the Court noted Plaintiffs alleged "that the City's Enacted Plan intentionally sorts voters in the Challenged Districts on the basis of race in violation of the Equal Protection Clause of the United States Constitution." *Id.* at 135.  Therefore, "the sole and dispositive question [was] . . . whether . . . race was the predominant factor driving the design of the" Challenged Districts.  *Id.* at 93.  This Court also acknowledged as "real and not insignificant" council members' concerns that the Challenged Districts "with . . . significantly high BVAP [(Black Voting Age Population)] percentage[s] [may be] . . . necessary to maintain the current level of minority representation on the City Council."  *Id.* at 135.  Nonetheless, the Court had "no authority or ability to address that concern in resolving the [Plaintiffs'] Constitutional challenge . . . ."  *Id.*

Accordingly, the Court specified that any interim remedial plan "must not use race as a predominant factor in the design of any district unless that use of race is narrowly tailored to comply with a constitutionally permissible compelling government interest."  *Id.* at 137-38.  The Court further ordered that the new remedial plan could not preserve the 2011 district lines or "minority access districts," and the City must take into consideration relevant public comment and feedback.  *Id.* at 110-12.  Defendants have complied with

3

the Court's Order, submitting a map that "comports with the Constitutional mandate of the Equal Protection Clause . . . ." *Id.* at 136.

## II.  LEGAL PRINCIPLES

Courts should, as this Court has done, grant legislative bodies the first opportunity to correct purported constitutional redistricting defects. *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978); *Reynolds v. Sims*, 377 U.S. 533, 586 (1964); *Covington v. North Carolina*, 283 F. Supp. 3d 410, 424 (M.D.N.C.), *aff'd in part, rev'd in part*, 138 S. Ct. 2548 (2018); *Wilson v. Jones*, 130 F. Supp. 2d 1315, 1321 (S.D. Ala.), *aff'd sub nom. Wilson v. Minor*, 220 F.3d 1297 (11th Cir. 2000); *Johnson v. Mortham*, 926 F. Supp. 1460, 1494 (N.D. Fla. 1996).  The Supreme Court has "recognized that reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *White v. Weiser*, 412 U.S. 783, 794–95 (1973).  Only when a legislature is unable or unwilling to fulfill its duties, or when it enacts districts failing to remedy the constitutional ills in an underlying plan, must the court take on the unwelcome obligation of drawing new districts. *Wilson*, 130 F. Supp. 2d at 1321; *Johnson v. Mortham*, 915 F. Supp. 1529, 1543 (N.D. Fla. 1995).

When reviewing a remedial plan, courts use the same standards for testing the plan's constitutionality as for evaluating the original plan. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995) (discussing burden of proof). *See also Veasey v. Abbott*, 888 F.3d 792, 800-02 (5th Cir. 2018) (plaintiff bore burden to establish infirmity of remedial redistricting plan); *Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 406–09 (5th Cir. 1991) (suggesting during remedial phase, plaintiff bears burden to prove plan's unconstitutionality). In so doing, the court must defer to the legislature and presume its good faith. *Miller*, 515 U.S. at 915; *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022); *McGhee v. Granville Cnty, N.C.*, 860 F.2d 110, 115 (4th Cir. 1988); *Tallahassee Branch of NAACP v. Leon Cnty., Fla.*, 827 F.2d 1436, 1438 (11th Cir. 1987); *Whitest v. Crips Cnty. Sch. Dist.*, No. 1:17-cv-109 (LAG), 2022 WL 2036315, at *3 (M.D. Ga. Apr. 28, 2022).

In no manner is "[t]he allocation of the burden of proof and the presumption of legislative good faith . . . changed by a finding of past discrimination." *Abbott*, 138 S. Ct. at 2324. Plaintiffs must still make the case that the remedial plan is unconstitutional. Moreover, when a legislative body, through a deliberative process, makes substantial race-neutral changes to a previously deemed unconstitutional law, any prior discriminatory taint

associated with the original legislation is removed.  *E.g.*, *Veasey*, 888 F.3d at 802; *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998).

The plaintiff must also establish, through direct or circumstantial evidence, that the drafters' predominant purpose was to sort citizens by race. *Cooper v. Harris*, 137 S. Ct. 1455, 1463-64 (2017); *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999); *Bush v. Vera*, 517 U.S. 952, 959 (1996); *Miller*, 515 U.S. at 904-05.  This "entails demonstrating that the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, . . . to 'racial considerations.'"  *Cooper*, 137 S. Ct. at 1463-64.  Where, however, "these or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a [legislature] can defeat a claim that a district has been gerrymandered on racial lines."  *Miller*, 515 U.S. at 916.  Conversely, should the plaintiff establish that district lines are so bizarre that they are "unexplainable on grounds other than race," the burden shifts to the redistricting body to demonstrate that any consideration of race satisfied the strict scrutiny standard.  *Cooper*, 137 S. Ct. at 1464; *Hunt*, 526 U.S. at 546; *Bush*, 517 U.S. at 959; *Miller*, 515 U.S. at 905.

If upon review, a court determines the proffered remedial plan fails to cure the initial plan's constitutional violations, the court must limit its own remedial choices to only those necessary to cure the identified constitutional defect.  *Upham v. Seamon*, 456 U.S. 37, 43 (1982).  The equitable remedy

crafted by the court "must be fashioned to address the constitutional violation established." *Miss. State Chapter, Operation Push, Inc.*, 932 F.2d at 406. *See also Covington*, 283 F. Supp. 3d at 431; *Wilson*, 130 F. Supp. 2d at 1321. If, however, the legislative body passes a remedial plan curing the underlying constitutional defects, the court should "authorize the plan's use on an emergency interim basis for the [upcoming] elections." *Johnson*, 926 F. Supp. at 1494. *See also Wise*, 437 U.S. at 540 ("The new legislative plan . . . will then be the governing law unless it, too, is challenged and found to violate the Constitution."); *Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872, 877 (E.D. Va. 2019) ("Once the racial gerrymanders at issue in this case [are] remedied, our role . . . is at an end.").

Importantly, if the remedial plan is constitutional, the "district court is precluded from substituting even what it considers to be an objectively superior plan for an otherwise constitutionally and legally valid plan that has been proposed and enacted by the appropriate state governmental unit." *Whitest*, 2022 WL 2036315 at *3 (internal citations and quotations omitted). *See also McGhee*, 860 F.2d at 115; *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir. 1985); *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 750 (N.D. Ohio 2009); *Miss. State Chapter, Operation Push, Inc.*, 932 F.2d at 406–07.

Finally, "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller*, 515 U.S. at 915.

A district court is therefore constitutionally "precluded by the twin principles of the separation of powers and federalism from usurping a [] legislature's authority to adopt a constitutional redistricting plan." *Johnson*, 915 F. Supp. at 1544–45. *See also Tallahassee Branch of NAACP*, 827 F.2d at 1438; *Page v. Va. State Bd. of Elections*, No. 3:13CV678, 2015 WL 3604029, at *18 (E.D. Va. June 5, 2015).

Plaintiffs cannot demonstrate the Council's IRP purposefully sorts residents by race. Rather, the Council passed an IRP that is lawful, complying with the Equal Protection Clause of the Fourteenth Amendment, and in accord with the Voting Rights Act (VRA). There is no need, therefore, for the Court to consider Plaintiffs' proffered plans. As such, this Court should rule the Council's remedial plan is constitutional and appropriate for use in all future elections pending final judgment in this matter. *Johnson*, 926 F. Supp. at 1494.

## III. PLAINTIFFS FAIL TO ESTABLISH THE IRP IS UNCONSTITUTIONAL

The IRP represents a wholesale revision of the Enjoined Plan. It comports with the Fourteenth Amendment's prohibition against racial gerrymandering and satisfies the constitutional requirement of "one person, one vote." *E.g.*, *Shaw v. Reno*, 509 U.S. 630, 649 (1993); *Reynolds*, 377 U.S. at

558. Additionally, the IRP does not preserve the Challenged Districts' lines or cores as they existed in the Enjoined Plan or its predecessors.

In crafting the IRP, the Council, with the assistance of Dr. Doug Johnson, worked under the following principles:

> (1) Creating districts that are nearly equal in population as possible in order to satisfy the "one person/one vote" requirement; (2) arranging all districts in as logical and compact a geographical pattern as possible; (3) creating compact and contiguous districts so that the people of the City, and their varied economic, social and ethnic interests and objectives, are adequately represented in the Council; (4) creating district boundaries along Citizen Planning Advisory Commission Committee (CPAC) region boundaries,[2] freeways, waterways and major roads; (5) accounting for the residence of City Council and School Board incumbents who can run for re-election and not pairing these incumbents against each other; (6) considering the political and socio-economic demographics of the districts; and (7) attempting to avoid changes to the boundaries of the unchallenged districts.

Doc. 67-1 at 17-18. Most importantly, "the race of the potential district constituents was not considered when creating the interim remedial district boundaries, nor were the 2011 district lines preserved." *Id.* at 18. *See also* Doc. 96-2 at ¶¶ 9-17 (describing Dr. Johnson's initial process).

Instead, Dr. Johnson proposed three maps to the Council, including the Maroon map,[3] which he drew from scratch and which ultimately served as the basis for the IRP. Docs. 74-1 at 180; 80-1 at 79. In drawing each map, Dr. Johnson first incorporated the unchallenged districts into his map drawing

---

[2] *See* Doc. 96-2 at ¶¶ 45-49.
[3] Dr. Johnson titled the maps by colors: Maroon, Lime, and Orange. *Id.* at ¶ 76.

software.  Doc. 96-2 at ¶¶ 23-25, 29.  He then began by working with D2, taking into account the various "ripple" effects and population variances any change to this district would have on surrounding challenged districts.  *Id.* at ¶¶ 26-28, 30-31.  He then considered such factors as contiguity, compactness, geographic and community boundaries (including CPACs), and the residences of incumbent City Council and School Board members.  *Id.* at ¶ 32.  As a result, the ultimate map passed by the Council is constitutional, addresses the infirmities in the Enjoined Plan, and is entitled to the Court's endorsement.

### A. District-by-district, the IRP cures the constitutional deficiencies in the Enjoined Plan

The IRP does not make changes to Districts 1, 4, 5, 6, or 13, as Plaintiffs did not challenge those areas.[4]  The Council did however, significantly change the Challenged Districts, curing the Fourteenth Amendment violations identified by the Court.  Plaintiffs fail to proffer any evidence demonstrating otherwise.

#### 1.   IRP-D2

A majority of IRD-D2's population is south of the St. Johns River, the southern boundaries of which Plaintiffs do not challenge.  Plaintiffs did however, challenge the boundaries D2 shared with D7, alleging "race was the

---

[4] Plaintiffs also did not challenge the boundaries of D3 or D11.  Nonetheless, the Council made a small change to those districts by shifting the Pablo Creek Development from D11 to D3.  *See e.g.*, Docs. 72-1 at 168-69; 74-1 at 215-16.

predominant factor in drawing the border between [those districts] – packing the former and stripping the latter."  Complaint at ¶ 203.[5]  IRP-D2 and its boundary with IRP-D8, addresses Plaintiffs' articulated concerns, as well as those noted by the Court.  Order at 79.

In drafting the new portions of D2, Dr. Johnson started at the borderline north of the St Johns River, selecting lines to allow the district to follow the logical and established boundaries of the Trout River, Main Street, and I-295. There are jagged portions of the boundary north of I-295.  As explained by Dr. Johnson, those exist because of odd-shaped Census Blocks through the area, and the need to balance population numbers among spread-out neighborhoods. Likewise, the Council responded to fervent citizen feedback about retaining the San Mateo neighborhood in IRP-D2, rather than moving it into the newly situated D8.  *See e.g.,* Docs. 74-1 at 229-30; 77-1 at 155-56, 202-03, 209-10; 80-1 at 177-80, 215-20, 238-39; 96-2 at ¶¶ 99, 129-137.

Figure A below illustrates IRP-D2 compared to the Enjoined Plan.

---

[5] Under the Enjoined Plan, districts 2 and 7 shared a border.  In the IRP, that area is now primarily shared by districts 2 and 8.



**Figure A: D2 Comparisons[6]**

IRP-D2, like those in Plaintiffs' proffered plans, includes two CPACs. Doc. 92-1 at 97.  *See also infra* Section IV (comparing CPACs).  Likewise, as measured under any measure, IRP-D2 is compact.  *See* Doc. 96-2 at ¶¶ 44, 211; *see also infra* Section IV (comparing compactness).

Plaintiffs also alleged that the northeast border of districts 2 and 7 racially separated a precinct.  Complaint at ¶ 216, Figure 8.  The particular area of residents (shaped a bit like a right facing profile) that Plaintiffs noted in their Complaint at Figure 8, is now included in IRP-D8.  *See* Doc. 67-1 at 34. Plaintiffs disregard this change, now arguing that IRP-D2 improperly retained

---

[6] References to "Original 2021 Map" are to the Enjoined Plan.

the San Mateo neighborhood.  Objections at 28.  However, two of Plaintiffs'
maps follow the same, if not exact, western borders between districts 2 and 8,
without any explanation for why their proffered boundaries are valid, but the
IRP's are not.  *See* Doc. 92-1 at 48-50.

### 2.   IRP-D7

Plaintiffs challenged D7 as being one of the most packed districts in the
City; for having a bizarre, illogical, and non-compact shape; racially splitting
precincts; and including several racially motivated "land bridges."  Complaint
at ¶¶ 194-202; *see also* Order at 95.  The IRP remedies these concerns.

IRP-D7 unites the historic urban core[7] of Jacksonville.  *See* Doc. 67-1 at
34.  Dr. Johnson drew the district to largely follow the CPAC Urban Core area
boundary, except for one small portion in the south where the CPAC border
divides the Riverside Historic District.  *See* Doc. 92-1 at 98.  There, he drew
the boundaries between districts 7 and 10 to keep that Historic District united.
IRP-D7 also kept the Springfield Historic District together and within the
Urban Core CPAC area – a request raised by citizens during the remedial
redistricting process and agreed to by the Council.  *E.g.*, Docs. 77-1 at 188-89,
212-13, 231; 80-1 at 203; 96-2 at ¶¶ 113, 138-46.

---

[7]In their own pleadings Plaintiffs "use the term 'Urban Core' to refer generally to the pre-
consolidation Old City and surrounding close-in neighborhoods."  Complaint at ¶ 167 n.10.

IRP-D7 also picks up portions of the Northwest CPAC region between the Urban Core and the Trout River. *See* Doc. 92-1 at 98. These areas have a close geographic connection to the urban core along with sharing socio-economic characteristics, resulting in a compact district. Finally, in order to ensure IRP-D7 maintained its required population numbers to comply with the one person one vote principle, Dr. Johnson moved the district boundary north of Trout River to include a compact area bounded by major roads (Lem Turner Road, Main Street and Dunn Avenue) and the Broward River. By moving IRP-D7's boundary to the north, rather than further west, he ensured that the IRP-D8 Councilmember was not removed from the heart of the population she had represented for years. Docs. 74-1 at 212-23, 219-20, 228-29, 237; 77-1 at 156; 96-2 at ¶¶ 100, 144.

Figure B illustrates IRP-D7 compared to the Enjoined Plan, and demonstrates its compactness. *See also* Doc. 96-2 at ¶¶ 44, 211; *see also infra* Section IV (comparing compactness). Likewise, in similar fashion the Plaintiffs' proffered plans, IRP-D7 includes three CPACs. Doc. 92-1 at 97. *See also* Section IV (comparing CPACs).



**Figure B: D7 Comparisons**

Contrary to Plaintiffs' assertions, IRP-D7 does not represent a "march back toward . . . the one in the Enjoined Plan." Objections at 29-30. Nor did the Council reject earlier iterations of Dr. Johnson's map proposals in favor of the final IRP because of their desire to retain the alleged unconstitutional formation of former D7. *Id.* at 28-30. Rather, the Council sought to respect public feedback regarding keeping Springfield together, as well as not drawing incumbents out of their districts.[8]

---

[8] The Council also sought to avoid drawing candidates from the November 2022 election out of the districts for which they were running, but ultimately jettisoned this consideration. Doc. 96-2 at ¶¶ 52, 116, 196-98. However, should the Court rule the IRP constitutional, Defendants request the Court waive any residency requirements that would otherwise exist for individuals seeking election in March 2023. *See* § 5.04, JACK. CHARTER; Doc. 80-1 at 185-87. *See also e.g.*, *Singleton v. Merrill*, 582 F. Supp. 3d 924, 936-37 (N.D. Ala. 2022) (extending candidate qualification deadline); *Covington v. North Carolina*, 267 F. Supp. 3d 664, 668

The City acknowledges IRP-D7's Any Part Black Voting Age Population (APBVAP) rests at 70.63%. *See* Doc. 92-1 at 118. This percentage, however, exists because a large number of Black individuals live in this geographic area, and in a highly concentrated manner. *See* Doc. 96-2 at 146. As this Court noted, "the Supreme Court has recognized that there is nothing inherently wrong with having a district with lopsided racial demographics if that is the natural result of residential segregation in Jacksonville." Order at 87 n. 49 (citing *Miller*, 515 U.S. at 920).[9] Such is the case with IRP-D7. Indeed, one of Plaintiffs' proposed maps has a district whose APBVAP is 84.19%. Doc. 92-1 at 135. Plaintiffs therefore agree a high APBVAP is not, in and of itself, unconstitutional.

### 3. IRP-D8

Plaintiffs' challenges to D8 mirror those raised for D7. Complaint at ¶¶ 172-75. Likewise, Plaintiffs contend the boundary between D8 and D12 was driven by race, packing Black residents into the former, and stripping them from the latter. *Id.* at ¶ 183. The Court also noted the curious shape of D8 as incorporating "an appendage reaching deep into downtown," as well as the

---

(M.D. N.C. 2017) (waiving state constitutional residency requirement); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1343 (N.D. Ga. 2004) (extending candidate qualifying period); *Moore v. Lee*, 644 S.W. 3d 59, 67 (Tenn. 2002) (extending candidate filing deadline).

[9] The same may be true of D10's high percentages of APBVAP in Plaintiffs' P2 and P3 (69.23% and 84.19% respectively). Plaintiffs, however, have not justified these high numbers. *See* Doc. 92-1 at 134, 135.

district's high BVAP population.  Order at 95, 116.  The IRP remedies these constitutional concerns.

IRP-D8 shares boundaries with districts 2, 7, 10, and 12.  As crafted by Dr. Johnson with the Council's feedback and direction, the newly shaped district unites North Jacksonville from the Main Street corridor in the east to the Northwest CPAC boundary in the west.  *See* Doc. 92-1 at 98.  East of Main Street, IRP-D8 extends into former D2 as needed for population balancing while staying north of I-295 to keep the San Mateo neighborhood within IRP-D2.  Because a series of Census Blocks east of Main Street and North of I-295 are large and odd-shaped, IRP-D8's eastern border has a jagged-edged look.  Nonetheless, Dr. Johnson worked to keep the scattered neighborhoods in that area as united as possible.  In summary, Dr. Johnson sought to balance the populations for IRP districts 2 and 8, while following major and logical geographic divisions.  *See* Doc. 96-2 at ¶¶ 147-56.

Along the west edge of I-295, IRP-D8 crosses the CPAC border into the Northwest CPAC, but only to balance population.  *See* Doc. 92-1 at 98.  This allows the IRP-D8/D12 border to follow the railroad all the way to I-295, creating a clear and logical line between the two districts.  Likewise, the IRP-D8/D10 border serves to keep both incumbents in their respective districts, by following compact neighborhood boundaries and major roads (New Kings,

Moncrief, and Edgewood).   The IRP-D8 border south of Trout River follows

another pair of major roads: Edgewood Avenue and Lem Turner Road.

Figure C illustrates IRP-D8 compared to the Enjoined Plan.



**Figure C: D8 Comparisons**

Despite Plaintiffs' assertions, IRP D8 bears little to no resemblance to

D8 in the Enjoined Plan.  Objections at 30.  Additionally, it contains the same

number of CPACs contained in Plaintiffs' suggested plans and is compact,

eliminating the appendage dipping into the City's downtown. *See* Doc. 92-1 at

97; Doc. 96-2 at ¶¶44, 210; *see also infra* Section IV (comparing compactness

and CPACs).

### 4.   IRP-D9

Plaintiffs asserted D9 was a packed district, had an illogical shape, and its border with D14 packed Black residents into D9 while stripping them from D14.  Complaint at ¶¶ 237-38, 245; *see also* Order at 78, 95.  The IRP addresses these concerns and presents a constitutional district.

IRP-D9 combines two large communities.  *See* Doc. 67-1 at 34.  In the south, it unites the communities along the I-295 corridor between the eastern Blanding Boulevard and the western Ortega River.  As IRP-D9 moves north, it continues to include the eastern side of the I-295 corridor and follows major roads, using I-295 on the west and Lane Avenue North on the east.  In this regard, Dr. Johnson did not draw IRP-D9 to include the western side of I-295 north of the CPAC border at Normandy Boulevard, thereby allowing for population balancing in adjoining IRP-D12, and to create a clear geographic border between IRP-D9 and IRP-D12.  *See* Doc. 96-2 at ¶¶ 83-84, 88, 103, 157-166.

In earlier iterations, the district continued north to preserve the goal of not removing incumbents from their current districts, and therefore only captured a minimum amount of territory in the north to include the incumbent Councilmember's residence.  *See* Docs. 72-1 at 158; 74-1 at 187.  However, at the Special Committee on Redistricting's request, Dr. Johnson revised these northern boundaries to focus more on keeping neighborhoods intact.  Docs. 74-

1 at 228-29, 237; 80-1 at 76-77, 93, 208, 214.  The final version of IRP-D9 unites as much of Allendale, Paxton, and Woodstock as geographically possible, without dividing IRP-D10 in half and creating non-contiguous districts.

Figure D illustrates IRP-D9 compared to the Enjoined Plan.  Figure E provides a satellite image showing how IRP-D9 widened and shifted west.  By a majority of the compactness measures, IRP-D9 is improved from the Enjoined Plan.  Doc. 96-2 at ¶¶ 44, 211; *see also infra* Section IV (comparing compactness).  While one might believe this configuration lacks compactness, its shape exists for reasons other than race, predominantly to keep the incumbent, who was elected in August of 2022, in the district.  *See* Doc. 80-1 at 85-86, 92-93.  The boundaries of Ortega River basin in the southwest and Blanding Boulevard in the southeast are also particularly clear (reinforcing the logic of using them as district borders), as is the neighborhood-focused nature of the northern portion of the District from I-295 in the west to Huron Street in the east.  Likewise, the revised district compares favorably to Plaintiffs' proffered plans regarding CPAC inclusion.  Doc. 92-1 at 97; *infra* Section IV (comparing CPACs).



**Figure D: D9 Comparisons**



**Figure E: D9 Satellite Image Comparisons**

### 5. IRP-D10

Plaintiffs contend D10 had an illogical shape and its boundaries with districts 12 and 14 packed Black residents into D10, and stripped them from D12 and D14. Complaint at ¶¶ 218-21, 225, 234; Order at 76, 95. IRP-D10 is constitutional.[10]

Dr. Johnson drew IRP-D10 bringing together the communities of Hillcrest, Avondale, Riverside, and Murray Hill in its central and southern regions, as well as Carver Manor and Lincoln Villas in the northwest. In response to strong public feedback about not separating the Avondale and Riverside areas, but in light of the population balancing challenges regarding where to place those two neighborhoods, they were included in IRP-D10. Docs. 74-1 at 1222-23, 232-33; 80-1 at 169-73, 192-93, 198-99; 96-2 at ¶¶ 68, 105-11, 124-25, 166-74.

IRP-D10 would be a highly compact district but for the "notch" needed to ensure the incumbent Councilmembers in IRP districts 9 and 10—both of whom intend to run again—could remain in their districts. Doc. 96-2 at ¶ 168. The additional notch where IRP-D10 crosses 12th Street on the north side of

---

[10] Plaintiffs also expressed concerns about split precincts and land bridges along D9's borders with former districts 10, 12, and 14. *See* Complaint at ¶¶ 225-36. Those issues no longer exist, as IRP-D10 no longer borders those portions of districts 12 and 14. Plaintiffs also assert that the IRP-D10 "barely chang[ed] the D10/14 boundary" and hence did "not cure the racial gerrymandering of the Enjoined Plan." Objections at 31. However, IRP-D10 adjoins D14 at a new location, not maintaining any of the border it formerly shared with D14. *See* Doc. 67-1 at 34.

IRP-D9 exists because of an odd-shaped Census Block. The railroad is a prominent visual and economic center of IRP-D10, and the eastern border of IRP-D10 is largely defined by the CPAC border.

Figure F illustrates IRP-D10 compared to the Enjoined Plan. IRP-D10 is now more compact and regular in shape, matching Plaintiffs' proffered maps regarding compactness and CPAC inclusion. *See* Doc. 96-2 at ¶¶ 44, 211; *see also infra* Section IV (comparing compactness and CPACs).



**Figure F: D10 Comparisons**

### 6.   IRP-D12

Plaintiffs' challenges to D12 relate to how that district shared boundaries with districts 8, 10, and 14.   Complaint at ¶¶ 182, 225.   As previously explained regarding the boundaries for districts 8 and 10, *see supra* Section III.A.3, A.5, along with the discussion below, IRP-D12 is constitutional.

IRP-D12 is a compact rural-dominated district that stays entirely west of I-295 and south of the Southern Railroad. State Route 23, a major road through the area, defines the boundary between IRP districts 12 and 14, and I-295 serves as the district's border in the Northwest CPAC.  *See* Doc. 92-1 at 98.   In crafting the IRP-D12/D9 boundary, Dr. Johnson balanced population and compactness concerns with the goal of keeping the more urban developments in IRP-D9 and the more rural areas in IRP-12.  *See* Doc. 96-2 at ¶¶ 175-78.

Figure G illustrates IRP-D12 compared to the Enjoined Plan. Visually, as well as by compactness measures, IRP-D12, is not illogical or bizarre, and aligns with Plaintiffs' plans.  *See* Doc. 96-2 at ¶¶ 44, 211; *see also infra* Section IV (comparing compactness and CPACs).



**Figure G: D12 Comparisons**

### 7.   IRP-D14

Plaintiffs' challenges to D14 echo their challenges to D12, and relate to the borders D14 shared with districts 9 and 10.  Complaint at ¶¶ 234, 244.  *See also supra* Section III.A.4-5.  IRP-D14 is constitutional.

IRP-D14 unites riverfront communities from Ortega down to the County's southern boundary.  IRP-D14's primary inland boundary is Blanding Boulevard, a major road separating the riverfront region from the I-295 corridor.  In the north, Dr. Johnson drew IRP-D14 to cross Blanding Boulevard in two places.  First, to unite the Lake Shore Boulevard community peninsula. Second, crossing Blanding Boulevard along Wilson Boulevard, Jammes Road, and 103rd Street ensured population balances.  *See also* Doc. 96-2 at ¶¶ 85-89, 179-86.

The other population center of IRP-D14 is Argyle Forest.  It is a heavily developed area separated from the rest of the county's urban portions by I-295 and the Ortega River. No roads cross the Ortega River between Collins Road in the south and 103rd Street in the north.  In order to keep the riverfront as united as possible, it made sense for Dr. Johnson to include Argyle Forest in IRP-D14.  Doing so kept those two community regions united, and did not separate Argyle Forest (including Chimney Lakes and Settlers Landing) into different districts.

Figure H illustrates IRP-D14 compared to the Enjoined Plan.  Figure I provides a satellite image of how IRP-D14 shifted south and settled west. Taking into account the non-racial reasons IRP-D14 was drawn to keep certain communities united, its shape makes sense, and is sufficiently compact.  *See* Doc. 96-2 at ¶¶ 44, 211; *see also infra* Section IV (comparing compactness).



**Figure H: D14 Comparisons**



**Figure I: D14 Satellite Image Comparisons**

**B. The Council did not use race as the predominant factor in the remedial redistricting process, nor did it subordinate permissible redistricting factors to race**

Plaintiffs fail to point to any direct evidence that race was the predominant factor driving the Council's passage of the IRP.   In Plaintiffs' effort to establish circumstantial evidence demonstrating the Council drew the IRP lines predominantly because of race, Plaintiffs attempt to distract with misleading factual assertions and disingenuous legal arguments.   Neither succeed in helping Plaintiffs meet their required burden or rebut the presumption of validity and good faith the Court must extend to the City's IRP.

### 1.   Race was not the IRP's predominant factor

Plaintiffs fail to carry their burden demonstrating the City used race as the predominant factor for the IRP. Rather, the Council explicitly and intentionally cabined racial considerations from its process.  Chastened by this Court's preliminary finding that Plaintiffs demonstrated a likelihood of success on their racial gerrymandering claim, the Council reframed its redistricting approach in order to pass a plan that complies with the Constitution.  Docs. 70-3 at 16-17, 48-49; 80-1 at 44.  Plaintiffs, nonetheless, attempt to conjure up predominant racial intent on behalf of the Council, mischaracterizing councilmember statements and inaccurately imputing racial intent to Dr. Johnson.

At the outset, Plaintiffs attempt to spin Councilmember Diamond's initial preference for the Maroon map to suggest that he, and his colleagues, desired to retain the purportedly unconstitutional aspects of the Enjoined Plan. Objections at 2, 5, 20-21. Not so. An objective reading of Councilmember Diamond's statements indicate his preference for the Maroon map was predicated on maintaining the City Council's political balance, rather than to further racial gerrymandering. Doc. 72-1 at 178:25-181:43. Plaintiffs also omit Councilmember Diamond's statement that he liked the Maroon map, in part, because it addressed the "unconstitutionality" of the Enjoined Plan. *Id.* at 179:21-25.

Plaintiffs further suggest Dr. Johnson attempted to mask his use of race in the drafting process by using terms "rural" and "urban" as "codewords" for white and Black communities. Objections at 26-27. Plaintiffs compound this inaccuracy by contending Council President Freeman perpetuated the feint when, under his direction, the Committee rejected Plaintiffs' proffered map,[11] as well as the Orange Map. Plaintiffs' racial allegations have no basis.

As Dr. Johnson attests, when he used the words "urban" and "rural," he never used those terms as code for racial distinctions. Rather, when referencing rural areas, he was referring to areas with "less-dense housing

---

[11] Plaintiffs presented their "Unity Map" at the October 25, 2022 City Council Meeting. Doc. 70-4 at 19-20.

patterns and significantly lower population per square-mile in comparison to other parts of the City." Doc. 96-2 at ¶ 192. The inverse was true when he described "urban" areas, including Argyle Forest and the Riverside Historic District, neither of which are close to majority-Black. *Id.*

Additionally, when the Committee rejected Plaintiffs' map, it was for reasons other than race. The map disrupted the Council's current political balance; District 11 grouped together otherwise distinct and differentiated communities; Districts 10 and 14 did not follow the natural boundary created by I-295, but rather each crossed this major interstate at different points without clear explanation; the map mixed dissimilar areas together (i.e., urban and rural areas combined in a single district); the map modified the boundaries of unchallenged districts; and the map did not keep incumbents in their current districts and paired incumbents against each other. Doc. 67-1 at 20; 72-1 at 154-57, 179; 74-1 at 166, 185; 80-1 at 140-41. Likewise, because the Orange Map contained a district spanning most of the east and northeast boundary of the County, and was based off the Plaintiffs' map, the Council rejected it as a viable option. Docs. 67-1 at 21; 96-2 at ¶¶ 78-80. Plaintiffs have presented nothing to rebut this evidence.

Plaintiffs also attempt to suggest that race predominated in Dr. Johnson's drafting process because he was aware of how the different plans he presented impacted the number of majority Black districts. Objections at 24.

However, Dr. Johnson has never been coy about when, and in what manner, he examined racial statistics during his drafting process.  Docs. 74-1 at 217-18, 236; 96-2 at ¶¶ 53, 55-58, 115, 189-90, 193, 200-01, 203.   All told, he only examined racial numbers on the back-end of his map drawing process and did not use race as the predominant factor in his work.  In no instance, therefore, do Plaintiffs demonstrate Dr. Johnson or the rest of the Council referred to racial data in a dubious or improper manner.  *See* Objections at 24.  *See also Bethune-Hill*, 368 F. Supp. 3d at 880 (deferring to expert's explanations regarding the manner in which he considered race).

Moreover, in the parties' November 21, 2022 status conference before the Court, Plaintiffs retracted their arguments regarding Dr. Johnson's racial intent.   During the conference, the City expressed interest in a limited evidentiary hearing so the Court could question Dr. Johnson regarding this matter.  *See* Doc. 96-1 at 5-7.  In response, Plaintiffs' counsel indicated if Dr. Johnson presented a declaration to the Court, they had

> no contest with the credibility of anything he might say in a declaration . . . , or anything that he said in the paper record that's already before the Court. And we think the four corners of the paper record has what it needs for the Court to make a decision.

*Id.* at 11:15-20.  This Court then commented that "[i]f there's no challenge to Mr. Johnson's credibility and if he presents a declaration, it would seem that that would be sufficient" in lieu of an evidentiary hearing.  *Id.* at 12:9-13.  The

Court further directed that if the City wanted to ensure the Court heard from Dr. Johnson, it should "file a declaration, because there is no guarantee that the Court will think a hearing is necessary, particularly given the representation by plaintiffs that they aren't going to question the credibility of his representations." *Id.* at 18:18-24.

It would appear, therefore, Plaintiffs have waived any argument regarding Dr. Johnson's credibility or representations and cannot now rely on their contentions that Dr. Johnson covertly used race when drawing district lines. Accordingly, the City does not believe an evidentiary hearing is needed. If the Court deems otherwise, the City will make Dr. Johnson available. In sum, a fair reading of the record demonstrates that race was not a predominant factor in drawing the IRP.

### 2. Plaintiff's "core retention" analysis is premised on an inaccurate legal foundation and is otherwise wrong

The Court should reject out of hand Plaintiffs' core retention argument. Plaintiffs erroneously suggest that the Court evaluate the IRP on a collective rather than district-by-district basis. Likewise, how they suggest the Court define "core retention" is dubious.

Throughout their Objections, Plaintiffs assert the IRP perpetuates the Enjoined Plan's racial gerrymandering by retaining 89% of the residents from Districts 7, 8, 9, and 10 in those same districts. *See* Objections at 1-2, 11-13.

32

In doing so, Plaintiffs intimate the Court should evaluate the IRP districts in a collective manner, rather than district-by-district.  *See id.* at 11 ("Most of the Black residents who were packed into D7-10 remain there.  89% of residents of the Enjoined Plan's D7-10 are *still* in [IRP-]D7-10").

Plaintiffs' proposition directly contradicts well-established law, including that articulated by this Court.  *See* Order at 18 ("In reviewing a claim of gerrymandering, a court must consider the question of racial predominance on a district-by-district basis.").  *See also e.g.*, *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018); *Bethune- Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799-800 (2017); *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015); *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022); *Johnson v. Miller*, 929 F. Supp. 1529, 1545 (S.D. Ga. 1996); *McConchie v. Scholz*, 577 F. Supp. 3d 842, 876 (N.D. Ill. 2021).  Plaintiffs further compound this legal error by how they advocate what constitutes "core retention."  They appear to proffer that "core retention" is evaluated by comparing the racial percentage of citizens living in a newly configured district with the racial percentage of citizens who lived in the old district, regardless of whether that percentage of new residents previously lived in the former district.  Objections at 11-13.

Again, Plaintiffs advance a theory unsupported by law and contrary to this Court's previous analysis.  As courts discuss "core retention," the concept is usually analyzed by comparing the geography of a new district with the

former district, and/or comparing the percentage of residents from the old district who are retained in the newly configured district. *See e.g.*, *Bethune-Hill*, 326 F. Supp. 3d at 173 n.53 (expert "defined 'core retention' as 'the percentage of the new district that is comprised of the former district,' or 'how many constituents the member took across the election cycle with them to their new district'"); *Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505, 544–45 (E.D. Va. 2015), *aff'd in part, vacated in part*, 580 U.S. 178 (2017) (defining core retention as "respecting existing district boundaries"); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1334 (N.D. Ga.), *aff'd*, 542 U.S. 947, 124 S. Ct. 2806, 159 L. Ed. 2d 831 (2004) ("Core retention can be viewed in one of two ways: (1) in terms of the largest core of a prior district that is included in a successor district, or (2) in terms of the district core of each incumbent located in a district."); *Baumgart v. Wendelberger*, No. 01-C-0121, 2002 WL 34127471, at *3 (E.D. Wis. May 30, 2002), *amended*, No. 01-C-0121, 2002 WL 34127473 (E.D. Wis. July 11, 2002) (defining "core retention" as "retaining previous occupants in new legislative districts"). *See also* Order at 88-89 (discussing "core retention" in the context of a district's geography and shape). Hence, in evaluating whether the IRP failed to cure the Enjoined Plan's constitutional ills, the Court should evaluate the new districts on an individual basis, comparing the racial percentage of residents in the new district as compared

to racial percentage of those individuals who lived in the old district, as well as the geography retained between the new and old districts.

Framed appropriately, the IRP does not perpetuate the Enjoined Plan's constitutional infirmities.  More particularly, IRP districts 7 through 10 no longer artificially pack Black residents within their individual borders.  Data provided by Plaintiffs' expert, Anthony Fairfax, demonstrates that districts 7 through 10 have all shed near majorities – or more – of their prior residents.[12] IRP-D7 retained 51.90% of its former residents; IRP-D8 retained only 35.35%; IRP-D9 only 37.18%; and IRP-D10 a mere 19.50%.  Doc. 92-1 at 113.  By Plaintiffs' own standards, these percentages are neither "overwhelming" nor "high."  Objections at 11 (citing *In re SJR*, 83 So. 3d 597 (Fla. 2012) for examples of overwhelming and high core retention rates).

Nor do the core retention rates for IRP districts 2, 12, and 14 advance Plaintiffs' position.  While IRP-D2 retains 98.51% of its core, this number exists because minor changes were needed for its boundaries, all of which addressed Plaintiffs' underlying challenges to the Enjoined Plan.  *See supra* Section III.A.1.  Similarly, IRP-D12 increased significantly geographically, but marginally decreased in population, those minor shifts explained above.  *Id.* at

---

[12] Fairfax's material is a series of charts, graphs, and maps, none of which are supported with analysis, or explanation. *See generally* Doc. 92-1.  Defendants assume the data in his report comports with how Courts define "core retention."

Section III.A.6.  Hence IRP-D12's core retention of 81.05% is not surprising. *See* 92-1 at 113.[13]  The same is true regarding IRP-D14 retaining 69.71% of its core.  *Id.*

Finally, the core retention for Plaintiffs' proffered maps demonstrate that in many instances, their retention rates for the Packed Districts are much higher than those in the IRP, while their core retention rates in the Stripped Districts are the same or higher.  Plaintiffs' plans appear to keep more Black residents within the former "packed" boundaries, while making limited or fewer changes to the "stripped" districts.  As such, Plaintiffs' core retention argument does not support their position that the IRP perpetuates the infirmities of the Enjoined Plan.

> ### 3.   The Council did not improperly consider incumbents or its political balance when drawing the IRP

Plaintiffs also attempt to build upon their core retention argument to suggest the Council's desire keep incumbents in their current districts, or to otherwise preserve the political balance of the Council, were additional ploys to hide its predominant racial motivations in drafting the IRP.  Objections at 13-23.  Again, this argument fails to move the mark.

---

[13] Plaintiffs' P3 presents a very similar, if not identical border for D12, but Plaintiffs fail to explain why that border and any associated core retention in P3 is acceptable, but not in the IRP.  Doc. 92-1 at 50.

Incumbent protection, in the form of not pairing incumbents against each other, is a valid redistricting principle. *Bush*, 517 U.S. at 963-65. So too is drawing district lines with the goal to "keep the constituency intact so the officeholder is accountable for promises made or broken." *Covington*, 283 F. Supp. 3d at 432–33. Conversely, incumbent protection is problematic when accomplished through preserving unconstitutional district cores or where the redistricting body "relies on redistricting criteria closely correlated with race in its pursuit of the . . . suspect goal of seeking to ensure that incumbents elected in a racially gerrymandered district prevail in their remedial district." *Id.* at 433.

Additionally, it is not unlawful for districts to be drawn to favor a specific party. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2508 (2019). "[A] jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be Black Democrats and even if those responsible for drawing the district are conscious of that fact." *Hunt*, 526 U.S. at 551. "[A] political classification [should] not be considered racial simply because the Democratic voters happened to be black." *Bethune-Hill*, 141 F. Supp. 3d at 544.

Plaintiffs cannot point to anything demonstrating the Council attempted to ensure incumbents would win in the newly configured districts. *See Covington*, 283 F. Supp. 3d at 433–34. The Council did not seek to preserve

former district cores, nor did it use data to perpetuate the unconstitutional effects of the Enjoined Plan.  Rather, the Council sought to avoid drawing incumbents – who were able to run again – out of their current districts, and sought to avoid pitting incumbents against one another.  Docs. 72-1 at 149; 74-1 at 212; 77-1 at 197; 80-1 at 92-93, 175, 228; 96-2 at ¶¶ 52, 116, 196-98.[14]

In not drawing incumbents out of their districts, the Council also sought to preserve the relationships between voters and their elected officials.  For example, the Council took heed when their colleague, Councilmember Clark-Murray, noted that after being in office for only two months, certain map proposals would result in her no longer representing numerous communities with which she had worked as a volunteer, candidate, and now a councilmember.  Doc. 80-1 at 204, 207-08, 214.  She noted

> [t]he work that I've done in those communities . . . according to the [map proposals] . . . I'm going to lose.  And when I say work, I mean meeting with those communities.  They have expectations.  We have made plans.  Those communities have been underserved for far too long.

*Id.* at 207.  Ultimately, the Council sought to ensure that she could remain accountable to those constituents.  As such, there is no validity to Plaintiffs' allegation that incumbent protection was a "fig leaf" for minimizing changes to the Enjoined Plan.  Objections at 18.

---

[14] Plaintiffs acknowledge their proffered maps do not honor these legitimate goals.  Objections at 41-42.

The same is true for Plaintiffs' contention that any motivation of the Council to maintain its political balance was merely a pretext to continue to sort residents by race. *Id.* at 20-23. Again, absent evidence otherwise, this argument presumes the City's bad faith, and turns the Court's assessment on its head. Dr. Johnson's declaration further belies the argument, noting that only fifty-five percent of registered Democrats in Jacksonville are Black, while Black registered voters in Jacksonville are "significantly more likely to be registered as 'other/independent'" than on a national level. Doc. 96-2 at ¶¶ 203-08.

Accordingly, Plaintiffs' incumbency and partisan arguments do not advance their position.

### 4. IRP districts are as logical and compact as possible

Plaintiffs also wrongly argue the Council abandoned compactness in favor of race. Objections at 3-4, 7, 27-28, 31. Plaintiffs suggest the Council disregarded the City Charter and Ordinance Code directing that districts be "arranged in a logical and compact geographic pattern to the extent possible," "so that the people of the City, and their varied economic, social and ethnic interests and objectives, are adequately represented in the Council." § 5.02 JACKS. CHARTER; § 18.101(c), Jacksonville Ord. Code. They are wrong.

Compactness is an ethereal concept. *See e.g.*, *Covington v. North Carolina*, 316 F.R.D. 117, 140–41 (M.D.N.C. 2016), *aff'd*, 198 L. Ed. 2d 655,

137 S. Ct. 2211 (2017) ("the Supreme Court has not established clear numerical standards defining when a district becomes non-compact."); *Bethune-Hill*, 141 F. Supp. 3d at 535 (noting at least 20 different measures of compactness and that "no one can agree what [compactness] is or, as a result, how to measure it."); *Favors v. Cuomo*, No. 11-CV-5632 DLI RR, 2012 WL 928216, at *11 (E.D.N.Y. Mar. 12, 2012), *report and recommendation adopted as modified,* No. 11-CV-5632 RR GEL, 2012 WL 928223 (E.D.N.Y. Mar. 19, 2012) ("[C]ourts and experts alike have not accepted any single measure of compactness; rather, compactness is an aesthetic as well as a geometric quality of districts, drawn from various tests.").  Indeed, the City's Charter and Ordinance acknowledge that a district's compactness need not be perfect but should be predicated on ensuring the sufficient representation of the City's many different communities.  In short, there is no absolute for what constitutes a compact district.

Nor is compactness "important for its own sake."  *Bethune-Hill*, 141 F. Supp. 3d at 535.  Rather, an uncompact district *may* serve as a flag – rather than a conclusion – that its shape was predicated on impermissible reasons. *Id.*  "[C]ompactness is important because it serves certain values of geographic representation. . . . . If the price of advancing these other neutral criteria is compactness, then the cost is not a judicial concern." *Id. See also* Doc. 96-2 at ¶¶ 33-45.

As previously discussed, under a majority, if not all the various compactness measures, the IRP does not raise any flags.  *See supra* Section III.A (discussing district compactness); *infra* Section IV (comparing compactness); Doc. 96-2 at ¶¶ 44, 211.  Slight shape oddities exist for non-racial reasons and Plaintiffs have not demonstrated otherwise.  The same is true for Plaintiffs' argument that the IRP fails to sufficiently hew to CPAC boundaries as compared to their proffered plans.  Objections at 39-40.  Rather, their data suggests their plans fare no better or worse than the IRP.  *See* Doc. 92-1 at 97; *see also infra* Section IV (comparing CPACs).

Plaintiffs also base their compactness argument on the misleading premise that General Counsel Jason Teal informed the Council it could disregard compactness because there was nothing problematic about having "funny looking districts."  Objections at 7.  In making this argument, Plaintiffs conveniently omit the crucial legal limitation Mr. Teal included in his advice to the Council.  In contrast to Plaintiffs' truncated quote, Mr. Teal fully directed the Council that it is

> okay to have funny looking districts. It's okay that they look, you know, like they are, you know, oddly shaped. ***What you can't do is you can't have them be oddly shaped because you are grabbing a racial majority. So you can't do it for racial reasons in order to pack a district.*** You already have these tendrils going out to grab people of the persuasion that you're going after.
>
> So in and of itself it's okay to have weirdly shaped districts. So I want to be clear on that that just because it looks a little bit weird doesn't mean that it's improper or unconstitutional. We just have to say why does it

> look weird. If we can say it looks weird because we're keeping
> neighborhoods together or because of republicans verses democrats or to
> keep an incumbent in their district, that's perfectly okay.

Doc. 74-1 at 224-25 (emphasis added). *See also* Doc. 80-1 at 165-66. Mr. Teal's advice to the Council was sound and undermines rather than advances Plaintiffs' argument. His advice indicates that a visual assessment alone cannot serve as a substitute for the various measures used to gauge and assess compactness.

Finally, the Court should reject Plaintiffs' suggestion that the IRP districts lack compactness because they inappropriately split neighborhoods. Objections at 38. Plaintiffs assert they are using neighborhood definitions pursuant to City Municipal Code Compliance Zones (MCC). *See* Doc. 92-1 at 91-94. These designations–like any neighborhood designations Plaintiffs have relied on in this litigation—do not represent definitive or legally enforceable boundaries for Jacksonville neighborhoods. *See* Doc. 41 at 26-27;[15] Doc. 96-2 at ¶¶ 50-51. The MCC also lists nearly 200 neighborhoods, while the neighborhoods listed on Plaintiffs' proffered maps (as well as the maps they present for the Enjoined Plan and IRP), only list just over 70 neighborhoods, *see e.g.*, Doc. 92-1 at 48, some of which are not included on the MCC list. *See* Doc. 92-1 at 91-94 (e.g., Cecil Airport, JU, and UNF are not on

---

[15] The neighborhood map Plaintiffs relied upon in their previous arguments before the Court, *see* Docs. 34-63; 34-64, differ from the "neighborhood map" critiqued by Dr. Johnson during the remedial redistricting process. *See* Doc. 77-1 at 151-54.

the MCC list).  Most importantly, while Plaintiffs suggest the IRP splits numerous neighborhoods, they provide no data as to which neighborhoods are split, and whether those splits are unconstitutionally based on race.  Doc. 92-1 at 95.  Plaintiffs' position, therefore, is lacking in both facts and argument and the Court should discard it.

**5. Plaintiffs have not demonstrated the IRP violates the VRA**

Plaintiffs fail to provide any meaningful argument that the IRP violates Section 2 of the VRA.  At best, Plaintiffs reference moments when City officials wished they had more time to thoroughly conduct a VRA analysis.  Objections at 6-7, 23-25; Doc. 96-2 at ¶¶ 59-68.  And yet, despite being equipped with statistics, data, and time, Plaintiffs have not provided any argument or analysis as to why the IRP violates Section 2.  Nor can they, as Section 2 is not triggered here.

In order to invoke Section 2, Plaintiffs must establish the IRP dilutes Black voters—thereby requiring four majority-minority districts—by establishing three preconditions:  (1) "the minority group" is "sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) "the minority group" is "politically cohesive;" and (3) "the white majority sufficiently votes as a block to enable it" "usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50-51

(1986).  Only after a plaintiff has established these three factors, do courts consider the totality of the circumstances to determine whether the minority group has less opportunity to elect candidates of its choice. *Id.* at 67-68. Plaintiffs have failed to satisfy any of the preconditions.

First, "the majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 129 S. Ct. 1231, 1245 (2009). Here, Plaintiffs have an odd way of asking for a fourth majority-minority district: they ask for only *two to three* such districts in their three alternative plans. Docs. 92-1 at 134-45; 92-1 at 133.  They suggest a fourth majority-Black district only as a "demonstration" in Mr. Fairfax's report, which lacks any supporting data or analysis.  Objections at 43 (*citing* 92-1 at 111). This begs the question of whether Plaintiffs (who have not pled a VRA claim) have carried their burden of showing that there is a "sufficiently large" and "geographically compact" cluster of Black voters to create a fourth majority-minority district. *Gingles*, 478 U.S. at 50.

The second and third preconditions gauge voting racial polarization. The more minority and majority groups vote for different political parties, the more racial polarization there is in voting. But evidence of crossover voting— minority and majority groups voting for the same political party— demonstrates a lack of racial polarization.  Crossover voting exists when less

than 50% + 1 of the minority voting age population is needed to elect a candidate of the minority's choice. Doc. 96-2 at ¶¶ 226-28. The VRA does not require the creation of such crossover influence districts—districts where a minority group, though too small to control an election, can nonetheless "influence" it. *LULAC v. Perry*, 548 U.S. 399, 446 (2006).

Here, Plaintiffs' expert, Dr. Imai, suggests that the Black population votes for Democratic candidates and thus Council districts with under 39% all-Black voting age population can elect Democratic candidates. Doc. 96-2 at ¶ 227. Contrary to Plaintiffs' intentions, Imai's argument establishes crossover voting and a lack of racial polarization. *Id.* at ¶¶ 226-28. This lack of racial polarization is further bolstered by Jacksonville voters' willingness to vote Black Republicans onto the Council and that 45% of Democratic voters in Jacksonville are not Black. *Id.* at ¶ 204. Furthermore, Dr. Imai omits any mention that 40% of the at-large Councilmembers in Jacksonville are Black, and that the District 1 representative is Black but does not represent a Black-majority council district. Furthermore, Dr. Imai's own research demonstrates that districts with Black population less than a majority ranging from 36% APBVAP to 49% APBVAP will elect candidates of choice. In short, Plaintiffs have failed to demonstrate the existence of racially polarized voting necessary to maintain a Section 2 claim.

Even if Plaintiffs could meet the three *Gingles* preconditions, they cannot show the totality of the circumstances cuts in their favor. Plaintiffs' expert, Dr. Austin, provides a broad discussion, but only intermittently cites evidence that Black voters in Jacksonville have a diminished opportunity to vote for candidates of their choice. *See e.g.*, Doc. 89-3 at ¶¶ 25, 109, 150, 151, 153, 236 (referencing Duval County in only 6 paragraphs out of 236); *id.* at ¶¶ 5, 105, 107, 153, 155, 196, 203, 228, 229, 231, 232, 233, 236 (mentioning City of Jacksonville in thirteen paragraphs); *id.* at ¶¶ 36, 41, 61, 117, 119, 120, 121, 124, 149, 152 (referencing City of Miami and Miami-Dade County). Her report is also short on evidence supporting her conclusions, *id.* at ¶¶ 90, 163-66; is couched with assumptions and qualifying language, *id.* at ¶¶156-66; and contains far-fetched conclusions, *id.* at t.1 & ¶ 155 (noting a 47.7% Black poverty rate in Duval County and a 20.9% Black poverty rate in Duval County). In short, Dr. Austin's report fails to meaningfully show the totality of the circumstances apply in Jacksonville. *See also* Doc. 96-2 at ¶¶ 230-36.

All told, Plaintiffs do not explain why the VRA applies in this case, and they entirely fail to address why the IRP violates the VRA.

## IV.   THERE IS NO LEGAL BASIS FOR THE COURT TO CONSIDER PLAINTIFFS' PROFFERED PLANS

The IRP is constitutional. The Court, therefore, has no reason to consider Plaintiffs' alternative plans. Even if it did, the Court would notice

those plans' compactness scores and CPAC-inclusion numbers are not materially different from the IRP.  Plaintiffs' expert, Mr. Fairfax, provides side-by-side comparisons of the plans' compactness scores and CPAC numbers. Doc. 92-1 at 60-63, 97.  The results are nearly the same.  Figure J excerpts Mr. Fairfax's compactness scores.

### Jacksonville, FL
### 2022-800 Plan
### Compactness Measurements

| District | Reock | Polsby-Popper | Area/Convex Hull |
|:---:|:---:|:---:|:---:|
| 2 | 0.49 | 0.27 | 0.73 |
| 7 | 0.39 | 0.41 | 0.79 |
| 8 | 0.54 | 0.31 | 0.81 |
| 9 | 0.27 | 0.31 | 0.67 |
| 10 | 0.39 | 0.34 | 0.77 |
| 12 | 0.50 | 0.69 | 0.97 |
| 14 | 0.39 | 0.33 | 0.69 |
| Mean | 0.42 | 0.42 | 0.78 |

**Jacksonville, FL**

Plaintiffs' 1 Plan

Compactness Measurements

| District | Reock | Polsby-Popper | Area/Convex Hull |
|---|---|---|---|
| 2 | 0.46 | 0.29 | 0.79 |
| 7 | 0.42 | 0.39 | 0.68 |
| 8 | 0.53 | 0.33 | 0.83 |
| 9 | 0.30 | 0.39 | 0.76 |
| 10 | 0.40 | 0.50 | 0.89 |
| 12 | 0.46 | 0.51 | 0.83 |
| 14 | 0.65 | 0.72 | 0.93 |
| Mean | 0.44 | 0.46 | 0.80 |

**Jacksonville, FL**

Plaintiffs' 2 Plan

Compactness Measurements

| District | Reock | Polsby-Popper | Area/Convex Hull |
|---|---|---|---|
| 2 | 0.49 | 0.27 | 0.73 |
| 7 | 0.36 | 0.32 | 0.67 |
| 8 | 0.55 | 0.33 | 0.82 |
| 9 | 0.36 | 0.42 | 0.81 |
| 10 | 0.37 | 0.41 | 0.81 |
| 12 | 0.53 | 0.64 | 0.90 |
| 14 | 0.47 | 0.50 | 0.85 |
| Mean | 0.44 | 0.44 | 0.79 |

**Jacksonville, FL**
Plaintiffs' 3 Plan
Compactness Measurements

| District | Reock | Polsby-Popper | Area/Convex Hull |
|:---:|:---:|:---:|:---:|
| 2 | 0.49 | 0.27 | 0.73 |
| 7 | 0.39 | 0.33 | 0.67 |
| 8 | 0.55 | 0.33 | 0.81 |
| 9 | 0.40 | 0.40 | 0.71 |
| 10 | 0.44 | 0.48 | 0.85 |
| 12 | 0.50 | 0.69 | 0.97 |
| 14 | 0.36 | 0.51 | 0.92 |
| Mean | 0.44 | 0.45 | 0.80 |

**Figure J**

Plaintiffs fail to explain how a compactness score of, say, .39 in IRP-D10, is any more or less constitutional than a score of .40. in Plaintiffs' P1.

The CPAC-splits are even more similar, as Figure K demonstrates.

**Jacksonville, FL**
CPAC Included within Districts

| District | 2022-800 | P1 | P2 | P3 |
|----------|----------|-----|-----|-----|
| 1 | 1 | 1 | 1 | 1 |
| 2 | 2 | 2 | 2 | 2 |
| 3 | 2 | 2 | 2 | 2 |
| 4 | 2 | 2 | 2 | 2 |
| 5 | 3 | 3 | 3 | 3 |
| 6 | 1 | 1 | 1 | 1 |
| 7 | 3 | 3 | 3 | 3 |
| 8 | 2 | 2 | 2 | 2 |
| 9 | 2 | 3 | 3 | 2 |
| 10 | 3 | 3 | 3 | 3 |
| 11 | 1 | 1 | 1 | 1 |
| 12 | 3 | 1 | 2 | 2 |
| 13 | 2 | 2 | 2 | 2 |
| 14 | 1 | 1 | 1 | 1 |
| Total CPAC | 6 | 6 | 6 | 6 |

**Figure K**

In districts 7 through 10 in each plan, three districts have the same CPAC-inclusion numbers. District 9 differs, but only by one.   In other words, Plaintiffs' plans are no better than the IRP.  And as explained above, Plaintiffs cannot rely on an argument that their plans are VRA compliant, given that they failed to demonstrate that the VRA applies.  Moreover, none of Plaintiffs' plans include four majority-minority districts, much less otherwise demonstrate why they are required under the VRA.  *See* Doc. 92-1 at 133-35.

50

At most, therefore, Plaintiffs' plans merely represent their preferred policy choices. As noted above, the Court is limited to reviewing whether the IRP cures the identified constitutional violations and not to whether a "better" plan is available.

## V.    CONCLUSION

The IRP complies with the Court's Order, curing the Fourteenth Amendment violations in the Enjoined Plan, and precluding any need for the Court to consider Plaintiffs' proffered plans. Defendants, therefore, respectfully request this Court deem the IRP constitutional and appropriate for use in future elections pending final judgment in this matter. Defendants also request the Court waive any candidate residency requirements for the March 2023 elections. *See supra* note 7.

Respectfully submitted,

| | |
|---|---|
| **HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK**<br><br>**Mohammad O. Jazil** (FBN 72556)<br>mjazil@holtzmanvogel.com<br>zbennington@holtzmanvogel.com<br>**Michael Beato** (FBN 1017715)<br>mbeato@holtzmanvogel.com<br>zbennington@holtzmanvogel.com<br>119 South Monroe Street, Suite 500<br>Tallahassee, FL 32301<br>(850) 270-5938<br><br>**Jason Torchinsky** (Va. BN 47481)<br>(D.C. BN 976033)<br>jtorchinsky@holtzmanvogel.com<br>HOLTZMAN VOGEL BARAN<br>TORCHINSKY & JOSEFIAK<br>15405 John Marshall Hwy<br>Haymarket, VA 20169<br>(540) 341-8808 | **OFFICE OF GENERAL COUNSEL CITY OF JACKSONVILLE**<br><br>*/s/ Mary Margaret Giannini*<br>**Mary Margaret Giannini**<br>Assistant General Counsel<br>Florida Bar No. 1005572<br>MGiannini@coj.net; SStevison@coj.net<br>**Helen Peacock Roberson**<br>Assistant General Counsel<br>Florida Bar No.: 0016196<br>HRoberson@coj.net; CStephenson@coj.net<br>117 West Duval Street, Suite 480<br>Jacksonville, FL 32202<br>Phone: (904) 255-5100<br>Facsimile: (904) 255-5120 |

*Attorneys for Defendants, City of Jacksonville and Mike Hogan, in his official capacity as Duval County Supervisor of Elections*

## CERTIFICATION OF WORD COUNT

This memorandum contains 9,880 words including titles, headings, footnotes, and quotations, but excluding case style, signature block, and certifications for word count and service.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 28th day of November, 2022, a copy of this document was filed electronically through the CM/ECF system and furnished by email to all counsel of record.


*<u>/s/ Mary Margaret Giannini</u>*
*Counsel for Defendant*