IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JACKSONVILLE BRANCH
OF THE NAACP, *et al.*,

    *Plaintiffs*,

v.

CITY OF JACKSONVILLE, *et al.*,

    *Defendants*.

                               /

Case No. 3:22-cv-493-MMH-LLL

## MOTION TO ORDER SPECIAL ELECTIONS FOR
## DUVAL COUNTY SCHOOL BOARD DISTRICTS 4 AND 6

Pursuant to the Parties' settlement agreement as entered by the Court, ECF 132, Plaintiffs respectfully move the Court to exercise its equitable power and discretion to order special elections in Duval County School Board Districts 4 and 6, to coincide with the regularly scheduled elections for School Board Districts 1, 3, 5, and 7.

### INTRODUCTION

"[I]ndividuals . . . whose constitutional rights have been injured by improper racial gerrymandering have suffered significant harm. Those citizens are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (internal punctuation and citations omitted), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017); *accord Page v. Va. State Bd. of Elections,* No. 3:13-cv-678, 2015 WL 3604029, at *18 (E.D. Va. June 5, 2015); *Smith v. Beasley*, 946 F. Supp. 1174, 1212 (D.S.C. 1996);

1

*Cosner v. Dalton*, 522 F. Supp. 350, 364 (E.D. Va. 1981).

In some cases, countervailing considerations outweigh this urgent principle. This is not one of those cases. Here, the Court can enfranchise Jacksonville residents who have suffered decades of race-based districting *without* significantly disrupting the ordinary processes of governance or improperly intruding on state sovereignty. Under such circumstances, the Court should exercise its equitable power to order special elections for Duval County School Board Districts 4 and 6. *See* ECF 53 at 136 (notwithstanding "reluctance" to intrude, "failing to act would be a[] . . . serious failure of the responsibility of the judicial branch"); *see also United States v. Osceola Cnty.*, 474 F. Supp. 2d 1254, 1255 (M.D. Fla. 2006) (ordering special elections to remedy Voting Rights Act violation).

## BACKGROUND

### A. Procedural Background

In March 2022, Jacksonville's City Council enacted a redistricting plan that largely maintained existing lines for City Council and School Board districts. Many of those districts, like their predecessors, were unnecessarily race-based in violation of the Fourteenth Amendment. Plaintiffs challenged those lines, seeking injunctive relief. Among their requests, Plaintiffs anticipated the need for special elections to ensure Jacksonville's citizens could "have their rights vindicated as soon as possible so that they c[ould] vote for their representatives under a constitutional [ ] plan." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 361 F. Supp. 3d 1296, 1305 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); *see* ECF 1 at 65 (prayer for relief).

2

In October 2022, this Court found that it was substantially likely that Plaintiffs would prevail on the merits of their racial gerrymandering claim—namely, that race predominated as the City Council packed Black residents into Council Districts 7, 8, 9, and 10, and School Board Districts 4 and 5, stripping them from Council Districts 2, 12, and 14, and School Board District 6. ECF 53; ECF 1. Recognizing the irreparable and severe harm Plaintiffs faced, the Court preliminarily enjoined Defendants from holding elections under the Council-passed redistricting plan and set forth a process for establishing an interim remedy to govern elections pending final judgment. ECF 53. The Council proposed an interim remedy that perpetuated the underlying constitutional violation, and this Court sustained Plaintiffs' objections to that proposal. ECF 101. The Court adopted a Plaintiff-submitted proposal ("P3") as the interim remedy pending final judgment. *Id*. Subsequently, the Parties entered into a settlement agreement ratified by the City Council and submitted the agreement for the Court's approval. ECF 128, 128-2. Pursuant to the agreement, the Parties requested that the Court enter final judgment adopting P3 as a permanent remedy until the 2030 Census. ECF 132-1 ¶ 3. The Parties also requested that the Court retain jurisdiction to enforce the agreement and to adjudicate the present motion—Plaintiffs' request for the Court to order special elections in School Board Districts 4 and 6, to coincide with the next regularly scheduled elections for School Board Districts 1, 3, 5, and 7. *Id*. ¶ 8.

### B. Duval County School Board

There are seven Duval County School Board districts. Each School Board

district encompasses two City Council districts. School Board elections are held on a staggered schedule for four-year terms. Odd-numbered seats (Districts 1, 3, 5, and 7) are elected in presidential election years; even-numbered seats (Districts 2, 4, and 6) are elected in gubernatorial election years.[1] So, the odd-numbered seats were last on the ballot in 2020 and will be next up in 2024. The even-numbered seats, meanwhile, were last on the ballot in 2022 and are next scheduled for 2026.

Each of the current School Board incumbents was elected under the district lines established in 2011. Because the 2022 elections occurred within nine months of the City Council's post-2020 Census redistricting legislation, they were held under the old lines. *See* Charter § 13.03. The 2024 elections for the odd-numbered seats will be held using the P3 districts established in the instant litigation. Finally, in the absence of this Court's intervention, elections for the even-numbered seats will be held using P3 in 2026.

Importantly, the districts the Court enjoined were "substantially the same" as the 2011 lines from which the current School Board incumbents were elected. ECF 53 at 88. In fact, it was "undisputed[] that the lines drawn in 2011 were reenacted in 2022 with only minor changes to the Challenged Districts." *Id.* at 103. As a result, the circumstantial evidence that the Court considered in enjoining the 2022 Plan applied in equal force to the 2011 Plan. *See, e.g., id.* at 88–89 ("[T]he Imai Report would seem to confirm what the uncontested historical evidence shows—that race predominated

---

[1] The primary election coincides with the statewide August primary, and the runoff election, if necessary, coincides with the state general election in November.

4

the 2011 design of the Challenged Districts."); *see also* ECF 34-18, Appendix A (Austin Report showing 2011 racial data by district). The direct evidence, meanwhile, led the Court to conclude "what occurred in 2011, which the City has not disputed, unabashedly points to racial gerrymandering." ECF 53 at 102. "Councilmembers representing the majority-minority districts were very focused on maintaining high BVAP percentages in those districts and ensuring that 'what's existing is not diluted,'" *id.* (citation omitted), including at one point instructing their redistricting consultants "to go identify 'where all the precincts are that have 60 percent minorities,'" *id.* at 25 (citation omitted). The Court concluded "that the 2011 evidence, which [was] . . . uncontradicted by the City, show[ed] that in 2011 race was the factor that could not be compromised, at least with respect to the drawing of Districts 7, 8, 9, and 10." *Id.* at 102–103; *see also id.* at 23–28 (recounting direct evidence).

As it currently stands, School Board District 4 consists of Council Districts 7 and 8, two of the previously packed Council districts. As the Court explained in its previous orders, Council Districts 7 and 8 traversed the city and split communities to capture as many Black residents as possible. District 7 "jump[ed] the Trout River, in order to connect a slice of Jacksonville's northside to the downtown," while "District 8, the bulk of which encompasses the rural northwest side of Jacksonville, forego[ed] compactness to incorporate an appendage reaching deep into downtown." *Id.* at 95. In fact, Districts 7 and 8 were the two most packed districts of all; District 8 approached 70% Black population, a percentage its incumbent did not want to see reduced. *Id.* at 42–43.

5

School Board District 4, meanwhile, consists of Council Districts 12 and 14. These districts were stripped of Black residents, making them artificially white. Each bordered District 9 or 10 as those districts snaked from downtown Jacksonville nearly to the Clay County border; in each case, "every single precinct on the District 7–10 side of the line has a higher BVAP percentage than the corresponding precinct on the District [ ] 12, or 14 side of the line. Not *some* precincts along the line, not *many* precincts along the line, but *every single one*." ECF 53 at 96. District 14's border was perhaps the most brazen, featuring "the strange hook protruding from District 9 into District 14," which "extend[ed] to surround Black adults in the area, while leaving White adults in District 14." *Id*. at 78.[2]

## LEGAL STANDARD

"Relief in redistricting cases is 'fashioned in the light of well-known principles of equity.'" *North Carolina v. Covington* ("*Covington I*"), 581 U.S. 486, 488 (2017) (quoting *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)). These principles require a court to account for "what is necessary, what is fair, and what is workable," *id*. (quoting *New York v. Cathedral Academy*, 434 U.S. 125, 129 (1977)), through a "careful case-specific analysis," *id*. at 489. When a plaintiff in a racial gerrymandering lawsuit seeks special elections, a court must weigh, among other factors, "[1] the severity and nature of the particular constitutional violation, [2] the extent of the likely disruption to the ordinary processes of governance if early elections are imposed, and [3] the need to act with

---

[2] School Board District 2 consists of Council Districts 3 and 13, which Plaintiffs did not challenge.

proper judicial restraint when intruding on state sovereignty." *Id*. at 488.

## ARGUMENT

### A. Plaintiffs Are Suffering a Severe Constitutional Violation

Plaintiffs are suffering immense constitutional harm. "Classifications of citizens on the basis of race 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). This Court has described the harm Plaintiffs suffer as "grievous," ECF 53 at 134, and "egregious," ECF 62 at 14. The Eleventh Circuit described it as "immense." *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *5 (11th Cir. Nov. 7, 2022). As this Court explained, Jacksonville's districting scheme "confines the voice of Black voters" to a handful of districts, preventing them from "hav[ing] a meaningful impact on any election or a meaningful voice on any issue of concern" in neighboring districts. ECF 53 at 122–123. The current School Board map "divid[es] communities to prioritize race in the drawing of district lines" thus "undermin[ing] the quality of representation for the people living in those communities and districts." *Id*. at 123.

The harm is not limited to individual Plaintiffs or other voters, which is important because in determining equitable relief, the Court must engage in a "'balancing of the individual *and collective* interests' at stake." *Covington I*, 581 U.S. at 488 (quoting *Swann v. Charlotte–Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971) (emphasis added)). Beyond the harm to voters, the "elected representatives" of racially gerrymandered districts receive a "pernicious" message that will make them "more

7

likely to believe that their primary obligation is to represent only the members of [one racial] group." *Shaw*, 509 U.S. at 648. These serious harms are "altogether antithetical to our system of representative democracy." *Id*. Indeed, "[r]acial gerrymandering strikes at the heart of our democratic process, undermining the electorate's confidence in its government as representative of a cohesive body politic in which all citizens are equal before the law." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 283 (2015) (Scalia, J., dissenting).

The scope and duration of this grievous harm also underscore its severity. In evaluating the severity of the constitutional violations at issue, courts have weighed the geographic scope of the violation, the number of individuals harmed, and the duration of the harm. *See, e.g.*, *Covington v. North Carolina* ("*Covington II*"), 270 F. Supp. 3d 881, 892 (M.D.N.C. 2017); *Sumter Cnty.*, 361 F. Supp. 3d at 1305; *League of Women Voters of Mich. v. Benson*, 373 F. Supp. 3d 867, 959 (E.D. Mich.), *vacated sub nom. Chatfield v. League of Women Voters of Mich.*, 140 S. Ct. 429 (2019).[3]

Here, the scope is broad: this Court held that seven of Jacksonville's fourteen City Council districts and three of its seven School Board districts were racially gerrymandered. Those districts include just under half of the City's population. *See* ECF 53-1 (map containing demographic data). Perhaps more importantly, in this context, they include a supermajority—72.6%—of Jacksonville's Black residents. *See*

---

[3] *Benson* involved a Fourteenth Amendment challenge to alleged partisan gerrymandering. The decision was vacated following the Supreme Court's decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), that partisan gerrymandering does not present a justiciable claim, but the court's analysis of special elections can be instructive here.

*id*. The scope of the violation is substantial by any measure. In *Covington*, for example, the district court found that 28 of the state's 120 state legislative districts had been racially gerrymandered. *See Covington I*, 581 U.S. at 486–87 (28 racially gerrymandered districts); N.C. CONST. art. II, § 4 (120 total districts). On remand from the Supreme Court, the district court concluded that the "broad geographic scope" of the violation and the number of people affected cut in favor of calling special elections. *Covington II*, 270 F. Supp. 3d at 892–93. Similarly, the court in *Benson* held that special elections were warranted for ten state senate seats due to the breadth of the constitutional violation. *Benson*, 373 F. Supp. 3d at 953–60. In that case, plaintiffs challenged 34 districts of the U.S. House, state senate, and state house *combined*, out of a total of 162 seats. *Id*. at 880, 959; *see also* MICH. CONST. art. IV, §§ 2–3 (38 state senate districts and 110 state house districts); U.S. Dep't of Commerce, U.S. Census Bureau, *Table 1: Apportionment Population and Number of Representatives by State: 2010 Census*[4] (14 U.S. House districts). The geographic and population scope of Jacksonville's racial gerrymander is comparatively high.

    The duration of Jacksonville's violation is nothing short of stunning. This Court has noted the City's "decades-long history of racial gerrymandering." ECF 101 at 5, 38. The Court has explained that evidence of "what occurred in 2011, which the City has not disputed, unabashedly points to racial gerrymandering." ECF 53 at 102. Defendants' own position in this litigation has been that any harm from racial

---

[4] Available at https://www2.census.gov/programs-surveys/decennial/2010/data/apportionment/apport2010-table1.pdf.

9

gerrymandering has existed since 1991. *See, e.g.*, ECF 41 at 29–30; ECF 57 at 6–7; ECF 40-34 at 16 (Defendants' expert explaining the 2022 redistricting structure "confirmed" the 1991, 2001, and 2011 processes). In *Covington*, the court on remand found it significant that the "harms ha[d] persisted for over six years, tainting three separate election cycles." *Covington II*, 270 F. Supp. 3d at 894. The violations here lasted even longer, regardless of whether 1991 or 2011 is the appropriate starting point by which to measure Jacksonville's racial gerrymander.

*Navajo Nation v. San Juan County* is instructive here. No. 2:12-cv-39, 2017 WL 6547635, (D. Utah Dec. 21, 2017), *aff'd*, 929 F.3d 1270 (10th Cir. 2019). There, the court found that race was the predominant factor in choosing to maintain the lines of a majority-minority district "for decades." *Id*. at *18–19 & n.150. Under those circumstances, the court found it clear that the violations were "severe and longstanding" enough to warrant special elections. *Id*. at *18–19. Importantly, this holding was unaffected by the fact that the districts had not been challenged in the past—the court did not ignore the reality of what had occurred in prior decades. *See id.* at *18 & n.150. Likewise, in assessing the severity of Jacksonville's gerrymander, this Court need not ignore the history it has already noted. That history is necessarily part of the "careful case-specific analysis" in which the Court must engage. *Covington I*, 581 U.S. at 489.

### B. Granting Plaintiffs' Request Would Not Significantly Disrupt Governance

The second *Covington* factor also militates in favor of granting Plaintiffs' request,

because ordering special elections here would not significantly disrupt the ordinary processes of governance. *See id.* at 488. Of course, any order requiring special elections definitionally disrupts ordinary processes, but the factors courts have considered to determine whether that disruption is *significant* cut in favor of granting Plaintiffs' motion, as do several other case-specific factors.

*First*, Plaintiffs ask for special elections for Districts 4 and 6 to coincide with the elections already scheduled for Districts 1, 3, 5, and 7. Plaintiffs don't ask this Court to set a new election day. Their request is relatively modest: order that six, rather than four, School Board seats appear on the August and (if necessary) November 2024 ballots. Other courts have observed that this kind of order is not particularly disruptive. *See Navajo Nation*, 2017 WL 6547635, at *18 ("The special elections will proceed under the regularly scheduled 2018 election deadlines and processes, thus minimizing their impact."); *Benson*, 373 F. Supp. 3d at 959 ("Because the special Senate election would occur on a regular election day and at a regularly-scheduled interval, it would not result in any additional election being held during the calendar year."). The majority of School Board seats will already be on the ballot. The August primary election will coincide with the statewide primary for federal and state offices and any runoff will coincide with the November general election, meaning the Supervisor of Elections will already be conducting a countywide election and most voters will be at the polls anyway. Adding two additional School Board races carries little "risk of generating voter confusion [or] low voter turnout" under these circumstances. *Sumter Cnty.*, 361 F. Supp. 3d at 1305.

*Second*, Plaintiffs' request seeks special elections in late August 2024—fourteen months from now. Other courts have considered the timeframe when assessing whether to order special elections. In *Benson*, for example, the court found it relevant that the requested special elections would not occur for eighteen months.[5] *Benson*, 373 F. Supp. 3d at 960. By contrast, on remand in *Covington*, the court declined to order special elections in part because of "overlapping and compressed election cycles," with "only a few months" lead time. *Covington II*, 270 F. Supp. 3d at 884, 900. The facts here are more similar to those in *Benson* than to those in *Covington*—there is no basis to conclude that the timeline here would be significantly intrusive.[6]

*Third*, the City Council has had ample opportunity to set new lines and has chosen to settle with Plaintiffs to adopt P3. Courts weighing the second *Covington* factor have considered whether the legislature has had appropriate time to craft new districts. Where the legislature has had a substantial amount of time to pass new lines, courts have viewed it as less disruptive to call special elections under those lines. *See Benson*, 373 F. Supp. 3d at 960; *Sumter Cnty.*, 361 F. Supp. 3d at 1305 (special election could be appropriate "after giving the legislature time to enact a new districting plan").

---

[5] At the time the *Benson* court concluded an eighteen-month timeframe counseled in favor of special elections, the legislature had not yet proposed a remedy. *Benson*, 373 F. Supp. 3d at 960. Here, a remedy already exists, so planning for special elections could begin immediately. *See generally* ECF 132.

[6] And unlike when the Court ordered P3 as the interim remedy for the 2023 City Council elections, here, no waivers of candidate residency requirements are needed to ease burdens on School Board candidates. Besides the year's notice candidates would have to prepare for the election, the Legislature eliminated all durational residency requirements for School Board candidates during the 2023 legislative session. Fla. Laws ch. 2023-101, § 4, at 2 (providing that school board candidates must reside in their district only by the date they assume office).

This Court is undoubtedly aware of how the Council came to adopt P3. In "only four meetings, over a total of only five and a half hours," ECF 62 at 12, the Council was able to pass a proposed interim remedy following the Court's injunction. Of course, the Court sustained Plaintiffs' objections to the proposed remedy, ECF 101, but that reflects the Council's impermissible choices, not any lack of opportunity to make permissible ones.[7]

The Council then chose to adopt P3 as part of a comprehensive settlement agreement. *See* ECF 128, 132. P3 was the Council's final choice, arrived at after negotiations with Plaintiffs, two committee hearings, and a final Council vote.[8] That means ordering special elections under those lines would not be significantly disruptive to the ordinary processes of government. To hold otherwise would effectively punish Plaintiffs for *Defendants*' failures in their interim remedial process—a bizarre result that would disincentivize future settlements.

*Finally*, Florida election administrators and voters are well-acquainted with truncated terms following redistricting. In the first election following each decennial redistricting, the entire Florida Senate is on the ballot to account for shifted district lines, with some senators elected to two-year terms instead of the ordinary four-year

---

[7] In fact, until settlement negotiations progressed, the Council appeared ready to "Confirm [Its] Intent to Permanently Adopt the Maroon III E Fix Map for Use in Duval County Until the Next Decennial Census in 2030." Jacksonville Ord. 2023-0090-W, available at https://jaxcityc.legistar.com/LegislationDetail.aspx?ID=6020976&GUID=8AB99C63-7E56-4706-B26A-ED73B0A38FC9.

[8] Jacksonville Ord. 2023-281-E, available at https://jaxcityc.legistar.com/LegislationDetail.aspx?ID=6176286&GUID=ADCFFFAC-9356-4AA3-8BDC-8B57120596DD.

13

terms. FLA. CONST. art. III, § 15(a); *In re SJR 1176*, 83 So. 3d 597, 658 (Fla. 2012). After litigation forced changes to the Senate map in 2015, the entire Senate stood for election in 2016.[9] The same thing occurred in the 1960s. *Swann v. Adams*, 263 F. Supp. 225, 227–28 (S.D. Fla. 1967) (truncating terms of all 165 state legislators and ordering special elections to be held in March 1967 to remedy equal protection violations). Moreover, the Legislature recently required certain county commission terms be truncated following redistricting. Fla. Stat. § 124.011(2)(a).

This makes good sense. The combination of redistricting and staggered terms can disenfranchise many voters. That's what has happened in Jacksonville. Voters who live in odd-numbered districts last voted in 2020; in the ordinary course, they should next vote four years later, in 2024. But if a voter was moved from an odd-numbered district to an even-numbered district, they will not be able to vote for six years. Consider a voter moved from District 5 in the 2011 Plan to District 6 in P3. She last voted for School Board in 2020, when odd-numbered seats were up for election; she could not vote in 2022, when even-numbered seats were up; but she was moved into an even-numbered seat after that, meaning she can't vote in 2024. She will go six years without casting a ballot for Duval County School Board.[10] 72,306 residents have

---

[9] Brandon Larrabee, *New Senate Numbers Set Off Election-year Scramble*, NEWS4JAX (Jan. 5, 2016), https://www.news4jax.com/news/2016/01/06/new-senate-numbers-set-off-election-year-scramble.
[10] A voter moved from District 6 to District 5, meanwhile, will be able to vote twice in two years: for the even-numbered seat in 2022, and for the odd-numbered seat in 2024. This confuses representation and accountability: without a special election, for two years there will be two incumbents for whom she may have voted and whom she might view as her representative. Plaintiff Dennis Barnum was moved from District 6 to District 5. Ex. 1 (Supp. Fairfax Rep.) ¶ 20. Ayesha Franklin is similarly situated, as she was moved from District 4 to District 5. *Id.*

14

been affected in this way: 35,886 people were shifted from the 2011 Plan's District 5 into P3's District 6;[11] 27,605 were shifted from District 5 into District 4;[12] and 8,815 were shifted from District 1 into District 4. Ex. 1 (Supp. Fairfax Rep.) ¶ 18.

Florida's practice of truncating terms has been lauded as a model for states to follow to avoid one-person, one-vote concerns. *See* Margaret B. Weston, Comment, *One Person, No Vote: Staggered Elections, Redistricting, and Disenfranchisement*, 121 YALE L.J. 2013, 2018–25 (2012). Several other states have similar systems. *Id.* at 2018–19. Here, Florida's statewide practice reflects two important points for the Court to consider. First, the fact that Florida law requires truncated post-redistricting terms for the state legislature and county commissions demonstrates a strong statewide policy on how to handle post-redistricting elections; granting Plaintiffs' request against this backdrop would be significantly less intrusive to governance. *See In re Apportionment Law, SJR 1E*, 414 So. 2d 1040, 1049 (Fla. 1982) (The truncation requirement "was intended as a means to implement a fair reapportionment plan at the earliest possible date."). Second, because Jacksonville's voters are already used to voting for truncated State Senate terms after redistricting, there is less chance of confusion; that, too, makes Plaintiffs' requested relief less intrusive.[13]

In fact, granting Plaintiffs' requested relief would *reduce* confusion and be particularly appropriate here because of the scope of the changes between the 2011

---

[11] This includes Plaintiff Sheila Singleton. Supp. Fairfax Rep. ¶ 20.
[12] This includes Plaintiffs Eunice Barnum and Janine Williams. Supp. Fairfax Rep. ¶ 20.
[13] The fact that all City Council seats are up at the same time, too, cuts in favor of granting relief. Jaxsons are accustomed to voting for all members of their local legislative body at once.

15

Plan and P3. Other courts have recognized that, when a lawsuit prompts significant changes in district lines, special elections are appropriate. In *Navajo Nation*, for example, the district court accepted its special master's recommendation to order "elections in all districts because the boundaries of the present districts and recommended districts overlap." *Navajo Nation*, 2017 WL 6547635, at *18. Otherwise, "if an election was not held in all districts it would create confusion as to which representative represented which voters." *Id.* (internal marks omitted). That confusion is a real concern here.[14] Under the new district lines, 36,420 people in District 4 have never had the chance to vote for or against their School Board representative—that's 27% of the District's population. Supp. Fairfax Rep. ¶ 18. District 6 is even worse: 42,698 people—or 30% of the population—are currently represented by an incumbent they have not been able to vote for or against. *Id.* It would be appropriate to grant Plaintiffs' request regardless of the political climate, but it bears noting that School Board elections and policy have been heavily racialized in recent years[15]—making it particularly galling to leave in place School Board districts that "confine[] the voice of

---

[14] School Board District 2, for which Plaintiffs do not seek a special election, is far less susceptible to this confusion. It is comprised of Council Districts 3 and 13, which Plaintiffs did not challenge. There was little change from the 2011 Plan because the Council sought to minimize changes from that Plan, and P3 did not alter districts south and east of the St. Johns River (beyond minor changes the Council itself sought, ECF 101 at 23 & n.12). Supp. Fairfax Rep. ¶ 18.

[15] *See, e.g.*, Steve Patterson, *As Duval School Board Meets Over Bad Teachers, Is Superintendent Diana Greene's Job Safe?*, FLA. TIMES-UNION (Apr. 25, 2023), https://www.jacksonville.com/story/news/education/2023/04/25/70146533007; Ryan Foley, *Anti-CRT Candidates Flip School Board Majorities in 5 Florida Counties*, CHRISTIAN POST (Aug. 24, 2022), https://www.christianpost.com/news/anti-crt-candidates-flip-school-board-majorities-across-florida.html; Emily Bloch, *Florida Board of Education Approves New Academic Standards Opposing Critical Race Theory*, FLA. TIMES-UNION (updated June 14, 2021), https://www.jacksonville.com/story/news/education/2021/06/10/7621918002/.

16

Black voters" and prevent them from "hav[ing] a meaningful impact on any election or a meaningful voice on any issue of concern" in neighboring districts. ECF 53 at 122–23.

### C. Granting Plaintiffs' Request Would Not Unduly Intrude on State Sovereignty

An order granting special elections is entirely consistent with judicial restraint. Importantly, sovereignty is evaluated from the standpoint of the *electorate*—not the elected officials sitting in unconstitutionally drawn districts. *See Benson*, 373 F. Supp. 3d at 958 ("[B]ecause sovereignty is vested in the people, by preventing the people . . . from fairly and effectively exercising their franchise, the [challenged plan] infringes on state sovereignty, further exacerbating its constitutional harm." (citation omitted)); *Covington II*, 270 F. Supp. 3d at 897 ("By unjustifiably relying on race to distort dozens of legislative district lines, and thereby potentially distort the outcome of elections and the composition and responsiveness of the legislature, the districting plans interfered with the very mechanism by which the people confer their sovereignty on the General Assembly."). Here, Defendants cannot invoke sovereignty to deprive voters of the right to choose their elected officials; to the contrary, sovereignty provides a *reason* for special elections.

Any inconvenience of a new election to legislators is no reason to let serious constitutional harm persist, especially when it deprives voters of their right to representation. A special election is necessary to remedy the widespread and serious constitutional harm arising from the City's racial gerrymander—as such, the principle

of judicial restraint does not militate against intervention here. In *Navajo Nation*, the court found *Covington*'s judicial restraint factor was satisfied where special elections were "specifically aimed at remedying constitutional violations that have affected . . . voters for decades." *Navajo Nation*, 2017 WL 6547635, at *19. As discussed above, the racial gerrymander in this case is similarly severe not just in duration, but also in scope and number of voters affected. Accordingly, the City's actions not only permit but also *necessitate* court intervention. *Cf.* ECF 53 at 136.

Finally, to the extent there are burdens on the City of Jacksonville, they do not rise to the level of undue intrusions on sovereignty. As noted above, the additional costs of holding such elections are, at most, minimal. Even so, any administrative costs are significantly outweighed by the interests of voters in constitutional representation. Proper representation, rather than administrative convenience, is the primary concern not just of courts applying the third *Covington* factor, *see Covington II*, 270 F. Supp. 3d at 895; *Benson*, 373 F. Supp. 3d at 959, but also of Florida law, which has long provided for the truncation of State Senate terms upon redistricting. An order granting special elections does not offend the principles of sovereignty and judicial restraint.

"[I]n cases involving unconstitutional . . . racial gerrymandering, numerous courts—including the Supreme Court—have concluded that shortening the terms of elected officials and ordering a special election does not unduly intrude on state sovereignty, particularly when the constitutional violation is widespread or serious." *Covington II*, 270 F. Supp. 3d. at 896 (collecting cases). This case is no different.

Jacksonville's residents have the right to vote in constitutional districts, and that right should be effectuated as quickly as practicable through special elections.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion and spare the residents of Jacksonville an additional two years of living in racially segregated School Board districts.

## LOCAL RULE 3.01(g) CERTIFICATION

Plaintiffs' counsel conferred with counsel for Defendants by email and phone. Defendants oppose this motion.

Respectfully submitted this 27th day of June, 2023,

*/s/ Daniel J. Hessel*

Nicholas Warren (FBN 1019018)
**ACLU FOUNDATION OF FLORIDA, INC.**
336 East College Avenue, Ste. 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU FOUNDATION OF FLORIDA, INC.**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Daniel J. Hessel\* †
Ruth Greenwood\*
Theresa J. Lee\*
Nicholas Stephanopoulos\*
**ELECTION LAW CLINIC**
**HARVARD LAW SCHOOL**

Krista Dolan (FBN 1012147)
Matletha Bennette (FBN 1003257)
**SOUTHERN POVERTY LAW CENTER**
P.O. Box 10788
Tallahassee, FL 32301-2788
(850) 521-3000
krista.dolan@splcenter.org
matletha.bennette@splcenter.org

Bradley E. Heard\*
Jack Genberg\*
**SOUTHERN POVERTY LAW CENTER**
150 East Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org

6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
dhessel@law.harvard.edu
rgreenwood@law.harvard.edu
thlee@law.harvard.edu
nstephanopoulos@law.harvard.edu

*Attorneys for Plaintiffs*

\* *Special admission*      † *Federal practice only*