IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JACKSONVILLE BRANCH
OF THE NAACP, *et al.*,

    *Plaintiffs*,

v.

CITY OF JACKSONVILLE, *et al.*,

    *Defendants*.

                            /

Case No. 3:22-cv-493-MMH-LLL

**PLAINTIFFS' REPLY IN SUPPORT OF
THEIR MOTION TO ORDER SPECIAL ELECTIONS**

In accordance with the Court's August 11 Order, ECF 138, Plaintiffs file this Reply in Support of Their Motion to Order Special Elections, ECF 134 ("Mot.").

The City's Opposition to Plaintiffs' Motion, ECF 137 ("Opp."), strains to wish away Plaintiffs' request for special elections. It tries to constitutionalize the request by turning standing doctrine on its head, ignores the breadth and nature of the Court's equitable discretion, and rests on several false premises. These attempts fall short. The Court has jurisdiction and broad equitable powers to tailor a remedy appropriate to the facts of this case. It should grant Plaintiffs' motion.

**A. The City Turns Standing Doctrine on Its Head.**

The City mentions multiple cases about standing, Opp. at 7–11, but not one has a holding applicable to Plaintiffs' request or analogous to the dispute here. The City cites each of these cases for broad and unobjectionable principles. *See id.* at 7–8 (citing

1

case that says Article III limits federal court jurisdiction to questions presented in adversarial cases); *id.* at 8 (citing cases that say courts cannot act absent a case or controversy); *id.* at 9–11 (citing cases that say injuries must be redressable). To be sure, Plaintiffs do not dispute the key proposition these cases stand for: that for a court to have jurisdiction to hear a case, a plaintiff's injury must be redressable. But that's *not* the same as saying that a court's equitable discretion is limited *only* to relief that, in the narrowest ways, redresses the injury.

In other words, the City puts the cart before the horse. To assess standing, a court must consider the injury and determine whether it is redressable through court-ordered relief. The City, meanwhile, would have the Court *start* with relief and work backward. Its theory would divest courts of jurisdiction to grant any equitable relief not explicitly and extensively discussed in a complaint.

In fact, under the City's theory, this Court has issued orders in an *ultra vires* way. The City's request to waive Charter residency requirements, ECF 104, 106, which the Court granted, ECF 107, illustrates the fallacy of its argument. Plaintiffs made no mention of residency requirements in their claim for relief. The Complaint "does not indicate [waiving residency requirements] will cure the underlying injury for which they sought relief." Opp. at 10. Nor does waiving the requirement "redress the injury alleged in their Complaint." *Id.* Under the City's theory, then, the Court lacked jurisdiction to grant that motion. But, of course, the Court *did* have jurisdiction to issue an Order that effectuated its other orders and was part of a remedy appropriate for the specific facts of this case.

The City's theory also would mean that countless other courts have violated Article III in issuing equitable relief. In *Navajo Nation v. San Juan County*, for example, the court applied the *Covington* factors and ordered special elections so that all San Juan County Commission seats would be up for election following court-ordered districting. No. 2:12-cv-00039, 2017 WL 6547635, at *19 (D. Utah Dec. 21, 2017), *aff'd*, 929 F.3d 1270 (10th Cir. 2019). But the complaint in that case challenged only *one* of the seats as racially gerrymandered.[1] Under the City's theory, then, the court acted unconstitutionally in ordering special elections for the other seats. So did the many courts in Voting Rights Act cases that have ordered special elections following a court-ordered switch from staggered at-large election systems to districted systems— because in those cases, violations are cured by elections in one or two minority-opportunity districts, not *all* districts.[2] Indeed, the City's theory of jurisdiction would

---

[1] The plaintiffs challenged other county commission districts under a separate theory, but the court never ruled on that theory, *see Navajo Nation v. San Juan Cnty.*, 162 F. Supp. 3d 1162, 1183 (D. Utah 2016), and the remedial order stemmed from the racial gerrymandering decision, 2017 WL 6547635, at *17 (discussing case history and racial gerrymandering decision in support of remedy).

[2] *See, e.g.*, *James v. City of Sarasota*, 611 F. Supp. 25, 31 (M.D. Fla. 1985) (ordering one Black-opportunity district as VRA remedy, calling elections for all five city commissioners—including two at-large seats—over city's objection, and providing temporary term lengths so terms become restaggered on normal rotation); Final Judgment, *Mayhue v. Sch. Bd. of Suwannee Cnty.*, No. 84-1104-Civ-J-14, Doc. 18 at 8 (M.D. Fla. Oct. 4, 1985) (ordering one Black-opportunity district as VRA remedy, calling elections for all five school board members, and providing temporary two-year terms so terms become restaggered); Consent Judgment, *Smith v. Calhoun Cnty. Sch. Bd.*, No. MCA-86-2100-RV, Doc. 11 at 4 (N.D. Fla. June 25, 1986) (ordering one Black-opportunity district as VRA remedy, calling special election for one district, and providing temporary two-year term so terms become restaggered); Final Judgment, *Battles v. Panama City*, No. MCA-84-2011, Doc. 22 at 11 (N.D. Fla. Jan. 11, 1985) (ordering one Black-opportunity district as VRA remedy, calling elections for all four city commissioners, and providing temporary two-year terms so terms become restaggered); Final Judgment, *Hamilton Cnty. Branch of NAACP v. Hamilton Cnty.*, No. 84-644-CIV-J-14, Doc. 23 at 3, 10–11 (M.D. Fla. June 25, 1985) (ordering one Black-opportunity district as VRA remedy, calling elections for all five county commissioners, and providing temporary two-year terms so terms become restaggered); *cf., e.g.*, Final Order on Remedial Election Plan, *Bradford Cnty. Branch of NAACP v. City of*

3

also call into question some of the most effective civil rights remedies that Article III courts have issued. Structural injunctions to desegregate schools and cure prisons of unconstitutional conditions, for example, typically include complex equitable relief that goes beyond the bare minimum required to redress the harm plaintiffs alleged in the underlying complaint when the court determines that those measures are "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (citations omitted).

### B. The City's Theory Unduly Constrains the Court's Substantial Equitable Discretion in this Context.

In fact, the Constitution vests the Court with broad equitable discretion in this context. In *Covington*, the Supreme Court confirmed that "[r]elief in redistricting cases is 'fashioned in the light of well-known principles of equity.'" *Id*. These principles far exceed the constraints the City would impose on the Court. While the City's arguments would categorically bar courts from issuing broad categories of orders, *see supra* Part A, that approach is squarely at odds with equitable principles, which recognize far broader jurisdiction. "The essence of equity jurisdiction has been the power . . . to do equity and to mould each decree to the necessities of the particular case." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted). In the districting context, Supreme Court precedent calls for the Court to "undertake an 'equitable weighing process' to select a fitting remedy for the legal violations it has

---

*Starke*, No. 3:86-cv-5-MMH-LLL, Doc. 124 at 8–9 (M.D. Fla. June 29, 1989) (remedial decree permitting holdover commissioners to serve out their terms rather than calling special elections, at parties' joint request).

identified . . . taking account of 'what is necessary, what is fair, and what is workable.'" *Covington*, 581 U.S. at 488 (citations omitted). That mandate is a far cry from the City's inelastic limits to the Court's jurisdiction to craft remedies. "Flexibility rather than rigidity has distinguished [equity jurisdiction]." *Weinberger*, 456 U.S. at 312.

The Court's power here is especially broad. The Supreme Court has repeatedly held that "[w]hen federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.'" *Kansas v. Nebraska*, 574 U.S. 445, 456 (2015) (quoting *Porter v. Warner Holding Co.,* 328 U.S. 395, 398 (1946)). "'Courts of equity may, and frequently do, go much farther' to give 'relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" *Id.* (quoting *Virginian Ry. Co. v. Ry. Emps.*, 300 U.S. 515, 552 (1937)). That remains true in the election law context. In *Covington*, for example, the Supreme Court noted it "would generally . . . expect[]" district courts to engage in a "'balancing of the individual and *collective* interests.'" 581 U.S. at 488 (emphasis added) (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971)).[3]

Here, the City's theory would unduly constrain the Court from tailoring its relief to the facts of this case. Notably, the City all but concedes that the 2011 district lines are racially gerrymandered—at no point does the City's opposition suggest otherwise. Nor does the City challenge the Court's previous findings that "what occurred in 2011,

---

[3] Plaintiffs' Complaint sought "any and all other relief this Court deems just and proper" to reflect this broad discretion and the need for tailored, case-specific relief. ECF 1 at 66.

which the City has not disputed, unabashedly points to racial gerrymandering," ECF 53 at 102; *see also* Mot. at 4–5—it simply tries to set them aside wholesale. That type of categorical rigidity is anathema to equity jurisdiction. *Kansas*, 574 U.S. at 456; *Weinberger*, 456 U.S. at 312. Instead, given the Court's prior findings and the scope of its equitable powers in this context, it certainly has the jurisdiction and discretion to order special elections. Doing so would be appropriate.

### C. Even if the City's Constitutional Theory Were Correct, It Still Wouldn't Preclude Relief.

In addition to unduly constraining the Court's discretion, the City's opposition is based on a false premise. The City acknowledges that Plaintiffs' Complaint anticipated the need for special elections but insists that because Plaintiffs "obtained adequate relief in the preliminary injunction proceedings, there [is] no need for special elections." Opp. at 11 & n.3. This argument attempts to silo Plaintiffs' current request from the rest of this case, reflecting a misunderstanding of Plaintiffs' motion.

In fact, as Plaintiffs' motion made clear, their current request is closely tied to ensuring adequate relief to effectuate the injunction ordering P3. *See* Mot. at 14–17. Once School Board elections occur next year, each official will hold themselves out and offer constituent services to the individuals and schools within their P3 district. But within Districts 4 and 6, tens of thousands of voters would have never had the chance to vote on the incumbents. *See* Mot. at 14–15. In this regard, special elections effectuate the Court's orders to use P3 and ensure full relief *in addition* to—and in service of—curing past gerrymanders.

6

As Plaintiffs noted in their motion, other courts have concluded that special elections are necessary in precisely such circumstances. In *Navajo Nation*, the court concluded special elections were warranted because of the scope of changes following court-ordered redistricting: "It is necessary to order special elections where the remedial districts vary so much from the constitutionally infirm districts they replace. To do otherwise would create an unworkable result—leaving citizens in the County confused about who represents them." 2017 WL 6547635, at *18. That's the situation here, too: the constitutional infirmity of past districts led to significant differences between past plans and P3, affecting tens of thousands of voters who need to know who represents them. *See* Mot. at 14–15.

The City's dismissal of this situation as a "distraction" that may "often" be "a natural consequence of the redistricting process," Opp. at 17, wholly ignores the specifics of *this* case. Because the Court had an obligation to cure the decades-long racial gerrymander, the shift to P3 imposed more drastic changes than is ordinary.[4] Far from a distraction, Plaintiffs' argument goes to the core of their request for effective relief and parallels the reasoning other courts have relied on in ordering special elections. Plaintiffs have not yet obtained "adequate relief" with respect to the School Board. An order setting special elections is necessary to fully effectuate the use of P3 by ensuring that as soon as practicable, voters live and vote in—and are represented by School Board members elected from—non-racially gerrymandered districts.

---

[4] This is why Plaintiffs seek special elections in Districts 4 and 6, which this case changed drastically, but *not* District 2, which featured the minimal changes more typical of decennial redistricting.

7

The City's arguments on this point are particularly inapt here because of the unique circumstances of the 2020 Census. Ordinarily, redistricting affects the first School Board elections following the release of Census data. Jacksonville City Charter § 5.02 (setting an eight-month redistricting deadline following Census release and use of new districts after nine months). 2020 Census data, however, was delayed, and the Council did not accelerate redistricting to complete the process in time for the 2022 School Board elections. *See* ECF 34-3 at 7, 12. So, in the ordinary course, by 2024, the entire School Board would have been elected under the post-2020 redistricting lines (i.e., P3). But here, because of Census delays, there will be an awkward mismatch until 2026. Under these circumstances, the Court has a strong equitable interest in minimizing confusion about representation and accountability and ordering that P3 be fully implemented. This is part of the "adequate relief" Plaintiffs sought in their Complaint and now seek in their motion. The fact that Plaintiffs' request would *also* address the historical gerrymander shouldn't cut *against* granting relief—it's all the more reason to grant the motion.

**D. The Settlement Agreement Doesn't Preclude Relief—It Anticipates It.**

For three independent reasons, the settlement agreement and the Court's previous orders do not divest the Court of the ability to issue relief here.

*First*, the City's arguments on this front are entirely premised on the notion that Plaintiffs' motion raises a new claim and seeks new relief. As explained above, those are false premises that attempt to silo Plaintiffs' current request from the other relief in this case. In fact, Plaintiffs' request is closely tied to effectuating P3. *See supra* Part C.

8

*Second,* the City's attempted bait-and-switch regarding the Court's Rule 41(a)(2) dismissal falls flat because it is premised on the idea of "reopen[ing] the case." Opp. at 12. In fact, the case has remained functionally open pending disposition of the present motion. Rule 41(a)(2) permits the Court to dismiss a claim "on terms that the court considers proper." Here, the relevant terms included (and were contingent on) retention of jurisdiction to decide the present motion. ECF 132-1 ¶¶ 7–8. The City agreed to those terms, asked the Court to approve them, and cites no apposite authority to suggest they are now null and void or unenforceable.[5]

Instead, the City's arguments are premised on the false notion that adjudicating Plaintiffs' claims would alter a final judgment. *See* Opp. at 13 (citing Rules 59(e) and 60(b), both of which deal with entry of judgments). But a "final judgment is generally regarded as a decision by the district court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 497 (1989) (internal marks omitted). Here, there has been no final judgment because there remains something for the Court to do (rule on the present motion). The fact that the Court styled its May Order as a "Final Judgment" does not alter the nature of the Order. *See, e.g.*, *Martindale v. Sullivan,* 890 F.2d 410, 413 (11th Cir. 1989); *In re Yarn Processing Pat. Validity Litig.*, 680 F.2d 1338, 1339 (11th Cir. 1982).

*Finally*, the Court has the "inherent power to enforce its own orders." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 90509, at *2 (N.D. Fla. Jan. 11, 2021)

---

[5] Since the City agreed to those terms, it is estopped from arguing that they are unenforceable. *See, e.g.*, *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, (11th Cir. 2017).

(citations omitted). The Court explicitly maintained that power when it retained jurisdiction to enforce the settlement agreement. ECF 132 ¶¶ 4–5. It is firmly established that a dismissal pursuant to Rule 41(a)(2) does not divest a court of jurisdiction to enforce a settlement agreement where the agreement explicitly anticipates retention of jurisdiction. *See Kokkonen v. Guardian Life. Ins. Co. of Am.*, 511 U.S. 375, 381 (1994); *Absolute Activist Value Master Fund Ltd. v. Devine*, 998 F.3d 1258, 1268 (11th Cir. 2021). The Parties noted as much in their joint motion to the Court seeking approval of their settlement agreement. ECF 128 at 8. Because the settlement agreement included a provision in which the parties agreed that the Court would adjudicate the current motion, adjudicating that motion is tantamount to enforcing the settlement. Just as the Court may enforce the provision of the Settlement Agreement that calls for the use of P3, or bars the use of the Enjoined Plan, it can enforce the provision that calls for adjudication of the instant motion.

### E. Conclusion

For the foregoing reasons, the Court should grant Plaintiffs' motion.

Respectfully submitted this 1st day of September, 2023,

*/s/ Daniel J. Hessel*
Daniel J. Hessel*
**ELECTION LAW CLINIC**
**HARVARD LAW SCHOOL**
6 Everett Street, Ste. 4105
Cambridge, MA 02138
dhessel@law.harvard.edu

*Attorney for Plaintiffs*

* *Special Admission, Federal Practice Only*